UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA/JOHNSON

JANE DOE #1 and JANE DOE #2,

      Petitioners,

vs.

UNITED STATES,

      Respondent.

_____/

UNITED STATES' RESPONSE TO JANE DOE #1 AND JANE DOE #2'S
MOTION FOR FINDING OF VIOLATIONS OF THE CRIME VICTIM RIGHTS
<u>ACT AND REQUEST FOR A HEARING ON APPROPRIATE REMEDIES</u>

Respondent, United States of America, by and through its undersigned counsel, files its

Response to Jane Doe #1 and Jane Doe #2's Motion for Finding of Violations of the Crime

Victims Rights Act and Request for a Hearing on Appropriate Remedies, and states:

I.      <u>INTRODUCTION</u>

The issue before this Court is whether the petitioners, Jane Doe #1 and Jane Doe #2, had

any rights under 18 U.S.C. § 3771(a), in the absence of a criminal charge being filed in the

Southern District of Florida, charging someone with the commission of a federal crime in which

petitioners were victims.   Resolution of this issue is a matter of statutory interpretation of the

language of the Crime Victims Rights Act (CVRA).   Whether the government had a legal duty

under § 3771(a) is not resolved with reference to the position taken by employees of the

Department of Justice (DOJ) in letters to the petitioners, or the defense attorneys representing

Jeffrey Epstein.   Nor are the subjective beliefs of DOJ employees relevant to the issue of

whether a duty existed under § 3771(a)(5) to consult with petitioners prior to entering into a Non-

Prosecution Agreement.  The CVRA clearly states that it creates no civil "cause of action for damages" for victims and that it does not "impair the prosecutorial discretion of the Attorney General or any officer under his direction."  18 U.S.C. § 3771(d)(6).  In this case, that officer was the U.S. Attorney for the Southern District of Florida, and he exercised his discretion by deferring prosecution in favor of prosecution by authorities of the State of Florida.  Thus, no federal charges were ever filed, and the CVRA was not triggered.

II.     PROCEDURAL HISTORY

This matter commenced on July 7, 2008, with the filing of Petitioner's Emergency Petition for Enforcement of Crime Victim's Rights Act (DE1), and a Certificate of Emergency (DE2).[1]  The Emergency Petition noted that Jeffrey Epstein had recently pled guilty to state court criminal charges (DE1 at 1.)  The Petition then alleged:

> 3.      Upon information and belief, the Defendant[2] is engaged in plea negotiations with the Office of the United States Attorney for the Southern District of Florida concerning federal crimes which he is alleged to have committed against minor children, including the Petitioner.  Such negotiations may likely result in a disposition of the charges in the next several days.

> 4.      Under the CVRA, before any charges are filed against the Defendant, the Petitioner has the rights (among others) to notice of her rights under the CVRA, to confer with the prosecutors, and to be treated with fairness.  As soon as charges are filed, the Petitioner has the rights (among others) to timely notice of court proceedings, the right not to be excluded from such proceedings, the right to be heard at such public proceedings regarding conditions of release, any plea, and any sentencing, the right to confer with the attorney for the government, the right to restitution, and the right to be

---

[1]Since no criminal case was pending, the Clerk's Office filed the Emergency Petition as a civil action and assigned a civil case number.

[2]Throughout her petition, Jane Doe #1 referred to Jeffrey Epstein as "the Defendant," although he was never charged with or convicted of any federal offense.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

treated with fairness and with respect for her dignity and privacy.

5.      The Petitioner has been denied her rights in that she has received no consultation with the attorney for the government regarding the possible disposition of the charges, no notice of any public court proceedings, no information regarding her right to restitution, and no notice of rights under the CVRA, as required under law.

6.      The Petitioner is in jeopardy of losing her rights, as described above, if the government is able to negotiate a plea or agreement with the Defendant without her participation and knowledge.

        WHEREFORE, for the reasons outlined above, the Petitioner respectfully requests this Court to grant her Petition, and to order the United States Attorney to comply with the provisions of the CVRA prior to and including any plea or other agreement with the Defendant and any attendant proceedings.

(DE1 at 1-2.)

On the same day, the government was ordered by the Court to respond.  (DE3.)  Two days later, on July 9, 2008, the Government filed its Response and an accompanying Declaration, establishing that (1) no federal criminal case charging Epstein had ever been filed and that a non-prosecution agreement ("NPA") had been signed and (2) despite this, the U.S. Attorney's Office had used its best efforts to comply with the CVRA.  (DE 6-8, 12-14.)

On July 10, 2008, the Court set the matter for a hearing on July 11, 2008.  (DE 5.)  At the hearing, Jane Doe #2 was added as a Petitioner.  (DE15 at 14.)  The Court inquired of Petitioners what remedy they sought, and Petitioners made clear that they wanted to invalidate the Non-Prosecution Agreement with Epstein.  (*Id.* at 12.).  The Court recognized that Epstein had entered his State court guilty plea in reliance on the NPA (*id.* at 20), and the Petitioners concurred (*id.* at 20-21).  Nonetheless, the Petitioners asked the Court "to vacate the agreement."  (*Id.* at 21.)

The Court asked the Petitioners whether there was "any need to rush to a decision in this

3

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

matter?"  (*Id.* at 24.)  The Petitioners said that there was not – "Your Honor is correct in stating

that it is not an emergency and it doesn't need to happen today. . . . It doesn't seem like there will

be any prejudice to any party."  (*Id.* at 26.)[3]

Two weeks later, on July 29, 2008, the government filed a notice informing the Court of

its position that there was no need for an evidentiary hearing and that the matter was ready for

ruling.  (DE17.)

A few days later, Petitioners filed a response to the government's notice, arguing that the

documents submitted by the government in its attachments to the Declarations it had filed

showed that violations of the CVRA had occurred and demanding the production of the NPA and

the report of an interview with Jane Doe #1.[4]  (DE19.)  In that "Response," the Petitioners asked

the Court to enter "judgment in their favor that their rights under the CVRA have been violated."

(*Id.* at 11.)

On August 14, 2008, the Court held a status conference.  (DE25.)  The parties discussed

two matters.  First, there was a discussion of the status of the litigation.  Second, there was a

discussion of the Petitioners' request to have access to the NPA.  With regard to the second topic,

the Court decided to order the government to make the NPA available to any and all identified

victims, so long as they agreed to abide by the terms of a Protective Order, and ordered the

parties to work out the terms of such a Protective Order.  (DE27 at 22-24.)

As to the first topic, the Court inquired of the Petitioners whether there was a sufficient

---

[3]The Court also heard argument on whether the government's filings needed to remain
under seal.  (*Id.* at 27-32.)

[4]With regard to the report of the meeting with Jane Doe #1, the government informed the
Court that no report was ever prepared.  (DE22.)

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

factual record for the Court to make its determination.  Petitioners responded: "I believe that you *do* have a sufficient record, in that I don't think that – I think that we're in agreement that additional evidence does *not* need to be taken in the case for Your Honor to make a ruling." (DE27 at 4 (emphasis added).)  Petitioners also stated that, "because of the legal consequences of invalidating the current agreement, it is likely not in my clients' best interest to ask for the relief that we initially asked for.  So in order to effectively evaluate the situation and ask for the appropriate relief, we would just be asking Your Honor at this point in time to allow us to see the full entire plea agreement . . ." (*Id.*)

The Court enquired, "All right.  And then if I grant that relief, you will evaluate the agreement and then decide whether to either dismiss your case or go forward and ask for some additional relief?" (*Id.*)

Petitioners responded, "That's correct, Your Honor." (*Id.* at 5.)

One week after the status conference, on August 21, 2008, the Court entered the agreed Protective Order, (DE26,) and the Petitioners were provided with a copy of the NPA.  More than a month later, on September 25, 2008, Petitioners did not dismiss their action, but, rather, asked for additional relief – that is, they filed a motion to unseal the NPA.  (DE28.)  On October 8, 2008, the government responded (DE29), stating that the NPA was never filed with the Court and there was no reason to unseal the document.  Petitioners filed a Reply on October 16, 2008, (DE30,) asserting, in part, that the failure to unseal the NPA allowed the government to file factually inaccurate Declarations.  In the Reply, Petitioners again did not ask for any additional relief, now that they had the NPA in their possession, other than their renewed request to unseal the NPA.  (*See* DE30.)

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

On December 22, 2008, the government filed a Supplemental Declaration of A. Marie Villafaña, which set forth information regarding: (1) how Epstein's attorneys had shifted positions regarding certain portions of the NPA, and (2) how the Protective Order had been implemented, in terms of making the NPA available to other victims and their counsel.  (DE35.)

On February 12, 2009, the Court denied the Petitioners' Motion to Unseal the NPA. (DE36.)

Thereafter, there was no action on the case, other than a Notice by Petitioners' counsel of his new address on April 9, 2009.  (DE 37.)  Despite having told the Court on August 14, 2008 that Petitioners would review the NPA and then advise the Court what relief they wanted to pursue, no such notice was ever filed, other than the motion to unseal the NPA.

Seventeen months later, on September 8, 2010, the Court issued an Administrative Order Closing the Case.  (DE 38.)  Shortly thereafter, Petitioners filed a "Notice in Response to Administrative Order," (DE39,) stating that they intended to file documents soon thereafter in connection with the case.  On October 12, 2010, the Court issued an Order to Show Cause for Lack of Prosecution.  (DE40.)  The Petitioners responded, arguing that its efforts at discovery in the civil cases Petitioners had filed *against Epstein* precluded dismissal of the instant action. (DE41.)

One day later,[5] the Court issued an Order reopening the case.  (DE44.)  The parties attempted to resolve the matter without success.  (*See* DE45.)  On March 18, 2011, Petitioners filed a series of Motions, including a "Motion for Finding of Violations of Crime Victim's

---

[5]The United States did not have the opportunity to respond regarding the Order to Show Cause for Lack of Prosecution.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Rights Act." (DE48, 49, 50, 51.)  This response follows.

## ARGUMENT

Petitioners are not entitled to any relief in this case for several reasons.  First, as stated in the government's response to Petitioners' Emergency Petition, CVRA rights do not attach in the absence of federal criminal charges filed by a federal prosecutor.  And crime victims cannot file a stand-alone suit to enforce those rights.  This conclusion is required by the CVRA itself and separation of powers principles.  Second, despite owing no legal duty, the U.S. Attorney's Office used its best efforts to treat both Petitioners fairly as set forth in the original response to the Emergency Petition, and as further explained herein.  Third, Petitioners' failure to prosecute this case in a timely fashion has extinguished their desired remedy under Due Process principles.

III.   PETITIONERS HAD NO RIGHTS UNDER 18 U.S.C. § 3771(a) BECAUSE CRIMINAL CHARGES WERE NEVER FILED AGAINST EPSTEIN IN THE SOUTHERN DISTRICT OF FLORIDA

The CVRA appears in Title 18, "Crimes and Criminal Procedure," and the procedures for enforcing the CVRA were implemented in the Federal Rules of *Criminal* Procedure.  *See* 18 U.S.C. § 3771; Fed. R. Crim. P. 60.[6]  The CVRA clearly states that it creates no civil "cause of action for damages" for victims and that it does not "impair the prosecutorial discretion of the Attorney General or any officer under his direction."  18 U.S.C. § 3771(d)(6).  "Crime victims have not been recognized as parties, and the Federal Rules of Criminal Procedure do not allow them to intervene as parties to a prosecution."  *In re Amy Unknown*, ___ F.3d ___, 2011 WL 988882 at *2 (5th Cir. Mar. 22, 2011).  *See also United States v. Aguirre-Gonzalez*, 597 F.3d 46,

---

[6]Fed. R. Crim. P. 60 was adopted on April 23, 2008 and made effective on December 1, 2008.  While this was after most of the relevant events in this case, it reenforces the CVRA's clear directive that it was not meant to create a civil cause of action.

7

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

53 (1st Cir. 2010) ("Notwithstanding the rights reflected in the restitution statutes, crime victims are not parties to a criminal sentencing proceeding. . . . Thus the baseline rule is that crime victims, as non-parties, may not appeal a defendant's criminal sentence.")

While the CVRA provides specific procedures for what should occur if a victim is not accorded rights in "any *court proceeding* involving any offense against a crime victim," in a federal criminal case, such as a change of plea or sentencing, *see* 18 U.S.C. §§ 3771(b)(1), (d)(3), no mandates are provided in instances where no federal criminal charges are ever filed.

Of the eight victims' rights set forth in 18 U.S.C. § 3771(a), the petition alleges a violation of § 3771(a)(5), the right to consult with the attorney for the Government; § 3771(a)(2), the right to reasonable, accurate, and timely notice of any public court proceeding; § 3771(a)(6), the right to full and timely restitution as provided in law; and notice of their rights under the CVRA.

It is undisputed that no federal criminal charges have been filed against Jeffrey Epstein, in the U.S. District Court, Southern District of Florida, pertaining to the sexual abuse of minors.[7] The United States submits that, since there was no "case" pending in the Southern District of Florida against Epstein, or any "court proceeding" involving an offense against Jane Doe #1 and Jane Doe# 2, they cannot invoke any protections under the CVRA.

Title 18, United States Code, § 3771(a)(5), provides that a "crime victim" has "[t]he reasonable right to confer with the attorney for the Government <u>in the case</u>." (emphasis supplied). In its interpretation of a federal statute, the court assumes that "Congress used words in a statute

---

[7] "A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases." *Cash Inn of Dade, Inc. v. Metropolitan Dade County*, 932 F.2d 1239, 1243 (11th Cir. 1991)(citations omitted).

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

as they are commonly and ordinarily understood," and reads the statute to give full effect to each of its provisions.  *United States v.  DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir.  1999), *citing United States v.  McLymont*, 45 F3d 400, 401 (11th Cir.  1995).   Section 3771(a)(5) grants a crime victim the reasonable right to confer with the attorney for the Government "in the case." The phrase "in the case" must be considered since there is a canon of statutory construction that "discourages courts from adopting a reading of a statute that renders any part of the statute mere surplusage."  *Bailey v.  United States*, 516 U.S. 137, 146 (1995)(noting that each word in a statute is intended to have "particular, nonsuperfluous meaning").

Congress intended the phrase "in the case" to mean a case filed in a federal court.  Federal criminal cases are filed in the United States district courts through the filing of a criminal complaint, Fed.R.Crim.P. 3, or indictment, Fed.R.Crim.P. 7.   In each instance, an attorney representing the United States Government is required to sign the complaint or indictment. Fed.R.Crim.P. 7(c)(1) provides that "[the] indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government."   Interestingly, section 3771(a)(5) provides that a crime victim has "[t]he reasonable right to confer with the attorney for the Government in the case."   The exact phrase "attorney for the government" is used in both Fed.R.Crim.P. 7(c)(1) and 18 U.S.C. § 3771(a)(5), with the addition of the term, "in the case," in latter provision. Thus, each criminal case filed in the district court has an "attorney for the Government" representing the sovereign United States.

Petitioners attempt to distort the meaning of "case" by arguing that a case existed in June 2007, when the FBI began investigating the allegations against Epstein.  DE 48 at 25-26.  In their

9

view, a case commences when a law enforcement agency begins its investigation of a potential

crime.   This interpretation is completely contrary to the text of section 3771(a)(5), since there is

no "attorney for the government" when a crime is first reported to a law enforcement agency.   In

most instances, the law enforcement agency begins its preliminary investigation without

consulting the U.S. Attorney's Office.   Only when it appears the investigation may generate a

potential for an indictment does the investigative agency refer the matter to the U.S. Attorney's

Office.   An "attorney for the government" appears only when a complaint or indictment is filed

in the district court.

Further, as used in legal documents, the word "case" is a term of art that has long been

understood to mean "a suit instituted according to the regular course of judicial procedure."

*Muskrat v. United States*, 219 U.S. 346, 356 (1911) (Article III "case" or controversy); see also

Black's Law Dictionary (6th ed.) 215 ("case" is a "general term for an action, cause, suit or

controversy at law or in equity").   "Whenever the claim of a party under the Constitution, laws or

treaties of the United States takes such a form that the judicial power is capable of acting upon it,

then it has become a case."   *Muskrat*, 219 U.S. at 356.   A "case," in other words, is an adversarial

dispute where one party purposefully invokes the judicial power seeking an adjudication of their

rights and obligations.   Id.; see also Black's at 215 (defining "case" as "a question contested

before a court of justice").   This general understanding is equally applicable to criminal

proceedings.   In *Chavez v. Martinez*, 538 U.S. 760 (2005), the Supreme Court held that a

criminal "case" – as distinct from an investigation – "at the very least requires the initiation of

legal proceedings."   *Id.* at 766 (holding that police questioning during the course of a criminal

investigation "does not constitute a 'case'" within the meaning of the Fifth Amendment's Self-

10

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Incrimination Clause) (citing *Blyew v. United States*, 80 U.S. (13 Wall.) 581, 595 (1871), and Black's Law Dictionary).

Finally, Congress's use of the definite article "the" in reference to the word "case" supports respondent's view that "the case" implies a specific adversary proceeding rather than an indefinite ongoing investigation. Cf. *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (use of definite article "the person" in 28 U.S.C. 2241's provision regarding a habeas custodian signifies that there is usually only one proper custodian, and not several different ones).

Because there was not and is not any case against Epstein in the Southern District of Florida, petitioners have no rights under § 3771(a)(5) to consult with the attorney for the Government.   The United States Attorney's Office was under no obligation to consult with petitioners prior to concluding its Non-Prosecution Agreement with Epstein.    For the same reason, petitioners' claim under § 3771(a)(2) also fails.    There has been no "public court proceeding" against Epstein in the U.S. District Court, Southern District of Florida, since no criminal case has been filed against him in the federal court.    Consequently, there has been nothing for which the U.S. Attorney's Office was required to give notice to petitioners.

A different provision in the CVRA, 18 U.S.C. § 3771(b), also supports the Government's interpretation of § 3771(a)(5).    Section 3771(b)(1) provides as follows:

> In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a).  Before making a determination described in subsection (a)(3), the court shall make every effort to permit the fullest attendance possible by the victim and shall consider reasonable alternatives to the exclusion of the victim from the criminal proceeding.  The reasons for any decision denying relief under this chapter shall be clearly stated on the record.

11

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

There is no "court proceeding" in this case because no federal criminal charges have been lodged against Jeffrey Epstein.    Section 3771(b)(1) envisions that a district court presiding over a criminal trial will be responsible for ensuring that a crime victim will be afforded rights granted in § 3771(a).    Section 3771(a)(3), which is expressly referenced in § 3771(b)(1), provides that a crime victim has

> The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

This provision contemplates that, in the event a defendant invokes the rule of sequestration in Fed.R.Evid.  615, the court must consider the crime victim's rights under § 3771(a)(3), and can only exclude the victim from the proceeding if the court finds there is clear and convincing evidence that the victim's testimony would be materially altered if the victim was allowed to hear other testimony at the proceeding.    By providing a difficult evidentiary standard which must be met before a victim's right to be present in the court proceeding can be denied, Congress was purposefully limiting a court's discretion in sequestering trial witnesses, when the witness is a crime victim.

In the instant case, there is no "court proceeding" since no federal criminal charges have been brought against Epstein.    Therefore, § 3771(b)(1) is inapplicable.   There is no role for this Court to fulfill under § 3771(b)(1).[8]

---

[8]As discussed, *infra*, this interpretation is buttressed by the Federal Rules Committee's decision to incorporate the CVRA into the Federal Rules of Criminal Procedure at Fed. R. Crim. P. 60.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

A.     The Venue Provision, Section 3771(d)(3), Does Not Support Petitioners'
       Argument That CVRA Rights Attach Prior to Formal Charges Being Filed

Petitioners also attempt to buttress their argument by claiming that section 3771(d)((3),

which sets forth the venue where a victim can seek relief, supports their view that the rights in

section 3771(a) attach before any criminal charges are filed.   DE 48 at 26.  Section 3771(d)(3)

provides, in pertinent part, that "[t]he rights described in subsection (a) shall be asserted in the

district court in which a defendant is being prosecuted for the crime or, if no prosecution is

underway, in the district court in the district in which the crime occurred."   As the respondent

explained at the July 11, 2008 hearing, section 3771(d)(3) is a venue provision, which provides

for where a motion under that section shall be filed.   Congress' provision of a location where a

motion can be filed does not lead to the conclusion that Congress also intended rights in section

3771(a) to exist even if no federal criminal charges are ever filed.

The venue language in the CVRA states that rights "shall be asserted . . . *if no*

*prosecution is underway*, in the district court in the district in which the crime occurred," 18

U.S.C. § 3771(c)(3).   Petitioners maintain that this provision establishes that the CVRA

contemplated a case such as this where no charges were ever filed.  To the contrary, the

Separation of Powers doctrine and the full context of the CVRA counsel otherwise.[9]  Here,

---

[9] By making this suggestion, the government is not suggesting that this language is
superfluous.  Rather the period referred to in 18 U.S.C. § 3771(d)(3) is the time between arrest
and indictment.  As stated by the Supreme Court, for purposes of the Sixth Amendment right to
counsel, "criminal prosecution" does not commence with the filing of a complaint and issuance
of an arrest warrant, but only upon the return of an indictment.  *Kirby v. Illinois*, 406 U.S. 682,
688-690 (1972).  *See also United States v. Pace*, 833 F.2d 1307, 1312 (9th Cir. 1987) (filing of
complaint and issuance of arrest warrant do not commence criminal *prosecution* for Sixth
Amendment purposes, but rather, based on Fed. R. Crim. P. 7, "*prosecution* commenced when
the indictment was handed down") (emphasis added).

13

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Petitioners have not articulated what they are seeking.  As set forth above in the Procedural

History, originally, Petitioners sought to have the NPA set aside.[10]  (DE15 at 12, 21.)  They later

explicitly denied that they were seeking that remedy.  (DE27 at 4.)  The Court asked Petitioners

to review the NPA and either dismiss their case or advise the Court promptly what remedy they

were seeking.  (*Id.*)  Thereafter, Petitioners asked only to have the NPA unsealed and made

---

The filing of a federal criminal complaint does not commence a formal *prosecution*. Rather, the main reason a law enforcement officer files such a complaint is to establish probable cause for an arrest warrant. *See* Fed. R. Crim. P. 3, 4(a); *United States v. Moore*, 122 F.3d 1154, 1156 (8th Cir.1997).  The criminal process is still in the investigative stage, and "the adverse positions of government and defendant" have yet to solidify.  The filing of the federal complaint, therefore, can no more be characterized as "the initiation of adversary judicial proceedings against the defendant," than can the filing of an affidavit in support of a search warrant.

*United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006) (quoting *United States v. Gouveia*, 467 U.S. 180, 187, 189) (emphasis added).  *See also United States v. Langley*, 848 F.2d 152 (11th Cir. 1988) (formal criminal *prosecution* does not commence upon issuance of arrest warrant).

During the period between the filing of a Criminal Complaint or a defendant's arrest (whichever occurs first), and the filing of an Indictment or an Information, several important events will occur, including his initial appearance and bond hearing.  There also may be pre-indictment plea negotiations.  Also, if the defendant is arrested outside of the district where he was charged, i.e., outside the district where the criminal activity occurred, the defendant may ask for permission to plead guilty in the arresting district – away from where the victims are located.  Section 3771(d)(3) makes certain that the victims can be heard in their "home" district to object to the Rule 20 procedure for transferring the case so that they can more easily exercise their right to appear at court proceedings.

Importantly, when incorporated into the Federal Rules of Criminal Procedure, this language became: "**Where Rights May Be Asserted.  A victim's rights described in these rules must be asserted in the district where a defendant *is being prosecuted for the crime*.**"  Fed. R. Crim. P. 60(b)(4) (emphasis added).

[10]As explained below, to the extent that they are still asserting the right to that relief, they are not entitled to it.

14

public.  (DE28.)  The Court denied that motion.  (DE36.)  Now, more than two years later, they

have asked the Court only to make a finding of a violation of the CVRA, asking that the issue of

remedy be saved for a later date.

The fundamental rationale of the separation of powers doctrine is particularly compelling

in the context of this case, the handling of criminal prosecutions.  "The Attorney General and

United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws.  They

have this latitude because they are designated by statute as the President's delegates to help him

discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"

*United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S.

598, 607 (1985); quoting U.S. Const., Art. II § 3; citing 28 U.S.C. §§ 516, 547).

> This broad discretion rests largely on the recognition that the decision to prosecute
> is particularly ill-suited to judicial review.  Such factors as the strength of the
> case, the prosecution's general deterrence value, the Government's enforcement
> priorities, and the case's relationship to the Government's overall enforcement
> plan are not readily susceptible to the kind of analysis the courts are competent to
> undertake.  Judicial supervision in this area, moreover, entails systemic costs of
> particular concern.  Examining the basis of a prosecution delays the criminal
> proceeding, threatens to chill law enforcement by subjecting the prosecutor's
> motives and decisionmaking to outside inquiry, and may undermine prosecutorial
> effectiveness by revealing the Government's enforcement policy.  All these are
> substantial concerns that make the courts properly hesitant to examine the
> decision whether to prosecute.

*Wayte v. United States*, 470 U.S.598, 607-08 (1985).  *See also Town of Newton v. Rumery*, 480

U.S. 386, 396 (1987) ("[C]ourts normally must defer to prosecutorial decisions as to whom to

prosecute.  The reasons for judicial deference are well known.  Prosecutorial charging decisions

are rarely simple.  In addition to assessing the strength and importance of a case, prosecutors also

must consider other tangible and intangible factors, such as government enforcement priorities.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Finally, they also must decide how best to allocate the scarce resources of a criminal justice system that simply cannot accommodate the litigation of every serious criminal charge.").  In the Epstein case, the U.S. Attorney's Office also had to balance its federal prosecutorial discretion with its relationship with the Palm Beach County State Attorney's Office in light of the pre-existing state investigation.

In addition to the authorities cited above, the Supreme Court's decision in *Heckler v. Chaney*, 470 U.S. 821 (1985), further supports the interpretation that the CVRA does not provide for judicial intervention in a case where no criminal charges were ever filed against a defendant. In *Chaney*, the Supreme Court held that an agency's decision to *refuse* enforcement of one of its regulations is unsuitable for judicial review, despite the existence of the Administrative Procedures Act ("APA"), like, in this case, the Justice Department's regulations on victim consultations.[11]  *See id* at 831; *see also American Disabled for Attendant Programs Today v. United States Dep't of Housing and Urban Dev.*, 170 F.3d 381, 384 (3d Cir. 1999 (citing

---

[11]The reasons are identical to those that disfavor judicial intervention into prosecutorial discretion:

> First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise.  Thus, the agency must not only assess whether a violation had occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all.  An agency generally cannot act against each technical violation of the statute it is charged with enforcing.  The agency is far better equipped than the courts to deal with the many variable involved in the proper ordering of its priorities.

*Id.* at 831-32

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

*Chaney*) ("Agency actions are typically presumed to be reviewable under the APA.[12]  Importantly however, the Supreme Court has established a presumption *against* judicial review of agency decisions that involve whether to undertake investigative or enforcement actions.").  Thus, as explained in *Chaney*, the existence of the APA and an agency's refusal to act, without more, will not create a "case or controversy."  *Chaney* explained that, the agency's refusal is "only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  *Chaney* at 833.

The CVRA reiterates the presumption created by the language contained in 3771(d)(6) – that there is no "cause of action" – and in 3771(f)(2)(D) – that there shall be no "judicial review of the final decision of the Attorney General" of any complaints of violations of the CVRA. *Block v. Securities and Exchange Comm'n*, 50 F.3d 1078 (D.C. Cir. 1995), is instructive.  In *Block*, petitioners filed a petition asking the Court to find that the SEC had failed to fulfill its obligation to hold a hearing and determine whether petitioners were "interested persons" under the Investment Advisers Act.  *Id.* at 1080.  The SEC responded that its decision not to act upon petitioners' application was a decision not to enforce that is committed to the agency's discretion and, therefore, was not subject to judicial review under *Chaney*.  *Block* at 1081.  The D.C. Circuit found that the *Chaney* rule applied:

> The Supreme Court in *Chaney* provided no formula by which to determine whether agency decisions of a particular type are "decisions to refuse enforcement."  The Court clearly included within that set, however, not only an agency's determination not to proceed against a recognized violation, but also its antecedent judgment upon the question "whether a violation has occurred."

---

[12]Of course, Petitioners have not invoked the APA as a basis for jurisdiction.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

*Block*, 50 F.3d at 1081 (quoting *Chaney*, 470 U.S. at 831).

That type of inquiry is exactly the one requested by Jane Does #1 and #2 – did the U.S. Attorney's Office for the Southern District of Florida violate the CVRA.  Here, Petitioners' request should be examined with even greater caution than the average agency decision because it involves a decision regarding a *criminal* prosecution.

At least one district court has also recognized that finding a CVRA violation, especially of the right to be treated with dignity and respect – the right that is the primary focus of Petitioners' Motion for Finding of Violations – does not always provide a remedy, even when a federal criminal case exists.  In *United States v. Rubin*, 558 F. Supp. 2d 411 (E.D.N.Y. 2008), the district court treated the victims with a fair amount of skepticism, and noted that the government believed that the victims were trying to use the CVRA as a mechanism to "undo Rubin's guilty plea in exchange for a favorable settlement of their ongoing civil suit in California state court. Movants take vigorous exception to any [such] suggestion . . ." although the Court later noted that the victims were attempting to use the CVRA to obtain discovery from the defendant.  *Id.* at 416, 425.  With respect to certain CVRA rights, the *Rubin* court noted the lack of a remedy:

> The CVRA also lists among the rights secured to a victim the right to "be treated with fairness and with respect for the victim's dignity and privacy."  18 U.S.C. § 3771(a)(8).  As Magistrate Judge Orenstein observed in *Turner*: "Neither the text of the statute nor its legislative history provides guidance as to what specific procedures or substantive relief, if any, Congress intended this provision to require or prohibit."  [*United States v. Turner*, 367 F. Supp. 2d 319, 335 (E.D.N.Y 2005).] While this provision must be read liberally as giving courts and the government the mission to do all that they can to vindicate a victim's legitimate requests for fairness, respect and dignity, the Court doubts, strongly, that the authors of the statute succeeded in doing more.  It is hard to comprehend, in any case, how a court presiding over the prosecution of a defendant could engage in sidebar dispute resolution between a victim and the government regarding the strategic decisions of the government about the very prosecution the Court is to

18

> try impartially. . . . the Court refuses to adopt an interpretation of (a)(8) that prohibits the government from raising legitimate arguments in support of its opposition to a motion simply because the arguments may hurt a victim's feelings or reputation.  More pointedly, such a dispute is precisely the kind of dispute a court should not involve itself in since it cannot do so without potentially compromising its ability to be impartial to the government and defendant, the only true parties to the trial of the indictment.

*Id.* at 428.  *Cf. Cole v. Federal Bureau of Investigation*, 719 F. Supp. 2d 1229, 1245 n.4 (D. Mont. 2010) (Purported crime victims brought class action claim against FBI and U.S. Attorney's Office for repeated failures to investigate and prosecute crimes involved Native American victims asserting, *inter alia*, violations of the CVRA.  District court dismissed most claims, including CVRA claims, noting that the alleged CVRA injury "does not meet the requirements for an injury-in-fact for standing purposes.  The lost opportunities to receive benefits under the crime victims statutes are too speculative to give rise to an Article III injury.")

B.    Construing the CVRA to Apply Before a Decision to Prosecute Federally Is Made Will Improperly Impair the Decision-Making Authority of the Executive Branch, in Contravention of the Legislative History of the CVRA

The ramifications of the position espoused by the Petitioners in this case are significant. And those ramifications were understood by Congress.  Thus, Congress maintained separate legislation aimed at rights governing pre-charging protections, *see* 42 U.S.C. § 10607, and legislation aimed at rights governing post-charging protections, that is, the CVRA.  Senator Kyl noted that the right to confer with the "attorney for the Government in the case" only applied post charging:

> This right to confer does not give the crime victims any right to direct the prosecution.  Prosecutors should consider it part of their profession to be available to consult with crime victims about concerns the victims may have which are pertinent to the case, case proceedings or dispositions.  Under this provision, victims are able

19

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

to confer with the Government's attorney about proceedings <u>after charging</u>.

150 Cong.Rec. S4260, S4268 (daily ed. Apr. 22, 2004)(statement of Sen. Kyl)(emphasis added).

In addition to issues of prosecutorial discretion described above, additional considerations prior to filing criminal charges include grand jury secrecy, *see* Fed. R. Crim. P. 6(e), and due process rights of persons under investigation.

Petitioners' argument fails to take into account the admonition of Congress in section 3771(d)(6) that "[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction."     It is well-settled that "the decision of whether or not to prosecute ... is a decision firmly committed by the [C]onstitution to the executive branch of the government."  *United States v. Renfro*, 620 F.2d 569, 574 (6th Cir. 1980). Further, "intervention by the court in the internal affairs of the Justice Department would clearly constitute a violation of the Separation of Powers doctrine."  <u>Id.</u>   In *Dresser Industries, Inc. v. United States*, 596 F.2d 1231, 1237 (5th Cir. 1979), the court of appeals observed that "[t]he decision to prosecute is largely unreviewable by the courts." *citing United States v. Cox*, 342 F.2d 167 (5th Cir. 1965).    The logical corollary to this proposition is that, the decision not to prosecute, or to dispose of a matter by entering into a non-prosecution agreement, is also largely unreviewable by the courts.

An interpretation that the rights enumerated in section 3771(a) do not attach until formal charges are filed in a district court comports with the notion of giving broad deference to the prosecutorial discretion of the Attorney General.   Under petitioners' interpretation, a case is commenced when a law enforcement agency begins to investigate to determine if a crime was

20

committed.   Under their view of section 3771(a)(5), a putative victim could file a motion with the district court, in the district where the crime occurred, to complain that a law enforcement agency declined to refer a case for prosecution to the U.S. Attorney's Office, and the law enforcement agency did not afford him or her "the reasonable right to confer with the attorney for the Government in the case," prior to making its decision not to refer the case.   It is only a small step to the next phase, a motion to challenge the U.S. Attorney's Office's decision to decline prosecution, without having conferred with the putative victim prior to making the decision.

Even if the U.S. Attorney's Office decided to seek a grand jury indictment, under petitioners' interpretation, a dissatisfied victim could file a motion challenging the Attorney General's choice of the charges to bring, or who it chose to charge, by arguing the U.S. Attorney's Office did not confer with the victim prior to drafting the indictment.   Of course, such judicial scrutiny is not available since "[d]ecisions on whether to charge, who to charge, and what to charge, are all in the prosecutor's discretion."  *United States v. BP Products North America, Inc.*, 2008 WL 501321 at *11, *citing United States v. Armstrong*, 517 U.S. 456, 464 (1996)(*quoting Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

Allowing claims like Petitioners' to proceed would open the inner workings of that prosecutorial discretion and the grand jury to judicial scrutiny – exactly the outcome that the CVRA states is disallowed.

For example, in *In re Petersen*, 2010 WL 5108692 (N.D. Ind. Dec. 8, 2010), an individual and a corporation filed an emergency petition for enforcement of the CVRA, "seeking an order compelling the Department of Justice and United States Attorney General Eric Holder, Jr. to comply with the CVRA and to accord them various rights conferred upon crime victims under

21

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

the Act, 18 U.S.C. § 3771(a)," in a case where no charges were ever filed against the putative

defendants. *Id.* at *1. The petitioners claimed that they were victims of various federal crimes

related to fraud, securities crimes, and money laundering, among others, and that the U.S.

Attorney's Office for the Northern District of Indiana had "refused to confer with them, denied

them their right to full and timely restitution, . . . and demonstrated 'a total indifference and lack

of respect to the victims of real estate and mortgage fraud crimes,' in violation of 18 U.S.C. §

3771(a)(5)-(8).'" *Id.*

 Citing the CVRA's express prohibition on impairing prosecutorial discretion, *id.* at *2,

and noting that the court had "no authority under the CVRA to compel the Attorney General to

promulgate regulations, 'meaningful' or otherwise," *id.* at *3, the *Petersen* court dismissed the

CVRA petition. Simply, "the U.S. Attorney didn't have an obligation under the CVRA to confer

with the petitioners until after a charge was filed and a case opened, and the decision not to bring

charges against the alleged perpetrators was a matter of prosecutorial discretion, not subject to

review under the CVRA." *Id.* at *2.

 *Petersen* previews the reasons for limiting CVRA actions to cases where criminal charges

have already been filed. Failure to do so could divert limited prosecutorial and judicial resources

to dealing with numerous frivolous claims. For example, any assault that occurs in a federal

prison could be charged as a federal offense.[13] The Bureau of Prisons also has its own

administrative remedies for resolving prisoner disputes. Construing the CVRA in the way that

---

[13]*See* 18 U.S.C. § 113 (assault within territorial jurisdiction of the United States); *United States v. Anderson*, 528 F.2d 590, 591 (5th Cir. 1976) (in prosecution for assault with intent to commit murder within territorial jurisdiction of United States, district court could properly take judicial notice of fact that FCI Tallahassee was within special territorial jurisdiction of United States).

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Petitioners urge would require AUSAs to meet and confer with *each and every* prisoner who alleged that he or she was the victim of an assault from another prisoner.  If the U.S. Attorney's Office determined that there was insufficient evidence to prosecute, or exercised its discretion to decline prosecution in favor of administrative remedies, the prisoner could, according to Petitioners, file a CVRA claim, and then a petition for mandamus that would have to be heard within 72 hours.[14]  At least one prisoner has filed exactly this type of suit, not once, but twice. *See Searcy v. NFN Paletz*, 2007 WL 1875802 (D.S.C. June 27, 2007) (prisoner who alleged he was victim of assault filed suit under CVRA attempting to force U.S. Attorney's Office, FBI, and BOP to prosecute alleged perpetrator); *Searcy v. NFN Skinner*, 2006 WL 1677177 (D.S.C. June 16, 2006) (same).

These fears are not imagined – several individuals have tried to use the CVRA to force the United States – via the federal courts – to act in ways never contemplated by the CVRA's drafters.  For example, a prisoner filed a writ of mandamus asking the Third Circuit Court of Appeals to find that the United States had violated his victims' rights under the CVRA by failing to file a Rule 35 motion to reduce his sentence after he provided information against another prisoner who had committed theft from the prison.  *See In re Dawalibi*, 338 Fed. Appx. 112, 2009 WL 2186517 (3d Cir. 2009).  The other prisoner had assaulted Dawalibi when he learned that Dawalibi had provided information against him, and Dawalibi asserted that the failure to award a Rule 35(b) sentence reduction violated his right under the CVRA to be treated with fairness.  *See id.*, 338 Fed. Appx. at 113-14.

---

[14]Pursuant to 18 U.S.C. § 3771(c)(3), "[i]f the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus. . . . The court of appeals shall take up and decide such application forthwith within 72 hours after the petition has been filed."

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

In *Sieverding v. United States Dep't of Justice*, 693 F. Supp. 2d 93 (D.D.C. 2010), the

district court discussed a series of claims brought by the Sieverdings, a husband and wife so well

known to the court for their "abusive litigation practices" that the district court "imposed filing

restrictions" on them and "arrested and jailed [Mrs. Sieverding] for civil contempt several times

between 2005 and 2007."  *Id.* at 99 (citations omitted).  Thereafter, the Sieverdings alleged

dozens of Privacy Act and other violations stemming from these arrests and incarcerations.  The

allegations by Mrs. Sieverding included that:

> DOJ was required to meet with her and investigate (if not prosecute) her various
> allegations of criminal behavior [by FBI agents and Deputy U.S. Marshals in
> connection with the court-ordered arrests].  She argues that the Justice for All Act
> of 2004[15] "gives her the right to discuss her allegation of criminal acts and DOJ's
> decisions to prosecute or not prosecute with a U.S. Attorney." . . .  Ms. Sieverding
> also alleges that the Justice for All Act and the Mandatory Victim's Restitution
> Act require DOJ to "subpoena the parties whom she alleges committed federal
> crimes that injured her."  Similarly she contends that DOJ had "a specific
> statutory mandate to investigate alleged crimes and they chose not to."

*Id.* at 110.  Just as in *Petersen*, the *Sieverding* court dismissed these claims, relying on 18 U.S.C.

§ 3771(d)(6) ("Nothing in this chapter shall be construed to impair the prosecutorial discretion of

the Attorney General or any officer under his direction.").  The Court should do the same in this

case.

C.      Analysis of Whether an Individual is a Victim Entitled to Protections under §
        3771(a) Is Based Upon the Criminal Charge Lodged By the United States
        Government in the United States District Court

Federal court decisions construing the CVRA have focused upon the charges formally

lodged against an accused, in determining whether an individual was covered by the CVRA.   In

*In Re Stewart*, 552 F.3d 1285 (11th Cir. 2008), the Eleventh Circuit observed, in the opening

---

[15]The Justice for All Act included the CVRA and several other criminal laws.

24

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

sentence of its opinion, that "[t]he Crime Victim Rights Act ("CVRA"), 18 U.S.C. § 3771,

provides that victims of a federal crime may appear and be heard during some phases *of the*

*prosecution of the person charged with the crime.*"  *Id.* at 1285-86 (footnote omitted and

emphasis added).   In *Stewart*, the issue was whether individuals who had purchased houses from

various real estate developers were victims under the CVRA, when the purchasers were required

to pay a two percent mortgage origination fee, instead of the one percent fee which Coast Bank

of Florida and American Mortgage Link, the mortgage origination firm, had agreed would be

paid by a purchaser.   The additional one percent was pocketed by defendant Phillip Coon, an

Executive Vice-President of Coast Bank, and defendant John Miller, president of American

Mortgage Link.

Coon and Miller were charged in a one-count Information on October 15, 2008, with

conspiracy to deprive the bank of honest services in violation of the wire fraud statute.  *Id.* at

1287.   On November 5, 2008, Coon and Miller entered into a plea agreement with the

government.   On the same day, Coon and Miller appeared before a Magistrate Judge to tender

their pleas of guilty.   The petitioners appeared and asked to be heard.  *Id.*   The government

objected, arguing that the petitioners were not victims of the offense charged in the information.

The Magistrate Judge agreed and denied the petitioners the right to be heard.  *Id.*

On appeal, the Eleventh Circuit noted that, "[t]he question the petition presents is whether

petitioners are victims of the criminal conduct as described in the information pending in the

district court."  *Id.* at 1288.   Referencing the definition of victim in 18 U.S.C. § 3771(c), the

Eleventh Circuit noted that, to determine a crime victim, first, the court identifies the behavior

constituting "commission of a federal offense," and second, identifies the direct and proximate

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

effects of that behavior on parties other than the United States.  *Id.*   If the criminal behavior causes a party direct and proximate harmful effects, the party is a victim under the CVRA.

The Eleventh Circuit ultimately found that the petitioners had been harmed because they had to pay the extra one percent.   In doing so, the appellate court examined the relevant criminal behavior which formed the basis for the criminal violation charged in the information.  Id. at 1288-89.

Similarly, in *United States v. Turner*, 367 F.Supp.2d 319 (E.D.N.Y. 2005), the district court analyzed the means by which a court would identify the victims in a criminal case, when applying the definition in § 3771(e).[16]   Noting the presumption of innocence that a defendant enjoys, the court observed that it could presume no person would meet the definition of victim unless and until the defendant was proved guilty beyond a reasonable doubt.  *Id.* at 326.  This approach was rejected because it would produce an absurd result that the court assumed Congress did not intend.   Next, the court found that, while the CVRA does not include an express provision preserving the presumption of a defendant's innocence, such a reasonable limitation must be inferred as a matter of due process and to avoid an interpretation that would render the statute unconstitutional.  *Id.* at 326(citations omitted).   The district court then concluded:

> Accordingly, I interpret the definition in § 3771(e) to include any person who would be considered a "crime victim" if the government were to establish the truth of the factual allegations in its charging instrument.

---

[16] 18 U.S.C. § 3771(e) defines "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia."

26

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Id. (emphasis added).

In *In Re McNulty*, 597 F.3d 344 (6th Cir. 2010), the petitioner claimed he was a victim under the CVRA in a prosecution of Arctic Glacier International, Inc., for participating in a conspiracy to suppress and eliminate competition by allocating packaged-ice customers in southeastern Michigan and the Detroit, Michigan, metropolitan area.   McNulty had been an employee of Arctic Glacier, and was told of the conspiracy.  *Id.* at 346-47.  When he refused to participate in the conspiracy, he was fired by Arctic Glacier.

On September 29, 2009, the United States government charged Arctic Glacier, in a sealed information, with violating 15 U.S.C. § 1.  *Id.* at 347.   Arctic Glacier  and the government entered into a plea agreement on October 13, 2009, in which Arctic Glacier agreed to plead guilty to the charge; the parties agreed to recommend a fine of $9 million; and the government agreed not to seek restitution.  *Id.*

At the sentencing hearing held on February 22, 2010, the district court found that the victims in the case were the customers of Arctic Glacier, and that McNulty was an employee of the defendant, not a customer.  *Id.* at 348.   The court further found that there was no evidence McNulty was directly or proximately harmed by the conspiracy for which Arctic Glacier was convicted.   Accordingly, the district court held McNulty was not a "victim of the offense charged in this case."  *Id.*

McNulty sought mandamus relief in the court of appeals under 18 U.S.C. § 3771(d)(3). Relying upon appellate court decisions from other circuits, including *Stewart*, the Sixth Circuit found that § 3771(e)'s definitional requirement that a victim be "directly and proximately harmed" encompassed the traditional "but for" and proximate cause analyses.  *Id.* at 350, *citing*

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

*In Re Rendon Galvis*, 564 F.3d 170, 175 (2nd Cir. 2009).   As applied to McNulty, the issue was whether he was directly and proximately harmed by criminal conduct in the course of the conspiracy or if the actions taken by defendants in the underlying case which allegedly harmed McNulty were merely ancillary to the conspiracy.   The Sixth Circuit stated:

> In making this determination, we must (1) look to the offense of conviction, based solely on the facts reflected in the jury verdict or admitted by defendant; and then (2) determine, based on those facts, whether any person or persons were "directly and proximately harmed as a result of the commission of [that] Federal offense. *Id.* at 351, *citing United States v. Atl. States Cast Iron Pipe Co.*, 612 F.Supp.2d 453, 536 (D.N.J. 2009).

Again, in determining whether an individual qualified as a victim, the appellate court looked to the charging document, and the crime charged, to decide whether the individual had been directly and proximately harmed.   In *McNulty*, the Sixth Circuit ultimately agreed with the district court's conclusion that McNulty was not a victim.  597 F.3d at 351-52.   The appellate court found that the alleged harm to McNulty stemmed from his firing for refusing to participate in the conspiracy, and his "blackballing" from future employment with packaged-ice companies until he stopped working with the government in exposing the conspiracy.   "If proven, these would indeed be harms to McNulty, but they are not criminal in nature, nor is there any evidence that they are normally associated with the crime of antitrust conspiracy."  *Id.* at 352.

Interestingly, the Sixth Circuit observed that McNulty's firing and subsequent blackballing in the packaged-ice industry may have supported a charge of obstruction of justice. *Id.* at 352 n.9.   Nonetheless, the court found this to be irrelevant because, "for purposes of the CVRA definition of 'crime victim,' the only material federal offenses are those for which there is a conviction or plea."  *Id.*, *citing Hughey v. United States*, 495 U.S. 411, 418 (1979), and *In Re*

28

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

*Rendon Galvis*, 64 F.3d at 175.

Plainly, the analysis of whether an individual is entitled to invoke rights provided in § 3771(a) is based upon an examination of the criminal charge in the charging instrument. It follows, therefore, that in the absence of any charging instrument, there are no rights under § 3771(a).

      D.    *In re Dean* Is Inapplicable to this Case

Petitioners rely heavily upon *In re Dean*, 527 F.3d 391 (5th Cir. 2008). DE 48 at 27-31. They argue <u>Dean</u> is "remarkably similar" to their case (DE 48 at 27), but close examination demonstrates there are major differences which render <u>Dean</u> inapplicable.

First, unlike here, a criminal charge was actually filed in *Dean*. The government in *Dean* filed its criminal information on October 22, 2007, and defendant BP signed the plea agreement two days later. *Id.* The information was unsealed, and notices sent to the victims in November 2007 and January 2008, advising of scheduled proceedings and their right to be heard. On February 4, 2008, BP plead guilty at a hearing, and all victims who wished to be heard were permitted to speak.

Second, "[b]efore bringing any charges, the government, on October 18, 2007, filed a sealed *ex parte* motion for 'an order outlining the procedures to be followed under the [CVRA].'" *Id.* at 392. The government invoked 18 U.S.C. § 3771(d)(2), applicable to cases involving multiple crime victims, and sought judicial review and approval of what the government deemed was a "reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings." *United States v. BP Products North America, Inc.*, 2008 WL 501321 (S.D.Tex. Feb. 21, 2008) at * 2. The government announced to the court

29

that a plea agreement was expected to be signed in about a week, and that because of the number

of victims, consulting all the victims would not be practicable, and notifying the victims would

result in media coverage that could impair the plea negotiation process and might prejudice the

case in the event no plea was reached. *Dean*, 572 F.3d at 392.   The district court granted the

government's *ex parte* motion, finding that notifying all the victims was impracticable due to

their large number, and that extensive media coverage could prejudice the plea negotiation

process or prejudice the case if no plea was reached.  The court directed that, once an agreement

was signed, the government should provide reasonable notice to all identifiable victims and

afford the victims of the rights set forth in the CVRA, prior to the actual entry of the guilty plea.

*Id.* at 393.

Ultimately, the Fifth Circuit found the district court erred in entering its *ex parte* order

because the fewer than 200 victims "could be easily reached." *Id.* at 394-95.   Additionally, the

Fifth Circuit assailed the district court's reasoning that any public notification of a potential

criminal disposition of the case, due to extensive media coverage of the explosion, would

prejudice BP and could impair the plea negotiation process and could prejudice the case in the

event that no plea was reached. *Id.* at 395.   The Fifth Circuit observed:

> In passing the Act, Congress made the policy decision – which we
> are bound to enforce – that the victims have a right to inform the
> plea negotiation process by conferring with prosecutors before a
> plea agreement is reached. *Id.*

In the instant case, the U.S. Attorney's Office never invoked the Court's authority to

obtain a dispensation on the application of the CVRA.   Since no filing of federal charges was

contemplated, there was no need to seek Court approval of the manner in which the CVRA

would be implemented, as in *Dean*.   In *Dean*, the U.S. Attorney's Office knew that it would be

30

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

filing criminal charges against BP, and the provisions in 18 U.S.C. § 3771(a) would become applicable.   Since it expected to formally file the criminal charges after a plea agreement had been concluded, it needed to consult the Court to obtain judicial approval of what it deemed would satisfy the CVRA.

In contrast, the U.S. Attorney's disposition of the Epstein matter was to enter into a non-prosecution agreement with him.   Unlike a plea agreement, non-prosecution agreements are not subject to judicial pre-approval.  *United States v. Dorsett*, 2009 WL 2386070 at *4 (D.Neb. Jul. 23, 2009)("Non-prosecution agreements are similar to plea agreements, except adherence to a non-prosecution agreement is the responsibility of the prosecutor alone while a plea agreement is subject to the approval of the court."), and *United States v. Minnesota Mining & Mfg. Co.*, 551 F.2d 1106, 1112 (8th Cir. 1977)("This was not a traditional plea bargain arrangement in which the trial judge was a participant.  Rather, it was a prosecutorial agreement, the inviolability of which rested completely in the province of the government prosecutors, who have sole power and responsibility to institute criminal proceedings").   Consequently, the U.S. Attorney's Office did not invoke the authority of the Court, or file a formal charge against Epstein.  These two key distinctions, the absence of any invocation of the Court's authority and the absence of any formal charge being filed, render *Dean* inapplicable to the instant case.

IV.    THE SUBJECTIVE BELIEFS OF UNITED STATES ATTORNEY'S OFFICE OFFICIALS, THAT PETITIONERS WERE COVERED BY THE CVRA, ARE <u>IRRELEVANT</u>

Petitioners next argue they are protected by the CVRA because the U.S. Attorney's Office took that position in letters to Jane Doe #1 and to Epstein's attorneys.  DE 48 at 31-33.   Further, petitioners have assembled a list of purportedly uncontroverted facts, based mainly upon e-mail

31

messages and correspondence between U.S. Attorney's Office officials and the legal representatives of Jeffrey Epstein, in the time surrounding the execution of the Non-Prosecution Agreement.   In several of the e-mails, U.S. Attorney's Office personnel express the view that the CVRA applied to petitioners, or that the CVRA obligated the U.S. Attorney's Office to take certain actions with regard to the victims.

Petitioners argue that the Government is somehow bound by the position taken in these e-mails and letters.   This assertion is plainly incorrect.  These e-mails authored by members of the U.S. Attorney's Office are "merely a statement of assertion or concession made for some independent purpose," and may be controverted or explained by the party who made it.  *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476-77 (5th Cir. 2001), *citing McNamara v. Miller*, 269 F.2d 511, 515 (D.C. Cir. 1959).  In contrast, a judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them. *Martinez*, 244 F.3d at 476.

Significantly, an admission is binding as a judicial admission only if it pertains to a fact, not a legal conclusion.  *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 681-82 (7th Cir. 2002)(Rovner, J., concurring).   In *Sulkoff v. United States*, 2003 WL 1903349 (S.D. Ind. 2003), the United States filed its answer in a Federal Tort Claims Act case, in which it admitted that a physician, Dr. Jackson, was an employee of the Veterans Administration at the time he treated the plaintiff Sulkoff.   Subsequently, the United States Attorney's Office became aware that Dr. Jackson was not an employee of the United States.   When the United States sought to amend its answer, Sulkoff claimed the government was bound by its judicial admission that Dr. Jackson was an employee of the United States.  *Id.* at *5.

32

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

The district court found that the United States' admission that Dr. Jackson was an employee was not a judicial admission, because "[w]hether Dr. Jackson was a federal employee under the FTCA appears to be a question of law." *Id.*(citations omitted).   The court also observed that, "[f]actual admissions can be binding as judicial admissions; admissions of legal conclusions cannot." *Id.*(citations omitted). *See also Dabertin v. HCR Manor Care, Inc.*, 68 F.Supp.2d 998, 1000 (N.D. Ill. 1999)("It is well established that judicial admissions on questions of law have no legal effect.")(citation omitted).

Inasmuch as judicial admissions, which are formally made in pleadings or stipulation by a party or its counsel, cannot extend to legal conclusions, it follows that evidentiary admissions, which are not made in the course of the litigation itself, also cannot bind a party on a question of law.   Simply stated, the subjective beliefs of some U.S. Attorney's Office officials that the CVRA applied to petitioners does not make it so.

Whether any of the rights in 18 U.S.C. § 3771(a) applied to petitioners is a question of law, to be decided by this Court.    Under petitioners' argument, the pre-litigation position taken by the U.S. Attorney's Office should be binding.   Of course, if the same e-mails and letters expressed the view that 18 U.S.C. § 3771(a) did not apply until a formal charge was filed, the government doubts petitioners would be withdrawing their motion.   If petitioners' argument is correct, then the resolution of whether rights accorded in § 3771(a) apply would depend upon the position asserted by the government, prior to the litigation.   Court decisions would be based upon what position the DOJ took prior to the inception of the litigation, what could lead to conflicting decisions, based not upon statutory interpretation, but the pre-litigation position taken by the Government.   Simply stated, the positions taken by the government in the e-mails and

33

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

letters are irrelevant to the resolution of the legal question of whether § 3771(a) applies prior to the filing of a formal charge.

V.     CONSIDERING EACH OF THE CVRA RIGHTS SEPARATELY, THERE
       <u>WAS NO CVRA VIOLATION</u>

As set forth above, the CVRA did not apply because the U.S. Attorney's Office ultimately exercised its discretion to defer prosecution in favor of prosecution by the State of Florida. Nonetheless, during its investigation, the agents and AUSA, in compliance with the Justice Department's guidelines on working with victims and witnesses, went above and beyond the legal minimum requirements and provided information and assistance prior to the decision to decline prosecution and even afterwards. Those guidelines encourage Justice Department employees to do more than the legal minimum when possible and to treat victims and witnesses with courtesy and respect. In doing so, the Court will see that, even if the CVRA had applied, there was compliance.

1.     <u>The right to be reasonably protected from the accused</u>

The first CVRA right is to be "reasonably protected from the accused." 18 U.S.C. § 3771(a)(1). As explained in *Rubin*, some victims have fastened "on this first enumerated right as a wellhead of boundless authority to fashion protection for victims in the guise of 'protecting them from the accused.' . . . Simply put, the 'accused' must be accused by the government, not just be someone complaining to the government that they have been the victim of a crime. The CVRA cannot realistically be read to create upon mere citizen complaint a self effectuating right to protection from the one accused, regardless of its impact on resources, any pending investigation or prosecutorial discretion." *Rubin*, 558 F. Supp. 2d at 420. Thus, according to the

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

statute's language, this first right only applies following a formal charge filed via a Criminal

Complaint or Indictment.[17]   Nonetheless, it is undisputed that Petitioners were given letters in

approximately June 2007 [Jane Doe #1] and August 2006 [Jane Doe #2] wherein they were

advised of this right and given the phone numbers of AUSA Villafaña, FBI Special Agent

Kuyrkendall, and the Justice Department's Office for Victims of Crime.  The letters specifically

advised that if the Petitioners felt that they were "being threatened or harassed, then please

contact Special Agent Kuyrkendall or [AUSA Villafaña].  (*See* DE14, Exs. 1 and 2.)

It is further undisputed that Jane Doe #1 actually took advantage of the offer of protection

when Epstein's counsel began harassing her to take her deposition.  Although not required to do

so, the AUSA and agents handling the investigation went above and beyond the minimum

required by law and secured legal representation for Jane Doe #1 in connection with that

deposition.  (*See* DE14 ¶ 9.)

      2.    <u>The right to notice of any public court proceeding, or release of the accused</u>

Again, by definition, a "public court proceeding" requires the existence of a federal case.

Nonetheless, it is undisputed that the Petitioners were advised, through counsel, of the *state* court

proceeding by the AUSA who conducted the federal investigation, so that the Petitioners, or their

counsel, could attend if they desired and could address the Court, either in person or via letters to

---

[17] The Victims Rights and Restitution Act (VRRA), 42 U.S.C. § 10607(c)(2), provides for a crime victim to have "reasonable protection from a suspected offender and persons acting in concert with or at the behest of the suspected offender."  Congress's use of the term "suspected offender" in the VRRA, and "the accused" in section 3771(a)(1) of the CVRA, demonstrates the intent to have the right to reasonable protection attach at different times, depending on which statute applies.   The right to reasonable protection, from a suspected offender, applies prior to the lodging of formal criminal charges.  In contrast, "the right to be reasonably protected from the accused," arises only when there is an "accused," which occurs when formal charges are filed.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

the judge.  They elected not to do so.[18]

Although not required to do so, the AUSA who conducted the federal investigation also attempted to keep the victims apprised of Epstein's release.  These attempts were met with resistance from Epstein's counsel, who took the position that the CVRA required no such notification and were evidence of overreaching by the AUSA conducting the investigation.  Nonetheless, the AUSA and agents attempted to go above and beyond on behalf of these victims.  A request was made to the Palm Beach County Sheriff's Office ("PBSO") that it notify the U.S. Attorney's Office of Epstein's release so that further release notification could be made, but PBSO did not honor that request.

     3.     <u>The right not to be excluded from public court proceeding</u>

There is no dispute that the Petitioners have never been excluded from a public court proceeding.

     4.     <u>The right to be reasonably heard at a public proceeding in the district court</u>

There was no proceeding in the District Court, and there is no allegation that Petitioners were ever kept from being heard at a public proceeding in the District Court.[19]

---

[18]In the "statement of undisputed fact," Petitioners suggest that, during negotiations for a possible plea to a federal charge, discussions of "avoiding the press" and handling the case in Miami were done so that the victims would not be informed of the case.  This is directly contradicted by the fact that, as shown, there was no obligation to inform the victims of the state court plea but, instead, the AUSA and agents who handled the federal investigation worked to contact the identified federal victims to personally inform them of the state court hearing so that they could attend.  Instead, as will be explained, *infra*, as part of the duty to respect the victims' privacy, the AUSA and agents sought a venue where the victims could participate in the process without fearing exposure of their identities due to excess press coverage.

[19]While this is not in dispute, it is worth noting, that "[i]t is, perhaps, with this enumerated CVRA right, though that it is most important to underline what the CVRA does not empower victims to do.  The right does not give the victims of crime veto power over any

36

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

5.      The reasonable right to confer with the government in the case

Again, the use of the words "in the case," as opposed to "in the investigation" or

otherwise, by definition requires that a *case* – i.e., a filed federal criminal charging instrument –

exist.  Thus, because no federal criminal case was ever filed against Epstein, this statutory right

to confer never ripened.

Nonetheless, AUSA Villafaña and the agents who conducted the federal investigation

went above and beyond the minimum statutory requirements.  For example, it is undisputed that:

(1) Petitioners were both advised of their right to consult with AUSA Villafaña in August 2006

and June 2007 and were given her telephone number; (2) Petitioners both met with AUSA

Villafaña and the agents before the NPA was signed in the context of witness interviews; (3)

neither of them contacted AUSA Villafaña prior to the NPA being signed to discuss plea

negotiations or asked to be consulted regarding a plea;[20] (4) there was never a time when

Petitioners asked to consult with AUSA Villafaña when she refused to meet with Petitioners; (5)

when counsel for Petitioners contacted AUSA Villafaña to ask her to consider certain evidence,

she encouraged counsel to send the evidence to her to review; and (6) at the time the Petitioners

became interested in seeing Epstein prosecuted in January 2008, he had already signed the NPA.

Thus, by the time the Petitioners were interested in urging individuals at the U.S. Attorney's

Office to seek harsher punishment for Epstein, the decision to decline prosecution in favor of the

state's prosecution had already been made.

---

prosecutorial decision, strategy or tactic regarding bail, release, plea, sentencing or parole."
*Rubin*, 558 F. Supp. 2d at 424 (citation omitted).

[20]As is discussed in the Response to DE49, Jane Doe #2's position at the time of her
interview was that Epstein should not be prosecuted.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

6.      The right to full and timely restitution as provided in law

With respect to restitution, the "CVRA does not grant victims any rights against individuals who have not been convicted of a crime.  Concomitantly, neither the Government nor the sentencing court are restricted by the CVRA from effecting reasonable settlement or restitution measures against *nonconvicted* defendants."  *In re W.R. Huff Asset Mgt. Co., LLC*, 409 F.3d 555, 564 (2d Cir. 2005) (emphasis added).  In *W.R. Huff*, petitioners filed two writs of mandamus seeking to vacate settlement agreements of forfeiture actions between the United States and members of the Rigas family.  Two members of the Rigas family were convicted of securities fraud.  A third was acquitted.  Adelphia Communications Corporation (a company founded by the Rigas family) entered into a *non-prosecution agreement* with the Government, pursuant to which it paid the Government $715 million  for a Victim Compensation Fund.  The Rigas family members signed a proposed Settlement Agreement with the government consenting to forfeitures.  As part of the Settlement Agreement, any victim who agreed to receive restitution from the Victim Compensation Fund had to agree to a release of all civil and other claims, including claims in bankruptcy court, against the Rigas family, Adelphia, and other conspirators. The district court approved the Settlement Agreement over the objection of the victims and the victims filed the petitions for mandamus.

On appeal, the Second Circuit disagreed with the victims:

To the extent that the Government recognizes that victims would have difficulty in effecting any recoveries from the Rigas family members because of difficulties in proof of culpability and because of security interests affecting the family's assets, petitioners cannot meet their burden in showing that the Government or the district court acted unreasonably in entering the Settlement Agreement or approving it.  Additionally, the district court in no way treated the victims unfairly or without "respect for [their] dignity and privacy," 18 U.S.C. § 3771(a)(8), but

38

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

rather took into consideration the numerosity of victims, the uncertainty of recovery, and the prospect of unduly prolonging the sentencing proceedings when adopting the settlement, factors which Congress has required the court to consider.  *See* 18 U.S.C. § 3771(d)(2).

*W.R. Huff*, 409 F.3d at 564.

In this instance, as in *W.R. Huff*, there was an un-convicted defendant, Epstein.  Unlike in *W.R. Huff*, here Epstein was the *only* defendant.  Nonetheless, the AUSA who investigated Epstein developed a procedure to provide for restitution, despite the fact that the "CVRA does not grant victims any rights against individuals who have not been convicted of a crime."  *Id.* That procedure not only provided for funds and attorney representation, it also provided for privacy and discretion, again to protect the victims' dignity.  (*See* discussion, *infra*.)

      7.     <u>The right to proceedings free from unreasonable delay</u>

The use of the term "proceedings" again refers to a federal court proceeding.  Accordingly, Petitioners have not alleged a violation of this right.  Nonetheless, Petitioners do complain about the delay in notification between the time of signing the NPA and the notification of its existence at the time of Epstein's state court plea.  As has been explained at hearings in this matter, the delay stemmed from Epstein's appeal to higher authority within the Department of Justice.  As will be further explained in the response to DE49, one of the bases for Epstein's counsel to appeal to the Department of Justice – which has been explained to Petitioners' counsel – was the inclusion of Jane Doe #2 among the list of identified victims.  The efforts of the AUSA and the agents to treat Jane Doe #2 with respect, despite her own insistence at the time that she was not a victim – resulted in allegations of overreaching and prosecutorial misconduct.  After several levels of review, the Senior Associate Deputy Attorney General concluded that there was

39

no misconduct.

8.   <u>The right to be treated with fairness and with respect for the victim's dignity and privacy</u>

The Petitioners maintain that this right has been violated.  Because there has been no "court proceeding involving an offense against a crime victim [where] the court shall ensure that the crime victim is afforded the rights described in subsection (a)," Petitioners are alleging that the "employees of the Department of Justice . . . [failed to] make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)."  18 U.S.C. §§ 3771(b)(1), (c)(1).  It is undisputed that Jane Does #1 and #2 were notified of this right in August 2006 and June 2007.  (DE14 Exs. 1 and 2.)  Thus the allegation is that best efforts weren't used to accord them these rights.  Since this right is the only one that does not mention the existence of a court proceeding or an accusation, Petitioners are trying to assert through this right everything from the right to be advised of and veto pre-indictment plea negotiations, to a demand that the prosecutor disregard her ethical obligation to treat opposing counsel and the putative defendant politely.

So, for example, Petitioners make numerous allegations regarding efforts to minimize press coverage, for example, "the U.S. Attorney's Office was interested in finding a place to conclude a plea bargain that would effectively keep the victims from learning what was happening through the press."  (DE48 at 7.)  Yet Petitioners admit that they were notified regarding the change of plea in state court.  Petitioners also neglect to mention that numerous other victims were *not* willing to give up their privacy and were very concerned about family members learning that they were even *connected* to the Epstein case, much less that they were

40

victims.  To allow them to participate in court proceedings, while maintaining their dignity and privacy, the AUSA handling the case thought it was, balancing the competing interests of several different girls, best to consider a venue outside of Palm Beach County.

Petitioners also allege that they were not treated with respect when they received letters stating that the case was "still under investigation" after the NPA was signed.  As noted above and in earlier presentations, after the NPA was signed, Epstein's counsel sought higher-level review in the Department of Justice seeking to set aside the NPA.  The U.S. Attorney's Office determined that, if Epstein were not to abide by the terms of the NPA, then it wanted to be prepared to go forward with charges.  Accordingly, the investigation of Epstein had to continue. Thus, the letters sent to Jane Does #1 and #2 were not false.  In fact, as set forth in Petitioners' "Undisputed Facts," on "January 31, 2008, Jane Doe #1 met with FBI Agents and AUSA's from the U.S. Attorney's Office.  She provided additional details of Epstein's sexual abuse of her." (DE48 at 17.)  And, one of Petitioners' counsel's other clients, S.R., was originally interviewed in October 2007 and refused to provide information regarding Epstein.  (DE14 at ¶ 7.)  During the time that Epstein was challenging the NPA, the investigation continued and agents were able to conduct a more thorough interview of S.R. in May 2008, such that she was identified as a victim who could benefit under the NPA.  Thus, the "undisputed facts" themselves show that the investigation was ongoing.

Petitioners also argue that "[a]t all times material to this statement of facts, it would have been practical and feasible for the federal government to inform Jane Doe #1 and Jane Doe #2 of the details of the proposed non-prosecution agreement with Epstein . . ."

First, Jane Doe #1 *was* informed of the details, including the fact that Epstein would not

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

be prosecuted federally, shortly after the NPA was signed.  (*See* DE14 at ¶ 8.)  In Petitioners'

"Undisputed Facts," Petitioners allege that Jane Doe #1 was told that Epstein would enter a

guilty plea to state charges, would register as a sex offender for life, and "he had made certain

concessions related to the payment of damages to the victims, including Jane Doe #1."  (DE48 at

12.)  Despite this, Petitioners suggest that it was "quite reasonable" for Jane Doe #1 to believe

that "Jane Doe #1 also understood her own case was move [*sic*] forward towards possible

prosecution."  (*Id.*)  It was not "quite reasonable" for Jane Doe #1 to believe that Epstein would

pay damages to Jane Doe #1 while still being exposed to criminal penalties for his conduct

towards Jane Doe #1.  While Jane Doe #1 may not have understood this, it was not due to any

misleading behavior by the agents; it was simply a misunderstanding on Jane Doe #1's part.  And

that misunderstanding was not a reasonable one.

        Second, after Jane Doe #1 was notified about the NPA, Epstein's attorneys began their

appeal to the Justice Department.  Hence, there was a situation where there was a signed NPA

that provided, amongst other things, that the victim-witnesses would receive compensation from

Epstein as a result of his resolution of the matter, but there also was a possibility that Epstein

would not perform the NPA.  A determination was made to cease notifications for the simple

reason that, if Epstein did not perform, and there was a trial, on cross-examination of the victim-

witnesses, Epstein would claim that the victims had been told, by the United States, that Epstein

would pay them if he were convicted.  This concern was not an unfounded one.  Epstein's

attorneys actually made these baseless allegations in depositions and other court filings.  (*See,

e.g., Jane Doe v. Jeffrey Epstein, Haley Robson, and Sarah Kellen*, Court File No. 08-80804-Civ-

Marra/Johnson, DE1 at 44-52.)

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Petitioners' allegations provide further examples of why the CVRA contains the caveat that nothing within the statute is meant to "impair the prosecutorial discretion of the Attorney General or any officer under this direction." 18 U.S.C. § 3771(d)(6). Petitioners simply cannot understand how their demands and allegations would have impacted the plan to prosecute Epstein. The AUSA and agents did use their "best efforts" to accord all of the rights to these and all of the identified victims. They also needed to preserve the possibility of prosecuting Epstein should he violate or not perform the NPA.

These Petitioners' interests are adverse to several of the other victims. For example, they neglect to mention that several other victims obtained counseling services during the investigation through the efforts of the AUSA and agents. If the Petitioners succeed in using these "above and beyond" efforts as proof of violations of the CVRA, it will preclude AUSAs and agents from offering such services in the future.

Finally, if Petitioners succeed in convincing the Court to set aside the NPA, all of the victims who obtained counsel and damages paid for by Epstein through the NPA will be adversely affected.

VI.    UNDER ELEVENTH CIRCUIT LAW, ESTOPPEL WILL NOT LIE AGAINST
       THE GOVERNMENT WHEN IT ACTS IN ITS SOVEREIGN CAPACITY

Petitioners argue the government should be estopped from denying that they had right under the CVRA, due to its representations in letters to Jane Doe #1 and Jane Doe #2 that they did have rights under § 3771(a). DE 48 at 33-36.    This argument should be rejected because the government, under Eleventh Circuit law, cannot be estopped when it is acting in its sovereign capacity.

43

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

In *FDIC v. Harrison*, 735 F.2d 408 (11th Cir. 1984), the Eleventh Circuit found that, "[a]ctivities undertaken by the government primarily for the commercial benefit of the government or an individual agency are subject to estoppel while actions involving the exercise of exclusively governmental or sovereign powers are not." *Id.* at 411. In a subsequent case, *United States v. Vondereau*, 837 F.2d 1540 (11th Cir. 1988), the Eleventh Circuit observed:

> This Court has held that for estoppel to apply against the Government (1) the traditional private law elements of estoppel must have been present; (2) the Government must have been acting in its private or proprietary capacity as opposed to its public or sovereign capacity; and (3) the Government's agent must have been acting within the scope of his or her authority.

*Id.* at 1541, *citing FDIC v Harrison*, 735 F.2d at 410.

In this case, the Government was acting in its sovereign capacity when it investigated whether Epstein had committed any federal crimes, and entered into the non-prosecution agreement with Epstein, which was an exercise of its prosecutorial discretion. *Nixon v. United States*, 418 U.S. 683, 693 (1974)("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). Therefore, estoppel will not lie against the Government.

Estoppel will also not lie in this case because this Court's authority is limited by what legal duties are created by section 3771(a). "The proposition that the law alone defines the limits of a court's power to enter a judgment can be traced to this Court's early precedents." *Libretti v. United States*, 116 S.Ct. 356, 371 (1995)(Stevens, J., dissenting). Just as a court's subject matter jurisdiction cannot be conferred by estoppel, *Mickler v. Nimishillen and Tuscarawas Railway Co.*, 13 F.3d 184, 189 (6th Cir. 1993), and *Intercontinental Travel*

44

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

*Marketing, Inc. v. FDIC*, 45 F.3d 1278, 1286 (9th Cir. 1994)("Estoppel may not prevent an objection to subject matter jurisdiction, because such an objection to subject matter jurisdiction may be raised at any time, by any party or the court."), estoppel cannot prevent the Government from contending it owed no duty to petitioners under section 3771(a).   This Court's authority to enter a judgment is based on its determination whether any legal duties were owed to petitioners under section 3771(a) in the absence of a formal charge being filed against Epstein.   The Government cannot be estopped from maintaining that such duties did not exist.

VII.   PETITIONERS' CASE SHOULD BE DISMISSED DUE TO THEIR FAILURE TO PROSECUTE THEIR CASE EXPEDITIOUSLY AS REQUIRED BY THE CVRA

As explained above, at the initial hearing on the Emergency Petition, Petitioners stated that their desired result was the setting aside of the NPA and the prosecution of Epstein.  At the second hearing on the matter, counsel stated that they no longer wanted that remedy and stated that they would inform the Court of their desired remedy upon reviewing the full NPA. However, after reviewing the NPA, no such notification was provided, other than filing a motion to unseal the NPA.  And, although the most recent motion (DE48) contains no demand for a remedy, the clear suggestion is that Petitioners are seeking to set aside the NPA.[21]

Epstein entered his guilty plea to state charges on June 30, 2008.  At the time that Petitioners filed the Emergency Petition on July 7, 2008, Epstein had been imprisoned for seven

---

[21]   *See* Jon Swaine, *Duke of York to Face Fresh Questions as Epstein Case Takes New Twist*, Telegraph (London), Mar. 11, 2011 ("Several women who claim they were sexually abused by Epstein are challenging a plea bargain deal that enabled the billionaire to avoid being tried for offences that carried a possible life sentence.  They say the deal with prosecutors was unlawful because under US law they should have been consulted, and want Epstein's convictions for lesser offences to be set aside so he can face a fresh trial. . . . One lawyer said the plea bargain deal 'stinks to high heaven' . . .")

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

(7) days.  At the time of the first hearing on the matter on July 11th, when the Petitioners made clear that they wanted to invalidate the NPA, Epstein had been imprisoned for eleven (11) days. At that hearing, the Petitioners again stated that they wanted to invalidate the NPA, even though Epstein had entered his state court guilty plea in reliance on the NPA.  (DE15 at 20-21.)  The Court asked Petitioners about whether the Court needed to rule on the Emergency Petition quickly, and the Petitioners said that the Court did not need to do so.  (*Id.* at 26.)

Briefing on the "Emergency Petition" was completed by August 1st, and the second hearing on the Petition was completed on August 14, 2008, wherein the Petitioners admitted that the Court had a sufficient record and did not need to take any additional evidence in the matter. (DE19; DE27 at 4-5.)  By this point, Epstein had served 49 days of his 18-month term of imprisonment.

Thereafter, other than Petitioners' motion to unseal the NPA, there was no further action on the matter until the Court's Order to administratively close the case.  Epstein was released from prison in July 2009 and his term of probation ended in July 2010.[22]

The CVRA's drafters understood that victims' rights of access needed to be balanced against defendants' rights to Due Process.  Unlike victims' rights, which are only statutory constructs, defendants' rights are guaranteed in the Constitution.  Accordingly, the CVRA contains strict time constraints.  First, a "district court shall take up and decide any motion

_____

[22]To be clear, the delay from October 28, 2010 through early March 2011 was due to the United States' efforts to reach amicable resolution of the case and the need to obtain an opinion from the Justice Department as set forth in the Status Report filed by the United States.  (DE45.) That additional delay is irrelevant to the analysis under the CVRA and the Due Process clause.

46

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

asserting a victim's right forthwith."  18 U.S.C. § 3771(d)(3).[23]  Second, if the district court

denies the victim's motion, the victim may petition the court of appeal for a writ of mandamus

and the "court of appeals shall take up and decide such application forthwith within 72 hours

after the petition has been filed."  *Id.*  Third, in "no event shall proceedings be stayed or subject

to a continuance of more than five days for purposes of enforcing this chapter."  *Id.*  Fourth, the

CVRA specifies that "[i]n no case shall failure to afford a right under this chapter provide

grounds for a new trial.  A victim may make a motion to re-open a plea or sentence only if . . .

(B) the victim petitions the court of appeals for a writ of mandamus within 14 days . . ."  18

U.S.C. § 3771(d)(5).

The First Circuit addressed how the conflict between the rights of victims and defendants

is exacerbated by the passage of time in *United States v. Aguirre-Gonzalez*, 597 F.3d 46 (1st Cir.

2010).  In *Aguirre-Gonzalez*, a group of victims appealed an order of restitution, asserting that

they were improperly excluded from the restitution award.  However, rather than seeking a writ

of mandamus under the expedited procedure in the CVRA, the victims filed a "regular" appeal.

The Court of Appeals began by deciding that "crime victims are not parties to a criminal

sentencing proceeding [and] the baseline rule is that crime victims, as non-parties, may not

[directly] appeal a defendant's criminal sentence;" *id.* at 53 (extensive citations omitted); thus,

crime victims are limited to proceeding via mandamus.  *Id.* at 54-55.

Next, the First Circuit considered whether it could convert the crime victims' direct

appeal into a petition for writ of mandamus.  Although the parties agreed that the court had the

---

[23]The Federal Rules Committee interpreted this as: "The court must promptly decide any
motion asserting a victim's rights described in these rules."  Fed. R. Crim. P. 60(b)(1).

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

authority to do so, the First Circuit declined because of its effect on the Due Process rights of the

defendant:

> The CVRA plainly envisions that crime victims' petitions challenging a denial of
> their rights will be taken up and decided in short order.  It requires expeditious
> consideration by the district court, quick appellate review, and provides that a
> victim may not move to disturb a defendant's plea or sentence unless, among
> other things, "the victim petitions the court of appeals for a writ of mandamus
> within 14 days" of the denial of the victim's motion in the district court.  18
> U.S.C. §§ 37771(d)(3), 3771(d)(5).  We are mindful that the federal restitution
> statutes are intended to protect victims, not defendants.  *See, e.g., United States v.
> Rostoff*, 164 F.3d 63, 66 (1st Cir. 1999) (applying VWPA).  However, the
> criminal justice system also has a strong interest in the finality of criminal
> sentences.  *Olsen v. Correiro*, 189 F.3d 52, 69 (1st Cir. 1999) (noting society's
> "interest in the integrity of the system of compromise resolution of criminal
> charges"); *see Blackledge v. Allison*, 431 U.S. 63, 71 (1977) ("The guilty plea and
> the often concomitant plea bargain are important components of this country's
> criminal justice system . . . The advantages can be secured, however, only if
> dispotision by guilty plea are accorded a great measure of finality."); *see also
> Teague v. Lane*, 489 U.S. 288, 309 (1989) ("The principle of finality . . . is
> essential to the operation of our criminal justice system.") These finality concerns
> animate the CVRA's procedural mechanisms.

> The CVRA was in force when appellants elected to pursue a direct appeal rather
> than petition for the writ as provided by statute and more than two years have
> passed since the district court sentenced Aguirre.  Under these circumstances, we
> conclude that appellants would not be entitled to mandamus relief . . .

*Id.* at 55-56 (brackets in original removed).

In this case, the CVRA was in force when Petitioners elected to tell the Court that there

was no longer any "Emergency."  It was in effect during the second hearing when Petitioners

announced that they were no longer seeking to have the NPA set aside, but, instead, would

review the NPA and then advise the Court of the remedy they were seeking.  It was in effect

throughout the years thereafter when there was no activity on the case.  Petitioners' counsel is

well acquainted with the CVRA and Rule 60, as he is credited with being the source of the initial

48

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

draft of Rule 60. *See* 153 Cong. Rec. S8742, S8746 (June 29, 2007) ("Federal district court judge Paul Cassell initiated the process [of incorporating the CVRA into the Federal Rules] by recommending rule changes to the Advisory Committee on Criminal Rules.")  And Petitioners were also well aware that Epstein was serving his prison sentence for his state court guilty plea, as administered by the Palm Beach County Sheriff's Office, in accordance with the terms of the NPA.

Against this backdrop, the Petitioners elected to focus on exercising their right to collect damages from Epstein, and filed civil suits against him.  Through those civil suits, they had the opportunity to have a public trial where they could have held him publicly accountable for the harms they alleged he caused them.  Instead, they chose to enter into confidential settlement agreements with him.  Only after those confidential settlement agreements were signed, and after Epstein completed his term of imprisonment and his term of community control, did the Court file its administrative order closing the case, which prompted Petitioners to file their notice that they intended to continue litigating this claim.

Petitioners bear the burden of proof as to all stages of their claim, that is, (1) that there is a justiciable case or controversy; (2) that there was any violation of the CVRA in this case where no federal charges were ever filed; and (3) that there is still a remedy available for the harm that was alleged to have occurred and that Petitioners are entitled to that remedy despite their failure to proceed promptly.  The remedy that is sought is an equitable one, because the CVRA clearly states that no claim for damages is allowed, *see* 18 U.S.C. § 3771(d)(6), and that remedy will impact a non-party to this suit – Epstein.  In deciding whether the Petitioners have shown that they are entitled to the remedy that they at one time disavowed – setting aside the NPA – the

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

Court should consider a comment from Washington Supreme Court Justice James M. Dolliver: "[E]mphasizing the conflict between the victim and the accused and placing the victim in the role of a quasi-prosecutor or co-counsel . . . represents a dangerous return to the private blood feud mentality." Dolliver, James, "Victims' Rights Constitutional Amendment: A Bad Idea Whose Time Should Not Come," 34 Wayne L. Rev. 87, 90 (1987) (quoted in Levine, Danielle, "Public Wrongs and Private Rights: Limiting the Victim's Role in a System of Public Prosecution," 104 Nw. U. L. Rev. 335, 353 (2010)).

Everyone who has encountered the Epstein case has an opinion regarding the NPA, the state court plea, the sentence imposed, and the way the sentence was served. If the civil settlement agreements were made public, people would doubtless have differences of opinion on those, as well. Nonetheless, the facts remain that Epstein entered his state court guilty plea in reliance on the NPA and he served his sentence. The Petitioners knew these facts and could have sought expedited review of their claim. They elected not to do so. As in *Aguirre*, the Petitioners' election not to seek expedited resolution should not be used to violate a criminal defendant's Due Process rights.

### VIII.   PETITIONERS LACK STANDING TO SEEK RELIEF UNDER SECTION 3771(d)(3)

Based on the foregoing, it is apparent that petitioners have no enforceable rights under section 3371(a) because no charges were filed in the district court.   Petitioners invoked section 3771(d)(3) in seeking relief, but they lack standing to seek such relief since the rights provided in section 3771(a) have not attached.   In *Baloco v. Drummond Company, Inc.*, 631 F.3d 1350 (11th Cir. 2011), the Eleventh Circuit observed that the Supreme Court discussed the standing inquiry

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

as asking two questions, whether Article III standing exists, and whether the statute at issue

grants the purported plaintiff a means to seek relief under the applicable statute. *Id.* at 1355.

Respondents believe petitioners cannot seek relief under section 3771(d)(3) because they

cannot establish that the rights enumerated in section 3771(a) attached, in the absence of a formal

charge being filed.   Consequently, petitioners lack standing.

IX.    PETITIONERS' MOTION FOR ENFORCEMENT, AND REQUEST FOR
       HEARING, SHOULD BE DENIED

The statutory text, legislative history, and case authority support the view that the right to

confer enumerated in section 3771(a)(5) does not attach until a formal charge is filed in the

district court.    Therefore, petitioners' motion for enforcement should be denied.

The remedy petitioners seek is to have this Court set aside the non-prosecution

agreement.  DE 48 at 36-40.  Assuming arguendo that the Court finds the right to confer did arise

in the absence of a formal charge being filed, respondents respectfully submit the Court would

lack the authority to set aside the non-prosecution agreement.    As stated previously, a non-

prosecution agreement, unlike a plea agreement, is not subject to judicial pre-approval.   It is an

exercise of prosecutorial discretion that is "largely unreviewable."

Inasmuch as a non-prosecution agreement would not normally come before the Court for

judicial scrutiny and approval, it should not come before the Court in the guise of a motion to

enforce the CVRA.   This would be contrary to section 3771(d)(6)'s clear intention that nothing

in the CVRA should be construed to impair the prosecutorial discretion of the Attorney General.

Petitioners contend that a violation of a right must have a remedy.  However, this is not

always the case.   Indeed, courts have recognized that a controversy is moot if effective relief

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

cannot be granted.  *Continental Casualty Co. v. Fibreboard Corp.*, 4 F.3d 777, 778 (9th Cir. 1993).  The non-prosecution agreement in this case was signed in 2007, and Epstein entered his pleas of guilty in July 2008, in Florida circuit court.    He was sentenced by the state court, and has served his sentence.    Individuals who were sexually abused by Epstein have filed civil actions against him, relying upon certain provisions of the non-prosecution agreement.

Any failure to confer under section 3771(a)(5) does not render the non-prosecution agreement illegal, as petitioners suggest.    A plea agreement that was entered into by the government without having conferred with a victim can be disapproved by the district court, since all plea agreements are subject to judicial scrutiny and approval.    A non-prosecution agreement is an exercise of prosecutorial discretion, not subject to judicial pre-approval.   While petitioners may assail the government's exercise of its discretion in this case, the exercise of that discretion is not subject to judicial review, either independent of a CVRA motion, or in conjunction with such a motion.

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

<u>CONCLUSION</u>

Petitioners' motion for finding of violations of the Crime Victim Rights Act and request

for a hearing on appropriate remedies should be denied.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:      s/ Dexter A.  Lee
DEXTER A.  LEE
Assistant U.S. Attorney
Fla.  Bar No.  0936693
99 N.E. 4th Street
Miami, Florida   33132
(305) 961-9320
Fax:  (305) 530-7139
E-mail:  dexter.lee@usdoj.gov

Attorney for Respondent

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 7, 2011, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.


  s/ Dexter A.  Lee
DEXTER A.  LEE
Assistant U.S. Attorney

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON

<u>SERVICE LIST</u>

Jane Does 1 and 2 v.  United States,
Case No.  08-80736-CIV-MARRA/JOHNSON
United States District Court, Southern District of Florida


Bradley J. Edwards, Esq.,
Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820
Fax:  (954) 524-2822
E-mail: brad@pathtojustice.com

Paul G. Cassell
S.J. Quinney College of Law at the
University of Utah
332 S. 1400 E.
Salt Lake City, Utah 84112
(801) 585-5202
Fax: (801) 585-6833
E-mail: casselp@law.utah.edu

Attorneys for Jane Doe # 1 and Jane Doe # 2

Respondent's Exhibit A
Case No. 08-80736-CIV-MARRA/JOHNSON