UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 08-80736-CIV-MARRA/JOHNSON

JANE DOE 1 and JANE DOE 2,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

_____/

**EXHIBIT A**

### Intervenor Jeffrey Epstein's Motion For a Protective Order And Opposition to Motions of Jane Doe 1 And Jane Doe 2 For Production, Use, And Disclosure Of Plea Negotiations

Pursuant to Federal Rules of Evidence 410 and 501, Federal Rule of Criminal Procedure 11, and the Constitutional right to effective assistance of counsel, Jeffrey Epstein opposes the motion of Jane Doe 1 and Jane Doe 2 for disclosure of all the plea negotiation letters and emails between his lawyers and federal prosecutors during the criminal investigation [DE 50 at 5]. Mr. Epstein also opposes the motion of Jane Doe 1 and Jane Doe 2 to use these plea negotiations as substantive evidence in their quest to invalidate the Non-Prosecution Agreement [DE 51], as well as their motion to disseminate the plea negotiations to the media [DE 51 at 7].

Established case law as well as sound and substantial policy considerations prohibit disclosure of the letters and emails prepared by Mr. Epstein's lawyers during plea negotiations with the government, and require that the letters and emails that Jane Doe 1 and Jane Doe 2 already have remain confidential. Mr. Epstein adopts all the arguments advanced by proposed intervenors Black, Weinberg, and Lefkowitz in their motion to intervene and attached motion for a protective order [DE 56], as well as during the August 12, 2011 hearing.

In further support of his position, Mr. Epstein submits this motion and memorandum of law. Part I shows that the Court should deny disclosure and use of the plea negotiations by simple reference to Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f), without having to reach the other issues raised by the parties and the proposed intervenors. This is because during the hearing on August 12, 2011, Jane Doe 1 and Jane Doe 2 admitted that they intend to use the plea negotiation letters and emails as substantive evidence at a "remedies hearing" where they will seek invalidation of Mr. Epstein's Non-Prosecution Agreement. Using this correspondence as evidence against Mr. Epstein is plainly prohibited by Evidence Rule 410 and Criminal Rule 11.

Part II of this memorandum shows that Jane Doe 1 and Jane Doe 2 are not entitled to discovery or use of the plea negotiations not only because of the reach of Rules 410 and 11, but also because plea negotiations enjoy an evidentiary privilege as recognized by the Supreme Court in *United States v. Mezzanatto,* 513 U.S. 196, 204 (1995) ("Rules 410 and 11(e)(6) 'creat[e], in effect, a privilege of the defendant,' and, like other evidentiary privileges, this one may be waived or varied at the defendant's request"). Additionally, because plea negotiations are "rooted in the imperative need for confidence and trust," and because their confidentiality serves significant public and private ends, they are properly subject to a common law privilege under Federal Rule of Evidence 501. Similar privileges, which are "rooted in the imperative need for confidence and trust" and which serve significant public and private ends, have been recognized by Judge Marcus in the case of *In Re Air Crash Near Cali, Colombia*, 959 F. Supp. 1529 (S.D. Fla. 1997); by Chief Judge Vinson of the Northern District of Florida in *Reichhold Chemicals, Inc. v. Textron, Inc.*, 157 F.R.D. 522 (N.D. Fla. 1994); and by a number of district courts recognizing a mediation privilege which shields from disclosure and use mediation documents, letters, and communications.

Finally, in response to the Court's question during the August 12, 2011 hearing, Part III establishes that Mr. Epstein has standing under Federal Rule of Criminal Procedure 6(e) to object to disclosure of matters occurring before the grand jury.

**PART I**

**A.**

**PLEA NEGOTIATIONS MAY NOT BE USED AGAINST MR. EPSTEIN
UNDER THE PLAIN LANGUAGE OF THE FEDERAL RULES**

The Court should deny disclosure and use of the plea negotiations by simple reference to Rule of Evidence 410 and Rule of Criminal Procedure 11(f), without having to reach the other issues raised by the parties and the proposed intervenors. During the August 12, 2011 hearing, the plaintiffs admitted that they seek the defense letters and emails to offer them as evidence to support their request that the Court invalidate Mr. Epstein's Non-Prosecution Agreement. According to the plaintiffs, the plea negotiations will show that Mr. Epstein supposedly "engineered" and "orchestrated" the claimed Crime Victims' Rights Acts violations and that therefore the plaintiffs are entitled to negate Mr. Epstein's interest in the protections and finality of the Non-Prosecution Agreement. [August 12, 2011 Trans. at 33-34, 61, 107-09].

The letters and emails exchanged between the government and defense counsel during plea negotiations are classic settlement discussions, written with the intention that they remain confidential. As such, they are protected by the constitutional right to effective assistance of counsel and the express language of Rule 410 and Federal Rule of Criminal Procedure 11(f). FED. R. EVID. 410 (discussions made during plea negotiations are "not, in any civil or criminal proceeding, admissible against the defendant who . . . was a participant in the plea discussions"); FED. R. CRIM. P. 11(f) ("the admissibility or inadmissibility of . . . a plea discussion and any related statement is

3

governed by Federal Rule of Evidence 410").

Obviously, the plaintiffs intend to use the plea negotiation letters "against" Mr. Epstein. They protested during the August 12 hearing that the letters would be offered "against the government" and "not against Mr. Epstein," but this is disingenuous given their emphatic and categorical representations to the contrary. [Compare Trans. at 29-30 with Trans. at 33-34, 61, 107-09]. The plaintiffs' arguments and accusations throughout this litigation, including the various conspiracy allegations leveled against Mr. Epstein during the August 12 hearing, establish that the plaintiffs' true purpose is to use the plea negotiations against Mr. Epstein in the current proceeding.

The prohibition on admission of plea negotiation communications clearly extends to the current proceeding, whether it is denominated a quasi-criminal or a civil proceeding. The committee notes to former Rule 11(e)(6), which read almost identical to Rule 410, specifically state that the words "*not . . . admissible against the defendant*" refer to "***the purpose*** for which [the evidence] is offered" and not "to the kind of proceeding in which the evidence is offered." FED. R. CRIM. PRO. 11 advisory committee note 1979 amendment (emphasis added). Rule 11 was amended in 1979 specifically to avoid confusion or misunderstanding regarding this phrase, and to emphasize that "against the defendant" means "the purpose" for which the evidence is being used:

> The phrase "in any civil or criminal proceeding" has been moved from its present position, following the word "against," for purposes of clarity. An ambiguity presently exists because the word "against" may be read as referring either to the kind of proceeding in which the evidence is offered or ***the purpose for which is offered***. The change makes it clear that the latter construction is correct.

*Committee on Rules of Practice And Procedure of The Judicial Conference of The United States, Standing Committee On Rules of Practice And Procedure*, 77 F.R.D. 507, 538 (February 1978) (emphasis added).

Even though the plaintiffs claim that they would technically offer the plea negotiation letters against the government because the government is its opponent, their real and express purpose is to offer the plea negotiations against Mr. Epstein to prove his supposed culpability in encouraging the government to breach what the plaintiffs contend is their statutory right to consultation, and to then seek the unprecedented and unconstitutional remedy of invalidation of the Non-Prosecution Agreement despite the fact that Mr. Epstein has already suffered all of its penal and adverse collateral consequences: jail, community custody, payment of substantial legal fees to an attorney representative for his accusers, payment of substantial civil settlements driven by waivers negotiated by the government to facilitate its witnesses bringing successful civil lawsuits, and registration requirements.

Rules 410 and 11 plainly prohibit admission of the plea communications.

**B.**
**BECAUSE PLEA NEGOTIATIONS ARE INADMISSIBLE, THE PLAINTIFFS BEAR THE BURDEN OF PARTICULARIZING A PROPER BASIS FOR DISCOVERY**

When a discovery request seeks "information subject to exclusion under the Federal Rules of Evidence, *such as settlement information,* . . . many courts shift the burden to the requesting party, requiring them to make a particularized showing that the inadmissible evidence is likely to lead to admissible evidence." *Reist v. Source Interlink Co.*, 2010 WL 4940096 at *2 (M.D. Fla. Nov. 29, 2010); *Bottaro v. Hatton Assocs.*, 96 F.R.D. 158, 159-60 (E.D.N.Y. 1982) ("the object of the inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue"). Such a burden-shifting analysis is particularly important where the discovery is protected by a rule of inadmissibility, where the plaintiffs have not identified any principled basis for discovery other than to seek to admit the plea communications in evidence, and where the

policies behind the rule of inadmissibility would be compromised by any disclosure, regardless of whether the communications are later excluded as evidence in proceedings in this case.

The plaintiffs in *Bottaro* sued a number of defendants for securities fraud.  One defendant settled and was dismissed from the lawsuit.  The remaining defendants later moved to compel disclosure of the settlement agreement. In denying the motion to compel, the Court recognized the strong public policy favoring settlements, and the need to encourage settlements by ensuring against "unnecessary intrusion" into "the bargaining table." *Id.* at 160.  For this reason, the Court held, parties seeking discovery of inadmissible settlement negotiations must first make a "particularized showing of a likelihood that admissible evidence will be generated" by their discovery request:

> Given the strong public policy of favoring settlements and the congressional intent to further that policy by insulating the bargaining table from unnecessary intrusions, we think the better rule is to require some particularized showing of a likelihood that admissible evidence will be generated by the dissemination of the terms of a settlement agreement. Since the terms of settlement do not appear to be reasonably calculated to lead to discovery of admissible evidence and the defendants have not made any showing to the contrary, this justification for [discovery] must fail.

*Id.; accord Reist*, 2010 WL 4940096 at *2  (recognizing the "chilling effect" that discovery can have on the willingness of parties to enter into settlement negotiations).

Other than their conclusory statement during the August 12 hearing that the plea negotiations would be used against the government and not Mr. Epstein, the plaintiffs have not made any particularized showing to convince this Court that any admissible evidence would result from their discovery of the plea negotiations.  Accordingly, their request for discovery of clearly inadmissible evidence should be denied.

**C.**

**THE PLEA NEGOTIATIONS ARE IRRELEVANT BECAUSE THE PLAINTIFFS ARE NOT ENTITLED TO INVALIDATE THE NON-PROSECUTION AGREEMENT**

Additionally, the purpose for which the plaintiffs seek the plea negotiation letters – to set aside the Non-Prosecution Agreement – is a remedy that, if granted, would violate the Constitution and the statutory rights of *both* the government and Mr. Epstein. It would also be extraordinarily inequitable given that while the plaintiffs failed to urge that this Court resolve their Complaint as an exigent or emergency matter, Mr. Epstein served the entirety of a prison sentence that resulted from obligations imposed upon him by the Non-Prosecution Agreement. He also served the entire community control consecutive sentence, and pursuant to the Non-Prosecution Agreement, he made payments of huge sums of money to the attorney representative of certain claimants. Finally, Mr. Epstein settled cases because of waivers within the Non-Prosecution Agreement.

Under the Crime Victims' Rights Act, neither Jane Doe 1 nor Jane Doe 2 can invalidate the Non-Prosecution Agreement. The Act expressly prohibits it: "Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6).

The Act codifies the long-standing principle that "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). This is due in large part to the separation of powers doctrine. *Id.*; U.S. CONST. art. II, § 3. Whether to investigate possible criminal conduct, grant immunity, negotiate a plea, or dismiss charges, are all central to the prosecutor's executive function. *United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000). "The judiciary cannot interfere with a prosecutor's charging discretion, except in narrow circumstances where it is necessary to do so in order to

7

discharge the judicial function of interpreting the Constitution." *Id.* And this Court has not been called upon to interpret the Constitution.

Even in the case of *In re Dean*, 527 F.3d 391 (5th Cir. 2008), upon which the plaintiffs rely, the district court, after remand from the Fifth Circuit, *denied* the motion of the victims to invalidate the defendant's plea agreement as a remedy for the claimed violation of the Crime Victims' Rights Act. The court found that "[t]he purpose of the conferral right is not to give the victims a right to approve or disapprove a proposed plea in advance or to participate in plea negotiations." *In re Dean* on remand as *United States v. BP Products North America, Inc.*, 610 F. Supp. 2d 655, 727 (S.D. Tex. 2009). Instead, "[t]he purpose of the reasonable right to confer is for victims to provide information to the government, obtain information from the government, and to form and express their views to the government and court." *Id.* The district court concluded that the violations alleged by the victims did not provide a basis for rejecting the plea agreement. *Id.* at 726-27; *see In re Acker*, 596 F.3d 370, 373 (6th Cir. 2010) (denying mandamus where petitioners sought to vacate plea agreement which made no provision for restitution in deference to pending civil litigation); *United States v. Aguirre-Gonzalez*, 597 F.3d 46 (1st Cir. 2010) (relying on the "strong interest in the finality of criminal sentences" to reject mandamus under the Act where a defendant had pleaded guilty and had been sentenced more than two years earlier); *see also United States v. Bedonie*, 413 F.3d 1126, 1129-30 (10th Cir. 2005) (district court had no authority under mandatory restitution act to reopen restitution proceedings after sentencing).

More recently in the case of *In re Peterson*, No. 2:10-CV-298, 2010 WL 5108692 (N.D. Ind. Dec. 8, 2010), the district court denied relief under the Crime Victims' Rights Act before any charges were filed. The court recognized that the Act "guarantees crime victims a range of substantive and

8

participatory rights," but that "[w]hether charges might be filed and proceedings initiated in the future is a matter of prosecutorial discretion, and the [Act] expressly provides that '[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any office under his direction.'" *Id.* at *2 (quoting 18 U.S.C. § 3771(d)(6)).

For these reasons, the Court should deny the motion of Jane Doe 1 and Jane Doe 2 to discover and use the plea negotiation letters as evidence.

## PART II

### MR. EPSTEIN'S PLEA NEGOTIATIONS ARE PRIVILEGED AND NOT DISCOVERABLE UNDER RULE 501

Jane Doe 1 and Jane Doe 2 are also not entitled to discovery or use of the plea negotiations because plea negotiations enjoy an evidentiary privilege, as recognized by the Supreme Court in *United States v. Mezzanatto*, 513 U.S. 196 (1995). Additionally, because plea negotiations are "rooted in the imperative need for confidence and trust," and because their confidentiality serves significant public and private ends, they are properly subject to a common law privilege under Federal Rule of Evidence 501. That Rule provides, in relevant part:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

FED. R. EVID. 501. This Court "has the power to recognize new privileges, consistent with Rule 501 of the Federal Rules of Evidence, in cases arising under federal law." *In Re Air Crash Near Cali, Colombia*, 959 F. Supp. 1529, 1533 (S.D. FL. Feb. 7, 1997).

**A.**
**"Reason and Experience" Are The Touchstones
For Accepting A Common Law Privilege For Plea Negotiations**

*Jaffee v. Redmond,* 518 U.S. 1 (1996), is perhaps the leading case addressing Rule 501 and the common-law principles underlying the recognition of testimonial privileges. The case involved a police officer and the extensive counseling she received after a traumatic incident in which she shot and killed a man. She was sued by the man's estate, which demanded discovery of the notes taken by the clinical social worker who provided therapy. *Id.* at 5-6. The officer and the therapist objected and asserted that their sessions were privileged, but the district court disagreed.

The Seventh Circuit reversed and concluded that "reason and experience," which are "the touchstone for acceptance of a privilege under Federal Rule of Evidence 501," compelled recognition of a privilege between patient and psychotherapist. *Id.* "Reason tells us that psychotherapists and patients share a unique relationship, in which the ability to communicate freely without fear of public disclosure is the key to successful treatment." *Id.* The Seventh Circuit also observed that even though a number of older federal decisions had previously rejected the privilege, things had changed in the intervening years and the "need and demand for counseling" had "skyrocketed during the past several years." *Id.*

The Supreme Court accepted certiorari to resolve a conflict among the Circuits, and affirmed the finding of a privilege. The Court's analysis was grounded "in the light of reason and experience," which showed that a therapist's ability to help a patient "is completely dependent" upon the patient's "willingness and ability to talk freely." *Id.* at 10, quoting Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183, 242 (1972). The Court found that the psychotherapist-patient privilege is "rooted in the imperative need for confidence and trust" and that "the mere possibility

10

of disclosure may impede the development of the confidential relationship necessary for successful treatment." *Id.* at 10.

Following *Jaffee*, three important sets of decisions have recognized privileges under Rule 501 to protect information that is exchanged in an environment that encourages candid disclosures, and that depends on this open exchange of information to promote significant private and public interests.  They are:

> the decision of Judge Marcus, before he was appointed to the Eleventh Circuit, denying discovery and recognizing a privilege for airline pilots who report incidents and violations, *In Re Air Crash Near Cali, Colombia*, 959 F. Supp. 1529 (S.D. Fla. 1997);

> the decision of Judge Vinson, now the Chief Judge in the Northern District of Florida, denying discovery and recognizing a privilege for a corporation that reports contamination and other environmental hazards and violations to the Florida Department of Environmental Regulation, *Reichhold Chemicals, Inc. v. Textron, Inc.*, 157 F.R.D. 522 (N.D. Fla. 1994); and

> a number of district court decisions denying discovery and recognizing a mediation privilege where litigants can "rely on the confidential treatment of everything that transpires during mediation . . . ." *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928 (2d Cir.1979); *Folb v. Motion Picture Ind. Pension & Health Plans,* 16 F. Supp. 2d 1164, 1173 (C.D.Ca. 1998); *Sheldone v. Pennsylvania Turnpike Comm'n,* 104 F. Supp. 2d 511, (W.D. Pa. 2000); *Microsoft Corporation v. Suncrest Enterprise*, 2006 WL 929257 (N.D. Cal. Jan. 6, 2006).

**1.     Judge Marcus and The Common Law Privilege Of Pilots Reporting Incidents And Violations, *In Re Air Crash Near Cali, Colombia*, 959 F. Supp. 1529 (S.D. Fla. 1997)**

*In re Air Crash Near Cali, Colombia* involved the crash of an American Airlines plane as it arrived in Cali just before Christmas, 1995.  The crash killed 159 passengers and crew members. One hundred and thirty lawsuits were consolidated before Judge Marcus, and a steering committee

was created to represent the plaintiffs.  959 F. Supp. at 1530.

During discovery, American Airlines refused to produce a number of responsive documents, asserting that they were privileged because they were prepared pursuant to the American Airlines Safety Action Partnership Program, known as the ASAP program.  The program was an initiative by the FAA, the Allied Pilots Association, and American Airlines. It was a "voluntary pilot self-reporting program designed to encourage pilots to report incidents and violations." *Id.* at 1531. The objectives of the ASAP program were "to identify and to reduce or eliminate possible flight safety concerns, as well as to minimize deviations from Federal Aviation Regulations." *Id*.

Judge Marcus agreed that American Airlines had made "a compelling argument for recognition of a limited common law privilege for the ASAP materials." *Id.* at 1533.  Relying on *Jaffee*, Judge Marcus found that he had the ability "to recognize new privileges, consistent with Rule 501 of the Federal Rules of Evidence, in cases arising under federal law." *Id.*  He addressed the following four factors:

First, the "private interests" involved – "in other words, whether dissemination of the information will chill the 'frank and complete disclosure of facts' shared in an 'atmosphere of confidence and trust.'" *Id.* at 1533. Judge Marcus found that American Airlines, the pilots, and the FAA had an interest in air safety and in encouraging the flow of safety information.  The FAA, as the regulatory body, also had an interest in being made aware of violations.  *Id.* at 1534.

Second, Judge Marcus considered the "public interests" furthered by the proposed privilege and  found that there was a compelling public interest in improving the safety of commercial flights.

Third, the "likely evidentiary benefit that would result from the denial of the privilege." *Id.* Judge Marcus did not find a benefit from denying the privilege.  On the contrary, he agreed that

violations would be "kept secret if the pilots believed that their reports might be used in litigation or otherwise disseminated to the public." *Id.* Judge Marcus also agreed that failure to recognize the privilege would "reduce the willingness of pilots to report incidents" and would "seriously damage and probably terminate a uniquely successful safety program . . . [which] relies on an assumption of strict confidentiality." Id. at 1534. He concluded that "without a privilege, pilots might be hesitant to come forward with candid information about in-flight occurrences, and airlines would be reluctant, if not altogether unwilling, to investigate and document the kind of incidental violations and general flight safety concerns whose disclosure is safeguarded by the ASAP program." *Id.* Finally, Judge Marcus warned that absent a privilege, "the prospect of ASAP reports being used by adverse parties in the course of litigation undoubtedly will affect the content, timeliness and candor of the reports submitted by its pilots." *Id.*

Fourth, whether the privilege had been recognized by the states. *Id.* The Court was not aware of any state or federal court that had recognized the privilege claimed by American Airlines, but that did not dissuade him from finding that a privilege existed.

With all these considerations in mind, Judge Marcus ruled that "[t]here is a genuine risk of a meaningful and irreparable chill from the compelled disclosure of ASAP materials in connection with the pending litigation." *Id.* at 1534. Likewise in Mr. Epstein's case, there is a genuine risk of a meaningful and irreparable chill from the compelled disclosure of plea negotiations in connection with the pending litigation.

Significant private interests support a plea negotiations privilege. It cannot be denied that defendants, prosecutors, the court system, victims, and law enforcement agencies all have a legitimate interest that criminal cases or investigations resolve by pleas. Plea negotiations benefit

defendants by limiting their exposure to jail or other punishment; they benefit all the parties in the system by avoiding the many expenses associated with jury trials; they benefit the court by keeping the flow of its dockets and making judges available to handle matters that are proceeding to trial or that are contested; and they benefit prosecutors and law enforcement not only by freeing their time so that they can focus on contested matters, but also by allowing them to debrief defendants and gather information about criminal activity.

The public interests in criminal cases resolving by way of plea negotiations also cannot be denied. The public has an interest in the finality of plea negotiations, in ensuring that the courts, prosecutors, and law enforcement agencies are available to dedicate their time to contested matters, and in information that may be provided by defendants that will help curb criminal activity in their communities. The public, as well as private victims and government entities, all have an interest in restitution.

There are significant evidentiary consequences if the Court denies a privilege to plea negotiations. As with air safety violations that would be "kept secret if pilots believed their reports might be used in litigation," defendants and people under criminal investigation would not engage in plea negotiations and waive their Fifth Amendment rights if they believed that statements made during those negotiations could be used against them later in litigation with third parties. Candid discussions simply cannot take place if defendants fear that statements made during negotiations can be divulged to third parties in other proceedings and used to harm them, send them to prison, or invalidate their bargains years after they have served prison sentences and suffered all the consequences of their deals. Just as the work-product privilege is created, in part, to encourage lawyers to keep notes without fear of disclosure, a privilege for plea communications is necessary

14

to encourage lawyers to communicate, in writing, without fear that their proposals, submissions, arguments, analysis of the facts, or legal arguments will become the grist of later civil litigation to the potential detriment to the client.

Few if any lawyers would engage in candid and open discussions with a prosecutor if their statements could later be used against their clients. The ethical and constitutional obligations we now have to initiate and engage in plea negotiations would be terribly at odds with any rule that made those negotiations public and admissible in evidence to be used as ammunition to harm our clients.

2.    **Chief Judge Vinson and the Common Law Privilege Of Reporting Environmental Hazards and Violations,** *Reichhold Chemicals, Inc. v. Textron, Inc.,* **157 F.R.D. 522 (N.D. Fla. 1994)**

*Reichhold Chemicals* involved a Consent Order between Reichhold and the Florida Department of Environmental Regulation. The Order obligated Reichhold "to investigate and remediate the contamination of groundwater on and under, and storm water runoff from, an industrial plant site it owns in Pensacola, Florida." 157 F.R.D. 523-24.

Reichhold brought an action against former owners of the plant site, to recover some of the cost of remediating the land. The defendants sought reports that Reichhold had prepared describing possible environmental violations. Reichhold asserted that these documents were protected by "the privilege of self-critical analysis." *Id.* at 524. This privilege, "also known as the self-evaluative privilege," had been adopted in other jurisdictions, but at the time, it presented an issue of first impression to Chief Judge Vinson. He ruled in favor of Reichhold and found that the privilege allows individuals and companies to candidly assess their compliance with legal requirements without creating evidence to be later used against them by their adversaries:

15

> The self-critical analysis privilege has been recognized as a qualified privilege which protects from discovery certain critical self-appraisals. It allows individuals or businesses to candidly assess their compliance with regulatory and legal requirements without creating evidence that may be used against them by their opponents in future litigation. The rationale for the doctrine is that such critical self-evaluation fosters the compelling public interest in observance of the law.

*Id.* at 524. Judge Vinson agreed with Reichhold that the privilege was necessary to protect an organization or individual from the Hobson's choice of either undertaking an aggressive investigation and correcting dangerous conditions, "thereby creating a self-incriminating record that may be evidence of liability," or "deliberately avoiding making a record on the subject (and possibly leaving the public exposed to danger) in order to lessen the risk of civil liability." *Id.*

In recognizing the privilege, Judge Vinson relied on *Bredice v. Doctor's Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), the first case to find a common law self-evaluation privilege. There, the hospital held staff meetings where the professional staff evaluated the treatment provided to patients. In a medical malpractice action, the estate of Bredice sought the minutes of the hospital's staff meetings where Bredice's treatment or death were discussed. The court denied the discovery, noting that "review of the effectiveness and results of treatments were valuable in improving the quality of health care available to the general public," and that "physicians would be unwilling to candidly critique the actions of their colleagues if such evaluations were subject to discovery and use as evidence in a subsequent malpractice action." *Id.* at 525.

**3.     The Common Law Mediation Privilege**

As is true in the case of plea negotiations, it seems self-evident that no system of mediation can function if parties fear that statements made and documents submitted in furtherance of mediation create a trail of incrimination that can later be used against them. "[C]ounsel, of necessity,

16

[would] feel constrained to conduct themselves in a cautious, tight-lipped, noncommittal manner more suitable to poker players in a high-stakes game than adversaries attempting to arrive at a just solution of a civil dispute." *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928 (2d Cir.1979).

*Lake Utopia* involved the Second Circuit's Civil Appeals Management Plan, which called for parties to engage in a conference before oral argument, to hopefully settle their dispute. The Circuit adopted this mediation program to encourage the parties to settle, and to expedite the processing of civil appeals. *Id.* at 929.

Counsel for the parties in *Lake Utopia* met pursuant to the program in an attempt to settle. The appellee later disclosed to the Court certain admissions made during the conference which showed that the appeal was frivolous. Rather than embrace this information, the Court chastised the appellee for disclosing it, holding that the purpose of the conference program was to encourage the parties to settle, and that the program would not function if statements made during the conference were later used against the parties. "It is essential to the proper functioning of the Civil Appeals Management Plan that all matters discussed at these conferences remain confidential. The guarantee of confidentiality permits and encourages counsel to discuss matters in an uninhibited fashion often leading to settlement . . . ." *Id.* at 930.

Ten years later, in *Folb v. Motion Picture Ind. Pension & Health Plans*, 16 F. Supp. 2d 1164, (C.D.Ca. 1998), the district court in California became the first federal court to adopt the mediation privilege as federal common law under Rule 501. Relying on *Lake Utopia Paper* as well as a number of other decisions addressing the confidentiality of settlement negotiations, *Folb* held that "the need for confidentiality and trust between participants in a mediation proceeding is sufficiently

imperative to necessitate the creation of some form of privilege." *Id.* at 1175.  The court emphasized that the mediation privilege is particularly important because federal courts rely on mediation to manage their dockets: "This conclusion takes on added significance when considered in conjunction with the fact that many federal district courts rely on the success of ADR proceedings to minimize the size of their dockets." *Id.*

More recently in *Sheldone v. Pennsylvania Turnpike Comm'n*, 104 F. Supp. 2d 511, (W.D. Pa. 2000), the court relied on *Jaffee* and on Judge Marcus' decision in *In re Air Crash Near Cali, Colombia* to hold that all mediation documents and mediation communications are privileged and not subject to discovery.  Mediation "afford[s] to litigants an opportunity to articulate their position[s] and to hear, first hand, both their opponent's version of the matters in dispute and a neutral assessment of the relative strengths of the opposing positions." *Id.* at 513.  Without a mediation privilege, "parties and their counsel would be reluctant to lay their cards on the table so that a neutral assessment of the relative strengths and weaknesses of their opposing positions could be made." *Id.*  This, of course, assumes that parties "would even agree to participate in the mediation process absent confidentiality." *Id.*  Confidentiality is therefore "essential to the mediation process," and it is "beyond doubt that the mediation privilege is rooted in the imperative need for confidence and trust." *Id.* at 514.

No real distinction exists between the need to keep mediation confidential and the need to keep plea negotiations confidential.  Both processes, and the goals they serve, are essentially identical.  Both processes aim at encouraging settlement and compromise.  Both processes depend on parties speaking candidly about the strengths and weaknesses of their positions.  And in both processes, it would be manifestly unfair to require that parties attempt to settle their disputes in this

fashion, only to later allow third parties to use their words as a weapon against them.

### B.
### THE COURT SHOULD RECOGNIZE A PLEA NEGOTIATIONS PRIVILEGE

The "central feature" of Rule 410 "is that the accused is encouraged candidly to discuss his or her situation in order to explore the possibility of disposing of the case through a consensual arrangement." *United States v. Herman*, 544 F.2d 791, 797 (5th Cir. 1977).  The Rule is derived from "the inescapable truth that for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fear that his statements will later be used against him." *Id.* at 796.  The legislative history, too, "shows that the purpose of Fed.R.Ev. 410 and Fed.R.Crim.P. 11(e)(6) is to permit the unrestrained candor which produces effective plea discussions between the . . . government and the . . . defendant." *Committee on Rules of Practice And Procedure of The Judicial Conference of The United States, Standing Committee On Rules of Practice And Procedure*, 77 F.R.D. 507 (February 1978) (emphasis added).[1]

For these reasons, criminal defense lawyers negotiate with prosecutors in an environment of confidentiality, fostered by the protections of Rules 410 and 11.  These rules encourage a process of searching and honest disclosures, and parties expect that their negotiations, and the information they exchange, will be protected from future use by an adversary.  And because criminal defense lawyers are *required,* by ethical and constitutional considerations, to engage in plea negotiations to discharge their duty to represent the client's *best interest*, they do so with the well-founded expectation that communications made during those negotiations will not later be used *to harm the client*.

---

[1] Rule 11(f) was formerly Rule 11(e)(6), which read almost identical to Rule 410.

1.     **The Court Should Recognize A Plea Negotiations Privilege Because Plea Negotiations Are Critical To The Criminal Justice System**

The Supreme Court has recognized that "Rules 410 and 11(e)(6) 'creat[e], in effect, a privilege of the defendant . . . .'" *Mezzanatto*, 513 U.S. at 204.This privilege encourages disposition of criminal cases by plea agreement, which is essential to the administration of justice:

> The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called "plea bargaining," is an essential component of the administration of justice.  Properly administered, it is to be encouraged.  If every criminal charge were subjected to a full-scale trial, the states and the federal government would need to multiply by many times the number of judges and court facilities.

*Santobello v. New York*, 404 U.S. 257, 260 (1971).  "[T]he fact is that the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system.  Properly administered, they can benefit all concerned."  *Blackledge v. Allison,* 431 U.S. 63, 71 (1977).

Those sentiments are just as true today.  The Bureau of Justice Statistics of the Department of Justice reports that in 2005, 96.1% of federal criminal cases were resolved by way of a plea bargain.  www.ojp.usdoj.gov/bjs/pub/html/fjsst/2005/fjs05st.htm   That today's justice system depends on plea negotiations is a monumental understatement.

2.     **The Court Should Recognize A Plea Negotiations Privilege Because Plea Negotiations Are Critical To The Effective Representation of Counsel**

Whether to negotiate a plea or contest a criminal charge "is ordinarily the most important single decision in any criminal case." *Boria v. Keane*, 99 F.3d 492 (2d Cir. 1996).  In the age of the Sentencing Guidelines, with the draconian sentences called for in federal criminal cases, minimum mandatories, and the abolition of parole, engaging in meaningful and effective plea negotiations is

perhaps one of the most important roles of a criminal defense attorney. Today, the lawyer's "ability to persuade the judge or the jury is . . . far less important than his ability to persuade the prosecutor" during plea negotiations. *United States v. Fernandez*, 2000 WL 534449 (S.D.N.Y. May 3, 2000) at *1.

Counsel's failure to discharge his duties during plea negotiations is malpractice: "[I]t is malpractice for a lawyer to fail to give his client timely advice concerning" pleas. *Id.* It also constitutes ineffective assistance of counsel, and violates the Constitution. Thus, counsel has a duty to advise clients fully on whether a particular plea is desirable, since "[e]ffective assistance of counsel includes counsel's informed opinion as to what pleas should be entered." *United States v. Villar,* 416 F. Supp. 887, 889 (S.D.N.Y. 1976); *Boria v. Keane*, 99 F.3d 492, 497 (2d Cir. 1996), citing ABA Model Code of Professional Responsibility, Ethical Consideration 7-7 (1992).

Counsel also has a constitutional obligation to seek out information from the government, especially information that the government intends to use against the client. Failure to do so constitutes ineffective assistance of counsel. *Rompilla v. Beard*, 545 U.S. 374 (2005). "The notion that defense counsel must obtain information that the state has and will use against the defendant is not simply a matter of common sense, . . . it is the duty of the lawyer . . . ." *Rompilla v. Beard*, 545 U.S. 374, 386 (2005), citing 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp).[2]

The constitution also requires that criminal defense lawyers conduct "a prompt investigation of the circumstances of the case," and this includes making every effort to secure information directly from the prosecutors:

---

[2] The Supreme Court has "long . . . referred [to these ABA Standards] as 'guides in determining what is reasonable.'" *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

*Rompilla v. Beard*, 545 U.S. 374, 386 (2005), citing 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp).

The lawyer's duty to investigate and obtain information from the prosecutor goes hand-in-hand with the lawyer's additional duty to "make suitable inquiry" to determine whether valid defenses exist. *Jones v. Cunningham*, 313 F.2d 347 (4th Cir.1963) ("Of course, it is not for a lawyer to fabricate defenses, but he does have an affirmative obligation to make suitable inquiry to determine whether valid ones exist").

And regardless of whether valid defenses exist, counsel has a duty *to initiate plea negotiations* if he is to discharge his duty to faithfully represent the client's interests. *Hawkman v. Parratt,* 661 F.2d 1161, 1171 (8th Cir. 1981*)* (counsel's "failure to initiate plea negotiations concerning the duplicitous felony counts constituted ineffective assistance of counsel which prejudiced Hawkman").

**3.     The Court Should Recognize A Plea Negotiations Privilege To Avoid A Meaningful And Irreparable Chill In Plea Negotiations**

Reason and experience tell us that the system we have in place of sentencing laws, ethical rules, federal court dockets, and constitutional considerations, will not function if plea negotiations are not privileged.  After all, "it is immediately apparent that no defendant or his counsel [would] pursue [plea negotiations] if the remarks uttered during the course of it are to be admitted in evidence as proof of guilt." *Herman*, 544 F.2d at 797.  Plea negotiations are "rooted in the imperative need

for confidence and trust," *Jaffee,* 518 U.S. at 10, and maintaining their confidentiality advances significant public and private ends.  Discovery and use of plea negotiations will cause "a meaningful and irreparable chill" to the "frank and complete disclosures" that result in negotiated resolution of criminal matters.  *In re Air Crash Near Cali, Colombia,* 957 F.2d at 1533.

For these reasons, plea negotiations are properly subject to a common law privilege under Federal Rule of Evidence 501. The Court should hold that the plea negotiation letters and emails between Mr. Epstein's lawyers and the government are privileged and not subject to discovery or evidentiary use by the plaintiffs.

## PART III

### MR. EPSTEIN HAS STANDING TO INVOKE RULE 6(E)

During the August 12 hearing, the Court asked whether only the government has standing under Rule 6(e) to object to disclosure of grand jury materials. [Trans. at 27]. The answer is no. Mr. Epstein, too, has standing to raise these issues. The grand jury was created to protect the citizens, not to protect the government. Rule 6(e) implements those protections by requiring secrecy of matters occurring before the grand jury. The rule protects citizens against disclosure of information that is damaging to them, and in particular "protects the reputation of an accused who is not indicted." *United States v. Malatesta*, 583 F.2d 748, 753 (5th Cir. 1978).  Mr. Epstein therefore has standing under Rule 6(e) to object to disclosure of matters occurring before the grand jury.

23

We certify that on September 2, 2011, the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system.

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN
& STUMPF, P.A.**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
Office: (305) 371-6421
Fax: (305) 358-2006

By _____/S/_____
     **ROY BLACK, ESQ.**
     Florida Bar No. 126088
     **JACKIE PERCZEK, ESQ.**
     Florida Bar No. 0042201
     *On Behalf of Jeffrey Epstein*
