## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-80736-Civ-Marra/Johnson

**JANE DOE No. 1 and JANE DOE No. 2**

     **v.**

**UNITED STATES**
_____/

### AFFIDAVIT OF BRADLEY J. EDWARDS, ESQ. REGARDING NEED FOR PRODUCTION OF DOCUMENTS

1.  I, Bradley J. Edwards, Esq., do hereby declare that I am a member in good standing of the Bar of the State of Florida.  Along with co-counsel, I represent Jane Doe No. 1 and Jane Doe No. 2 (as referred to as "the victims") in the above-listed action to enforce their rights under the Crime Victims Rights Act (CVRA).  I also represented them (and several other victims) in civil suits against Jeffrey Epstein for sexually abusing them.  I am also familiar with the criminal justice system, having served as state prosecutor in the Broward County State Attorney's Office.

2.   This affidavit covers factual issues regarding the Government's assertions of privilege to more than 13,000 pages of documents it has produced for in camera inspection in this case.  This affidavit provides factual information demonstrating that the Government's assertions of privilege are not well founded.  It further demonstrates that the victims have a compelling and substantial need for the information requested and have no other way of obtaining the information.

### Background Regarding Unsuccessful Efforts to Reach Stipulated Facts with the Government

3.  On July 7, 2008, I filed a petition to enforce the CVRA rights of Jane Doe No. 1 and Jane Doe No. 2 with regard to sex offenses committed against them by Jeffrey Epstein while they were minors.  The course of the proceedings since then is well-known to the Court.  For purposes of this affidavit regarding privileges, it is enough to briefly recount the efforts of the victims to reach a stipulated set of facts with the Government – efforts that the Government has blocked.

4.  The Court first held a hearing on victims' petition on July 11, 2008.  The Court discussed a need to "hav[e] a complete record, and this is going to be an issue that's … going to go to the Eleventh Circuit, [so it] may be better to have a complete record as to what your position is and the government's is as to what actions were taken."  Tr. at 25-26.   The Court concluded the hearing with the following instructions:  "So I'll let both of you confer about whether there is a need for any additional evidence to be presented."  Tr. at 32.

1

5.   The victims and the U.S. Attorney's Office then attempted to reach a stipulated set of facts underlying the case.  The U.S. Attorney's Office offered a very abbreviated set of proposed facts, and the victims responded with a detailed set of proposed facts.  Rather than respond to the victims' specific facts, however, the U.S. Attorney's Office suddenly reversed course.  On July 29, 2008, it filed a Notice to Court Regarding Absence of Need for Evidentiary Hearing (DE 17).  The U.S. Attorney's Office took the following position: "After consideration, the Government believes that an evidentiary hearing is not necessary" (DE 17 at 1).  The Office asserted that the Court need only take judicial notice of the fact that no indictment had been filed against Epstein to resolve the case.

6.   On August 1, 2008, the victims filed a response to the Government's "Notice," giving a proposed statement of facts surrounding the case.  DE 19 at 5.  The victims' response also requested that the Court direct the Government to confer with the victims regarding the undisputed facts of the case, and produce the non-prosecution agreement and other information about the case.  *Id.* at 14.  On August 14, 2008, the Court held a hearing on the case regarding the confidentiality of the non-prosecution agreement.  The Court ultimately ordered production of the agreement to the victims.

7.   After the U.S. Attorney's Office made the non-prosecution agreement available to the victims, the victims reviewed it and pursued further discussions with the U.S. Attorney's Office.  Ultimately, however, the U.S. Attorney's Office declined to reach a stipulated set of facts with the victims and declined to provide further information about the case.

8.   With negotiations at an impasse, the victims attempted to learn the facts of the case in other ways.  In approximately May 2009, counsel for the victims propounded discovery requests in both state and federal civil cases against Epstein, seeking to obtain correspondence between Epstein and prosecutors regarding his plea agreement – information that the U.S. Attorney's Office was unwilling to provide to the victims and information that was highly relevant both to the victims' civil suit and their CVRA enforcement action.  Epstein refused to produce that information, and (as the Court is aware) extended litigation to obtain the materials followed.  The Court rejected all of Epstein's objections to producing the materials.

9.   On June 30, 2010, counsel for Epstein sent to counsel for the victims  approximately 358 pages of e-mail correspondence between criminal defense counsel and the U.S. Attorney's Office regarding the plea agreement that had been negotiated between them.  *See* DE48-Attachment 1/Exhibit A.  These e-mails began to disclose for the first time the extreme steps that had been taken by the U.S. Attorney's Office to avoid prosecuting Epstein and to avoid having the victims in the case learn about the non-prosecution agreement that had been reached between Epstein and the Government.   While the Court ordered that all of the correspondence be turned over to the victims, Epstein chose to disobey that order and instead only produced the correspondence authored by the Government and redacted all correspondence authored by him or his attorneys.

10.   In mid-July 2010, Jane Doe No. 1 and Jane Doe No. 2 settled their civil lawsuits against Epstein.    Then, armed with the new information, they turned to moving forward in the CVRA case. On September 13, 2010, the victims informed the Court that they were preparing new filings in the case.

11.   On October 12, 2010, the Court entered an order directing the victims to provide a status report on the case by October 27, 2010.  That same day, counsel for the victims again contacted

the U.S. Attorney's Office about the possibility of reaching a stipulated set of facts in the case. That same day, the U.S. Attorney's Office responded: "*We don't have any problem with agreeing that a factual assertion is correct if we agree that is what occurred*" (DE 41 at 2).

12.   On October 23, 2010, the victims e-mailed to the U.S. Attorney's Office a detailed proposed statement of facts, with many of the facts now documented by the correspondence between the U.S. Attorney's Office and Epstein's counsel. The victims requested that the U.S. Attorney's Office identify which facts it would agree to. In a letter to the U.S. Attorney's Office, the victims stated:

> If you believe that any of the facts they propose are incorrect, Jane Doe No. 1 and Jane Doe No. 2 would reiterate their long-standing request that you work with us to arrive at a mutually-agreed statement of facts. As you know, in the summer of 2008 Jane Doe No. 1 and Jane Doe No. 2 were working with you on a stipulation of facts and took that position that no recitation of the facts was necessary (*see* doc. No. 19 at 2). . . . I hope that your e-mail means that you will at least look at our facts and propose any modifications that you deem appropriate. Having that evidence quickly available to the Court could well help move this case to a conclusion.

That same day, the U.S. Attorney's Office agreed to forward the proposed statement of facts to the appropriate Assistant U.S. Attorney for review (DE 41 at 2-3).

13.   On October 26, 2010, rather than stipulate to undisputed facts, the U.S. Attorney's Office contacted the victims' attorneys and asked them to delay the filing of their motion for a two-week period of time so that negotiations could be held between the Office and the victims in an attempt to narrow the range of disputes in the case and to hopefully reach a settlement resolution without the need for further litigation. Negotiations between the victims and the U.S. Attorney's Office then followed over the next two days. However, at 6:11 p.m. on October 27, 2010 – the date on which the victims' pleading was due – the U.S. Attorney's Office informed the victims that it did not believe that it had time to review the victims' proposed statement of facts and advise which were accurate and which were inaccurate. The Office further advised the victims that it believed that the victims did not have a right to confer with their Office under the CVRA in this case because in its view the case is "civil" litigation rather than "criminal" litigation (doc. No. 41 at 3). [1]

14.   As a result, purely as an accommodation to the U.S. Attorney's Office, on October 27, 2010, the victims filed a report with the Court in which they agreed to delay filing their motion and accompanying facts for up to two-weeks to see if negotiations can resolve (or narrow) the disputes with the U.S. Attorney's Office (DE 41 at 4).   Discussions with the U.S. Attorney's Office dragged on, including a personal meeting between Jane Doe No. 1 and the U.S. Attorney in December 2010.

---

[1] In seeming contradiction to this position, on March 17, 2011, the U.S. Attorney's Office informed the victims that it would not be making any initial disclosures to the victims as required for civil cases by Fed. R. Civ. P. 26(a)(1).  The U.S. Attorney's Office did not explain why they believe that this rule of civil procedure is inapplicable if they think this case is properly viewed as a "civil" case.

15.   After further discussions failed to produce any agreement or other visible progress, the victims informed the U.S. Attorney's Office that they would file their "summary judgment" motion with the Court on March 18, 2011 and requested further cooperation from the Office on the facts.

16.   Ultimately, after months of discussion, the U.S. Attorney's Office informed counsel for the victims that – contrary to promises made earlier to stipulate to undisputed facts – no such stipulation would be forthcoming.   Instead, on March 15, 2011, the U.S. Attorney for the Southern District of Florida, Wifredo A. Ferrer, sent a letter to the victims declining to reach any agreement on the facts:

> Because, as a matter of law, the CVRA is inapplicable to this matter in which no federal criminal charges were ever filed, your requests for the government's agreement on a set of proposed stipulated facts is unnecessary and premature. That is, because whether the rights in 18 U.S.C. § 3771(a) attach prior to the filing of a charge in a federal court is a matter of statutory interpretation, resolution of that question is not dependent upon the existence of any certain set of facts, other than whether a charging document was ever filed against Jeffrey Epstein in the United States District Court for the Southern District of Florida.  And while this Office remains willing to cooperate, cooperation does not mean agreeing to facts that are not relevant to the resolution of the legal dispute at issue . . . .

Letter from Wifredo A. Ferrer to Paul G. Cassell (March 15, 2011).

17.   Accordingly, unable to work with the Government to reach a resolution of the facts, on March 21, 2011, the victims filed a Motion for Summary Judgment, alleging 53 undisputed facts along with some evidentiary support for each of the facts.  DE 48.  The victims also filed a motion to have their facts accepted because of the Government's failure to contest their facts. DE 49.  The victims also filed a motion to have the Court direct the Government to not withhold relevant evidence.  DE 50.

18.   Following a hearing on the motions, on September 26, 2011, the Court rejected the Government's argument that the CVRA was inapplicable in this case because the Government had never filed charges against Epstein.  DE 99.  The Court, however, rejected the victims' argument that it should accept their facts because of the Government's failure to contest the facts.  DE 99 at 11.  Instead, the Court directed that discovery could proceed in the form of requests for admission and document production requests.  Id. at 11.  The Court reserved ruling on the victims' motion that the Government should be directed not to withhold evidence.

19.   In light of the Court's order, on October 3, 2011, the victims filed requests for production with the Government.  The requests included 25 specific requests, each of which linked very directly to the facts that the victims were attempting to prove in this case.

20.   On November 7, 2011, the day when the Government's responses were due, rather than produce even a single page of discovery, the Government filed a motion to dismiss the victims' petitions.  DE 119.  On that same day, the Government filed a motion to stay discovery.  DE 121. The victims filed a response, arguing that the Government's motion was a stall tactic.  DE 129. The victims also filed a motion to compel production of all of their discovery requests.  DE 130. The Government filed a reply, arguing that it was not stalling.  Indeed, the Government told the Court that "the United States has agreed to provide some information to [the victims] even

during the pendency of the stay [of discovery] and is undertaking a search for that information." DE 140 at 4. Contrary to that representation, however, over the next seventeen months, the Government did not produce any information to the victims, despite the victims reminding the Government of that statement made to the court.

21. Ultimately, after some additional motions and rulings, on June 19, 2013, the Court denied the Government's motion to dismiss and lifted any stay of discovery. DE 189. That same day, the Court entered an order granting the victims' motion to compel and directing the Government to produce (1) all correspondence between it and Epstein; (2) all communications between the Government and outside entities; and (3) every other document requested by the victims. DE 190 at 2. With respect to the third item, the Court allowed the Government to assert privilege by producing the items in question for in camera inspection and filing a contemporaneous privilege log. *Id.* The Court required that the privilege log must "clearly identify[] each document[] by author(s), addressee(s), recipient(s), date, and general subject matter . . . ." DE 190 at 2.

22. On July 19 and July 27, 2013, the Government made its production. With regard to item (1) – correspondence with Epstein, the Government withheld the correspondence pending a ruling from the Eleventh Circuit on Epstein's motion to stay production of these materials. With regard to the other items, the Government produced 14,825 pages of documents to the Court for in camera inspection, but turned over only 1,357 pages to the victims. Thus, the Government asserted privilege to more than 90% of the documents in question. The documents that the Government produced were almost worthless to the victims, as they included such things that the victims' own letters to the Government (Bates 0001-04), court pleadings filed by the victims themselves or other victims, by Epstein, or by news media organizations (*e.g.,* Bates 00142-88, 00229-31, 281-311, 00668-69), public court rulings on Epstein related matters (*e.g.*, Bates 0008-10, 0012-14. 0036-86, 00190-228), public newspaper articles (e.g., Bates 0011, 0030, 0032-33), and similar materials already available to the victims. It also included roughly four hundred pages of notices sent to the various other victims in this case – notices that were substantively indistinguishable from the notices the victims themselves in this case had already received. Almost without exception, the documents the Government produced do not go to the disputed issues in this case.

23. The Government made one last production of materials in this case on August 6, 2013. This involved roughly 1,500 pages of documents that were largely meaningless in the context of the contested issues in the case. They included public documents in the case such the crime victims' own pleadings, *see, e.g.,* Bates 000671-000711 (copy of the victims' redacted summary judgment motion). Curiously, while the Government has produced these documents that would likely fall into an "irrelevant" category of documents, they have simultaneously refused production of hundreds of other documents that are responsive to our requests on the basis of relevance.

24. The victims have tried to obtain information on all relevant subjects through requests for admission. The Government, however, has refused to admit many of the victims' central allegations in this case. A copy of the victims' requests for admissions and the Government's responses is attached to this affidavit so that the Court can see that the victims have diligently tried to pursue this avenue for developing the facts in this case.

25.   The victims have also tried to obtain information on subjects related to their suit by voluntary requests for interview with persons who are no longer employed by the Justice Department.  For example, I have sent letters to both Bruce Reinhart and Alex Acosta, who both have information about the Epstein case, requesting an opportunity to discuss the case with them. Both of them have ignored my letters.

### The Need for the Materials Requested by the Victims

26.  The documents that the victims requested that the Government produce to them on October 3, 2011, are all highly relevant to their CVRA enforcement action.  We would not have requested them otherwise.  The victims also have no other means of obtaining the requested material.  This section of the affidavit explains why the materials are needed by the victims.  For the convenience of the Court, the affidavit will proceed on a section-by-section basis concerning the need for the materials.  Also for the convenience of the Court, a copy of the October 3, 2011, request for production is attached to this Affidavit.  Also attached is the victims' supplemental discovery request of June 24, 2013.  As the Court will note from reviewing the requests for production, most of the requests specifically recount the allegations that the requested documents would support, in an effort to eliminate any dispute from the Government that the documents were not relevant to the case.  Many of the requests for production link directly to specific paragraphs in the victims' previously-filed summary judgment motion.  Accordingly, the victims have a very specific need for these documents to support the allegations in the summary judgment motion found at DE 48 at 3-23.

27.  The Court has previously concluded that the victims' proof of their claims is, at this point in the case, inadequate.  Instead, the Court has ruled: "Whether the evidentiary proofs will entitle [the victims] to that relief [of setting aside the non-prosecution agreement] is a question properly reserved for determination upon a fully developed evidentiary record."  DE 189 at 11-12.  The Court has further indicated that it will be considering an "estoppel" argument raised by the Government as a defense in this case.  DE 189 at 12 n.6.  The Court has noted that this argument "implicates a fact-sensitive equitable defense which must be considered in the historical factual context of *the entire interface between Epstein, the relevant prosecutorial authorities and the federal offense  victims* – including an assessment of the allegation of a deliberate conspiracy between Epstein and federal prosecutors to keep the victims in the dark on the pendency of negotiations between Epstein and federal authorities until well after the fact and presentation of the non-prosecution agreement to them as *a* fait accompli."  DE 189 at 12 n.6 (emphasis added). The victims have a compelling need for information about the Government's actions to show what the "entire interface" was and to respond to the Government's estoppel arguments, as well as other defenses that it appears to be preparing to raise.  *See, e.g.,* DE 62 (52-page response from the Government to the victim's summary judgment motion, raising numerous factually-based and other arguments against the victim's position).

28.   Request for Production ("RFP") No. 1 requests information regarding the Epstein investigation.  These documents are needed to support the victims' allegations that the Government had a viable criminal case for many federal sex offenses that it could have pursued against Epstein.  *See, e.g.,* DE 48 at 3-7.

29.  RFP No. 2 requests information regarding crime victim notifications in this case.  These documents are needed to support the victims' allegations that their rights under the CVRA, their

right to notice and to confer with the Government, were violated in this case.  In particular, these documents are needed to demonstrate that the victims were not properly notified about the non-prosecution agreement (NPA) entered into by the Government and Jeffrey Epstein and that the Government did not confer with the victims about the agreement.  *See, e.g.,* DE 48 at 11-17.

30.  RFP No. 3 requests information about the NPA, including in particular its confidentiality provision.  These documents are needed to demonstrate that the confidentiality provision precluded disclosing the agreement to Jane Doe No. 1 and Jane Doe No. 2, as well as to other victims.  *See, e.g.,* DE 48 at 10-17.  These documents are further needed to demonstrate that Jeffrey Epstein specifically orchestrated the secrecy of the agreement, thereby deliberately causing the Government's CVRA violation in this case. *See, e.g.,* DE 48 at 13.

31.  RFP No. 4 requests documents relating to negotiations between the Government and Jeffrey Epstein concerning the court and/or location in which Jeffrey Epstein would enter any guilty plea (including in particular any negotiations concerning concluding the plea in Miami or another location outside of West Palm Beach).  These documents are relevant to the victims allegations that the Government was interested in finding a place to conclude any plea agreement that would effectively keep Epstein's victims (most of whom resided in or about West Palm Beach) from learning what was happening through the press. *See, e.g.,* DE 48 at 7-8.

32.  RFP No. 5 requests documents pertaining to negotiations between the Government and Jeffrey Epstein regarding any legal representation of the victims in civil cases against Epstein. These documents are needed to prove the victims' allegation that part of the plea negotiations with Epstein involved Epstein's efforts to make sure that the victims would be represented in civil cases against Epstein by someone who was not an experienced personal injury lawyer or by someone familiar to Epstein or his legal team. *See, e.g.,* DE 48 at 9.

33.  RFP No. 6 requests documents concerning the Government's and/or Epstein awareness or discussion of possible public criticism and/or victim objections to the non-prosecution agreement that they negotiated.  The documents are needed to prove the victims' allegations that the Government wanted the non-prosecution agreement with Epstein concealed from public view because of the intense public criticism that would have resulted had the agreement been disclosed and/or the possibility that victims would have objected in court and convinced the judge not to accept the agreement.  *See, e.g.,* DE 48 at 7-8, 11. They are also relevant to bias and motive by the authors or subjects of other documents in this case.

34.  RFP No. 7 requests documents regarding the Government's awareness of its potential CVRA obligations in this case and regarding any discussions between the Government and Epstein concerning these CVRA obligations in this case. These documents are needed to prove the victims' allegations that the Government was aware that it potentially had obligations under the CVRA to notify the victims about the non-prosecution agreement and any related state court plea agreement.  *See, e.g.,* DE 48 at 12-13.

35.  RFP No. 8 requests documents regarding Epstein's lobbying efforts to persuade the Government to give him a more favorable plea arrangement and/or non-prosecution agreement, including efforts on his behalf by former President Bill Clinton, Prince Andrew, and Harvard Law Professor Alan Dershowitz.   These materials are needed to prove the victims allegation that, after Epstein signed the non-prosecution agreement, his performance was delayed while he used his significant social and political connections to lobby the Justice Department to obtain a

more favorable plea deal. *See, e.g.,* DE 48 at 16-18. These materials also are needed to establish the course of the proceedings in this case, which is necessary in light of the Government's letters to the victims (discussed in the next paragraph) concerning the status of the case.

36.   RFP No. 9 requests documents regarding the letters sent to the victims by the FBI on January 10, 2008, Jane Doe No. 1 and Jane Doe No. 2 advising them that "this case is currently under investigation."  These documents are needed to show that these letters were inaccurate or, at the very least, highly misleading, because they conveyed the impression that no plea arrangement (for example, a non-prosecution agreement) had been negotiated between Epstein and the Government.  *See, e.g.,* DE 48 at 16.  These documents are also needed to respond to the Government's "estoppel" defense, as noted in the Court's order DE 189 at 12 n.6.

37.   RFP No. 10 requests documents regarding the victims' allegations that the FBI was led to believe that their investigation of Epstein was going to produce a federal criminal prosecution and that the FBI was also misled by the U.S. Attorney's office about the status of the case.  The Government has argued that these documents are not relevant to the case, because the only issue is whether the Government misled the victims.  But the Government fails to recognize that the victims received information about the case through the FBI.   These documents are therefore needed to demonstrate that the victims received inaccurate information about the status of the case – inaccurate information caused by the U.S. Attorney's Office's negotiations with Epstein. If the FBI agents were not accurately informed about the progress of the cases, then they could not have accurately informed the victims about the progress of the case – a central point in the victims' argument.  Moreover, these documents would show a common scheme or plan – something made admissible in a trial by operation of Fed. R. Evid. 404(b).  Of course, if the U.S. Attorney's Office was misleading the FBI about the NPA, it would have been part of the same scheme or plan to mislead the victims as well. The documents are also needed to support specific allegations in the victims' summary judgment motion.  *See, e.g.,* DE 48 at 16-17.

38.   RFP No. 11 requests documents regarding various meetings that the Government (including FBI agents) had with the victims.  These documents are needed to prove that during those meetings the Government did not disclose to the victims (or to their attorneys) that a non-prosecution agreement had been negotiated with Epstein, and even signed with Epstein, that related to their cases, allegations that the victims have advanced in their summary judgment motion.  *See, e.g.,* DE 48 at 16-18.

39.   RFP No. 12 requests all documents connected with a request from the U.S. Attorney's Office to me (Bradley J. Edwards) to write a letter concerning the need for filing federal charges against Epstein and follow-up to that letter.  These documents are needed to show that this request was made to me without disclosing the existence of the non-prosecution agreement. Thus, just as Jane Doe No. 1 and Jane Doe No. 2 were deceived about the NPA, I was deceived as well. *See, e.g.,* DE 48 at 18-19.  It is also needed to contradict the Government's apparent position that it disclosed the "existence' of the NPA to me and to the victims.  *See, e..g.,* Gov't Answers to RFA ¶ 13(d) ("The government admits that, when Epstein was pleading guilty to the state charges discussed in the non-prosecution agreement, the USAO and Epstein's defense attorneys sought to keep the document memorializing the non-prosecution agreement confidential, but denies that they sought at that time  to keep the existence of the non-prosecution agreement confidential.").

40.  RFP No. 13 requests documents regarding how, on or about June 27, 2008, the Government learned that Epstein would be entering his plea to state charges on or about June 30, 2008.  The documents are needed to describe the course of proceedings in this case and to prove both the Government's and Epstein's awareness that he would be entering a guilty plea (and thus blocking prosecution of other crimes) without the victims' full knowledge of what was happening. *See, e.g.,* DE 48 at 19-20.

41.   RFP No. 14 requests documents relating to the Government and Epstein working together to keep the existence of the non-prosecution agreement secret, including declining comment about the existence of such an agreement when asked about it when his guilty plea in state court became public knowledge.  These documents are needed to prove the victims' allegations that the Government concealed the NPA from them, *see, e.g.,* DE 48 at 14-18,and to contradict what appears to be the Government's position, namely that the victims were aware of the NPA shortly after it was negotiated, *see, e.g.,* Gov't Answers to RFA ¶ 13(b) (claiming that "the USAO had communicated with Jane Doe #1 about the non-prosecution agreement prior to Epstein's June 30, 2008 guilty plea.").  These documents are also necessary to contradict the Government's apparent claim that the NPA did not bar discussions with crime victims.  *See, e.g.,* Gov't Answers to RFA ¶ 13(d) (Government denying request that it admit that "Epstein's defense attorneys had negotiated for a confidentiality provision in the non-prosecution agreement that barred conferring with victims about the agreement").

42.  RFP No. 15 requests documents pertaining to the feasibility of notifying the victims about the NPA, along with information concerning how the victims came to receive a "corrected" notification letter on about September 3, 2008 – months after Epstein had pled guilty.  These documents are needed to demonstrate that the Government had no valid reason for failing to provide notice to the victims.  It is also needed to demonstrate why the victims at first received inaccurate information about the NPA, as well as Jeffrey Epstein's involvement in that inaccurate notice. *See, e.g.,* DE 48 at 15-16.

43.  RFP No. 16 requests documents regarding Bruce Reinhart, a senior prosecutor who was present in the U.S. Attorney's Office during the time that the Office negotiated the NPA with Epstein, blocking his prosecution for federal crimes in the Southern Districdt of Florida.  In RFP No. 16, the victims have sought documents showing that Reinhart learned confidential, non-public information about Epstein matter.   The Court will recall that Reinhart has filed a sworn affidavit with this Court, in which he flatly declared that while he was a prosecutor in the Office: "I never learned any confidential, non-public information about the Epstein matter." DE 79-1 at 3 (¶ 12).  When Reinhart made that statement, it seemed improbable to me, because Reinhart was in close contact with other prosecutors in the Office and would seem likely that he would have discussed the high-profile Epstein case with them.  Additionally, I learned through public record that while still a prosecutor at the Office Mr. Reinhart established his criminal defense office at the exact address (and exact Suite number) as Jeffrey Epstein's personal business address.  However, I did not have any direct way of contradicting Reinhart's sworn statement.  Since then, however, in answering the victims' Requests for Admissions, the Government has admitted that it possesses information that Reinhart learned confidential, non-public information about the Epstein case and that he discussed the Epstein case with other prosecutors.   Gov't Answers to RFA's ¶ 15(a) & (b). Of course, this means that the Government has documents that Reinhart

9

filed a false affidavit with this Court. This gives rise to the reasonable inference that, if Reinhart was willing to provide false information about this subject, he may have additional information about the case that is being concealed as well.

44. Materials about Reinhart are also needed to support the victims' summary judgment motion. *See, e.g.,* DE 48 at 22-23 (raising allegations about Reinhart).

45. Reinhart's affidavit with the Court also states: "Because I did not have any, I did not share non-public confidential information about the Epstein investigation with any of Epstein's attorneys." DE 79-1 at 4 (¶ 17). Because the Government has information demonstrating that the first part of this statement is false, it may well be that the second part of the statement is false as well. Given that Mr. Reinhart established a business address identical to Epstein's business address, at a time while he was still working at the US Attorney's Office, and that Mr. Reinhart ultimately represented several of Epstein's co-conspirators, jet pilots, and staff, during the civil litigation, any involvement Mr. Reinhart had with the Epstein case while working at the Office is highly relevant.

46. The Government has further admitted that it possesses documents reflecting contacts between Bruce Reinhart and persons/entities affiliated with Jeffrey Epstein before Reinhart left his job at the U.S. Attorney's Office. Gov't Answers to RFA's ¶ 16. As stated above, Reinhart left the U.S. Attorney's Office to start a private firm that was located in the same address as Epstein's personal business where he was daily. This would appear to be a violation of the Florida rules of ethics for attorneys.

47. Information about Reinhart's connections to Epstein is critical to the victims' allegations in this case. If Reinhart was helping Epstein gain insight into the prosecutions efforts, that would provide a motive for Reinhart (and other prosecutors) not to properly notify the victims and not to confer with them. Also, if Epstein was improperly receiving information about the prosecution efforts against him (or lack thereof), that could be highly relevant to the remedies stage of this case, in which the victims will ask (among other things) to have the NPA agreement invalidated. Epstein has already indicated that he will raise a double jeopardy argument against that effort. However, double jeopardy considerations do not apply in situations where the defendant was not truly in jeopardy of prosecution. In addition, the Court may wish to consider, in crafting a remedy, Epstein's culpability for the violations of the NPA. Evidence that Epstein was improperly obtaining information about the prosecution efforts against him would be highly relevant to that culpability assessment. It is also relevant to the estoppel defense that the Government (and perhaps Epstein as well) intend to raise.

48. Evidence concerning Reinhart's connections, including improper connections, to Epstein is also relevant to bias and motive in this case. It would show, for example, the Reinhart had a reason to encourage others in the U.S. Attorney's Office to give Epstein a more lenient deal than the one he was entitled to.

49. RFP No. 16 requested information not only about improper connections between Epstein and Reinhart, but more broadly about such connections with any other prosecutors. Of course, if the Government possesses such information, it would be highly relevant to the victims' allegations for the reasons just discussed. In its answers to the victims' Requests for Admission, the Government admits that it has information about a personal or business relationship between Jeffrey Epstein and another prosecutor involved in the Epstein case, Matthew Menchel. Answers

10

to Requests for Admission at ¶ 20.   The Government should be required to disclose all of those documents so that the victims can determine whether there was anything improper about those relationships.   In my experience, it is highly unusual for federal prosecutors to work on a case prosecuting someone (such as Jeffrey Epstein) and then, shortly thereafter, leave the employment of the federal government and enter into a business relationship with the person who was being prosecuted.

50.   RFP No. 17 asks for documents concerning an investigation into the Epstein prosecution undertaken by the Justice Department's Office of Professional Responsibility (OPR) in Washington, D.C.   The investigation was undertaken at the request of the victims, who asked the Justice Department to determine whether "improper influences" were brought to bear during the negotiations involving the possible prosecution (and ultimately the non-prosecution) of Jeffrey Epstein.   It is apparent from the privilege logs that the Government has produced that OPR generated a great deal of correspondence (at least 46 pages) regarding this request.   *See* Bates P-013909 to P-013955.   Of course, improper influences being brought to bear on the Epstein prosecution would support the victims' allegations that they were not being properly notified. Moreover, OPR may well have investigated the specific allegations that are at issue in this case – or directed others to undertake such an investigation.   Here again, this information would be critical to supporting the victims' case.   In fact, because OPR has presumably investigated many of the precise actions and actors, about which the victims complain in this litigation, and have already gathered many of the documents needed, the production of the OPR case file could probably short-cut this litigation and discovery process.

51.   There is no other way to obtain this information from OPR.   On May 6, 2011, nearly half a year after the victims' request of December 10, 2010, for an investigation, OPR sent a letter to my co-counsel, Professor Paul Cassell, in which it stated that it "regret[ted] it could not be of assistance" in providing information about the allegations.

52.   RFP No. 18 asks for information about why the U.S. Attorney's Office for the Southern District of Florida was "conflicted out" of handling various issues related to the Epstein case. This information is needed to show why the victims did not receive proper notifications about the NPA that the Office negotiated with Epstein.   It appears that the conflict of interest that has been recognized may have to do with the Office's treatment of the victims.   Moreover, in its production of documents, and in follow-up correspondence, the U.S. Attorney's Office for the Southern District of Florida has indicated that there are no responsive documents being held by the U.S. Attorney's Office in the other district that is handling conflict matters.   (It appears that this other office is the Middle District of Florida.)   This appears to be improbable, because the conflict matters would presumably generate many documents covered by the victims' discovery requests, including the OPR investigative file.   Accordingly, the conflict matter is highly relevant to determining whether the U.S. Attorney's Office has provided complete production to the victims.   A conflict of interest would also be highly relevant to the motivations of the Government attorneys throughout the handling of the Epstein case.

53.   RFP No. 19 asks for information supporting allegations made in March 2011, by former U.S. Attorney Alexander Acosta.   He sent a three-page letter to the news media in which he claimed that when Government attorneys began investigating Epstein, Epstein launched "a yearlong assault on the prosecution and the prosecutors."   This information is needed to explain

why the U.S. Attorney's Office would have withheld notifications from the victims about the NPA. If the prosecutors were being assaulted, as Acosta has said they were, then they would have reason to disregard their obligations to crime victims. In addition, this would show improper behavior by Epstein, which would be relevant at the remedies stage of this case in determining the scope of any remedy. These allegations would also bear strongly on motive and bias.

54. RFP No. 20 requests documents between the Government and state and local prosecutors and police agencies (including The Palm Beach Police Department) regarding the non-prosecution agreement. Because this involves information outside of the Department, it is the victims understanding that the Government has already turned over all of this information to them, as the Court has directed. *See* DE 190 at 2 (requiring production of information with persons or entities outside the federal government). For the sake of completeness, however, it is worth noting that this information is needed to demonstrate that the victims were not properly informed that Epstein's plea to state charges would trigger the NPA and preclude prosecution for crimes committed against them.

55. RFP No. 21 requests correspondence regarding the NPA. Here again, the victims understand that the Government is prepared to produce all of this information to them (once the stay pending action by the Eleventh Circuit is lifted). Again, for the sake of completeness, it is worth noting that this correspondence is needed to demonstrate the victims' claims that the Government was concealing the existence of the NPA from them and that this was done at Epstein's behest. The Court has specifically noted that the victims have a need for information that will allow them to argue to the Court in support of their "allegation of a deliberate conspiracy between Epstein and federal prosecutors to keep the victims in the dark on the pendency of negotiations between Epstein and federal authorities until well after the fact and presentation of the non-prosecution agreement to them as a *fait accompli*." DE 189 at 12 n.6.

56. RFP No. 22 requests information about any considerations that Epstein provided, or offered to provide, to any individual within the Government. Here again, the victims understand that this information is being provided to them. It is again worth noting, however, that this information is highly relevant to explaining why the U.S. Attorney's Office would not have properly notified the victims about what was happening in their case, an allegation that is at the center of the victims' summary judgment motion. *See, e.g.,* DE 48 at 11 (noting allegation that Epstein pushed the U.S. Attorney's Office to keep the NPA secret from public view to avoid public criticism).

57. RFP No. 23 asks for documents that will assist Jane Doe No. 1 and Jane Doe No. 2 in protecting their rights under the CVRA. This request links to the Government's obligations under the CVRA to use its "best efforts" to protect victims' rights. 18 U.S.C. § 3771(c)(1). The direct connection between this request and the victims' case is self-explanatory.

58. RFP No. 24 request correspondence related to the Epstein prosecution that the Government had with entities outside the federal government. Here again, it is my understanding that these materials have already been ordered produced. *See* DE 190 at 2 (requiring production of information with persons or entities outside the federal government). For the sake of completeness, this information is again relevant to showing the course of the Epstein

investigation and why the victims were not properly notified about event during that investigation.

59.  RFP No. 25 requests all initial productions that are required under the Federal Rules of Civil Procedure. This is a protective request to ensure that, should it be determined that the Civil Rules apply, they then receive all materials to which they are entitled.

60.  In June 2013, the victims sent a supplemental request for production, asking the Government to provide any information concerning any investigation that the Department undertook concerning the treatment of the victims during the investigation in this case, including any FBI, grand jury, OPR or other investigation in the Southern District of Florida, Middle District of Florida, or elsewhere.  Here again, this information is critically needed, as it would go directly to proving the victims' allegations that their rights were violated during the investigation of Epstein.  This information would also go directly to defeating the Government's "estoppel" argument. This information would also show motive and bias.

### Inadequate Privilege Log

61. The Government has produced a privilege log that violates the Court's order in this case.  I have been greatly hampered in responding to the Government's assertions of privilege because of that inadequate log.  Indeed, in many cases, it is impossible to determine whether the Government's assertions of privilege are even plausible because of the inadequacy of the log.

62.  The Court has directed the Government to produce a privilege log that "clearly identif[ies] each document[] [as to which privilege is asserted] by author(s), addressee(s), recipient(s), date, and general subject matter . . . ."  DE 190 at 2.  Many of the entries in the privilege log fail to meet this requirement.

63.  A good illustration of the inadequacies of the privilege log comes from the very first entry in the log, covering Box No. 1 (P-000001 through P-000039), some 39 pages of documents.  DE 212-1.  Yet the only description of these 39 pages is: "File folder entitled 'CORR RE GJ SUBPOENAS' containing correspondence related to various grand jury subpoenas and attorney (Villafaña) handwritten notes."

64.  Another good illustration of the inadequacies of the privilege log is provided on page 20 of the first privilege log, with regard to Box No. 3 (P-012362 through P-012451).  The Government asserts privilege here regarding 90 pages of documents.  Yet the only description of these 90 pages is: "File folder entitled 'Key Documents' containing correspondence between AUSA and case agent regarding indictment prep questions, victim identification information, corrections to draft indictment, indictment preparation timeline, key grand jury materials."

65.  There are many other illustrations of the inadequacies of the privilege log which the Court will see when it examines it.  I have also filed contemporaneously a response to the government's privilege log, which identifies many situations of an inadequate privilege log, as well as other responses that are needed to respond to the Government's privilege log.

66.  The Government has never contacted me or co-counsel about any burdens associated with producing a privilege log that complied with the Court's directives.  At all times relevant to this case, I would have been willing to work with Government counsel to minimize any excessive burden from producing an adequate privilege log.  The requests for production that I sent to the Government specifically invited discussion to avoid any excessive burden.

### Failure to Prove Factual Underpinnings of Privilege Claim

67.   Many of the Government's privilege assertions require factual premises – such as the existence of an attorney-client relationship and the rendition of legal services within that relationship.   Yet the Government has not provided the factual underpinnings for any of its privilege assertions.

68.   An illustration of this problem is found on page 1 of the supplemental privilege log (DE 216-1), with regard to supplemental box No. 3 (P-013284).   The entry here reads: "7/10/08 emails between J. Sloman and A. Marie Villafaña, K. Atkinson, and FBI re proposed response to Goldberger's letter re victim notification."   The log then indicates that the Government is asserting attorney-client privilege, work product privilege, and deliberative process privilege. The Government, however, does not provide any document for any of the factual underpinnings of any of these claims.   For example, with regard to the attorney-client claim, the Government does not explain who the attorney is and who the client is.   With regard to the work product claim, the Government does not explain what litigation this document contemplated.   And with regard to deliberative process, the Government does not explain what deliberative process was involved.

69.   There are many other illustrations of the Government's failure to prove the factual underpinnings of privilege assertions, which the Court will see when it examines the privilege log and the victims responsive log.

### Waiver of Confidentiality

70.  Some of the privileges that the Government has asserted have been waived.  Of course, a requirement of a privilege is that confidentiality be maintained.  Some of the materials have been circulated outside of any confidential circle, thereby waiving privilege.

71.  An illustration of waiver found on page 1 of the supplemental privilege log (DE 216-1), with regard to supplemental box No. 3 (P-013282 to 83).   The entry here reads: "7/08/08 email from A. Marie Villafaña to A. Acosta, J. Sloman, Ki. Atkinson, and FBI re proposed response to Goldberger's letter re victim notification."   The log then indicates that the Government is asserting attorney-client privilege regarding these emails.   But the emails were not internal to the U.S. Attorney's Office, but were also sent to the "FBI."   (This is another illustration of the inadequacies of the privilege log, because who in the FBI the materials were sent to is not disclosed.)   But the FBI is a law enforcement investigative agency, not an agency that provides legal advice.   Accordingly, any attorney-client privilege would be waived by dissemination of this e-mail outside the U.S. Attorney's Office.

72. Another illustration of waiver is found on page 3 of the supplemental privilege log (DE 216-1), with regard to supplemental box No. 3 (P-013504 to P-013507).   The entry here reads:  "File folder labeled 'Mtg w/ Ken Starr, RAA, JS, Drew' containing handwritten notes by A. Marie Villafaña." Kenn Starr, of course, is a *defense* attorney who represented defendant Epstein. Recording information provided by a defense attorney is not part of any governmental attorney-client privilege.

73.  Another illustration of waiver is found on page 7 of the supplemental privilege log (DE 216-1), with regard to supplemental box No. 3 (P-013644 through P-013653).   The entry here reads: "File folder entitled "Notes Re Plea Negotiations" containing 9/17/07 e-mail from A. Marie Villafaña to J. Richards, N. Kuyrkendall re status update; undated and typed handwritten notes by A. Marie Villafaña re items to be completed on case, strength of case, victim interviews,

summary of evidence, guidelines calculations."  The Government is asserting attorney-client privilege regarding this e-mail.  I understand the reference to "Richards' and "Kuyrkendall" to be references to FBI agents – not attorneys in the U.S. Attorney's Office.  Accordingly, the attorney-client privilege would not extend to this e-mail.

### The Government's Fiduciary Duty to Crime Victims Bars Any Privilege

74.  I am familiar with the caselaw recited in our pleadings regarding a "fiduciary exception" (also known as the "*Garner* exception" in some settings) to privileges.  In this case, the Government had a fiduciary obligation to protect the CVRA rights of Jane Doe No. 1 and Jane Doe No. 2.   Specifically, because they were recognized "victims" under the CVRA, the Government had obligations to provide them rights under the CVRA, including the right to confer, the right to notice, and the right to be treated with fairness.  Because of this fiduciary duty, an exception applies to many of the Government privilege claims regarding interactions with the victims.

75.  The fiduciary duty of the Government to the victims in this case is clear.  In 2007, the FBI determined that both Jane Doe No. 1 and Jane Doe No. 2 were victims of sexual assaults by Epstein while they were minors beginning when they were approximately fourteen years of age and approximately thirteen years of age respectively.  These sexual assaults involved use of means of interstate commerce (i.e., a telephone) and travel in interstate commerce. Both Jane Does were initially identified through the Palm Beach Police Department's investigation of Epstein.

76.  Confirming the fact that the Government had identified Jane Doe No. 1 as a victim in this case, on about June 7, 2007, FBI agents hand-delivered to Jane Doe No. 1 a standard CVRA victim notification letter.  The notification promises that the Justice Department would make its "best efforts" to protect Jane Doe No. 1's rights, including "[t]he reasonable right to confer with the attorney for the United States in the case" and "to be reasonably heard at any public proceeding in the district court involving . . . plea . . . ."  The notification further explained that "[a]t this time, your case is under investigation."

77. Similarly, on about August 11, 2007, FBI agents hand-delivered to Jane Doe No. 2 a standard CVRA victim notification letter.  The notification promises that the Justice Department would make its "best efforts" to protect Jane Doe No. 1's rights, including "[t]he reasonable right to confer with the attorney for the United States in the case" and "to be reasonably heard at any public proceeding in the district court involving . . . plea . . . ."  The notification further explained that "[a]t this time, your case is under investigation."

78. Early in the investigation, the FBI agents and the Assistant U.S. Attorney had several meetings with Jane Doe No. 1.  Jane Doe No. 2 was represented by counsel that was paid for by Epstein and, accordingly, all contact was made through that attorney.  These meetings occurred because the FBI had obligations to protect the victims' rights under the CVRA.

79. In October 2007, shortly after the initial non-prosecution agreement was signed between Epstein and the U.S. Attorney's Office for the Southern District of Florida, Jane Doe No. 1 was contacted to be advised regarding the investigation.  On October 26, 2007, Special Agents E. Nesbitt Kuyrkendall and Jason Richards met in person with Jane Doe No. 1 because she was recognized as a "victim' of Epstein's crime.

80.  In all of these dealings between the Government and the victims, as well as other dealings of a similar nature, the Government had a fiduciary obligation to protect the interests of the victims under the Crime Victims Rights Act.  Accordingly, the Government is precluded from raising any privilege claim to which a fiduciary exception applies or, at the very least, any privilege assertion would be outweighed by the victims' compelling need for the material.

81. An illustration of a situation where the fiduciary duty exception applies is found on page 1 of the supplemental privilege log (DE 216-1), with regard to supplemental box No. 3 (P-013282 to 83).  The entry here reads: "7/08/08 email from A. Marie Villafaña to A. Acosta, J. Sloman, K. Atkinson, and FBI re proposed response to Goldberger's letter re victim notification."    In responding to defense attorney Goldberger's letter about victim notification, the U.S. Attorney's Office had a statutory duty under the CVRA to protect the victims' interests.  Accordingly, the Office cannot assert privilege when questions about whether it fulfilled its obligations to the victims have arisen in this case or, at the very least, any privilege assertion would be outweighed by the victims' compelling need for the materials.

82.  Another illustration of a situation where the fiduciary duty exception applies is found on page 16 of the first privilege log (DE 212-1), with regard to Box #2 P-010526 to P-010641.  The entry reads:  "File folder entitled 'Rsrch re Crime Victims Rights' containing attorney research, handwritten notes, draft victim notification letter, and draft correspondence to Jay Lefkowitz."  Here again, the materials at issue go to the heart of this case – what kind of notifications were made to the victims and how did the defense attorneys shape and limit those notifications.  Moreover, in evaluating victims' rights issues and determining what kind of letter to send, the Government was fulfilling legal duties that it owed to the victims.  Accordingly, the Office cannot now assert privilege when questions about whether it fulfilled its obligations to the victims have arisen in this case.

### Communications Facilitating Crime-Fraud-Misconduct Not Covered

83.  I am familiar with the cases cited in our brief regarding an exception to various privileges when the communications concern crime, fraud, or government misconduct.  Many of the important documents about the treatment of the victims to which the Government is asserting privilege would fall within that exception.

84.  With regard to fraud and government misconduct, a number of the documents in the Government's privilege log concern concealment from the victims of the existence of a non-prosecution agreement between the Government and Epstein.  I have reviewed a copy of the non-prosecution agreement signed on about September 24, 2007, by Epstein and his attorneys and a representative of the U.S. Attorney's Office.  The text of that agreement bars disclosure of the agreement to the victims.

85.  On about January 10, 2008, my clients Jane Doe No. 1 and Jane Doe No. 2 received letters from the FBI advising them that *"[t]his case is currently under investigation.  This can be a lengthy process and we request your continued patience while we conduct a thorough investigation."*  The statement in the notification letter was deceptive, because it did not reveal that the case had previously been resolved by the non-prosecution agreement entered into by Epstein and the U.S. Attorney's Office discussed previously.  Moreover, the FBI did not notify Jane Doe No. 1 or Jane Doe No. 2 that a plea agreement had been reached previously, and that part of the agreement was a non-prosecution agreement with the U.S. Attorney's Office for the

Southern District of Florida and that the Non-Prosecution Agreement would resolve the federal case completely.  (Whether the FBI itself had been properly informed of the non-prosecution agreement is also unclear.  We are not alleging misconduct by the FBI, but rather that the FBI was not properly informed about the case or, in any event, was acting at the direction of the U.S. Attorney's Office.)

86.  In about April 2008, Jane Doe No. 1 contacted the FBI because Epstein's counsel was attempting to take her deposition and private investigators were harassing her.  Assistant U.S. Attorney A. Marie Villafaña secured pro bono counsel to represent Jane Doe No. 1 and several other identified victims in connection with the criminal investigation.  Pro bono counsel was able to assist Jane Doe No. 1 in avoiding the improper deposition.  AUSA Villafaña secured pro bono counsel by contacting Meg Garvin, Esq. of the the National Crime Victims' Law Center in Portland, Oregon, which is based in the Lewis & Clark College of Law.  During the call, Ms. Garvin was not advised that a non-prosecution agreement had been reached in this matter.

87.  On May 30, 2008, another one of my clients who was recognized as an Epstein victim by the U.S. Attorney's Office, received letters from the FBI advising her that *"[t]his case is currently under investigation.  This can be a lengthy process and we request your continued patience while we conduct a thorough investigation."*  The statement in the notification letter was deceptive because it did not reveal that the case had been resolved by the non-prosecution agreement entered into by Epstein and the U.S. Attorney's Office in September 2007.

88.  In mid-June 2008, I contacted AUSA Villafaña to inform her that I represented Jane Doe No. 1 and, later, Jane Doe No. 2.  I asked to meet to provide information about the federal crimes committed by Epstein, hoping to secure a significant federal indictment against Epstein.  AUSA Villafaña and I discussed the possibility of federal charges being filed.  At the end of the call, AUSA Villafaña asked me to send any information that I wanted considered by the U.S. Attorney's Office in determining whether to file federal charges.  I was not informed that previously, in September 2007, the U.S. Attorney's Office had reached an agreement not to file federal charges.  I was also not informed that any resolution of the criminal matter was imminent at that time.  Presumably the reason the U.S. Attorney's Office withheld this information from me was because of the confidentiality provision that existed in the non-prosecution agreement.  At this point it is clear that AUSA Villafana was restricted in what she was being permitted to tell me.

89.  On July 3, 2008, I sent to AUSA Villafaña a letter.  In the letter, I indicated my client's desire that federal charges be filed against defendant Epstein.  In particular, I wrote on behalf of my clients: "We urge the Attorney General and our United States Attorney to consider the fundamental import of the vigorous enforcement of our Federal laws.  We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual predator."  When I wrote this letter, I was still unaware that a non-prosecution agreement had been reached with Epstein – a fact that continued to be concealed from me (and the victims) by the U.S. Attorney's Office.  I only learned of this fact later on.

90.  As alleged in the preceding paragraphs, and elsewhere in this affidavit and in this case, deliberate concealment from crime victims and their legal counsel of the existence of a signed

non-prosecution agreement would be a fraud and government misconduct.  Documents relating to that fraud and misconduct would then fall outside of many of the privileges being asserted.

91.  An illustration of a document to which the crime-fraud-misconduct exception applies on this basis is found on page 3 of the supplemental privilege log (DE 216-1), with regard to Suppl. Box #3 P-013342 to P-013350.  The entry reads: "File folder entitled '12/05/07 Starr to Acosta' containing drafts of 11/30/07 letters from A. Acosta to K. Starr and from J. Sloman to J. Lefkowitz re performance and victim notification with handwritten notes and edits by A. Marie Villafaña."  Again, these materials are central to the dispute in this case, as they involve discussions between the U.S. Attorney's Office and defense attorneys about notifications to crime victims.  And given the dates of the communications, in all likelihood they would be related to the deceptive notifications that the Government made to the victims a few weeks later.

92.  Another illustration of a document to which the crime-fraud-misconduct exception applies is found on page 1 of the supplemental privilege log (DE 216-1), with regard to Suppl. Box #3 P-013282 to P-013283.  The entry reads: "7/9/08 Email from A. Marie Villafaña to A. Acosta, J. Sloman, K. Atkinson, and FBI re proposed response to Goldberger letter re victim notification." These communications would presumably reflect efforts by the government prosecutors and Epstein's defense attorneys (e.g., Goldberger) to keep the non-prosecution agreement secret.

93.  Another illustration of where the crime-fraud-misconduct exception would apply is to information that the Government possesses that Bruce Reinhart learned private, non-public information about the Epstein case.  This would show (at the very least) misconduct by Bruce Reinhart in later representing Epstein-related entities.  Because the Government's (inadequate) privilege log does not reveal which entries relate to Reinhart, it is not possible to point the Court to the specific documents that demonstrate this misconduct. These documents, however, are covered by the crime-fraud-misconduct exception.

94.  Another illustration of where the crime-fraud-misconduct exception could potentially apply is with regard to information that the Government possesses that Matthew Menchel has a personal or business relationship with defendant Jeffrey Epstein. Gov't Answers to RFA's  ¶ 20. This could potentially show misconduct by Menchel, and also potentially a motive to violate the victims' rights as explained previously.  The Government's privilege log has numerous entries showing that Menchel was substantially and personally involved in making decisions related to the Epstein prosecution.  *See, e.g.,* page 19 of the first privilege log (DE 212-1), with regard to Box #3 P-011923 to P-011966.  The victims have information suggesting that immediately after leaving his employment with the U.S. Attorney's Office, Menchel was associated with Epstein-controlled entities or had some business relationship with him.   The documents that the Government possesses showing a personal or business relationship between one of its prosecutors and the man he was charged with prosecuting should be produced.

95.  The Government has admitted that its internal affairs component – the Office of Professional Responsibility – has collected information about possible improper behavior during the investigation of the Epstein matter.  Gov't Answers to RFA ¶22 (government admits that "The Justice Department's Office of Professional Responsibility and/or other Government entities have collected information about . . . other government attorney's [apart from Bruce Reinhart's] possible improper behavior in the Epstein matter").   The fact that the Government's own investigating agencies have collected such information demonstrates that there is a prima facie

case of improper behavior, which is enough to trigger the crime-fraud-misconduct exception to various privileges.

### Factual Materials Not Privileged

96.   As noted in the accompanying legal memorandum, factual materials are generally not covered by the privileges at issue in this case.  Many of the materials to which the Government is asserting privilege are factual materials.

### Assertions of Attorney-Client Privilege

97.  The Government has asserted attorney client privilege regarding many documents.  Yet with regard to most of these assertions, it is impossible to determine who is the attorney, who is the client, whether professional legal services are being rendered, and whether the communications were confidential to those involved in the delivery of legal services.  Accordingly, it is very difficult for me to respond to many of the assertions of attorney client privilege and, in any event, the Government has failed to carry *its* burden of showing that the privilege applies.

98.  An illustration of documents at to which attorney-client privilege appears to have been improperly asserted or inadequately described is found at page 7 of the first privilege log (DE 216-1), with regard to Suppl. Box #3 P-013811 to P-013833.  The entry for these twenty-two pages of documents reads: "File folder entitled 'Information Packet Drafts' containing several drafts of Informations, and complete draft Information packet."   It is impossible from this description to see how the attorney-client privilege applies to these documents.  I could provide many other illustrations of the problem.

99.  The Government's attorney-client privilege claim directly covers situations where it was in a fiduciary relationship with the victims and therefore is limited in now asserting privilege.  For example, page 3 of the supplemental privilege log (DE 216-1) contains an entry concerning Suppl. Box #3 P-013342 through P-013350, which involves "File folder entitled '12/05/07 Starr to Acosta' containing drafts of 11/30/07 letters from A. Acost to K. Starr and from J. Sloman to J. Lefkowitz re performance and victim notification with handwritten notes and edits by A. Marie Villafaña."  This information goes very directly to the issues involved in this case, as it goes directly to "victim notification."   Yet the Government has asserted an attorney-client privilege to prevent the victims from learning what is in these documents.   The fiduciary exception to the attorney-client privilege applies in this situation, and limits the government's ability to invoke a privilege.   This also appears to be shared communications between the Government and Epstein's attorneys, and it is unclear how the attorney-client privilege could ethically apply to such documents.

100.  As one example of why the victims have established a compelling need for the materials described in the preceding paragraph (and other materials like them) is the fact that the Court has indicated that it will be considering an "estoppel" argument raised by the Government as a defense in this case.  DE 189 at 12 n.6.  The Court has noted that this argument "implicates a fact-sensitive equitable defense which must be considered in the historical factual context of *the entire interface between Epstein, the relevant prosecutorial authorities and the federal offense victims* – including an assessment of the allegation of a deliberate conspiracy between Epstein and federal prosecutors to keep the victims in the dark on the pendency of negotiations between Epstein and federal authorities until well after the fact and presentation of the non-prosecution agreement to them as *a* fait accompli."  DE 189 at 12 n.6 (emphasis added).  The materials to

which the Government is asserting attorney-client privilege go directly to that "interface" between *the victims,* the Government, and Epstein. The victims have a compelling need for this information and the fiduciary exception to the attorney-client privilege applies to permit the Court to provide these documents to the victims.

101. The Government has not explained any harm that would come from releasing the documents covered by attorney client privilege to the victims. If the Government raises any such harm, I respectfully request an opportunity to provide additional information on that alleged harm.

### Deliberative Process Privilege

102. Some of the correspondence that is being withheld by the Government under the deliberative process privilege concerns an investigation that the Justice Department's Office of Professional Responsibility (OPR) opened with regard to the Epstein case. This investigation was undertaken at the request of the victims in this case. On December 10, 2010, co-counsel, Professor Paul Cassell of the University of Utah College of Law, and I met with the U.S. Attorney for the Southern District of Florida regarding this case in the U.S. Attorney's Office in Miami, Florida. At on that date, Professor Cassell presented a letter to the U.S. Attorney, Mr. Ferrer, asking him to personally investigate what happened during the Epstein prosecution and how the victims were treated during that investigation. Based on the privilege log that has been provided, as well as subsequent correspondence sent to Professor Cassell, that request for investigation was turned over to OPR in Washington, D.C.

103. The ultimate outcome of the OPR investigation is unclear. What is clear is that many documents are being withheld about that investigation – documents that would go to the central issues in this case. Approximately three whole pages of the privilege log – pages 12 through 14 of the supplemental privilege log (DE 216-1) – relate to the OPR investigation of how the Epstein case was handled and how the victims were treated.

104. A deliberative *process* privilege claim can only be asserted with regard to the process of reaching a decision, not the ultimate decision itself. The Government here has apparently asserted a deliberative process claim over not only the OPR process, but also over the OPR decision. It is not clear which document embodies the final OPR decision (or, given the inadequacies of the Government's privilege log, whether that final decision has been produced). Given the limited descriptions of the documents that have been provided, it appears that the OPR decision may be reflected in a document found on page 13 of the supplemental privilege log (DE 216-1), with regard to Suppl. Box #3 P-013940 to P-013942. The description there reads: "Draft Letter, marked 'Confidential: To Be Opened by Addressee Only,' Robin C. Ashton to Wifredo A. Ferrer, with handwritten corrections." No date is provided regarding this letter. Nor is there any indication as to whether the letter was or was not circulated to other persons. It is also noteworthy that this letter is described as a "draft" letter. Nowhere in the privilege log is the final version of the letter indicated, raising questions about what was "draft" and what was "final." If this is the final embodiment of OPR's conclusions, then this letter would not be protected by a "deliberative process" privilege, because the deliberations would have come to an end. (It is also worth noting that because OPR is an agency that investigates misconduct by federal prosecutors, it would not be providing attorney-client advice to prosecutors and its

documents would not be attorney-client privileged with regard to, for example, the U.S. Attorney's Office for the Southern District of Florida.)

105.  The fact that OPR has investigated many of the exact claims raised by Jane Does 1 and 2, and were able to gather documents unobstructed by the Government in order to reach its conclusion likely means that production of the OPR file to the victims in this case could significantly shortcut this discovery process and the litigation.  Additionally, if OPR "needed" the documents to investigate and make findings regarding the victims' claims, then logically the victims share that "need" and have no other means through which to obtain the documents.  The Government has not explained any harm that would come from releasing the documents covered by deliberative process privilege to the victims.  If the Government raises any such harm, I respectfully request an opportunity to provide additional information on that alleged harm.

<strong><u>Investigative Privilege</u></strong>

106.  The investigative privilege is a qualified privilege, which balances the need of particular litigate for access to information against any public interest in non-disclosure.  That balancing process is ordinarily made with reference to factors discussed in *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973), specifically:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case.

On the facts of this case, these factors weigh in favor of disclosing the information the victims have requested.

107.  With regard to factor (1) (the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information), I represented four victims of Epstein's sex offenses in Federal Court – Jane Doe No. 1, Jane Doe No. 2, and a victim I will refer to as "S.R." and "M.J.", and other victims of Jeffrey Epstein's abuse as well. If further information is disclosed about this case, that will not discourage them from providing information, but rather will encourage them.  I have also talked personally to attorneys for a number of other victims in this case.  I have been told that many of these other victims hope that Jane Doe No. 1 and Jane Doe No. 2 are successful in their case.

108. With regard to factor (2) (the impact upon persons who have given information of having their identities disclosed), Jane Doe No. 1 and Jane Doe No. 2 are not asking for information that would identify any particular victim.  Accordingly, there will be no effect on other victims. Additionally, I am aware of the true names of many of Epstein's victims and that information has

21

not been disseminated to the public where those individual victims did not wish for their identities to be disseminated.

109. With regard to factor (3) (the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure), this is a lawsuit to force the compliance by the Government with its CVRA obligations.  Accordingly, the Government's "program" of providing victims' rights will be directly improved if the victims are able to enforce their rights in this lawsuit.

110. With regard to factor (4) (whether the information sought is factual data or evaluative summary), many of the items that the victims seeks are factual summaries.  An example of this is found at page 18 of the first privilege log (DE 212-1), with regard to Box #3 P-011778 to P-011788.  The entry reads: "File folder entitled '6/12/09 Victim Notif. Log' containing chart with victim contact information and attorney notes regarding dates and type of contacts."  This would include, for example, dates of contacts with Jane Doe No. 1 and Jane Doe No. 2, which would be purely factual information.

111.   With regard to factor (5) (whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question), Jane Doe No. 1 and Jane Doe No. 2 are plainly *victims* of a crime, not criminal defendants.  Indeed, as the Court is aware, it is the *criminal defendant* (Jeffrey Epstein) who has undertaken several "limited" intervention efforts to try and block disclosure of information to the victims.

112.   With regard to factor (6) (whether the police investigation has been completed), the investigation of Epstein was completed years ago and the Government has not produced in its privilege log any information indicating recent investigative activity.

113.   With regard to factor (7) (whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation), it appears than OPR investigation has arisen as a direct result of the victims' efforts in this case.  However, it does not appear that release of any information to the victims would hamper any disciplinary proceedings.  Indeed, to the extent that the victims are able to obtain information about this case and find information about misconduct, then they can provide that information to Government and other disciplinary entities as appropriate.

114.   With regard to factor (8) (whether the plaintiff's suit is non-frivolous and brought in good faith), it should be clear at this juncture of a five-year long case that the victims have a substantial claim that is brought in good faith.

115.   With regard to factor (9) (whether the information sought is available through other discovery or from other sources), as recounted throughout this affidavit, the victims have no other way to obtain the information at issue in this privilege debate, as it involves information internal to the Justice Department.

116.   With regard to factor (10) (the importance of the information sought to the plaintiff's case), the information that the victims are seeking is highly important to their case.  Indeed, without adequate proof, the Court has indicated that it may have to deny the victims' petition.  DE 99 at 11.  Throughout this affidavit, I have provided numerous examples and explanations of why the victims need the information that they are requesting.  The documents to which the Government

is asserting investigative privilege, for example, bear directly on the Government's alleged "estoppel" defense, which the victims need a complete evidentiary record to dispute.

## Work-Product Doctrine

117.  A work product claim can be defeated by a showing of substantial need and undue hardship to obtain the materials in other ways. In this affidavit, I have tried to articulate the specific and compelling need for all of the materials that victims are seeking.  I will not repeat all of those assertions here, but simply note that I stand ready to provide any additional information that the Court may require to determine the compelling need that the victims have for the materials they have requested as well as the undue hardship (if not actual impossibility) of obtaining the materials in other ways. Any balancing of considerations tips decisively in the victims favor.

118. As one example, the victims have a compelling need for the materials that OPR collected as part of its investigation.  Because Justice Department attorneys are generally required to talk to OPR investigators, OPR was apparently able to investigate the claims of misconduct related to the Epstein case by getting statements from the attorney's involved.  These interviews appear to be recorded in materials found at page 14 of the supplemental privilege log (DE 216-1), with regard to Suppl. Box #3 P-013956 to P-013846 [sic – apparently should be P-013970, a total of 14 pages].  Judging from the entry, these notes would be factual statements from Justice Department prosecutors about how the Epstein case was handled and whether any misconduct occurred during the handling of the case.  Those are central issues in this case.  There is no other way for the victims to obtain information about these subjects, because the Justice Department has declined to provide information on this subject.

119.  The victims have established a substantial need for the materials they are requesting in the previous paragraphs of this affidavit that review, request-by-request, their document production requests numbers 1 through 25 and supplemental request number 1.

120.  As another example of why the victims have established a compelling need for the materials is the fact that the Court has indicated that it will be considering an "estoppel" argument raised by the Government as a defense in this case.  DE 189 at 12 n.6.  The Court has noted that this argument "implicates a fact-sensitive equitable defense which must be considered in the historical factual context of *the entire interface between Epstein, the relevant prosecutorial authorities and the federal offense  victims* – including an assessment of the allegation of a deliberate  conspiracy between Epstein and federal prosecutors to keep the victims in the dark on the pendency of negotiations between Epstein and federal authorities until well after the fact and presentation of the non-prosecution agreement to them as *a* fait accompli." DE 189 at 12 n.6 (emphasis added).  The materials to which the Government is asserting work product protection go directly to that "interface" between the victims, the Government, and Epstein.  The victims have no other way of showing what that interface is.  The Government will not be harmed if the materials are provided to the victims.

## Grand Jury Information

121.  The victims' legal pleading has explained why the Government has not properly asserted any grand jury secrecy to the documents at issue.  In addition, many of the Government's grand jury privilege assertions appear to broadly cover both grand jury and non-grand jury information. Even if the Court allows the Government to assert some form of grand jury privilege, it should require the Government to sever grand jury materials from non-grand jury materials.

122.  An illustration of this problem comes from page 12 of the first privilege log (DE 212-1), with regard to Box #2 P-008616 to P-008686.  The entry reads: "File folder entitled 'FBI Summary Charts' containing chart prepared at direction of AUSA, containing victims names, identifying information, summary of activity, and other information relevant to indictment." This does not appear to be a document that was ever presented to the grand jury or that directly discloses grand jury proceedings.  Moreover, to the extent that it involves some kind of limited disclosure of grand jury proceedings, that limited disclosure could be redacted and the other information provided to the victims.

123.  It does not appear that any of the alleged grand jury materials that the Government is asserting privilege involve on-going grand jury issues.  Moreover, it does not appear that disclosing any of the materials would "tip off" a potential target to a Government investigation. Of course, Jeffrey Epstein (and his associates) are well aware of the Government's investigation into their crimes against young girls for sexual purposes.

124.  The Government has not explained any harm that would come from releasing the documents to the victims.  If the Government raises any such harm, I respectfully request an opportunity to provide additional information on that alleged harm.

**Privacy Rights of Other Victims**

125.  Jane Doe No. 1 and Jane Doe No. 2 do not seek confidential or identifying information about any other victims. To clarify that fact, on July 31, 2013, I sent a letter to the Government stating, in part, that "to avoid any interference with any privacy rights of victims who are not parties to this litigation, Jane Doe #1 and Jane Doe #2 are not seeking any identifying information about other victims. In any of the documents that Jane Doe #1 and Jane Doe #2 have requested the Government produce, the Government should not produce the names of other victims or other identifying information (e.g., address or telephone number) but should instead redact that information."

\* \* \* \* \*

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 16th day of August, 2013.

_____ /s/ Bradley J. Edwards
BRADLEY J. EDWARDS, ESQ.

Attachments:
1. October 3, 2011, request for production;
2. June 24, 2013, supplemental request for production; and
3. Victims' Requests for Admissions and Government Answers

# EXHIBIT 1
## To
## Brad Edwards Affidavit

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80736-Civ-Marra/Johnson

JANE DOE #1 and JANE DOE #2,

     Plaintiffs

     v.

UNITED STATES,

     Defendants

_____/

JANE DOE #1 AND JANE DOE #2'S FIRST REQUEST FOR PRODUCTION
TO THE GOVERNMENT REGARDING INFORMATION RELEVANT TO THEIR
PENDING ACTION CONCERN THE CRIME VICTIMS RIGHTS ACT

COME NOW Jane Doe #1 and Jane Doe #2 ("the victims"), by and through undersigned counsel, and request the defendant United States (hereinafter "the Government") to produce the original or best copy of the items listed herein below for inspection and/or copying, pursuant to the Court's Order (DE #99) directing discovery in this case.

BACKGROUND

As the Government will recall, the victims have asked the Government to stipulate to undisputed facts in this case. The Government has declined. Accordingly, the victims filed their Motion for Finding of Violations of the Crime Victims' Rights Act and Request for a Hearing on Appropriate Remedies (DE 48) (the victims' "summary judgment motion") along with a Motion to Have Their Facts Accepted Because of the Government's Failure to Contest Any of the Facts (DE 49).

On September 26, 2011, the Court denied the victims' motion to have their facts accepted (DE 99 at 11). At the same time, however, the Court has ordered discovery to develop the

factual record concerning the summary judgment motion (DE 99 at 11).   The Court reserved ruling on the victims' motion for an order directing the Government not to suppress relevant evidence (DE 99 at 11).

On September 28, 2011, the victims requested that the Government voluntarily provide documents concerning this case.  The Government declined to provide even a single document. Accordingly, the victims now seek the following information relevant to their pending summary judgment motion.

## **DISCOVERY REQUESTED**

The numbered discovery requests below should all be construed in light of the definitions of terms provided at the end of the requests.

1.   In the victims' currently-pending summary judgment motion, the victims contend that the Government conducted an extensive criminal investigation into Jeffrey Epstein's sexual exploitation of young girls, including Jane Doe #1 and Jane Doe #2 between 2001 and 2008. The victims also contend that the FBI and other federal agencies established that Epstein operated a large criminal enterprise that used paid employees and underlings to repeatedly find and bring minor girls to him.  In deferring ruling on the victims' summary judgment motion, the Court noted that the victims had alleged that the FBI and the U.S. Attorney's Office's "investigation developed a strong case for a federal prosecution against Epstein based on 'overwhelming' evidence."  DE 99 at 2.  The Court, however, also noted that this was an allegation that needed "further factual development."   DE 99 at 2 n.2.  Please provide all documents, correspondence, and other information that supports these victims' allegations, including:

  (a)  the FBI case file on the Epstein case;

  (b)  all documents, correspondence, witness statements, FBI 302s, and other similar information, that the Government collected as part of its case against and/or investigation of Epstein, including any information provided to Epstein or receive from Epstein as part of "discovery" or exchange of information concerning the case;

  (c)  all documents, correspondence, witness statements, and other similar information that the Government received from any federal, state, local, or other law enforcement agency regarding sex offenses committed against children by Jeffrey Epstein;

  (d)  the 82-page prosecution memorandum (a/k/a "pros memo") outlining numerous federal sexual offenses committed by Epstein (and any attachments to that memorandum) and the 53-page draft indictment for numerous federal

offenses that the Government developed in this case and any similar successor or predecessor document; and

(e) Any other prosecution memorandum regarding Jeffrey Epstein (and any documents attached to that memorandum) and all draft federal indictments that were prepared regarding Epstein.  Please also provide all documents, correspondence, and other information regarding these prosecution memoranda and the draft federal indictments.

2.   Throughout their pending summary judgment motion, the victims contend that they received only limited notifications from the Government (and, in particular, the U.S. Attorney's Office acting through FBI agents) about the plea negotiations that occurred with Jeffrey Epstein and the non-prosecution agreement that was ultimately reached.  Please provide all documents, correspondence and other information regarding victim notifications in this case, including (but not limited to):

   a)   All crime victims notifications (and draft notifications) sent to Jane Doe #1 and Jane Doe #2 and the other identified victims of Epstein's offenses;

   b)   All correspondence, documents, and other information regarding negotiations between the Government and Epstein's defense attorneys concerning the extent and nature of notifications to be made to Epstein's victims;

   c)   All correspondence, documents, and other information regarding discussions between the Government, the FBI, the Palm Beach Police Department, the Palm Beach County State Attorney's Office, and Epstein's defense attorneys concerning the extent and nature of notifications to be made to Epstein's victims;

   d)   All correspondence, documents, and other information regarding "marching orders" that were given to FBI agents regarding the information that they could provide to the victims about the negotiations and the non-prosecution agreement;

   e)   All correspondence, documents, and other information regarding information that could be given to attorneys for the victims about the non-prosecution agreement, including information about what could be told to Brad Edwards (counsel for Jane Doe #1 and Jane Doe #2) about the non-prosecution agreement;

   f)   All correspondence, documents, and other information regarding Epstein's awareness that his victims (including Jane Doe #1 and Jane Doe #2) would not be notified of the non-prosecution agreement (and its ultimate presentation in court) or given a chance to confer regarding the plea negotiations he was conducting with the Government.

3.   The victims allege in their pending summary judgment motion that the Government negotiated a non-prosecution agreement with Epstein and that among the subjects covered in that non-prosecution agreement was a confidentiality provision that precluded disclosing the agreement to them and to other victims.  Please provide all draft plea agreements (both state and federal) and non-prosecution agreements prepared either by attorneys for the Government or by attorneys for Epstein, as well as any correspondence, documents or other information pertaining to these agreements and to any confidentiality provision in these agreements.  Please indicate that date on which each of these proposed agreements was drafted and by whom.

4.   The victims allege in their pending summary judgment motion that the Government was interested in finding a place to conclude any plea agreement that would effectively keep Epstein's victims (most of whom resided in or about West Palm Beach) from learning what was happening through the press.   Please provide all correspondence, documents, and other information pertaining to negotiations between the Government and Jeffrey Epstein concerning the court and/or location in which Jeffrey Epstein would enter any guilty plea (including in particular any negotiations concerning concluding the plea in Miami or other location outside of West Palm Beach).

5.   The victims allege in their pending summary judgment motion that part of the plea negotiations with Epstein involved Epstein's efforts to make sure that the victims would be represented in civil cases against Epstein by someone who was not an experienced personal injury lawyer.   Please provide all correspondence, documents, and other information pertaining to negotiations between the Government and Jeffrey Epstein regarding any legal representation of the victims in civil cases against Epstein, including any negotiations about what kinds of representation should be provided in a plea agreement or non-prosecution agreement.

6.   The victims allege in their pending summary judgment motion that the Government wanted the non-prosecution agreement with Epstein concealed from public view because of the intense public criticism that would have resulted had the agreement been disclosed and/or the possibility that victims would have objected in court and convicted the judge not to accept the agreement. Please provide all correspondence, documents, and other information concerning the Government's and/or Epstein awareness or discussion of this possible public criticism and/or victim objections.

7.   The victims allege in their pending summary judgment motion that the Government was aware that it potentially had obligations under the CVRA to notify the victims about the non-prosecution agreement and any related state court plea agreement.   Please provide all correspondence, documents, and other information regarding the Government's awareness of its potential CVRA obligations in this case and regarding any discussions between the Government and Epstein concerning these CVRA obligations in this case.  This should include any objections raised by Epstein to any notification of the victims (including Jane Doe #1 and Jane Doe #2) and any Government response to these objections.  This should also include any correspondence and information about whether the CVRA applied to the victims.

8.   The victims allege in their pending summary judgment motion that, after Epstein signed the non-prosecution agreement, his performance was delayed while he used his significant social and political connections to lobby the Justice Department to obtain a more favorable plea deal (including lobbying components of the Justice Department in Washington, D.C., including the Child Exploitation Obscenity Section).  Please provide all correspondence, documents, and other information regarding Epstein's lobbying efforts to persuade the Government to give him a more favorable plea arrangement and/or non-prosecution agreement, including efforts by former President Bill Clinton, Andrew Albert Christian Edward (a/k/a Prince Andrew, Duke of York), Harvard Law Professor Alan Dershowitz, Ken Starr, Lillian Sanchez, Jay Lefkowitz, and Roy Black on his behalf.

9.  On January 10, 2008, Jane Doe #1 and Jane Doe #2 received letters from the FBI advising them that "this case is currently under investigation."  Please provide all documents, correspondence, and other information relating to those representations being made by the FBI to Jane Doe #1 and Jane Doe #2, including all information about whether the FBI was aware of the non-prosecution agreement at that time and about whether Epstein was aware of the notifications being made to the victims.

10.  In their pending summary judgment motion, the victims have alleged that the FBI was led to believe that their investigation of Epstein was going to produce a federal criminal prosecution and that the FBI was also misled by the U.S. Attorney's office about the status of the case.  Please provide all documents, correspondence, and other information relating to these allegations, including:

    a)  All documents, correspondence, and other information relating to discussions between the U.S. Attorney's Office and the FBI concerning the status of the investigation and the plea discussions with Epstein, as well as what kind of charges would appropriately be filed against Epstein;

    b)  All documents, correspondence, and other information relating to the U.S. Attorney's Office's representations to the FBI and any other state or local law enforcement agency about how this case was being handled; and

    c)  All documents, correspondence, and other information relating to whether the FBI would support the position of the U.S. Attorney's Office that it has not violated the rights of Epstein's victims in this case.

11.  In their pending summary judgment motion, the victims have alleged that they had various meetings with Government prosecutors and/or agents (including FBI agents).  Related to these meetings, they also allege that in mid-June 2008, their attorney (Bradley J. Edwards) discussed with an AUSA involved in the case the need for filing federal charges and that the AUSA asked the attorney to send a letter about why such charges should be filed without disclosing the existence of a previously-signed non-prosecution agreement.  The victims further allege that on about July 3, 2008, their attorney sent a letter urging the filing of federal charges against Epstein.  Please provide all documents, correspondence, and other information regarding these meetings with the victims and their legal counsel, including meetings with the victims on October 26, 2007, and January 31, 2008, and the contact with their legal counsel in mid-June 2008.  Please also provide all documents, correspondence, and other information related to contacts between the Government and the National Crime Victim's Law Institute (NCVLI) concerning possible legal representation or other assistance to the victims by NCVLI.

12.  In their pending summary judgment motion, the victims allege that in mid-June 2008, their attorney (Bradley J. Edwards) discussed with an AUSA involved in the case the need for filing federal charges and that the AUSA asked the attorney to send a letter about why such charges should be filed without disclosing the existence of the non-prosecution agreement.  The victims further allege that on about July 3, 2008, their attorney sent a letter urging the filing of federal charges against Epstein. Please provide all documents, correspondence, and other information regarding these contacts, including e-mails and correspondence generated as a result of the attorney's inquiry and any action that was taken in response to the letter that he sent.

13. In their pending summary judgment motion, the victims allege that on or about June 27, 2008, the Government learned that Epstein would be entering his plea to state charges on about June 30, 2008.  Please provide all documents, correspondence, and information regarding:

    a) How the Government Office learned that the plea was going to be entered;

    b) How the Government notified victims about the entry of the guilty plea; and

    c) The contents of the notifications given to the victims about the entry of the guilty, including whether the victims were informed about the non-prosecution agreement and about whether the entry of this plea would preclude prosecution of crimes Epstein had committed against them.

14. In their pending summary judgment motion, the victims have alleged that the Government and Epstein worked together to keep the existence of the non-prosecution agreement secret, including declining comment about the existence of such an agreement when asked about it when his guilty plea in state court became public knowledge.  Please provide all documents, correspondence, and information about the Government's and Epstein's efforts to keep the existence of the non-prosecution agreement secret, including all e-mails and correspondence about "declining comment" or similar devices to keep the non-prosecution agreement secret.

15. In their pending summary judgment motion, the victims allege that at all materials times, it would have been practical and feasible for the Government to have kept the victims informed about the discussions concerning the non-prosecution agreement.  The victims further allege that on about July 9, 2008, the U.S. Attorney's Office provided notice to Jane Doe #1 of some of the terms of the agreement between it and Jeffrey Epstein.  The victims also received a "corrected" notification letter on about September 3, 2008.  Please provide all documents, correspondence, and other information about these notifications, including:

    a) any information about whether these notifications should or should not include some mention of the non-prosecution agreement;

    b) any information about the contents of these notifications;

    c) any communications between the Government and Epstein's counsel regarding what the notifications should contain, including any communication on or about July 9, 2008, objecting to parts of the draft;

    d) Any communications between the Government and Epstein's counsel about which parts of the non-prosecution agreement were operative (including whether Part 3 was operative);

    e) Any communications between the Government and Epstein's counsel regarding the September 3, 2008, corrected notification letter; and

    f) any documents, correspondence, and other information regarding the practicality and feasibility of providing notice to the victims of the existence of the agreement, which shall include any correspondence related to meeting with the victims or notifying them in any way of the non-prosecution agreement.

16. In their pending summary judgment motion, the victims allege that one of the senior prosecutors in the U.S. Attorney's Office joined Epstein's payroll shortly after important decisions were made limiting Epstein's criminal liability – and improperly represented people close to Epstein.  In light of this fact, the peculiar nature of the non-prosecution agreement

reached in this case, and other information in the possession of the victims, it is also possible that other improper relationships exist between Government agents and Epstein.  Please provide any documents, correspondence, and other information regarding the possibility of any improper relationship, including:

    a) Attorney Bruce Reinhart's involvement in and/or awareness of any aspect of the Government's criminal investigation and/or possible prosecution/non-prosecution of Epstein;

    b) Attorney Bruce Reinhart's involvement in and/or awareness of the Government's interest in any witness, subject, or target of the Epstein investigation, including Sarah Kellen, Ghislaine Maxwell, Nadia Marcinkova, Lesley Groff, Haley Robson, Louella Ruboyo, Larry Morrison, Larry Visoki, David Rogers, William Hammond, and Robert Roxburgh;

    c) All documents, correspondence, and other information reflecting telephone calls (including telephone logs and telephone billing statements) made by or received by Reinhart from Jeffrey Epstein, the Florida Science Foundation, Jack Goldberger, Alan Dersowitz, Roy Black, Ken Starr, Lillian Sanchez, and any other person involved with the criminal defense of Jeffrey Epstein, including telephone calls to and from Jack Goldberger and the Florida Science Foundation;

    d) All documents, correspondence, and other information (including, for example, e-mails) that were sent to, copied to, or sent by Reinhart in which the word "Epstein," "Kellen, "Ruboyo," "Morrison," "Visoki," "Rogers," "Hammond," Roxburgh," "Villafana, " "Florida Science Foundation," "Starr," "Black," "Goldberger," "Jeffrey," "Australian," "Lewis," "Sanchez," "358 El Brillo Way" appears and which are connected to or related to Jeffrey Epstein, Jack Goldberger, or the Jeffrey Epstein investigation or prosecution;

    e) All documents, correspondence, and other information (including for example e-mails) of a similar nature that indicate that <u>any</u> other Government prosecutor has represented (or discussed representing) a person or entity related to Jeffrey Epstein or has received business or funds from a person or entity related to Jeffrey Epstein;

    f) All documents, correspondence, and other information that indicate or suggest that <u>any</u> Government prosecutor or investigator (including state and local prosecutor or investigator) has had any form of business, social, personal, or other relationship with Jeffrey Epstein or a person or entity related to Jeffrey Epstein; and

    g) All documents, correspondence, and other information that indicate or suggest that <u>any</u> Government prosecutor or investigator (including state and local prosecutor or investigator) would receive anything of value, directly or indirectly from Jeffrey Epstein or a person or entity related to Jeffrey Epstein (including any charitable contributions to be made by Epstein to any entity).

    17. In December 2010, the victims sent a letter to the U.S. Attorney's Office for the Southern District of Florida, requesting that the Office investigate whether "improper influences" were brought to bear during the negotiations involving the possible prosecution (and ultimately the non-prosecution) of Jeffrey Epstein.  That letter led to a reference of the matter to the Office of

Professional Responsibility (OPR) in the Justice Department in Washington, D.C., which began some kind of an inquiry/investigation.  Please provide:

   a) All documents, correspondence, and other information collected by the Office of Professional Responsibility (OPR) and any other component of the Justice Department (including the FBI) in response to the victims' letter;

   b) All documents, correspondence, witness statements, and other information collected as part of OPR's inquiry/investigation;

   c) All documents, correspondence, witness statements and other information collected as part of any criminal inquiry/investigation that was initiated as a result of that letter, including any inquiry/investigation into criminal conflict of interest violations (such as 18 U.S.C. § 205 and § 207)

   d) All documents, correspondence, witness statements, and other information collected by any federal investigative agency that was triggered by OPR's inquiry/investigation, including any FBI inquiry/investigation regarding any improper influences or criminal or ethical violations that may have been committed by government attorneys during the handling of the Epstein investigation and/or prosecution;

   e) Any documents, correspondence, and other information regarding the accuracy or inaccuracy of Bruce Reinhart's sworn statements (found in DE 79-1 at p. 31) that he "did not participate in any way in the Office's investigation of Epstein;" that he "was not involved in any of the Office's decisionmaking with regard to the Epstein matter;" and that he "never learned any confidential, non-public information about the Epstein matter;"

   f) Any documents, correspondence, or other information regarding the circumstances that lead OPR to send a letter to the victims on May 6, 2011, indicating that they would not provide any further assistance to the victims in connection with their allegations that improper influences were brought to bear on the Epstein case;

   g) Any document, correspondence, e-mail, memoranda, or other information prepared by OPR, the FBI, or other Justice Department Component as a result of or following up on the victims' December 2010 letter concerning the Epstein case; and

   h) Any documents, correspondence, or other information that OPR has collected or obtained regarding the Epstein investigation and/or prosecution.

18. At a couple points during the prosecution of this action, including in approximately December 2010 and most recently after the August 2011 hearing, the Justice Department in Washington, D.C., discussed or determined that the U.S. Attorney's Office for the Southern District of Florida (USAO SDFL) was "conflicted out", or may be conflicted out, of handling various issues related to the Epstein case because it suffered from a conflict of interest.  The Justice Department accordingly sent various issues related to the Epstein case (and, on information and belief, issues related to Jane Doe #1 and Jane Doe #2) to the Department of Justice and to a United States Attorney's Office in another District.  Please provide all documents, correspondence, and other information regarding the potential conflicts of interest that the Justice Department discussed or determined existed for the USAO SDFL, as well as any referral that was made to Main Justice or to any other District, including any documents that

were transmitted to any other District regarding the conflict and regarding what was to be investigated.

19. In March 2011, former U.S. Attorney Alexander Acosta sent a three-page letter to the news media in which he claimed that when Government attorneys began investigating Epstein, Epstein launched "a yearlong assault on the prosecution and the prosecutors." Shortly thereafter, Jeffrey Epstein's defense attorney Roy Black sent a responsive letter to Alexander Acost's letter to the news media in which he claimed that he did not pry into the personal lives of prosecutors but merely pointed out misconduct and over-reaching by certain people involved in the Epstein investigation. Please provide all documents, correspondence and other information that supports or contradicts Acosta's allegations in his letter, including any information that the Justice Department received from Epstein attacking the prosecutors and investigators working on the case. Please also provides all documents, correspondence, information about misconduct and over-reaching that was provided by Black and that the Government found that supported or contradicted such allegations.

20. In their pending summary judgment motion, the victims have alleged that Epstein's guilty plea to state charges was intended to be the consummation of a non-prosecution agreement that barred prosecution of federal offenses committed against them. They have further alleged that Epstein entered such a guilty plea on or about June 30, 2008. Please provide all documents, correspondence, and other information between the Government and state and local prosecutors and police agencies (including The Palm Beach Police Department and Palm Beach State Attorney's Office) regarding the Epstein investigation and ultimate Epstein plea.

21. In their pending summary judgment motion, the victims have alleged that correspondence in the possession of the Government will support their claims. Please provide all documents, correspondence, and other information between Government attorneys/officials (including both federal and state prosecutors) and attorneys for Jeffrey Epstein (or non-attorney acting on Epstein's behalf) relating to (1) negotiations involving the possible prosecution (and ultimately the non-prosecution) by federal or state agencies for sex offenses, including sex offenses committed against Jane Doe #1 and Jane Doe #2, (2) Epstein's entry of state guilty pleas for related sex offenses; (3) a non-prosecution agreement entered into between Epstein and the Government that barred his prosecution for offenses committed against Jane Doe #1 and Jane Doe #2; (4) the fulfillment of Epstein's and/or the Government's obligations under the non-prosecution agreement and/or the state guilty pleas Epstein entered; (5) any work release or other conditional release of Epstein from confinement; (6) any designation of Epstein as a sex offender or restrictions on him contacting victims of his offenses (including Jane Doe #1 and Jane Doe #2); and (7) any termination of supervision or parole of Epstein. This information should include unredacted e-mails, letters, and correspondence of any type between government prosecutors working on the case (including, but not limited to, federal prosecutors Alexander Acosta, Jeffrey H. Sloman, Matt Menchel, Andy Lourie, Ann Marie Villafana, Dexter Lee, and Bruce Reinhart and state prosecutors Dahlia Weiss, Lana Belolovek, and others involved in the Epstein investigation) and defense attorneys representing Epstein (including, but not limited to, Roy Black, Jay Lefkowitz, Jack Goldberger, Martin Weinberg, Gerald Lefcourt, Michael Tien, Guy Lewis, Lilly Ann Sanchez, Ken Starr, Alan Dershowitz) and agents acting in support of Epstein (including, but not limited to former President Bill Clinton and Andrew Albert Christian Edward

(a/k/a Prince Andrew, Duke of York).  This should also include letters of recommendation or similar communications submitted to any Government official vouching for or providing support for Jeffrey Epstein.

22. As you know, throughout their pending summary judgment motion, the victims have alleged that they were not properly notified of plea negotiations with Jeffrey Epstein and were denied their right to confer by the Government and that instead the Government gave Epstein generous concessions through the plea negotiations.   Please provide any documents, correspondence and other information that reflects or discusses any consideration of any type that Epstein had previously provided or offered to provide to the Government (or any individual within the Government, in either his official or private capacity) or any person previously employed by the Government and involved in the Epstein investigation or prosecution.   The documents, correspondence, and other information should include any information discussing:

      (a) Any donation or offer to donate, directly or indirectly, either funds, services, or any other valuable consideration to any person or entity;

      (b) Any offer to assist, directly or indirectly, any person to obtain employment, business opportunities, business clients, real estate, office properties;

      (c) Any offer to assist the Government or law enforcement agencies in the investigation or prosecution of any federal or state criminal offense;

      (d) Any consideration that Epstein had provided to Government or law enforcement agencies in the past; and

      (e) Any other consideration of any type that Epstein offered to provide or had provided in the past that could provide a basis for the Government extending Epstein a more generous or lenient plea bargain or non-prosecution agreement than would be received by any other similarly situated child abuse suspect.

23. The Crime Victims' Rights Act, 18 U.S.C. § 3771(c)(1), requires the Government to use its "best efforts" to protect the rights of crime victims.   Please provide all documents, correspondence, and other information that will assist Jane Doe #1 and Jane Doe #2 in protecting their rights under the CVRA, including all documents, correspondence, and other information that the Government previously identified as being helpful to the victims but refused to provide based on its legal interpretation (now rejected by the Court) that the CVRA did not apply to this case because no indictment was filed.

24. In the course of its investigation of Epstein and negotiations with Epstein, the Government (i.e., federal investigators and prosecutors) shared documents, correspondence, and information with other persons outside the federal government, including state and local prosecuting and law enforcement agencies, prosecuting and law enforcement agencies in other countries, Epstein's legal counsel, legal counsel for crime victims, and other entities.   Please provide all documents, correspondence, and other information that the Government shared with any entity or person outside the federal government, including all correspondence (including e-mails) with those entities or persons.

25.  After the victims had made extensive efforts to try and reach a stipulated set of facts in this case, in March 2011 the Government refused to negotiate about such facts.  Accordingly, at that time the victims filed various motions to obtain evidence in this case and, at the same time,

the victims voluntarily made all initial disclosures on their part that are required by Federal Rule of Civil Procedure 26(a)(1).  Please provide all initial disclosures required by the Federal Rules of Civil Procedure, including all disclosures required by Rule 26(a)(1).

## DEFINITIONS

For the purpose of construing the foregoing discvery requests, the following terms are defined:

The term "documents" means and includes, without limitation, all writings of any kind, including the originals and all non-identical copies or drafts, whether different from the original by reason of any notation made on such copy or draft or otherwise including, without limitation, correspondence, memoranda, notes, diaries, statistics, letters, e-mails, electronic computer files, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice communications, offers, notations of any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer print-outs, teletypes, facsimiles, invoices, work sheets and all drafts, alterations, modifications, changes, and amendments of any of the foregoing, graphic or aural writs, records or representations of any kind including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures; and electronic, mechanical or electric records or representations of any kind including, without limitation, tapes, cassettes and disc recordings, and writings and printed material of every kind.

The term "correspondence" means any tangible object that conveys information or memorializes information that was conveyed in tangible or oral form including, but not limited to, writings, letters, memoranda, reports, notes, e-mails, telephone logs, telephone billing information, telephone recordings, and interoffice communications.

The term "Epstein's victims" means any person that the Government identified as a possible victim of a sex offense committed by Jeffrey Epstein, including Jane Doe #1, Jane Doe #2, all victims identified in attachment to the non-prosecution agreement entered into by Epstein, and another person that the Government investigated as a possible victim of Epstein's sex offenses.

The term "Government" means the federal government, including all employees of and components of the United States Department of Justice (such as, the Office of the Attorney General, the Office of the Deputy Attorney General, the Criminal Divisions, the Office of Professional Responsibility, the Child Exploitation and Obscenity Section, the U.S. Attorney's Offices for the Southern District and Middle District of Florida, and the Federal Bureau of Investigation) and other federal government agencies with law enforcement responsibilities related to the Epstein case (such as the Internal Revenue Service).  This request for production seeks all documents, correspondence, and other information held by all of these entities, including all employees of and components of the Justice Department that worked on or were in any way involved the Epstein investigation and/or that possess information relevant to the victims' claims.

The term "including" means containing within the request, but not limiting the request.

The term "witness statement" means any document or other recording in any form (including oral form) reflecting, recording, or otherwise memorializing a statement made or information conveyed by a potential witness, including for example FBI 302's.  The term includes information collected by any law enforcement, prosecuting or government agency, including all federal, state, and local law enforcement agencies located in Washington, D.C., or Florida.

## NO GRAND JURY TRANSCRIPTS SOUGHT

If any of the foregoing requests cover grand jury transcripts, do not provide the grand jury transcript.  If any of the foregoing requests include documents that quote directly from a grand jury transcript, please redact that particular quotation.

## PRIVILEGE LOG

If you believe that any document, correspondence, or other information requested in this request is subject to a privilege and if you intend to assert that privilege, please provide a "privilege log" consistent with Local Rule 26.1(g), including a description a document that is consistent with Local Rule 26.1(g)(3)(B).  Your privilege log should include the type of document, general subject matter of the document, date of the document, and author and addressee of the document or correspondence.

## REDUCING UNDUE BURDEN

If you believe that complying with any of the foregoing requests would be unduly burdensome, please contact victims counsel – Bradley J. Edwards – to discuss ways to reduce any such burden.

DATED: October 3, 2011

Respectfully Submitted,

s/ Bradley J. Edwards
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
Florida Bar No.: 542075
E-mail: brad@pathtojustice.com

*and*

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
   University of Utah
332 S. 1400 E.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Facsimile: 801-585-6833
E-Mail: cassellp@law.utah.edu

Attorneys for Jane Doe #1 and Jane Doe #2

## CERTIFICATE OF SERVICE

The foregoing document was served on October 3, 2011, on the following via US Mail and E-Mail Transmission:

Dexter Lee
A. Marie Villafaña
Assistant U.S. Attorneys
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
(561) 820-8711
Fax: (561) 820-8777
E-mail: Dexter.Lee@usdoj.gov
E-mail: ann.marie.c.villafana@usdoj.gov
Attorneys for the Government

Roy Black, Esq.
Jackie Perczek, Esq.
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
RBlack@royblack.com
Attorneys for Proposed Intervenors Roy Black et al.

Respectfully Submitted,

*S/ Bradley J. Edwards*
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.

# EXHIBIT 2
## To
## Brad Edwards Affidavit

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 08-80736-Civ-Marra/Johnson**

JANE DOE #1 and JANE DOE #2,

    **Plaintiffs**

    **v.**

UNITED STATES,

    **Defendants**

_____/

**JANE DOE #1 AND JANE DOE #2'S SUPPLEMENTAL REQUEST
FOR PRODUCTION TO THE GOVERNMENT REGARDING NEW INFORMATION
CONCERNING INVESTIGATION OF HANDLING OF EPSTEIN NON-
PROSECUTION AGREEMENT**

COME NOW Jane Doe #1 and Jane Doe #2 ("the victims), by and through undersigned counsel, and request the defendant United States (hereinafter "the Government") to produce the original or best copy of the items listed herein below for inspection and/or copying, pursuant to the Court's Order (DE 99) directing discovery in this case, the Court's Order denying the Government's motion to dismiss and lifting stay of discovery (DE 189), and the Court's Omnibus Order (DE 190):

**BACKGROUND**

As the Government will recall, the victims have repeatedly asked the Government to stipulate to undisputed facts in this case. The Government has declined. Accordingly, the victims filed their Motion for Finding of Violations of the Crime Victims' Rights Act and Request for a Hearing on Appropriate Remedies (DE 48) (the victims' "summary judgment motion") along with a Motion to Have Their Facts Accepted Because of the Government's Failure to Contest Any of the Facts (DE 49).

On September 26, 2011, the Court denied the victims' motion to have their facts accepted (DE 99 at 11).  At the same time, however, the Court has ordered discovery to develop the factual record concerning the summary judgment motion (DE 99 at 11).   The Court reserved ruling on the victims' motion for an order directing the Government not to suppress relevant evidence (DE 99 at 11).

On September 28, 2011, the victims requested that the Government voluntarily provide documents concerning this case.  The Government declined to provide even a single document.

On October 3, 2011, the victims sent requests for production of documents relevant to this case.

On November 8, 2011, the same day that the production of this discovery was due, rather than produce a single item of discovery or stipulate to a single fact, the Government filed a motion to dismiss the victims' case.  The Government also filed an accompanying motion for a stay in this case.

On November 8, 2011, the Government filed an ex parte, sealed motion to stay further discovery in this case.  (DE 121).  On November 9, 2011, the Court granted an ex parte, sealed order to stay.  (DE 123).

On December 5, 2011, the victims filed a response to Government's motion to stay.  The victims strenuously objected to the Government's approach, alleging specifically that "delay appears to be the Government's motivation for filing the motion to dismiss."  DE 129 at 2.  The victims went on to recount the fact that the Government had waited three years to file a motion to dismiss, concluding that "as a practical matter, the Government's motion has had the desired effect of delay: While its motion remains pending, the victims have been effectively denied any ability to obtain discovery from the Government."  DE 129 at 2-3.  The victims also filed a

protection motion to compel (DE 130) asking that the Court direct the Government to produce the requested materials.

On January 24, 2012, the Government filed a reply in support of its motion to stay. DE 140. In that reply, the Government represented that it would voluntarily be providing information to the victims: "[T]he United States has agreed to provide some information to [the victims] even during the pendency of the stay and is undertaking a search for that information." DE 140 at 4. Contrary to that representation, however, over the next seventeen months, the Government did not provide *any* information to the victims.

A year after the Government's motion to dismiss, on December 6, 2012, the victims filed a Motion for a Prompt Ruling Denying the Government's Motion for a Stay (DE 179). The motion explained that it had been more than a year since the Government had filed its motion for a stay and that the Government's refusal to produce any information continues to effective block the victims from learning what happened during the Government's plea negotiations with the man who sexually abused them. The Government filed a response in opposition to that motion (DE 182).

On February 25, 2013, counsel for the victims sent a request to the Government that, in view of that fact that its requested stay had never been granted, it should begin fulfilling its court-ordered discovery obligations:

> The victims believe that in view of fact that it has been more than fifteen months since the Government filed its motion for a stay of discovery and yet the Court has not granted that motion, the Court's discovery order is in effect and controlling. Accordingly, the victims respectfully request that by March 8, 2013, the Government produce all of the materials which is covered by the victims' discovery requests. If the Government has not produced those materials by March 8, 2013, the victims may be forced to seek the intervention of the Court to order the Government to follow its obligations.
>
> If you would like to discuss this further, please feel free to set up a time where we can talk to you over the phone about all this. We are happy to work

with you to try and minimize any unnecessary burden from your discovery obligations.

E-mail from Paul G. Cassell & Bradley J. Edwards to Dexter Lee, et al., Counsel for the Government (February 25, 2013).

The Government ignored the e-mail and did not respond in any way.

Accordingly, in view of the Government recalcitrance and refusal to even discuss its discovery obligations, on March 14, 2013, the victims filed a motion to compel production of discovery materials. The Government did not respond to this motion.

On June 1, 2013, the Court denied the Government's motion to dismiss. DE 189. That denial also lifted stay of discovery proceedings. DE 189 at 14 ("The stay of discovery pending ruling on the Government's motion to dismiss entered on November 8, 2011 [DE# 123] is also lifted."). The Court also entered an Omnibus Order (DE 190) that, among other things, granted the victim motion to compel (DE 130).

## SUPPLEMENTAL DISCOVERY REQUEST

The victims now request one specific item of supplemental discovery relating to information that, in large measure, has come into existence since they filed the first request for production of documents on October 3, 2011:

Jane Doe #1 and Jane Doe #2 have asked the Government to investigate their allegations that the U.S. Attorney's Office for the Southern District of Florida entered into a non-prosecution agreement with Jeffrey Epstein for sexual offenses committed against them and other victims based on considerations apart from the merits of the criminal case and also that violations of criminal law, rules of ethics, Justice Department policies (including policies on crime victims' rights), and the Crime Victims Rights Act occurred during the negotiations leading up to and surrounding the entry of the non-prosecution agreement. Please provide any information that the Government has developed concerning or relating to those allegations and the handling of the negotiations and consummation of the non-prosecution agreement, including any information developed by the Justice Department's Office of Professional Responsibility (OPR), the Federal Bureau of Investigation or other federal investigative entity, and any grand jury investigating these (or releated) allegations, including any grand jury meeting in the Southern District of Florida, the Middle District of Florida, the District of

New Jersey, and/or the District of Columbia.  For this one discovery request only, please include all relevant grand jury transcripts and evidence collected by the grand jury.

## DEFINITIONS

For the purpose of construing the foregoing discovery requests, the following terms are defined:

The term "documents" means and includes, without limitation, all writings of any kind, including the originals and all non-identical copies or drafts, whether different from the original by reason of any notation made on such copy or draft or otherwise including, without limitation, correspondence, memoranda, notes, diaries, statistics, letters, e-mails, electronic computer files, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice communications, offers, notations of any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer print-outs, teletypes, facsimiles, invoices, work sheets and all drafts, alterations, modifications, changes, and amendments of any of the foregoing, graphic or aural writs, records or representations of any kind including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures; and electronic, mechanical or electric records or representations of any kind including, without limitation, tapes, cassettes and disc recordings, and writings and printed material of every kind.

The term "correspondence" means any tangible object that conveys information or memorializes information that was conveyed in tangible or oral form including, but not limited to, writings, letters, memoranda, reports, notes, e-mails, telephone logs, telephone billing information, telephone recordings, and interoffice communications.

The term "Epstein's victims" means any person that the Government identified as a possible victim of a sex offense committed by Jeffrey Epstein, including Jane Doe #1, Jane Doe #2, all victims identified in attachment to the non-prosecution agreement entered into by Epstein, and another person that the Government investigated as a possible victim of Epstein's sex offenses.

The term "Government" means the federal government, including all employees of and components of the United States Department of Justice (such as, the Office of the Attorney General, the Office of the Deputy Attorney General, the Criminal Divisions, the Office of Professional Responsibility, the Child Exploitation and Obscenity Section, the U.S. Attorney's Offices for the Southern District and Middle District of Florida, and the Federal Bureau of Investigation) and other federal government agencies with law enforcement responsibilities related to the Epstein case (such as the Internal Revenue Service).  This request for production seeks all documents, correspondence, and other information held by all of these entities, including all employees of and components of the Justice Department that worked on or were in any way involved the Epstein investigation and/or that possess information relevant to the victims' claims.

The term "including" means containing within the request, but not limiting the request.

The term "witness statement" means any document or other recording in any form (including oral form) reflecting, recording, or otherwise memorializing a statement made or information conveyed by a potential witness, including for example FBI 302's.  The term includes information collected by any law enforcement, prosecuting or government agency, including all federal, state, and local law enforcement agencies located in Washington, D.C., or Florida.

## PRIVILEGE LOG

If you believe that any document, correspondence, or other information requested in this request is subject to a privilege and if you intend to assert that privilege, please provide a "privilege log" consistent with Local Rule 26.1(g), including a description a document that is consistent with Local Rule 26.1(g)(3)(B).  Your privilege log should include the type of document, general subject matter of the document, date of the document, and author and addressee of the document or correspondence.

## REDUCING UNDUE BURDEN

If you believe that complying with any of the foregoing requests would be unduly burdensome, please contact victims counsel – Bradley J. Edwards – to discuss ways to reduce any such burden.

DATED: June 24, 2013

Respectfully Submitted,

s/ Bradley J. Edwards
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
Florida Bar No.: 542075
E-mail: brad@pathtojustice.com

*and*

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
  University of Utah
332 S. 1400 E.

Salt Lake City, UT 84112
Telephone: 801-585-5202
Facsimile: 801-585-6833
E-Mail: cassellp@law.utah.edu

Attorneys for Jane Doe #1 and Jane Doe #2

# EXHIBIT 3
## To
## Brad Edwards Affidavit

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-80736-Civ-Marra/Johnson

**JANE DOE #1 and JANE DOE #2,**

    **Plaintiffs**

    **v.**

**UNITED STATES,**

    **Defendants**

_____/

### JANE DOE #1 AND JANE DOE #2'S FIRST REQUEST FOR ADMISSIONS TO THE GOVERNMENT REGARDING QUESTIONS RELEVANT TO THEIR PENDING ACTION CONCERNING THE CRIME VICTIMS RIGHTS ACT

COME NOW Jane Doe #1 and Jane Doe #2 ("the victims"), by and through undersigned counsel, and request the defendant United States (hereinafter "the Government") to admit or deny the following facts:

### BACKGROUND

As the Government will recall, the victims have asked the Government to stipulate to undisputed facts in this case. The Government has declined. Accordingly, the victims filed their Motion for Finding of Violations of the Crime Victims' Rights Act and Request for a Hearing on Appropriate Remedies (DE 48) (the victims' "summary judgment motion") along with a Motion to Have Their Facts Accepted Because of the Government's Failure to Contest Any of the Facts (DE 49).

On September 26, 2011, the Court denied the victims' motion to have their facts accepted (DE 99 at 11). At the same time, however, the Court has ordered discovery to develop the factual record concerning the summary judgment motion (DE 99 at 11). The Court reserved

ruling on the victims' motion for an order directing the Government not to suppress relevant evidence (DE 99 at 11).  The Court allowed the victims to propound requests for admission to the Government.

### DISCOVERY REQUESTED

The numbered requests for admissions below should all be construed in light of the definitions of terms provided at the end of the requests.  Where the request for admission has separate, lettered sub-parts, please admit or deny each separate sub-part:

1. The FBI and the U.S. Attorney's Office for the Southern District of Florida's investigation into Jeffrey Epstein developed a case for a federal prosecution against Epstein for many federal sex offenses.

**UNITED STATES RESPONSE:**

> **1. The government admits that the FBI and the U.S. Attorney's Office for the Southern District of Florida ("USAO") conducted an investigation into Jeffrey Epstein ("Epstein") and developed evidence and information in contemplation of a potential federal prosecution against Epstein for many federal sex offenses. Except as otherwise admitted above, the government denies Request No. 1.**

> **\* The government's response is confined to Request No. 1 through Request No. 26 in the "Discovery Requested" section of the *Request for Admissions* and does not intend to respond to assertions in any other section of the *Request for Admissions* (including the "Background" section), none of which appear to separately state any matter calling for an admission. Nonetheless, the government denies the assertion that the government has declined the request of Jane Doe #1 and Jane Doe #2 to stipulate to undisputed facts in this case.**

--------------------

2.  Regarding notifications provided to victims of Jeffrey Epstein's sexual abuse:

(a)  The U.S. Attorney's Office negotiated with Jeffrey Epstein's defense attorneys concerning the notifications to be provided to victims of Epstein's abuse;

**UNITED STATES RESPONSE:**

> **2. (a) The government admits that, after Epstein's attorneys learned of the notification that the government planned to provide to Jane Doe #2, who claimed that she was not a victim, Epstein's attorneys contacted the USAO and objected to the procedures for notification and the legal bases therefor. The government further admits that the USAO considered those objections when evaluating what notification to provide to victims. Except as otherwise admitted above, the government denies Request No. 2(a).**

(b)  It is not standard practice for the U.S. Attorney's Office to negotiate with defense attorneys about the extent of notifications provided to crime victims;

**UNITED STATES RESPONSE:**

> **(b) Admitted.**

(c)  As a result of those negotiations or requests received from Epstein, the U.S. Attorney's Office stopped making notifications to some crime victims;

**UNITED STATES RESPONSE:**

> **(c) The government admits that, as a result of objections lodged by Epstein's attorneys, the government reevaluated the notifications that it had intended to provide to victims and, as a result of that reevaluation, the USAO altered the scope, nature, and timing of notifications that it had contemplated providing to victims. With regard to Jane Doe #2, the government further admits that, as a result of representations made by Jane Doe #2 that she was not a victim and objections lodged by Epstein's attorneys, the USAO stopped making notifications to Jane Doe #2. Except as otherwise admitted above, the government denies Request No. 2(c).**

(d)     The language used in the notifications to Jane Doe #1 and Jane Doe #2 were affected by the negotiations with Epstein's defense lawyers;

**UNITED STATES RESPONSE:**

**(d) The government admits that, after the USAO received objections to victim notifications from Epstein's counsel and reevaluated its victim notification obligations, the USAO altered the language that was ultimately contained in the July 9, 2008 notification letter to Jane Doe #1 in care of Bradley Edwards. Except as otherwise admitted above, the government denies Request No. 2(d).**

(e)     At least in part as a result of the negotiations, Jane Doe #1 and Jane Doe #2 were not told that the U.S. Attorney's Office had entered into a non-prosecution agreement with Epstein until after the agreement was executed.

**UNITED STATES RESPONSE:**

**(e) The government admits that, at least in part as a result of objections lodged by Epstein's lawyers to victim notifications, the USAO reevaluated its obligations to provide notifications to victims, and Jane Doe #1 was thus not told that the USAO had entered into a non-prosecution agreement with Epstein until after the agreement was signed. The government further admits that Jane Doe #2 was not told that the USAO had entered into a non-prosecution agreement with Epstein until after the agreement was signed, but denies that the USAO did not inform Jane Doe #2 as a result of any negotiations involving Epstein or any objections lodged by Epstein's lawyers; the USAO did not consider Jane Doe #2 a victim after she informed the USAO and the FBI that she was not a victim of any offense committed by Epstein, and, as a result, the USAO did not consider informing Jane Doe #2 about the non-prosecution agreement. Except as otherwise admitted above, the government denies Request No. 2(e).**

3.  Because of a confidentiality provision in the non-prosecution agreement signed by the U.S. Attorney's Office, it would have been a breach of the agreement for the U.S. Attorney's Office to inform Jane Doe #1 and Jane Doe #2 of the existence of the terms of that non-prosecution agreement barring prosecution of certain sex offenses.

**UNITED STATES RESPONSE:**

**3. Denied.**

4.  During its negotiations with Jeffrey Epstein's defense attorneys, the U.S. Attorney's Office was aware that publicly disclosing the non-prosecution agreement with Jeffrey Epstein would likely have led to public criticism of the agreement.

**UNITED STATES RESPONSE:**

**4. Denied.**

5.  During negotiations with Jeffrey Epstein regarding the non-prosecution agreement, it was the position of at least one experienced attorney within the U.S. Attorney's Office that the Crime Victims' Rights Act required notifications to the victims in this case.

**UNITED STATES RESPONSE:**

**5. The government admits that, during the negotiations with Jeffrey Epstein regarding the non-prosecution agreement, at least one experienced attorney within the USAO subscribed to the position that the CVRA required notifications to the victims in this case and that position was communicated to Epstein's counsel. To the extent that Request No. 5 seeks admissions regarding the positions held by attorneys within the USAO that were not communicated to non-government personnel regarding whether or not the CVRA ultimately required notifications to the victims in this case, the government objects to Request No. 5 as violative of the deliberative process privilege.**

6.  The Justice Department possesses documents, correspondence or other information reflecting contacts with the Department between May 2007 and September 2008 on behalf of Jeffrey Epstein by:

**UNITED STATES RESPONSE:**

(a)  President Bill Clinton;   **Denied.**

(b)  Andrew Albert Christian Edward (a/k/a Prince Andrew, Duke of York);  **Denied.**

(c)  Harvard Law Professor Alan Dershowitz;  **Admitted**

(d)  Ken Starr;  **Admitted.**

(e)  Lillian Sanchez;

> **Admitted to the extent that the reference to "Lillian Sanchez" was meant to refer to Lilly Ann Sanchez.**

(f)  Jay Lefkowitz;  **Admitted**  and

(g)  Roy Black.  **Admitted**

7. On about January 10, 2008, when Jane Doe #1 and Jane Doe #2 were sent letters advising them that "this case is currently under investigation," the U.S. Attorney's Office had already entered into a non-prosecution agreement with Jeffrey Epstein.

**UNITED STATES RESPONSE:**

**7.   The government admits that, on about January 10, 2008, when Jane Doe #1 and Jane Doe #2 were sent letters advising them that "this case is currently under investigation," the U.S. Attorney's Office had already signed a non-prosecution agreement with Jeffrey Epstein, but that, on that date, the non-prosecution agreement nonetheless remained in a state of some flux and was subject to being set aside as Epstein was challenging the propriety of the non-prosecution agreement and seeking further review from the Department of Justice.**

8. In September 2007 when the U.S. Attorney's entered into the non-prosecution agreement with Epstein, it did not inform FBI agents of the details of the disposition of the case in the way that it ordinarily informed them of dispositions of other cases.

**UNITED STATES RESPONSE:  Denied**

9. With regard to the non-prosecution agreement between Epstein and the Government:

(a)   Epstein insisted on, and the U.S. Attorney's Office agreed to, a provision in the non-prosecution agreement that made the agreement secret;

**UNITED STATES RESPONSE:**

**(a) The government admits that, at Epstein's insistence, the USAO agreed to a provision in the non-prosecution agreement that provided as follows: "The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure." Except as otherwise admitted above, the government denies Request No. 9(a).**

(b)   In particular, the agreement stated: "The parties anticipate that this agreement will not be made part of any public record;"

**UNITED STATES RESPONSE:  Admitted**

(c)    By entering into such a confidentiality agreement, the U.S. Attorney's Office put itself in a position that conferring with the crime victims (including Jane Doe #1 and Jane Doe #2) about the non-prosecution agreement would violate certain terms of the agreement;

**UNITED STATES RESPONSE:  Denied**

(d)    Even notifying the victims about the agreement would have violated the confidentiality provision; and

**UNITED STATES RESPONSE:  Denied**

(e)    From September 24, 2007 through June 2008, the U.S Attorney's Office did not notify Jane Doe #1 and Jane Doe #2 of the existence of the non-prosecution agreement.

**UNITED STATES RESPONSE:**

**(e) The government admits that, during the period from September 24, 2007 through June 2008, the USAO did not notify Jane Doe #2 of the existence of the non-prosecution agreement. The government further admits that, although FBI agents notified Jane Doe #1 of the existence and substance of the agreement at the request of the USAO on or about October 27, 2007, no employee of the USAO personally notified Jane Doe #1 of the existence of the non-prosecution agreement during the period from September 24, 2007 through June 2008. Except as otherwise admitted above, the government denies Request No. 9(e).**

10.  With regard to contact between the Government and the victims:

(a)    On about October 26, 2007, FBI agents met with Jane Doe #1;

**UNITED STATES RESPONSE:**

**10. (a) Admitted. Because Request No. 10 appears directed solely to the communications between FBI agents and Jane Doe #1 during their meeting on or about October 26, 2007, the government responses to Requests No. 10(b) through 10(g) address only that meeting.**

(b)    The agents explained that Epstein would plead guilty to state charges involving another victim, he would be required to register as a sex offender, and he had made certain concessions related to the payment of damages to the victims, including Jane Doe #1;

**UNITED STATES RESPONSE:**

**(b) The government admits that, on or about October 26, 2007, FBI agents explained to Jane Doe #1 that Epstein would plead guilty to state charges for procuring minors to engage in prostitution; that Epstein would be required to register as a sex offender; that Jane Doe #1 would be entitled to seek damages from Epstein; and that, if she desired, Jane Doe #1 would be entitled to use the services of an attorney at no expense to her in seeking those damages from Epstein. The government denies that the FBI agents explained that the state charges "involv[ed] another victim."**

(c)     During this meeting, the agents did not explain that an agreement had already been signed that precluded any prosecution of Epstein for federal crimes committed against Jane Doe #1;

**UNITED STATES RESPONSE:**

**(c) The government denies that the FBI agents did not explain to Jane Doe #1 that an agreement had already been signed; denies that the FBI agents did not explain to Jane Doe #1 that the agreement resolved the investigation of the federal case involving Jane Doe #1; and denies that the FBI agents did not explain to Jane Doe #1 other terms of that agreement Except as otherwise admitted above, the government denies Request No. 10(c).**

(d)     The agents could not have revealed this part of the non-prosecution agreement without violating the terms of the non-prosecution agreement;

**UNITED STATES RESPONSE:  Denied**

(e)     The agents themselves had not been informed of the existence of the provision in the non-prosecution agreement barring Epstein's prosecution for various federal crimes or sex offenses at that time;

**UNITED STATES RESPONSE:  Denied**

(f)     Because the non-prosecution agreement had already been reached with Epstein, the agents made no attempt to secure Jane Doe #1's view on the proposed resolution of the case; and

**UNITED STATES RESPONSE:  Denied**

(g)     The agents never explained that the non-prosecution agreement would ultimately bring to an end the federal investigation in the case.
**UNITED STATES RESPONSE:  Denied**

11. On about November 29, 2007, the U.S. Attorney's Office sent a draft of a crime victim notification letter to Jay Lefkowitz, defense counsel for Jeffrey Epstein.  The notification letter would have explained: "I am writing to inform you that the federal investigation of Jeffrey Epstein has been completed, and Mr. Epstein and the U.S. Attorney's Office have reached an agreement containing the following terms . . . ."    Because of concerns from Epstein's attorneys, the U.S. Attorney's Office never sent the proposed victim notification letter to the victims.

**UNITED STATES RESPONSE:**

**11. The government admits that, on or about November 28, 2007, A. Marie Villafaña of the USAO sent a draft of a crime victim notification letter to Jay Lefkowitz, counsel for Jeffrey Epstein, and that the draft notification letter stated, in part: "I am writing to inform you that the federal investigation of Jeffrey Epstein has been completed, and Mr. Epstein and the U.S. Attorney's Office have reached an agreement containing the following terms . . . ." The government further admits that, in part as a result of objections lodged by Epstein's lawyers, the USAO reevaluated its obligations to provide notifications to victims, and, as a result of that reevaluation and other considerations and developments, the USAO never sent victims the draft notification letter that was sent to Jay Lefkowitz on or about November 28, 2007. Except as otherwise admitted above, the government denies Request No. 11.**

12. On July 3, 2008, when Bradley J. Edwards was working on a letter to the U.S. Attorney's Office concerning the need to federally prosecute Epstein for sex offenses committed against Jane Doe #1 and Jane Doe #2, the U.S. Attorney's Office had already entered into a binding non-prosecution agreement with Jeffrey Epstein.

**UNITED STATES RESPONSE:**

**12. The government admits that, prior to July 3, 2008, the USAO had already entered a binding non-prosecution agreement with Jeffrey Epstein. The government is without knowledge of precisely when "Bradley J. Edwards was working on a letter to the U.S. Attorney's Office concerning the need to federally prosecute Epstein for sex offenses committed against Jane Doe #1 and Jane Doe #2," and, accordingly, the government denies the assertion that Edwards worked on that letter on July 3, 2008. Except as otherwise admitted above, the government denies Request No. 12.**

13.  When Jeffrey Epstein pled guilty to state charges on June 30, 2008,

(a)     Jane Doe #1 and Jane Doe #2 had not been informed by the U.S. Attorney's Office of the existence of the non-prosecution agreement.

**UNITED STATES RESPONSE:**

**13. (a) The government admits that, when Epstein pled guilty to state charges on June 30, 2008, Jane Doe #2 had not been informed by the USAO of the existence of the non-prosecution agreement. The government further admits that, although the USAO, through FBI agents, had notified Jane Doe #1 of the existence of the non-prosecution agreement prior to Epstein's June 30, 2008 guilty plea, no employee of the USAO had personally notified Jane Doe #1 at that time of the existence of the non-prosecution agreement. Except as otherwise admitted above, the government denies Request No. 13(a).**

(b)     The U.S. Attorney's Office had not conferred with either Jane Doe #1 or Jane Doe #2 about the non-prosecution agreement;

**UNITED STATES RESPONSE:**

**(b) The government denies that, by the time of Epstein's June 30, 2008 guilty plea, an attorney for the government working at the USAO had not already conferred with Jane Doe #1 and Jane Doe #2 about their opinions regarding how the federal investigation and potential prosecution of Epstein should proceed. The government admits that the USAO had not conferred with Jane Doe #2 about the non-prosecution agreement prior to Epstein's June 30, 2008 guilty plea. The government further admits that, although the USAO had communicated with Jane Doe #1 about the non-prosecution agreement through FBI agents prior to Epstein's June 30, 2008 guilty plea, no employee of the USAO had personally conferred with Jane Doe #1 about the non-prosecution agreement prior to Epstein's guilty plea. Except as otherwise admitted above, the government denies Request No. 13(b).**

(c)     Epstein's defense attorneys were aware that the U.S. Attorney's Office had not conferred with Jane Doe #1 and Jane Doe #2 about the agreement; and

**UNITED STATES RESPONSE:**

**(c) Although the government was aware that Jane Doe #2 had been represented by counsel paid for by Epstein, the government is unaware of the extent of Epstein's defense attorneys' awareness of the USAO's communications with Jane Doe #1 and Jane Doe #2 about the agreement, as described in the responses to Requests No. 13(a) and 13(b), and therefore can neither deny nor admit Request No. 13(c). Except as otherwise admitted above and in the responses to Requests No. 13(a) and 13(b), the government denies Request No. 13(c).**

(d)    Epstein's defense attorneys had negotiated for a confidentiality provision in the non-prosecution agreement that barred conferring with victims about the agreement.

**UNITED STATES RESPONSE:**

**(d) The government admits that Epstein's attorneys negotiated with the USAO for a provision in the non-prosecution agreement that ultimately provided as follows: "The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure." Except as otherwise admitted above, the government denies Request No. 13(d).**

14.  When Epstein was pleading guilty to the state charges discussed in the non-prosecution agreement, both the U.S. Attorney's Office and Epstein's defense attorneys were working to keep the existence of the non-prosecution agreement confidential.

**UNITED STATES RESPONSE:**

**14. The government admits that, when Epstein was pleading guilty to the state charges discussed in the non-prosecution agreement, the USAO and Epstein's defense attorneys sought to keep the document memorializing the non-prosecution agreement confidential, but denies that they sought at that time to keep the existence of the non-prosecution agreement confidential. Except as otherwise admitted above, the government denies Request No. 14.**

15.  Defense attorney Bruce E. Reinhart:

(a)    learned confidential, non-public information about the Epstein matter;

**UNITED STATES RESPONSE:**

**15. (a) The government admits that, while Bruce E. Reinhart was an Assistant U.S. Attorney, he learned confidential, non-public information about the Epstein matter.**

(b)    discussed the Epstein matter with an attorney working on the case for the U.S. Attorney's Office; and

**UNITED STATES RESPONSE:**
**(b) The government admits that, while Bruce E. Reinhart was an Assistant U.S. Attorney, he discussed the Epstein matter with another Assistant U.S. Attorney working on the Epstein matter.**

(c)      was involved in decision-making with regard to the Epstein matter.

**UNITED STATES RESPONSE:  Denied**

16. The Government possesses information (including telephone logs and emails) reflecting contacts between Bruce E. Reinhart and persons/entities affiliated with Jeffrey Epstein (including Jeffrey Epstein, the Florida Science Foundation, Jack Goldberger, Harvard Law Professor Alan Dershowitz, Roy Black, Ken Starr, Lily Ann Sanchez) before Reinhart left the employment of the U.S. Attorney's Office.

**UNITED STATES RESPONSE:  Admitted.**

17. The Government possesses information (including telephone logs or emails) reflecting contacts between Bruce E. Reinhart and persons working at or for the Department of Justice or United States Attorney's Office that related to Jeffrey Epstein or the investigation into Jeffrey Epstein and other potential co-conspirators of Jeffrey Epstein.

**UNITED STATES RESPONSE:  Admitted.**

18. The government possesses, or has knowledge or information (including telephone logs or photographs or emails) reflecting improper communication or influence made or attempted with the Government, on Jeffrey Epstein's behalf by:

(a)      Guy Lewis

**UNITED STATES RESPONSE:  Denied.**

(b) LilyAnn Sanchez      **UNITED STATES RESPONSE:  Denied.**

19. The government possesses, or has knowledge or information (including telephone logs, photographs, emails or statement(s) of other credible sources) about a personal or business relationship between Jeffrey Epstein and U.S. Attorneys and/or Assistant US Attorneys.

**UNITED STATES RESPONSE:**

**19. To the extent that Request No. 19 is directed to the business or personal relationships of the 93 U.S. Attorneys and over 5,400 Assistant U.S. Attorneys serving across this country, or the countless individuals who have formerly served as U.S. Attorneys and Assistant U.S. Attorneys throughout this nation, the government objects to Request No. 19 as overly broad and burdensome and not calculated to lead to or involve information relevant to the instant matter.**

**The government denies possessing or having any knowledge or information about a personal or business relationship between Jeffrey Epstein and either the U.S. Attorney or any Assistant U.S. Attorney serving in the Southern District of Florida. Except as otherwise admitted above, the government denies Request No. 19.**

20. The government possesses, or has knowledge or information (including telephone logs, photographs, emails or statement(s) of other credible sources) about a personal or business relationship between Jeffrey Epstein and **Matthew Menchel**.

    **UNITED STATES RESPONSE:  Admitted.**

21. The government possesses, or has knowledge or information (including telephone logs, photographs, emails or statement(s) of other credible sources) about a personal or business relationship between Jeffrey Epstein and **Alex Acosta**.

    **UNITED STATES RESPONSE:  Denied**

22. The Justice Department's Office of Professional Responsibility and/or other Government entities have collected information about:

    (a)     Bruce Reinhart's possible involvement in the Epstein matter;

    **UNITED STATES RESPONSE:  Admitted**

    (b)     Other government attorney's possible improper behavior in the Epstein matter; and

    **UNITED STATES RESPONSE:  Admitted**

    (c)     A conflict of interest regarding the U.S. Attorney's Office for the Southern District of Florida handling issues relating to the Epstein matter.

    **UNITED STATES RESPONSE:  Admitted**

23. The non-prosecution agreement signed by the U.S. Attorney's Office and Jeffrey Epstein currently blocks the U.S. Attorney's Office from prosecuting sex offenses committed by Epstein against Jane Doe #1 and Jane Doe #2 in the Southern District of Florida.

**UNITED STATES RESPONSE:**

**23. The government admits that the non-prosecution agreement signed by the USAO and Jeffrey Epstein currently blocks the USAO from prosecuting sex offenses committed by Epstein against Jane Doe #1 and Jane Doe #2 in the Southern District of Florida from in or around 2001 through in or around September 2007, provided that those offenses are set out on pages 1 and 2 of the non-prosecution agreement, were the subject of the joint investigation by the FBI and the USAO, or arose from the federal grand jury investigation. Except as otherwise admitted above, the government denies Request No. 23.**

24. The Justice Department possesses information that Epstein, himself or through his attorney's or acquaintances, has provided or offered to provide to the federal government (or an individual within the Government, in his official or private capacity) valuable consideration.

**UNITED STATES RESPONSE:**

**24. Admitted; Jeffrey Epstein provided valuable consideration to the federal government through the non-prosecution agreement he entered with the USAO.**

25. The Justice Department's Office of Professional Responsibility's investigation/inquiry into alleged misconduct relating to the negotiation and consummation of the Epstein non-prosecution agreement has relevance to issues pending in this case.

**UNITED STATES RESPONSE:  Denied**

26. The Government possesses evidence, not covered by grand jury secrecy rules, that reveals that districts outside the Southern District of Florida share jurisdiction and venue with the Southern District of Florida over potential federal criminal charges based on the alleged sexual acts committed by Epstein against Jane Doe #1 and/or Jane Doe #2.

**UNITED STATES RESPONSE:**

**26. The government objects to Request No. 26 because it seeks information protected from disclosure by the law enforcement investigative privilege.**

## DEFINITIONS

For the purpose of construing the foregoing discovery requests, the following terms are defined:

The term "documents" means and includes, without limitation, all writings of any kind, including the originals and all non-identical copies or drafts, whether different from the original by reason of any notation made on such copy or draft or otherwise including, without limitation, correspondence, memoranda, notes, diaries, statistics, letters, e-mails, electronic computer files, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice communications, offers, notations of any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer print-outs, teletypes, facsimiles, invoices, work sheets and all drafts, alterations, modifications, changes, and amendments of any of the foregoing, graphic or aural writs, records or representations of any kind including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures; and electronic, mechanical or electric records or representations of any kind including, without limitation, tapes, cassettes and disc recordings, and writings and printed material of every kind.

The term "correspondence" means any tangible object that conveys information or memorializes information that was conveyed in tangible or oral form including, but not limited to, writings, letters, memoranda, reports, notes, e-mails, telephone logs, telephone billing information, telephone recordings, and interoffice communications.

The term "Epstein's victims" means any person that the Government identified as a possible victim of a sex offense committed by Jeffrey Epstein, including Jane Doe #1, Jane Doe #2, all victims identified in attachment to the non-prosecution agreement entered into by Epstein, and another person that the Government investigated as a possible victim of Epstein's sex offenses.

The term "Government" means the federal government, including all employees of and components of the United States Department of Justice (such as, the Office of the Attorney General, the Office of the Deputy Attorney General, the Criminal Divisions, the Office of Professional Responsibility, the Child Exploitation and Obscenity Section, the U.S. Attorney's Offices for the Southern District and Middle District of Florida, and the Federal Bureau of Investigation) and other federal government agencies with law enforcement responsibilities related to the Epstein case (such as the Internal Revenue Service).  This request for production seeks all documents, correspondence, and other information held by all of these entities, including all employees of and components of the Justice Department that worked on or were in any way involved the Epstein investigation and/or that possess information relevant to the victims' claims.

The term "including" means containing within the request, but not limiting the request.

The term "U.S. Attorney's Office" means the U.S. Attorney's Office for the Southern District of Florida and includes all branch offices within the Southern District of Florida.

## PRIVILEGE LOG

If you believe that any request for admission is subject to a privilege and if you intend to assert that privilege, please provide a "privilege log" consistent with Local Rule 26.1(g), including a description a document that is consistent with Local Rule 26.1(g)(3)(B).   Your privilege log should include a specific identification of the privilege being asserted and the basis for the privilege.

DATED: December 1, 2011

Respectfully Submitted,

s/ Bradley J. Edwards
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
Florida Bar No.: 542075
E-mail: brad@pathtojustice.com

*and*

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
  University of Utah
332 S. 1400 E.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Facsimile: 801-585-6833
E-Mail: cassellp@law.utah.edu

Attorneys for Jane Doe #1 and Jane Doe #2

## CERTIFICATE OF SERVICE

The foregoing document was served on December 1, 2011, on the following persons via US Mail and electronic mail to:
Dexter A. Lee
A. Marie Villafaña

Assistant U.S. Attorneys
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
(561) 820-8711
Fax: (561) 820-8777
E-mail: dexter.lee@usdoj.gov
E-mail: ann.marie.c.villafana@usdoj.gov
Attorneys for the Government