## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 9:08-cv-80736-KAM

**JANE DOE 1 AND JANE DOE 2,**

      **Petitioners,**

      **v.**

**UNITED STATES,**

      **Respondent.**

_____/

### JANE DOE 1 AND JANE DOE 2'S CONSOLIDATED STATEMENT OF UNDISPUTED MATERIAL FACTS AND MOTION FOR PARTIAL SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

Jane Doe 1 and Jane Doe 2 (also referred to as "the victims"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, move for summary judgment on the issue of the United States Government's violation of their rights under the Crime Victims' Rights Act (CVRA), where no genuine issue of material fact exists.[1]  In support, they state:

### INTRODUCTION

In 2004, Congress enacted the CVRA because it found that in case after case "victims, and their families, were ignored, cast aside, and treated as non-participants in a critical event in their lives.  They were kept in the dark by prosecutors too busy to care enough . . . and by a court system that simply did not have place for them."  150 CONG. REC. 7296 (2004) (statement of

_____

[1]  The Court previously granted the victims leave to file a 60-page motion for partial summary judgment.  DE 327.

1

Sen. Feinstein).  In passing the CVRA, Congress mandated a series of rights for crime victims. Sadly, several years later, when the Government began handling this case, it did precisely what Congress thought it had forbidden.  The Government deliberately kept crime victims "in the dark" so that it could enter into a plea arrangement designed to prevent the victims from raising any objection.  In doing so, the Government refused to afford victims the rights they had been promised by Congress—particularly "the right to reasonable, accurate, and timely notice of any public court proceeding," "the reasonable right to confer with the attorney for the Government in the case," and "the right to be treated with fairness and with respect for the victim's dignity and privacy."[2]

The undisputed evidence begins in 2005, when the Palm Beach Police Department ("PBPD") had identified numerous girls as victims of Jeffrey Epstein's sexual crimes.  In 2006, the PBPD turned the case over to federal authorities for further investigation.  As early as March 15, 2007 and throughout the rest of the investigation, the United States Attorney's Office for the Southern District of Florida ("the Office") specifically identified several dozen girls whom it classified as "victims" under the CVRA.  Once that identification was made, the Government was obligated to afford these victims certain rights under the CVRA—a fact of which the Government itself was well aware.[3]  Indeed, the Government provided notification to the girls that they were classified as "victims" under the CVRA.

But what the Government did *not* tell the victims lies at the heart of the case.  It is undisputed that the Government did not tell the victims that, by May 2007, the Office had

---

[2]  18 U.S.C. § 3771(a)(2), (4)-(5), (8); RFP MIA 000001-000006 (Exhibit 1).
[3]  000966-000967 (Exhibit 2); 000589-000591 (Exhibit 3); US_Atty_Cor_00135 (Exhibit 4); RFP MIA 000222 (Exhibit 5).

prepared an 82-page prosecution memorandum and a 53-page indictment against Epstein and his co-conspirators.[4]  At that time, rather than confer with the victims about how to proceed, the Government began conferring about this issue exclusively with Epstein's counsel.  Epstein's counsel contended that, despite abundant connection to interstate commerce, Epstein's sex trafficking was purely of local concern.  By August 2007, federal prosecutors had disproven or rejected these defense arguments and notified the defense that all of the identified victims retained federal rights.

For example, during August 2007, Jane Doe 1, and other similarly situated victims, provided details to federal agents of the abuse that they endured at the hands of Epstein and his co-conspirators.  In September 2007, without conferring with *any* of the victims, the Government and Epstein shifted gears and began working together to concoct a criminal charge for Epstein to plea to other than his sexual abuse of minors.  As alternative charges, they discussed charging Epstein with: (1) various misdemeanors, (2) assaulting his co-conspirators and girlfriend, (3) using private investigators to chase and harass victims' families, (4) obstructions of grand jury subpoenas, or (5) his obstruction of the federal investigation when he instructed another co-conspirator to lie to federal agents.[5]  Ultimately, however, none of those would work.  Assistant U.S. Attorney ("AUSA") Marie Villafaña (the "line prosecutor") informed Epstein's counsel that she was getting pushback for creating a charge using one of the main co-conspirators as the

---

[4]  RFP WPB 000286 (Exhibit 6).
[5]  US_Atty_Cor_00030-00032 (Exhibit 7); RFP MIA 000129 (Exhibit 8); RFP MIA 000133 (Exhibit 9); RFP MIA 000095 (Exhibit 10); RFP MIA 000075-000076 (Exhibit 11); RFP WPB 000220 (Exhibit 12); RFP MIA 000077-000087 (Exhibit 13); RFP MIA 000088 (Exhibit 14); RFP WPB 000235-000244 (Exhibit 15); RFP WPB 000107-000112 (Exhibit 16); RFP WPB 002188 (Exhibit 17); RFP WPB 000266-000277 (Exhibit 18); RFP MIA 000113 (Exhibit 19); RFP MIA 000151-000160 (Exhibit 20); RFP MIA 000098-000105 (Exhibit 21).

victim.[6]  Consequently, the Government and Epstein searched for another crime for Epstein to plead to, which could accompany a federal non-prosecution agreement (NPA).  Incredibly, the offense to which Epstein and the Government ultimately agreed, labeled the minor victims "prostitutes."

The undisputed evidence clearly shows that by September 21, 2007, the line prosecutor had informed Palm Beach State Attorney Barry Krischer that a federal resolution had been reached by way of a NPA, yet the victims remained uninformed.[7]  On September 24, 2007, the NPA was signed, preventing prosecution of all federal crimes committed by Epstein and his co-conspirators against the victims.  After the signing of the NPA, the Government and Epstein's attorneys worked together to choose a lawyer to be paid by Epstein to represent Epstein's victims for the purpose of settling civil restitution claims.  This too was all being done without the victims having any knowledge whatsoever.  The correspondence between the Government and a candidate for that representative position as well as between the Government and Epstein's counsel reflects that the Government still had not yet disclosed the NPA to the victims, and was following the guidance of Epstein's counsel in making decisions with respect to the timing and substance of any communication to the victims.[8]

For the next nine months, from the time the NPA was signed through the date of Epstein's state court plea in June of 2008, the Office—doing Epstein's bidding—assiduously concealed the NPA's existence from the victims.  While this indulgent deal was incredible in its own right, even more extraordinary was how the victims were treated during the process.  Rather

---

[6] Exhibit 15.
[7] RFP WPB 002125 (Exhibit 22).
[8] *See e.g.*, US_Atty_Cor_00166 (Exhibit 23).

4

than confer with the victims about the fact that resolution by NPA was ever being considered—or even tell them that it was already a signed deal—the Office and Epstein inserted a "confidentiality" provision into the agreement barring its disclosure to anyone, including the victims.  There is no dispute that the Government did not inform the victims of the NPA or of the possibility of any such type of resolution.  Consequently, there is no dispute that the Government did not afford the victims any rights *before* the signing of the NPA.

In October 2007, after the NPA was signed, federal agents spoke with three of the more than 30 identified victims, including Jane Doe 1.[9]  The Government does not dispute that this contact only occurred *after* the signing of the NPA.  Even more important, it is not disputed that this contact was: 1) made by the Federal Bureau of Investigation ("FBI") and not a "prosecutor for the Government," 2) that the FBI did not inform the victims of the NPA and certainly did not confer with the victims about the details of the NPA, and 3) that this contact only occurred with three of the more than 30 victims.  Lastly, while the content of that conversation is contested, any stretched argument that the conversation satisfied CVRA requirements for Jane Doe 1 are belied by the timing of the conversation as well as the uncontested documentary evidence of the communications with the victims (including with Jane Doe 1) that followed that conversation.

Subsequent to the FBI's contact with three of Epstein's victims, the Government informed Epstein's attorneys that victim notification letters needed to be sent to all the victims pursuant to the CVRA.  Rather than comply with this acknowledged requirement, Epstein's counsel convinced the Government that (contrary to standard Government practice) Epstein

---

[9]  RFP MIA 000464-000468 (Exhibit 24).

should be permitted to provide input into any message being delivered, and ultimately that the victims should not be told anything "until after Epstein pleas."[10]

In January 2008, FBI agents again met with Jane Doe 1 and gathered additional details about Epstein's abuse as well as the direct sexual abuse by one of his co-conspirators, Nadia Marcinkova—who participated in the abuse of other victims as well. The Government then sent a victim notification letter to Jane Doe 1 informing her of her rights under the CVRA, that "this will be a long investigation," and to "be patient."[11]  Jane Doe 1 was sent a similar letter on June 7, 2008.[12]  Other victims were also sent these letters communicating that the Epstein case was an on-going active criminal investigation—not that the Government had already immunized Epstein for all federal crimes committed against each of the victims, through a NPA.  These misleading letters were sent almost up until the date of Epstein's state court plea in late June 2008.[13]

On June 30, 2008, Epstein pled guilty to state court charges. It is uncontested that the victims were not reasonably and accurately informed about that hearing—specifically, they were never told the hearing was part of a process that would extinguish any possibility of Epstein being prosecuted for the crimes he had committed against them in Florida.  Even after the plea, the Government once again conferred with Epstein's attorneys to decide what to tell the victims.

As the Court is aware, this CVRA action was filed in July 2008 at a time when the victims mistakenly believed that the federal case remained open, and wanted to ensure that their rights under the CVRA were afforded *before* any possible federal disposition.  At the emergency

---

[10]  RFP WPB 001978-001979 (Exhibit 25).
[11]  Declaration of Jane Doe 1 (Exhibit 26); Declaration of Jane Doe 2 (Exhibit 27).
[12]  000978-000989 (Exhibit 28).
[13]  [DE 48] Exhibit I (Exhibit 29).

hearing on the Petition for Enforcement of Crime Victims' Rights Act, Jane Doe 1 and Jane Doe 2 were in the courtroom to learn for the first time that the federal case had been resolved.

The undisputed facts show that for nine months, the Government and Epstein conspired to conceal the NPA from the victims to prevent them from voicing any objection, and to avoid the firestorm of controversy that would have arisen if it had become known that the Government was immunizing a politically-connected billionaire and all of his co-conspirators from prosecution of hundreds of federal sex crimes against minor girls.  Such facts demonstrate clear violations of the CVRA's requirements that the Government afford victims the reasonable right to confer, the right to be treated with fairness, and the right to reasonable and accurate notice about court hearings.  No genuine issue of material fact or law can exist on these points. The Court should accordingly grant summary judgment for the victims on the issue of the CVRA violations and then, in subsequent proceedings, turn to the issue of the proper remedy for those violations.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, the victims submit this statement of undisputed material facts in support of their motion for partial summary judgment:[14]

---

[14]  In an effort to streamline their case and bring it to a more rapid resolution, in this summary judgment motion the victims present only some of the evidence that they are prepared to produce at any evidentiary hearing in this matter. For instance, the victims have concentrated on the emails and other documents establishing violations of their rights, largely avoiding issues of the Government's "motive" for the violations and other related issues.  Because of the possibility that the Court may not grant summary judgment on this narrower approach, the victims are continuing to pursue discovery with regard to motive and several other important issues that would come into play at a broader evidentiary hearing.  *See, e.g.*, [DE 344] (victims' motion for deposition of government witnesses).  The victims reserve the right to supplement this motion if additional discovery is received through these discovery efforts and to present these broader issues at any evidentiary hearing or remedy phase of these proceedings.

## EPSTEIN'S CRIMES

1.  Between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls, including Jane Doe 1 and Jane Doe 2, at his mansion in Palm Beach, Florida, located in the Southern District of Florida, and elsewhere in the United States and overseas.[15]

2.  Because Epstein and his co-conspirators knowingly traveled in interstate and international commerce to sexually abuse Jane Doe 1, Jane Doe 2, and other similarly situated victims, they committed violations of not only Florida law (*see, e,g.*, Fla. Stat. §§ 794.05, 796.04, 796.045, 39.201 & 777.04), but also federal law, including repeated violations of 18 U.S.C. §§ 1591, 2421, 2422, 2423, & 371).[16]

## EPSTEIN'S VICTIMS

3.  In addition to personally abusing his victims, Epstein also directed other persons to sexually abuse the girls.  For example, Nadia Marcinkova sexually abused Jane Doe 1 and other victims at the direction of Epstein.[17]

---

[15] *See, e.g.,* Exhibit 26; Exhibit 27; Jane Doe 102 v. Epstein Complaint (Exhibit 30); Response to Request for Admission #1 (Exhibit 31) (admitting federal investigation); FBI 302 of Interview with Jane Doe 1 on August 14, 2007 (Exhibit 32); FBI 302 of Interview with Jane Doe 1 on January 31, 2008 (Exhibit 33); Palm Beach Police Report (Exhibit 34) (discussing investigation of numerous Epstein victims); Exhibit 6 (noting 82-page prosecution memo and 52-page prepared indictment); [DE 304] Declaration of FBI Special Agent Slater (Exhibit 35) (noting that the FBI identified many potential victims of sexual abuse by Epstein); The People of the State of New York v. Jeffrey Epstein (Exhibit 36); RFP WPB 000550-000554 (Exhibit 37) (listing 31 victims the that U.S. Attorney's Office was prepared to name as a victim of an enumerated federal offense); Sora Hearing Transcript (Exhibit 38); RFP MIA 000361-000365 (Exhibit 39) (Chief of Child Exploitation Section of the Justice Department concluding after review of the facts that U.S. Attorney's would not abuse its discretion in prosecuting; noting "multiple mutually-corroborating witnesses;" the Epstein case "consistent in principle with other federal prosecutions nationwide").

[16] *See* note 14, *supra*.

[17] *See* Exhibit 32; Exhibit 33; Exhibit 34.

8

## THE INVESTIGATION OF EPSTEIN'S CRIMES

4.  In 2005, the Town of Palm Beach Police Department received a complaint from the parents of a 14-year-old girl about her sexual abuse by Jeffrey Epstein.  The PBPD then capably conducted a thorough investigation and ultimately identified approximately 20 girls between the ages of 14 and 17 who were sexually abused by Epstein.[18]

5.  In 2006, at the request of the PBPD, the FBI opened a federal investigation into allegations that Epstein and his personal assistants had used facilities of interstate commerce to induce girls between the ages of 14 and 17 to engage in illegal sexual activities.

6.  The FBI ultimately determined that both Jane Doe 1 and Jane Doe 2 were victims of sexual abuse by Epstein while they were minors.  Jane Doe 1, for example, provided detailed information about her abuse—and the abuse of Jane Doe 2—to the FBI on August 7, 2007.[19]

7.  On about August 11, 2006, Jane Doe 2 received a standard CVRA victim notification letter.  The notification promised that the Justice Department would make its "best efforts" to protect Jane Doe 2's rights, including "[t]he reasonable right to confer with the attorney for the Government in the case" and "to be reasonably heard at any public proceeding in the district court involving … plea."  The notification further explained that "[a]t this time, your case is under investigation." [20]  That notification meant that Jane Doe 2 had been identified as a victim of a federal offense and as someone protected by the CVRA.

---

[18] Exhibit 34; *see also* RFP WPB 001940-001941 (Exhibit 40) (later description of investigation by the U.S. Attorney's Office).
[19]  Exhibit 26; Exhibit 27; Exhibit 32.
[20]  August 11, 2006 Victim Notification Letter to Jane Doe 2 (Exhibit 41).

8.  More generally, the FBI established that Epstein used paid employees to repeatedly find and bring minor girls to him.  Epstein worked in concert with others to obtain minor girls not only for his own sexual gratification, but also for the sexual gratification of others.[21]

### EPSTEIN'S FEDERAL PLEA NEGOTIATIONS

9.  From January 5, 2007 through September 2007, plea discussions took place between the U.S. Attorney's Office for the Southern District of Florida and Jeffrey Epstein, who was represented by numerous attorneys.[22]

10. On February 1, 2007, the Epstein defense team sent a 24-page letter to the Office going over what they intended to present during a meeting at the Office the same day.  The letter falsely stated: "Epstein did not know or believe any women were under 18 years of age."  It also contained other deceptive factual and legal arguments about Epstein's culpability.[23]

11. By March 15, 2007, the Office was sending letters to victims informing them of their rights pursuant to the CVRA.[24]

12. By May 2007, the Office had drafted an 82-page prosecution memorandum and 53-page indictment outlining numerous federal sexual offenses committed by Epstein.[25]

13. On about June 7, 2007, FBI agents hand delivered to Jane Doe 1 a standard CVRA victim notification letter.  The notification promised that the Justice Department would make its "best efforts" to protect Jane Doe 1's rights, including "[t]he reasonable right to confer with the attorney for the United States in the case" and "to be reasonably heard at any public proceeding

---

[21] *See* note 14, *supra*.
[22] RFP WPB 001744 (Exhibit 42).
[23] RFP WPB 000730-000754 (Exhibit 43) (asserting Epstein thought the girls were 18 or older).
[24] Exhibit 1.
[25] US_Atty_Cor. 00004 (Exhibit 44); Exhibit 6.

in the district court involving [a]…plea." The notification further stated that, "[a]t this time, your case is under investigation."[26]

14. The notification described in the previous paragraph meant that Jane Doe 1 had been identified as a victim of a federal offense and as someone protected by the CVRA. Jane Doe 1 relied on these representations and believed that the Government would protect these rights and keep her informed about the progress of her case.[27]

15. On July 6, 2007, Epstein's lawyers sent a 23-page letter lodging numerous, technical legal arguments to persuade the Office that no federal crimes had been committed by Epstein, and that consequently there were no federal crime victims. The letter also falsely claimed that "Mr. Epstein never targeted minors," and urged the Government against a federal prosecution on the basis that Epstein was an upstanding citizen who had made tremendous philanthropic and personal contributions that warranted a declination to prosecute.[28]

16. On August 2, 2007, another attorney for Epstein sent a similar letter expressing the same sentiments.[29]

17. However, by August 3, 2007, the Government had disproven or rejected Epstein's various arguments against federal charges, as AUSA Matt Menchel sent a letter to Epstein's counsel stating, "[w]e would reiterate that the agreement to Section 2255 liability applies to all of the minor girls identified during the federal investigation, not just the 12 that form the basis of an

---

[26] June 7, 2007 Victim Notification Letter to Jane Doe 1 (Exhibit 45).
[27] Exhibit 26.
[28] MIA_CEOS_00077-00099 (Exhibit 46); RFP MIA 000189 (Exhibit 47).
[29] RFP MIA 000053-000055 (Exhibit 48).

initial planned charging instrument."[30]   This was a clear indication from the federal prosecutors that all of the minor girls identified through the investigation were classified as victims with federal rights pursuant to the CVRA.

18.   By September 10, 2007, multiple drafts of the NPA had been exchanged between Epstein's counsel and the U.S. Attorney's Office; however, no one from the Office and no Government representative had notified a single victim about the existence of the plea negotiations, much less conferred with them about their views on those negotiations.[31]

19.   On September 12, 2007, while attempting to create alternative charges against Epstein, the U.S. Attorney's Office expressed concern about "the effect of taking the position that Mr. Epstein's house is in the special maritime and territorial jurisdiction of the United States" because the Government had "no evidence of any assaults occurring either on Mr. Epstein's plane or offshore from his residence."[32]

20.   On September 13, 2007, the line prosecutor emailed Epstein's counsel indicating that in an effort to come up with a solution to the September 12 concern, she had been "spending some quality time with Title 18 looking for *misdemeanors*."   The line prosecutor further indicated, "I know that someone mentioned there being activity on an airplane, I just want to make sure that there is factual basis for the plea that the agents can confirm."   Epstein's counsel responded, "[a]lready thinking about the same statutes."[33]

---

[30]   RFP WPB 001479-001480 (Exhibit 49); Exhibit 48 (earlier correspondence attached for reference).
[31]   RFP MIA 000058-000063 (Exhibit 50).
[32]   Exhibit 12; RFP MIA 000072-000073 (Exhibit 51).
[33]   Exhibit 11 (emphasis added).

21.  On September 14, 2007, after having spoken on the telephone about the subject matter of the September 13 emails, Epstein's counsel and the line prosecutor exchanged emails including a proposed plea agreement for Epstein to plea to assaulting one of his co-conspirators.[34]

22.  On September 15, 2007, the line prosecutor sent an email to the Epstein defense team raising concerns about a resolution that would not involve one of Epstein's minor victims and stating:

> I have gotten some negative reaction to the assault charge with [a co-conspirator] as the victim, since she is considered one of the main perpetrators of the offenses that we planned to charge in the indictment.  Can you talk to Mr. Epstein about a young woman named [Jane Doe]?  We have hearsay evidence that she traveled on Mr. Epstein's airplane when she was under 18, in around the 2000 or 2001 time frame.[35]

23.  On September 16, 2007, the line prosecutor corresponded with Epstein's counsel about having Epstein plead to obstruction of justice for pressuring one of his co-conspirators to prevent her from turning over evidence or complying with a previously-served grand jury subpoena.[36]

24.  In the same correspondence, the Office discussed with defense counsel how they could contrive to establish jurisdiction away from the location where the crimes actually occurred—and away from where the victims actually lived—so as to avoid the public finding out about anything: "On an 'avoid the press' note, I believe that Mr. Epstein's airplane was in Miami on the day of the [co-conspirator] telephone call.  If he was in Miami-Dade County at the time, then

---

[34]  Exhibit 13.
[35]  Exhibit 15; RFP WPB 000066-000074 (Exhibit 52).
[36]  RFP WPB 000124-000126 (Exhibit 53).

I can file the charge in the District Court in Miami, which will hopefully cut the press coverage significantly." They also discussed having Epstein plea to a second charge of assaulting a different co-conspirator.[37]

25. On September 16, 2007, the line prosecutor wrote to Epstein's counsel indicating that the Office did not like the factual basis for the proposed charges as the Office was "not investigating Mr. Epstein abusing his girlfriend."[38]

26. The correspondence further discussed a possible plea disposition that would make it hard for a judge to see what was happening:

> Andy [i.e., AUSA Andrew Laurie] recommended that some of the timing issues be addressed only in the state agreement, so that it isn't obvious to the judge that we are trying to create federal jurisdiction for prison purposes.
>
> I will include our standard language regarding resolving all criminal liability and I will mention 'co-conspirators,' but I would prefer not to highlight for the judge all of the other crimes and all of the other persons that we could charge. Also, we do not have the power to bind Immigration . . . there is no plan to try to proceed on any immigration charges against either Ms. [co-conspirator] or Ms. [co-conspirator].[39]

27. In the same email, the line prosecutor wrote to defense counsel about a meeting outside the U.S. Attorney's Office: "Maybe we can set a time to meet. If you want to meet 'off campus' somewhere, that is fine."[40]

28. On about September 16, 2007, Epstein's counsel provided a proposed NPA to the Government that extended immunity from federal prosecution not only for Epstein, but also to

---

[37] US_Atty_Cor. at 29 (Exhibit 54); RFP WPB 000122 (Exhibit 55); RFP WPB 000125-000126 (Exhibit 56); RFP MIA 000281 (Exhibit 57).
[38] Exhibit 7.
[39] *Id.*
[40] Exhibit 7; US_Atty_Cor. 00196 (Exhibit 58) (indicating that at least one additional meeting was held off campus between the Government and counsel for Epstein).

certain co-conspirators: "Epstein's fulfilling the terms and conditions of the Agreement also precludes the initiation of any and all criminal charges which might otherwise in the future be brought against Sarah Kellen, Adriana Ross, Lesley Groff, and Nadia Marcinkova or any employee of N.E.S. for any criminal charge that arises out of the ongoing federal investigation as described above."[41]

29. On September 17, 2007, the line prosecutor wrote to defense counsel Jay Lefkowitz: "Please send [a document] to my home e-mail address – [redacted] and give me a call on my cell [redacted] so I can be ready for some discussions tomorrow."[42]   In discovery in this case, the U.S. Attorney's Office has not produced any emails sent to or from any home e-mail addresses of its prosecutors.

30. On September 17, 2007, defense counsel Jay Lefkowitz responded: "[D]o you have another obstruction proffer I can review that you have drafted?  Also, if we go that route, would you intend to make the deferred prosecution agreement public?"[43]

31. On September 18, 2007, the Office responded: "A non-prosecution agreement would not be made public or filed with the Court, but it would remain part of our case file.  It probably would be subject to a FOIA request, but it is not something that we would distribute without compulsory process."[44]

32. On September 20, 2007, the U.S. Attorney's Office wrote: "On the issue about 18 USC 2255 [a civil restitution provision], we seem to be miles apart.  Your most recent version

---

[41]  Exhibit 16.
[42]  RFP WPB 001709 (Exhibit 59).
[43]  Exhibit 17.
[44]  Exhibit 10.

not only had me binding the girls to a trust fund administered by the state court, but also promising that they will give up their 2255 rights.… In the context of a non-prosecution agreement, the office may be more willing to be specific about not pursuing charges against others."[45]

33. On September 21, 2007, state prosecutor Barry Krischer wrote the line prosecutor about the proposed deal and added: "Glad we could get this worked out for reasons I won't put in writing. After this is resolved I would love to buy you a cup at Starbucks and have a conversation."[46]  Such statement is further evidence of the fact that Epstein's counsel, the U.S. Attorney's Office, and the State of Florida were conferring daily in an effort to resolve the case in a way that would compensate the victims through restitution, yet no one made any effort to notify the victims of the true status of the case.

34. On September 21, 2007, the line prosecutor emailed Epstein's counsel stating, "I think that the attached addresses the concerns about having an unlimited number of claimed victims, without me trying to *bind* girls whom I do not represent."[47]  Despite knowledge that such agreement would be binding on the victims, the Office never attempted to notify or confer with the victims about the existence of the NPA.

35. On September 23, 2007, the U.S. Attorney's Office sent an email to Lefkowitz stating: "It is factually accurate that the list we are going to give you are persons we have identified as victims.  If we did not think they were victims, they would have no right to bring suit."[48]

---

[45] RFP MIA 000173 (Exhibit 60).
[46] Exhibit 21.
[47] US_Atty_Cor_0081-0087 (Exhibit 61) (emphasis added).
[48] Exhibit 4.

36. On September 24, 2007, the line prosecutor sent an e-mail to a prospective representative for the Epstein victims named Humberto "Bert" Ocariz, entitled "Conflict Check" confirming the girls' status as victims, stating: "Please keep this confidential because these are minor victims.  This is a preliminary list."[49]  Later on September 24, 2007, the line prosecutor sent an email to Lefkowitz stating, "I have compiled a list of 34 confirmed minors."[50]

37. As correspondence continued on September 24, 2007, and the NPA was being executed, Lefkowitz sent an email to line prosecutor Marie Villafaña stating: "Marie – Please do whatever you can to keep this [i.e., the NPA] from becoming public."[51]

### SIGNING THE SECRET NON-PROSECUTION AGREEMENT

38.  On September 24, 2007, Epstein and the U.S. Attorney's Office formally reached an agreement whereby the United States would defer federal prosecution in favor of prosecution by the State of Florida.  Epstein and the Office accordingly entered into a NPA reflecting such agreement.  Most significantly, the NPA gave Epstein a promise that he would not be prosecuted in the Southern District of Florida for a series of federal felony offenses involving his sexual abuse of more than 30 known minor girls and countless other unknown minors.  The NPA instead allowed Epstein to plead guilty to state felony offenses for solicitation of prostitution and procurement of minors for prostitution.[52]

39. The NPA also set up a procedure whereby a victim of Epstein's sexual abuse could obtain an attorney to proceed with a civil settlement with Epstein, provided that the victim

---

[49] Exhibit 2.
[50] Exhibit 4.
[51] Exhibit 57.
[52] Executed Non-Prosecution Agreement (Exhibit 62).

agreed to limit damages sought from Epstein.[53]  Such provision was devised by Epstein's counsel and the Office without the knowledge or consent of the victims, and without any opportunity for them to reasonably confer on the provision.

40. Among other provisions, the NPA expanded immunity to any "potential co-conspirator" of Epstein's: "In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova."[54]

41. The NPA also provided that it was confidential: "The parties anticipate that this agreement will not be made part of any public record.  If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure."[55]

## LACK OF VICTIM NOTIFICATION BEFORE THE NPA WAS SIGNED

42. From the time the FBI began investigating Epstein until September 24, 2007—when the NPA was concluded—the U.S. Attorney's Office never conferred with the victims about a NPA.[56]

43. From the time the FBI began investigating Epstein until September 24, 2007—when the NPA was concluded—the U.S. Attorney's Office never even told the victims that such an

---

[53] Exhibit 62.
[54] *Id.* at 5.
[55] *Id.*
[56] *See* Tr. of July 11, 2008 Hearing (Exhibit 63) at 9-12; [DE 14] at 4 (Exhibit 64).

agreement was under consideration.[57]

## FAILURE TO NOTIFY OTHER SIMILARLY-SITUATED VICTIMS ABOUT THE NPA

44. Many, if not all, other similarly-situated victims received standard CVRA victim notification letters substantively identical to those sent to Jane Doe 1 and Jane Doe 2 and the Government reasonably expected them to rely on those representations.[58]

45. The U.S. Attorney's Office did not consult or confer with any of the victims about the NPA before it was signed. [59]

46. The U.S. Attorney's Office did not tell any of the victims about the NPA before it was signed.[60]

47. Because none of the victims knew about the NPA or any other possible resolution of the case, they could not have conferred with prosecutors about the NPA before it was signed.[61]

48. Epstein's counsel was aware that the Office was deliberately keeping the NPA secret from the victims and, indeed, had sought assurances to that effect.[62]

## NEGOTIATIONS ABOUT CONCEALING THE NPA FROM THE VICTIMS

49. After the NPA was signed, Epstein's counsel and the Office began negotiations about whether the victims would be told about the NPA.[63]

---

[57] *See* Exhibit 63 at 9-12; Exhibit 64 at 4; [DE 225-1] at 51 (Exhibit 65).
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] Exhibit 26; Exhibit 27.
[62] Exhibit 63 at 9; US_ Atty_Cor. 0153 (Exhibit 66) (emphases added); RFP MIA 000489-000491 (Exhibit 67).
[63] Exhibit 66 (emphases added).

19

50. It was a deviation from the Government's standard practice to negotiate with defense counsel about the extent of crime victim notifications.[64]

51. To pressure the Office to agree to positions they wanted, Epstein's counsel began "a year-long assault on the prosecution and the prosecutors." This assault was more aggressive than any U.S. Attorney Alex Acosta, or any of his prosecutors, had ever seen in their extensive experience.[65]

52. On about September 24, 2007, the U.S. Attorney's Office sent an e-mail to Lefkowitz, stating that the Government and Epstein's counsel would negotiate privately about what information would be disclosed to the victims about the agreement:

> Thank you, Jay. I have forwarded your message only to [United States Attorney] Alex [Acosta], Andy, and Roland. I don't anticipate it going any further than that. When I receive the originals, I will sign and return one copy to you. The other will be placed in the case file, which will be kept confidential since it also contains identifying information about the girls.
>
> When we reach an agreement about the attorney representative for the girls, *we can discuss what I can tell him and the girls about the agreement.* I know that Andy promised Chief Reiter an update when a resolution was achieved.… Rolando is calling, but Rolando knows not to tell Chief Reiter about the money issue, just about what crimes Mr. Epstein is pleading guilty to and the amount of time that has been agreed to. *Rolando also is telling Chief Reiter not to disclose the outcome to anyone.*[66]

53. On September 25, 2007, the line prosecutor sent an e-mail to Lefkowitz stating: "And can we have a conference call to discuss what I may disclose to . . . the girls regarding the agreement."[67]

---

[64] Exhibit 65 at 50.
[65] 001795-001797 (Exhibit 68); *see, e.g.*, Exhibit 24.
[66] Exhibit 66 (emphases added).
[67] US_Atty_Cor. at 156 (Exhibit 69).

54.  On September 25, 2007, the line prosecutor sent an email to Lefkowitz, (1) expressing what she called "bias" against plaintiffs' attorneys, (2) trying to set up an arrangement whereby Epstein's victims would not be represented by various private attorneys, and (3) arguing instead for an attorney in Miami who could help keep things concealed: "They [Ted Babbitt, Stuart Grossman, Chris Searcy, Jake Lytal] are all very good personal injury lawyers, but I have concerns about whether there would be an inherent tension because they may feel that THEY might make more money (and get a lot more press coverage) if they proceed outside the Terms of the plea agreement.  (Sorry – I just have a bias against plaintiffs' attorneys.)  One nice thing about Bert is that he is in Miami where there has been almost no coverage of this case."[68]

55.  On September 26, 2007, the line prosecutor sent an e-mail to Lefkowitz in which she stated: "Hi Jay – Can you give me a call at 561-[xxx-xxxx] this morning?  I am meeting with the agents and want to give them their marching orders regarding what they can tell the girls."[69]

56.  On September 27, 2007, the attorney appointed by the Office to represent the victims—without the knowledge of the victims—emailed the Office asking questions about the assignment, including whether he could see a copy the indictment or plea agreement "so that we understand exactly what Epstein concedes to in the civil case."[70]

57.  On September 27, 2007, upon inquiry from the Office, Lefkowitz responded by stating that the attorney representative "certainly [] should not get a copy of any indictment."[71]

---

[68]  RFP WPB 000384 (Exhibit 70).
[69]  Exhibit 26; US_Atty_Cor. at 359 (Exhibit 71).
[70]  000574-000575 (Exhibit 72).
[71]  RFP WPB 001687 (Exhibit 73).

58. On September 27, 2007, the line prosecutor informed Epstein's counsel of concerns raised by the attorney representative for the girls selected by the Government and paid for by Epstein. Specifically, "[t]he concern is, if all 40 girls decide they want to sue, they don't want to be in a situation where Mr. Epstein says this is getting too expensive, we won't pay anymore attorneys' fees."[72]

59. On September 27, 2007, the line prosecutor sent an email to state prosecutors Lanna Belohlavek and Barry Krischer: "Can you let me know when Mr. Epstein is going to enter his guilty plea and what judge that will be in front of? I know the agents and I would really like to be there, 'incognito.'" The fact that they intended to be at the plea proceeding "incognito" is evidence that they did not intend to notify the victims of the proceeding.[73]

60. On October 3, 2007, the U.S. Attorney's Office sent a proposed letter that would have gone to a special master for selecting an attorney representative for the victims under NPA's compensation procedure. The letter described the facts of the Epstein case as follows: "Mr. Epstein, through his assistants, would recruit underage females to travel to his home in Palm Beach to engage in lewd conduct in exchange for money. Based upon the investigation, the United States has identified 40 young women who can be characterized as victims pursuant to 18 U.S.C. § 2255. Some of those women went to Mr. Epstein's home only once, some went there as many as 100 times or more. Some of the women's conduct was limited to performing a

---

[72] Exhibit 23.
[73] RFP WPB 002046 (Exhibit 74).

topless or nude massage while Mr. Epstein masturbated himself.  For other women, the conduct escalated to full sexual intercourse."[74]

61. On October 10, 2007, Lefkowitz sent a letter to U.S. Attorney Acosta stating, in pertinent part: "Neither federal agents nor anyone from your Office should contact the identified individuals to inform them of the resolution of the case, including appointment of the attorney representative and the settlement process. Not only would that violate the confidentiality of the agreement, but Mr. Epstein also will have no control over what is communicated to the identified individuals at this most critical stage. We believe it is essential that we participate in crafting mutually acceptable communication to the identified individuals."  The letter further proposed that the attorney representative for the victims be instructed that "[t]he details regarding the United States's investigation of this matter and its resolution with Mr. Epstein is confidential. You may not make public statements regarding this matter."[75]

62. On October 18, 2007, the U.S. Attorney met with Lefkowitz in person for breakfast. Meanwhile, the victims had still not been notified of the NPA.[76]

63. On October 23, 2007, Lefkowitz sent a letter to U.S. Attorney Acosta, which stated: "I also want to thank you for the commitment you made to me during our October 12 meeting in which you . . . *assured me* that your Office would not . . . *contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter.*"[77]

---

[74] RFP WPB 000411-000412 (Exhibit 75).
[75] RFP MIA 000015-000016 (Exhibit 76).
[76] RFP WPB 002020-002021 (Exhibit 77).
[77] Exhibit 67 (emphasis added).

23

64.  On October 24, 2007, AUSA Jeff Sloman sent a letter to Jay Lefkowitz, proposing an Addendum to the NPA clarifying the procedures for the third-party representative for the victims under the NPA's compensation procedures.[78]

65.  On October 25, 2007, AUSA Jeff Sloman sent a letter to Ret. Judge Davis about selecting an attorney to represent the victims under the NPA's compensation procedure.[79]

**LACK OF VICTIM NOTIFICATION AFTER THE NPA WAS SIGNED**

66.  After the NPA was signed, the Office regarded the agreement as having "an express confidentiality provision."[80]

67.  By entering into the confidentiality provision, the Office put itself in a position that conferring with the crime victims—including Jane Doe 1, Jane Doe 2, and other similarly-situated victims—about the co-conspirator immunity provision and the NPA's non-prosecution provisions would have violated the confidentiality provision of the agreement.[81]

68.  The confidentiality provision was a contractual prohibition, binding on the U.S. Attorney's Office, against disclosing the terms of the NPA.[82]

69.  Epstein was well aware of this failure to notify the victims and, indeed, arranged for this failure to notify the victims.[83]

70.  On about October 26 or 27, 2007, after the initial plea agreement was signed, FBI agents contacted Jane Doe 1.  Special Agents E. Nesbitt Kuyrkendall and Jason Richards met in

---

[78] US_Atty_Cor. 00220-00226 (Exhibit 78).
[79] 000551-000554 (Exhibit 79).
[80] Exhibit 64 at 4.
[81] Exhibit 62.
[82] *Id.*
[83] *Id.*; Exhibit 63 at 4-6, 18-19, 22-23, 28-29; Exhibit 64 at 4-5; Exhibit 69.

person with Jane Doe 1.  During this litigation, the Special Agents have said that they explained that Epstein would plead guilty to state charges involving another victim, he would be required to register as a sex offender for life, and he had made certain concessions related to the payment of damages.[84]

71.  During this meeting, the Special Agents did not explain that an agreement had already been signed that precluded any prosecution of Epstein for federal charges for crimes committed against Jane Doe 1 or the many other victims cooperating with the federal investigation.[85]

72.  The Special Agents also did not explain that an agreement had already been signed that precluded any prosecution of Epstein's co-conspirators, including Marcinkova who had personally sexually abused Jane Doe 1 at the direction of Epstein.  Because the plea arrangement had already been reached with Epstein, the agents made no attempt to secure Jane Doe 1's view on the proposed resolution of the case or to confer with her about it.[86]

73. Jane Doe 1 did not get the opportunity to meet or confer with the attorney for the Government in the case about any potential federal deal that related to her or the crimes Epstein committed against her.[87]

74.  The agents could not have revealed the immunity features of the NPA without violating its terms, which required that the Government "provide notice to Epstein before making … disclosure" of the NPA.[88]

---

[84] Exhibit 26.
[85] Exhibit 62; Exhibit 26; Exhibit 63 at 4-6, 18-19, 22-23.
[86] *Id.*
[87] *Id.*
[88] *Id.*

75. Jane Doe 1's understanding of the Special Agent's explanation was that only the state portion of the Epstein investigation was being resolved, and that the federal investigation in which she was participating would continue. This understanding is consistent with the future communication she received.[89]

76. In addition to Jane Doe 1, FBI agents talked to only two other victims out of the 34 identified victims about the "general terms" of the NPA, including the provision providing a federal civil remedy to the victims.[90]

77. After these meetings with three victims, Epstein's defense team complained. At that point, the U.S. Attorney's Office decided not to make any notifications about the NPA to any victim.[91]

78. Other than the three victims mentioned above, the United States did not inform any of the victims of anything about the status of the case or any plea discussions with Epstein, including even the existence of the NPA.[92]

79. On about November 27, 2007, AUSA Jeff Sloman sent an e-mail to Lefkowitz, (with a cc to U.S. Attorney Acosta) stating that the Office had a statutory obligation to notify the victims about Epstein's plea to state charges that was part of the NPA:

> *The United States has a statutory obligation (Justice for All Act of 2004) to notify the victims of the anticipated upcoming events and their rights associated with the agreement entered into by the United States and Mr. Epstein in a timely fashion.* Tomorrow will make one full week since you were formally notified of the selection. I must insist that the vetting process come to an end. Therefore, unless you provide me with a good faith objection to Judge Davis's selection [as special

---

[89]  Exhibit 26; Exhibit 63 at 4-6, 18-19, 22-23, 28-29; [DE 58] (Exhibit 80) at 11.
[90]  RFP MIA 000408 (Exhibit 81); Exhibit 64 at 4.
[91]  Exhibit 64 at 5.
[92]  Exhibit 62; Exhibit 65 at 57; Exhibit 64 at 4-5.

master for selecting legal counsel for victims pursuing claims against Epstein] by COB tomorrow, November 28, 2007, I will authorize the notification of the victims.  Should you give me the go-head on [victim representative] . . . selection by COB tomorrow, I will simultaneously send you a draft of the letter.  I intend to notify the victims by letter after COB Thursday, November 29th.[93]

80.  On November 28, 2007, the Government sent an email to Lefkowitz attaching a letter dated November 29, 2007 (the apparent date upon which it was intended to be mailed) and explained that "I am writing to inform you that the federal investigation of Jeffrey Epstein has been completed, and Mr. Epstein and the U.S. Attorney's Office have reached an agreement containing the following terms."  The proposed letter then spelled out a number of the provisions in the NPA, including that because Epstein's plea to state charges was "part of the resolution of the federal investigation," the victims were "entitled to be present and to make a statement under oath at the state sentencing."[94]

81.  On November 28, 2007, Lefkowitz sent an email to U.S. Attorney Acosta (with a copy to AUSA Sloman) objecting to victim notifications:

> *We do, however, strongly and emphatically object to your sending a letter to the alleged victims*.  Finally, we disagree with your view that you are required to notify the alleged victims pursuant to the Justice for All Act of 2004.… Furthermore, if a letter is to be sent to these individuals, we believe we should have a right to review and make objections to that submission prior to it being sent to any alleged victims.… *[I]t it should happen only after Mr. Epstein has entered his plea.*[95]

82.  The Government complied with such direction and failed to inform the victims of the NPA until after Epstein entered his plea.  On November 29, 2007, Lefkowitz sent a letter to U.S. Attorney Acosta objecting to the proposed victim notification letter, stating that it is

---

[93] US_Atty_Cor. at 00255-00262 (Exhibit 82) (emphasis rearranged).
[94] RFP WPB 000429 (Exhibit 83); RFP MIA 000011-000014 (Exhibit 84).
[95] Exhibit 26 (emphasis added).

inappropriate for any letter to be sent to the victims before Epstein entered his plea or had been sentenced.  Lefkowitz also told the Government that the victims should not be invited to the state sentencing, that they should not be encouraged to contact law enforcement officials, and that encouraging the attorney representative to do anything other than get paid by Epstein to settle the cases was to encourage an ethical conflict.[96]

83.  On about November 30, 2007, U.S. Attorney Acosta sent a letter to one of Epstein's defense attorneys, Ken Starr, stating: "I am directing our prosecutors not to issue victim notification letters until this Friday at 5 p.m., to provide you with time to review these options with your client."  The letter also explained that the line prosecutor had informed Acosta "that the victims were not told of the availability of Section 2255 relief during the investigation phase of this matter" despite the fact that the "[r]ule of law . . . now requires this District to consider the victims' rights under this statute in negotiating this Agreement."[97]

84.  Because of concerns from Epstein's attorneys, the U.S. Attorney's Office never sent the proposed victim notification letters discussed in previous paragraphs to the victims or anything discussing any of the NPA provisions.[98]

85.  On December 5, 2007, Starr sent a letter to U.S. Attorney Acosta (with copy to AUSA Sloman) asking about issuance of victim notification letters and stating: "While we believe that it is wholly inappropriate for your Office to send this letter under any circumstances, it is certainly inappropriate to issue this letter without affording us the right to review it."[99]

---

[96] RFP MIA 000007-000010 (Exhibit 85).
[97] RFP MIA 000501-507 (Exhibit 86).
[98] Exhibit 26; RFP MIA 000025-000037 (Exhibit 87).
[99] Exhibit 76.

86.   On about December 6, 2007, Sloman sent a letter to Lefkowitz again recognizing the

rights of the victims, and also recognizing that the victims had not yet been afforded any rights,

despite the fact that the NPA was signed months earlier.  The letter stated:

> [E]ach of the listed individuals are persons whom the Office identified as victims.
> [T]he Office is prepared to indict Mr. Epstein based upon Mr. Epstein's
> 'interactions' with these individuals. This conclusion is based upon a thorough
> and proper investigation - one in which none of the victims was informed of any
> right to receive damages of any amount prior to the investigation of her claim.
>
> [T]he Office can say, without hesitation, that the evidence demonstrates that each
> person on the list was a victim of Mr. Epstein's criminal behavior.
>
> Finally, let me address your objections to the draft Victim Notification Letter.
> You write that you don't understand the basis for the Office's belief that it is
> appropriate to notify the victims.  Pursuant to the 'Justice for All Act of 2004,'
> crime victims are entitled to: 'The right to reasonable, accurate, and timely notice
> of any public court proceeding … involving the crime' and the 'right not to be
> excluded from any such public court proceeding.…'  18 U.S.C. § 3771(a)(2) &
> (3).  Section 3771 also commands that 'employees of the Department of Justice . .
> . engaged in the detection, investigation, or prosecution of crime shall make their
> best efforts to see that crime victims are notified of, and accorded, the rights
> described in subsection (a).'  18 U.S.C. § 3771(c)(1).…
>
> With respect to notification of the other information that we propose to disclose,
> the statute requires that we provide a victim with the *earliest possible* notice of:
> the status of the investigation, the filing of charges against a suspected offender,
> and the acceptance of a plea. 42 U.S.C. 10607(c)(3). Just as in 18 U.S.C. 3771,
> these sections are not limited to proceedings in a *federal* district court. Our Non-
> Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein
> to plead to a state offense. *The victims identified through the federal investigation
> should be appropriately informed*, and our Non-Prosecution Agreement does not
> require the U.S. Attorney's Office to forego its legal obligations.
>
> [T]he Office believes that it has proof beyond a reasonable doubt that each listed
> individual was a victim of Mr. Epstein's criminal conduct while the victim was a
> minor. The law requires us to treat all victims "with fairness and with respect for
> the victim's dignity and privacy." 18 U.S.C. 3771(a)(8).[100]

---

[100]   US_Atty_Cor. 190-193 (Exhibit 88) (emphasis added).

The letter included a footnote stating: "Unlike the State's investigation, the federal investigation shows criminal conduct by Mr. Epstein at least as early as 2001, so all of the victims were minors at the time of the offense."[101]

87.  On December 7, 2007, defense attorney Lilly Ann Sanchez sent a letter to AUSA Sloman, requesting "that the Office hold off on sending any victim notification letters." The Government complied.[102]

88.  While discussing with defense counsel changes in the October 2007 Addendum and in a December 19, 2007 letter from the U.S. Attorney to Attorney Lilly Ann Sanchez, the U.S. Attorney's Office did not confer with any of the victims about these modifications to the NPA.

89.  On December 13, 2007, the line prosecutor sent a letter to Lefkowitz confirming that the Government had earlier stopped making victim notifications because of objections from Epstein's criminal defense counsel:  "You raised objections to any victim notification, and no further notifications were done."[103]  The December 13, 2007 letter reveals it would have been possible to confer with victims about the NPA.  The U.S. Attorney's Office was able to confer constantly with Epstein's counsel about the parameters of the NPA, but intentionally declined to confer with Epstein's victims about the Agreement.[104]

90.  On December 19, 2007, U.S. Attorney Acosta sent a letter to Lilly Ann Sanchez stating, "I understand that the defense objects to the victims being given notice of time and place of Mr. Epstein's state court sentencing hearing.  We intend to provide victims with notice of the

---

[101]   RFP WPB 000620 (Exhibit 89).
[102]   RFP WPB 001557 (Exhibit 90).
[103]   Exhibit 24; Exhibit 69; RFP MIA 00469 (Exhibit 91).
[104]   *Id.*

federal resolution, as required by law.  We will defer to the discretion of the State Attorney regarding whether he wishes to provide victims with notices of the state proceedings.[105]

91.  In about early January 2008, as the result of pressure from Epstein's attorneys, Acosta agreed with Epstein's attorneys "that there were significant irregularities with the deferred prosecution agreement" and "called a time-out."  At that time, Acosta asked the Child Exploitation and Obscenity Section of the Justice Department's Criminal Division, located in Washington, D.C., to look at the case.[106]

## CONCEALING THE NPA WHILE EPSTEIN SOUGHT REVIEW

92. Following the entry of the "time out," any requirement that Epstein carry out his obligations under the NPA was delayed while he sought higher level review within the Justice Department.  During this review, the victims were not told about the existence of the NPA.[107]

93.  On January 10, 2008, Jane Doe 1 and Jane Doe 2 received victim notification letters from the FBI advising them that "[t]his case is currently under investigation.  This can be a lengthy process and we request your *continued patience while we conduct a thorough investigation*."[108]

94.  The January 10, 2008, notification letter did not disclose that the federal cases in the Southern District of Florida involving Jane Doe 1 and Jane Doe 2 were the subject of the NPA

---

[105]   US_Atty_Cor. 00272-00273 (Exhibit 92); RFP MIA 000038-000040 (Exhibit 93); RFP MIA 00041-00047 (Exhibit 94); RFP MIA 000048-000052 (Exhibit 95).
[106]   Exhibit 91 (email from Lefkowitz to Acosta, dated February 29, 2008, and noting that it had been nearly two months since the "time out" agreement).
[107]   Exhibit 26; Exhibit 27; RFP WPB 001616-001623 (Exhibit 96); Exhibit 63 at 4-5, 18-19, 22-29.
[108]   January 10, 2008 Victim Notification Letter to Jane Doe 1 (Exhibit 97) (emphasis added); January 10, 2008 Victim Notification Letter to Jane Doe 2 (Exhibit 98).

entered into by Epstein and the U.S. Attorney's Office discussed previously, or that there had been any potentially binding resolution.[109]

95.   On about January 10, 2008, other victims similarly-situated to Jane Doe 1 and Jane Doe 2 received letters identical in substance to those described in the immediately preceding paragraphs.[110]

96.   In early 2008, Jane Doe 1 and Jane Doe 2 believed that criminal prosecution of Epstein was extremely important.   They also desired to be consulted by the FBI or other representatives of the Federal Government about the prosecution of Epstein.   In light of the letters that they had received around January 10, 2008, they reasonably believed, as was obviously intended by the letters, that a federal criminal investigation of Epstein was on-going—including investigation into Epstein's crimes against them.   They also reasonably believed that they would be contacted by and have an opportunity to confer with federal prosecutors before the Federal Government reached any final resolution of that investigation.[111]

97.   On January 31, 2008, Jane Doe 1 met with FBI Agents and AUSA's from the U.S. Attorney's Office.   She provided additional details of Epstein's sexual abuse of her.   The AUSA's did not disclose to Jane Doe 1 at this meeting that they had already negotiated a NPA with Epstein.[112]

98.   On March 19, 2008, the line prosecutor sent a lengthy email to a prospective pro bono attorney for one of Epstein's victims who had been subpoenaed to appear at a deposition.   The

---

[109]   *Id.*
[110]   Exhibit 63 at 4-5, 18-19, 22-29.
[111]   Exhibit 63 at 4-6, 18-19, 22-23, 28-29; Exhibit 26; Exhibit 27.
[112]   Exhibit 33.

email listed the attorneys representing Epstein, the targets of the investigation, and recounted in detail the investigation that had been conducted to that point.  The email did not reveal the fact that Epstein had signed the NPA in September 2007.[113]

99.  On May 30, 2008, Jane Doe 5 (another client of the undersigned), who was recognized as an Epstein victim by the U.S. Attorney's Office, received a letter from the FBI advising her that "[t]his case is currently under investigation.  This can be a lengthy process and we request your continued *patience while we conduct a thorough investigation*."[114]  The statement in the notification letter was misleading.  The letter did not disclose the NPA already entered into by Epstein and the Office, and instead implied that the Office was still investigating Epstein and had not decided how to proceed with the case, neither of which was accurate.[115]

100.  The May 30, 2008, victim letter to Jane Doe 5 also acknowledged the victims' rights under the CVRA at the same time as the Office was not disclosing the NPA's existence to Jane Doe 5 and the other victims.[116]

101.  In mid-June 2008, Mr. Edwards contacted the line AUSA handling the case to inform her that he represented Jane Doe 1 and, later, Jane Doe 2.  Mr. Edwards asked to meet to provide information about the federal crimes committed by Epstein against these victims, hoping to secure a significant federal indictment against Epstein, consistent with his clients' desires.  The line prosecutor and Mr. Edwards discussed the possibility of federal charges being filed in the

---

[113]  Exhibit 40.
[114]  Exhibit 29.
[115]  *Id.*
[116]  Exhibit 28; Exhibit 62.

future. Mr. Edwards was lead to believe federal charges could still be filed, with no mention whatsoever of the existence of the NPA or any other possible resolution to the case. [117]

102.  At the end of the call, the line prosecutor asked Mr. Edwards to send any information that he wanted considered by the Office in determining whether to file federal charges.  Because of the confidentiality provision that existed in the plea agreement, the line prosecutor did not inform Mr. Edwards that months earlier, in September 2007, the Office had reached an agreement not to file federal charges.  The line prosecutor also did not inform Mr. Edwards that resolution of the criminal matter was imminent.[118]

103. On June 19, 2008, Mr. Edwards sent an email to the line prosecutor requesting to meet in person to confer with the Government regarding the status of his clients' case.[119]

104.  Because the line prosecutor did not tell Mr. Edwards about the NPA, Mr. Edwards was not able to confer with the prosecutor about the NPA on behalf of his clients.  Mr. Edwards, however, made it perfectly clear that his clients wanted to confer with the prosecutor before any resolution was reached.  Epstein was aware of this continued concealment of the NPA from the victims and, indeed, sought this concealment.[120]

105. On June 23, 2008, the line prosecutor sent an email to Lefkowitz stating that the Deputy Attorney General had completed his review of the Epstein matter and "determined that federal prosecution of Mr. Epstein's case [wa]s appropriate.  Accordingly, Mr. Epstein ha[d] until

---

[117]  Exhibit 63 at 4-6, 18-19, 22-23, 28-29; Exhibit 64 at 5-6.
[118]  *Id.*; US_Atty_Cor. 0321 (Exhibit 99).
[119]  RFP WPB 001894 (Exhibit 100).
[120]  Exhibit 63 at 4-6, 18-19, 22-23, 28-29; Exhibit 64 at 5-6; Exhibit 99.

the close of business on Monday, June 30, 2008, to comply with the terms and conditions of the agreement between the United States and Mr. Epstein."[121]

### EPSTEIN'S ENTRY OF HIS GUILTY PLEA

106.  On and before June 30, 2008, the Government and Epstein's attorneys corresponded extensively (often multiple times on any given day) regarding Epstein's entry of his guilty plea. Throughout the course of these communications, the Government and Epstein operated on the agreement that the victims would not be told about the NPA, much less about the fact that Epstein's plea was a triggering event for the federal case being resolved.[122]

107. On about June 27, 2008, the U.S. Attorney's Office called Mr. Edwards to provide notice to his clients regarding the impending Monday morning hearing.  The notice, however, was only that Epstein was pleading guilty to state solicitation of prostitution charges involving other victims—not Mr. Edwards' clients nor any of the federally-identified victims.  The U.S. Attorney's Office did not tell Mr. Edwards that the guilty pleas in state court would bring an end to the possibility of federal prosecution pursuant to the plea agreement.[123]

108.  In fact, the U.S. Attorney's Office did not disclose to Edwards the fact that the guilty pleas in state court had any bearing on the cases of Jane Doe 1 and Jane Doe 2.  As a result, Jane Doe 1 and Jane Doe 2 did not attend the plea hearing.[124]

---

[121]  Exhibit 40.
[122]  Exhibit 26; Exhibit 27; Exhibit 62; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 99; RFP WPB 000512-000513 (Exhibit 101).
[123]  Exhibit 62; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 99; Exhibit 101.
[124]  Exhibit 26; Exhibit 27; Exhibit 62; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 99; Exhibit 101; Declaration of Brad Edwards (Exhibit 102).

109.  Had they known that the plea agreement in state court made it impossible to prosecute Epstein federally for his crimes against them, they would have objected to this resolution and would have certainly attended the hearing.[125]

110.  On or before June 30, 2008, the Office prepared a draft victim notification to be sent to the victims—a letter that it intended to show to both Epstein and Jack Goldberger, as reflected by a place for the initials of both Epstein and Goldberger on the document.  The notification was designed to inform the victims of the provisions of deferral of federal prosecution in favor of state charges.  The notification letter began by describing Epstein's guilty plea in the past tense: "On June 30, 2008, Jeffrey Epstein … entered a plea of guilty to violations of Florida statutes forbidding the solicitation of minors to engage in prostitution and felony solicitation of prostitution."  Later, a substantively identical letter was prepared for Epstein's and Guy Lewis' review. [126]

111. On June 30, 2008, the Office sent an e-mail to Goldberger reflecting continuing efforts to keep the NPA secret: "Jack: The FBI has received several calls regarding the Non-Prosecution Agreement.  I do not know whether the title of the document was disclosed when the Agreement was filed under seal, but the FBI and our office are declining comment if asked."[127]

112.  On June 30, 2008, Epstein plead guilty to state law solicitation of prostitution charges. Because the Federal Government failed to notify the victims about the NPA or its arrangements with Epstein, neither Jane Doe 1, Jane Doe 2, Jane Doe 5, nor any of the identified victims in the

---

[125]  Exhibit 26; Exhibit 27; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 99; Exhibit 101; Exhibit 102.
[126]  US_Atty_Cor. 00323 (Exhibit 103); RFP WPB 000515-000520 (Exhibit 104).
[127]  Exhibit 99.

federal case were aware of the ramifications of the state proceeding (either in person or through counsel).[128]

113.  Immediately following the June 30, 2008 hearing, the line prosecutor told one of the victims' attorneys that Epstein had "plead guilty today in state court."[129]

114.  On June 30, 2008, based on what she had been told by the Government, Jane Doe 1 thought that the Office was still investigating and pursuing her case.  She did not receive notice that Epstein's state guilty plea affected her rights in any way.  If she had been told that the state plea had some connection to blocking the prosecution of her case, she would have attended and tried to object to the judge to prevent that plea from going forward.[130]

115. On June 30, 2008, based on what she and her attorneys had been told by the Government, Jane Doe 2 thought that the Government was still investigating her case.  If she had been told that the state plea had some connection to blocking the prosecution of her case, she would have tried to confer with the prosecutors about it and tried to get charges filed.  She wanted to be treated fairly in the process.[131]

116.  From September 24, 2007, the date that the NPA was signed, through at least the state court plea on June 30, 2008—a period of more than nine months—the Office did not notify any of Epstein's victims about the existence of the NPA.[132]

---

[128]  Exhibit 26; Exhibit 27; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 64 at 6; 000001-000002 (Exhibit 105).
[129]  RFP WPB 001861 (Exhibit 106).
[130]  Exhibit 26; Exhibit 63 at 4-6, 18-19, 22-23.
[131]  Exhibit 27; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 105.
[132]  Exhibit 62; Exhibit 63 at 4-6, 18-19, 22-23, 28-29; Exhibit 64 at 4; US_Atty_Cor. 00267-00271 (Exhibit 107).

117. On July 1, 2008, the day following Epstein's plea, the line prosecutor emailed the Assistant State Attorney a copy of the NPA for "filing with the Court under seal" demonstrating that the agreement continued to be withheld from the victims.[133]

118. On July 3, 2008, as specifically directed by the U.S. Attorney's Office, Mr. Edwards sent a letter to the Office communicating the wishes of Jane Doe 1, Jane Doe 2, and Jane Doe 5 that federal charges be filed against Epstein: "We urge the Attorney General and our United States Attorney to consider the fundamental import of the vigorous enforcement of our Federal laws. We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual predator."[134]

119. When Mr. Edwards wrote his July 3, 2008 letter, he was still unaware that a NPA had been reached with Epstein and that there was any federal resolution of the case—facts that the Office continued to conceal, at the request of Epstein, not only from Edwards but also as his clients and other victims.[135]

120. On July 7, 2008, the line prosecutor again conferred with Epstein's counsel seeking permission to *begin* distributing the notification letters to the victims, acknowledging her failure to include one victim who was still a minor in 2008.[136]

121. Mr. Edwards first saw a reference to the NPA on or after July 9, 2008, when the Government filed its responsive pleading to Jane Doe's emergency petition. That pleading was

---

[133] RFP WPB 001857 (Exhibit 108).
[134] Exhibit 105.
[135] Exhibit 63 at 4-6, 18-19, 22-23, 28-29; Exhibit 99; RFP WPB 001855 (Exhibit 109); [DE 48] (Exhibit 110) at 18-19.
[136] RFP WPB 001854 (Exhibit 111).

the first public mention of the NPA and the first disclosure to Mr. Edwards—and thus to Jane Doe 1, Jane Doe 2, and Jane Doe 5—of the possible existence of a NPA.[137]

122.   Mr. Edwards detrimentally relied on the misleading representations made by the Office that the case was still under investigation when he was writing his July 3, 2008 letter.  He would not have wasted his time undertaking a pointless exercise had he known that the U.S. Attorney's Office had previously negotiated a NPA, and he would have informed his clients about the agreement.[138]

## A MOTIVE TO CONCEAL THE NPA FROM THE VICTIMS

123.   The U.S. Attorney's Office—pushed by Epstein—wanted the NPA kept from public view because of the strong objection it would have faced from victims of Epstein's abuse, and because of the public criticism that would have resulted from allowing a politically-connected billionaire who had sexually abused more than 30 minor girls to escape from federal prosecution with only a county court jail sentence.[139]

124.   When deciding whether to notify the victims before Epstein entered his guilty plea, the Office was aware that a state court judge would have to review the plea and determine whether it was in the public interest, and accordingly chose not to "highlight" certain potentially objectionable features.[140]

---

[137]  Exhibit 62; Exhibit 63 at 4-6, 18-19, 22-23, 28-29; Exhibit 99; Exhibit 110 at 18-19.
[138]  *See* Exhibit 28; Exhibit 102; Exhibit 105.
[139]  Exhibit 26; Exhibit 27; Exhibit 62; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 99; Exhibit 101; Exhibit 102; Exhibit 57 (urging Government to try and keep agreement from becoming public); Exhibit 7 (explaining Government's desire not to "highlight" possible charges or defendants being immunized).

125.  Concealing the NPA from the victims prevented them from using their right to confer with the Government about why the NPA was not desirable or appearing at Epstein's plea and sentencing hearing to raise their concerns with the Court.[141]

### THE VICTIMS' UNSUCCESSFUL ATTEMPTS TO ENFORCE THEIR RIGHTS

126.  On July 7, 2008, Jane Doe 1 filed an emergency petition for enforcement of her rights under the CVRA.  At the time, Jane Doe 1 was not aware of the NPA, so she sought a court order directing the Government to confer with her before reaching any such agreement.  Epstein quickly became aware of this petition.[142]

127. On July 8, 2008, the line prosecutor sent a letter to Epstein's counsel stating that victims would be informed about the civil compensation provision of the NPA the next day:

> In accordance with the terms of the Non-Prosecution Agreement, on June 30, 2008, the United States Attorney's Office provided you with a list of thirty-one individuals "whom it was prepared to name in an Indictment as victims of an enumerated offense by Mr. Epstein."  . . . In deference to your vacation, we allowed you a week to provide us with any objections or requested modifications of the list and/or the Notification language.  Yesterday, I contacted you via telephone and e-mail, but received no response.  Accordingly, the United States hereby notifies you that it will distribute the victim notifications tomorrow, July 9, 2008, to each of the thirty-two identified victims, either directly or via their counsel.[143]

128.  On July 9, 2008, Jack Goldberger sent a letter to the line prosecutor raising concerns about the notifications, and suggesting modifications to the notification letter.  Epstein's counsel also objected to the victim notification letters containing certain information about the NPA.[144]

---

[141]  18 U.S.C. § 3771; Exhibit 26; *see also* Exhibit 62.
[142]  [DE 1] (Exhibit 112) at 1-2.
[143]  Exhibit 101.
[144]  RFP WPB 000524-000525 (Exhibit 113).

129. Later on July 9, 2008, the line prosecutor sent a response back to Goldberger, explaining how she intended to keep the victims from having access to the terms of the NPA:

> Without such an express Acknowledgment by Mr. Epstein that the notice contains the substance of that Agreement, I believe that the victims will have justification to petition for the entire agreement, which is contrary to the confidentiality clause that the parties have signed.[145]

130. On July 9, 2008, the U.S. Attorney's Office sent victim notification letters to Jane Doe 1 and Jane Doe 5, via their attorney, Mr. Edwards, and to other identified victims of Epstein. That notification contained a written explanation of some of the civil compensation provisions of the NPA. The notification did not provide the full terms of the NPA. For example, the notification did not disclose the NPA or the immunity for "other potential co-conspirators" of Epstein.[146]

131. On July 10, 2008, Epstein's counsel continued to protest victim notification as evidenced by Goldberger's email to the line prosecutor stating, "we respectfully request a reasonable opportunity to review and comment on a draft of the modified notification letter you intend to mail before you send it."[147]

132. On July 11, 2008, the Court held a hearing on Jane Doe 1's petition and, with the stipulation of the Government, added Jane Doe 2 as a petitioner because she was a recognized crime "victim." The Court unsealed a declaration that the line prosecutor had filed in response to the petition, and because the declaration contained one paragraph of the NPA, that paragraph

---

[145] RFP WPB 000526-000527 (Exhibit 114).
[146] 000777-000779 (Exhibit 115); 000774-000776 (Exhibit 116).
[147] RFP WPB 000535-000537 (Exhibit 117).

became unsealed.  The line prosecutor sent an email to Goldberger informing him of the unsealing of that one paragraph.[148]

133.  During the July 11, 2008 hearing, the Government conceded that the NPA had been concluded months before the victims were notified about it.[149]

134.  Throughout July 2008, Epstein's attorneys and the Government continued to correspond about issues such as subpoenas related to his computers and returning of his property.[150]

135.  On August 7, 2008, the line prosecutor emailed one of Epstein's defense attorneys, Roy Black, notice of the motion to disclose the NPA to the victims and assured him that the Government intended "to oppose the motion based upon the confidentiality provision."[151]

136.  On August 10, 2008, Jane Doe 1 and Jane Doe 2 filed a motion seeking release of the NPA.[152]

137.  Immediately after the motion was filed, the Office coordinated with another Epstein attorney about how to best object to the motion.[153]

138.  On August 11, 2008, Roy Black wrote back to the line prosecutor, thanking the Government for "agreeing to oppose any disclosure of the 9/24/07 agreement."[154]

---

[148]  RFP WPB 001845 (Exhibit 118).
[149]  *See* Exhibit 63 at 12 (". . . the agreement was consummated by the parties in December of 2007."); *see also* Exhibit 62.
[150]  RFP WPB 000470-000471 (Exhibit 119); RFP WPB 000481-000489 (Exhibit 120); RFP WPB 000547 (Exhibit 121).
[151]  [DE 19] (Exhibit 122); RFP WPB 001825 (Exhibit 123).
[152]  Exhibit 122.
[153]  RFP WPB 001820-001838 (Exhibit 124).
[154]  RFP WPB 001819 (Exhibit 125).

139. Between August 11 and 14, 2008, the line prosecutor attempted to obtain a copy of the NPA that Epstein's counsel had filed in state court.[155]  After receiving a copy, on August 14, 2008, the line prosecutor wrote to Lefkowitz: "I can no longer argue that the Court shouldn't force us to produce the agreement because we have already provided the victims with the relevant portion when I now understand from you that I have NOT provided them with the relevant portion."[156]

140. Further communications ensued between the line prosecutor and Epstein's counsel about what exactly was contained in the NPA—specifically, whether a December modification to the agreement was part of the NPA.  The notification to the victims about the civil restitution provisions had quoted from the December language.[157]

141. On August 14, 2008, the line prosecutor emailed Epstein's counsel stating that the court has "ordered us to make the Agreement available to the plaintiffs."[158]

142. On August 15, 2008, the line prosecutor sent a letter to Epstein's counsel confirming that recent correspondence was intended "solely to determine what Mr. Epstein considered to be the terms of the Non-Prosecution Agreement" so that the Government would know exactly what needed to be produced to the victims in this CVRA case.[159]

143. On August 18, 2008, Lefkowitz wrote the line prosecutor that Epstein objected to disclosure of the terms of the NPA, but that Epstein would "cooperate with the government to reach an agreement as to substance of the notification to be sent to the government's list of

---

[155]  RFP WPB 001809-001818 (Exhibit 126).
[156]  RFP WPB 001804 (Exhibit 127).
[157]  RFP WPB 001805-001808 (Exhibit 128).
[158]  RFP WPB 001798 (Exhibit 129).
[159]  Exhibit 68; RFP WPB 000575-000576 (Exhibit 130).

individuals.  Based on the Agreement, the information contained in the notification should be limited to (1) the language provided in the Agreement dealing with civil restitution (paragraphs 7-10) and (2) the contact information of the selected attorney representative.  We object to the inclusion of additional information about the investigation of Mr. Epstein, the terms of the Agreement other than paragraphs 7-10 and the identity of other identified individuals." [160]

144.  On August 21, 2008, the Government sent a letter to Epstein's counsel stating that, "[c]opies of the victim notifications will continue to be provided to counsel for Mr. Epstein." The letter further requested substantive objections to the draft notification letters, which were being re-sent "[b]ecause I previously provided the victims with incorrect information—albeit with the approval of Mr. Epstein's counsel—it is imperative that I correct the error promptly."[161]

145.  On August 26, 2008, the Government sent another letter to Epstein's counsel stating, "Mr. Goldberger and Mr. Tein explicitly approved the language in my earlier victim notification letter, even though they apparently were taking the position that the December 19, 2007 letter was *not* part of the Agreement, so that misinformation was provided to the victims with the approval of Mr. Epstein's attorneys."[162]

146.  Jane Doe 1 and Jane Doe 2 were not informed of the contents of the NPA until August 28, 2008, when the line prosecutor provided a copy to Mr. Edwards.[163]

147.  On September 2, 2008, nearly a year after the NPA was signed, the line prosecutor sent an email to Epstein's counsel stating, "I will start sending out the victim notifications today.

---

[160]  RFP WPB 000581-000583 (Exhibit 131).
[161]  RFP WPB 000587-000588 (Exhibit 132).
[162]  RFP WPB 000603-000604 (Exhibit 133) (emphasis in original).
[163]  RFP WPB 001776 (Exhibit 134).

In accordance with your request, I have changed the language regarding the victims' right to receive a copy of the Agreement."[164]

148. On September 2 and 3, 2008, the U.S. Attorney's Office sent to Jane Doe 1 and other identified victims amended notification letters correcting the earlier inaccurate information about the civil compensation provisions contained in the earlier notifications.[165]

149. The victim notification letters that the victims received were confusing.  They did not directly state that Epstein's crimes against them were not going to be prosecuted, but instead said that "the United States has agreed to defer federal prosecution in favor of this state prosecution." The letter did not inform the victims of how this applied to them.[166]

150. The victim notification letters also state that there was "litigation between the United States and two other victims regarding the disclosure of the entire agreement between the United States and Mr. Epstein."  The letters did not explain that the remedy being sought in the litigation was not just to get "disclosure" of the agreement, but instead to uphold the rights of Epstein's victims.[167]

151. On September 16, 2008, the *Palm Beach Daily News* wrote the State Attorney's Office that it had "recently discovered" the NPA and wanted to know what was in it.  The State Attorney's Office wrote the line prosecutor inquiring how to respond.[168]

152. On September 16, 2008, attorney Jeffrey Herman, who represented several Epstein victims, wrote to the line prosecutor to strenuously object to the restitution procedures

[164] RFP WPB 001775 (Exhibit 135).
[165] September 3, 2008 Victim Notification Letter to Jane Doe 1 (Exhibit 136); Exhibit 2; Exhibit 94 at 2-3.
[166] *Id.*; Exhibit 26; Exhibit 27.
[167] *Id.*
[168] 002343-002344 (Exhibit 137).

established in the NPA after learning that another attorney established through the NPA would be making unsolicited contacts to the victims.  Mr. Herman explained that the notification letters were "misleading" because they referred generally to a waiver of "any other claim for damages" without informing them that this waiver might include a valuable punitive damages claim against an alleged billionaire.[169]

153.  On September 17, 2008, the line prosecutor sent an email to State Attorney Barry Krischer, explaining that the NPA "contain[ed] a confidentiality provision that require[ed] us to inform Mr. Epstein's counsel before making any disclosure."[170]

154.  On September 18, 2008, attorney Katherine Ezell representing some of Epstein's victims emailed the line prosecutor, asking whether the NPA was "blessed" by Judge Marra. The line prosecutor emailed back: "As far as I know, Judge Marra has not ever seen the agreement or these notification letters.… I don't know if the sentencing judge ever reviewed it. The letters were reviewed by my office and Jay Lefkowitz and Roy Black before they went out."[171]

155.  In 2010, Jane Doe 1 met with the new U.S. Attorney, Wilfredo Ferrer.  She explained to him how the NPA had been concealed from her.  Nothing ever came of the meeting, and Mr. Ferrer has continued to fight efforts by Jane Doe 1 and other victims to have the court declare that their rights were violated while the NPA was drafted and implemented.[172]

---

[169] *Id.*
[170] RFP WPB 001773 (Exhibit 138).
[171] RFP WPB 001763 (Exhibit 139).
[172] Exhibit 26; Tr. Nov. 23, 2015 (Exhibit 140) at 3-5 (U.S. Attorney's Office argues that the victims are "complicit" in their own sexual abuse and therefore cannot receive any remedy under the CVRA).

156. At all times material to this statement of facts, it would have been practical and feasible for the federal government to inform Jane Doe 1, Jane Doe 2, Ms. Giuffre, Jane Doe 5, and all other similarly-situated victims of the details of the proposed NPA with Epstein, including in particular the fact that the agreement barred any federal criminal prosecution of crimes that Epstein committed against them.[173]

157. At no time while it negotiated and executed the NPA did the Government notify the victims that Epstein's guilty plea would prevent his prosecutions for crimes against them.  Nor did the Government ever allow the identified victims to "confer with the prosecutor on the case," 18 U.S.C. § 3771(a)(5), or "treat them with fairness, respect and dignity" by making them aware of the NPA, § 3771(a)(8).  In fact, to the contrary, the Government went to great lengths to conceal the fact that there was a federal resolution at all and mislead the victims into believing that the federal case was proceeding so that the NPA could be secretly put in place before the victims knew what was going on.[174]

## MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

In light of the foregoing undisputed material facts, summary judgment for the victims on the issue of whether their CVRA rights were violated is appropriate.  The Court is well aware of the applicable summary judgment standard, which requires that there be no disputed issues that are genuine or material for the moving party to be entitled to judgment as a matter of law.  *See, e.g.*, *Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1333 (S.D. Fla. 2012).  The undisputed facts

---

[173] *See* Exhibit 88.
[174] Exhibit 26; Exhibit 27; Exhibit 62; Exhibit 63 at 4-6, 18-19, 22-23; Exhibit 99; Exhibit 101; Exhibit 102; Exhibit 57; Exhibit 7.

here plainly establish that the Government—with the knowledge of, and at the urging of Epstein—violated the CVRA rights of Jane Doe 1, Jane Doe 2, and other similarly-situated victims, by deliberately concealing from them the NPA barring the prosecution of Jeffrey Epstein and his co-conspirators for the federal offenses they committed against them.   In particular, the Government violated the victims' right to confer with prosecutors, right to accurate notice of court hearings, and right to be treated with fairness. 18 U.S.C. § 3771(a)(5), (2), & (8).

### A.      The Government Violated the Victims' Right to Confer.

There can be no real debate that the Government violated the victims' right to confer. Indeed, it is worth recalling that in earlier proceedings, the victims filed a similar (although less detailed) motion for summary judgment.  DE 48.  The Government responded not by claiming that it had in fact conferred with the victims, but rather by advancing the legal argument that the CVRA does not extend any rights to victims before the filing of an indictment.  DE 62.  This argument was flatly contradicted by the Government's own earlier decision to provide notification to victims after the NPA was signed – and even during the investigation treating them as victims. *See, e.g.,* ¶¶ 10-16, 34-35, 69-73, 91-94, 98, 125, *supra*.  In any event, this Court has now firmly rejected the Government's contrived legal position.  DE 99 (the court has determined "that as a matter of law the CVRA can apply before formal charges are filed").[175]

---

[175]  Not only has this Court rejected the Government's position, but Congress and the President have specifically decided to end any debate and to codify this Court's ruling into federal law.  *See* 18 U.S.C. § 3771(a)(9) (victims have the "right to be informed in a timely manner of any plea bargain or deferred prosecution agreement") (added as part of Pub. L. 114-22, Title I, § 113(a), (c)(1) (May 29, 2015)).  This codification builds on the fact that Senator Kyl, the Senate co-sponsor of the CVRA, took to the Senate floor to directly express his approval of this Court's ruling.  157 Cong. Rec. S7060-01 (statement of Senator Kyl) (Nov. 2, 2011) (applauding this Court's decision and

The Government's inability to demonstrate that it afforded victims their right to confer is unsurprising.  Under the CVRA, identified crime victims are granted "the reasonable right to confer with the attorney for the Government in the case."  18 U.S.C. § 3771(a)(5).  In some cases, there might be a debate about how much conferring is "reasonable" for the prosecutor to undertake.  But here, no such debate is possible for the simple reason that the Government simply concealed that it was planning to enter into an agreement blocking the federal prosecution of Epstein from more than 30 of Epstein's identified victims.  *See, e.g.*, ¶¶ 17, 32-33, 38, 41, 44-46, 66, 71-72, 87-88, 95, 102, 113, 123, *supra*.

Whatever other rights the CVRA extends to crime victims, it surely extends the simple right to know when the Government is entering into a deal with a sex offender blocking his prosecution for crimes committed against them. *See, e.g.*, ¶ 155, *supra*.  Here, the Government violated the victims right to confer during at least three separate time periods: (1) on and before September 24, 2007, when the Government was negotiating and signing the NPA; (2) in and around January 2008, when it sent letters telling the victims not about the previously signed NPA, but rather counseling "patience" while the Government finished its "investigation;" and (3) in and around June 30, 2008, when the Government didn't tell the victims that the state plea would effectively extinguish their rights to ever see Epstein prosecuted.  *See ¶¶* 17, 32-33, 38, 41, 44-46, 66, 71-72, 87-88, 95, 102, 113, 123, *supra*.

noting its "careful[] review" of the issues).

49

Simply put, the NPA barred prosecution of the federal sexual offenses that Epstein had committed against Jane Doe 1, Jane Doe 2, and other similarly-situated victims.  Under the CVRA, the victims were entitled to confer about this disposition and attempt to persuade prosecutors to reach a different result.  Recognizing a right to confer about such dispositions is "not an infringement … on the government's independent prosecutorial discretion; instead, it is only a requirement that the government confer in some reasonable way with the victims *before* ultimately exercising its broad discretion."  *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (internal citations omitted) (emphasis added).

The victims fully understand that if they had conferred with the Government, the prosecutors could possibly have ultimately reached the same kind of agreement.  But there is good reason to believe that if the prosecutors had exposed their dealings to scrutiny by Jane Doe 1, Jane Doe 2, and the other victims, they would not have reached such a sweetheart plea deal. *See* ¶¶ 121-23, *supra*.  For example, despite the fact that this case has been in litigation for more than seven years spanning several hundred pleadings, the Government does not write even a single sentence explaining why it entered into an NPA with a sex offender who had committed hundreds of federal sex offenses against young girls.  Perhaps there is some reason for this extraordinary leniency.  But if so, the Government has yet to offer it.  In any event, regardless of the ultimate consequences of conferring, Congress promised to all crime victims—including Jane Doe 1, Jane Doe 2, and other similarly-situated victims—that they would be able to confer with prosecutors before a disposition was reached in their case.  18 U.S.C. § 3771(a)(5).  The victims never received that congressionally-mandated opportunity.

In sum, the Government repeatedly violated the victims' CVRA right to confer — and did so at the specific request of Jeffrey Epstein.  Summary judgment is thus appropriate on this basis.

### B.      The Government Violated the Victims' Right to Be Treated With Fairness.

The Government also violated the victims' "right to be treated with fairness and with respect for the victim's dignity and privacy."  18 U.S.C. § 3771(a)(8).  Entirely apart from whether the victims had any right to confer with prosecutors, at a bare minimum they had a right to be treated fairly and not be deceived by the Government.  Yet here the Government repeatedly and deliberately misled the victims about what was happening in their case, concealing from them the NPA's negotiation and all of the terms it ultimately contained.  As with the violation of the right to confer, these violations occurred at multiple points in the process, including the time before the NPA was signed, after the NPA was signed, and when Epstein was entering his State court guilty plea.

A clear-cut example of the Government's violating the victims right to be treated fairly is its remarkable decision in 2008, well after the NPA had been signed, to send the victims (and, in some cases, their attorneys) deceptive information that the case "is currently under investigation" and that "[t]his can be a lengthy process and we request your continued patience while we conduct a thorough investigation."  *See* ¶¶ 91-103, *supra*. When the Government finally did inform the victims about what had happened, the notifications were not only incomplete and inaccurate, but they also arrived too late for the victims to do anything about the deal.  Specifically, it was too late to confer with the prosecutor or attend the sentencing hearing.  *See* ¶¶ 124-48, *supra*.  Most important, the notifications did not inform the victims that a NPA had been

signed with Epstein, preventing federal prosecution in the Southern District of Florida (and thus, as a practical matter, *any* prosecution for most of the victims) for the crimes he and his co-conspirators had committed against them. The notification letters also described this litigation as "the disclosure" of the NPA, rather than its true purpose of vindicating the victims' rights and securing for the victims a right to confer about prosecuting Epstein free from the backdrop of the NPA.  See ¶¶ 145-48, supra.

The foregoing facts provide numerous other examples of the victims not being treated fairly.  These examples include, but are not limited to:

- Secretly discussing with Epstein's defense counsel contrived charges to avoid making victim notifications (¶¶ 17-22, *supra*);

- Secretly discussing with Epstein's defense counsel arranging a guilty plea in a jurisdiction located some distance from the victims to make it hard for them to find out what was happening (¶ 23, *supra*);

- Secretly reaching a resolution of the case that would make it hard for a judge to see what was going on (¶ 25, *supra*);

- Not telling the victims the NPA was under consideration (¶¶ 41-47, *supra*);

- Deviating from standard policy by negotiating with defense counsel about the extent and substance of crime victim notifications (¶ 49, *supra*);

- Negotiating with defense counsel about concealing the agreement (¶¶ 48-58, *supra*);

- Working to have agents attend Epstein's sentencing hearing "incognito" without telling the victims what was happening (¶ 58, *supra*);

- Making a commitment to Epstein not to contact victims about the NPA (¶ 62, *supra*);

- Entering into a NPA with a confidentiality provision that precluded compliance with CVRA victim notification obligations (¶¶ 65-69, *supra)*;

- Sending FBI agents to meet with three victims, while precluding the agents from being able to discuss the NPA (¶¶ 69-73, *supra*);

- Agreeing with defense counsel to stop victim notifications required under the CVRA (¶¶ 76-77, *supra*);

- Agreeing to notify victims only after Epstein had entered his plea (¶¶ 80-81);

- Sending deceptive letters about the case still being "under investigation" (¶¶ 91-94, 98);

- Concealing the NPA from attorneys for the victims (¶¶ 100-02, 116-17);

- Failing to provide reasonable notice of Epstein's sentencing hearing to the victims (¶¶ 105-10); and

- Agreeing with Epstein to oppose the release of the NPA to the victims after his plea (¶¶ 134-36).

The Government took all of these actions, it should be noted, with the knowledge of – and, indeed, at the insistence of – Epstein, the criminal who had sexually abused the victims.  *See* ¶ 1, *supra*.

　　The overarching point on many of these actions is that victims of crime are not treated fairly if prosecutors are deceiving them about what is going on with regard to prosecuting their abusers.  Whatever else "fairness" might mean, it has to at least mean that the Government keep the victims properly informed and otherwise try to insure that their interests are respected in the criminal justice process.  *See* 150 CONG. REC. 7303 (Apr. 22, 2004) (statement of Sen. Kyl describing right to fairness in broad terms). The foregoing facts amply demonstrate numerous situations wherein the Government deliberately kept the victims in the dark about what was happening.   Accordingly, the Government violated their right to fairness too and summary judgment is warranted on this independent basis as well.

### C.     The Government Violated the Victims' Right to Reasonable and Accurate Notice.

The Government also violated the victims' "right to *reasonable, accurate* and timely notice of any public court proceedings…involving the crime." 18 U.S.C. § 3771(a)(2) (emphasis added). The Government may claim that it complied with this right by giving the victims notice of the state court proceeding in which Epstein pled guilty to sex offenses involving other girls less than one business day before the hearing.[176] But the Government violated the victims' right to "reasonable" and "accurate" notice about this hearing. The Government concealed from Jane Doe 1, Jane Doe 2, and all the other victims, that the NPA and the federal investigation were implicated in this hearing—and thus their right to see Epstein prosecuted was about to be permanently extinguished. As a result of this concealment, they missed their only chance to speak to the Court about the crimes committed against them and to see with their own eyes Epstein being sent to jail. Indeed, even afterwards, the Government continued to hide what was happening with regard to the NPA. *See* ¶¶ 124-148, *supra*.

Importantly, one of the motives for this concealment was to avoid scrutiny by the victims—and the public—of what the Government was doing. *See* ¶¶ 121-23, *supra*. Jane Doe 1, Jane Doe 2, and other similarly-situated victims of serious federal sex offenses did not attend Epstein's plea hearing and sentencing for the obvious reason that they thought it had nothing to do with them—which is precisely what the Government and Epstein were trying to accomplish

---

[176] The Government also seems to argue that the CVRA did not apply to this hearing because it was held in state court. But the hearing was one "involving the crime" committed against the victims, 18 U.S.C. § 3771(a)(2), because the NPA was directly involved in the proceedings in state court. Because of the way the Government and Epstein had constructed the NPA, the state plea triggered the applicability of the federal NPA – and thus the CVRA.

together.  Whatever else might be said about one of the most extraordinarily lenient plea arrangements in American history, the Government simply failed to discharge its duty to Epstein's victims to provide "reasonable" and "accurate" notice about court hearings connected with their abuse.  Summary judgment should therefore also be granted on this basis.

## **CONCLUSION**

Under the Crime Victims' Rights Act, once the Government had identified the victims of Epstein's sexual offenses, it had statutory obligations to them that it was legally required to respect.  Despite those responsibilities to the victims, the Government chose instead to side with the man who had victimized them.  Rather than properly inform the victims what was happening, the Government engaged in months of undisclosed plea negotiations with Epstein.  Once the negotiations had produced a plea arrangement that was sufficiently lenient to be acceptable to Epstein, rather than tell the victims what had been agreed, the Government conspired with Epstein to conceal that agreement.  The undisputed facts clearly show that, for months, the Government deceived the victims about the existence of this arrangement—deception that was necessary to permit the agreement to be consummated before the victims could object.

Perhaps before Congress enacted the CVRA, such outrageous behavior could escape a judicial response.  But Congress has now spoken.  The Government has an obligation to confer with crime victims, to treat them fairly, and to provide them reasonable and accurate notice of judicial proceedings relevant to their victimization.  To the contrary, the undisputed facts in this case show that the Government did not make *any* effort to extend to *any* of Epstein's dozens of victims *any* of the rights which Congress promised them. This Court is accordingly now

obligated to take all necessary steps to "ensure" that the victims' rights are protected.  18 U.S.C.

§ 3771(b).

This is not a close case.  This is a summary judgment case.  For all the foregoing reasons,

the Court should find the Government violated the rights of Jane Doe 1, Jane Doe 2, and other

similarly situated victims under the Crime Victims' Rights Act.  If the Court grants their motion,

the victims would then ask the Court to set an appropriate schedule for briefing and a hearing on

the issue of the remedy for the violations of their rights.

DATED: February 10, 2016

Respectfully Submitted,

/s/ *Bradley J. Edwards*
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
E-mail: brad@pathtojustice.com

*And*

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
University of Utah[*]
332 S. 1400 E.
Salt Lake City, UT 84112
Telephone:801-585-5202
Facsimile:801-585-6833

---

[*]This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah.

56

E-Mail:cassellp@law.utah.edu

*Attorneys for Jane Does 1 and 2*

## CERTIFICATE OF SERVICE

I certify that the foregoing document was served on February 10, 2016, on the following

using the Court's CM/ECF system:

Dexter Lee
A. Marie Villafaña
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
(561) 820-8711
Fax: (561) 820-8777
E-mail: Dexter.Lee@usdoj.gov
E-mail: ann.marie.c.villafana@usdoj.gov

*Attorneys for the Government*

Roy Eric Black
Jacqueline Perczek
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard
Suite 1300
Miami, FL 33131
305-371-6421
Fax: 358-2006
Email: pleading@royblack.com

*Attorneys for Jeffrey Epstein*

/s/ *Bradley J. Edwards*