# EXHIBIT 43

LAW OFFICES OF

# GERALD B. LEFCOURT, P.C.

A PROFESSIONAL CORPORATION

148 EAST 78ᵀᴴ STREET

NEW YORK, NEW YORK 10021

GERALD B. LEFCOURT
lefcourt@lefcourtlaw.com

TELEPHONE
(212) 737-0400
FACSIMILE
(212) 988-6192

SHERYL E. REICH
reich@lefcourtlaw.com
RENATO C. STABILE
stabile@lefcourtlaw.com
FAITH A. FRIEDMAN
ffriedman@lefcourtlaw.com

February 1, 2007

BY HAND

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401

*Jeffrey Epstein*

Dear Ms. Villafaña and Mr. Lourie:

The following outlines the talking points we intend to cover in today's meeting.

The events at issue occurred in 2004 and 2005. The matter was investigated during the course of nearly a year beginning in March 2005 by the Palm Beach County Police Department (PBPD).

As will be discussed in detail below, it appears that a PBPD detective formed a view early on as to the criminality of the conduct of Jeffrey Epstein (Epstein). That view tainted both the determination of what to include in the Police Report[1] and led the PBPD to ignore evidence that did not support the initial conclusion of the investigating officers, including ignoring material evidence supplied to the State Attorney by defense counsel.

We understand that the PBPD has sought your intervention in this matter; we also believe that the misleading and inaccurate reports of the PBPD may well have affected how you view the

---

[1] A copy of the unredacted Police Report, to which we make reference throughout the letter, is provided at Tab 1. Note, pages 81 - 87 are taken from the redacted Police Report because we do not have an unredacted copy of these pages. Other documents cited herein, all of which were provided to you previously, are annexed in successive Tabs.

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 2

matter and whether you believe it warrants federal intervention. We respectfully submit that there is no basis for the exercise of federal jurisdiction here. The conduct at issue is entirely local and subject to State prosecution under the State's standards and policies. And indeed, as you know, Epstein has been indicted for felony charges relating to this matter. That indictment is still pending.

Moreover, key elements that are necessary to support the invocation of federal jurisdiction in this area are wholly lacking. As we detail below, the evidence will not support a determination that Epstein knew or believed that any of the women was under the age of 18. Indeed, the witness statements[2] demonstrate that the opposite is true. As                         herself told the PBPD: '                        told me to say I was 18 because          said . . . if you're not then he [Epstein] won't really let you in his house. So I said I was 18". Nor is there any evidence whatever that any of the women traveled in interstate commerce for the purpose of engaging in prohibited sexual activity or that Epstein ever traveled in interstate commerce for the purpose of engaging in prohibited sexual activity – the clear predicates for any federal violation. Neither is there any reason to breach the *Petite* Policy in favor of the discretionary exercise of federal jurisdiction: there has been a full investigation that has resulted in a prosecution by State authorities on charges deemed appropriate and that the facts will support. And, even if a case could be made, and the exercise of federal jurisdiction were warranted, the extraordinary forensic barriers to a successful prosecution, including the need to use witnesses who themselves have provided sworn statements that contradict key elements of any prosecution, compel that no case be brought. In fact, we believe the State's choice in which charges to pursue was informed by the significant credibility problems of the potential witnesses.

## I.     The Facts Will Not Support a Charge Under Federal Statutes Governing Sexual Conduct

Although to date the federal statutes Epstein may have violated have not been identified, nevertheless, there are certain key elements common to the statutes governing sexual conduct that we believe present insurmountable hurdles to any federal prosecution. We are, of course, prepared to provide further explication of why particular statutes are inapplicable to the conduct alleged here once the statutes you believe may apply have been specified.

---

[2] We are prepared to provide copies of all recordings if requested them.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 3

## 1. <u>Epstein Did Not Know or Believe Any Women Were Under 18 Years of Age.</u>

Each of the potential statutes requires that the government prove that Epstein knew or believed a particular woman was under 18 (or in some instances, under 16), at the time of the events at issue. Epstein did not. There is substantial evidence, found in the sworn statements of the women themselves, that to the extent any were in fact under the age of 18, each affirmatively lied about her age because she knew that Epstein would not "let [her] into his house" if she were under 18. Evidence also supports that Epstein took affirmative steps to ensure that every woman was at least 18 years of age. In fact, many were indisputably over the age of 18.[3]

• 

> Q: At any time, did he speak to you and does he know how old you are? Did he know how old you were?
>
> A: . . .As a mater of fact,          told me to say I was 18 because        said tell him you're 18 because if you're not, then he won't really let you in his house. So I said I was 18. As I was giving him a massage, he's like, how old are you? And then I was like 18.  But I kind of said it really fast because I didn't want to make it sound like I was lying or anything.  (Statement of 3/15/05).

• 

> Q: Did he ask you your age?
> A: Yeah, I told him I was 18.  (Sworn Statement of 10/05/05).

• 

> Q: Did he know your age?
> A: I don't think -- I think he did.  Downstairs        was like oh, well if they ask you how old are you just say you're 18 but

---

[3]  In addition to the women referenced herein, the evidence reflects that witnesses                    were all over the age of 18 at the time each visited Epstein's home.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 4

he never asked me how old I was. I thought you had to be 18
to give a massage (inaudible). (Sworn Statement of 12/13/05 )

A: We were supposed to say we were 18.

Q: Who told you that, to say that?

A:          (Sworn Statement of 11/8/05).

He likes the girls who are between the ages of 18 and 20.
(Sworn Statement of 10/3/05).

Well with                    I don't know how old she is because
she lied about her age.  She lied to me when I first met her.
When I was 18 she told me she was 18. (Inaudible.) Well she left
her purse at my house and she told me to make sure that I didn't
look in her purse. When I went through her purse I found her
state license that said she was 16 so she lied to me about her age.
(Statement of 10/03/05).[4]

Q: Now, how old were you when you first started going there?

A: Eighteen. I'm 19 now this last March." (Sworn Statement of
    10/12/05).

---

[4] In addition to giving a sworn statement at the PBPD Station,          conversations with Detective
Recarey while being transported to and from the station were also recorded. This excerpt is taken from
the recording of          traveling from the station.

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 5

Q: And all this occurred when you were 18 though?

A: Uh-huh. I had been 18 for like 8 months, nine months already.
My birthday is in June so I had been 18 for a while. (Sworn
Statement of 2/3/05).

Q: Okay. How old are you now? You're –

A: I'm 20

Q: You're 20. So a couple months ago you would have been
what, 19?

A: Uh-huh.

Q: Alright. So July, August you would have been 19, 20. On the
verge of 20?

A: Uh-huh. (Sworn Statement of 11/4/05).

Q: Okay. Did they appear young to you?

A: Yes. They were young. You know, that I never seen anybody
older than 28 or something like that.

Q: Anybody younger than 18?

A: It's hard to say that, sir. You know there were a lot of girls
that were very, very young, but you know for me to say they
were minors, you know, you know, I never see their driver's
license.[5] (Sworn Statement of 1/4/06).

---

[5] To put Rodriguez' comments about the age of the women in context, referring to Epstein's girlfriend,
Nadia Marcinkova, Rodriguez stated she was "very, very young". Sworn Statement of 1/4/06. Since
Marcinkova's date of birth is ███████, she was in fact twenty at the relevant time.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 6

Even as to those women with respect to whom there is no explicit evidence of their being at least 18 at the time or having made affirmative misrepresentations of being so, each was introduced to Epstein through either _____ or others,[6] who instructed the women to say they were 18 even if they were not. Thus, proof of this critical element would be lacking.

### 2. No Travel Was For the Purpose of Engaging in Prohibited Sexual Activity.

Federal law criminalizes *travel for the purpose* of knowingly engaging in unlawful sexual activity with minors. *United States v. Hayward*, 359 F.3d 631, 638 (3d Cir. 2004); *United States v. Tykarsky*, 446 F.3d 458, 471 (3d Cir. 2006). This is the highest level of culpability in the four tier hierarchy of culpability that the Model Penal Code uses. "The different levels in this hierarchy are commonly identified, in descending order of culpability, as purpose, knowledge, recklessness, and negligence. . . [A] person who causes a particular result is said to act purposefully if 'he consciously desires that result, whatever the likelihood of that result happening from his conduct.'" *United States v. Bailey*, 444 U.S. 394, 404 (1980), *quoting United States v. United States Gypsum Co.*, 438 U.S. 422, 445 (1978).[7]

The Supreme Court has repeatedly interpreted this language to require that the illegal activity be the dominant motive for the travel. *See, e.g., Mortensen v. United States*, 322 U.S. 369, 373 (1944) (". . .an intention that the women or girls shall engage in the conduct outlawed by Section 2 must be found to exist before the conclusion of the interstate journey and must be *the dominant motive* of such interstate movement") (emphasis supplied); *Hawkins v. United States*, 358 U.S. 74, 79 (1958) ("[T]he only factual issue in the case was whether petitioners dominant purpose in making the trip was to facilitate her practice of prostitution. . .); *Cleveland v. United States*, 329 U.S. 14, 20 (1946) ("There was evidence . . . that the unlawful purpose was the dominant motive.").

There is no basis for concluding that Epstein's paramount or dominant purpose in going to Palm Beach on any occasion was to engage in proscribed sexual activity, even if we assume that some such conduct occurred while he was there. Epstein's interstate *travel* was motivated

---

[6] As _____ said, "Like I said, some bring friends who bring friends". Statement of 10/3/03.

[7] Indeed, a 2003 change in the law, redefining the *mens rea* necessary for a violation of 18 U.S.C. § 2423 with respect to international travel, left untouched the standard for domestic travel, and thus underscores the strict standard needed for a prosecution in this area. *See United States v. Clark*, 435 F.3d 1100, 1104-05 (9th Cir. 2006).

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 7

by his need to be outside of New York for tax reasons. *That* was the principal purpose of his travel: to be certain not to be present in New York in excess of half of each year. That he chose Florida as his destination was a function of his decision made long ago to maintain a home there, which also was not motivated by any desire to or intention to engage in prohibited sexual activity. Epstein has maintained a connection to Florida for nearly 30 years, the last seventeen as a homeowner. Prior to that Epstein rented homes in the area. Epstein's parents also lived there for years and, before his mother's death in 2004, especially during the four years of illness that led to her death (his father died earlier), Epstein frequently traveled to see her. Since their deaths, he has traveled to Florida specifically to visit their graves. Epstein's brother, too, maintains a home in Palm Beach County.

Indeed, Epstein has been traveling there regularly, integrating into the Palm Beach community. He was a member of The Breakers Club from 1993 to 2006. He maintains bank accounts in Florida, including accounts at the First Bank of the Palm Beaches, in which bank he had an ownership interest, as well. He holds a concealed weapons permit from the State of Florida; maintains the corporate records of his two airplanes in Florida, which airplanes receive virtually all of their scheduled maintenance work in Florida; has titled and registered twelve automobiles in Florida, as well as his boat; the majority of all demonstrations and inspections of new aircraft and boats have been done in Florida; until recently has maintained a driver's license in Florida; and he employs pilots who reside in Florida. So ensconced in Florida is he that his regular physician is based in Florida and most medical procedures he has had performed over the years have been done in Florida. Foundations he controls have donated generously and regularly to Ballet Florida during the period from 2000 to 2007.

Epstein also uses his home in Florida for meeting regularly with important business contacts, many of whom either live or maintain residences in the Palm Beach area. Beginning in 2003 and continuing through most of 2004, Epstein also traveled frequently to Florida to negotiate the purchase of the Abraham Gosman Estate, which was finally sold at auction in November 2004. Although, Epstein was ultimately outbid, nearly a dozen trips to Florida were made in direct pursuit of his offer.

In furtherance of these activities – being out of New York for in excess of half of each year, visiting his mother and brother, meeting with business associates, and negotiating the purchase of the Gosman Estate – Epstein made 65 separate trips to Florida in 2004 and 2005[8].

---

[8]  There trips are reflected on the flight records previously provided to you. We are not reproducing them here because of their bulk. If you would like an additional copy we will provide it.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 8

Having massages were entirely incidental to the purpose of his travel to Florida. And given the other purposes of his travel to Florida, the act of going there cannot itself give rise to any inference of an improper purpose. Indeed, it can be demonstrated that Epstein typically spent between one third and one half his time at his home in Florida.

Likewise, there is no evidence that any of the women traveled in interstate commerce for the purpose of engaging in the conduct alleged. Though the Police Report suggests that one of the witnesses, Alfredo Rodriquez, claimed that one or more of the women in question traveled on Epstein's plane, a careful reading of the interview itself shows that the detective confused Epstein's assistants, his girlfriend, and her friends, all of whom are indisputably over the age of 18, with the women at issue here. More to the point, even if Rodriquez did so claim, the flight records and the statements of the pilots show conclusively that none of these women ever traveled in interstate commerce on any of Epstein's planes to engage in any of the conduct alleged.

### 3. There Was No Intent To Engage in the Conduct at the Time of the Travel.

Even assuming *arguendo* that any travel occurred for the purpose of getting massages from women, there is no evidence that *at the time he was traveling to Florida* Epstein had planned to engage in the conduct with a person he knew or believed was under 18. Thus, even if, once in Florida, Epstein purposefully engaged in a proscribed act (which is denied), that purpose arose long after his travel to Florida was complete, while a particular massage with a particular masseuse was in progress.

It is for these reasons that no prosecution would lie for the conduct alleged to have occurred with                         According to the Police Report (at 13-15)          a woman evidently in fact under 16 at the time of the events, met with Epstein on only one occasion. The evidence is that *at the time he traveled to Florida,* Epstein had no knowledge that he would see anyone at all, let alone knowledge that he would see          or any person whom he knew or believed was under 16. Thus, whatever the evidence shows occurred during the time          was in Epstein's home, any case would be fatally flawed because there is no evidence Epstein traveled in interstate commerce with any intention of meeting

Similarly, there is no evidence that *at the time he was traveling to Florida* on any particular occasion he intended to engage in prohibited activity with any other person whom he knew or believed was under 18.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 9

## II.     Statements in the Police Report that Have No Factual Basis or Are
## Contradicted by the Record

We have reviewed recordings of many of the interviews (conducted in person or by
telephone) and controlled calls cited in the Police Report. We have compared them to the
statements purporting to summarize them in the Police Report and Probable Cause Affidavit.[9] In
instance after instance, we find material statements in the Police Report attributed to these sworn
recorded statements that either simply were not said, or in some instances, are flatly contradicted,
by the witness who purportedly made the statement. We highlight the most significant ones
identified to date:

1.                    (Sworn Statement of 3/15/05)

- Police Report at 15: "              stated        seemed upset or jealous when she
told her that she received three hundred dollars". PBPD Transcript at 26-27:[10]
'          like, let me see what he gave you. And then I showed her my $300
and she's like, we're going to Marshalls".

2.                    (Sworn Statement of 10/04/05)

- Police Report at 30: "Sometime during the massage Epstein grabbed her
buttocks and pulled her close to him." Sworn Statement: "Q: Did he touch
you in any way? A: He was like kind of like leaning towards me but I was like
you could tell I was shy so I think that's why he didn't. Q: He did not touch
you inappropriately? A: No".

3.                    (Telephone Interview of 10/04/05)

- Police Report at 34: "As            was wearing tight jeans and had a tight belt
on Jeff was unable to touch her buttocks". There is no mention in her

---

[9]  There were three Probable Cause Affidavits prepared and executed by Detective Recarey on the same
date. The affidavits are in all material respects identical and we here refer to the one concerning Epstein.
It is annexed at Tab 2. Because the Probable Cause Affidavit merely parrots the Police Report, for
simplicity we refer solely to the Police Report.

[10]  We have not reviewed a recording of the bulk of the              interview. Instead we are relying on a
transcript with which we were provided.

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 10

statement of what she was wearing or Epstein's inability to touch her because of it.

- Police Report at 34: '          stated she is aware that her friend,
          was also at the house and had a problem with Jeff." There is no
  mention in her statement of          being at Epstein's house or having a
  problem with Epstein.

4.          (Sworn Statement of 11/14/05)

- Police Report at 52: '          also stated she was sixteen years old when she
  first went to Epstein's house". Sworn Statement: "Q: Okay. How old were
  you when you first went there? A: Seventeen. Q: Seventeen. A: And I was 17
  the last time I went there too. I turned 18 this past June".

5.          (Sworn Statement of 11/8/05)

- Police Report: "On occasion, Epstein would use a massage/vibrator, which
  she described as white in color with a large head, on her." Sworn Statement:
  "Did he ever, did he ever take out any toys? A: No".

6.          (Sworn Statement of 2/3/06)

- Police Report at 80: "I asked her if she provided the massage naked.          said
  she did." Sworn Statement: "Well, I was not – I wasn't naked. Like I was in
  boy shorts and like topless and boy shorts".

7. **Juan Alessi** (Sworn Statement of 11/21/05)

- Police Report at 57: "Alessi stated that towards the end of his employment,
  the masseuses were younger and younger". Sworn Statement at 9[11]: "Did they
  seem young to you? A. No, sir. Mostly no. We saw one or two young ones
  in the last year. Before that, it was all adults . . . I remember one girl was
  young. We never asked how old she was. It was not in my job . . . But I
  imagine she was 16, 17".

- Police Report at 57: "[T]he bed would almost always have to be made after
  the massage". Sworn Statement at 11-12: ". . . At the end, it was a few times
  that the bed was undone. You know, we make the beds three or four times a

---

[11] We have not reviewed a recording of the Alessi interview. However, we were provided with a
certified transcript of it.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 11

day. And sometimes we went to clean up the massage to put it back, the massage table, to pick up the towels, but the bed was undone again. So either he took a nap or he went for a nap, I don't know. Q. Or something else occurred? A. Or something else. I cannot [say]". [12]

8.              (Sworn Statement of 10/11/05) [13]

- Probable Cause Affidavit at 11: "          advised that during her frequent visits Epstein asked for her real age,        stated she was 16. Epstein advised her not to tell anyone her real age". There is no such statement in her recording.

- Police Report at 40: Hall recounted how Epstein was "naked in the bedroom, she entered and removed her clothing . . . [Nadia] Marcinkova [Epstein's girlfriend] entered the room from the steam room area already naked." These events are not described in         statement.

- Probable Cause Affidavit at 12 "          stated Epstein would photograph Marcinkova and her naked and having sex and proudly display the photographs within the home". Sworn Statement: ". . . it was me standing in front of a big white marble bathtub . . . it wasn't like, I was, you know, spreading my legs or anything for the camera. I was like, I was standing up. I think I was standing up and I just like, it was me kind of like looking over my shoulder kinda smiling, and that was that".

- Police Report at 40: "          stated that on one occasion she] continued rubbing his legs, thigh, and feet. . . . [and then Epstein] turned over onto his back. She continued to rub his legs with the oils. Epstein touched her breasts and began to masturbate". These events appear to be synthesized from         account of two separate incidents. However, concerning neither did         make mention of rubbing Epstein's legs, thighs, and feet or of Epstein turning over onto his back.

---

[12] This statement is also directly contradicted by other witnesses, who never made any accusation that any activity ever occurred on the bed.

[13]        was interviewed by Detective Recarey twice, once by telephone, and once in person. The portions of the Police Report to which we refer specifically cite the in-person interview of        as the source for the information reported. We have reviewed the recording of that interview and base the comparison on that. We have never heard a recording of the telephone interview.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 12

- Police Report at 40: "Epstein had purchased ▊▊▊▊ from her family in Yugoslavia . . . [and] bragged he brought her to the United States to be his Yugoslavian sex slave". No such statement is made by ▊▊▊ who refers to Marcinkova as Epstein's "girlfriend" and refers offhandedly to other women in the home as "slaves".

## III. Material Omissions from the Police Report

In addition to the misstatements in the Police Report and Probable Cause Affidavit as to the evidentiary record, there were also material omissions, both of facts known to the PBPD and also of facts not known by the PBPD though known by the State's Attorney. In the latter instance, the lack of knowledge was the result of the PBPD's refusal to receive the evidence. Thus, anyone relying on the Police Report or Probable Cause Affidavit would have a skewed view of the facts material to this matter. Examples follow.

1. *The Video Surveillance Equipment Located in Epstein's Office and Garage.* Both the Police Report (at 43) and the Probable Cause Affidavit (at 18) make particular mention of the "discovery" of video surveillance equipment (or "covert cameras" as they are called) in Epstein's garage and library/office. Inclusion of this information insinuates a link between the equipment and the events at issue: the Probable Cause Affidavit notes (at 18) that "on the first floor of the [Epstein] residence I [Detective Recarey] found two covert cameras hidden within clocks. One was located in the garage and the other located in the library area on a shelf behind Epstein's desk . . . The computer's hard drive was reviewed which showed several images of ▊▊▊▊ and other witnesses that have been interviewed. All of these images appeared to come from the camera positioned behind Epstein's desk".

   Clearly omitted from both the Police Report and the Probable Cause Affidavit is the fact that the PBPD, and specifically Detective Recarey, knew about the cameras since the cameras were installed in 2003, **with the help of the PBPD**, to address the theft of cash from Epstein's home. This fact is detailed in a Palm Beach Police Report prepared in October 2003 detailing the thefts, the installation of video equipment, the video recording capturing Alessi (then Epstein's house manager) "red handed", and the incriminating statements made by Alessi when he was confronted at the time. *See* Alessi Police Report (annexed at Tab 3) at 5, 8. The contemporaneous police report confirms the fact that the video footage was turned over to Detective Recarey himself.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 13

2. **Polygraph Examination and Report.** On May 2, 2006, Epstein submitted to a polygraph examination by George Slattery, a highly respected polygraph examiner who is regularly used by the State Attorney. The examination was done at a time when we were told that the sole focus of the investigation was the conduct with                    A copy of the Report is annexed at Tab 4.

Epstein was asked (a) whether he had "sexual contact with                    (b) whether he "in anyway threaten[ed]                    ; (c) whether he was told by                    "that she was 18 years old"; and (d) whether he "believed                    was 18 years old". As set forth in the Report of the examination, the term "sexual contact" was given an extremely broad meaning in order to capture any inappropriate conduct that could have occurred.[14] The results of the examination confirmed that (i) no such conduct occurred; (ii) Epstein never threatened                    (iii)                    told Epstein she was 18 years old; and (iv) Epstein believed                    was 18 years old. Though the results of the examination were given to the PBPD and a meeting scheduled for the PBPD to meet with the polygraph examiner to satisfy itself as to the *bona fides* of the exam, representatives of the PBPD refused to attend the meeting and no information concerning the fact of the exam or the results appeared in the Police Report or the Probable Cause Affidavit.

3. **Broken "Sex Toys" in Epstein's Trash.** The Police Report details the police finding in Epstein's trash what is described as broken pieces of a "sex toy" and that this "discovery" purportedly corroborated witness statements. Omitted from both the Police Report and the Probable Cause Affidavit is the fact that during the course of executing the search warrant in Epstein's home, the police discovered the other piece of that key "sex toy" and realized it was in fact only the broken handle of a salad server. Though "sex toys" play a prominent role in the Police Report and Probable Cause Affidavit, the Police Report was never amended to reflect the discovery of this new and highly relevant evidence.

4. **Meetings with the State Attorney's Office.** On multiple occasions, attorneys representing Epstein met with prosecutors and investigators in the State Attorney's Office. Though there is vague reference to one or more meetings with counsel (*see,*

---

[14] The definition included: "sexual intercourse, oral sex acts (penis in mouth or mouth on vagina), finger penetration of the vagina, finger penetration of the anus, touching of the vagina for sexual gratification purposes, touching of the penis for sexual gratification purposes, masturbation by or to another, touching or rubbing of the breasts, or any other physical contact involving sexual thoughts and/or desires with another person".

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 14

*e.g.*, Police Report at 64, 87), virtually no information provided or evidence turned over to them regarding the alleged witnesses is included in the Police Report or Probable Cause Affidavit. Instead, there are misleading or false references to such meetings. For example, the briefest reference is made to a conversation Detective Recarey had on June 1, 2006, with ASA Belohlavek regarding a meeting earlier that day between representatives of the State Attorney's Office and defense attorney Jack Goldberger (Police Report at 87). Omitted are the facts of the meeting (Police Report at 87): In addition to the presence of other defense counsel, there was in attendance both Slattery, who administered the polygraph examination, and a psychiatrist who had performed a rigorous psycho-sexual evaluation of Epstein and who concluded that Epstein not unhealthy and posed no danger. Both experts were made available for questioning by the State Attorney and the PBPD; unfortunately, the PBPD refused to attend the meeting. Nor is there any mention of the presentation made by defense counsel in which the claims being made with respect to ██████████ (then the sole focus of any potential prosecution) were rebutted.

5.  *Failure to Consider Exculpatory or Impeaching Evidence.* Other exculpatory and impeaching evidence known by the PBPD was omitted from the Police Report and Probable Cause Affidavit by, in our view, manipulating the date the investigation was allegedly closed. According to the Police Report (at 85), Detective Recarey "explained [to ASA Belohlavek] that the PBPD had concluded its case in December of 2005". That assertion, which is false, conveniently resulted in the omission of all information adduced subsequent to that date. Thus, though the Police Report in fact contains information obtained after December 2005, the PBPD purported to justify its refusal to consider, or even to include, in the Police Report, the Probable Cause Affidavit or what it released to the public, all the exculpatory and impeaching evidence presented on behalf of Epstein, most of which was provided after December 2005. That evidence is listed below.

6.  *Unreported Criminal Histories and Mental Health Problems of the Witnesses Relied on in the Police Report and Probable Cause Affidavit.* Evidence obtained concerning the witnesses relied upon to support the Probable Cause Affidavit casts significant doubt on whether these witnesses are sufficiently credible to support a finding of probable cause, let alone to sustain what would be the prosecution's burden

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 15

of proof at a trial.[15]  Though such evidence was submitted to the PBPD, none of it
was included in the Police Report or the Probable Cause Affidavit.

a.  **Juan Alessi:**  While the Police Report (at 57) and the Probable Cause Affidavit (at
21) contain assertions by Alessi which allegedly support the bringing of a criminal
charge, omitted is the evidence revealing Alessi's evident mental instability; prior
criminal conduct against Epstein; and bias towards Epstein.

  • **Juan Alessi Admitted Burglarizing Epstein's Home and Mental
    Health Issues**.  As detailed above (at 12-13), in 2003, Alessi was filmed
    taking money from Epstein's home.  After being caught on videotape
    unlawfully entering Epstein's home and stealing cash from a briefcase,
    Alessi admitted to the PBPD that he entered the house unlawfully on
    numerous occasions, stealing cash and attempting to steal Epstein's
    licensed handgun to commit suicide.  Though this information was known
    by Detective Recarey at the time the Police Report and Probable Cause
    Affidavit were prepared, and is clearly material to any determination of
    credibility, it was omitted.

b.  ███████████████  was the source of the vast majority of the
serious allegations made against Epstein.  While the Police Report and Probable
Cause Affidavit rely on ██████ numerous assertions, there are two significant
problems with that reliance.  First there is no mention of material admissions
made by ████ during her interview, as well as on her MySpace webpage
(discovered by defense investigators and turned over to the State Attorney).  A
copy of the webpage is annexed at Tab 5.  Second, all but omitted from the Police
Report is any reference to the facts known about her by the PBPD, specifically,
that at the time ████ was making these assertions **she had been arrested by the
PBPD and was being prosecuted for possession of marijuana and drug
paraphernalia.**  A copy of the Police Report documenting Hall's arrest is

---

[15] While we have never intended to and do not here seek gratuitously to cast aspersions on any of the
witnesses, in previously asking the State and now asking you to evaluate the strength of any case that
might be brought, we have been constrained to point out the fact that the alleged victims chose to present
themselves to the world through MySpace profiles with self-selected monikers such as "Pimp Juice"
██████ Tab 5) and ██████████████████████ Tab 13) or with nude photos ████
██ ab 9).



LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 16

annexed at Tab 6. We take each in turn.

- ▮▮▮▮▮▮▮▮ **Admits Voluntary Sexual Conduct With Epstein,
  Refuses to Disclose the Disposition of the Monies She Earned, and
  Lies About Being "Given" a Car by Epstein**: Detective Recarey failed
  to include in the Police Report▮▮▮ admission that on one occasion she
  engaged in sexual conduct with Epstein's girlfriend as her birthday "gift"
  to Epstein. Nor does Detective Recarey include the fact that▮▮▮ flatly
  refused to discuss with him the disposition of the thousands of dollars she
  said she was given by Epstein, or that she falsely claimed not to use drugs,
  despite her MySpace entries that scream "I can't wait to buy some
  weed!!!!!!!". Detective Recarey was aware the car had been rented, not
  purchased, and only month to month for two months. While ▮▮▮▮▮
  fanciful claim that she was given a car appears in the Police Report, it is
  never corrected.

- ▮▮▮▮▮▮▮▮ **Was Arrested for Possession of Marijuana and Drug
  Paraphernalia.** As noted, on September 11, 2005, ▮▮▮ was arrested for
  possession of marijuana and drug paraphernalia. *See* Tab 6. In response
  to this arrest, ▮▮▮ "came forward" (as the Probable Cause Affidavit
  implies at 10-11), claiming she had knowledge of "sexual activity taking
  place" at Epstein's residence and misconduct by Epstein. (This "coming
  forward" appears no where in the Police Report.) Thus, it becomes clear
  that ▮▮▮ assertions of misconduct by Epstein were motivated by a desire
  to avoid the repercussions of her own criminal conduct, which should have
  been taken into account when assessing her credibility as a witness.

- ▮▮▮▮▮▮▮▮ **Steals From a Victoria's Secret Store**. An investigation
  by private investigators working for the defense revealed that in late 2005
  ▮▮▮ was employed at a Victoria's Secret store in Florida. Three days after
  her marijuana case was terminated, ▮▮▮ was caught by a store manager as
  ▮▮▮ attempted to leave the store with merchandise in her purse, the
  security tag still attached. *See* Incident Report annexed at Tab 7. Seeing
  the manager, ▮▮▮ claimed "someone is trying to set me up". Following an
  internal investigation, which disclosed additional thefts from both the store
  and a customer, she was fired. In a recorded interview, ▮▮▮ admitted to
  stealing and asserted that her reason for doing so was that "she was not
  getting paid enough". This information and supporting documentation

RFP WPB 000745

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Louric, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 17

was presented to the PBPD, but was never included in the Police Report or
Probable Cause Affidavit.

- ████████████ **Lies on MySpace About Victoria's Secret Store
  Termination.** Also uncovered by defense investigators is ████
  dissembling version of the Victoria's Secret debacle on her "MySpace"
  webpage. There, ████ announced that she ". . . forgot to let everyone
  know I quit my job at V.S. They said they suspected me of 'causing losses
  to their company' – which by the way is bullshit. I was 'by the book' on
  EVERYTHING!!! . . . I got so fed up in that office that I handed the Loss
  Prevention lady back my keys and walked out". This information and
  supporting documentation was provided by the defense to the PBPD, but
  was not included in the Police Report or Probable Cause Affidavit.

- ████████████ **Was 18 at the Time She Alleges to Have Engaged in
  Sexual Conduct with Epstein.** Epstein denies he ever had sex with ████
  However, even if he did, evidence, in the form of a credit card receipt,[16]
  was presented to the PBPD and the State Attorney's Office which confirms
  that any such encounter occurred at a time when ████ was already 18 years
  of age. (Indeed, it is our understanding that it was this information,
  combined with a theft report of her employer that highlighted her lack of
  credibility, that led the State Attorney to conclude that ████ was neither
  credible nor a proper complainant.) This information, though known to
  the PBPD, was omitted from the Police Report or the Probable Cause
  Affidavit.

- ████████████ **Lies on her Victoria's Secret Job Application.**
  Additional information on Hall's MySpace webpage casts further doubt on
  her credibility. For example, she boasts to having engaged in a fraudulent
  scheme to get hired by Victoria's Secret, explaining, "Oh, it was so funny
  – I used [my boyfriend] as one of my references for my Victoria's Secret
  job and the lady called me back and told me that William Tucker gave me
  such an outstanding reference that she did not need to call anyone else
  back, . . . he got me the job! Just like that . . . I lied and said he was the old
  stock manager at Holister – she bought it. . ." This information and

---

[16] A copy is annexed at Tab 8.

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 18

supporting documentation was provided by the defense to the PBPD, but
was not included in the Police Report or Probable Cause Affidavit.

- ███████████ **Boasts About Her Marijuana Use.** Also on her
  MySpace webpage can be found ████ admissions of purchasing and
  using marijuana and marijuana paraphernalia. Specifically, ████ states she
  "can't wait to buy some weed!!! . . . I can't wait!!! . . . (Hold on: let me
  say that again) I can't wait to buy some weed!!!. . . I also want to get a
  vaporizer so I can smoke in my room because apparently there are 'narcs'
  everywhere". ████ also posted a photograph of a marijuana cigarette and
  labeled it "what heaven looks like to me". This information and
  supporting documentation was provided by the defense to the PBPD, was
  not included in the Police Report or Probable Cause Affidavit (although
  there is both a fleeting reference in the Police Report to ████ use of
  marijuana with her boyfriend (at 67) and in the Probable Cause Affidavit
  to ████ marijuana arrest (at 10-11)).

- ███████████ **Lies, Alleging Defense Investigators Impersonated
  Police Officers**. During the course of the investigation, the defense was
  notified that an unidentified witness claimed that defense investigators had
  impersonated police officers in an effort to get her statement. The defense
  subsequently concluded that these accusations were made by ████ (A
  reference to this accusation was included in the Police Report (at 67) and
  the Probable Cause Affidavit). Defense counsel immediately questioned
  the investigators and learned the accusation was baseless; the investigators
  gave ████ a business card clearly identifying them as private investigators.
  ████ initially declined to speak to the investigators because she said she
  "does not speak to cops", to which the investigators responded they were
  not "cops". Despite having this information from defense counsel, the
  PBPD failed to include it in the Police Report or Probable Cause Affidavit,
  instead citing only ████ claims.

c. ███████████ While the Police Report and Probable Cause Affidavit contain
numerous assertions intended to negate ████████ admission she told Epstein she
was 18, omitted from these documents is reference to ████████ MySpace
webpage, where **she affirmatively represented to the world that she was 18,**
thereby corroborating her lie to Epstein. A copy of ████████ MySpace webpage
is annexed at Tab 9. Also omitted is any reference to her long history of run-ins

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 19

with law enforcement. Among those are multiple runaway complaints by her
parents and her assignment to a special high school for drug abusers.

- ████████ **MySpace Webpage States She Drinks, Uses Drugs, Gets
  into Trouble, Has Beaten Someone Up, Shoplifts, Has Lost her
  Virginity, Earns $250,000 and Higher, and Contains Naked and
  Provocative Photographs.** The first image seen on ████████ MySpace
  webpage, the photo ████████ chose to represent her, is that of a naked
  woman provocatively lying on the beach. The illuminating webpage also
  contains ████████ assertions that of all her body parts, she "love[s] her
  ass", she drinks to excess, uses drugs, "gets into trouble", has beaten
  someone up, has shoplifted "lots", "already lost" her virginity, and earns
  "$250,000 and higher". As with the other impeaching information, this
  material, vital to determining credibility, was provided by the defense to
  the PBPD but was never included in the Police Report or Probable Cause
  Affidavit.

- ████████ **Police Contacts – Drugs, Alcohol, Running Away From
  Home.** ████████ has a history of running away/turning up missing from
  her parents' various homes; of using drugs and alcohol; and of associating
  with unsavory individuals. For example, a Palm Beach County Sheriff's
  Office Report (annexed at Tab 10) details how only two days after she
  returned to Florida to live with her father, on March 31, 2006, police were
  called to the home in response to her father's report that she and her twin
  sister were missing. The Police Report describes her as "under the
  influence of a narcotic as [she] could barely stand up, [her] eyes were
  bloodshot, and [her] pupils were diluted [sic]". It further documents that
  ████████ and her sister had stayed out all night and were returned home
  by a "drug dealer". This event coincided with ████████ having been
  found at an "inappropriate location" by Georgia police in response to a
  call about ████████ disappearance. Although this information, material
  to determining credibility, was provided by the defense and known to the
  PBPD, it was never included in the Police Report or Probable Cause
  Affidavit.

d. **Daniel** ████████ While the Police Report and Probable Cause Affidavit rely on
statements of Daniel ████████ father, omitted is Daniel
████████ federal bank fraud conviction (annexed at Tab 11), which defense

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 20

investigators discovered and turned over to the PBPD during the course of the investigation. ████ served 21 months in federal prison for his offense.

e.  ████████  While the Police Report and Probable Cause Affidavit rely on statements of ████████████ step-mother, omitted is ████ ████ state conviction for identity fraud (annexed at Tab 12). This information, uncovered by defense investigators, was also turned over to the PBPD during the course of the investigation.

## IV.  The Facts of This Case Militate Against Bringing a Federal Prosecution

### A.  Declining To Prosecute as an Exercise of Discretion

Epstein is being prosecuted by state authorities in Florida. Even if we assume *arguendo* that Epstein's conduct constitutes a federal crime that can be proven, nevertheless no "substantial Federal interest" would be served by prosecuting him. On this question, the United States Attorney's Manual (USAM) itself gives specific guidance. Section 9-27.230 provides:

> In determining whether prosecution should be declined because no substantial Federal interest would be served by prosecution, the attorney for the government should weigh all relevant considerations, including: Federal law enforcement priorities; the nature and seriousness of the offense; the deterrent effect of prosecution; the person's culpability in connection with the offense; the person's history with respect to criminal activity; the person's willingness to cooperate in the investigation or prosecution of others; and the probable sentence or other consequences if the person is convicted.[17]

Each of these factors militates against prosecution. As indicated, federal law enforcement priorities focus on particular phenomena involving the sexual abuse of minors, the use of the

---

[17]  Each of these factors is discussed in greater detail in USAM 9-27.230(B).

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 21

internet to lure minors to engage in prohibited sexual activity, child pornography, or trafficking. The conduct in which Epstein is alleged to have engaged fits nowhere in these categories. Given its essentially *sui generis* character, its prosecution would have little or no general deterrent effect.

If prosecuted under statutes designed to address far more serious conduct and far more dangerous offenders, he would be subject to punishment that is grossly disproportionate to his alleged behavior. Even though society has a legitimate interest in preventing and punishing sexual exploitation of minors, under our federal system, that interest is one that is shared between the federal government and the states, and one in which there is a division of responsibility. Under our system of federalism, the states, and only the states, act where the concern is local, and the federal government only where there is a federal interest at stake. This is just as true with respect to sexual activity involving minors as it is with respect to murder, which can be prosecuted, federally, only in special circumstances where there is a genuine federal interest to be served.

Most importantly, there is no identifiable federal interest to be served by prosecuting the conduct at issue in this case. The federal interest lies in addressing the problem of internet predators, a problem of uniquely federal interest. As the Director of the Office for Victims of Crime of the DOJ has stated, ". . .the nature of Internet crimes presents complex new challenges for law enforcement agencies and victim service providers with regard to investigating crimes, collecting evidence, identifying and apprehending offenders, and assisting child victims and their families." U.S.D.O.J., Office of Justice Programs, OVC Bulletin, Internet Crimes Against Children, December 2001. Federal lawmakers recognized that while the internet presents wonderful opportunities for young people, at the same time "criminals are also using modern technology – to prey on innocent victims." *Id.*

That should be sufficient to end the matter, as Epstein's case has nothing whatever to do with internet predation, or the type of predators to which the legislation is addressed.

After all, it is a first principle that the Constitution creates a federal government of enumerated powers. *See United States v. Lopez*, 514 U.S. 549, 552 (1995) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.") (*quoting Gregory v. Ashcroft*, 501 U.S. 452, 458 (1997)). Thus, Congress's power to legislate in this area is constrained by the Commerce Clause. As *Lopez* demonstrates, the

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 22

Clause imposes real limitations on Congress's power to criminalize essentially local behavior. *See United States v. Morrison*, 529 U.S. 598 (2000) (Violence Against Women Act exceeded Congressional power under the Commerce Clause or § 5 of the Fourteenth Amendment).

   *Lopez*, of course, recognizes Congress's power to regulate "the use of the channels of interstate commerce" and "to keep the channels of interstate commerce free from immoral and injurious uses." *Lopez*, 514 U.S. at 558. But this confirms that the *legitimate federal interest* is in the misuse of instrumentalities or channels of interstate commerce. This suggests that, in defining and weighing the federal interest, the focus should be on *the use of interstate travel,* and not upon the sexual conduct itself. Clearly, Epstein's interstate travel can be of no legitimate or significant federal interest. He spent a great deal of his time in Florida because he has owned a home there for seventeen years and has many professional, social and personal interests centered there, none of which has anything to do with sexual conduct. Given the attenuated relationship between sexual conduct with any person under 18 and interstate travel, the federal interest in this matter is negligible.

   The conduct at issue is not an example of a widespread or growing phenomenon that in general crosses state or international lines (like internet sexual predators or sex tourism) that is difficult to police or prosecute and that the United States has a special interest in eliminating. It does not involve the special targeting of children. It does not involve organized prostitution, sex trafficking, or organized crime. It does not involve violence or the threat of violence, nor physical harm or threat of harm. It does not involve child pornography. Indeed, the circumstances of this case are so idiosyncratic that its pursuit would not significantly advance the protection of minors. Instead, the conduct at issue here is precisely the conduct that is primary interest to the state. And it is the state that has the authority, and the right, to establish and rely on reasonable criteria for deciding which cases to bring and which to forego.

   To the extent that the federal statutes in this area are broadly drafted, this is to confer on the authorities sufficient leeway to exercise their discretion and "get the bad guys" who *do* exploit minors, often on a massive scale or for financial rewards. The very breadth of the statutory language places on federal prosecutors the weighty responsibility of insuring that their discretion is exercised thoughtfully. Certainly, the fact that conduct arguably falls within the broad scope of a broadly worded federal criminal statute cannot itself establish that a *substantial* federal interest is at stake.

   Nor does the statutory breadth mean that prosecutors should strive to test the statutes' outer boundaries. This is particularly true here, where private conduct is at issue; where the

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 23

federal statutes, broadly read, would criminalize sexual conduct that state law may permit; and where the question of whether federal legislation in this area exceeds Commerce Clause authority, in light of *United States v. Lopez, supra*, remains unresolved by the Supreme Court. It is well to remember that hard cases make bad law – for the government as well as for its citizens. Indeed, if the use of a handgun that traveled in interstate commerce does not allow a federal prosecution by invocation of the Commerce Clause, as the Supreme Court ruled in *Lopez*, then surely purely local sexual activity would not, either.

### B.      *Petite* **Policy**

In addition to the factors discussed above, the *Petite* Policy (regarding dual and successive prosecutions), a limitation on prosecutorial authority, may also stand as a bar to federal prosecution. If it is arguable whether the policy applies, the policy itself may require that Justice Department authorization to proceed be obtained.

The Policy, which takes its name from *Petite v. United States*, 361 U.S. 529 (1960), is set forth in the USAM at 9-2.031. The *Petite* Policy "establishes guidelines for the exercise of discretion by appropriate officers of the Department of Justice in determining whether to bring a federal prosecution based on substantially the same act(s) or transactions involved in a prior state or federal proceeding."

The purpose of the policy "is to vindicate substantial federal interests through appropriate federal prosecutions, to protect persons charged with criminal conduct from the burdens associated with multiple prosecutions and punishments for substantially the same acts or transactions, to promote efficient utilization of Department resources, and to promote coordination and cooperation between federal and state prosecutors." USAM 9-2.031(A). Though the Policy does not create any substantive or procedural rights enforceable by law, *see, e.g., United States v. Snell*, 592 F.2d 1083 (9th Cir. 1979), it nevertheless provides a valid basis for arguing against the institution of charges in this matter.

The crux of the Policy is this:

> This policy precludes the initiation or continuation of a federal prosecution, following a prior state or federal prosecution based on substantially the same act(s) or transaction(s) unless three substantive prerequisites are satisfied: first, the matter must

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 24

> involve a substantial federal interest; second, the
> prior prosecution must have left that interest
> demonstrably unvindicated; and third, applying the
> same test that is applicable to all federal
> prosecutions, the government must believe that the
> defendant's conduct constitutes a federal offense,
> and that the admissible evidence probably will be
> sufficient to obtain and sustain a conviction by an
> unbiased trier of fact.   In addition, there is a
> procedural prerequisite to be satisfied, that is, the
> prosecution must be approved by the appropriate
> Assistant Attorney General.

> Satisfaction of the three substantive prerequisites
> does not mean that a proposed prosecution must be
> approved or brought.   The traditional elements of
> federal prosecutorial discretion continue to apply.

Whether the matter involves a substantial federal interest is a determination to be made on a case-by-case basis, applying the considerations applicable to all federal prosecutions. The second prerequisite is that the prior prosecution must have left that substantial federal interest "demonstrably unvindicated." "In general, the Department will presume that a prior prosecution, regardless of result, has vindicated the relevant federal interest." USAM 9-2.031(D).[18]

The presumption may be overcome when the prior prosecution resulted in a conviction if the prior sentence was manifestly inadequate in light of the federal interest involved or if the choice of charges in the prior prosecution was affected by certain inappropriate or irrelevant factor such as "incompetence, corruption, intimidation, or undue influence."

No such factors operated here. The negotiations between the State Attorney were conducted at arms length, and at times in an atmosphere of mutual hostility. At no point was Epstein granted any sort of break in his case due to his wealth, his political affiliations, or the prominence of his lawyers. If anything, those factors worked against him. The state prosecutors devoted enormous resources to a lengthy investigation, refused to reveal the nature of the charges

---

[18] All three substantive pre-requisites for approval of a prosecution governed by the *Petite* Policy are discussed in greater detail in USAM 9-2.031(D).

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

A. Marie Villafaña, Esq., Assistant United States Attorney
Andrew Lourie, Esq., Deputy Chief, Northern Region
Office of the United States Attorney
Southern District of Florida
February 1, 2007
Page 25

they were considering, refused to speak with Epstein's attorney of choice, and tried to strong-arm Epstein to plead guilty to a violent felony by threatening to place witnesses, whom the State knew were not credible, on the stand before a grand jury.

In determining the charges, the State Attorney took into account the fact that both of the principal victims – ███████████ and ███████████ – have serious credibility problems, including damaging histories of lies, illegal drug use, and crime. The State Attorney, quite appropriately, took into account the substantial possibility that, with witnesses of their ilk, it might not be able to make any case against Epstein at all. In fact, according to Barry Krischer, the State Attorney for Palm Beach County, his reason to take the case to the grand jury, rather than proceed by information, was to determine whether his witnesses would testify under oath, even without being subjected to cross-examination. Tellingly, though subpoenaed to testify at the grand jury, Ms. ████ failed even to appear.

The charging decision was not an act of favoritism, but a rather harsh exercise of the State Attorney's discretion. The State Attorney had never before prosecuted a case involving erotic touching unless the victim was exceedingly young, vulnerable, or in a trust relationship with the perpetrator. Cases brought by the State Attorney previously involved far more egregious conduct, including the videotaping of sexual activity, multiple rapes, and keeping minors as sex slaves, including tattooing them to indicate ownership and control over them. Any suggestion that Epstein received preferential treatment – or that the State prosecutors were corrupt – would be utterly without merit.

For all of these reasons, we submit that no prosecution can or should be brought against Jeffrey Epstein. We would like to reserve the opportunity to make a further submission in which we address more specifically the applicable law once we have had the benefit of narrowing the focus at our meeting.

Very truly yours,

Gerald B. Lefcourt

cc: Roy Black, Esq.
    Lilly Ann Sanchez, Esq.