# EXHIBIT 46

LAW OFFICES OF

# GERALD B. LEFCOURT, P.C.

A PROFESSIONAL CORPORATION

148 EAST 78TH STREET

NEW YORK, NEW YORK 10021

GERALD B. LEFCOURT
lefcourt@lefcourtlaw.com

———

SHERYL E. REICH
reich@lefcourtlaw.com
RENATO C. STABILE
stabile@lefcourtlaw.com
FAITH A. FRIEDMAN
ffriedman@lefcourtlaw.com

TELEPHONE
(212) 737-0400
FACSIMILE
(212) 988-6192

July 6, 2007

## BY FEDERAL EXPRESS

Jeffrey Sloman, Esq., First Assistant United States Attorney
Matthew Menchel, Esq., Chief, Criminal Division
The United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, Florida 33132

Andrew Lourie, Deputy Chief, Northern Region
A. Marie Villafaña, Assistant United States Attorney
The United States Attorney's Office
Southern District of Florida
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401

*Jeffrey Epstein*

Dear Messrs. Sloman, Menchel and Lourie and Ms. Villafaña:

We write as counsel to Jeffrey Epstein to follow-up on our meeting on June 26, 2007. We thought the meeting was extremely productive and appreciate your giving us the opportunity to engage you on the facts, law and policy that will inform any decision you make on how and whether to proceed.

## I.    18 U.S.C. §2422(b) Has No Applicability to the Facts Here.

Even assuming the facts as you believe them to be, as demonstrated below, a prosecution under 18 U.S.C. §2422(b) would violate the explicit terms of the statute, pose insurmountable constitutional barriers, and be unprecedented, unwise, and utterly inappropriate. This statute, with its mandatory minimum sentence[1] was designed to reach

---

[1] The statute in effect during the events at issue carries a mandatory five-year period of incarceration. The current ten-year mandatory minimum was instituted in 2006.

MIA_CEOS_00077

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 2

those who deliberately, knowingly, and intentionally target and exploit children through the internet. Though the literal language may superficially apply to a wider variety of behaviors, we submit that the statute cannot properly be used to prosecute what have traditionally been viewed as state offenses, even if some facility or means of interstate commerce can be said to have been used by someone at some point during the course of events.

1.   Congress's Purpose

Section 2422(b), the so-called "Internet Luring Statute", addresses online enticement of children. The subsection was included in Title V of the Telecommunications Act of 1996, entitled "Obscenity and Violence", after the Senate Judiciary Committee held a hearing regarding child endangerment via the internet. *See* H.R. Conf. Rep. No. 104-458, at 193 (1996), *quoted in United States v. Searcy*, 418 F.3d 1193, 1197 (11th Cir. 2005); *see also* K. Seto, "Note: How Should Legislation Deal with Children and the Victims and Perpetrators of Cyberstalking?" 9 *Cardozo Women's L.J.* 67 (2002).

In enacting the statute, Congress recognized that young people were using the internet in ever-increasing numbers, and it was proving to be a dangerous place. According to a DOJ study, one in five youths (aged 10 to 17) had received a sexual approach or solicitation over the internet in the previous year. One in 33 had received an "aggressive sexual solicitation", in which a predator had asked a young person to meet somewhere or called a young person on the phone. U.S.D.O.J., Office of Justice Programs, *OVC Bulletin*," Internet Crimes Against Children" (12/2001); www.ojp.usdoj.gov/ovc/publications/bulletons/internet_" 2_2001/internet _2_01_6.html.

Congress saw that, with so many children online, the internet created a new place – cyberspace – where predators could easily target children for criminal acts. Use of the internet, which occurs in private, and the secrecy and deception that acting in cyberspace permits, eliminated many of the risks predators face when making contact in person, and presented special law enforcement problems that are difficult for any local jurisdiction to tackle. The mandatory minimum sentence for a violation of this section was increased from five years to ten years in 2006, by virtue of the Adam Walsh Child Protection and Safety Act of 2006, which also eliminated any statute of limitations. *See* 18 U.S.C.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 3

§3299.[2] The law was named in memory of Adam Walsh who, 25 years earlier, had been abducted from a department store and was later found murdered, and whose parents had become advocates for missing children. In his signing statement, President Bush noted that it increased federal penalties for crimes against children, imposing "tough mandatory minimum penalties for **the most serious crimes against our children.**" 2006 U.S.C.C.A.N. S35, 2006 WL 3064686 (emphasis added). The five-year mandatory minimum it replaced was itself established as part of the PROTECT Act of 2003, another law designed to strengthen the government's ability to deal with certain dangerous sexual predators who exploited children in ways the states had been unable to address fully.[3]

2.   General Overview

It must be remembered that §2422(b), by using the phrase "any sexual activity for which any person can be charged with a criminal offense",[4] in some sense incorporates all the sex offense laws of all 50 states, in all their variety and in all their ambiguity. This in itself raises questions of the utmost seriousness, implicating fairness and the due process clause. It also constitutes an extreme example of federal pre-emption, or, more precisely, the wholesale annexation of the enforcement responsibility of each of the 50 states' sex-related crime statutes – whether felony, misdemeanor or violation – wherever there has been use of the ever-present wires. To make every state sex "offense" involving a person under 18 potentially into a mandatory minimum ten-year federal felony without any statute of limitations is certainly not what Congress had in mind when it enacted §2422(b).

---

[2] Other federal crimes with ten-year mandatory minimum involve very serious acts. *See, e.g.*, 18 U.S.C. §2113(e) (bank robbery where a person is killed or kidnapped); 18 U.S.C. §924 (involving discharge of firearm).

[3] Section 2422(b) has always carried a substantial penalty. When first enacted, the maximum sentence it permitted was ten years. Pub.L. 104-104, Title V, Sec. 508, 110 Stat. 137. After that, the maximum was increased to 15 years. Pub.L. 105-314, Title I, sec, 102, 112 Stat. 2975 (Oct. 30, 1998 to April 29, 2003).

[4] A phrase which, by itself, and in the context of the remainder of the statute, raises mind-numbing questions as to what, exactly, is proscribed.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 4

The bulk importation of complex bodies of state law is highly problematic, and strongly counsels that such matters should be left to the states except in those rare circumstances where both a federal interest is clear and weighty, and the states are for some reason incapable of acting. Like issues of family law, these issues are quintessentially of state concern within our federal system.

State laws regarding both sexual activity and the age of consent to engage therein are hugely varied, reflecting different histories, values, politics, and personalities. *See* Richard A. Posner & Katharine B. Silbaugh, *A Guide to America's Sex Laws* (1996). The various and shifting societal reasons underlying those laws, and the societal pressures operating in the area, where sexual mores change over time, complicate the matter even further. *See generally* Richard A. Posner, *Sex and Reason* (1992). The history of the Mann Act confirms the caution with which the federal government should approach this entire area. For example, historically, the Act was used by some prosecutors in some jurisdictions to prosecute acts -- such as a man traveling with his paramour -- which, we submit, never implicated a legitimate federal concern. *See generally* D.J. Langum, *Crossing the Lines: Legislating Morality Under the Mann Act* (1994).

Even where there is broad agreement that certain conduct should be criminalized, the various states treat the very same conduct differently; to apply such laws selectively by different federal prosecutors would undermine further what uniformity does exist. In New York, for example, a 50 year old man who patronizes a 15 year old prostitute is guilty of a Class A misdemeanor. New York Penal Law §230.04. If §2422(b) were read expansively, then such person would face a 10-year mandatory minimum if he used the telephone to set-up his date with the young prostitute, **even if the date never happened**. And that would be so even if the prostitute were 17 ½ (and despite the fact that in New York the age of consent is 17, since prostitution is a "sexual offense" in New York). Clearly, these are applications and outcomes Congress did not contemplate when it enacted the law.

Instead, these are matters best left to state law and state law enforcement. In the state, prosecutors and law enforcement authorities, who have far more experience dealing with sexual crimes, can exercise their discretion as to whom to prosecute and for what charges, taking into account both local attitudes and the wide range of circumstances that may exist when sexual offenses, or possible sexual offenses, involving minors were, or may have been, committed. That is particularly so since state laws generally permit the exercise of sentencing discretion, allowing the punishment to fit both the crime and the

MIA_CEOS_00080

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 5

perpetrator. Section 2422(b), with its ten-year mandatory minimum is far too blunt a tool to use in any circumstances except the narrow, clear-cut, and egregious circumstances Congress had in mind when it enacted this law.[5]

Though §2422(b) is susceptible to multiple interpretations, it was designed to address a specific problem with which Mr. Epstein's case has nothing in common. If stretched to reach beyond the core concern of the statute, a host of problems immediately arise. A simple reading of the words of the statute leaves any reasonable reader with far more questions than answers as to what is illegal. Any attempt to apply the statute to Mr. Epstein's situation highlights the many problems of vagueness, overbreadth, and simple incomprehensibility lurking in or just below the statute's text.

     3.    <u>The Statute's Text And Its Thrust</u>

Section 2422(b) currently provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than ten years or for life.

The statutory language and reported decisions confirm the statute's important, but narrow, focus: the luring of children over the internet. Unlike 18 U.S.C. §§2241 *et seq.*,

---

[5] Penalties under state statutes criminalizing online enticement also vary widely. According to the National Center for Missing and Exploited Children, though the offense can be a felony in all states, 15 states permit misdemeanor sentences in some cases (generally where the victim is 14 or older). Nineteen states classify online enticement as a felony, but grant judges statutory discretion to sentence offenders to less than one year in prison /missingkids/servlet/NewsEventServlet?LanguageCountry=en... 6/28/2007.

MIA_CEOS_00081

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 6

§2422(b) does not establish any federal sex crimes with a minor.  Section 2422's subject
is not sex or sexual activity or face-to-face sexual exploitation of minors.  Such behavior
remains a matter of *state*, not *federal*, concern.  The plain language of the statute
mandates focus on the *communication* and demands that the knowing "persuasion",
"inducement", "enticement" or "coercion" be done "**using** the mail or any facility or
means of interstate . . .commerce" (emphasis added).  Any other reading would violate
constitutional principles of fair warning, notice, lenity and due process.  Additionally, any
broader reading would violate the clearly stated intent of Congress that enacted the law
and the President who signed it.  It would also exceed the authority of Congress under the
Commerce Clause by federalizing virtually all state sex offenses involving people under
the age of 18.

Section 2422(b) defines a crime of *communication*, not of contact.  It makes
unlawful a narrow category of communications, ones not protected by the First
Amendment.  Both the attempt and the substantive crime defined by §2422 are complete
at the time when *communication* with a minor or purported minor takes place; the essence
of the crime occurs *before* any face-to-face meeting or any sexual activity with a minor,
and regardless of whether any meeting or activity ever occurs.

Turning the statute on its head by first looking at the alleged sexual activities and
then seeking to find a mailing, a use of the wires, or the involvement of another facility or
means of interstate commerce as a pretext for the invocation of federal jurisdiction would
be without precedent and make a narrowly-focused statute into virtually a complete
federalization of all state sex offenses involving minors.

4.  The Statute Is Violated Only If A Facility Or Means Of Interstate
Commerce Is Used To Do the Persuading Or Inducing

Though the statute raises several difficult issues of construction, on one point it is
clear and unambiguous:  To be guilty of a crime under §2422(b), the mail or a facility or
means of interstate commerce must be used **to do the persuading or inducing**.  As the
Court wrote in *United States v. Davis*, 165 F.3d Appx. 586, 2006 WL 226038 (10th Cir.
2006), to prove a violation, the government must show "(1) **the use of a facility of
interstate commerce**; (2) **to knowingly persuade**, induce, entice or coerce, as well as
the other elements. *See also United States v. Bolen*, 136 Fed. Appx. 325, 2005 WL
1475845 (11th Cir. 2005).

MIA_CEOS_00082

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 7

The statutory language can bear no other construction. The words "whoever, using . . . knowingly persuades . . ." necessarily requires that the "whoever" must "use" the interstate facility to knowingly persuade. That is, the word "using" is in the present, not the past, tense. Thus, the "using" must occur at the same time as the "persuading". If the statute meant otherwise, it could and would have been drafted differently: "whoever having used the mail and knowingly persuades" or "whoever uses the mail and knowingly persuades". But, as it is written, the actor must use the interstate facility *to* persuade or *to* entice, or to attempt to do so; use of the instrumentality cannot be incidental or peripheral.

Indeed, assuming, *arguendo*, that the grammar and structure of the statute would allow another interpretation – which we believe it does not – nevertheless the obvious, straightforward reading controls. Anything else would violate the rule of lenity, requiring strict construction of penal statutes, as well as the requirement of fair notice guaranteed by the due process clause. [6] As Thomas Jefferson put it in 1823: "Laws are made for men of ordinary understanding, and should therefore be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make any thing mean every thing or nothing, at pleasure".

According to one of the world's leading experts on grammar and specifically, the syntax and semantics of verbs, these rules of "ordinary understanding" and "common sense" dictate that

> . . . an English speaker, reading the statute, would naturally understand it as applying only to persuasion (etc.) that is done while "using the mail" (etc.). To understand it as applying to persuasion (etc.) done subsequent to the use of

---

[6] We note that the structure of this statute is radically different from the structure of §1341, the mail fraud statute. There, the statute first describes the fraud and recognizes the federal concern by requiring, for purposes of executing such scheme or artifice, that the defendant use the mail. Section 2422(b) on the other hand defines the crime as using the mail to knowingly persuade, etc. The difference in the language and structure of the two crimes clearly shows that with §2422(b), using the mail to knowingly persuade is the essence of the crime.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 8

the mail, phone, etc., would be an unnatural and grammatically inaccurate reading of the language. [7]

That the statute is so limited is also confirmed by the fact that prosecutors have clearly understood this limitation. After conducting extensive research, we find no case of a defendant being prosecuted under §2422(b) where he has used the internet or the telephone, and then, by *some other means*, such as personal contact, attempted to persuade, induce, or entice. On the contrary, all §2422(b) prosecutions we have reviewed are **premised** on a defendant's use of the internet (or occasionally the text messaging on a phone) **as the vehicle of the inducement.** *See, e.g., United States v. Murrel*, 368 F.3d 1283, 1286 (11th Cir. 2004) (government must ... prove that Murrell, using the internet, acted with a specific intent to persuade a means to engage in unlawful sex).

In fact, we have reviewed every indictment filed in the Southern District of Florida in which there is at least one allegation of a violation of §2422(b). To the extent the facts could be discerned from the indictment, we found no case brought where the use of the means of communication was remote from the persuading, coercion, etc. [8]

Such prosecutorial restraint is in full accord with the legislative intent, which, as set forth above, was to go after internet predators who use the means of communication to persuade, coerce, etc. That the statute also makes reference to the mails and facilities or means of interstate commerce other than the internet does not suggest that the statutory purpose was broader: it is a common *modus operandi* of internet predators to continue to pursue young people whom they first contact on the internet. If the statute were read to make it a crime to induce or persuade where the inducement or persuasion did not occur over the wires, the statute would sweep within it conduct that Congress had no intention of making a federal crime. Given the ubiquity of the telephone in modern life, especially

---

[7] To confirm our view of the "plain meaning" of the words, we asked Steven Pinker, Johnstone Family Professor at Harvard University's Department of Psychology and a noted linguist, to analyze the statute to determine the natural and linguistically logical reading or readings of the section. Specifically, we asked whether the statute contemplates necessarily that the means of communication must be the vehicle through which the persuading or enticing directly occurs. According to Dr. Pinker, that is the sole rational reading in the English language. *See* Letter annexed at Tab "A" at 3.

[8] Annexed at Tab "B" is a chart in which each of the cases and its relevant facts are listed.

MIA_CEOS_00084

LAW OFFICES OF
**GERALD B. LEFCOURT, P.C.**

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 9

in the lives of young people, de-coupling the "persuasion/enticement" element from the "use of the interstate facility" would make virtually any sexual activity with a minor, chargeable under state law, a federal offense – with no statute of limitations and a mandatory ten-year minimum sentence.

Indeed, given that the interstate highway system is itself an avenue of interstate commerce, *United States v. Horne*, 474 F.2d 1004, 1006 (7th Cir. 2007), allowing a prosecution wherever a means or facility of interstate commerce is used and a forbidden inducement later occurs, would mean that anyone who used the interstate highways, and then, at some other time, induced a minor face-to-face to engage in forbidden activity (or attempted to do so), would be subject to the mandatory ten years. The complete federalization of sex crimes involving children would have occurred, though there is no indication whatsoever that such a sea change in the federal/state balance was intended or is even needed.

Moreover, such an expansive reading, even if permissible, would very likely exceed the Commerce Clause power as the Supreme Court presently construes it. In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court struck down the Gun-Free School Zones Act, holding that it exceeded Congress's Commerce Clause authority. In so ruling, the Court reaffirmed a set of fundamental principles, including that the powers delegated to the federal government are few and defined, and that this "constitutionally mandated division of authority was adopted by the Framers to ensure protection of our fundamental liberties." *Id.* at 552, *quoting Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). The *Lopez* majority concluded that the statute before the Court "upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power." *Id.* at 580. In so ruling, the Court expressed its concern that an overly expansive view of the interstate Commerce Clause "would effectively obliterate the distinction between what is national and what is local and create a completely centralized government." *Id.* at 557.

Making it clear that the Court meant what it said in *Lopez*, five years later, in *United States v. Morrison*, 529 U.S. 598 (2000), the Court struck down the civil remedy provision of the Violence Against Women Act of 1994, ruling that it, too, was beyond Congress's Commerce Clause powers. Once again, the majority expressed concern that "Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority." *Id.* at 615.

MIA_CEOS_00085

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 10

To the extent that §2422(b) criminalizes the use of the internet (or telephone) by a sexual predator to target a vulnerable minor and to convince, or to try to convince, her to engage in conduct proscribed by law, the statute may not be unconstitutional on its face. *See United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006) (both §§ 2422(b) and 2423(b) "fall squarely within Congress's power to regulate the first two categories of activities described in *Lopez*"). The statute would, however, be plainly unconstitutional if it were applied to situations like Mr. Epstein's, where neither the telephone nor the internet was used in that fashion, and where the use of the telephone was, *at most*, a tenuous link in a chain of events that may, or may not, have preceded or followed sexual contact with a minor.[9] In other words, if the instrumentality of commerce is not the vehicle used to facilitate the harm Congress is trying to address, but is simply a "jurisdictional hook," the hook is too weakly connected to the problem (sexual crimes against minors) to sustain the statute as a proper exercise of Commerce Clause power.

Questions about the nature of federalism, and, specifically, just how far the federal government may go into matters of traditionally state concern, will continue to arise and will be answered case-by-case. As Justice O'Connor said in her dissent in *Gonzales v. Raich*, 545 U.S. 1, 47 (2005), ". . . the task is to identify a mode of analysis that allows Congress to regulate more than nothing . . . and less than everything. . ." (O'Connor, J. dissenting). *United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005), illustrates the difficulty of the task. In that case, the deeply split *en banc* Court considered whether and to what extent the Commerce Clause authority included the power to punish a church arsonist who had traveled in interstate commerce to commit his arsons.

Though clearly not settled, what is clear is that Congress's specification of a jurisdictional element such as the use of an instrumentality or channel of interstate

---

[9] As can be readily noted on the chart at Tab "B", to the extent discernable, **every** case brought under §2422(b) in this district includes use of the internet. There are only four reported cases in the Eleventh Circuit involving use of the phones only: three of them concern telephone calls to travel agencies advertising overseas underage sex tours and involved explicit talk of sexual activity with known minors. A fourth is *United States v. Evans*, 476 F.3d 1176 (11th Cir. 2007) (11th Cir, 2007). But there, in facts far different from those presented here, the defendant **"admitted** using both a cellular telephone and a land-line telephone to entice Jane Doe to engage in prostitution" (emphasis added). That admission makes *Evans* no precedent for a prosecution here, since there is no evidence the phones were used "to entice".

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 11

commerce does not, in and of itself, end the inquiry. Where the use of such instrumentality is far removed from the conduct being targeted (in the case of §2422(b), sexual exploitation of children), the lack of any basis for federal jurisdiction presents itself squarely.

In Mr. Epstein's case, since the crime being considered (as Congress intended) is the use of the internet by internet predators to target and lure vulnerable children to engage in illicit sex, the law is arguably within Congress' Commerce Clause powers. But Mr. Epstein's conduct would be outside the law's scope. If you were to contend that *any* use of the telephone which is connected in any fashion to an act of sexual misconduct with a minor is within the statute's scope, Congress would then have reached well into traditional state spheres, and there is a powerful argument that Congress would have been acting in excess of its Commerce Clause authority.

Elimination of Constitutional uncertainty regarding §2422(b) depends upon confining it to situations where an instrumentality of interstate commerce has **itself** been used for an immoral or injurious purpose. Statutes must be read to eliminate serious doubts as to Constitutionality, as long as such a reading is not plainly contrary to the intent of Congress. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994), citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568 (1988). At the least, to eliminate questions as to its constitutionality, §2422(b)'s reach must be limited to situations where there is a **very close connection** between the use of an instrumentality of interstate commerce and the persuasion or attempted persuasion that the statute makes a crime.

Moreover, even if, *arguendo*, the expansive reading of the statute would not violate the Commerce Clause -- which current case law strongly suggests it would -- nevertheless the **federal interest** in prosecuting sexual offenses involving minors where the facility or means of interstate commerce was not the vehicle for committing the crime is so attenuated that no such federal prosecution should be brought.

Here, there is no evidence that Mr. Epstein himself ever persuaded, induced, enticed, or coerced anyone under the age of 18 over the telephone or internet to engage in prostitution or other illegal conduct. Any prosecution would therefore have to be predicated on a theory that he was criminally culpable for a telephone call made by a third party. Such a theory of vicarious liability requires proof beyond a reasonable doubt that the person making the telephone call and Mr. Epstein shared the same criminal intent

MIA_CEOS_00087

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 12

and knowledge and, critically, that the shared intent and knowledge existed *at the time* of the communication in question. Absent proof beyond a reasonable doubt that Mr. Epstein had actual knowledge that the person making a telephone call would induce or persuade a specific underage person during the telephone call to engage in unlawful sexual activity or to engage in prostitution, there can be no federal crime.

If the telephone call in question were simply to *schedule* a topless massage, then the call lacked the essential element of inducement, persuasion, enticement, or coercion. If the telephone call in question was to schedule a topless massage (or even more) with a woman whose age was not known by Mr. Epstein to be under 18, it also fails to satisfy the requirements of §2422(b). If Mr. Epstein had not formed the intent to engage in unlawful sexual activity as of the time of the communication (even if he did form the intent thereafter), an essential element of the federal statute is again lacking. If the person making the call had knowledge or a criminal intent or belief not fully shared by Mr. Epstein (for example, Mr. Epstein did not know the telephone call was intended to induce a minor to engage in unlawful activity), the essential element of shared intent and shared knowledge is again lacking.[10] Finally, even if there were a call to schedule a second meeting with someone who had previously been to the Epstein residence, this call lacks the necessary element of persuasion, inducement, or enticing even if the person receiving the call hoped or expected remuneration from the return visit. That is so because the statute focuses on the content of the communication, not on any *quid pro quo* that occurs thereafter at a meeting. The latter conduct is exclusively within the ambit of state prosecution.

5. <u>Other Reasons Why § 2422(b) Does Not Apply</u>

As we demonstrate above, this statute is addressed to those who purposely and intentionally target children. Here, there was no such targeting. As the Sixth Circuit said in rejecting a First Amendment challenge to the statute: "The statute only applies to those who 'knowingly' persuade or entice, or attempt to persuade or entice, minors. *United States v. Bailey,* 228 F.3d 637, 639 (6th Cir. 2000). *See United States v. Panfil,* 338 F.3d

---

[10] Indeed, this last problem is best illustrated by any calls ▮▮▮▮▮ may claim to have made to solicit persons to massage Mr. Epstein. Though Ms. ▮▮▮▮▮ may have known the actual ages of the women whom she called at the time she called, and may therefore have known that one or more was in fact under 18, she was clear in speaking to detectives that she never communicated such information to Mr. Epstein. Rather, she understood Mr. Epstein wanted massages from women at least 18 years of age. (Video Interview of ▮▮▮▮▮ on October 3, 2005).

MIA_CEOS_00088

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 13

1299 (11th Cir. 2003) (scienter requirement discourages "unscrupulous enforcement" and clarifies §2422(b)). Directed towards those who commit "the most serious crimes against children," it cannot properly be used as a trap for the unwary, sweeping within its net all who may – even unwittingly and unintentionally – communicate or otherwise interact improperly with persons who turn out to be minors.

A prosecution of Mr. Epstein would violate the teachings of *Bailey* and *Panfil*. As we believe we persuaded you at the June 26th meeting, Mr. Epstein never targeted minors. On the contrary, what he did – at worst – was akin to putting up a sign saying to all, come in if you are interested in giving a massage for $200. A few among those who accepted the general invitation may have in fact been under 18 (though they lied about that age and said they were 18), but that is, at its worst, comparable to "post[ing] messages for all internet users, either adults or children, to seek out and read at their discretion," which the courts have held does not violate §2422(b).

Thus, for this reason as well, Mr. Epstein's case is far outside the parameters of the §2422(b) cases that have been prosecuted. A key factor common to cases brought under §2422(b) is not present here: Prosecutions under this statute have focused on a sexual predator who used the internet to identify and to communicate with a child or purported child (or a person with influence over such child or purported child), and did so with the intent to arrange to engage in sexual activity with the child, with full knowledge that sexual activity with an individual of that age was illegal. In light of this common and well-accepted understanding, the cases decided under §2422(b) take as a given that its proper application lies *only* where the defendant knows or believes the person with whom he is interacting is a child.

Virtually all of the prosecutions brought under §2422(b) resulting in published decisions have involved undercover "sting" operations, involving an essentially standard fact pattern in which over an extended period of time and in the course of multiple conversations on line an undercover agent pretends to be a young teenager. In each of the cases, the prosecution had, from the very words used by the defendant, an all but irrefutable case showing the clear knowledge and intent of the defendant. A prototypical case is *United States v. Farner*, 251 F.3d 510 (5th Cir. 2001), where the defendant participated, over time, in instant messaging, e-mail, and follow-up telephone calls with a person who identified herself as 14 years old, engaged in explicit internet conversation, sent her pornographic pictures, persuaded her to meet with him for sexual activity, arranged such a meeting, and traveled to the meeting place. The Fifth Circuit held that

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 14

defendant's §2422(b) attempt conviction was valid; it mattered not that the 14 year old
was really an adult FBI agent engaged in a sting operation, for the defendant "believed
Cindy to be a minor and acted on that belief." 251 F.3d at 512. Our own survey of the
cases brought in this district under §2422(b) confirms that prosecutions in this District
have also been all but limited to internet sting cases. *See* Tab "B".

In the context of this standard fact pattern involving the internet's use by
predators, other Circuits, including the Eleventh, have been unanimous in holding that the
non-existence of an actual minor was of no moment; defendant's **belief** that he was
dealing with a minor was sufficient to make out the crime. *See United States v. Root*, 296
F.3d 1222, 1227-32 (11th Cir. 2002); *United States v. Sims*, 428 F.3d 945, 959 (10th Cir.
2005); *United States v. Helder*, 452 F.3d 751 (8th Cir. 2006); *United States v. Meek*, 366
F.3d 705, 717-20 (9th Cir. 2004). Likewise, the Circuits have rejected void for vagueness,
overbreadth, and First Amendment challenges to the statute, brought in the context of
these prototypical prosecutions where the internet was the vehicle of communication and
enticement, and the defendant demonstrated in writing his belief that he was dealing with
a child well below the age of consent. *E.g., United States v. Tykarsky*, 446 F.3d 458, 473
(3d Cir. 2006); *United States v. Thomas*, 410 F.3d 1235, 1243-44 (10th Cir. 2005); *United
States v. Panfil, supra*, 338 F.3d at 1300-01 (11th Cir. 2003).[11]

―――――――――――――

[11] There are approximately two dozen Eleventh Circuit cases that include a prosecution under
§2422(b), most of which involve the prototypical fact pattern. *See, e.g., United States v. Morton*,
364 F.3d 1300 (11th Cir. 2004), *judgment vacated for Booker consideration*, 125 S. Ct. 1338
(2006); *United States v. Orrega*, 363 F.3d 1093 (11th Cir. 2004); *United States v. Miranda*, 348
F.3d 1322 (11th Cir. 2003); *United States v. Tillmon*, 195 F.3d 640 (11th Cir. 1999); *United States v.
Panfil, supra*, 338 F.3d 1299 (11th Cir. 2003); *United States v. Garrett*, 190 F.3d 1220 (11th Cir.
1999); *United States v. Burgess*, 175 F.3d 1261 (11th Cir. 1999); *United States v. Rojas*, 145 Fed.
Appx. 647 (11th Cir. 2005); *United States v. Root*, 296 F.3d 1222 (11th Cir. 2002).

*United States v. Murrell*, 368 F.3d 1283 (11th Cir. 2004), is in the same mold, except that, in that
sting operation, the defendant communicated, not with the purported 13 year old girl, but with an
undercover agent holding himself out to be the imaginary girl's father. The initial contacts
between Murrell and the agent occurred in internet chatrooms named "family love" and "Rent F
Vry Yng." Over time, Murrell sought to make arrangements with the girl's father to make his
daughter available for sex in exchange for money. After the initial internet communications
concerning renting the girl for sexual purposes, further negotiations between the defendant and
the undercover occurred via the phone, per the defendant's suggestion. The Eleventh Circuit,
framing the issue to be whether the defendant must communicate directly with the minor or
supposed minor to violate §2422(b), answered the question in the negative, reasoning that "the

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 15

In light of this common and well-accepted understanding, the cases decided under §2422(b) take **as a given** that its proper application lies *only* where the facts demonstrate beyond dispute that the defendant knows or believes the person with whom he is interacting is a minor.

The Ninth Circuit has so held. *United States v. Meek,* 366 F.3d 705, 718 (9th Cir. 2004), held that the term "knowingly" refers both to the **verbs** – "persuades", "induces", "entices", or "coerces" – as well as to the **object** – "a person who has not achieved the age of 18 years," *citing United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), and *Staples v. United States*, 511 U.S. 606 (1994). The *Meek* Court wrote:

> The statute requires mens rea, that is, a guilty mind. The guilt arises from the defendant's knowledge of what he intends to do. In this case, knowledge is subjective – it is what is in the mind of the defendant.[12]

The very lengthy sentence under §2422(b) speaks against strict liability, especially since it applies in cases where there is no sexual contact **at all** with **any person**, let alone with a real minor. The Eleventh Circuit's decision in *United States v. Murrell, supra,* reflects this same understanding of the statute. The *Murrell* court wrote that, under the "plain language" of §2422(b), "to prove an attempt the government must

---

efficacy of §2422(b) would be eviscerated if a defendant could circumvent the statute simply by employing an intermediary to carry out his intended objective. *Id.* at 1287. Fact patterns similar to Murrell's exist in *United States v. Hornaday*, 392 F.3d 1306 (11th Cir. 2004); *United States v. Houston*, 177 Fed. Appx. 57 (11th Cir. 2006); *United States v. Searcy*, 418 F.3d 1193 (11th Cir. 2005); *United States v. Scott*, 426 F. 3d 1324 (11th Cir. 2005); and *United States v. Bolen*, 136 Fed. Appx. 325 (11th Cir. 2002).

[12] Several Courts of Appeal have held that, in a prosecution under **§2422(a)**, the defendant need not know that the individual that a defendant has persuaded, induced, enticed, or coerced **to travel in interstate commerce** is under the age of 18. *United States v. Jones*, 471 F.3d 535 (4th Cir. 2006), is one of these cases, though its facts are very different, and much more egregious than Mr. Epstein's. Assuming *Jones* was correctly decided and that the government need not prove defendant's knowledge under §2422(a), that still does not answer the question under §2422(b). The two are very different statutes, with different histories and different purposes. And §2422(a), unlike subsection (b), carries no mandatory minimum sentence, let alone ten years.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 16

first prove that Murrell, using the internet, acted **with a specific intent to persuade a minor to engage in unlawful sex.**" 368 F.3d at 1286 (emphasis added).[13] *United States v. Root, supra*, 296 F.3d at 1227, follows this pattern, and confirms that, at the time the defendant induces or entices the minor, he must intend to have sexual conduct with a minor or one he believes to be a minor *and* know that such conduct is proscribed. ("Root's statement to task force agents upon his arrest confirmed that he believed he would meet a 13-year-old girl for sex, which he said he knew was wrong but 'exciting'"). *See also United States v. Rojas*, 145 Fed. Appx. 647 (11ᵗʰ Cir. 2005) (unpublished). This *mens rea* requirement applies equally where the completed crime occurs.[14]

Finally, *actus non facit reum, nisi mens sit rea* – the act alone does not amount to guilt; it must be accompanied by a guilty mind. This principle of concurrence mandates that the *actus reus* and the *mens reus* concur in time. *See* Paul H. Robinson, *Criminal Law* §4.1 at 217 (1997) (concurrence requirement "means that the required culpability as to the element must exist at the time of the conduct constituting the offense"); LaFave, *Substantive Criminal Law* §3.11(a) (West 1986) (noting that Concurrence is a basic principle of criminal law and "the better view is that there is concurrence when the defendant's mental state actuates the physical conduct"). *See also United States v. Bailey, supra*, 444 U.S. at 402. In this case, the requisite *actus reus* is absent; likewise the required mental state. Even if those two fatal defects could be set aside, nevertheless, there was no concurrence of guilty mind and evil act, providing an additional reason why a successful prosecution under §2422(b) could not be brought.

6.  Conclusion

In Mr. Epstein's case, there was no use of the internet to induce, etc., and, given the legislative history and purpose, that is itself dispositive. Nor does the case present any of the dangers associated with internet predators and cyberspace. Not surprisingly

---

[13] Otherwise, the police could, for example, conduct a sting operation with a 17 year-old pretending to be an 18 year-old. Such an absurd operation is surely not intended by the statute.

[14] Even the completed crime does not require any sexual activity. Arguably, one commits the attempt offense when the actor, on the internet, asks a known or believed-to-be minor to have sex, even if she says no. The **completed** offense occurs when he takes an additional step, even before any sexual activity and regardless of whether one ever takes place.

MIA_CEOS_00092

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 17

then, the statutory language does not fit: Mr. Epstein did not use any facility of interstate commerce to do the forbidden act – to persuade, entice, induce, or coerce – nor did he attempt to do so. Others did use the telephone to make a variety of arrangements for Mr. Epstein's residence in Palm Beach, including getting the house ready for his arrival, checking movie schedules, and making telephone calls to schedule doctor's appointments, personal training, physical therapy and massages. Even if Mr. Epstein could be held responsible for the use of the telephone on his behalf, nevertheless, calls made by others regarding massages were not the statutorily proscribed persuasions or enticements of a known minor to do acts known to be illegal. Within his home, even if Mr. Epstein may arguably have persuaded or induced individuals to engage in forbidden conduct with him, he did not violate §2422(b). If he engaged in such persuasion or inducement, it occurred only face to face and spontaneously.

If such conduct constituted a crime, it would be a classic state offense. The state is the appropriate forum for addressing these issues. Though in our meeting it was asserted that cases under §2422(b) are often brought where there was simply use of a telephone, and casual use at that, it would not from our survey appear to be so on either count – that is, use of a telephone rather than the internet, and use of the means of communication remote from the enticing, etc. This is neither the defendant, nor the factual context, to break new ground.

## II.     Mr. Epstein Warrants Declination to Prosecute as Exercise of Discretion.

We believe strongly that no federal case would lie under the facts here. Moreover, as we discussed, there is a pending state case against Mr. Epstein which can be resolved in a way that vindicates the state's rights and obligations in this matter.

In considering an appropriate disposition in a case such as this, where the applicability of the statute, both legally and as a matter of policy, raise serious questions, and both the reliability and admissibility of much of the evidence is in doubt, it is useful to consider how best to use the broad discretion you enjoy in choosing whether to prosecute. In this regard, we suggest that having a greater understanding of who Jeffrey Epstein is as a person may help inform how best to proceed.

Jeffrey Epstein was raised in a middle class neighborhood in Brooklyn, New York, by hardworking parents. His father was a laborer and his mother a secretary. They lived comfortably, but were by no means well off. Mr. Epstein's parents instilled a strong work ethic in him, and growing up he held a variety of jobs to support himself, from

MIA_CEOS_00093

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 18

driving a taxi cab to working as a mechanic. Any notion that he was born with a "silver spoon in his mouth" should be dismissed.

Although Mr. Epstein is self-made and worked long and hard, he could not have achieved his successes without the personal guidance and support of others. These key people first identified the promise in Mr. Epstein and brought him to Bear Stearns and Company, Inc. There, starting in 1976 at the age of 23 as a floor trader's junior assistant, he became in 1980 a limited partner. Among the very many benefits that his experience there provided was an introduction to the people who ultimately became his clients.

Early in his professional career, Mr. Epstein realized the profound impact that even one person can have on the life of another. His gratitude for the assistance he personally received, and his sense of obligation to provide similar assistance and guidance to others, is in large part, the motive for the primacy of philanthropy in his life or his particular philanthropic interests. Mr. Epstein has devoted a substantial portion of his time, efforts and financial resources to helping others, both on an individual basis and on a more far reaching scope. Mr. Epstein gives generously, of both his time and his financial resources equally to individuals whom he knows personally and well and to those with whom he has had little or no personal contact. Just a few examples:

Some time ago, the two year old son of an employee was diagnosed with retinal blastoma. When told, Mr. Epstein not only gave the employee unlimited time off to attend to his son and promised whatever financial support was needed, but Mr. Epstein made the full list of his medical and research contacts available. The employee was put in contact with a former colleague who was then conducting eye research at Washington University. Mr. Epstein organized several meetings to determine how the colleague could be of assistance, including by arranging for further meetings with experts at Washington University. Though the employee's son lost one eye, he is now an otherwise normal twelve year old who attends private school along with his five siblings, the expenses of which are borne by Mr. Epstein.

Several years ago, a new employee with whom Mr. Epstein had little or no prior contact approached Mr. Epstein to request a change in his medical insurance. It was soon revealed that the employee and his wife were experiencing fertility problems and they were seeking treatments that cost nearly $15,000 per month. Mr. Epstein insisted on paying directly for the treatments, and did so month after month. After each unsuccessful cycle, Mr. Epstein sat with the employee, exploring available alternatives, including adoption, and encouraging the employee to continue additional cycles at Mr. Epstein's. Mr. Epstein referred the employee to medical experts with whom Mr. Epstein

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 19

was acquainted and assigned personnel to assist the employee with administrative and secretarial needs that arose in seeking a solution to the problem. Mr. Epstein is now the godfather of the employee's seven-year old twins.

Recently, both a second employee and a consultant of Mr. Epstein each confided that they and their respective spouses were experiencing similar fertility problems. Again, Mr. Epstein offered to pay the uncovered medical costs. The consultant and his wife are now expecting their first child. The second employee continues with infertility treatments.

Two years ago, a building workman approached Mr. Epstein with news that the workman's wife needed a kidney transplant and that the workman's sister-in-law in Colombia was a willing donor. The non English speaking workman had neither the financial resources nor the know-how to get the sister-in-law to the United States. Mr. Epstein arranged for immigration counsel to expedite a visa for the sister-in-law and purchased the plane tickets for the sister-in-law's visit to the United States. The surgery was a success and both patients recovered completely. The sister-in-law flew back to Colombia at Mr. Epstein's expense.

Mr. Epstein is a devoted advocate of personal improvement through education. As a former board member of Rockefeller University, Mr. Epstein has made available academic scholarships to worthy students, most of whom he has had no prior connection to whatsoever. In addition, Mr. Epstein covers the tuition required to send the family members of his employees to nursery, private elementary, middle and secondary schools and colleges. He has funded and personally encouraged continuing education programs for his adult employees and professional consultants.

Among his other acts:

- On a trip to Rwanda to inspect the genocide camps, Mr. Epstein approached the President of Rwanda and offered to help identify and then to fund two worthy Rwandan students to earn undergraduate degrees in the United States. The students, whom Mr. Epstein did not meet until after their second year of studies, both are expected to graduate with honors from the City University of New York in 2008. Notes from each of them are annexed at Tab "C".

- Even to those with less lofty goals, seeking only to advance in their chosen paths, Mr. Epstein freely gives of his time to provide guidance and, when appropriate, financial support. For example, Mr. Epstein has been meeting

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 20

monthly with a teenage building workman whose expenses of vocational school are being paid by Mr. Epstein. Each month, Mr. Epstein reviews the workman's school progress and discusses career opportunities. One of the monthly reports is annexed at Tab "D".

- In addition, Mr. Epstein blocks out time each week to meet with young professionals to discuss their career prospects and counsel them regarding appropriate next steps.

Although Mr. Epstein is deeply committed to helping others in very personal and meaningful ways, he has also sought to use his good fortune to help others on a broader basis. Mr. Epstein has sponsored more than 70 athlete wellness programs, building projects, scholarship funds and community interest programs in the United States Virgin Islands alone.

Moreover, Mr. Epstein has given generously to support philanthropic organizations across the United States and around the world, including America's Agenda; Robin Hood; Alliance for Lupus Research; Ovarian Cancer Research Fund; Friends of Israel Defense Forces; Seeds of Peace; the Jewish National Fund; the Hillel Foundation; the National Council of Jewish Women; and the Intrepid Fallen Heroes Fund – to name only a few.

In a feature article about Mr. Epstein in *New York Magazine*, former President Clinton aptly described Mr. Epstein as "a committed philanthropist with a keen sense of global markets and an in-depth knowledge of twenty-first-century science." President Clinton reached this conclusion during a month-long trip to Africa with Mr. Epstein, which Mr. Epstein hosted. The purpose of that trip was to increase AIDS awareness; to work towards a solution to the AIDS crisis; and to provide funding to reduce the costs of delivering medications to those inflicted with the disease.

Both before and after that trip to Africa, Mr. Epstein worked hard to achieve improvements in people's lives on a global basis. He actively sought advancement of his philanthropic goals through his participation and generous support of both the Trilateral Commission and the Council on Foreign Relations. As you may know, the Trilateral Commission was formed to foster closer cooperation among core democratic industrialized areas of the world in the pursuit of goals beneficial to the global population. The Council on Foreign Relations is an independent, national membership organization and a nonpartisan center for scholars dedicated to increase international understanding of world issues and the foreign policy decisions that affect those issues.

MIA_CEOS_00096

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 21

    Mr. Epstein was part of the original group that conceived the Clinton Global Initiative, which is described as a project "bringing together a community of global leaders to devise and implement innovative solutions to some of the world's most pressing challenges." Focuses of this initiative include poverty, climate change, global health, and religious and ethnic conflicts.

    Mr. Epstein has sought to improve people's lives through active participation in worthy scientific and academic research projects, as well. He spent hundreds of hours researching the world's best scientists, and he himself studied as a Harvard Fellow in order to increase his own knowledge in fields that he believed could provide solutions to the world's most difficult problems. He is committed to helping the right researchers find those solutions, especially in the fields of medical science, human behavior and the environment.

    In the past four years alone, Mr. Epstein has made grants to research programs at major institutions under the supervision of some of the most highly regarded research professionals and scholars in their fields, including Martin Nowak, a mathematical biologist who studies, among other things, the dynamics of infectious diseases and cancer genetics; Martin Seligman, known for his work on Positive Psychology – that is to say the psychology of personal fulfillment; Roger Schank, a leading researcher in the application of cognitive learning theory to the curricula of formal education; the renown physicist/cosmologist Lawrence Krauss, and many others. Institutions funded include Harvard University; Penn State University; Lenox Hill Hospital (New York); the Biomedical Research and Education Foundation; the Santa Fe Institute; Massachusetts Institute of Technology; Case Western Reserve University; and Harvard Medical School's Institute for Music and Brain Science.

    Moreover, Mr. Epstein has sponsored and chaired symposia that have provided a rare opportunity for the world's leading scholars and research professionals to share ideas across interdisciplinary lines. These leaders gather to discuss important and complex topics, including the origin of life, systems for understanding human behavior, and personal genomics.

    In order to expand the pool of qualified research professionals actively engaged in addressing the world's numerous problems, Mr. Epstein co-founded, and served as a trustee and actively participated in the selection committee of, the Scholar Rescue Fund. The Scholar Rescue Fund (SRF) is a program of the Institute of International Education, the group that, *inter alia*, administers the Fulbright Scholarship program. The SRF provides support and safe haven to scholars at risk from around the world. Over the past

MIA_CEOS_00097

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 22

five years, SRF has made 155 grants to scholars from more than 37 countries. Scholars are placed at host universities in a safe country. More than 87 institutions around the world have hosted SRF scholars to date, including eight of the top ten universities in the United States. Most recently, SRF launched the Iraq Scholar Rescue Project to save scholars in Iraq, many of whom have been particularly targeted for kidnapping and death since the conflict there began. Mr. Epstein is a highly valued member of the selection committee. Just a few articles mentioning these and other projects are annexed at Tab "E".

Even a casual review of the good works large and small in which he has involved himself leads one to conclude that he has a powerful instinct to help others. He does this not simply because he can, but because he has a deeply ingrained desire to do so. In fact, he believes that, as a result of his good fortune, he is obligated to do so.

Since 2000, Mr. Epstein has funded educational assistance, science and research and community and civic activities. As you can see, his philanthropy is not limited to financial support. To the contrary, it has involved the dedication of a remarkable amount of his time and effort and has yielded admirable results. It is noteworthy that a majority of the people he has helped over the years have been those with whom he has had little or no contact, which further confirms that he derives no personal benefit from his good works, other than the personal satisfaction derived from using his good fortune to help others.

The sincere devotion to others evidenced by Mr. Epstein's philanthropic activities is no less apparent in his interpersonal relationships. Mr. Epstein has maintained both long term significant, intimate as well as professional relationships. He remains close personal friends with people with whom he went to high school and, to this day, maintains close business contacts with his former colleagues at Bear Stearns. Those who know Mr. Epstein well describe him admittedly as quirky but certainly not immoral; and overall as kind, generous and warm-hearted. They have remained staunch supporters despite the lurid media attention during this two-year investigation.

Mr. Epstein acknowledges that the activities under investigation, as well as the investigation itself, have had and continue to have an unfortunate impact on many people. With a profound sense of regret, Mr. Epstein hopes to end any further embarrassment to all who are and who may become involved in this serious matter. Resolution of the outstanding charges in the state would put an appropriate end to the matter for everyone.

MIA_CEOS_00098

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Jeffrey Sloman, Esq.
Matthew Menchel, Esq.
Andrew Lourie, Esq.
A. Marie Villafaña, Esq.
The United States Attorney's Office
Southern District of Florida
July 6, 2007
Page 23

   Again, we and our colleagues thank you for your attention at the June 26 meeting.
I welcome any questions or comments you may have and am available to discuss this and
any other issues at your earliest convenience.

Very truly yours,

*Gerald B. Lefcourt*

Gerald B. Lefcourt

*Alan Dershowitz*

Alan Dershowitz

cc: Lilly Ann Sanchez, Esq.
    Roy Black, Esq.

MIA_CEOS_00099