# EXHIBIT 110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80736-Civ-Marra/Johnson

JANE DOE #1 and JANE DOE #2

v.

UNITED STATES
_____/

### JANE DOE #1 AND JANE DOE #2'S MOTION FOR FINDING OF VIOLATIONS OF THE CRIME VICTIMS' RIGHTS ACT AND REQUEST FOR A HEARING ON APPROPRIATE REMEDIES

COME NOW Jane Doe #1 and Jane Doe #2 (also referred to as "the victims"), by and through undersigned counsel, to move for a finding from this Court that the victims' rights under the Crime Victims Rights Act (CVRA), 18 U.S.C. § 3771, have been violated by the U.S. Attorney's Office, and to request a hearing on the appropriate remedies for these violations.

The victims have proffered a series of facts to the Government, which they have failed to contest. Proceeding on the basis of these facts,[1] it is clear that the U.S. Attorney's Office has repeatedly violated the victims' protected CVRA rights, including their right to confer with prosecutors generally about the case and specifically about a non-prosecution agreement the Office signed with the defendant, as well as their right to fair treatment. *See* 18 U.S.C. 3771(a)(5) & (8).

It is now beyond dispute, for example, that in September 2007, the U.S. Attorney's Office formally signed a non-prosecution agreement with Jeffrey Epstein that barred his

_____

[1] The victims are contemporaneously filing a motion to have their facts accepted by the Court.

1

prosecution for numerous federal sex offenses he committed against the victims (as well as against many other minor girls). Rather than confer with the victims about this non-prosecution agreement, however, the U.S. Attorney's Office and Jeffrey Epstein agreed to a "confidentiality" provision in the agreement barring its disclosure to anyone – including the victims. For the next nine months, as Epstein was well aware, the U.S. Attorney's Office assiduously concealed from the victims the existence of this signed non-prosecution agreement. Indeed, the Office went so far as to send (in January 2008) a false victim notification letter to the victims informing them that the "case is currently under investigation." In fact, the U.S. Attorney's Office had already resolved the case three months earlier by signing the non-prosecution agreement. Again on May 30, 2008, the U.S. Attorney's Office sent yet another victim notification letter to a recognized victim informing her that the "case is currently under investigation" and that it "can be a lengthy process and we request your continued patience while we conduct a thorough investigation." Then in June 2008, on the eve of consummating Epstein's state guilty plea that was part of the non-prosecution agreement, the U.S. Attorney's Office asked legal counsel for the victims to send a letter expressing the victims' views on why federal charges should be filed – not disclosing to the victims' legal counsel that this was a pointless exercise because the non-prosecution agreement had already been signed some nine months earlier.

These actions and many more like them constitute clear violations of Jane Doe #1 and Jane Doe #2's rights under the Crime Victims Rights Act, including the right to confer with prosecutors and the right to fair treament. The only argument that the U.S. Attorney's Office advances is that the CVRA does not apply because no indictment was formally filed in this case. But this position is inconsistent with both the CVRA's plain language, *see, e.g.,* 18 U.S.C. §

2

3771(c)(1) (Justice Department agencies involved in the "detection" and "investigation" of federal crimes covered by CVRA), and with persuasive case law, *see, e.g., In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008) (victims should have been notified before pre-indictment plea reached). Moreover, the U.S. Attorney's Office itself was fully aware of its obligations to notify the victims in this case, as e-mails from the Office and other evidence make perfectly clear. The only reason that the Office concealed the existence of the non-prosecution agreement from the victims was not to comply with some legal restriction, but rather to avoid a firestorm of public controversy that would have erupted if the sweetheart plea deal with a politically-connected billionaire had been revealed.

The Court should accordingly find that the U.S. Attorney's Office – in coordination with Jeffrey Epstein -- has violated the Act and set a briefing schedule and hearing on the proper remedy for those violations.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Jane Doe #1 and Jane Doe #2 offer the following statement of undisputed material facts. If the Government disputes any of these facts, the victims request an evidentiary hearing to prove each and every one of them:[2]

1. Between about 2001 and 2007, defendant Jeffrey Epstein (a billionaire with significant political connections) sexually abused more than 30 minor girls at his mansion in West Palm

---

[2] The Court should accept all these facts as true for reasons the victims explain in their contemporaneously-filed Jane Doe #1 and Jane Doe #2's Motion to Have Their Facts Accepted Because of the Government's Failure to Contest Any of The Facts. The Court should also direct the Government to produce all evidence that it possesses supporting these facts, for reasons the victims explain in their contemporaneously-filed Jane Doe #1 and Jane Doe #2's Motion for Order Directing the U.S. Attorney's Office Not to Withhold Relevant Evidence.

3

Beach, Florida, and elsewhere. Among the girls he sexually abused were Jane Doe #1 and Jane Doe #2. Epstein performed repeated lewd, lascivious, and sexual acts on them, including (but not limited to) masturbation, touching of their sexual organs, using vibrators or sexual toys on them, coercing them into sexual acts, and digitally penetrating them. Because Epstein used a means of interstate commerce and knowingly traveled in interstate commerce to engage in abuse of Jane Doe #1 and Jane Doe #2 (and the other victims), he committed violations of federal law, including repeated violations of 18 U.S.C. § 2422. *See, e.g.,* Complaint, E.W. v. Epstein, Case No. 50 2008 CA 028058 XXXXMB AB (15th Cir. Palm Beach County, Florida); Complaint, L.M. v. Epstein, Case No 50 2008 CA 028051 XXXXMB AB (15th Cir. Palm Beach Count, Florida).

2. Jeffrey Epstein flew at least one underage girl on his private jet for the purpose of forcing her to have sex with him and others. Epstein forced this underage girl to be sexually exploited by his adult male peers, including royalty, politicians, businessmen, and professional and personal acquaintances. Complaint, Jane Doe No. 102 v. Epstein, No. 9:09-CV-80656-KAM (S.D. Fla. May 1, 2009).

3. In 2006, at the request of the Palm Beach Police Department, the Federal Bureau of Investigation opened an investigation into allegations that Jeffrey Epstein and his personal assistants had used facilities of interstate commerce to induce young girls between the ages of thirteen and seventeen to engage in prostitution, among other offenses. The case was presented to the United States Attorney's Office for the Southern District of Florida, which accepted the case for investigation. The Palm Beach County State Attorney's Office was also investigating

the case. *See generally* U.S. Attorney's Correspondence, Exhibit "A" to this filing (hereinafter cited as "U.S. Attorney's Correspondence" and referenced by Bates page number stamp).

4. The FBI soon determined that both Jane Doe #1 and Jane Doe #2 were victims of sexual assaults by Epstein while they were minors beginning when they were approximately fourteen years of age and approximately thirteen years of age respectively. Jane Doe #1, for example, provided detailed information about her abuse (and the abuse of Jane Doe #2) to the FBI on August 7, 2007. Exhibit "B."

5. More generally, the FBI through diligent investigation established that Epstein operated a large criminal enterprise that used paid employees and underlings to repeatedly find and bring minor girls to him. Epstein worked in concert as part of the enterprise with others, including Ghislane Maxwell and Jean Luc Brunel, to obtain minor girls not only for his own sexual gratification, but also for the sexual gratification of others. The FBI determined that Epstein had committed dozens and dozens of federal sex crimes against dozens of minor girls between 2001 and 2007. They presented information to the U.S. Attorney's Office for criminal prosecution. *See* Exhibit "B"; U.S. Attorney's Correspondence at 47-55.

6. On about June 7, 2007, FBI agents hand-delivered to Jane Doe #1 a standard CVRA victim notification letter. The notification promised that the Justice Department would makes its "best efforts" to protect Jane Doe #1's rights, including "[t]he reasonable right to confer with the attorney for the United States in the case" and "to be reasonably heard at any public proceeding in the district court involving . . . plea . . . ." The notification further explained that "[a]t this time, your case is under investigation." That notification meant that the FBI had identified Jane Doe #1 as a victim of a federal offense and as someone protected by the CVRA. Jane Doe #1

5

relied on these representations and believed that the Justice Department would protect these rights and keep her informed about the progress of her case. *See* Exhibit "C."

7. On about August 11, 2007, Jane Doe #2 received a standard CVRA victim notification letter. The notification promised that the Justice Department would makes its "best efforts" to protect Jane Doe #2's rights, including "[t]he reasonable right to confer with the attorney for the United States in the case" and "to be reasonably heard at any public proceeding in the district court involving . . . plea . . . ." The notification further explained that "[a]t this time, your case is under investigation." That notification meant that the FBI had identified Jane Doe #2 as a victim of a federal offense and as someone protected by the CVRA. Jane Doe #2 relied on these representations and believed that the Justice Department would protect these rights and keep her informed about the progress of her case. *See* Exhibit "D."

8. Early in the investigation, the FBI agents and an Assistant U.S. Attorney had several meetings with Jane Doe #1. Jane Doe #2 was represented by counsel that was paid for by the criminal target Epstein and, accordingly, all contact was made through that attorney.

9. In and around September 2007, plea discussions took place between Jeffrey Epstein, represented by numerous attorneys (including lead criminal defense counsel Jay Lefkowitz), and the U.S. Attorney's Office for the Southern District of Florida, represented by Assistant U.S. Attorney A. Marie Villafaña and others. The plea discussions generally began from the premise that Epstein would plead guilty to at least one federal felony offense surrounding his sexual assaults of more than 30 minor girls. From there, the numerous defense attorneys progressively negotiated more favorable terms so that Epstein would ultimately plead to only two state court

6

felony offenses and would serve only county jail time.  Many of the negotiations are reflected in e-mails between Lefkowitz and the U.S. Attorney's Office.  *See generally* Exhibit "A."

10.  The evidence supporting these charges was overwhelming, including the interlocking consistent testimony of several dozen minor girls, all made automatically admissible in a federal criminal sexual assault prosecution by operation of Fed. R. Evid. 414.  U.S. Attorney's Correspondence at 4.

11. 

12. The correspondence also shows that the U.S. Attorney's Office was interested in finding a place to conclude a plea bargain that would effectively keep the victims from learning what was happening through the press.  The Office wrote in an e-mail to defense counsel: "▮▮▮ The

7

U.S. Attorney's Office was aware that most of the victims of Epstein, including Jane Doe #1 and Jane Doe #2, resided well outside the Miami area in the West Palm Beach area. The Office was also aware that the chances of press coverage of a case filed in Miami would be significantly less likely to reach the Palm Beach area. U.S. Attorney's Correspondence at 29.

13. On about September 24, 2007, the U.S. Attorney's Office sent an e-mail to Jay Lefkowitz, criminal defense counsel for Epstein, regarding the agreement. The e-mail stated that the Government and Epstein's counsel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



U.S. Attorney's Correspondence at 153 (emphases added).

14. On about September 25, 2007, the U.S. Attorney's Office sent an e-mail to Lefkowitz stating: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ U.S. Attorney's Correspondence at 156.

15. On about September 26, 2007, the U.S. Attorney's Office sent an e-mail to Lefkowitz in which she stated: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████ Apparently the '███████ agreed to between the Government and Epstein's defense counsel was that no mention would be made of the non-prosecution agreement between the U.S. Attorney's Office and Epstein, as no subsequent mention was made to the victims of the non-prosecution agreement and a confidentiality provision was made part of that agreement (as discussed below). U.S. Attorney's Correspondence at 359.

16. On about September 25, 2007, the U.S. Attorney's Office sent a letter to Jay Jefkowitz in which it suggested that the victims should be represented in civil cases against Epstein by someone who was not an experienced ███████: ███████



███████ U.S. Attorney's Correspondence at 157. The U.S. Attorney's Office continued to push a different attorney in part because it would reduce publicity, explaining that ███████

███████

*Id.*

17. On about September 24, 2007, Epstein and the U.S. Attorney's Office formally reached an agreement whereby the United States would defer federal prosecution in favor of prosecution by the State of Florida. Epstein and the U.S. Attorney's Office accordingly entered into a "Non-Prosecution Agreement" (NPA) reflecting their agreement. Most significantly, the NPA gave Epstein a promise that he would not be prosecuted for a series of federal felony offenses involving his sexual abuse of more than 30 minor girls. The NPA instead allowed Epstein to plead guilty to two state felony offenses for solicitation of prostitution and

9

procurement of minors for prostitution. The NPA also set up a procedure whereby a victim of Epstein's sexual abuse could obtain an attorney to proceed with a civil claim against Epstein, provided that the victim agreed to limit damages sought from Epstein. To obtain an attorney paid for by Epstein, the victim would have to agree to proceed exclusively under 18 U.S.C. § 2255 (i.e., under a law that provided presumed damages of $150,000 against Epstein – an amount that Epstein argued later was limited to $50,000). The agreement was signed by Epstein and his legal counsel, as well as the U.S. Attorney's Office, on about September 24, 2007. Non-Prosecution Agreement, Exhibit "E."

18. Epstein insisted on, and the U.S. Attorney's Office agreed to, a provision in the non-prosecution agreement that made the agreement secret. In particular, the agreement stated: "The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making the disclosure." By entering into such a confidentiality agreement, the U.S. Attorney's Office put itself in a position that conferring with the crime victims (including Jane Doe #1 and Jane Doe #2) about the non-prosecution agreement would violate terms of the agreement – specifically the confidentiality provision. Indeed, even notifying the victims about the agreement would presumably have violated the provision. Accordingly, from September 24, 2007 through at least June 2008 – a period of more than nine months -- the U.S Attorney's Office did not notify any of the victims of the existence of the non-prosecution agreement. Epstein was well aware of this failure to notify the victims and, indeed, arranged for this failure to notify the victims. *Id.*; U.S.

10

Attorney's Correspondence at 270; Transcript of Hearing in this case on July 11, 2008, at 4-6, 18-19, 22-23, 28-29 (hereinafter cited as "Tr. July 11, 2008").

19. A reasonable inference from the evidence is that the U.S. Attorney's Office – pushed by Epstein – wanted the non-prosecution agreement kept from public view because of the intense public criticism that would have resulted from allowing a politically-connected billionaire who had sexually abused more than 30 minor girls to escape from federal prosecution with only a county court jail sentence. Another reasonable inference is that the Office wanted the agreement concealed at this time because of the possibility that the victims could have objected to the agreement in court and perhaps convinced the judge reviewing the agreement not to accept it.

20. The Non-Prosecution Agreement that had been entered into between the U.S. Attorney's Office and Epstein was subsequently modified by an October 2007 Addendum and a December 19, 2007, letter from the U.S. Attorney to Attorney Lilly Ann Sanchez. The U.S. Attorney's Office did not confer with any of the victims about these modifications of the agreement (or even notify them of the existence of these modifications) through at least June 2008 – a period of more than six months. *See* Supplemental Declaration of A. Marie Villafaña (doc. #35, at 1); U.S. Attorney's Correspondence at 234-37; Tr. July 11, 2008, 18-19, 22-23, 28-29.[3]

21. In October 2007, shortly after the initial plea agreement was signed, FBI agents contacted Jane Doe #1. On October 26, 2007, Special Agents E. Nesbitt Kuyrkendall and Jason Richards met in person with Jane Doe #1. The Special Agents explained that Epstein would

---

[3] On about August 14, 2008, Epstein's defense counsel told the U.S. Attorney's Office that they did not consider the December 19, 2007, letter to be operative.

plead guilty to state charges involving another victim, he would be required to register as a sex offender for life, and he had made certain concessions related to the payment of damages to the victims, including Jane Doe #1. During this meeting, the Special Agents did not explain that an agreement had already been signed that precluded any prosecution of Epstein for federal charges against Jane Doe #1. The agents could not have revealed this part of the non-prosecution agreement without violating the terms of the non-prosecution agreement. Whether the agents themselves had been informed of the existence of the non-prosecution agreement by the U.S. Attorney's Office is not certain. Because the plea agreement had already been reached with Epstein, the agents made no attempt to secure Jane Doe #1's view on the proposed resolution of the case. Exhibit "E," Tr. July 11, 2008 at 4-6, 18-19, 22-23.

22. Jane Doe #1's (quite reasonable) understanding of the Special Agent's explanation was that only the State part of the Epstein investigation had been resolved, and that the federal investigation would continue, possibly leading to a federal prosecution. Jane Doe #1 also understood her own case was move forward towards possible prosecution. Tr. July 11, 2008, at 4-6, 18-19, 22-23, 28-29.

23. On about November 27, 2007, Assistant U.S. Attorney Jeff Sloman sent an e-mail to Jay Lefkowitz, defense counsel for Epstein. The e-mail stated that the U.S. Attorney's Office had an obligation to notify the victims ████████████████████████





U.S. Attorney's Correspondence at 255 (emphasis rearranged).

24.  On about November 29, 2007, the U.S. Attorney's Office sent a draft of a crime victim notification letter to Jay Lefkowitz, defense counsel for Jeffrey Epstein.  The notification letter would have explained:  The letter then would have gone on to explain that Epstein would ████████████████████████████████████  The letter would not have explained that, as part of the agreement with Epstein, the Justice Department had previously agreed not to prosecute Epstein for any of the numerous federal offenses that had been committed.  U.S. Attorney's Correspondence at 256-59.

25.  Because of concerns from Epstein's attorneys, the U.S. Attorney's Office never sent the proposed victim notification letter discussed in the previous paragraph to the victims. Instead, a misleading letter stating that the case was "currently under investigation" (described below) was sent in January 2008 and May 2008.  At no time before reaching the non-prosecution agreement did the Justice Department notify any victims, including for example Jane Doe #1, about the non-prosecution agreement.  The victims were therefore prevented from exercising their CVRA right to confer with prosecutors about the case and about the agreement.  Epstein

13

was aware of these violations of the CVRA and, indeed, pressured the U.S. Attorney's Office to commit these violations.  Tr. July 11, 2008, at 9.

26.  On about December 6, 2007, Jeffrey H. Sloman, First Assistant U.S. Attorney sent a letter to Jay Lefkowitz, noting the U.S. Attorney's Office's legal obligations to keep victims informed of the ███████████████████████  The letter stated:



U.S. Attorney's Correspondence at 191-92 (emphasis added).

27.  Despite this recognition of its obligation to keep victims ███████████ about the non-prosecution agreement, the U.S. Attorney's Office did not follow through and inform the victims of the non-prosecution agreement.  To the contrary, as discussed below, it continued to tell the victims that the case was "under investigation."  Tr. July 11, 2008, at 4-5, 18-19, 22-29.

28.  On December 13, 2007, the U.S. Attorney's Office sent a letter to Jay Lefkowitz, defense counsel for Epstein, rebutting allegations that had apparently been made against the

AUSA handling the case by the Epstein defense team. (The Justice Department concluded the allegations were meritless.) The letter stated that a federal indictment against Epstein ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ The letter also recounted that ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████ U.S. Attorney's Correspondence at 269.

29. The December 13, 2007, letter also reveals that the Justice Department stopped making victim notifications because of ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████ U.S. Attorney's Correspondence at 270 (emphasis added). It was a deviation from the Justice Department's standard practice to negotiate with defense counsel about the extent of crime victim notifications.

30. The December 13, 2007, letter also demonstrates that the Justice Department was well aware of who the victims of Epstein's sexual offenses were. The Justice Department was prepared to make notifications to the victims, but suspended those notifications only because objections from defense counsel. *Id.*

31. The December 13, 2007, letter reveals it would have been possible to confer with the victims about the Non-Prosecution Agreement. The U.S. Attorney's Office was fully able to

15

confer with Epstein's counsel about the parameters of the Non-Prosecution Agreement, but refused to confer with Epstein's victims about the Agreement. *Id.*

32. Following the signing of the Agreement and the modifications thereto, Epstein's performance was delayed while he sought higher level review within the Department of Justice. *See* U.S. Attorney's Correspondence *passim.* A reasonable inference from the evidence is that Epstein used his significant political and social connections to lobby the Justice Department to avoid significant federal prosecution. The Justice Department has in its possession internal documents (i.e., phone logs, emails, etc.) that would reveal the event of those lobbying efforts. The Justice Department, however, has refused to make these materials available to the victims.

33. On January 10, 2008, Jane Doe #1 and Jane Doe #2 received letters from the FBI advising them that *"[t]his case is currently under investigation.* This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." Exhibits "F" & "G." The statement in the notification letter was misleading and, in fact, false. The case was not currently "under investigation." To the contrary, the federal cases involving Jane Doe #1 and Jane Doe #2 had been resolved by the non-prosecution agreement entered into by Epstein and the U.S. Attorney's Office discussed previously. Moreover, the FBI did not notify Jane Doe #1 or Jane Doe #2 that a plea agreement had been reached previously, and that part of the agreement was a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida. Exhibit "E." Whether the FBI was aware of this fact at this time is unclear. In any event, the FBI was acting at the direction of the U.S. Attorney's Office, which clearly did not confer with Jane Doe #1 and Jane Doe #2 about the case and, by concealing the true state of affairs, and failed to treat Jane Doe #1 and Jane Doe #2 with fairness. Epstein was aware of

16

these actions of the U.S. Attorney's Office and, indeed, solicited these actions of the U.S. Attorney's Office. U.S. Attorney's Correspondence at 191-92, 270.

34. Jane Doe #1 and Jane Doe #2 relied on the representations of the U.S. Attorney's Office to their detriment. Had they known the true facts of the case – i.e., that Epstein had negotiated a non-prosecution agreement – they would have taken steps to object to that agreement. Tr. July 11, 2008 at 4-6, 18-19, 28-29.

35. Undersigned counsel believes that the FBI was lead to believe that their investigation of Epstein was going to lead to a federal criminal prosecution and that the FBI was also mislead by the U.S. Attorney's office about the status of the case.

36. In early 2008, Jane Doe #1 and Jane Doe #2 believed that criminal prosecution of Epstein was extremely important. They also desired to be consulted by the FBI and/or other representatives of the federal government about the prosecution of Epstein. In light of the letters that they had received around January 10, they believed that a criminal investigation of Epstein was on-going – including investigation into Epstein's crimes against them -- and that they would be contacted before the federal government reached any final resolution of that investigation. Tr. July 11, 2008, at 4-6, 18-19, 22-23, 28-29.

37. On January 31, 2008, Jane Doe #1 met with FBI Agents and AUSA's from the U.S. Attorney's Office. She provided additional details of Epstein's sexual abuse of her. The AUSA's did not disclose to Jane Doe #1 at this meeting (or any other meeting) that they had already negotiated a non-prosecution agreement with Epstein. Exhibit "H."

38. On about February 25, 2008, Assistant U.S. Attorney Sloman sent an e-mail to Jay Lefkowitz, Epstein's criminal defense counsel, explaining that the Justice Department's Child

Exploitation Obscenity Section (CEOS) had agreed to review Epstein's objections to the proposed plea agreement that had been reached with the U.S. Attorney's Office for the Southern District of Florida. The letter indicated that, should CEOS reject Epstein's objections to the agreement, then ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ U.S. Attorneys Correspondence at 290-91.

39. On May 30, 2008, another of Mr. Edwards's clients who was recognized as an Epstein victim by the U.S. Attorney's Office, received a letter from the FBI advising her that *"[t]his case is currently under investigation.* This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." Exhibit "I." The statement in the notification letter was misleading and, in fact, false. The case was not currently "under investigation." To the contrary, the case had been resolved by the non-prosecution agreement entered into by Epstein and the U.S. Attorney's Office discussed previously. Exhibit "E."

40. In mid-June 2008, Mr. Edwards contacted the AUSA handling the case to inform her that he represented Jane Doe #1 and, later, Jane Doe #2. Mr. Edwards asked to meet to provide information about the federal crimes committed by Epstein against these victims, hoping to secure a significant federal indictment against Epstein. The AUSA and Mr. Edwards discussed the possibility of federal charges being filed. At the end of the call, the AUSA asked Mr. Edwards to send any information that he wanted considered by the U.S. Attorney's Office in determining whether to file federal charges. Because of the confidentiality provision that existed in the plea agreement, Mr. Edwards was not informed that previously, in September 2007, the U.S. Attorney's Office had reached an agreement not to file federal charges. Mr. Edwards was

18

also not informed that resolution of the criminal matter was imminent.  This concealment prevented Edwards from (among other things) exercising his client's CVRA right to confer with the prosecutors about the case.  Epstein was aware of this concealment – and, indeed, sought this concealment.  Tr. July 11, 2008, at 4-6, 18-19, 22-23, 28-29.

41.  On Friday, June 27, 2008, at approximately 4:15 p.m., the U.S. Attorney's Office received a copy of Epstein's proposed state plea agreement and learned that the plea was scheduled for 8:30 a.m., on Monday, June 30, 2008.  The U.S. Attorney's Office and the Palm Beach Police Department attempted to provide notification to victims in the short time that Epstein's counsel had provided.  The U.S. Attorney's Office called attorney Edwards to provide notice to his clients regarding the hearing.  The notice, however, was only that Epstein was pleading guilty to state solicitation of prostitution charges involving another victim.  The U.S. Attorney's Office did not tell Edwards that the guilty pleas in state court would bring an end to the possibility of federal prosecution pursuant to the plea agreement.  Thus, there was no reason for attorney Edwards to believe that the guilty pleas in state court had any bearing on the cases of Jane Doe #1 and Jane Doe #2.  As a result, Jane Doe #1 and Jane Doe #2 did not attend the plea hearing, as they did not think that it was pertinent to their particular cases.  Had they known that the plea agreement made it impossible to prosecute Epstein federally for his crimes against them, they would have objected to this resolution.   Jane Doe #1 and Jane Doe #2 thus detrimentally relied on the inaccurate representations of the U.S. Attorney's Office that their cases were still under investigation.  Tr. July 11, 2008 at 4-6, 18-19, 22-23.

42. On June 30, 2008, the U.S. Attorney's Office sent an e-mail to Jack Goldberger, criminal defense counsel for Epstein, reflecting continuing efforts to keep the NPA secret: ▆▆▆▆▆▆

[black redaction bar]

[black redaction bar] U.S. Attorney's Correspondence at 321.

43. On July 3, 2008, as requested, Mr. Edwards sent to the U.S. Attorney's Office a letter. In the letter, Mr. Edwards indicated his client's desire that federal charges be filed against defendant Epstein. In particular, he wrote on behalf of his clients: "We urge the Attorney General and our United States Attorney to consider the fundamental import of the vigorous enforcement of our Federal laws. We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual predator." *See* Exhibit "J."

44. When Mr. Edwards wrote his July 3, 2008 letter, he was still unaware that a non-prosecution agreement had been reached with Epstein – a fact that continued to be concealed from him (and the victims) by the U.S. Attorney's Office. Mr. Edwards first saw a reference to the NPA on or after July 9, 2008, when the Government filed its responsive pleading to Jane Doe's emergency petition. That pleading was the first public mention of the non-prosecution agreement and the first disclosure to Mr. Edwards (and thus to Jane Doe #1 and Jane Doe #2) of the possible existence of a non-prosecution agreement. Tr. July 11, 2008 at 4-6, 18-19, 22-23, 28-29.

45. Mr. Edwards detrimentally relied on the misleading representations made by the U.S. Attorney's Office that the case was still under investigation when he was writing this letter. He would not have wasted his time undertaking a pointless exercise had he known that the U.S.

20

Attorney's Office had previously negotiated a non-prosecution agreement. *See* Exhibits "E" & "J."

46.  On July 7, 2008, Jane Doe #1 filed a petition for enforcement of her rights under the CVRA. At the time, Jane Doe #1 was not aware of the non-prosecution agreement, so she sought a court order directing the Justice Department to confer with her before reaching any such agreement. Epstein quickly became aware of this petition. Doc. #1 at 1-2.

47.  On July 9, 2008, the U.S. Attorney's Office sent a victim notification to Jane Doe #1 via her attorney, Bradley Edwards. That notification contains a written explanation of some of the terms of the agreement between Epstein and the U.S. Attorney's Office. A full copy of the terms was not provided. A notification was not provided to Jane Doe #2 because the agreement limited Epstein's liability to victims whom the United States was prepared to name in an indictment. As a result, Jane Doe #2 never received a notification letter about the agreement. The notification did not mention the non-prosecution agreement with the U.S. Attorney's Office. Exhibits "E" & "K."

48.  The notification that the U.S. Attorney's Office sent to Jane Doe #1 and other victims contained false and inaccurate information about the terms of the non-prosecution agreement. The false information was specifically approved by Epstein's attorneys. Supplemental Declaration of A. Marie Villafana, Dec. 22, 2008, doc. #35 at 2-3.

49.  On July 11, 2008, the Court held a hearing on Jane Doe #1 and Jane Doe #2's Emergency Petition for Enforcement of Rights. During the hearing, the Government conceded that Jane Doe #1 and Jane Doe #2 were "victims" within the meaning of the Crime Victim's

21

Rights Act. Epstein was aware of these and subsequent proceedings involving the CVRA. Tr. July 11, 2008, at 14-15.

50. During the July 11, 2008 hearing, the Government conceded that its agreement had been concluded months before the victims were notified about it. *See id.* at 12 (". . . the agreement was consummated by the parties in December of 2007.").

51. At all times material to this statement of facts, it would have been practical and feasible for the federal government to inform Jane Doe #1 and Jane Doe #2 of the details of the proposed non-prosecution agreement with Epstein, including in particular the fact that the agreement barred any federal criminal prosecution. *See* U.S. Attorney's Correspondence at 191-92.

52. One of the senior prosecutors in the U.S. Attorney's Office joined Epstein's payroll shortly after important decisions were made limiting Epstein's criminal liability – and improperly represented people close to Epstein. During the federal investigation of Epstein, Bruce Reinhart was a senior Assistant U.S. Attorney in the U.S. Attorney's Office for the Southern District of Florida. Within months after the non-prosecution agreement was signed, Reinhart left the Office and immediately went into private practice as a "white collar" criminal defense attorney. His office coincidentally happened to be not only in the same building (and on the same floor) as Epstein's lead criminal defense counsel, Jack Goldberger, but it was actually located right next door to the Florida Science Foundation – an Epstein-owned and -run company where Epstein spent his "work release." *See* http://www.brucereinhartlaw.com.

53. While working in this Office adjacent to Epstein's, Reinhart undertook the representation of numerous Epstein employees and pilots during the civil cases filed against

22

Epstein by the victims – cases that involved the exact same crimes and same evidence being reviewed by the U.S. Attorney's office when he was employed there. Specifically, he represented Sarah Kellen (Epstein's number one co-conspirator who was actually named as such in the NPA), his housekeeper (Louella Ruboyo), his pilots Larry Morrison, Larry Visoski, David Rogers, William Hammond and Robert Roxburgh. (Hammond and Roxburgh were not deposed, but the others were.) *See* depositions of these individuals in various Epstein civil cases. On information and belief, Reinhart's representation of these individuals was paid, directly or indirectly, by Epstein. Such representations are in contravention of Justice Department regulations and Florida bar rules. Such representations also give, at least, the improper appearance that Reinhart may have attempted to curry with Epstein and then reap his reward through favorable employment.

## LEGAL MEMORANDUM

The victims have previously briefed the issues of why they are entitled to entry of an order by this Court finding that the U.S. Attorney's Office violated their rights under the CVRA. *See* doc. #1; doc #9 at 3-11; doc. #19 at 3-9, 14. The victims specifically incorporate those pleadings by reference here. In short, as explained in the victims' earlier pleadings, the Office violated the victims' right to confer before reaching the non-prosecution agreement and also failed to use its best efforts to comply with the CVRA. The victims now provide additional briefing on two issues: (1) the CVRA applies to Jane Doe #1 and Jane Doe #2 even though no indictment was filed in their case; and (2) the Court should find that the government has clearly violated the CVRA in this case and set up a briefing schedule and hearing on the appropriate remedy.

23

I.   **THE CVRA PROTECTS JANE DOE #1 AND JANE DOE #2 EVEN THOUGH THIS CASE WAS RESOLVED BY A NON-PROSECUTION AGREEMENT RATHER THAN INDICTMENT.**

In this litigation, the Government is apparently taking the position that the Crime Victims' Rights Act does not extend rights to Jane Doe #1 and Jane Doe #2 because no indictment was ever filed in federal court and thus no federal court proceedings were ever held. This crabbed litigation position about the breadth of the CVRA cannot be sustained. Indeed, neither the FBI nor the U.S. Attorney's Office itself took this position during the Epstein investigation – until the victims in this case filed their petition requesting enforcement of their rights. Instead, both the FBI and the U.S. Attorney's Office recognized that because the U.S. Attorney's Office was negotiating a non-prosecution agreement that affected the rights of specifically identified victims, the CVRA was applicable. The Court should reject the Government's newly-contrived position.

A.   **The Plain Language of the CVRA Makes Clear that Victims Have Rights Before an Indictment is Filed.**

The CVRA promises crime victims that they will have various rights, including "[t]he reasonable right to confer with the attorney for the Government *in the case*," 18 U.S.C. § 3771(a)(5) (emphasis added), and "the right to be treated with fairness," 18 U.S.C. § 3771(a)(8).. In earlier pleadings filed in this action, the Government has tried to narrowly construe the CVRA so that it applies only to a "court proceeding." *See* Gov't Response to Victim's Emergency Petition (doc. #13) at 1-2.

The Government's position contravenes the plain language of the CVRA. The CVRA guarantees to Jane Doe #1 and Jane Doe #2 the right to confer with prosecutors "in the case,"

not in a "court proceeding." And the CVRA broadly extends a right to them "to be treated with fairness" – a right that is not circumscribed to just court proceedings. Indeed, the fact that (as the Government notes) the drafters of the CVRA used the term "court proceeding" elsewhere in the statute (i.e., 18 U.S.C. § 3771(a)(2) (victim's right to notice "of any public court proceeding")) makes it obvious that they intended to give victims a right to confer that extended beyond simple court proceedings – that is, the right to confer about "the case" – as well as a broad right to be treated fairly throughout the process.

Moreover, it is patently obvious that a criminal "case" against Epstein had been going on for months before the victims learned about the non-prosecution agreement. As recounted in the statement of facts above, both the FBI and the U.S. Attorney's Office for the Southern District of Florida had opened a "case" involving Epstein's sexual abuse of the victims well before they entered into plea negotiations with Epstein. Indeed, as early as June 7, 2007 – more than three months before they concluded the NPA with Epstein – the U.S. Attorney's Office sent a notice to Jane Doe #1 stating "your *case* is under investigation." *See* Exhibit "C" (emphasis added). The notice went on to tell Jane Doe #1 that "as a victim and/or witness of a federal offense, you have a number of rights." *Id.* at 1. Among the rights that the U.S. Attorney's Office itself told Jane Doe that she possessed was "[t]he right to confer with the attorney for the United States in the case." Of course, she would not have had those rights if she was not covered by the CVRA. Interestingly, the letter also advised Jane Doe #1 that "if you believe that the rights set forth above [e.g., the right to confer and other CVRA rights] are being violated, you have the right to petition the Court for relief." *Id.* at 1.

The plain language of the CVRA makes clear that crime victims have right even before the filing of any indictment. The CVRA's instructs that crime victims who seeks to assert rights in pre-indictment situations should proceed in the court where the crime was committed: "The rights described in subsection (a) [of the CVRA] shall be asserted in the district in which a defendant is being prosecuted for the crime or, *if no prosecution is underway*, in the district court in the district in which the crime occurred." 18 U.S.C. § 3771(d)(3) (emphasis added). The victims have relied on this language through their pleadings, but the Government has not offered any response.

The CVRA also directs that "[o]fficers and employees of the Department of Justice and other departments and agencies of the United States engaged in the *detection, investigation*, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in [the CVRA]." 18 U.S.C. § 3771(c)(1) (emphasis added). Of course, there would be no reason to direct that agencies involved in the "detection" and "investigation" of crime have CVRA obligations if the Government's construction of the Act were correct. Plainly, Congress envisioned the victims' rights law applying during the "detection" and "investigation" phases of criminal cases.

For all these reasons, the Court need look no further than the language of the CVRA to conclude that the victims in this case had protected rights under the Act.

**B.      Other Courts Have Recognized That Crime Victims Have Rights Before An Indictment is Filed.**

In its briefing to date, the Government has yet to cite a single case that has accepted its sweeping position that the CVRA only extends rights to victims after the formal filing of an

indictment. This is because the case law all cuts the opposite way and recognizes that the CVRA does protect victims during the investigation of federal criminal cases.

In a case remarkably similar to this one, the Fifth Circuit has held that victims have a right to confer with federal prosecutors even before any charges are filed. In *In re Dean*, 527 F.3d 391, 394 (5ᵗʰ Cir. 2008), a wealthy corporate defendant reached a generous plea deal with the Government – a deal that the Government concluded and filed for approval with the district court without conferring with the victims. When challenged on a mandamus petition by the victims, the Fifth Circuit held:

> The district court acknowledged that "[t]here are clearly rights under the CVRA that apply before any prosecution is underway." *BP Prods.*, 2008 WL 501321 at *11, 2008 U.S. Dist. LEXIS 12893, at *36. Logically, this includes the CVRA's establishment of victims' "reasonable right to confer with the attorney for the Government." 18 U.S.C. § 3771(a)(5). At least in the posture of this case (and we do not speculate on the applicability to other situations), the government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain.

*Id.*

As we understand the Government's attempt to distinguish *Dean*, it asks this Court to decline to follow the Fifth Circuit's holding and create a split of authority on this important issue. See Gov't Response to Emergency Petn. at 2-3. Instead, the Government would have this Court deviate from the Fifth Circuit's well-reasoned opinion because the Circuit's "discussion of the scope of the right to confer was unnecessary because the court ultimately declined to issue mandamus relief." Gov't Response at 2 (citing *Dean*, 527 F.3d at 395). This is simply untrue. The Fifth Circuit faced a petition for mandamus relief from the victims in that case, asking the

Court to reject a proposed "binding" plea agreement negotiated under Fed. R. Crim. P.
11(c)(1)(C) (i.e., a plea agreement obligating the judge to impose a specific sentence).   The
victims asked for that relief because of the Government's failure to confer with them before the
charges and accompanying plea agreement were filed.   The Fifth Circuit held that the victims'
rights had been violated in the passages quoted above.   It then went on to remand the matter to
district court for further consideration of the effect of the violations of the victims' rights:

> We are confident, however, that the conscientious district court will fully consider
> the victims' objections and concerns in deciding whether the plea agreement
> should be accepted.
>
> The decision whether to grant mandamus is largely prudential. We conclude that
> the better course is to deny relief, confident that the district court will take heed
> that the victims have not been accorded their full rights under the CVRA and will
> carefully consider their objections and briefs as this matter proceeds.

*In re Dean*, 527 F.3d at 396.   Obviously, the Fifth Circuit could not have instructed the District
Court to "take heed" of the violations of victims' rights unless it has specifically held, as a matter
of law, that the victims' rights had been violated.

The Government's next effort to deflect the force of the Fifth Circuit's decision is that the
Circuit did not directly quote three words found in the CVRA's right to confer – the words "in
the case."   *See* Gov't Response to Emergency Petn. at 2.   But the Fifth Circuit had received
briefs totaling close to 100 pages in that case and was obviously well aware of the statute at
hand.   Indeed, in the very paragraph the Government claims is troublesome, the Fifth Circuit
cited to the district court opinion under review, which had quoted all the words in the statute.
*See United States v. BP Products*, 2008 WL 501321 at *7 (noting victims right to confer "in the
case"), *cited in In re Dean*, 527 F.3d at 394.

The Government finally notes that the Fifth Circuit stated that its ruling about the Government violating the right to confer applied "in the posture of this case." *In re Dean*, 527 F.3d at 394. But the posture of the case involving Epstein here – at least in its relevant aspects -- is virtually identical to the posture there. The Fifth Circuit held that the Government had an obligation to confer with the victims *before charges were filed and before a final plea arrangement was reached*. Without giving the victims a chance to confer before hand, the plea agreement might be fatally flawed because it did not consider the concerns of the victims. Thus, the Fifth Circuit emphasized the need to confer with victims before any disposition was finally decided: "The victims do have reason to believe that their impact on the eventual sentence is substantially less where, as here, their input is received after the parties have reached a tentative deal. As we have explained, that is why we conclude that these victims should have been heard at an earlier stage." *Id.* at 395. The posture in this case is exactly the same – the Government should have conferred before the parties "reached a tentative deal." The fact that the deal reached here is slightly different than the deal reached in the *Dean* case (a non-prosecution agreement versus a plea agreement) is truly a distinction without a difference. If anything, the facts here cry out for conferral even more than in that case. At least the defendant there agreed to plead guilty to a federal felony. Here, the wealthy defendant has escaped all federal punishment – a plea deal that Jane Doe #1 and Jane Doe #2 would have strenuously objected to . . . if the Government had given them the chance.

The Fifth Circuit's decision in *Dean* has been cited favorably in two recent District Court decisions, which provides further support for Petitioner's position here. In *United States v. Rubin*, 2008 WL 2358591 (E.D.N.Y. 2008), the victims argued for extremely broad rights under

29

the CVRA. After citing *Dean*, the District Court agreed that the rights were expansive and could apply before indictment, but subject to the outer limit that the Government be at least "contemplating" charges:

> Quite understandably, movants perceive their victimization as having begun long before the government got around to filing the superseding indictment. They also believe their rights under the CVRA ripened at the moment of actual victimization, or at least at the point when they first contacted the government. Movants rely on a decision from the Southern District of Texas for the notion that CVRA rights apply prior to any prosecution. In *United States v. BP Products North America, Inc.*, the district court reasoned that because § 3771(d)(3) provided for the assertion of CVRA rights "in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred," the CVRA clearly provided for "rights . . . that apply before any prosecution is underway." (United States v. BP Products North America, Inc., Criminal No. H-07-434, 2008 WL 501321 at *11 (S.D.Tex. Feb.21, 2008) (emphasis in original), mandamus denied in part, *In re Dean*, No. 08-20125, 2008 WL 1960245 (5th Cir. May 7, 2008). But, assuming that it was within the contemplation and intendment of the CVRA to guarantee certain victim's rights prior to formal commencement of a criminal proceeding, the universe of such rights clearly has its logical limits. For example, the realm of cases in which the CVRA might apply despite no prosecution being "underway," cannot be read to include the victims of uncharged crimes that the government has not even contemplated. It is impossible to expect the government, much less a court, to notify crime victims of their rights if the government has not verified to at least an elementary degree that a crime has actually taken place, given that a corresponding investigation is at a nascent or theoretical stage.

*Id.* at *6. Here, of course, the criminal investigation went far beyond the "nascent or theoretical stage" – to a point where the Government determined that crimes had been committed and that the defendant should plead guilty to either a state or federal offense.

Similarly, at least one other district court has reviewed the issue and agreed with the victims' position that crime victims can have rights before charges are filed. In rejecting an argument that the CVRA should be limited to cases in which a defendant has been convicted, *United States v. Okun*, explained: "Furthermore, the Fifth Circuit has noted that victims acquire

30

rights under the CVRA even before prosecution. *See In re Dean,* 527 F.3d 391, 394 (5th Cir.2008). This view is supported by the statutory language, which gives the victims rights before the accepting of plea agreements and, therefore, before adjudication of guilt. *See* 18 U.S.C. § 3771(a)(4)." 2009 WL 790042 at \*2 (E.D.Va. 2009).

Accordingly, rather than create a split of authority, this Court should follow the Fifth Circuit's holding in *Dean* (and the view of the U.S. District Courts for the Eastern District of New York and the Eastern District of Virginia) and conclude that the CVRA extends rights to Jane Doe #1 and Jane Doe #2 under the facts of this case.

**C.    The U.S. Attorney's Office Has Previously Recognized that Jane Doe #1 and Jane Doe #2 Have Rights Under the CVRA.**

A final reason for concluding that Jane Doe #1 and Jane Doe #2 are protected by the CVRA is that the U.S. Attorney's Office itself reached that conclusion – well before the victims filed this petition.  The U.S. Attorney's Office arranged to have the FBI send a notice to, for example, Jane Doe #1 informing her that she had rights under the CVRA.  Later, in discussions with defendant Epstein, the Office explained to Epstein their obligations to the victims under the CVRA.  Indeed, it was only *after* Jane Doe #1 and Jane Doe #2 filed a petition with this Court seeking protection of their rights that the U.S. Attorney's Office reversed its position.  The Court should reject this remarkable about-face.

As recounted in more detail above, the U.S. Attorney's Office made clear to both the victims and to Epstein that the victims had rights under the CVRA.  For example, on about June 7, 2007, FBI agents hand-delivered to Jane Doe #1 a standard CVRA victim notification letter, promising that the Justice Department would makes its "best efforts" to protect Jane Doe #1's

31

rights, including "[t]he reasonable right to confer with the attorney for the United States in the case" and "to be reasonably heard at any public proceeding in the district court involving . . . plea . . . ." Exhibit "C." Similarly, on about November 27, 2007, then First Assistant U.S. Attorney Jeff Sloman sent an e-mail to Jay Lefkowitz, defense counsel for Epstein stating: ▮

▮

▮ U.S. Attorney's Correspondence at 255 (emphasis rearranged). Apparently, this assertion produced some sort of objection from defendant Epstein. The U.S. Attorney's Office, however, rejected those objections  In a letter on about December 6, 2007, Jeffrey H. Sloman, First Assistant U.S. Attorney again sent a letter to Jay Lefkowitz, reiterating the U.S. Attorney's Office's legal obligations to keep victims informed of the status of ▮ The letter stated:

▮

U.S. Attorney's Correspondence at 191-92 (emphasis added). What this correspondence shows is that the U.S. Attorney's Office quite clearly took the position with defendant Epstein that the CVRA extended rights to Epstein's victims. Yet when the victims in this case filed a petition in this Court asking those rights to be respected, the Government simply reversed course. The U.S. Attorney's Office had it right the first time – the CVRA does extend rights to Jane Doe #1 and Jane Doe #2 in this case.

**D. The U.S. Attorney's Office Is Estopped From Arguing that the CVRA Does Not Apply in this Case.**

For all the reasons just explained, it is clear that the CVRA applies to this case and the Jane Doe #1 and Jane Doe #2 had rights under the Act. In addition, however, the Government is simply stopped from arguing otherwise. *The Government told the victims that they had rights under the CVRA and would keep them informed about the progress of the case.* Exhibits "C," "D," "F," & "G." Having made those representations to the victims – and having induced reliance by the victims – the Government is stopped from taking a different position now.

As explained by the Eleventh Circuit, to make out a claim of estoppel against the Government, a party must adduce evidence of the following:

> (1) words, conduct, or acquiescence that induces reliance;
> (2) willfulness or negligence with regard to the acts, conduct, or acquiescence;
> (3) detrimental reliance; and
> (4) affirmative misconduct by the Government.

*United States v. McCorkle*, 321 F.3d 1292 (11th Cir. 2003). Each of these four factors is easily met here.

33

First, the Government made statements to the victims that induced reliance. The victims received an official notice on Justice Department letterhead that they were crime victims in the Epstein case and that the Justice Department would use its "best efforts" to protect their rights.

Second, these statements were obviously not accidental – to the contrary, the Government specifically and deliberately sent these notices to the victims.

Third, the victims detrimentally relied on these statements. As explained at greater length in the victims proposed facts, the victims were lead to believe that their case was "under investigation." As a result, they did not take steps to object to Epstein's plea agreement and, indeed, did not even attend the court hearing where Epstein pled guilty. Similarly, their attorney (Mr. Edwards) was induced to spend an afternoon writing a letter to the U.S Attorney's Office about why Epstein should be federally prosecuted – time that was taken away from other matters at his busy law practice. This was a complete wild goose chase, as the U.S. Attorney's Office was concealing from Mr. Edwards at the time that a federal non-prosecution agreement had already been reached with Epstein.

Fourth, the U.S. Attorney's Office engaged in affirmative misconduct. We do not make this allegation lightly. But the facts recounted above demonstrate the following chain of events. The U.S. Attorney's Office first reached a non-prosecution agreement with Epstein, in which it agreed not to prosecute him for numerous crimes (including, for example, sex offenses committed by Epstein against Jane Doe #1). As part of that agreement, the U.S. Attorney's Office agreed to a "confidentiality" provision that forbade publicly disclosing the existence of the agreement. As a result, the U.S. Attorney's Office (and FBI agents acting under its

34

direction[4]) kept the existence of the non-prosecution agreement secret from the victims and the public. The reasonable inference from the evidence is that the U.S. Attorney's Office wanted to keep the agreement a secret to avoid intense criticism that would have surely ensued had the victims and the public learned that a billionaire sex offender with political connections had arranged to avoid federal prosecution for numerous felony sex offenses against minor girls.

As part of this pattern of deception, the U.S. Attorney's Office discussed victim notification with the defendant sex offender and, after he raised objections, stopped making notifications. Then later in January 2008, the U.S. Attorney's Office arranged for letters to be sent to the victims – including Jane Doe #1 and Jane Doe #2 – that falsely stated that to each that your "case is currently under investigation." This was untrue, as the U.S. Attorney's Office had already resolved the federal case by signing a non-prosecution agreement with Epstein. Indeed, the pattern of deception continued even after Jane Doe #1 and Jane Doe #2 were represented by legal counsel. In May 2008, the Office sent a similar letter stating "your case is currently investigation" to another victim (represented by attorney Bradley J. Edwards). As late as the middle of June 2008 – more than eight months after the non-prosecution agreement had been signed -- the Assistant U.S. Attorney handling the case told Edwards to send information that he wanted the Office to consider in determining whether to file federal charges. The Office concealed from him that it had already made the determination not to file federal charges and that the Office had in fact signed a non-prosecution agreement long ago. The Office also concealed from him the fact that guilty pleas in state court were imminent. The Office disclosed

---

[4] It is unknown whether the U.S. Attorney's Office even made the FBI aware of the NPA in a timely fashion.

the non-prosecution agreement only after Epstein had entered his guilty pleas in state court – in
other words, only after the time for the victims to be able to object to the non-prosecution
agreement during the plea process had come and gone. Even at that time, the Office did not
disclose the provisions in the agreement. In short, the victims never learned about the non-
prosecution agreement barring federal prosecution of their cases because of a deliberate
decisions by the U.S. Attorney's Office, not mere "negligence or inaction." *McCorkle*, 321 F.3d
at 1297. Accordingly, the Government is stopped from arguing that the Crime Victims' Rights
Act does not apply to this case.

## II. THE COURT SHOULD FIND THAT THE VICTIMS' RIGHTS HAVE BEEN VIOLATED AND THEN SET UP A BRIEFING SCHEDULE AND HEARING ON THE APPROPRIATE REMEDY.

This U.S. Attorney's Office's behavior in this case does not satisfy the Office's
obligations under the CVRA to use its "best efforts" to insure that victims receive protection of
their rights. 18 U.S.C. § 3771(c)(1). In particular, the undeniable chain of events makes clear
that the victims were not afforded their right "to confer with the attorney for the Government in
the case." 18 U.S.C. § 3771(a)(5). Whatever else may be said about the deception, it also
starkly violates the victims' right "to be treated with fairness and with respect for the victim's
dignity . . . ." 18 U.S.C. § 3771(a)(8). The pattern also denied the victims of timely notice of
court proceedings, 18 U.S.C. § 3771(a)(3), including in particular the state court guilty plea.

As we understand the position of the Government, it does not truly contest that – if the
CVRA applied – it managed to discharge its various obligations under the Act. Instead, the
Government relies solely on a technical argument to reach the conclusion that it discharged its
obligations – namely, the argument that the CVRA does not apply until a formal indictment is

36

filed. As just explained, however, that technical argument must be rejected as inconsistent with the CVRA's plain language and interpretation by other courts. Accordingly, this Court should find that the Government has violated its CVRA obligations.

Once the Court finds such a violation, the next issue becomes what remedy should apply. Since the earliest days of our nation, it has been settled law that "where there is a legal right, there is also a legal remedy . . . .." *Marbury v. Madison*, 5 U.S. 137, 163 (1803) (internal quotation omitted). Moreover, "[i]f the right is created by a federal statute, the federal courts have the power to fashion an appropriate remedy." *Intracoastal Transp., Inc. v. Decatur County, Georgia* 482 F.2d 361, 371 (5th Cir. 1973). As we understand the Government's position in this case, however, they believe that this Court is powerless to do anything to correct the palpable violation of victims' rights documented in this case.

Jane Doe #1 and Jane Doe #2 respectfully request that the Court set up a briefing schedule and a hearing on this important issue. The victims believe that they can establish that the appropriate remedy for the clear violations of their rights is to invalidate the Non-Prosecution Agreement. While the victims request an opportunity to provide more extensive briefing on this subject, they provide a few citations in support of their position here.

When other plea arrangements have been negotiated in violation of federal law, they have been stricken by the courts. For example, *United States v. Walker*, 98 F.3d 944 (7th Cir. 1996), held that where a sentence on a new crime could not run concurrently with a probation revocation the defendant was then serving – contrary to the assumption of the parties to the plea agreement – the defendant was not entitled to specific performance of the plea agreement. The Court explained that the case was one "in which the bargain is vitiated by illegality . . . ." *Id.* at

947.  Here, of course, exactly the same is true: the non-prosecution agreement is vitiated by illegality – namely, the fact that it was negotiated in violation of the victims' rights.  Other cases reach similar conclusions.  *See, e.g., United States v. Cooper*, 70 F.3d 563, 567 (10th Cir. 1995) (prosecutor agreed to recommend probation, but it later appeared that would be an illegal sentence in this case, and thus only adequate remedy is to allow defendant to withdraw plea); *Craig v. People*, 986 P.2d 951, 959-60 (Colo. 1999) (because "neither the prosecutor nor the trial court have authority to modify or waive the mandatory parole period," such "is not a permissible subject of plea negotiations," and thus, even if "the trial court erroneously approves of such an illegal bargain" such plea is "invalid" and thus will not be specifically enforced).  Nor can the defendant claim some right to specific performance of an illegal non-prosecution agreement.  *See State v. Garcia*, 582 N.W.2d 879, 881-82 (Minn. 1998) (plea agreement for 81 months sentence, but court added 10-year conditional release term because, under facts of case, sentence without such release term "plainly illegal," and thus remedy of specific performance not available); *State v. Wall*, 348 N.C. 671, 502 S.E.2d 585, 588 (1998) (plea agreement was for sentence to be concurrent with one not yet completed, but state statute mandates consecutive sentence on facts of this case; "defendant is not entitled to specific performance in this case because such action would violate the laws of this state"); *Ex parte Rich*, 194 S.W.3d 508, 515 (Tex. Crim. App. 2006); (where "the plea bargain seemed fair on its face when executed, it has become unenforceable due to circumstances beyond the control of [the parties], namely the fact that one of the enhancement paragraphs was mischaracterized in the indictment, resulting in an illegal sentence far outside the statutory range," proper remedy is plea withdrawal, as "there is no way of knowing whether the State would have offered a plea bargain within the proper range of

punishment that he deemed acceptable"); *State v. Mazzone*, 212 W.Va. 368, 572 S.E.2d 891, 897 (2002) (where plea agreement was that defendant would plead guilty to 2 felony counts of felon in possession of firearm and prosecutor would dismiss remaining 6 counts re other offenses with prejudice, and all parties erroneously believed these 2 crimes were felonies, lower court "correctly resolved this unfortunate predicament by holding that a plea agreement which cannot be fulfilled based upon legal impossibility must be vacated in its entirety, and the parties must be placed, as nearly as possible, in the positions they occupied prior to the entry of the plea agreement").

The Non-Prosecution Agreement that the Government entered into in this case was simply illegal. The Government did not protect the congressionally-mandated rights of victims before it entered into this Agreement. Perhaps it is for this reason that the Agreement is so shockingly lenient – blocking prosecution for dozens and dozens of federal felony sex offenses against several dozen minor girls. But regardless of the leniency, the only issue for the Court is whether the Agreement was lawful. It was not, and so the Court invalidate it.[5] The victims respectfully ask for a full briefing schedule and a hearing on this important issue.

---

[5] Defendant Jeffrey Epstein was notified about this case long ago, and was notified on August 26, 2010, that the victims would be filing correspondence in support of their motions. He has not chosen to intervene in this action, and so he should not be heard to complain about remedy the Court might impose.

In any event, there are no double jeopardy barriers to invalidating the plea. As explained in a leading criminal procedure treatise:

> The review of defendant's sentence is also provided in federal cases upon application of a victim. The Crime Victim's Rights Act allows a victim to seek to reopen a sentence through a writ of mandamus, if the victim has asserted and been denied the right to be heard at sentencing. Like the prosecution's statutory right to appeal, the victim's statutory remedy should pose no double jeopardy

## CERTIFICATE OF CONFERENCE

As recounted above, counsel for Jane Doe #1 and Jane Doe #2 have approached the U.S. Attorney's Office for more than two and a half years in an effort to reach stipulated facts. The U.S. Attorney's Office ultimately terminated those efforts on March 15, 2011, taking the position that the facts of the case are irrelevant and that, on any set of facts, it did not violate the CVRA.

## CONCLUSION

For all the foregoing reasons, the Court should find the U.S. Attorney's Office violated Jane Doe #1 and Jane Doe #2's rights under the Crime Victims Rights Act and then schedule an appropriate hearing on the remedy for these violations. The scope of the remedy that is appropriate may depend in part of the scope of the violations that the Court finds. For this reason, it makes sense for the Court to bifurcate the process and determine, first, the extent of the violations and then, second, the remedy appropriate for those violations. If the Court would prefer to see more immediate briefing on remedy issues, the victims stand prepared to provide that briefing at the Court's direction.

---

difficulties if as the [*DiFrancesco*] Court explained . . . the defendant is 'charged with knowledge of the statute and its . . . provisions, and has no expectation of finality in his sentence until the [review by writ] is concluded . . . .'"

LAFAVE ET AL., CRIMINAL Procedure § 26.7(b) (Nov. 2010) (*quoting United States v. DiFrancesco*, 449 U.S. 117, 146 (1980)).

DATED: March 21, 2011

Respectfully Submitted,

s/ Bradley J. Edwards
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
Florida Bar No.: 542075
E-mail: brad@pathtojustice.com

*and*

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
   University of Utah
332 S. 1400 E.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Facsimile: 801-585-6833
E-Mail: cassellp@law.utah.edu

Attorneys for Jane Doe #1 and Jane Doe #2

## CERTIFICATE OF SERVICE

The foregoing document was served on March 21, 2011, on the following using the Court's

CM/ECF system:


A. Marie Villafaña
Assistant U.S. Attorney
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
(561) 820-8711
Fax: (561) 820-8777
E-mail: ann.marie.c.villafana@usdoj.gov
Attorney for the Government

Joseph L. Ackerman, Jr.
Joseph Ackerman, Jr.
Fowler White Burnett PA
777 S. Flagler Drive, West Tower, Suite 901
West Palm Beach, FL 33401
Criminal Defense Counsel for Jeffrey Epstein
(courtesy copy of pleading via U.S. mail)