GOVERNMENT

EXHIBIT

G

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

777 South Figueroa Street
Los Angeles, California 90017

Kenneth W. Starr
To Call Writer Directly:
(213) 680-8440
kstarr@kirkland.com

(213) 680-8400

www.kirkland.com

Facsimile:
(213) 680-8500

April 28, 2008

**BY ELECTRONIC MAIL
AND FEDERAL EXPRESS**

Honorable Sigal P. Mandelker
Deputy Assistant Attorney General
United States Department of Justice
1400 New York Avenue, 6th Floor
Washington, DC 20530

Dear Ms. Mandelker:

Since our last submission to you earlier this month (a copy of which is attached for your convenience), two more civil lawsuits have been filed against Jeffrey Epstein. Plaintiffs' counsel in the two civil lawsuits is, once again, the former law partner of First Assistant USA Jeffrey Sloman. As we indicated in our earlier submission, Mr. Sloman's former law firm — a very small firm in Miami — was chosen out of the myriad attorneys in South Florida by virtually all of the alleged victims who have filed lawsuits, two of whom now reside in Virginia. Thus far all of the women who have retained Mr. Herman in connection with this matter are on the government's list of alleged "victims," a list the USAO in Miami assured us would remain confidential. Putting aside the appearance of impropriety, I write to you now to raise our growing concern with respect to the evolving pattern of improper federal involvement.

The new information, contained in the latest complaints, again confirms that this matter is not appropriately within the heartland of federal law. You may recall that in commenting on the earlier civil lawsuits, Mr. Herman was quoted in the Palm Beach *Post* last month as saying that "it doesn't matter" that his clients lied about their ages and told Mr. Epstein that they were 18 or 19. The civil suits also state that the plaintiffs did not discuss engaging in sexually-related activities with anyone prior to arriving at Mr. Epstein's residence. This reinforces our submission that no telephonic or Internet persuasion, inducement, enticement or coercion of any kind occurred. None.

That is only the beginning. Not only are the alleged victims seeking tens of millions of dollars through the avenue of civil litigation unleashed by Mr. Sloman's former law firm, but we also have recently received additional confirmation that FBI Special Agent Kurkendayl attempted to convince witnesses that they were in fact "victims" even though the women themselves strongly disagreed with this characterization. This conduct, once again, goes to the heart of the integrity of the investigation.

Chicago        Hong Kong        London        Munich        New York        San Francisco        Washington, D.C.

MIA_CEOS_00006

## KIRKLAND & ELLIS LLP

Honorable Sigal P. Mandelker
April 28, 2008
Page 2

    In an age of victimization, this effort to proselytize young women and bring them into the maw of the federal criminal justice system raises questions that go to the very core of the honorable use of federal power. In a sworn statement by Ms. ███████, one of the witnesses, Ms. ███ was quite condemnatory of the overreaching by federal law enforcement officers in this case. She further testified—in no uncertain terms—that she does not, and never did, feel like a "victim," despite the fact that the FBI repeatedly tried to convince her otherwise. Ms. ███ rejection of this mischaracterization is strongly corroborated by the record:

> ***First.*** No young woman ever complained. Ever. In fact, the genesis of the state investigation into this matter was not a result of any first-hand account. This silence, even after the highly irregular release of the raw police reports, speaks volumes.
>
> ***Second.*** A highly unusual victim notification letter (discussed in greater detail below) improperly overstated Mr. Epstein's prospective criminal status and cited law incorrectly (as subsequently admitted by the USA). This unorthodox letter also inappropriately invited the alleged "victims" of yet to be proven "federal" crimes to make statements at state proceeding(s), even though their names and the basis for their inclusion on the so-called "victims" list, to this day, remain unknown to the State Attorney himself. This is just another example of the federal prosecutors' attempt to 'father' the witnesses and brand them as "victims" without any communication or coordination with state and local authorities.
>
> ***Third.*** The new civil lawsuits contain blatant inconsistencies that indicate the women involved did not believe themselves to be victims. The latest civil complaints, which, like the other complaints, also seek significant monetary damages, are riddled with inconsistencies and untrue allegations, many of which both contradict prior sworn testimony of the alleged victims -- and even contradict specific allegations made in those other complaints, filed by the same lawyer. For example, even though one of the new lawsuits alleges that the plaintiff's encounters with Mr. Epstein caused her "emotional injuries," this same woman admitted in her sworn statement to the state authorities that she brought her friends, including another one of the other civil plaintiffs, to Mr. Epstein's home after she herself had already been there. This woman's actions do not reflect the actions of a surprised and traumatized victim.

**KIRKLAND & ELLIS LLP**

Honorable Sigal P. Mandelker
April 28, 2008
Page 3

  Also, we are concerned that you may be unaware of an important policy-laden issue and thus feel obligated to bring it to your attention. We briefly mentioned above the victim notification letter and now elaborate on that point. FAUSA Sloman and AUSA Villafana threatened to send a highly improper and unusual "victim notification letter" to all of the women on their list of alleged "victims." This letter was only halted by an eleventh hour appeal to AAG Fisher.

  The letter expressly encouraged civil litigation against Mr. Epstein (a copy is available at your request), and as we have previously informed you, AUSA Villafana even tried to facilitate the retention of her own boyfriend's friend to represent the alleged "victims" at Mr. Epstein's expense. Indeed, although in the end this letter was not transmitted to any witnesses in this case, AUSA Villafana has admitted that shortly after Mr. Epstein signed the deferred prosecution agreement (which Ms. Villafana represented would remain confidential), *she notified three women on her list of so called "victims" of the general terms of the deferred prosecution agreement, including the terms relating to civil compensation.*

  At every turn, as our own investigation continues, we see overreaching and questionable conduct by federal officials. At bottom, for reasons we have discussed with you, this is a state matter. Transmogrifying this into a federal criminal matter can only be done, as we have demonstrated, by stretching federal law and stretching the facts. Now, in the illuminating reality of unprecedented actions by federal prosecutors in Miami, we see a pattern of victimhood marketing. We see federal officials trumpeting the values of civil litigation, demanding (such as that by AUSA Villafana) that Mr. Epstein make, at a "minimum," a payment of $150,000 to each of the 34 women that the government has labeled as "victims," even though the federal prosecutors have freely acknowledged in writing that they cannot vouch for the veracity of the allegations of any of the alleged "victims."

  It is with genuine concern for the bedrock integrity of our federal system that we state most emphatically: This is a state matter that was fully investigated and appropriately handled by the State of Florida, but one that has been seized upon, improperly, by federal enforcement officers and by a US Attorney's office that has chosen to leak confidential (and perhaps grand jury) information to the New York Times and then deny having done so.

**KIRKLAND & ELLIS LLP**

Honorable Sigal P. Mandelker
April 28, 2008
Page 4

      This cries out for remediation. The Department of Justice has enormous power, which should be employed with honor and integrity — and reserved for matters that are properly within the federal sphere in what Justice Hugo Black called, simply, Our Federalism. The State of Florida should no longer be stymied in its enforcement of its own law.

      Respectfully submitted,

Kenneth W. Starr

Attachment

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Kenneth W. Starr
To Call Writer Directly:
(213) 680-8440
kstarr@kirkland.com

777 South Figueroa Street
Los Angeles, California 90017

(213) 680-8400

www.kirkland.com

Facsimile:
(213) 680-8500

April 8, 2008

**BY ELECTRONIC MAIL
AND FEDERAL EXPRESS**

Honorable Sigal P. Mandelker
Deputy Assistant Attorney General
United States Department of Justice
1400 New York Avenue, 6th Floor
Washington, DC 20530

Dear Ms. Mandelker:

As you continue, on behalf of the Assistant Attorney General, to assess the submission provided to you late last month, I am obliged to bring more formally to the Department's attention several profoundly important matters that go to the heart of the fairness of this investigation. From the outset, we have maintained that the subject matter of the federal investigation into Jeffrey Epstein, based on the principles of federalism, is quintessentially appropriate for state resolution. Conversely, this matter is wholly inappropriate for federal attention, much less federal prosecution. The State has responded aggressively to the facts at hand—in the form of a state felony disposition. The public interest is thus being fully vindicated by the experienced judgment of the duly elected state prosecutor, a state-empanelled grand jury and a state judge in Palm Beach County.

Unfortunately, we have witnessed prosecutors in the United States Attorney's Office in the Southern District of Florida (the "USAO") attempting to stretch the law and the facts to override the state action in this case. We have new evidence that goes directly to the core of whether there has been adherence to the fundamental principles of both fairness and even-handedness. We ask you, respectfully, to consider these unassailable new facts, as they are inextricably linked to the manner in which the prosecutors have *presented* the facts to you in this case.

As counsel for Mr. Epstein, we have previously brought to the attention of the USAO a clear violation of Departmental policy concerning disclosures that were made to the New York Times. In response, Mr. Sloman stated in writing that "Mr. Thomas was given, pursuant to his request, non-case specific information concerning specific federal statutes." February 27, 2008 Email from J. Sloman. However, we now know, and can prove, that Mr. Sloman's characterization of the nature of these disclosures is materially false.

The USAO has (at a minimum) violated the United States Attorney's Manual through providing case-specific, deeply factual, and highly injurious revelations to the New York Times.

Chicago          Hong Kong          London          Munich          New York          San Francisco          Washington, D.C.

MIA_CEOS_00010

## KIRKLAND & ELLIS LLP

Honorable Sigal P. Mandelker
April 8, 2008
Page 2

Shortly before the recent wave of civil lawsuits filed by Jeffrey Herman (the former partner of First Assistant United States Attorney in Miami, Jeffrey Sloman), which ask for relief in the amount of $50 million each, Landon Thomas, a New York Times reporter, called the USAO and asked to speak about the Epstein investigation. Mr. Thomas was directed to David Weinstein, an Assistant United States Attorney who reports to FAUSA Sloman. Mr. Weinstein then had significant communications with Mr. Thomas, in which he revealed a great deal of confidential information.

These communications, which were not "off the record," constitute a clear breach of Departmental policy. Members of Mr. Epstein's defense team, including Jay Lefkowitz, have now had the opportunity to hear first-hand and review the contemporaneous notes of the conversations between the USAO and Mr. Thomas. We were shocked and deeply disappointed to learn that the reporter gained substantive and extensive knowledge about both the case and highly confidential aspects of the plea negotiations. For example, AUSA Weinstein told Mr. Thomas that Mr. Epstein had requested armed guards as one part of his plea proposal. According to Mr. Thomas, Mr. Weinstein also urged him "not to believe the spin of [Mr. Epstein's] high-priced attorneys" and that "[Mr. Epstein] does not have a defense, as sexual contact occurred." There is no need to belabor the obvious: this highly prejudicial conduct raises serious issues with respect to the impartiality and objectivity of those prosecutors who have been insisting upon the federalization of a quintessentially state matter.

Also, as you are aware, the terms of the Deferred Prosecution Agreement contain a highly irregular and unprecedented condition with reference to a civil remedy demanded as a condition to the deferral. Specifically, the Agreement requires Mr. Epstein to waive jurisdiction and liability under 18 U.S.C. § 2255 for the settlement of monetary claims that might be made by unidentified alleged victims who would be identified by the USAO at some point, but only after Mr. Epstein was sentenced. We have received an opinion from Joe D. Whitley, a former United States Attorney and Associate Attorney General (with oversight responsibilities over United States Attorneys around the country) regarding this provision. Based on his very considerable experience, the former Associate Attorney General concluded that the procedures and terms dictated by the USAO are both "without precedent" and wholly unorthodox. He further noted that the prosecutors' insistence on including § 2255 is "extremely problematic." This opinion, which I would urge you to consider in its totality, is available upon your request. Neither I, nor any of the other defense lawyers involved with this matter, have ever heard of such a procedure. Furthermore, as a part of this Agreement, Mr. Epstein is precluded from contesting liability as to civil lawsuits seeking monetary compensation for damages brought by any of the identified individuals who elect to settle their civil claims for the statutory minimum of $150,000 or some other agreed-upon higher amount. To add to the strange nature of the § 2255 provision—and the aggressive manner in which federal prosecutors interpret this provision—Mr. Epstein would also be required to pay for an attorney to represent the women if they choose to litigate against him.

## KIRKLAND & ELLIS LLP

Honorable Sigal P. Mandelker
April 8, 2008
Page 3

Respectfully, federal criminal investigators and prosecutors should not be in the business of helping alleged victims of state crimes secure civil financial settlements as a condition precedent to entering non-prosecution or deferred prosecution agreements. This is especially true where the defendant is pleading to state crimes for which there exists a state statute allowing victims to recover damages. *See* Florida Statutes § 796.09. Despite the existence of a state statute that confers on victims a civil remedy, which truly eliminates the need for a waiver of liability under a federal statute, federal prosecutors inexplicably rejected the idea of employing the state restitution statute. Furthermore, 18 U.S.C. § 2255 is a civil statute implanted in the criminal code that (in contrast to all other criminal restitution statutes) fails to correlate payments to specific injuries or losses and instead presumes that victims under the statute have sustained damages of at least a minimum lump sum without regard to whether the complainants suffered actual medical, psychological or other forms of individualized harm. We understand that it is for this reason that 18 U.S.C. § 2255 has never before been employed in this manner in connection with a non-prosecution or deferred prosecution agreement. Furthermore, the requirement that a *criminal* defendant waive his rights as to *civil* settlement on which USAO insisted is also not a traditional aspect of criminal resolutions.

In addition to the irregular § 2255 provisions, a thematic emphasis on money remedies and private attorney compensation has characterized from the outset the federal prosecutors' demands. Indeed, it is apparent that Mr. Sloman and one of his subordinates, Ms. Ann Marie Villafana, have also been unusually active in encouraging civil litigation against Mr. Epstein. We have mapped out a chronological timeline of the questionable conduct in relation to this specific concern and would be happy to make it available upon your request. However for illustrative purposes, I cite only one example below.

The sudden recent involvement of Mr. Sloman's former law firm—a boutique firm with very few partners—chosen by several of the alleged victims out of all the hundreds of attorneys available in South Florida raises serious issues of at least an appearance that disinterestedness is lacking. It appears that around the same time that Mr. Epstein's defense team was addressing the Deferred Prosecution Agreement with FAUSA Sloman and AUSA Villafana, Mr. Sloman's former law partner—Jeffrey Herman—was recruiting potential plaintiffs for civil litigation against Mr. Epstein.* Furthermore, when Mr. Sloman first learned that counsel for Mr. Epstein had begun to interview some of the alleged victims, Mr. Sloman demanded that Mr. Epstein's counsel desist from contacting the potential plaintiffs. November 5, 2007 Letter from J. Sloman ("there will be no further efforts to contact any victims"). Unfortunately, the representation of

---

\* As recently as one month ago, Mr. Sloman's name was still prominently listed as a part of his former law firm on the public Florida Bar website. Florida State Bar Website.

MIA_CEOS_00012

## KIRKLAND & ELLIS LLP

Honorable Sigal P. Mandelker
April 8, 2008
Page 4

several of these women by Mr. Herman's law firm, at a minimum, calls into serious question the motivation for objecting to such communications. Although prosecutors previously had assured Mr. Epstein's counsel that the terms of the Deferred Prosecution Agreement would "be kept confidential," (September 24, 2007 Email from M. Villafana), the same prosecutors have recently admitted to disclosing the Agreement's general terms to "three victims" only shortly after the Agreement was signed. December 13, 2007 Letter from M. Villafana.

I am constrained to conclude that the actions of Ms. Villafana and Mr. Sloman call into question the "appearance of impropriety" that federal law and Department policy are intended to prevent. *See* 5 C.F.R. § 2635.702 ("An employee shall not use his public office ... for the private gain of friends, relatives, or persons with whom the employee is affiliated in a nongovernmental capacity . . . To ensure that the performance of his official duties does not give rise to an appearance of use of public office for private gain or of giving preferential treatment, an employee whose duties would affect the financial interests of a friend, relative or person with whom he is affiliated in a nongovernmental capacity shall comply with [5 C.F.R.] § 2635.502.").

I respectfully submit that the conduct of the USAO in Miami should be carefully reviewed. The decisions of that Office have been tainted by unprofessional means, directed against Jeffrey Epstein, seemingly with the objective of casting him in highly unfavorable light with the leading newspaper in the United States.

We stand ready to support, with documentation, the issues raised in this letter, either in a full submission or in a meeting, if you believe either would be helpful.

Respectfully submitted,

Kenneth W. Starr