GOVERNMENT

EXHIBIT

L

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Jay P. Lefkowitz, P.C.
To Call Writer Directly
(212) 446-4970
lefkowitz@kirkland.com

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

December 11, 2007

## VIA FACSIMILE (305) 530-6444

Honorable R. Alexander Acosta
United States Attorney
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, FL 33132

*Re: Jeffrey Epstein*

Dear Alex:

I appreciate the opportunity you have provided to review some of the issues and concerns of Mr. Epstein's defense team. Importantly, I appreciate your agreement that this submission would neither be understood by you as constituting a breach of the Non-Prosecution Agreement ("Agreement") nor result in any unwinding of the Agreement by your Office. Implicit in this agreement is the understanding that I can share with you our concerns and request a review on the basis for these concerns, while at the same time assure my client that this submission will not in any respect result in formal or informal repercussions or attempts by any member of the prosecution or investigative team to involve themselves to Mr. Epstein's detriment in any matter related to the Agreement, particularly in the state prosecution. This letter is intended to support our assertion to you that the manner in which both the investigation of allegations against Mr. Epstein and the resolution thereof were highly irregular and warrant a full review. We appreciate your willingness to consider the evidence. We respectfully request that you review Judge Stern's letter to Alan Dershowitz, faxed to you on December 7, 2007, in connection with the concerns we set forth in this submission.

## I.   FEDERAL INVESTIGATORS RELIED UPON TAINTED EVIDENCE.

We have serious concerns that the summaries of the evidence that have been presented to you have been materially inaccurate. As you may know, the principal witnesses in this case were first interviewed by Detective Recarey of the Palm Beach Police Department (the "PBPD") and other state law enforcement officers. These interviews (the "witness statements") were often tape-recorded thus providing a verbatim and detailed record of the recollections of the witnesses at a point in time prior to any federal involvement. Unfortunately, the police report authored by Detective Recarey and certain affidavits executed by him contained both material misstatements

Chicago       Hong Kong       London       Los Angeles       Munich       San Francisco       Washington, D.C.

RFP MIA 000444

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 2

regarding the specifics of what he was told by his witnesses and also contained omissions of critical and often exculpatory information that was recorded verbatim during the taped interview sessions. The federal investigation involved interviews with many of the same witnesses. We are aware that at least one federal interview (████████) was recorded.

We understand that Detective Recarey provided his police report and certain affidavits to the federal authorities but did not provide the actual witness statements of the taped interviews to your Office or to the FBI. These witness statements constitute the best evidence available (they are verbatim and earlier in time to the federal interviews), and they contain statements that are highly exculpatory to Mr. Epstein. Because understanding the compromised nature of the "evidence" against Mr. Epstein is key to a proper view of this case, we summarize it in detail below.

### A.   The Witness Statements Establish That Mr. Epstein Did Not Target Masseuses Under 18.

Indeed, the witness statements demonstrate that the opposite is true. First, the evidence shows that the many of the masseuses were eighteen or over, including ████████, ████████ ████████ ████████ and ████████ at the time they visited Mr. Epstein's home. Also, there is substantial evidence, found in the sworn statements of the women themselves, which indicate that, to the extent others were in fact under the age of eighteen, many affirmatively lied about her age. As ████████ herself told the PBPD: "████████ told me to say I was 18 because ████ said . . . if you're not then he [Epstein] won't really let you in his house. So I said I was 18". Detective Recarey, however, largely ignored these critical admissions in his Police Report and Probable Cause Affidavit.

- ████████

   Q: At any time, did he speak to you and does he know how old you are? Did he know how old you were?

   A: . . . As a matter of fact, ████████ told me to say I was 18 because ████ said tell him you're 18 because if you're not, then he won't really let you in his house. So I said I was 18. As I was giving him a massage, he's like, how old are you? And then I was like 18. But I kind of said it really fast because I didn't want to make it sound like I was lying or anything. (Sworn Statement of 3/15/05).

- ████████

   Q: Did he ask you your age?

   A: Yeah, I told him I was 18. (Sworn Statement of 10/05/05).

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 3

- ▪ ███████████████

Q: Did he know your age?

A: I don't think -- I think he did. █████████████ was like oh, well if they ask you how old are you just say you're 18 but he never asked me how old I was. I thought you had to be 18 to give a massage (inaudible). (Sworn Statement of 12/13/05)

- ▪ ███████████████

A: We were supposed to say we were 18.

Q: Who told you that, to say that?

A: █████ (Sworn Statement of 11/8/05).

- ▪ ███████████

A: I told him I was 18. (Sworn Statement of 10/3/05).

- ▪ ████████ concerning █████████████████

Well with █████████████ don't know how old she is because she lied about her age. She lied to me when I first met her. When I was 18 she told me she was 18. (Inaudible.) Well she left her purse at my house and she told me to make sure that I didn't look in her purse. When I went through her purse I found her state license that said she was 16 so she lied to me about her age. (Sworn Statement of 10/03/05).[1]

- ▪ ███████████████

Q: Now, how old were you when you first started going there?

A: Eighteen. I'm 19 now this last March." (Sworn Statement of 10/12/05).

- ▪ ███████████████

Q: And all this occurred when you were 18 though?

---

[1] In addition to giving a sworn statement at the PBPD Station, █████ conversations with Detective Recarey while being transported to and from the station were also recorded. This excerpt is taken from the recording of █████ raveling from the station.

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 4

> A: Uh-huh. I had been 18 for like 8 months, nine months already. My birthday is in June so I had been 18 for a while. (Sworn Statement of 2/3/05).

- ▇▇▇▇▇▇▇

> Q: Okay. How old are you now? You're –

> A: I'm 20

> Q: You're 20. So a couple months ago you would have been what, 19?

> A: Uh-huh.

> Q: Alright. So July, August you would have been 19, 20. On the verge of 20?

> A: Uh-huh. (Sworn Statement of 11/4/05)

We believe that other witnesses have similarly told the FBI that Mr. Epstein attempted to monitor the ages of the masseuses who came to his home. We further believe that these transcripts would show that the federal interest in prosecuting Mr. Epstein for paradigmatic state offenses was far less compelling than the inaccurate police reports suggest.

### B. Detective Recarey Made Crucial Misstatements in the Police Report and Probable Cause Affidavits.

We have reviewed the sworn and recorded witness statements of many of the individuals who were interviewed (conducted in person or by telephone) as well as a number of the controlled calls cited in the Police Report. Time after time, we found statements in the Police Report attributed to statements made in the sworn recordings that either simply were not said, or in some instances, are flatly contradicted, by the witness who purportedly made the statement. In fact, they often stand in stark contrast to representations made by Detective Recarey in both the official Police Report and in affidavits signed by him under oath. We highlight the most significant ones identified to date:

- ▇▇▇▇▇▇▇▇▇▇ *Did Not* Report that Epstein Told Her to Lie About her Age

The Probable Cause Affidavit indicates that during her sworn statement "▇▇▇ advised that during her frequent visits Epstein asked for her real age. ▇▇▇ stated she was sixteen [and that] Epstein advised her not to tell anyone her real age." Arrest Probable Cause Affidavit at 11. That statement appears nowhere in ▇▇▇ sworn statement.

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 5

- ██████████ *Did Not* State that Epstein Photographed Her Having Sex

  Detective Recarey also reports ███ as claiming that "Epstein would photograph Marcinkova and her naked and having sex and proudly display the photographs within the home." *Id.* at 12. Again, this statement is not in ███ sworn statement. To the contrary, the transcript reflects that ███ stated: "I was just like, it was me standing in front of a big white marble bathtub . . . in the guest bathroom in his master suite. And it wasn't like I was you know spreading my legs or anything for the camera, I was like, I was standing up. I think I was standing up and I just like, it was me kind of looking over my shoulder kinda smiling, and that was that." Sworn Statement of 10/11/05 at 35. [2]

- ██████████ Said Epstein *Did Not* Touch Her Inappropriately

  Detective Recarey recounts that █████████ advised that "Epstein grabbed her buttocks and pulled her close to him." Probable Cause Affidavit at 6. *See also*, Police Report (10/07/05) at 30 (same). ███ never made this statement. In fact, when Detective Recarey asked, "He did not touch you inappropriately?" ███ responded, "No." Sworn Statement of 10/04/05 at 11.

- ██████████ *Was Not* Sixteen When She First When to Epstein's Home.

  Detective Recarey states: "███ also stated she was sixteen years old when she first went to Epstein's house". Incident Report at 52. However, ████████ affirmatively states that she was seventeen when she first went to Epstein's home: "Q: Okay. How old were you when you first went there? A: Seventeen. Q: Seventeen. A: And I was 17 the last time I went there too. I turned 18 this past June". Sworn Statement of 11/14/05.

- ██████████ Told Detective Recarey that Epstein *Did Not* Take out Sex Toys.

  The Probable Cause Affidavit indicates that █████████ stated, "Epstein would use a massager/vibrator, which she described as white in color and a large head. Epstein would rub the vibrator/massager on her vaginal area as he would masturbate." Probable Cause Affidavit at 14; *see also* Police Report (11/10/05) at 49 ("Epstein would use a massager/vibrator, which she described as white in color with a large head, on her."). This statement appears nowhere in the transcript of ███ sworn

---

[2] ███ was interviewed by Detective Recarey twice, once by telephone, and once in person. The portions of the Police Report to which we refer specifically cite the in-person interview of ███ as the source for the information reported. We have reviewed the recording of that interview and base the comparison on that review. We have never heard a recording of the telephone interview.

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 6

> statement. In fact, when Detective Recarey asked whether Mr. Epstein had "ever
> take[n] out any toys," [      ] responded, "No." Sworn Statement of 11/08/05 at 17.

- **[            ] Did *Not* Recall Mr. Epstein Masturbating**

> Detective Recarey recounts that [            ] "advised she was sure [Mr. Epstein]
> was masturbating based on his hand movements going up and down on his penis
> area." Probable Cause Affidavit at 8. *See also* Police Report (10/07/05) at 35 (same).
> Detective Recarey's account is in direct contradiction to [            ] true
> statement, specifically:

> Q: Okay did he ever take off – did he ever touch himself?

> A: I don't think so.

> Q: No. Did he ever masturbate himself in front of you?

> A: I don't remember him doing that. He might have but I really don't
> remember. (Sworn Statement of 10/05/05 at 7).

- **Juan Alessi Stated that *Only One* Girl Looked Young**

> Police Report at 57: "Alessi stated that towards the end of his employment, the
> masseuses were younger and younger". However, he said no such thing:

> Q: Did they seem young to you?

> A. No, sir. Mostly no. We saw one or two young ones in the last year. Before that,
> it was all adults . . . I remember one girl was young. We never asked how old she
> was. It was not in my job . . . But I imagine she was 16, 17". (Sworn Statement of
> 11/21/05)

### C.    Detective Recarey Made Material Omissions in the Police Report.

In addition to the misstatements in the Police Report and Probable Cause Affidavit as to
the evidentiary record, there were also material omissions, both of facts known to the PBPD and
also of facts not known to the PBPD, though known by the State Attorney. In the latter instance,
the lack of knowledge was the result of the PBPD's refusal to receive the exculpatory evidence.
In fact, they refused to attend a meeting called by the State Attorney specifically to provide the
relevant evidence. Thus, the Police Report and Probable Cause Affidavit only offer a skewed
view of the facts material to this matter. Examples follow.

1.    *The Video Surveillance Equipment Located in Mr. Epstein's Office and Garage.*
      Both the Police Report (at 43) and the Probable Cause Affidavit (at 18) make

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 7

particular mention of the "discovery" of video surveillance equipment (or "covert cameras" as they are called) in Epstein's garage and library/office. Inclusion of this information insinuates a link between the equipment and the events at issue: in the Probable Cause Affidavit Detective Recarey states, "on the first floor of the [Epstein] residence I [Detective Recarey] found two covert cameras hidden within clocks. One was located in the garage and the other located in the library area on a shelf behind Epstein's desk . . . The computer's hard drive was reviewed which showed several images of ▮▮▮▮▮ and other witnesses that have been interviewed. All of these images appeared to come from the camera positioned behind Epstein's desk". *See* Probable Cause Affidavit at 18.

Clearly omitted from both the Police Report and the Probable Cause Affidavit is the fact that the PBPD, and specifically Detective Recarey, knew about the cameras since they were installed in 2003, *with the help of the PBPD*, to address the theft of cash from Epstein's home. This fact is detailed in a Palm Beach Police Report prepared in October 2003 detailing the thefts, the installation of video equipment, the video recording capturing Juan Alessi (Mr. Epstein's then house manager) "red handed", and the incriminating statements made by Alessi when he was confronted at the time. *See* Alessi Police Report at 5, 8. The contemporaneous police report confirms the fact that the video footage was turned over to Detective Recarey himself.

2.     ***Polygraph Examination and Report***. On May 2, 2006, Mr. Epstein submitted to a polygraph examination by George Slattery, a highly respected polygraph examiner who is regularly used by the State Attorney. The examination was done at a time when we were told that the sole focus of the investigation was the conduct with ▮▮▮▮

Mr. Epstein was asked (a) whether he had "sexual contact with ▮▮▮▮▮▮▮ (b) whether he "in anyway threaten[ed] ▮▮▮▮▮▮ (c) whether he was told by ▮▮▮▮▮▮ "that she was 18 years old"; and (d) whether he "believed ▮▮▮▮ was 18 years old". As set forth in the Report of the examination, the term "sexual contact" was given an extremely broad meaning in order to capture any inappropriate conduct that could have occurred.[3] The results of the examination confirmed that (i) no such conduct occurred; (ii) Mr. Epstein never threatened ▮▮▮▮ ; (iii) ▮▮▮▮▮ told Mr. Epstein she was 18 years old; and (iv) Mr. Epstein believed ▮▮▮▮ was 18 years old.

---

[3]  The definition included: "sexual intercourse, oral sex acts (penis in mouth or mouth on vagina), finger penetration of the vagina, finger penetration of the anus, touching of the vagina for sexual gratification purposes, touching of the penis for sexual gratification purposes, masturbation by or to another, touching or rubbing of the breasts, or any other physical contact involving sexual thoughts and/or desires with another person".

RFP MIA 000450

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 8

3.  **Broken "Sex Toys" in Mr. Epstein's Trash.** The Police Report details the police finding in Mr. Epstein's trash what is described as broken pieces of a "sex toy" and that this "discovery" purportedly corroborated witness statements. Omitted from both the Police Report and the Probable Cause Affidavit is the fact that during the course of executing the search warrant in Epstein's home, the police discovered the other piece of that key "sex toy" and realized it was in fact only the broken handle of a salad server. Though "sex toys" play a prominent role in the Police Report and Probable Cause Affidavit, the Police Report was never amended to reflect the discovery of this new and highly relevant evidence.

4.  **Failure to Consider Exculpatory or Impeaching Evidence.** Other exculpatory and impeaching evidence known by the PBPD was omitted from the Police Report and Probable Cause Affidavit by, in our view, manipulating the date the investigation was allegedly closed. According to the Police Report (at 85), Detective Recarey "explained [to ASA Belohlavek] that the PBPD had concluded its case in December of 2005". That assertion, which is false, conveniently resulted in the omission of all information adduced subsequent to that date. Thus, though the Police Report in fact contains information obtained after December 2005, the PBPD purported to justify its refusal to consider, or even to include, in the Police Report, the Probable Cause Affidavit or what it released to the public, all the exculpatory and evidence impeaching the witnesses submitted on behalf of Mr. Epstein, most of which was provided after December 2005. That evidence is listed below.

5.  **Unreported Criminal Histories and Mental Health Problems of the Witnesses Relied on in the Police Report and Probable Cause Affidavit.** Evidence obtained concerning the witnesses relied upon to support the Probable Cause Affidavit casts significant doubt on whether these witnesses are sufficiently credible to support a finding of probable cause, let alone to sustain what would be the prosecution's burden of proof at a trial.[4] Though such evidence was submitted to the PBPD, none of it was included in the Police Report or the Probable Cause Affidavit.

   - **Juan Alessi:** While the Police Report (at 57) and the Probable Cause Affidavit (at 21) contain assertions by Alessi, which allegedly support bringing a criminal charge, the evidence revealing Alessi's evident mental instability; prior criminal conduct against Epstein; and bias towards Epstein is notably omitted. As detailed above, in 2003, Alessi was filmed taking money from Epstein's home. After being caught on videotape unlawfully entering Epstein's home and stealing cash from a briefcase,

---

[4] While we have never intended to and do not here seek to gratuitously cast aspersions on any of the witnesses, in previously asking the State and now asking you to evaluate the strength of this case, we have been constrained to point out the fact that the alleged victims chose to present themselves to the world through MySpace profiles with self-selected monikers such as "Pimp Juice" and "████████████" or with nude photos.

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 9

Alessi admitted to the PBPD that he entered the house unlawfully on numerous occasions, stealing cash and attempting to steal Epstein's licensed handgun to commit suicide. Although this information was known by Detective Recarey at the time the Police Report and Probable Cause Affidavit were prepared, and is clearly material to any determination of credibility, it was omitted.

- ▉▉▉▉▉▉ ▉▉▉▉▉▉ was the source of the vast majority of the serious allegations made against Epstein. While the Police Report and Probable Cause Affidavit rely on ▉▉▉ numerous assertions, there are two significant problems with that reliance. First there is no mention of certain critical admissions made by ▉▉▉ during her interview, as well as on her MySpace webpage (discovered by defense investigators and turned over to the State Attorney). Second, all but omitted from the Police Report is any reference to the facts known about her by the PBPD, specifically, that at the time ▉▉▉ was making these assertions *she had been arrested by the PBPD and was being prosecuted for possession of marijuana and drug paraphernalia.* We take each in turn.

    - ▉▉▉▉▉▉ *Admits Voluntary Sexual Conduct With Epstein, Refuses to Disclose the Disposition of the Monies She Earned, and Lies About Being "Given" a Car by Epstein*: Detective Recarey failed to include in the Police Report ▉▉▉ admission that on one occasion she engaged in sexual conduct with Epstein's girlfriend as her birthday "gift" to Epstein. Nor does Detective Recarey include the fact that ▉▉▉ flatly refused to discuss with him the disposition of the thousands of dollars she said she was given by Epstein, or that she falsely claimed that she did not use drugs, despite her MySpace entries in which she exclaims "I can't wait to buy some weed!!!!!!!". Detective Recarey was aware the car had been rented, not purchased, and only it was only leased on a monthly basis for two months. While ▉▉▉ fanciful claim that she was given a car appears in the Police Report, it is never corrected.

    - ▉▉▉▉▉▉ *Was Arrested for Possession of Marijuana and Drug Paraphernalia.* As noted, on September 11, 2005, ▉▉▉ was arrested for possession of marijuana and drug paraphernalia. In response to this arrest, ▉▉▉ "came forward" (as the Probable Cause Affidavit implies at 10-11), claiming she had knowledge of "sexual activity taking place" at Epstein's residence and misconduct by Epstein. (This "coming forward" appears no where in the Police Report.) Thus, it becomes clear that ▉▉▉ assertions of misconduct by Epstein were motivated by a desire to avoid the repercussions of her own criminal conduct, which should have been taken into account when assessing her credibility as a witness.

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 10

- ▇▇▇▇▇▇▇ ***Steals From a Victoria's Secret Store.*** An investigation by private investigators working for the defense revealed that in late 2005 ▇▇ was employed at a Victoria's Secret store in Florida. Three days after her marijuana case was terminated, Hall was caught by a store manager as ▇▇ attempted to leave the store with merchandise in her purse, the security tag still attached. Seeing the manager, ▇▇ claimed "someone is trying to set me up". Following an internal investigation, which disclosed additional thefts from both the store and a customer, she was fired. In a recorded interview, ▇▇ admitted to stealing and asserted that her reason for doing so was that "she was not getting paid enough". This information and supporting documentation was presented to the PBPD, but was never included in the Police Report or Probable Cause Affidavit.

- ▇▇▇▇▇▇ ***Lies on MySpace About Victoria's Secret Store Termination.*** Also uncovered by defense investigators is ▇▇ dissembling version of the Victoria's Secret debacle on her "MySpace" webpage. There, ▇▇ announced that she ". . . forgot to let everyone know I quit my job at V.S. They said they suspected me of 'causing losses to their company' which by the way is bullshit. I was 'by the book' on EVERYTHING!!! . . . I got so fed up in that office that I handed the Loss Prevention lady back my keys and walked out". This information and supporting documentation was provided by the defense to the PBPD, but was not included in the Police Report or Probable Cause Affidavit.

- ▇▇▇▇▇▇ ***Lies on her Victoria's Secret Job Application.*** Additional information on ▇▇ MySpace webpage casts further doubt on her credibility. For example, she boasts to having engaged in a fraudulent scheme to get hired by Victoria's Secret, explaining, "Oh, it was so funny I used [my boyfriend] as one of my references for my Victoria's Secret job and the lady called me back and told me that William Tucker gave me such an outstanding reference that she did not need to call anyone else back, . . . he got me the job! Just like that . . . I lied and said he was the old stock manager at Holister she bought it. . ." This information and supporting documentation was provided by the defense to the PBPD, but was not included in the Police Report or Probable Cause Affidavit.

- ▇▇▇▇▇▇ ***Boasts About Her Marijuana Use.*** Also on her MySpace webpage can be found ▇▇ admissions of purchasing and using marijuana and marijuana paraphernalia. Specifically, ▇▇ states she "can't wait to buy some weed!!! . . . I can't wait!!! . . . (Hold on:

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 11

let me say that again) I can't wait to buy some weed!!!. . . I also want
to get a vaporizer so I can smoke in my room because apparently there
are 'narcs' everywhere". ███ also posted a photograph of a marijuana
cigarette and labeled it "what heaven looks like to me".   This
information and supporting documentation was provided by the
defense to the PBPD, was not included in the Police Report or
Probable Cause Affidavit (although there is both a fleeting reference in
the Police Report to ███ use of marijuana with her boyfriend (at 67)
and in the Probable Cause Affidavit to ███ marijuana arrest (at 10-
11)).

▪  ███: While the Police Report and Probable Cause Affidavit contain
numerous assertions intended to negate ███ taped admission that she clearly
told Epstein she was 18, omitted from these documents is reference to ███
MySpace webpage, presented to the State Attorney's Office, where , in no connection
to this case, *she affirmatively represented to the world that she was 18*, thereby
corroborating her lie to Epstein. Also omitted is any reference to her long history of
run-ins with law enforcement. Among those are multiple runaway complaints by her
parents and her assignment to a special high school for drug abusers.

  • *███ MySpace Webpage States She Drinks, Uses Drugs, Gets
    into Trouble, Has Beaten Someone Up, Shoplifts, Has Lost her
    Virginity, Earns $250,000 and Higher, and Contains Naked and
    Provocative Photographs.*   The first image seen on ███
    MySpace webpage, the photo ███ chose to represent her, is that
    of a naked woman provocatively lying on the beach. The illuminating
    webpage also contains ███ assertions that of all her body parts,
    she "love[s] her ass", she drinks to excess, uses drugs, "gets into
    trouble", has beaten someone up, has shoplifted "lots", "already lost"
    her virginity, and earns "$250,000 and higher".   As with the other
    impeaching information, this material, vital to determining credibility,
    was provided by the defense to the PBPD but was never included in
    the Police Report or Probable Cause Affidavit.

  • *███ Prior Record – Drugs, Alcohol, Running Away From
    Home.*  ███ has a history of running away/turning up missing
    from her parents' various homes; of using drugs and alcohol; and of
    associating with individuals of questionable judgment. For example, a
    Palm Beach County Sheriff's Office Report details how only two days
    after she returned to Florida to live with her father, on March 31, 2006,
    police were called to the home in response to her father's report that
    she and her twin sister were missing. The Police Report describes her
    as "under the influence of a narcotic as [she] could barely stand up,

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 12

[her] eyes were bloodshot, and [her] pupils were diluted [sic]". It further documents that ▓▓▓▓ and her sister had stayed out all night and were returned home by a "drug dealer". This event coincided with ▓▓▓▓ having been found at an "inappropriate location" by Georgia police in response to a call about ▓▓▓▓ disappearance. Although this information, material to determining credibility, was provided by the defense and known to the PBPD, it was never included in the Police Report or Probable Cause Affidavit.

- ▓▓▓▓ While the Police Report and Probable Cause Affidavit rely on statements of ▓▓▓▓ father, ▓▓▓▓ his federal bank fraud conviction, which defense investigators discovered and turned over to the PBPD during the course of the investigation, was omitted. ▓▓▓▓ served 21 months in federal prison for his offense.

- ▓▓▓▓ While the Police Report and Probable Cause Affidavit rely on statements of ▓▓▓▓ ▓▓▓▓ stepmother, omitted is ▓▓▓▓ state conviction for identity fraud. This information, uncovered by defense investigators, was also turned over to the PBPD during the course of the investigation.

D. **In Light Of The Compromised Nature Of The Evidence, A Fulsome Review Should Be Conducted.**

These tainted and inaccurate reports compromised the federal investigation.[5] As you may know, the PBPD took the unprecedented and highly unethical step of releasing these reports to the media as well. These reports spread across the Internet, and were undoubtedly read by the other individuals who were later interviewed by the FBI for giving Mr. Epstein massages. As we have shown, these reports contain multiple fabrications, omissions, and outright misstatements of fact. Moreover, the evidence and the allegations were undeniably misrepresented to the FBI, with no inclusion of the evidence exposing the deficiencies of the "proof" and the exculpatory evidence upon which the State relied. Furthermore, it should be noted that many of these same individuals were also interviewed by the FBI after their state interviews but prior to Mr. Epstein's counsel providing the government with the transcripts of the recorded interviews. The

_____

[5] Although we have been informed that the FBI identified and then interviewed additional potential witnesses, many of their discoveries are believed to have emanated from message pads containing contact information that were seized from Mr Epstein's home pursuant to a state search warrant that was deeply and constitutionally flawed by Recarey's misstatements and omissions as well as other facial deficiencies.

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 13

transcripts and tapes, which we hope to share with you in person, will likely present a very different view of those interviews taken afterwards.

Therefore, in the interest of truth, we ask you to review the transcripts, compare them to the FBI reports upon which the indictment was predicated, and then determine whether the FBI summaries and the prosecution memorandum upon which the charging decisions were made overstate Mr. Epstein's federal culpability. Concomitant to these requests, we would ask that you determine whether the investigative team ever provided these trustworthy tapes and transcripts to those in your Office who were being asked to authorize the prosecution so that they could themselves assess the reliability of the FBI interview reports against a verbatim record of the same witness's prior statements. We believe that this request is fair and would not be unduly burdensome.

## II.     THE IMPROPER INVOLVEMENT AND CONDUCT OF FEDERAL AUTHORITIES.

As established above, the State's charging decision, of one count of the solicitation of prostitution, was hardly irrational or irregular. Indeed, Lana Belohlavek, a Florida sex prosecutor for 13 years, concluded that the women in question were prostitutes and that "there are no victims here." There was no evidence of violence, force, drugs, alcohol, coercion or an abuse of a position of authority. Each and every one of the alleged "victims" knew what to expect when they arrived at Mr. Epstein's house and each was paid for her services. In fact, Mr. Epstein's message book establishes that many of these women routinely scheduled massage sessions with Mr. Epstein themselves, without any prompting. Ms. Belohlavek also noted that many of these individuals worked either as exotic dancers or in one of the many massage parlors dotted across West Palm Beach. Ms. Belohlavek also specifically stated that [redacted] could not be trusted and was "only interested in money." She further found that it was inappropriate for Mr. Epstein to register as a sex offender because she did not believe that he constituted a threat to young girls and because registration had not been required in similar or even more serious cases. Ms. Belohlavak thought, and still believes, that the appropriate punishment is a term of probation.

Yet, the government has devoted an extraordinary amount of its time and resources to prosecute Mr. Epstein for conduct the State believes amounts to a "sex for money" case. While we are loathe to single-out for criticism the conduct of any particular professional, we cannot escape the conclusion that the cumulative effect of the conduct of Assistant United States Attorney Marie Villafana led your Office to take positions during the investigation and negotiation of this matter that has led to unprecedented federal overreaching. In fact, Judge Herbert Stern's states " . . .the federal authorities inappropriately involved themselves in the investigation by the state authorities and employed highly irregular and coercive tactics to override the judgment of state law enforcement authorities as to the appropriate disposition of their case against your client." *See* Judge Stern's letter faxed to you on December 7, 2007.

RFP MIA 000456

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 14

### A.      The Petite Policy Should Have Precluded Federal Involvement.

As you know, prior to negotiating the terms of the Agreement, we requested that the government consider the *Petite* Policy and the problems associated with conducting a dual and successive prosecution. We stressed to your Office, on a number of occasions, that we had reached a final negotiated resolution with the State and were only being forced to postpone the execution of that agreement for the sake of the federal investigation. We made submissions and met with your Office to present analyses of the fact that federal prosecution in this matter was in direct conflict with the requirements of the *Petite* Policy. It was our contention, and remains our contention, that federal prosecutors had never intervened in a matter such as this one. And because there was no deficiency in the state criminal process that would otherwise require federal intervention, the express terms of the *Petite* Policy precluded federal prosecution *regardless of the outcome of the state case*. Since the state investigation was thorough and in no way inadequate and the concerns implicated by the matter all involved local issues and areas of traditionally local concern, we urged your Office to contemplate whether a federal prosecution was appropriate.

However, on August 3, 2007, Matthew Menchel rejected a proposed state plea which included that Mr. Epstein serve two years of supervised custody followed by two years of incarceration in a state prison, with the option of eliminating incarceration upon successful completion of the term of supervised custody, among other terms. Mr. Menchel stated that "the federal interest will not be vindicated in the absence of a two year term in state prison." *See* August 3, 2007 letter. Such an articulation of the federal interest, we believe, misunderstands the *Petite* Policy on two grounds. First, the Office's position that the federal interest would not be vindicated in the absence of a jail term for Mr. Epstein, runs contrary to Section 9-2.031D of the United States Attorney's Manual, because this section requires the federal prosecutor to focus exclusively on the *quality or process* of the prior prosecution, not the sentencing outcome. Second, the state plea agreement offered was not "manifestly inadequate" under U.S.A.M. § 9-2.031D. Indeed, the only real difference between the state and federal plea proposals was whether Mr. Epstein served his sentence in jail or community quarantine.

We formerly believed that our *Petite* Policy concerns were being addressed or, at least, preserved, but we learned that only after reaching a final compromise with your Office as to the terms of the Agreement, and at the very last minute, that language regarding the *Petite* Policy was removed from the final version. The two following references to the *Petite* Policy had been included in the draft prosecution Agreements up until September 24, 2007, the day the Agreement was executed, at which point they were eliminated by your Office:

> IT APPEARING, after an investigation of the offenses and Epstein's background, that the interest of the United States pursuant to the Petite policy will be served by the following procedure . . .

> Epstein understands that the United States Attorney has no authority to require the State Attorney's Office to abide by any terms of this agreement. Epstein understands that it is his

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 15

> obligation to undertake discussion with the State Attorney's Office to ensure compliance with these procedures, which compliance will be necessary to satisfy the United States' interest, pursuant to the *Petite* policy.

We reiterate that this case was at heart a local matter that was being fully addressed by the state criminal justice system. The state process resulted in an appropriate resolution of this matter and would have vindicated any conceivable federal interest. Thus, there was no substantial federal interest that justified a federal prosecution. It has recently come to our attention that that the CEOS chief statements may be relevant to this matter. While we welcome the opportunity to consider these statements, our extensive research had found only one federal action that was remotely similar to the federal investigation for the prosecution of this matter, and that case has since been distinguished as well.

### B.    Ms. Villafana Prompted An Unduly Invasive Investigation Of Mr. Epstein.

Ms. Villafana's investigation of Mr. Epstein raises serious questions. Despite the fact that she was made aware of the inaccuracies in the PBPD's Probable Cause Affidavit, she chose to include the affidavit in a document filed with the court knowing that the public could access it. Then, Ms. Villafana issued letters requesting documents whose subject matter have no relation to the allegations against Mr. Epstein. Notably, after we objected to these overly broad and intrusive requests, Deputy Chief Andrew Lourie denied knowledge of Ms. Villafana's actions and Mr. Lourie commendably sought to significantly narrow the list of documents requested. In a subsequent court filing, Ms. Villafana referred to our agreement to remove these items from her demand list as evidence of Mr. Epstein's "non-cooperation".

This was only the beginning. Ms. Villafana also subpoenaed an agent of Roy Black (without following the guidelines provided in the United States Attorney's Manual that require prior notification to Washington necessary to seek a lawyer's records). We once more requested Mr. Lourie to intervene. Despite these efforts, Ms. Villafana followed up with a subpoena for Mr. Epstein's confidential medical records served directly on his chiropractor (with no notice to Mr. Epstein). Ms. Villafana also made the unusual request of asking the State Attorney's Office for some of the grand jury materials. She threatened to subpoena the State when she was informed that it was a violation of Florida law to release this information.

After compiling this "evidence", Ms. Villafana stated she would be initiating an investigation into purported violations of 18 U.S.C. §1591 (again without the required prior DOJ notification). Ms. Villafana then broadened the scope of the investigation without any foundation for doing so by adding charges of money laundering and violations of a money transmitting business to the investigation. Mr. Epstein's counsel explained that there could be no basis for these charges since Mr. Epstein did not commit any prerequisite act for a money laundering charge and has never even been engaged in a money transmitting business. Ms. Villafana responded that Mr. Epstein could be charged under these statutes because he funded

# KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 16

illegal activities. To suggest that Mr. Epstein could violate these statutes simply by spending his legally earned money on prostitutes is manifestly an erroneous interpretation of the law.

To our relief, after briefing Matthew Menchel at a meeting regarding the spurious application of these statutes, we were told to ignore the laundry list and that defense counsels' focus should be turned to 18 U.S.C. §2422(b). Once Mr. Epstein's counsel submitted and presented the reasons why a federal case would require stretching the relevant federal statutes beyond recognition, and that federal involvement in this matter should be precluded based on federalism concerns, the *Petite* Policy, and general principles of prosecutorial discretion, the parties commenced discussions of a possible plea agreement. Around this time, we received an e-mail from Ms. Villafana suggesting that she wanted to discuss the possibility of a concurrent federal and state resolution. We were immediately informed by your Office that Ms. Villafana did not have the authority to make any such plea proposals and would not be involved in any further negotiations of a plea. Despite this commitment, Ms. Villafana was the principle negotiator of the Agreement. At our meeting on September 7, she made reference to an allegation against Mr. Epstein involving a 12 year old individual. This allegation is without merit and without foundation. Though your last letter suggests there was "no contact" between individuals in your Office and the press, we were previously told by Mr. Lourie that the FBI was receiving "information" specifically from Connolly, a Vanity Fair reporter, and not vice versa.

## C.    Ms. Villafana Included Unfair Terms in the Agreement.

Ms. Villafana took positions in negotiating this matter that stray from both stated policy and established law. First, Ms. Villafana insisted that as part of the federal plea agreement, the State Attorney's Office, without being shown new evidence, should be convinced to charge Mr. Epstein with violations of law and recommend a sentence that are significantly harsher than what the State deemed appropriate. In fact, the State Attorney viewed this matter as a straightforward prostitution case and believed that a term of probation was - and is - the appropriate sentence. At Ms. Villafana's insistence, however, Mr. Epstein was forced to undertake the highly unusual and unprecedented action of directing his defense team to contract the State prosecutors themselves and ask for an upward departure in both his indictment and sentence. There was no effort by the state and federal prosecutors to coordinate the prosecutions, a practice which is against the tenets of the *Petite* Policy. In our view, it is unprecedented to micro-manage each and every term of Mr. Epstein's State plea, including the exact state charges to which Mr. Epstein plead guilty; the time-frame within which Mr. Epstein must enter that state plea and surrender to state officials; and the amount of time he must spend in county jail. This is particularly true where the State

### KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 17

Attorney's Office has a different view of the case and there has been no coordination with state authorities.[6]

In addition, Ms. Villafana required that Mr. Epstein's sentence include a registerable offense. As you know, requiring sexual offender registration will have a significant impact both immediately and forever after. This harsh term, which is said to be suggested by the FBI, was added despite the fact that the State believed that Mr. Epstein's conduct did not warrant any such registration. As you know, state officials have special expertise in deciding which offenders pose a threat to their community. Moreover, this demand places the state prosecutors' credibility at issue and diminishes the force of sexual registration when it is applied to offenders who state prosecutors do not believe are dangerous or require registration. Ms. Villafana's decision not to permit the State Attorney to determine a matter uniquely within its province was unwarranted.

What is more, when negotiating the settlement portion of the Agreement, Ms. Villafana insisted that a civil settlement provision be included in the Agreement, namely, the inclusion of 18 U.S.C. § 2255, a negotiating term which is unprecedented in nature.[7] While we were reluctant and cautious about a plea agreement in which a *criminal* defendant gives up certain rights to contest liability for a *civil* settlement, Ms. Villafana's ultimatums required that we acquiesce to these unprecedented terms. For instance, when plea discussion stalled as a result of Ms. Villafana's demands, Mr. Epstein's counsel received a letter from her stating as it "now appears you will not settle." At this point, Ms. Villafana expressed her intention to re-launch the government's previously set aside money laundering investigation. She also issued a rash of subpoenas and sent target letters to Mr. Epstein's employees, adding new federal charges including obstruction of justice. She then personally called Mr. Epstein's largest and most valued business client without any basis to inform him of the investigation.

In an attempt to prevent further persecution and intimidation tactics, we proposed that Mr. Epstein establish a restitution fund specifically for the settlement of the identified individuals' civil claims and that an impartial, independent representative be appointed to administer that fund. There was no dollar amount limit discussed for the fund, but the idea was still rejected. We then pointed out that the state charges to which Mr. Epstein was to plead guilty carried with it a state restitution provision that would allow "victims" to recover damages. Ms. Villafana, however, rejected this idea and suggested requiring a guardian ad litem, implying that

---

[6] When asked whether Department of Justice polices regarding coordination with state authorities had been followed, Ms. Villafana gave no response other than stating, "it is none of your concern."

[7] In fact, Stephanie Thacker, a former deputy to Drew Osterbahm, has stated that she knew of no other case like this being prosecuted by CEOS. With that in mind, we welcome the opportunity to review the extensive research that CEOS has done, as indicated by your Office.

RFP MIA 000460

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 18

the alleged "victims" in question were currently minors and needed special representation. We later learned that the government's list of individuals included a woman as old as twenty-four, which flies in the face of prior representations (it should be noted that any person who is currently twenty four years old or older could not have been a "victim" under 18 U.S.C. § 2255, even if the conduct occurred in 2001). At Ms. Villafana's insistence, the parties ultimately agreed to the appointment of an attorney representative, but Ms. Villafana then took the position that Mr. Epstein should pay for the representative's fees, which effectively meant that Mr. Epstein must pay to sue himself.[8]

Ms. Villafana also proposed wholly irrelevant charges such as making obscene phone calls and violations of child privacy laws. When Mr. Lourie learned of these proposed charges he asked Mr. Epstein's defense team to ignore them as they would "embarrass the Office."

### D.   Ms. Villafana Continually And Purposefully Misinterpreted The Critical Terms of the Agreement.

Since the execution of the Agreement, Ms. Villafana has repeatedly misconstrued the terms contained therein. As you know, several facets of this matter have been highly contested by the parties. We sometimes have obtained two competing views as to your willingness to compromise on specific issues that we have raised with your Office. In particular, there are times when we have received verbal agreement from you or your staff (and sometimes from Ms. Villafana herself) on a particular issue, only to subsequently receive a contradictory interpretation from Ms. Villafana that negates our prior common understanding. Her misinterpretations appear to be attempts to effectively change the spirit and the meaning of the Non-Prosecution Agreement. We offer several examples of significant misinterpretations.

First, despite the fact that we received several commitments from your Office that it would monitor Mr. Epstein's state sentencing but not interfere with it in any way, Ms. Villafana sought to do just that. Ms. Villafana's decision to utilize a civil remedy statute in the place of a restitution fund for the alleged victims eliminates the notification requirement under the Justice for All Act of 2004, a federal law that requires federal authorities to notify victims as to any available restitution, not of any potential civil remedies, to which they are entitled. Despite this fact, Ms. Villafana proposed a Victims Notification letter to be sent to the alleged federal victims. Ms. Villafana has gone even further, alleging that the "victims" may make written statements or testify against Mr. Epstein at the sentencing. We find no basis in law or the Agreement that provides the identified individuals with either a right to appear at Mr. Epstein's plea and sentence or to submit a written statement to be filed by the State Attorney. Here, Mr.

---

[8] This arrangement does not put these alleged "victims" in the same position as they would have been had Mr. Epstein been convicted at trial — in fact, they are much better off.

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 19

Epstein is pleading guilty to, and being sentenced for, state offenses, not the federal offenses under which the government has unilaterally recognized these identified individuals as "victims". The notion that individuals whose names are not even known to the charging prosecutor in a state action should somehow be allowed to speak at a proceeding is unjustifiable.

Furthermore, only after obtaining the executed Agreement did Ms. Villafana begin insisting that the selected representative's duties go beyond settlement and include litigating claims for individuals. In Ms. Villafana's Victims Notification letter, she states that Mr. Podhurst and Mr. Josefsberg, the selected attorney representatives, may "represent" the identified individuals. This language assumes that the selected representatives will agree to serve in the capacity envisioned by Ms. Villafana, which is patently incorrect. Yet, neglecting the spirit of the negotiations; neglecting the terms of the Agreement; and neglecting commonly-held principles of ethics with respect to conflicts, Ms. Villafana continues to improperly emphasize that the chosen attorney representative should be able to litigate the claims of individuals.

In a similar fashion, Ms. Villafana has overstated the scope of Mr. Epstein's waiver of liability pursuant to the Agreement. Ms. Villafana began asserting that Mr. Epstein has waived liability even when claims with the identified individuals are not settled just after the execution of the Agreement. Despite the fact that at that time, we obtained an agreement from you that Mr. Epstein's waiver would not stretch past settlement, Ms. Villafana continues to espouse this erroneous interpretation.

### E.     Ms. Villafana and The Settlement Process.

We are concerned that Ms. Villafana has repeatedly attempted to manipulate the process under which Mr. Epstein has agreed to settle civil claims. First, she inappropriately attempted to nominate Humbert "Bert" Ocariz for attorney representative, despite the fact that Mr. Ocariz has a longstanding relationship with Ms. Villafana. Mr. Ocariz turns out to be a very good personal friend and law school classmate of Ms. Villafana's boyfriend, a fact she assiduously kept hidden from counsel. We also learned from Ms. Villafana that she shared with Ocariz the summary of charges the government was considering against Mr. Epstein. Even after your Office conceded that it was inappropriate for its attorneys to select the attorney representative, Ms. Villafana continued to lobby for Mr. Ocariz's appointment. On October 19, 2007, retired Judge Edward B. Davis, who was appointed by the parties to select the attorney representative, informed Mr. Epstein's counsel that he received a telephone call from Mr. Ocariz directly requesting that Judge Davis appoint him as the attorney representative in this matter.

Furthermore, federal interference continues to plague the integrity of the implementation of the Agreement. We recently learned that despite the fact that there was no communication between state and federal authorities as to the investigation of Mr. Epstein, the FBI visited the State Attorney's Office two weeks ago to request that Mr. Epstein be disqualified to participate in work release even though the Agreement mandates that Mr. Epstein be treated as any other inmate.

RFP MIA 000462

## KIRKLAND & ELLIS LLP

R. Alexander Acosta
December 11, 2007
Page 20

### III.    CONCLUSION

In sum, we request that you review the evidence supporting the prosecution of Mr. Epstein. Such a review would serve to address similar concerns as those raised in *Brady v. Maryland*, which mandate the disclosure of evidence material to guilt or innocence even after the execution of an Agreement to enter a plea of guilty. *See* 373 U.S. 83 (1963). We believe that the "prosecution team" was informed by its witnesses (including persons other than ▮▮▮▮ and ▮▮▮▮ who are discussed at length above) that Mr. Epstein's practice was to seek women older than 18 rather than targeting those under 18. We would expect, for instance, that ▮▮▮▮▮▮ a key witness whose interview with the FBI was recorded, would have provided such exonerating information as well as many others. We would also expect the review to uncover clear evidence that demonstrates that Mr. Epstein did not travel to Florida for the purpose of having illegal underage sex nor that he induced underage women by using the Internet or the phones.

Furthermore, we ask you to consider whether there is reliable evidence not just that Mr. Epstein had sexual contact with witnesses who were in fact underage but whether the allegations are based on trustworthy (and corroborated) evidence that (i) Mr. Epstein knew that the female(s) in question was under 18 at the time of the sexual contact, (ii) Mr. Epstein traveled to his home in Palm Beach for the purpose of having such sexual contact to the extent the allegation charges a violation of 18 U.S.C. § 2423(b) and (c) Mr. Epstein induced such sexual contact by using an instrumentality of interstate commerce to the extent the allegations charge a violation of 18 U.S.C. § 2422(b) (there is no evidence of internet solicitation which is the norm upon which federal jurisdiction is usually modeled under this statute). We believe that the information we provide to you in this submission will be informative and spark a motivation to gain more information with respect to the investigation of this matter.

Again, we are not seeking to unwind the Agreement; we are only seeking for you to exercise your discretion in directing that an impartial and respected member of your Office test the evidence upon which the draft federal indictment was based against the "best evidence," including the transcripts of the tape recorded pre-federal involvement interviews.

Finally, I would like to reiterate our appreciation for the opportunity you have provided to review some of our issues and concerns. I look forward to speaking with you shortly.

Sincerely,

Jay P. Lefkowitz