GOVERNMENT

EXHIBIT

R

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE #1 AND JANE DOE #2,

    Petitioners,

vs.

UNITED STATES,

    Respondent.
_____/

## SECOND DECLARATION OF E. NESBITT KUYRKENDALL

I, E. Nesbitt Kuyrkendall, declare as follows:

1. I am a Special Agent in the Federal Bureau of Investigation (FBI) and have been so employed since 1997. I am currently assigned to the West Palm Beach office of the FBI Miami Field Division.

2. In 2006, I was assigned as the case agent on the investigation of Jeffrey Epstein, which was referred to as Operation Leap Year.

3. As part of that investigation, I attempted to interview Jane Doe #2 at her residence. Jane Doe #2 was walking to her vehicle, and she refused to speak with me.

4. I returned to my vehicle to get a grand jury subpoena for Jane Doe #2 and handed it to her. Jane Doe #2 threw the grand jury subpoena onto the ground. I then verbally instructed her that it was a court order and she was expected to appear at the grand jury at the location, date, and time that appeared on the subpoena. Jane Doe #2 got into the vehicle and drove away without speaking to me.

5. Jane Doe #2 later obtained counsel and appeared for a videotaped interview on April 24, 2007. During the videotaped interview, Jane Doe #2 expressed her opinion that Jeffrey Epstein should not be prosecuted. She said, "I hope Jeffrey, nothing happens to Jeffrey because he's an awesome man and it would really be a shame. It's a shame that he has to go through this because he's an awesome guy and he didn't do nothing wrong, nothing."

6. Other than these events, neither I nor any other FBI agent had any contact with Jane Doe #2 during the course of the investigation. Jane Doe #2 never contacted me or my co-case agents asking for information about the investigation or asking to confer with anyone from the government about the resolution of the matter.

7. On August 7, 2007, my co-case agent and I interviewed Jane Doe #1 as part of the investigation of Jeffrey Epstein. At no time during that interview did Jane Doe #1 ask to confer with anyone from the government about any potential criminal charging decisions or about any potential resolution of the matter. An FBI report was prepared. Between the time of the interview and the signing of the Non-Prosecution Agreement in September 2007, Jane Doe #1 never contacted me or my co-case agent asking for information about the investigation or asking to confer with anyone from the government about any potential criminal charging decisions or about the resolution of the matter.

8. In October 2007, my co-case agent and I met with Jane Doe #1 at a Publix grocery store in Palm Beach Gardens. We were meeting with Jane Doe #1 to advise her of the main terms of the Non-Prosecution Agreement. Among other information I provided, I told Jane Doe #1 that an agreement had been reached, Mr. Epstein was going to plead guilty to two state charges, and there would not be a federal prosecution.

9. After my co-case agent and I met with Jane Doe #1 and two other victims, I became concerned about what would happen if Jeffrey Epstein failed to perform his obligations under the Non-Prosecution Agreement. If Mr. Epstein breached or failed to perform those obligations, then the government would need to be ready to proceed with a prosecution. I was concerned that if the victims were informed of the Non-Prosecution Agreement, which included an option for victims to seek monetary damages in a civil matter, then Epstein's counsel would use the notifications to impeach me and the victims if a prosecution were to proceed in the future. Accordingly, after conferring with the U.S. Attorney's Office, a decision was made that no further notifications would be made at that time.

10. After the Non-Prosecution Agreement was signed, in the last quarter of 2007 and continuing through 2008, the investigative team felt that there was a possibility that Epstein would breach or fail to perform the terms of the Agreement. Accordingly, the investigation continued in case the prosecution of Epstein would later proceed. The continuing investigation included additional witness interviews, service of grand jury subpoenas, and testimony before the grand jury.

11. On January 31, 2008, as part of the continuing investigation of Jeffrey Epstein, I participated in an interview of Jane Doe #1 with Marie Villafaña from the U.S. Attorney's Office and Myesha Braden from the Justice Department. Jane Doe #1 was re-interviewed in case Epstein breached or failed to perform under the Non-Prosecution Agreement.

12. Throughout the investigation, we interviewed many victims that fell within the scope of Mr. Epstein's criminal activity. A majority of the victims expressed concern about the possible disclosure of their identities to the public. A number of the victims raised concerns about having to testify and/or their parents finding out about their involvement with Mr. Epstein.

3

Additionally, for some victims, learning of the Epstein investigation and possible exposure of their identities caused them emotional distress. Overall, many of the victims were troubled about the existence of the investigation. They displayed feelings of embarrassment and humiliation and were reluctant to talk to investigators. Some victims who were identified through the investigation refused even to speak to us. Our concerns about the victims' well-being and getting to the truth were always at the forefront of our handling of the investigation.

13. During interviews conducted from 2006 to 2008, no victims expressed a strong opinion that Epstein be prosecuted. As noted above, Jane Doe #2 expressed her opinion that nothing should happen to Epstein.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on May 22, 2017.

E. NESBITT KUYRKENDALL
Special Agent
Federal Bureau of Investigation
West Palm Beach, Florida