GOVERNMENT

EXHIBIT

S

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80736-Civ-Marra/Matthewman

JANE DOE 1 AND JANE DOE 2,

       Petitioners,

vs.

UNITED STATES,

       Respondent.

_____/

**DECLARATION OF A. MARIE VILLAFAÑA
IN SUPPORT OF GOVERNMENT'S RESPONSE AND OPPOSITION
TO PETITIONERS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

1.      I, A. Marie Villafaña, do hereby declare that I am a member in good standing of the Bar of the State of Florida.   I graduated from the University of California at Berkeley School of Law (Boalt Hall) in 1993.   After serving as a judicial clerk to the Hon. David F. Levi in Sacramento, California, I was admitted to practice in California in 1995.   I also am admitted to practice in all courts of the states of Minnesota and Florida, the Eighth, Eleventh, and Federal Circuit Courts of Appeals, and the U.S. District Courts for the Southern District of Florida, the District of Minnesota, and the Northern District of California.   My bar admission status in California and Minnesota is currently inactive.   I am currently employed as an Assistant United States Attorney in the Southern District of Florida and was so employed during all of the events described herein.

2.      I am the Assistant United States Attorney who was assigned to the investigation of

Jeffrey Epstein.   For purposes of 18 U.S.C. § 3771(a)(5), I was the "attorney for the Government," although, as discussed below, no federal criminal charges were ever filed and there was no "case," as that term is used in the statute.   I have previously filed two Declarations (*see* DE14 and DE35). This Declaration repeats some of the information contained in the earlier Declarations for ease of reference.

3.   The federal investigation of Jeffrey Epstein was handled by the Federal Bureau of Investigation ("FBI").   The federal investigation was initiated in 2006 at the request of the Palm Beach Police Department ("PBPD") into allegations that Jeffrey Epstein and his personal assistants had used facilities of interstate commerce to induce young girls between the ages of thirteen and seventeen to engage in prostitution, amongst other offenses.

4.   Although the U.S. Attorney's Office for the Southern District of Florida ("the Office") opened the matter to conduct an investigation and to evaluate a possible prosecution, the Office never accepted the matter for federal prosecution, that is, the Office never authorized the presentation of a proposed indictment to a federal grand jury or the filing of any federal charge in a criminal complaint or information, and no case was ever filed.

5.   Throughout the investigation, the FBI's Victim-Witness Specialist and I prepared and provided victim notification letters.   (*See* Exs. E[1] & F).   Letters to reported victims were prepared early in the investigation and subsequently delivered as each of those victims was contacted.   The victim notification letters that were sent early in the investigation were sent to

---

[1] Exhibits designated by a number are attached to this Declaration.   Exhibits designated by a letter are attached to the Government's Response and Opposition to Petitioners' Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment.

individuals who had been identified as potential victims of Epstein, but whom the investigative team had not yet interviewed and had not necessarily determined were in fact victims of a federal offense or came under the protection of the Crime Victims' Rights Act ("CVRA").   For example, the U.S. Attorney's Office letters were hand-delivered by FBI agents to Jane Doe 1 and Jane Doe 2 on dates subsequent to the dates of the letters.   At the time those letters were sent, determinations had not yet been made that Jane Doe 1 and Jane Doe 2 were in fact victims of a federal offense or came under the protections of the CVRA.   Nonetheless, the investigative team and I adopted an approach of providing more notice and assistance to potential victims than the CVRA may have required, even before the circumstances of those individuals had been fully investigated and before any charging decisions had been made.   My letters to Jane Doe 1 and Jane Doe 2 notified them of their rights under the CVRA, including the right to confer with me and the right to seek counsel with respect to their CVRA rights.   (*Id.*).   My letters also contained my direct dial telephone number, the direct dial telephone number of the case agent, Nesbitt Kuyrkendall, and the telephone number for the Justice Department's Office for Victims of Crime.   (*Id.*).   Both Jane Doe 1 and Jane Doe 2 also received letters from the FBI's Victim-Witness Specialist, which were sent on January 10, 2008.   (*See* Ex. J).   Neither Jane Doe 1 nor Jane Doe 2 ever contacted me to discuss the investigation, potential charges or resolutions of the matter, or otherwise.   If they had, I would have been happy to discuss the matter and provide their comments, concerns, or desires to my superiors.   I never declined any victim's request to confer regarding any aspect of the investigation.

      6.      A subpoena was issued to Jane Doe 2 for testimony and documents in September, 2006.   Within a few days, I was contacted by attorney James Eisenberg, who informed me that he

3

was representing Jane Doe 2.   Mr. Eisenberg also informed me that Jane Doe 2 would not provide testimony or appear for a consensual interview unless the U.S. Attorney's Office obtained court-ordered use immunity for Jane Doe 2 pursuant to 18 U.S.C. § 6001, *et seq.   See* Ex. A.   I had several oral and written communications with Mr. Eisenberg asking him if Jane Doe 2 would appear under the protection of a standard *Kastigar* letter, but he told me that Jane Doe 2 would only appear if statutory immunity pursuant to 18 U.S.C. § 6001 was received.   For example, in my letter of January 24, 2007, I confirmed my earlier conversation where Mr. Eisenberg had advised that Jane Doe 2 intended "to invoke the Fifth Amendment if questioned," and that she "was unwilling to speak to [the investigative team] pursuant to a *Kastigar* letter."   (*See* Ex. 1.)

       7.      In the same letter of January 24, 2007, I raised concerns regarding whether Mr. Eisenberg had a conflict of interest.   (*See id.*)   As noted in Jane Doe 2's Declaration, Mr. Eisenberg's fees were paid by Jeffrey Epstein, the target of the investigation.   In response, Mr. Eisenberg wrote the attached letter dated February 1, 2007.   (*See* Ex. 2.)   Mr. Eisenberg stated that it was the attitude of the U.S. Attorney's Office, in which the "office refuses to accept the fact that it is [Jane Doe 2's] decision not to cooperate with the government that upsets her."   (*Id.* at ¶ 1.)   Mr. Eisenberg also assured me "that there is no conflict of interest in [his] representation of [Jane Doe 2].   In this case I have always been asked and always will exercise independent judgment to follow my client's independent will."   (*Id.* at ¶ 2.)   Despite his expressed misgivings about the Palm Beach Police Department's handling of its investigation, Mr. Eisenberg stated that "[n]one of the above is directed at you personally.   I want to repeat that you have always treated us with respect."   (*Id.* at p. 2, final paragraph.)

8.      In light of Mr. Eisenberg's representations that there was no conflict of interest, and in light of his clear statements that he represented Jane Doe 2, I could not directly contact or "confer" with Jane Doe 2 without running afoul of the Florida Bar rules (e.g., R. Regulating Fla. Bar 4-4.2) and 28 U.S.C § 530B.

9.      I continued to converse with Mr. Eisenberg about having Jane Doe 2 appear for a voluntary interview, which continuously delayed the investigation.   To that end, on February 5, 2007, I provided Mr. Eisenberg with two proposed *Kastigar* letters that I felt should assure Jane Doe 2 that she was being interviewed only as a witness and potential victim.  (*See* Ex. 3.)   At Jane Doe 2's request, I also prepared Office paperwork to obtain authorization for childcare while Jane Doe 2 was interviewed.   (*See* Ex. 4.)

10.      On February 12, 2007, after another conversation in which Mr. Eisenberg re-iterated Jane Doe 2's intent to invoke her Fifth Amendment privilege and Jane Doe 2's refusal to testify without 6001 immunity, Mr. Eisenberg provided, at my request, a letter detailing Jane Doe 2's concerns regarding testifying without immunity.  (*See* Ex. 5.)   In that letter, Mr. Eisenberg "reiterate[d] that [Jane Doe 2] will refuse to voluntarily cooperate with the federal government." Jane Doe 2 thereafter denied being involved in or a victim of any criminal activity and made statements meant to exculpate Jeffrey Epstein, including "[Jane Doe 2] never touched Mr. Epstein in a sexual way and Mr. Epstein never touched [Jane Doe 2] at all.   At one point, Mr. Epstein did ask [Jane Doe 2] her age.   [Jane Doe 2] insisted that she was eighteen years old."  (*See id.*) Describing Jane Doe 2's position, Mr. Eisenberg wrote: "We believe no crime was committed." (*See id.*)

5

11.     Based upon the proffer letter provided by Mr. Eisenberg, in March 2007, I prepared a Request for Authorization to Apply for a Compulsion Order seeking Immunity pursuant to 18 U.S.C. §§ 6001-6003 for Jane Doe 2.   On April 13, 2007, Bruce C. Swartz, Deputy Assistant Attorney General, approved the request, on behalf of Alice Fisher, Assistant Attorney General. (*See* Ex. B.)   I then applied to the Court for an Order compelling Jane Doe 2's testimony.   U.S. District Judge Middlebrooks granted the application on April 16, 2007.   (Ex. 6.)

12.     After learning of Judge Middlebrooks' Order, Mr. Eisenberg asked whether Jane Doe 2 could appear for an interview, rather than provide formal testimony pursuant to her subpoena, so that he could be present.   On April 24, 2007, Jane Doe 2 was interviewed; the interview was videotaped.   (Ex. C.)   During the interview, Jane Doe 2 again denied being involved in or a victim of any criminal activity and made statements meant to exculpate Jeffrey Epstein.   (*See id.*)   Jane Doe 2 also informed me and the FBI agents who were present that she "hope[d] . . . nothing happens to [Epstein] because he's an awesome man" and that she believed that it was "a shame that he has to go through this because he's an awesome guy and he didn't do nothing wrong, nothing."   (*Id.*)

13.     Other than that interview, I had no direct contact with Jane Doe 2 during the course of the investigation.   Jane Doe 2 never contacted me at all, either directly or through Mr. Eisenberg, whether seeking information; requesting to confer with me regarding the investigation, charging decisions, or the resolution of the matter; or complaining that she was not being treated with fairness and respect.

14.     In light of other evidence and witness statements, the investigative team considered Jane Doe 2's exculpatory statements to be false.   Nonetheless, those statements precluded us from

6

including her as a victim who would be referenced in any federal indictment.   Despite this, in light of the investigative team's general approach to try to go above and beyond in terms of caring for the victims, I continued to treat her as a victim.   In that vein, shortly after the Non-Prosecution Agreement (NPA) was signed, I contacted Mr. Eisenberg to ask whether he still represented Jane Doe 2.   Mr. Eisenberg stated that he did.   I then told him that we would soon be making victim notifications, and asked Mr. Eisenberg whether I could send the notification directly to Jane Doe 2, or if it had to be served through him.   Mr. Eisenberg instructed me that any victim notification should be sent to him.

15.    As explained in further detail below, after the NPA was signed, Mr. Epstein, through his counsel, made several attempts to avoid having to perform the obligations that he had undertaken in the NPA.   Several of those attacks alleged prosecutorial misconduct by me, and Epstein's attorneys used my efforts to provide a post-NPA-signing victim notification to Jane Doe 2 as evidence of that claimed misconduct.   (*See, e.g.,* Ex. L.)   In response to Mr. Lefkowitz's ruinous allegations against Jane Doe 2 and myself, on December 13, 2007, I sent a response to Mr. Lefkowitz defending myself and Jane Doe 2.   (Ex. 7.)

16.    During the course of the suit filed by Jane Doe 1 and Jane Doe 2, the Petitioners have alleged that the case agents, the U.S. Attorney's Office, and I personally committed acts that violated their rights under the CVRA.   They have pointed to various pieces of correspondence with counsel for Epstein to suggest that the negotiations were not at arms' length or that certain things were done inappropriately in order to keep the victims from finding out about the NPA. Their interpretations and assertions are incorrect.

7

17.     In the summer of 2007, Jeffrey Epstein, through his attorneys, and the U.S. Attorney's Office for the Southern District of Florida ("the Office") entered into negotiations to resolve the investigation.   Prior to that, Epstein's attorneys had made several attempts to convince the Office to discontinue its investigation and not pursue any possible federal prosecution of Epstein.   These attempts were rejected.   At that time, Mr. Epstein had already been charged by the State of Florida with solicitation of prostitution, in violation of Florida Statutes § 796.07.   Mr. Epstein's attorneys sought a global resolution of the matter.   The Office instructed me to engage in negotiations to reach an agreement with Epstein to defer federal prosecution in favor of prosecution by the State of Florida, so long as certain basic preconditions were met -- Epstein would have to serve a jail sentence of two years (later reduced to 18 months), Epstein would have to register as a sex offender, and Epstein would have to accept liability to the victims identified in the federal investigation for damages in lieu of the restitution that would have been mandatory if Epstein had been convicted of the federal offenses under investigation.

18.     Prior to the Office making its decision to direct me to engage in negotiations with Epstein's counsel, I discussed the strengths and weaknesses of the case with members of the Office's management and informed them that most of the victims had expressed significant concerns about having their identities disclosed.   While I was not part of the final decision-making at the Office that arrived at the two-year sentence requirement, I was part of the discussions regarding sex offender registration and the restitution provision.   It is my understanding from these and other discussions that these factors, that is, the various strengths and weaknesses of the case and the various competing interests of the many different victims (including the privacy concerns expressed by many), together with the Office's desire to obtain a guaranteed sentence of

incarceration for Epstein, the equivalent of uncontested restitution for the victims, and guaranteed sexual offender registration by Epstein to help protect other minors throughout the country in the future, were among the factors that informed the Office's discretionary decision to negotiate a resolution of the matter and to ultimately enter into the NPA.

19.     After the fact, Petitioners are critical of the NPA's terms.   They have alleged that Epstein would easily have been convicted and that all of the victims were eager to participate in a full-fledged federal prosecution.   Alternatively, they have suggested that a successful federal prosecution could have been mounted based solely on Epstein's actions with Jane Doe 1 and Jane Doe 2.   As the prosecutor who handled the investigation, I can say that these contentions overlook the facts that existed at the time the NPA was negotiated.   First, as set out above, Jane Doe 2 clearly stated her opposition to assisting the investigation, much less a prosecution.   She was not alone.   As noted in Special Agent Kuyrkendall's Declaration, many victims expressed reservations about assisting in the investigation.   For example, Special Agent Timothy Slater described how one victim told him that she did not want to be bothered again, she had moved away to distance herself from the situation, and she wanted to "let this be in my past."   (Ex. 8 at ¶ 7.) Similarly, the person whom Petitioners refer to as "Jane Doe 5" also had been approached by the investigative team in 2007 but refused to speak with them.   (*See* D.E. 14 at ¶ 3.)   Regardless of the perceived strength of the corroborating evidence, it was and remains my professional opinion as an experienced prosecutor that a successful prosecution would have required convincing all of the identified victims to come forward and speak publicly at a trial, knowing that they would face public scrutiny and withering cross-examination.   Using my best efforts to accord all of the victims their right to be treated with fairness and with respect for their dignity and privacy, and in

the exercise of my prosecutorial discretion, I believed and still believe that a negotiated resolution of the matter was in the best interests of the Office and the victims as a whole.   The Office had also reached that same conclusion.

20.     Second, the suggestion that a successful prosecution could have been mounted naming only Jane Doe 1 and Jane Doe 2 as victims is overly optimistic at best.   The investigative team and I worked tirelessly to put together the evidence necessary to prove beyond a reasonable doubt that Epstein committed federal offenses.   We recognized how difficult a trial would be and that a successful case could be made only if a jury heard from a long series of credible victims, who did not know each other (to avoid an allegation of collusion) and who had all been subjected to the same treatment at Epstein's hands.   A case involving just two victims who knew each other, including one who had previously stated – on videotape – that she never engaged in sexual contact with Epstein, would never have been charged as a federal case, must less resulted in a conviction.

21.     Negotiations to resolve the Epstein matter were difficult, and it was not clear that they would be successfully completed.   If Epstein did not enter an agreement with the Office, then the Office needed to be in the best position it could be to charge and convict him.   Accordingly, I did not want to share with victims that the Office was attempting to secure for them the ability to obtain monetary compensation for the harm they had suffered.   I was aware that, if I disclosed that and the negotiations fell through, Epstein's counsel would impeach the victims and my credibility by asserting that I had told victims they could receive money for implicating Epstein. In fact, Epstein's attorneys made exactly that claim in a deposition of one of the victims.   (*See* Ex. 9 at 44-51.)   Attorney Michael Tien, who represented Epstein, asked one of the identified victims the following questions:

10

TIEN:   Now tell me about when the federal prosecutors told you about getting reimbursed.

A:      I have no idea what you're talking about.

TIEN:   Tell me about when the federal prosecutors spoke to you about getting money you feel you're entitled to from Mr. Epstein.

A:      I don't know what you're talking about.

TIEN:   Do you know who Marie Villafana is?

A:      No, sir.

TIEN:   Did you ever meet with any federal prosecutors?

A:      I think – yeah.   I think they were – I think they were like FBI.

TIEN:   Uh-huh.   Did you meet with federal prosecutors?

A:      They came to my house one time, yes.

TIEN:   When did they come to your house?

A:      Very long ago.

TIEN:   Was it this year, 2008?

A:      It was not this year, no.

TIEN:   Was it 2007?

A:      I'd have to say at least two years ago or a year ago, yeah.   So it would be 2007, 2006; but it was a while ago.

* * *

TIEN:   So if I say the name to you Marie Villafana, you don't know who that is?

A:      No, sir.

TIEN:   How many women and how many men came to your house?

A:      I want to say two ladies and two guys.

TIEN:   Did someone named Jeffrey Sloman come to your house?

A:      I don't know names, sir.

TIEN:   Do you know who Jeffrey Sloman is?

A:      No, sir.

* * *

TIEN:   And you say you don't know who Jeff Sloman is?

A:      No, sir.

11

TIEN:    Does it refresh your recollection that he's the number two prosecutor at the U.S. Attorney's Office?

A:       No.

TIEN:    That he's Marie Villafana's boss?

A:       No.

\* \* \*

TIEN:    Did you meet with an agent named Nesbitt Kuyrkendall, a woman?

A:       I don't know.

TIEN:    Did Ms. Kuyrkendall speak to you about getting reimbursed from Mr. Epstein?

A:       I've never had a discussion with anyone about getting reimbursed from Mr. Epstein.

\* \* \*

TIEN:    And we've learned that many of the girls, some of whom are as old as 23, were told by the government that they would get money at the end of the criminal prosecution.   Does that sound familiar to you?

A:       No, sir.

While I knew that none of the Special Agents or I had ever discussed lawsuits or even restitution with any victim during any of their interviews and that First Assistant U.S. Attorney Sloman had never met any of the victims, this was exactly the type of cross-examination that I anticipated Epstein's attorneys would try at a trial.   The Office and I concluded that opening up the possibility for such impeachment would be detrimental to the prosecution of Epstein if a negotiated resolution failed and Epstein were thereafter to be criminally charged.

22.      As noted above, the negotiations were difficult and at times I urged the Office to break off negotiations when I felt Epstein's attorneys were proceeding in bad faith.   Despite my reservations, I attempted to conduct the negotiations professionally and cordially.   Petitioners in this case have attempted to construe some of my communications to suggest that I was overly friendly with Epstein's counsel to the detriment of the victims or that I was taking steps to undercut

12

the victims' ability to be present at any change of plea.   These allegations are erroneous.   I was simply being professional and cordial with opposing counsel.

23.     For example, I am chided for an email regarding researching misdemeanor charges (*see* DE361 at ¶ 20), but, as noted above, I was instructed to construct a plea to federal or state offenses that resulted in a sentence of two years (later reduced to 18 months).   This required me to find a relevant charge with the agreed-upon statutory maximum and then determine whether the facts developed in the investigation fit that charge.   I was unable to find a relevant federal charge that had a statutory maximum of two years, and that required me to research the possibility of stacking two federal misdemeanor charges.

24.     The Petitioners also suggest that I attempted to "contrive to establish jurisdiction away from the location where the crimes actually occurred—and away from where the victims actually lived—so as to avoid the public finding out about anything" (DE361 at ¶ 24).   This also is false.   By the time of that email, there already was intense press coverage of the case, including efforts to publicly identify victims.   As noted above and in the Declaration of Special Agent Kuyrkendall, and even in the letters from Jane Doe 2's counsel (Exs. 2 and 5), the victims who had been interviewed in the federal investigation were most concerned about keeping their identities secret.   The possibility of press coverage was a strong deterrent to their participation in the investigation and possible prosecution.   My reason for recommending filing charges in Miami was to protect the privacy interests of the victims in the case by allowing them the opportunity to attend court proceedings – by definition, proceedings open to the public – with a reduced chance that their identities would be compromised.   The FBI and the U.S. Attorney's Office regularly transport victims from their homes to court proceedings, and the same would have occurred if

13

federal charges against Epstein had been filed in Miami.   Similarly, with regard to the selection of the attorney representative for the victims, I recommended two Miami attorneys whom I knew to have reputations for being tenacious, skillful, and committed to protecting their clients rather than burnishing their reputations in the press.   Although I understood that any civil suits that were filed would be publicly available, in light of the stated desire of most victims to remain anonymous, I did not believe that an attorney representative who actively sought out press coverage would be best suited to represent the victims in this case and protect their privacy interests.

25.     Petitioners' suggestion that it was the Office, rather than the victims, who desired confidentiality also is misplaced.   Even now, more than a dozen years after the investigation began, the Petitioners are proceeding by pseudonym to protect their privacy, and the Office has asserted the privacy rights of the other identified victims, as has counsel for other victims (*e.g.*, DE 335).   All of the victims who filed civil claims against Epstein did so by pseudonym, and some victims did not even pursue civil claims for fear of being publicly identified.   A suggestion that, ten to twelve years ago, when many were still teenagers, the victims were willing to step forward in a public forum and expose themselves to public scrutiny – much of which was unfairly critical of them – is unfounded and untrue.

26.     In June 2009, while Jane Doe 1 and Jane Doe 2 and many other victims were pursuing their civil suits against Epstein and while the instant case was pending, the Court asked me to address an issue related to the NPA and the civil suits.   With counsel for Petitioners present, I informed the Court that:

> the non-prosecution agreement[] sought to do one thing, which was to place the victims in the same position they would have been if Mr. Epstein had been convicted of the federal offenses for which he was investigated.   And that if he had

been federally prosecuted and convicted, the victims would have been entitled to restitution, regardless of how long ago the crimes were committed, regardless of how old they were at the time, and hold old they are today, or at the time of the conviction. And it also would have made them eligible for damages under [18 U.S.C. §] 2255. And so our idea was, our hope was that we could set up a system that would allow these victims to get that restitution without having to go through what civil litigation will expose them to. *You have a number of girls who were very hesitant about even speaking to authorities about this because of the trauma that they have suffered and about the embarrassment that they were afraid would be brought upon themselves and upon their families. So we do through the non-prosecution agreement tried [sic] to protect their rights while also protecting their privacy.*

(Ex. 10 at 31-32 (emphasis added)). None of the victims' attorneys who were present, including Petitioners' counsel, disputed my statement, and that statement remains true today. The investigative team, the FBI's victim-witness coordinator, and I all proceeded with a "victims first" approach, and we all used our best efforts to protect the victims and accord them their rights. Petitioners allege that I did not give their now-professed desires to have Epstein prosecuted sufficient weight, but they never communicated those desires to me or the FBI agents and my role was to evaluate the entire situation, consider the input received from all of the victims, and allow the Office to exercise its prosecutorial discretion accordingly.

27.     Petitioners' motion also suggests that some of the terms of the NPA or my actions were improper (*see* DE361 at ¶¶ 26-27). First, plea negotiations – like settlement negotiations (whether between the parties in the instant case or between Jane Doe 1, Jane Doe 2, and Epstein) – are normally kept confidential. Rule 11(c)(1) of the Federal Rules of Criminal Procedure prohibits judicial involvement in plea negotiations, and the Eleventh Circuit has ruled that there is a "bright line rule" that courts should not offer any comments on plea negotiations. *See, e.g., United States v. Johnson*, 89 F.3d 778, 783 (11th Cir. 1996); *United States v. Tobin*, 676 F.3d

15

1264, 1307 (11th Cir. 2012).   Likewise, Federal Rule of Criminal Procedure 6(e) requires confidentiality for persons subject to a grand jury investigation.   My recommendations to opposing counsel to limit any plea agreement to its essential terms, rather than disclosing the reasons behind those terms, and to exclude the names of persons who would not be parties to the agreement, was in keeping with those general policies.   Finally, when at an impasse in negotiations, a change of venue can be beneficial, such as when settlement conferences are held in a judge's chambers or a mediator's office rather than in the office of one of the parties.   My suggestion to meet Epstein's counsel "off campus" was in no way improper; it was simply an effort to facilitate a resolution through a meeting at a neutral location, but that meeting never even occurred.   On the other hand, during the course of the investigation, I routinely traveled to meet with victims at their homes, their jobs, and at coffee shops.

28.     With regard to paragraph 29 of DE361, copies of emails sent to and from my personal email address were produced in discovery.   Pursuant to my agreement with Mr. Edwards (counsel for Petitioners), personal email addresses were redacted.   Some of those emails are included in the exhibits attached to Petitioners' motion.   (*See, e.g.*, DE361-15.)

29.     In the end, the Office and I agreed that no federal misdemeanor charges adequately addressed the facts of the case, and the Office decided that, instead, it would forego federal prosecution if Epstein pled guilty to an applicable state offense that would require sex offender registration and an 18-month jail term, and if Epstein also agreed to allow the identified victims to obtain an uncontested recovery of damages in lieu of the restitution that would have been available under federal law.

16

30.    Also, with regard to the confidentiality of the Non-Prosecution Agreement, the statements contained in paragraph 31 of DE361 are accurate.   As courts have acknowledged, NPAs are not made part of a public court file but are maintained by a prosecutor's office.   The Privacy Act, Fed. R. Crim. P. 6(e), and other statutes and rules keep private files related to subjects of investigations.   There are some laws, including FOIA, that limit the confidentiality of those files, but, generally speaking, there is no public right of access to the Office's files.   Thus, the assurance that I would not distribute – essentially, "leak" – the NPA was simply an assurance that I intended to abide by Office and Department policy and the law.   The NPA made clear that the Office would disclose the NPA in response to appropriate FOIA requests and compulsory process, but would provide Epstein with notice before making such disclosure.   (DE361, Ex. 62 at 5.)   In part, this notice would ensure that no unlawful disclosure would be made mistakenly and subject the Office to civil liability.   Nothing in the NPA prohibited disclosing its terms to the victims; the confidentiality provision covered only the document itself.

31.    Petitioners' motion contains a number of other criticisms of the terms of the NPA, but despite my letters to them giving them my telephone number and encouraging them to contact me, neither Jane Doe 1 nor Jane Doe 2 ever contacted me or Special Agent Kuyrkendall prior to the signing of the NPA to ask about the investigation or to encourage prosecution.   Jane Doe 2 specifically told me that she did not want Epstein prosecuted.   Other victims had told me their fears of having their involvement with Esptein revealed and the negative impact it would have on their relationships with family members, boyfriends, and others.

32.    Once the NPA was signed on September 24, 2007, I asked the agents to meet with the victims to provide them with information regarding the terms of the agreement and the

17

conclusion of the federal investigation.   I also anticipated that they would be able to inform the victims of the date of the state court change of plea, but that date had not yet been set by state authorities at the time the first victims were notified.

33.     Special Agents Kuyrkendall and Richards met with three victims, including Jane Doe 1, soon after the NPA was signed.   It had been anticipated that they would meet with all the victims.   However, almost immediately after the NPA was signed, Epstein, through his counsel, began to delay and inhibit the performance of his obligations under the NPA.   First, he challenged the method for selecting the attorney-representative provided by the NPA for victims who wished to use that attorney's services in seeking damages from Epstein.   Among other efforts, Epstein also sought to challenge the list of victims identified during the course of the investigation and, as mentioned above, specifically attacked the inclusion of Jane Doe 2 as a victim because of her exculpatory statements.   While Petitioners here suggest that I was too lenient in my handling of the negotiations with Epstein's counsel, after the NPA was signed, Epstein's counsel raised challenges that I had been too aggressive.

34.     These and other attacks and efforts to avoid the NPA's terms led the FBI investigative team, the Office, and me to conclude that prosecution and trial remained a possibility and we should prepare as such.   This meant that the victim notifications had to cease because: (1) we no longer knew whether Epstein would perform under the NPA and, hence, we did not know whether providing information about the NPA would be accurate; and (2) we believed that Epstein, through his counsel, would attempt to use victim notifications concerning the NPA to suggest that the victims had been encouraged by the FBI or the Office to overstate their victimization for monetary compensation.   The FBI and the Office decided, therefore, to do no further notifications

18

regarding the NPA at that time.   Our concerns were prescient as shown by the deposition quoted in paragraph 21 above.   This deposition occurred in February 2008 during the period that Epstein was complaining to various levels of the Justice Department about the investigation and the NPA.

35.     Accordingly, the investigation continued while Epstein raised numerous erroneous allegations against me, the investigative team, other Office personnel, and the victims, seeking release from the Office and the Department of Justice of the obligations he had undertaken in the NPA.   (*See* Exs. D, G, K, L, O.)   While those "appeals" proceeded to the U.S. Attorney, the Child Exploitation and Obscenity Section in Washington, D.C., the Assistant Attorney General, and the Deputy Attorney General, the investigative team and I continued interviewing and identifying victims, issuing subpoenas, and collecting evidence.   The investigation continued up until the day that Epstein entered his state court guilty plea.

36.     One of the people who was re-interviewed after the NPA was signed was Jane Doe 1, who was re-interviewed on January 31, 2008.   I was present for that interview.   Since I was aware that Epstein might proceed to trial, as with other victims whom I interviewed, I asked Jane Doe 1 whether she would be willing to testify if there were a trial.   At that time, Jane Doe 1 stated that she hoped Epstein would be prosecuted and that she was willing to testify.   The FBI's letters of January 10, 2008, informing Jane Doe 1 and Jane Doe 2 that the case was still under investigation and that it could be a lengthy process (Ex. J) were accurate.   Jane Doe 1's re-interview was part of that continued investigation, so no one was deceived.   The process was not lengthier only because Epstein ultimately entered his state court guilty pleas as contemplated by the NPA.

19

37.     In mid-June 2008, Attorney Edwards contacted your Affiant to inform me that he represented Jane Doe 1 and another identified victim (not Jane Doe 2).   Attorney Edwards asked to meet to provide me with information regarding Epstein.   On June 19, 2008, Attorney Edwards sent me an email stating that he had "information and concerns that I would like to share" and that he wanted to meet with me to "discuss [his] plans."   DE362-30.   As noted in the email, he had one "client" at the time, who has been referred to in this suit as Jane Doe 1, and he did not state that Jane Doe 1 wished to meet with me.   (*Id.*)   I invited Attorney Edwards to send to me any information that he wanted me to consider.   At the time of my conversation with Attorney Edwards, I was still preparing to present charges against Epstein if Epstein succeeded in having the NPA set aside or if he failed to perform the terms of the NPA.   I did not disclose the existence of the NPA to Edwards because I did not know whether the NPA remained viable at that time or whether Epstein would enter the state court guilty pleas that would trigger the NPA.   I was aware that a final decision on Epstein's challenges to the NPA and the federal investigation was expected shortly, so I impressed upon Attorney Edwards that time was of the essence.   Attorney Edwards sent nothing at that time, nor did he ever inform me that Jane Doe 1 and/or Jane Doe 2 wanted to confer with me before any resolution was reached.   If anything had been provided by Edwards, Jane Doe 1, or Jane Doe 2, I would have reviewed it and shared it with my superiors.   I also advised Attorney Edwards that he should consider contacting the State Attorney's Office.   I was informed, however, that no contact with that office was made.   At that time, attorney Edwards had also alluded to Jane Doe 2, so I advised him that, to my knowledge, Jane Doe 2 was still represented by Attorney James Eisenberg.   He did not dispute or correct my understanding.

20

38.     On Friday, June 27, 2008, at approximate 4:15 p.m., I received a copy of Epstein's proposed state plea agreement and learned that Epstein's state court change of plea was scheduled for 8:30 a.m., Monday, June 30, 2008.   The Palm Beach Police Department and I attempted to notify the victims about that hearing in the short time available to us.   I specifically called attorney Edwards to provide notice to his clients regarding the hearing.   I believe that it was during this conversation that Attorney Edwards notified me that he represented Jane Doe 2.   I urged attorney Edwards to have his clients attend the hearing so that they could address the Court, if they wished, and I stressed the importance of the hearing.   I never told Attorney Edwards that the state charges involved "other victims," and neither the state court charging instrument nor the factual proffer limited the procurement of prostitution charge to a specific victim.   In fact, as mentioned in ¶ 37, *supra*, I had encouraged Attorney Edwards to contact the State Attorney's Office to discuss his client and the Epstein investigation with the state prosecutor.   Attorney Edwards informed me that he could not attend the hearing but that someone would be present at the hearing.   The case agents and I attended the hearing as members of the general public, and did not publicly announce our presence since we were there only as observers.   Neither attorney Edwards nor any of his clients were present, and no one identified themselves to me, the FBI agents, or the state court as being present on behalf of the petitioners.

/ / /

/ / /

/ / /

21

39.     On July 3, 2008, attorney Edwards contacted me to discuss how the Epstein matter had been resolved and to raise concerns regarding that resolution.  I shared the concerns that attorney Edwards raised with my superiors at the U.S. Attorney's Office.

40.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _Znd_ day of June, 2017.


A. Marie Villafaña, Esq.

22

## EXHIBITS TO 6/2/2017 VILLAFAÑA DECLARATION

| Exhibit Number | Description |
|:---:|:---|
| 1 | January 24, 2007 letter from A. Marie Villafaña to James Eisenberg with attachment (redacted) |
| 2 | February 1, 2007 letter from James Eisenberg to A. Marie Villafaña (redacted) |
| 3 | February 5, 2007 fax from A. Marie Villafaña to James Eisenberg with attachments (redacted) |
| 4 | February 6, 2007 Authorization for Reimbursement of Unusual Expenses (redacted) |
| 5 | February 12, 2007 letter from James Eisenberg to A. Marie Villafaña (redacted) |
| 6 | April 16, 2007 Order from Judge Middlebrooks (redacted) |
| 7 | December 13, 2007 letter from A. Marie Villafaña to Jay Lefkowitz (redacted) |
| 8 | January 26, 2015 Declaration of Timothy R. Slater, Section Chief, Federal Bureau of Investigation (redacted) |
| 9 | February 20, 2008 Deposition Transcript, *State of Florida v. Jeffrey Epstein* (redacted) |
| 10 | June 12, 2009 Hearing Transcript, *Jane Doe, et al. v. Jeffrey Epstein*, S.D. Fla. Case No. 08-80119-CIV-Marra |

# Exhibit 1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*500 South Australian Ave., Suite 400*
*West Palm Beach, FL  33401*
*(561) 820-8711*
*Facsimile: (561) 820-8777*

January 24, 2007

DELIVERY BY HAND
James L. Eisenberg, Esq.
250 S Australian Ave, Ste 704
West Palm Beach, FL 33401-5007

   Re: Federal ███████ Subpoena

Dear Jim:

   ██████████████████████████████ I have enclosed a new subpoena for T██
M███ As I mentioned earlier, Ms. M███ is not a target of this investigation and the United
States seeks her testimony solely as a victim/witness. During our last conversation regarding
Ms. M███, you indicated that she was unwilling to speak with us pursuant to a *Kastigar*
letter and that she also was unwilling to speak with the ███████ and intends to invoke the
Fifth Amendment if questioned. Please confer with her to confirm whether this remains her
position. If it is, please advise in writing. Even if Ms. M███ is inclined to invoke her Fifth
Amendment rights, she must still appear pursuant to the subpoena so that I may ask her
questions that would not require the invocation of the Fifth Amendment. If she still invokes,
I intend to move to compel her answers. If you or your client is unavailable on February 6,
2007, please let me know of another Tuesday when you are available.

   I also am concerned about a potential conflict of interest in your representation of Ms.
M███ In case of future litigation regarding this issue, please provide me with information
regarding who is paying (directly or indirectly) for your services on behalf of Ms. M███ the
scope of your representation, and whether you are taking direction on this matter from
anyone other than Ms. M███ If any formal or informal joint defense agreements exist,
whether in writing or otherwise, please provide a copy of such agreements. If the agreement
is purely oral, please provide a written summary of its terms.



GOVERNMENT
EXHIBIT
1

JAMES EISENBERG, ESQ.
JANUARY 24, 2007
PAGE 2

  I look forward to your response.

        Sincerely,
        R. Alexander Acosta
        United States Attorney

    By:

        A. Marie Villafaña
        Assistant United States Attorney

# United States District Court
## SOUTHERN DISTRICT OF FLORIDA

TO:   T███ M███

## SUBPOENA TO TESTIFY

**SUBPOENA FOR:**

[X] **PERSON**      [X] **DOCUMENTS OR OBJECT[S]**

**YOU ARE HEREBY COMMANDED** to appear and testify before the Grand Jury of the United States District Court at the place, date and time specified below.

| PLACE:<br>United States District Courthouse<br>701 Clematis Street<br>West Palm Beach, Florida 33401 | ROOM: ██████<br><br>DATE AND TIME:<br>February 6, 2007<br>1:00pm* |
| --- | --- |

**YOU ARE ALSO COMMANDED** to bring with you the following document(s) or object(s):



*Please coordinate your compliance with this subpoena and confirm the date and time , and location of your appearance with Special Agent Nesbitt Kuyrkendall, Federal Bureau of Investigation, Telephone: (561) 822-5946.

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK<br><br>(BY) DEPUTY CLERK | | DATE:<br><br>January 23, 2007 |
| --- | --- | --- |

| This subpoena is issued upon application<br>of the United States of America<br><br>_(signature)_ | Name, Address and Phone Number of Assistant U.S. Attorney<br>Ann Marie C. Villafaña, Assistant U.S. Attorney<br>500 So. Australian Avenue, Suite 400<br>West Palm Beach, FL 33401-6235<br>Tel: (561) 820-8711 x3047<br>Fax: (561) 802-1787 |
| --- | --- |

*If not applicable, enter "none."        To be used in lieu of AO110        FORM ORD-227

# Exhibit 2

# EISENBERG & FOUTS, P.A.
## Attorneys At Law

**JAMES L. EISENBERG**
Florida Bar Board Certified Criminal Trial Lawyer
National Board Of Trial Advocacy Certified Criminal Trial Advocate
**KAI LI ALOE FOUTS**

One Clearlake Centre, Suite 704, 250 Australian Avenue South, West Palm Beach, FL 33401  561/659-2009 Fax: 561/659-2380

February 1, 2007

A. Marie Villafana, Asst. U.S. Attorney
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401

Re:    Grand Jury Subpoena for T██ M██

Dear Marie,

I received your letter dated January 24, 2007 with regard to T██ M██ I must admit I forced myself to wait several days to respond in order to "cool off" and not say anything I would regret later. Now that time has passed, allow me to respond appropriately.

1. If you want to force Ms. M██, a single mother, to come to the ████████████ to personally invoke her Fifth Amendment rights, she will be there. That does remain her position. My only request is that you provide a babysitter service for her child. I will be there, but I am not paid to babysit and Ms. M██ should not have to pay someone. It is this type of attitude, that your office refuses to accept the fact that it is Ms. M██'s decision not to cooperate with the government that upsets her. Your office fails to recognize that merely coming to court is a problem for a single mother like Ms. M██ and, under these circumstances, appears to be a waste of time at best and, in her mind, personal harassment.

2. Rest assured that there is no conflict of interest in my representation of Ms. M██ In this case I have always been asked and always will exercise independent judgment to follow my client's independent will. The remainder of your questions as to this matter are really none of the Government's business.

3. I will share with you that one of the reasons for our firm position that Ms. M██ will invoke her Fifth Amendment right and choose not to voluntarily cooperate with the Government is our concern that the Government is not exercising independent judgment in this case.

The history of this case has been in the newspapers. The case is being prosecuted in State court. Despite the state court prosecution, the Town of Palm Beach Police Chief went on what can only be



GOVERNMENT
EXHIBIT

**2**

A. Marie Villafana, Asst. U.S. Attorney
February 1, 2007
Page Two

described as a public rampage in the newspaper when the case was not prosecuted to his liking that reminded me of a small child having a public temper tantrum. In my thirty years of experience, I have never seen a law enforcement officer like this publicly make what appeared to be a political case in the newspaper for a prosecution and publicly criticize anyone who got in his way, including the elected State Attorney. This resulted in a federal investigation on a topic no one remembers the Federal Government ever being interested in prosecuting before. Although I am certain that you personally have not had your decision-making process compromised, the appearance that your office is being influenced by the Town of Palm Beach Police Chief's agenda is very real. Under these circumstances I don't see how any lawyer could advise any client to voluntarily cooperate. Of special concern is that the Town of Palm Beach Police have promoted prosecuting at least one of the girls who allegedly gave massages.

One final thought. My client and my fear that Ms. M____ could be prosecuted is enhanced by the demand for the personal appearance made in your letter. Your initial Kastiger letter fell far short of granting the functional equivalent of DOJ immunity. Several months ago I was given the distinct impression through our conversations that you were going to obtain DOJ immunity for Ms. M____. Now the government is changing course for no apparent reason. This leads to speculation that the only reason for the turnabout is that prosecution in either state or federal court is being considered by someone.

None of the above is directed at you personally. I want to repeat that you have always treated us with respect. Maybe your office should advise the Town Police Chief to act in a similar fashion.

Sincerely,

JAMES L. EISENBERG

JLE:gw
cc:   T____ M____

# Exhibit 3



**U.S. Department of Justice**

United States Attorney
Southern District of Florida

A. Marie Villafaña
500 South Australian Ave, Suite 400
West Palm Beach, Florida 33401
(561) 820-8711
Facsimile (561) 820-8777

FACSIMILE COVER SHEET

TO: JIM EISENBERG, ESQ.          DATE:          February 5, 2007

FAX NO.   561 659-2380          # OF PAGES:     6

PHONE NO.                        RE:    T███    M███

FROM:    A. MARIE VILLAFAÑA, ASSISTANT U.S. ATTORNEY

PHONE NO.   561 820-8711

COMMENTS:  Hi Jim — These probably say the
same thing, but they sound a little
different. If you have any suggestions
for changes, please let me know.

          Thank you for your time today. I
appreciate your patience.

                    Regards,

                    Marie

GOVERNMENT
EXHIBIT
3



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*500 South Australian Ave., Suite 400*
*West Palm Beach, FL 33401*
*(561) 820-8711*
*Facsimile: (561) 820-8777*

February 5, 2007

DELIVERY BY HAND
Ms. T██████ M████
c/o James L. Eisenberg, Esq.
250 S Australian Ave, Ste 704
West Palm Beach, FL 33401-5007

      Re: ██████████ Testimony of T███ M███

Dear Ms. M████:

    This letter confirms the understanding between yourself and the United States Attorney's Office for the Southern District of Florida.

    You have represented that you will truthfully answer questions of the federal government in its investigation of the procurement of prostitutes, amongst others. You will supply complete and truthful information to the attorneys and law enforcement officers of the federal government and to any ████████████ which may conduct an investigation, as well as in any other proceeding related to or growing out of this investigation. The obligation of truthful disclosure includes your obligation to provide the attorneys and law enforcement officers of the federal government with any documents, records or other tangible evidence within your custody or control relating to the matters about which you are questioned. You will neither attempt to protect any person or entity through false information or omission, nor falsely implicate any person or entity.

    No statements provided by you on this date in this matter pursuant to this agreement will be offered into evidence in any criminal case against you, except during a prosecution for perjury and/or giving a false statement. However, if it is determined that you have materially violated any provision of this agreement, all statements made by you shall be admissible in evidence against you in any proceeding.

    The federal government remains free to use information derived from the ██████████ testimony directly or indirectly for the purpose of obtaining leads to other evidence, which may be used against you. You expressly waive any right to claim that such evidence should not be introduced because it was obtained as a result of the grand jury testimony. Furthermore, the federal government may use statements made in the grand jury testimony and all evidence derived directly or indirectly therefrom for the purpose of cross-examination, if you testify at any trial or if you

P-003739

Ms. T███ M███
FEBRUARY 5, 2007
PAGE 2

suborn testimony that contradicts your prior statements and testimony.

No additional promises, agreements and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.

Sincerely,

R. Alexander Acosta
United States Attorney

By: _____
A. Marie Villafaña
Assistant United States Attorney

I have read this agreement and discussed it with my attorney, and I hereby acknowledge that it fully sets forth my agreement with the office of the United States Attorney for the Southern District of Florida. I state that there have been no additional promises, agreements or representations made to me by any officials of the United States in connection with this matter.

Dated: February ____, 2007
West Palm Beach, Florida

_____
T███ M███

Witnessed by:

_____
James L. Eisenberg, Esq.
Attorney for T███ M███

P-003740



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*500 South Australian Ave., Suite 400*
*West Palm Beach, FL 33401*
*(561) 820-8711*
*Facsimile: (561) 820-8777*

February 5, 2007

<u>DELIVERY BY HAND</u>
James L. Eisenberg, Esq.
250 S Australian Ave, Ste 704
West Palm Beach, FL 33401-5007

      Re:   T█ M█

Dear Mr. Eisenberg:

    I am writing to clarify the ground rules for the interview with your client, T█ M█ ("your client"), to occur February ___, 2007.

    As I mentioned earlier, Ms. M█ is not a target or subject of this investigation, but instead is being interviewed solely as a victim/witness. However, to address your concern about criminal exposure, if your client complies with every provision of this agreement, then the United States Attorney's Office for the Southern District of Florida ("this Office") will treat all statements made by your client during the interview as statements made pursuant to Rule 11(f) of the Federal Rules of Criminal Procedure. This is not a grant of immunity, which can be given only with approval of the Justice Department, but protects your client from having the statements made by her during the interview from being used against her directly. To guard against any misunderstandings concerning the interview of your client, this letter sets forth the terms of this agreement.

    Your client agrees to be fully interviewed, that is, to provide information concerning your client's knowledge of, and participation in criminal activity, including but not limited to the procurement of prostitutes. The protection of this letter applies to an interview that will be conducted by this Office, Special Agents of the Federal Bureau of Investigation, and any other federal law enforcement agency this Office may require. Under this agreement, no information disclosed by your client during the interview will be offered in evidence against her in any criminal or civil proceeding, provided that your client complies with this agreement and that the information your client furnishes is truthful, complete, and accurate.

    If, however, your client gives materially false, incomplete, or misleading information,

                                                      P-003741

JAMES L. EISENBERG, ESQ.
RE: T███ M███
FEBRUARY 2, 2007
PAGE 2

then this Office may use such information in any matter or proceeding and your client is subject to prosecution for perjury, obstruction of justice, and making false statements to government agencies. Any such prosecution may be based upon information provided by your client during the course of the interview, and such information, including your client's statements, will be admissible against your client in any grand jury or other proceeding.

The government also may use statements made by your client in the interview and all evidence derived directly or indirectly therefrom for the purpose of impeachment or cross-examination if she testifies at any trial or hearing, and/or in any rebuttal case against your client in a criminal trial in which she is a defendant or a witness. These provisions are necessary to ensure that your client does not make or offer any false representation or statement in any proceeding or to a government agency or commit perjury during any testimony.

Your client further agrees that attorneys for the United States may be present at the interview, and agrees not to seek disqualification of any such government attorney from any proceeding or trial because of their participation at the interview.

The entire agreement between the United States and your client is set forth in this letter. No additional promises, agreements, or conditions have been entered into and none will be entered into unless in writing and signed by all parties.

If the foregoing accurately reflects the understanding and agreement between this Office and your client, it is requested that you and your client execute this letter as provided below.

Sincerely,
R. Alexander Acosta
United States Attorney

By:

A. Marie Villafaña
Assistant United States Attorney

I have received this letter from my attorney, James L. Eisenberg, Esquire, have read it and discussed it with my attorney, and I hereby acknowledge that it fully sets forth my understanding and agreement with the Office of the United States Attorney for the Southern

P-003742

JAMES L. EISENBERG, ESQ.
RE: T███ M███
FEBRUARY 2, 2007
PAGE 3

District of Florida.  I state that there have been no additional promises or representations made to me by any official of the United States Government or by my attorney in connection with this matter.

Dated: _____

T█████ M█████

Witnessed by: _____

James L. Eisenberg, Esquire

Exhibit 4

U.S. Department of Justice

Authorization for Reimbursement
of Unusual Expenses of Fact Witnesses

Request for Unusual Expense(s) of Fact Witness
(For United States Attorney's Office Use Only)

Control #

| 1. Case Name | 2. Court Docket Number | 3. Requesting AUSA |
| --- | --- | --- |
| ▓▓▓▓▓ | | A. Marie Villafaña |
| 4. Location of Court Proceeding | 5. Contact Person | 6. Contact Person Number |
| West Palm Beach | | 561 209 - 1047 |

| 7. Witness Name & Address, Phone #, SSN | 8. Vendor Name & Address, Phone #, TIN/SSN |
| --- | --- |
| T▓▓▓ M▓▓▓ | |

| 9. Payment to be made to: | 10. Receipt/Invoice is: |
| --- | --- |
| T▓▓▓ M▓▓ | |

| 11. Type of Unusual Expense: | 12. Explanation: |
| --- | --- |
| ☐ Medically Necessary Item (Attached Supporting Statement) <br> ☒ Dependent Care <br> ☐ Excess Lodging/Per Diem <br> ☐ Travel & Transportation <br> ☐ Pretrial Conference Waiver <br> ☐ Other | The witness has a small child and ~~would not~~ had no one who could watch the child while she testified. |

| 13. Start Date of Service (MO/DA/YR) | 14. End Date of Service (MO/DA/YR) | 15. Amount |
| --- | --- | --- |
| 2/6/07 | 2/6/07 | |

16. Justification:

**GOVERNMENT EXHIBIT 4**
PENGAD 800-631-6989

17. I hereby certify that the expenses and services listed on this document are appropriate and are within the Federal laws and regulations. I fully understand that I can be held personally liable or be subject to disciplinary action for improperly using government funds or services that exceed delegated authority or that violate Federal laws or regulations.

| | |
| --- | --- |
| Signature of Requesting AUSA | Date |

| 18. Name & Title of Approving Official | 19. Date (MO/DA/YR) | 20. Signature of Approving Official |
| --- | --- | --- |
| | | |

UPWE Form

Case No. 08-80736-CV-MARRA                                                                 P-003744

# Exhibit 5

# EISENBERG & FOUTS, P.A.

## Attorneys At Law

**JAMES L. EISENBERG**
Florida Bar Board Certified Criminal Trial Lawyer
National Board Of Trial Advocacy Certified Criminal Trial Advocate
**KAI LI ALOE FOUTS**

One Clearlake Centre, Suite 704, 250 Australian Avenue South, West Palm Beach, FL 33401   561/659-2009 Fax/561/659-2380

February 12, 2007

A. Marie Villafana, Asst. U.S. Attorney
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401

Re:     ▮▮▮▮▮▮▮▮ for ▮▮▮ M▮▮▮

Dear Marie,

As always, it was a pleasure speaking to you the other day. Pursuant to our telephone conference I am writing this letter to proffer my concerns for ▮▮▮ M▮▮ should she testify without immunity before a ▮▮▮▮▮▮▮▮. Therefore, allow me to reiterate that Ms. M▮▮ will refuse to voluntarily cooperate with the federal government. She has a good faith basis for her position under the Fifth Amendment to the United States Constitution.

We, of course, do not live or work in a vacuum. We have read many inflammatory remarks the Town of Palm Beach Police Chief has made to the media about the state court's handling of the Jeffrey Epstein investigation. The police chief's remarks frighten both myself and my client. I am aware that the town police have prepared documents to charge at least one of Mr. Epstein's lady friends in state court. If they can push to have one lady charged I remain unconvinced that they do not have the ability or political clout to push to have other ladies such as Ms. M▮▮ charged.

The proffered facts that raise my concerns are being provided via this proffer letter. Pursuant to our telephone conference agreement, this letter and its contents cannot be used against Mr. M▮▮

Ms. M▮▮ is not at all certain of dates. She does remember meeting Mr. Epstein about three years ago. She is not certain of her age, it could have been when she was sixteen. A girlfriend asked her if she wanted a job giving massages. Ms. M▮▮ agreed because she had knowledge of massages through her mother, who was a masseuse.

Ms. M▮▮ went to Mr. Epstein's house via taxi. Ms. M▮▮'s girlfriend instructed Ms. M▮▮ that, if asked, she had to tell Mr. Epstein that she (M▮▮) was eighteen years old. The friend was nineteen years old and M▮▮ looked old for her age, so passing for eighteen was not a problem. At

GOVERNMENT
EXHIBIT
5

P-003730

the home Ms. M███ met Mr. Epstein and later gave him a massage. The friend had told Ms. M███ to give the message topless. Mr. Epstein told M███ that if she were at all uncomfortable being topless, not to do it and it was not a requirement of employment as a masseuse. Ms. M███ never touched Mr. Epstein in a sexual way and Mr. Epstein never touched Ms. M███ at all. At one point, Mr. Epstein did ask Ms. M███ her age. Ms. M███ insisted that she was eighteen years old.

Ms. M███ continued to see Mr. Epstein over time and massages were given in a similar fashion. She was later asked if her friends wanted to work in a similar way and she asked some girls who did give Mr. Epstein massages. Ms. M███ was never asked to bring girls of any age to Mr. Epstein's home. When she did have her friends come over, she instructed all of them that if asked, they insist that they were eighteen years old. She is not certain at all of any of these girls' real ages.

In summary, our concern is that if the government believes that Mr. Epstein committed some federal offense, then Ms. M███ could be considered a co-conspirator. We believe no crime was committed. The Fifth Amendment was not intended to protect the guilty, however. It was enacted to protect citizens who fear prosecution notwithstanding their innocence. Our fear of any prosecution, especially in light of the Town police chief's public remarks, is clearly in good faith.

Sincerely,

JAMES L. EISENBERG

JLE:gw
cc:    Ms. T██ M███

# Exhibit 6



GOVERNMENT
EXHIBIT

6

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## NORTHERN (WEST PALM BEACH) DIVISION

IN RE:

### SEALED ORDER

On Application of the United States Attorney for the Southern District of Florida, and it appearing to the satisfaction of the Court:

1.      That T███M███ has been called to testify and to provide other information before the United States District Court for the Southern District of Florida, ████████████████ ████████████; and

2.      That in the judgment of the said United States Attorney, T███M███ has refused to testify and provide other information on the basis of her privilege against self-incrimination; and

3.      That in the judgment of the said United States Attorney, the testimony and other information from T███M███ may be necessary to the public interest; and

4.      That the aforesaid Application has been made with the approval of the Assistant Attorney General in charge of the Criminal Division of the Department of Justice or a duly designated Acting Assistant Attorney General, pursuant to the authority vested in him by Title 18, United States Code, Section 6003, and Title 28, Code of Federal Regulations, Sections 0.175 and 0.132(e).

NOW, THEREFORE, it is ordered pursuant to Title 18, United States Code, Section 6002, that T███M███ give testimony and provide other information which she refuses to give or to

provide on the basis of her privilege against self-incrimination, as to all matters about which she may be interrogated before said United States District Court, ███████████████████████ as well as any subsequent proceeding or trial.

However, no testimony or other information compelled under this Order (or any information directly or indirectly derived from such testimony or other information) may be used against T██ ·M██ in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with this Order.

IT IS FURTHER ORDERED the this Order shall be **SEALED** in accordance with Fed. R. Crim. P. 6(e)(6), except that a copy of this Order shall be provided to counsel for the United States, who may disclose the existence of the Order ████████████████ to the witness, to counsel for the witness, and to law enforcement officers engaged in the investigation ████████ ███████████████ . Those persons may review the Order, but may not retain a copy of the Order, nor may they disclose the existence of the Order to any others.

**DONE** and **ORDERED** this ____16____ day of April, 2007, at West Palm Beach, Florida.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc:    A. Marie Villafaña, AUSA

# Exhibit 7



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*500 S. Australian Ave, Ste 400*
*West Palm Beach, FL 33401*
*(561) 820-8711*
*Facsimile: (561) 820-8777*

December 13, 2007

DELIVERY BY ELECTRONIC MAIL
Jay P. Lefkowitz, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675

      Re:   Jeffrey Epstein

Dear Jay:

    I am writing not to respond to your asserted "policy concerns" regarding Mr. Epstein's Non-Prosecution Agreement, which will be addressed by the United States Attorney, but the time has come for me to respond to the ever-increasing attacks on my role in the investigation and negotiations.

    It is an understatement to say that I am surprised by your allegations regarding my role because I thought that we had worked very well together in resolving this dispute. I also am surprised because I feel that I bent over backwards to keep in mind the effect that the agreement would have on Mr. Epstein and to make sure that you (and he) understood the repercussions of the agreement. For example, I brought to your attention that one potential plea could result in no gain time for your client; I corrected one of your calculations of the Sentencing Guidelines that would have resulted in Mr. Epstein spending far more time in prison than you projected; I contacted the Bureau of Prisons to see whether Mr. Epstein would be eligible for the prison camp that you desired; and I told you my suspicions about the source of the press "leak" and suggested ways to avoid the press. Importantly, I continued to work with you in a professional manner even after I learned that you had been proceeding in bad faith for several weeks – thinking that I had incorrectly concluded that solicitation of minors to engage in prostitution was a registrable offense and that you would "fool" our Office into letting Mr. Epstein plead to a non-registrable offense. Even now, when it is clear that neither you nor your client ever intended to abide by the terms of the agreement that he signed, I have never alleged misconduct on your part.

    The first allegation that you raise is that I "assiduously" hid from you the fact that Bert Ocariz is a friend of my boyfriend and that I have a "longstanding relationship" with Mr. Ocariz.

GOVERNMENT
EXHIBIT
7
PEN/GAO 000-001-0668

JAY P. LEFKOWITZ, ESQ.
DECEMBER 13, 2007
PAGE 2 OF 5

I informed you that I selected Mr. Ocariz because he was a friend and classmate of two people whom I respected, and that I had never met or spoken with Mr. Ocariz prior to contacting him about this case. All of those facts are true. I still have never met Mr. Ocariz, and, at the time that he and I spoke about this case, he did not know about my relationship with his friend. You suggest that I should have explicitly informed you that one of the referrals came from my "boyfriend" rather than simply a "friend," which is the term I used, but it is not my nature to discuss my personal relationships with opposing counsel. Your attacks on me and on the victims establish why I wanted to find someone whom I could trust with safeguarding the victims' best interests in the face of intense pressure from an unlimited number of highly skilled and well paid attorneys. Mr. Ocariz was that person.

One of your letters suggests a business relationship between Mr. Ocariz and my boyfriend. This is patently untrue and neither my boyfriend nor I would have received any financial benefit from Mr. Ocariz's appointment. Furthermore, after Mr. Ocariz learned more about Mr. Epstein's actions (as described below), he expressed a willingness to handle the case *pro bono*, with no financial benefit even to himself. Furthermore, you were given several other options to choose from, including the Podhurst firm, which was later selected by Judge Davis. You rejected those other options.

You also allege that I improperly disclosed information about the case to Mr. Ocariz. I provided Mr. Ocariz with a bare bones summary of the agreement's terms related to his appointment to help him decide whether the case was something he and his firm would be willing to undertake. I did not provide Mr. Ocariz with facts related to the investigation because they were confidential and instead recommended that he "Google" Mr. Epstein's name for background information. When Mr. Ocariz asked for additional information to assist his firm in addressing conflicts issues, I forwarded those questions to you, and you raised objections for the first time. I did not share any further information about Mr. Epstein or the case. Since Mr. Ocariz had been told that you concurred in his selection, out of professional courtesy, I informed Mr. Ocariz of the Office's decision to use a Special Master to make the selection and told him that the Office had made contact with Judge Davis. We have had no further contact since then and I have never had contact with Judge Davis. I understand from you that Mr. Ocariz contacted Judge Davis. You criticize his decision to do so, yet you feel that you and your co-counsel were entitled to contact Judge Davis to try to "lobby" him to select someone to your liking, despite the fact that the Non-Prosecution Agreement vested the Office with the exclusive right to select the attorney representative.

Another reason for my surprise about your allegations regarding misconduct related to the Section 2255 litigation is your earlier desire to have me perform the role of "facilitator" to convince the victims that the lawyer representative was selected by the Office to represent their interests alone and that the out-of-court settlement of their claims was in their best interests. You now state that doing the same things that you had asked me to do earlier is improper meddling in civil litigation.

Much of your letter reiterates the challenges to Detective Recarey's investigation that have

JAY P. LEFKOWITZ, ESQ.
DECEMBER 13, 2007
PAGE 3 OF 5

already been submitted to the Office on several occasions and you suggest that I have kept that information from those who reviewed the proposed indictment package. Contrary to your suggestion, those submissions were attached to and incorporated in the proposed indictment package, so your suggestion that I tried to hide something from the reviewers is false. I also take issue with the duplicity of stating that we <u>must</u> accept as true those parts of the Recarey reports and witness statements that you like and we <u>must</u> accept as false those parts that you do not like. You and your co-counsel also impressed upon me from the beginning the need to undertake an independent investigation. It seems inappropriate now to complain because our independent investigation uncovered facts that are unfavorable to your client.

You complain that I "forced" your client and the State Attorney's Office to proceed on charges that they do not believe in, yet you do not want our Office to inform the State Attorney's Office of facts that support the additional charge nor do you want any of the victims of that charge to contact Ms. Belohlavek or the Court. Ms. Belohlavek's opinion may change if she knows the full scope of your client's actions. You and I spent several weeks trying to identify and put together a plea to federal charges that your client was willing to accept. Yet your letter now accuses me of "manufacturing" charges of obstruction of justice, making obscene phone calls, and violating child privacy laws. When Mr. Lourie told you that those charges would "embarrass the Office," he meant that the Office was unwilling to bend the facts to satisfy Mr. Epstein's desired prison sentence – a statement with which I agree.

I hope that you understand how your accusations that I imposed "ultimatums" and "forced" you and your client to agree to unconscionable contract terms cannot square with the true facts of this case. As explained in letters from Messrs. Acosta and Sloman, the indictment was postponed for more than five months to allow you and Mr. Epstein's other attorneys to make presentations to the Office to convince the Office not to prosecute. Those presentations were unsuccessful. As you mention in your letter, I – a simple line AUSA – handled the primary negotiations for the Office, and conducted those negotiations with you, Ms. Sanchez, Mr. Lewis, and a host of other highly skilled and experienced practitioners. As you put it, your group has a "combined 250 years experience" to my fourteen. The agreement itself was signed by Mr. Epstein, Ms. Sanchez, and Mr. Lefcourt, whose experience speaks for itself. You and I spent hours negotiating the terms, including when to use "a" versus "the" and other minutiae. When you and I could not reach agreement, you repeatedly went over my head, involving Messrs. Lourie, Menchel, Sloman, and Acosta in the negotiations at various times. In any and all plea negotiations the defendant understands that his options are to plead or to continue with the investigation and proceed to trial. Those were the same options that were proposed to Mr. Epstein, and they are not "persecution or intimidation tactics." Mr. Epstein chose to sign the agreement with the advice of a multitude of extremely noteworthy counsel.

You also make much of the fact that the names of the victims were not released to Mr. Epstein prior to signing the Agreement. You never asked for such a term. During an earlier meeting, where Mr. Black was present, he raised the concern that you now voice. Mr. Black and I did not have a chance to discuss the issue, but I had already conceived of a way to resolve that

Jay P. Lefkowitz, Esq.
December 13, 2007
Page 4 of 5

issue if it were raised during negotiations. As I stated, it was not, leading me to believe that it was not a matter of concern to the defense. Since the signing of the Non-Prosecution Agreement, the agents and I have vetted the list of victims more than once. In one instance, we decided to remove a name because, although the minor victim was touched inappropriately by Mr. Epstein, we decided that the link to a payment was insufficient to call it "prostitution." I have always remained open to a challenge to the list, so your suggestion that Mr. Epstein was forced to write a blank check is simply unfounded.

Your last set of allegations relates to the investigation of the matter. For instance, you claim that some of the victims were informed of their right to collect damages prior to a thorough investigation of their allegations against Mr. Epstein. This also is false. None of the victims was informed of the right to sue under Section 2255 prior to the investigation of the claims. Three victims were notified shortly after the signing of the Non-Prosecution Agreement of the general terms of that Agreement. You raised objections to any victim notification, and no further notifications were done. Throughout this process you have seen that I have prepared this case as though it would proceed to trial. Notifying the witnesses of the possibility of damages claims prior to concluding the matter by plea or trial would only undermine my case. If my reassurances are insufficient, the fact that not a single victim has threatened to sue Mr. Epstein should assure you of the integrity of the investigation.[1]

---

[1] There are numerous other unfounded allegations in your letter about document demands, the money laundering investigation, contacting potential witnesses, speaking with the press, and the like. For the most part, these allegations have been raised and disproven earlier and need not be readdressed. However, with respect to the subpoena served upon the private investigator, contrary to your assertion, and as your co-counsel has already been told, I did consult with the Justice Department prior to issuing the subpoena and I was told that because I was not subpoenaing an attorney's office or an office physically located within an attorney's office, and because the business did private investigation work for individuals (rather than working exclusively for Mr. Black), I could issue a grand jury subpoena in the normal course, which is what I did. I also did not "threaten" the State Attorney's Office with a grand jury subpoena, as the correspondence with their grand jury coordinator makes perfectly clear.

With regard to your allegation of my filing the Palm Beach Police Department's probable cause affidavit "with the court knowing that the public could access it," I do not know to what you are referring. All documents related to the grand jury investigation have been filed under seal, and the Palm Beach Police Department's probable cause affidavit has never been filed with the Court. If, in fact, you are referring to the *Ex Parte* Declaration of Joseph Recarey that was filed in response to the motion to quash the grand jury subpoena, it was filed both under seal and *ex parte*, so no one should have access to it except the Court and myself. Those documents are still in the Court file only because you have violated one of the terms of the Agreement by failing to "withdraw [Epstein's] pending motion to intervene and to quash certain grand jury subpoenas."

JAY P. LEFKOWITZ, ESQ.
DECEMBER 13, 2007
PAGE 5 OF 5

     With respect to Ms. M███, I contacted her attorney – who was paid for by Mr. Epstein and was directed by counsel for Mr. Epstein to demand immunity – and asked only whether he still represented Ms. M███ and if he wanted me to send the victim notification letter to him. He asked what the letter would say and I told him that the letter would be forthcoming in about a week and that I could not provide him with the terms. With respect to Ms. M███ s status as a victim, you again want us to accept as true only facts that are beneficial to your client and to reject as false anything detrimental to him. Ms. M███ made a number of statements that are contradicted by documentary evidence and a review of her recorded statement shows her lack of credibility with respect to a number of statements. Based upon all of the evidence collected, Ms. M███ is classified as a victim as defined by statute. Of course, that does not mean that Ms. M███ considers herself a victim or that she would seek damages from Mr. Epstein. I believe that a number of the identified victims will not seek damages, but that does not negate their legal status as victims.

     I hope that you now understand that your accusations against myself and the agents are unfounded. In the future, I recommend that you address your accusations to me so that I can correct any misunderstandings before you make false allegations to others in the Department. I hope that we can move forward with a professional resolution of this matter, whether that be by your client's adherence to the contract that he signed, or by virtue of a trial.

               Sincerely,

               R. Alexander Acosta
               United States Attorney

        By:     *s/A. Marie Villafaña*
               A. Marie Villafaña
               Assistant United States Attorney

cc:    R. Alexander Acosta, U.S. Attorney
       Jeffrey Sloman, First Assistant U.S. Attorney

---

     You also accuse me of "broaden[ing] the scope of the investigation without any foundation for doing so by adding charges of money laundering and violations of a money transmitting business to the investigation." Again, I consulted with the Justice Department's Money Laundering Section about my analysis before expanding that scope. The duty attorney agreed with my analysis.

# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE #1 and JANE DOE #2,

     Petitioners,

vs.

UNITED STATES OF AMERICA,

     Respondent.

_____/

### DECLARATION OF FBI SPECIAL AGENT TIMOTHY R. SLATER

TIMOTHY R. SLATER declares as follows:

1.  I am a Special Agent, Federal Bureau of Investigation (FBI), currently assigned as a Section Chief at FBI Headquarters, Washington, D.C.  I was appointed a Special Agent in May 1999.  Upon graduation from the FBI Academy at Quantico, Virginia, in September 1999, I was assigned to the Detroit Field Office.  I was subsequently transferred to the FBI Miami Field Office in May 2006.

2.  In 2006, I was assigned to work on an investigation of Jeffrey Epstein, who was accused of sexually abusing many young girls under the age of 18.  In the course of our investigation, the FBI identified many potential victims of sexual abuse by Epstein.  We obtained names by speaking to other victims, who frequently knew of friends who had also been paid money by Epstein to provide sexual services to him.

3.  One of the victims identified was ▮▮▮▮▮▮▮▮▮▮ In January – February 2007, I used various computer indices to try and locate Ms. ▮▮▮▮  By using these indices and other means, I found two international phone numbers which I believed were being used by Ms.



GOVERNMENT
EXHIBIT

Case     8

████

4.  Sometime during January -- February 2007, I called the one of the numbers, in an attempt to speak to Ms. ████   Also in my office was FBI Special Agent Nesbitt E. Kuyrkendall, the lead agent for the investigation of Jeffrey Epstein.  I was not using a speakerphone when I spoke with Ms. ████   I asked S/A Kuyrkendall to be present because she, as the lead agent, was thoroughly versed in the details of the entire investigation, and I might need her assistance to respond to a question posed by Ms. ████ that I was unable to answer.

5.  When I dialed the number, a young woman answered the phone.  I told her my name, identified myself as a Special Agent with the FBI, and asked if she was ████  She said yes.  I used a technique which I employ when speaking to people on the phone, who might question whether I am truly an FBI agent.  I provided her with the phone number of the FBI Field Office in Miami, Florida, and told her she could hang up and verify the number.  She could then call me back at the number, and her call would be routed to me.  Ms. ████ said that would not be necessary.

6.  I told Ms. ████ about our investigation of Jeffrey Epstein, and the allegations that Epstein had sexually abused many underage young girls.  I told her we believed she might be a victim of sexual abuse by Epstein.

7.  Ms. ████ answered basic questions, telling me that she did know Jeffrey Epstein. She quickly became uncomfortable, telling me she moved away to distance herself from this situation, and expressing her desire to "let this be in my past."  She asked that I not bother her with this again.

8.  I thanked Ms. ████ and told her I appreciated her time.  I provided my name and encouraged her to call the FBI Miami Field Office, if she had any questions or needed assistance.

The entire phone conversation only last several minutes.

9.  I did not hear from Ms. ███ again.  In mid-March 2007, I reported for my new assignment at FBI Headquarters in Washington, D.C.

10.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 26, 2015.

TIMOTHY R. SLATER
Section Chief
Federal Bureau of Investigation
Washington, D.C.

3

# Exhibit 9



**Consor & Associates**
Reporting and Transcription, Inc.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT

IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 2006 CF09454AXX

STATE OF FLORIDA,

    -vs-

JEFFREY EPSTEIN,

        Defendant.

_____/

DEPOSITION OF ███████████

Wednesday, February 20, 2008

2:00 p.m. - 4:30 p.m.

Palm Beach County Courthouse

205 North Dixie Highway

West Palm Beach, Florida 33401



Reported By:

Judith F. Consor, FPR

Notary Public, State of Florida

Consor & Associates Reporting and Transcription

Phone - 561.682.0905



GOVERNMENT
EXHIBIT

9

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

### Censor & Associates
Reporting and Transcription, Inc.

Page 2

```
 1     APPEARANCES:
 2         On behalf of the State:
 3         LANNA BELOHLAVEK, ESQ.
           ASSISTANT STATE ATTORNEY
 4         401 North Dixie Highway
           West Palm Beach, Florida 33401
 5         561.355.7100
 6         On behalf of the Defendant:
            MICHAEL R. TEIN, ESQ.
 7         KATHRYN A. MEYERS, ESQ.
            LEWIS TEIN, PL
 8         3059 GRAND AVENUE, SUITE 340
            COCONUT GROVE, FL 33133
 9
           On behalf of the Defendant:
10         JACK A. GOLDBERGER, ESQ.
           ATTERBURY, GOLDBERGER & WEISS
11         250 AUSTRALIAN AVENUE SOUTH
           SUITE 1400
12         WEST PALM BEACH, FLORIDA 33401
           561.659.8300
13
14     ALSO PRESENT:
       ON BEHALF OF THE WITNESS:  THEODORE J. LEOPOLD, ESQ.
15     KEITH J. BRETT, DIRECTOR OF MULTIMEDIA DIVISION,
       LEGAL-EZE
16                             -   -   -
17
18
19
20
21
22
23
24
25
```

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

08-80736-CV-MARRA

**Censor & Associates**
Reporting and Transcription, Inc.

Page 3

1                          I N D E X

2    WITNESS:                                PAGE:

3    ████████████████

     DIRECT EXAMINATION                        4

4    BY MR. TEIN:

5

6                         -   -   -

7            N O   E X H I B I T S   M A R K E D

8                         -   -   -

9    ...............CERTIFIED QUESTIONS...............

10          Page                      Line

            53                         22

11          55                          1

            59                          2

12          111                        14

            112                         2

13

14

15

16

17

18

19

20

21

22

23

24

25

## Consor & Associates
### Reporting and Transcription, Inc.

Page 4

```
 1              Deposition taken before Judith F. Consor,

 2      Court Reporter and Notary Public in and for the State of

 3      Florida at Large, in the above cause.

 4                            -   -   -

 5      Thereupon,

 6              ███████████████████

 7      having been first duly sworn or affirmed, was examined

 8      and testified as follows:

 9              THE WITNESS:  I do.

10                      DIRECT EXAMINATION

11      BY MR. TEIN:

12              Q.    Good afternoon.  Please tell me your full

13      name.

14              A.    ███████████████████████

15              Q.    And can you please spell it.

16              A.    █████████████████████████

17      ████████████

18              Q.    Thank you.

19              May I call you ██████

20              A.    Uh-huh.

21              Q.    ██████  I'm going to ask you a few

22      questions, several questions today.  If at any time you

23      want to take a break, you just let me know.  Okay?

24              A.    Okay.

25              Q.    If you at any time don't understand one of
```

## Censor & Associates
### Reporting and Transcription, Inc

Page 5

1    my questions, will you just please let me know?

2         A.    Yes.

3         Q.    And if at any time you're not feeling well

4    or something like that, you'll tell us, right?

5         A.    Yes.

6         Q.    Do you feel okay today?

7         A.    Yes.

8         Q.    Not taking any alcohol or drugs or anything

9    like that, right?

10        A.    No.

11        Q.    So you feel ready to have your deposition

12   taken?

13        A.    Yes.

14        Q.    ████████ what is your address?

15        A.    I'm currently living at my aunt's house and

16   I don't know it off the top of my head.

17        Q.    Where is it?

18        A.    In Jupiter.

19        Q.    Who is your aunt?

20        A.    ████████████████

21        Q.    Who else is living there?

22        A.    ████████████ my uncle.

23        Q.    Anyone else living there?

24        A.    No.

25        Q.    The contempt motion that your mother filed

Censor & Associates
Reporting and Transcription, Inc.

Page 6

1    against your father regarding your fifty million-dollar

2    lawsuit against Jeffrey Epstein says that you live with

3    your aunt and uncle and have been living there; is that

4    correct?

5         A.    Yes.

6         Q.    How long have you been living with your

7    aunt and uncle?

8         A.    Since my father kicked me out.

9         Q.    That was Thanksgiving of this past year?

10        A.    Yes, sir.

11        Q.    Okay.  Didn't your firefighter boyfriend

12    ▮▮▮▮▮▮▮ get an apartment for the two of you?

13        A.    No, sir.  He has an apartment, but by

14    himself.

15        Q.    Did he get an apartment for the two of you

16    to live in?

17        A.    No, sir.

18        Q.    Are you planning to move in with him?

19        A.    Maybe one day in the future.

20        Q.    Do you have a plan to move in with him

21    presently?

22        A.    No.

23        Q.    Have you been to the apartment that you and

24    ▮▮▮▮▮▮▮ have discussed moving in together?

25        A.    I have been to the apartment.

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

**Censor & Associates**
Reporting and Transcription, Inc.

Page 7

1    Q.    Where is that?

2    A.    Palm Beach Lakes.

3    Q.    Have you spent the night over there?

4    A.    No, sir.

5    Q.    Do you know the address there?

6    A.    I do not.

7    Q.    Isn't your sister ███ planning on living

8    with you and ███?

9    A.    No.

10    Q.    ███ you know that this court case is a

11    criminal prosecution, correct?

12    A.    Correct.

13    Q.    And you know that it's a criminal

14    prosecution against a man who has no criminal background.

15    Do you know that?

16    A.    I do now.

17    Q.    You agree that court is a very serious

18    matter?

19    A.    Yes.

20    Q.    And you're here with your lawyer

21    Mr. Leopold, right?

22    A.    Yes.

23    Q.    And you know that Mr. Leopold recently

24    filed a lawsuit in federal court against Jeffrey Epstein,

25    seeking fifty million dollars.

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

**Censor & Associates**
Reporting and Transcription, Inc.

Page 8

1          MR. LEOPOLD:  Let me just object.

2          ████████ let me instruct you.  Anything that

3      you have learned through conversations between you

4      and me are protected.  So if you know any of that

5      information outside of those discussions, you may

6      answer.  But if the only way you know it is

7      through our discussions, do not answer that

8      question.

9   BY MR. TEIN:

10         Q.  ██████ you know that Mr. Leopold recently

11     filed a lawsuit in federal court on your behalf against

12     Jeffrey Epstein seeking fifty million dollars?

13         MR. LEOPOLD:  Same objection.

14         If you know the answer to that outside of

15     our discussions, you may answer.  If it is the

16     only way that you know the answer is through our

17     discussions, do not answer that question.

18         THE WITNESS:  Okay.

19         MR. LEOPOLD:  Attorney/client privilege.

20   BY MR. TEIN:

21         Q.  You can answer the question unless --

22         MR. LEOPOLD:  Same objection.

23         MR. TEIN:  Let me finish.

24         MR. LEOPOLD:  Excuse me.  We're --

25         MR. TEIN:  No.  Let me finish.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 9

1          MR. LEOPOLD:  Lewis, we're not going to do

2      that.

3          MR. TEIN:  My name is not Lewis.

4      I'm going to finish my question.  Okay?

5          MR. LEOPOLD:  Do not answer until you hear

6      from me.

7   BY MR. TEIN:

8      Q.   Other than conversations that you have had

9   with Mr. Leopold -- I'm not asking about that -- are you

10  aware that Mr. Leopold has filed a lawsuit in federal

11  court seeking fifty million dollars from Jeffrey Epstein

12  on your behalf?

13          MR. LEOPOLD:  Same objection.

14      Anything that you learn through

15      conversations between you and me, do not answer.

16      Those are protected.  If you know through any

17      other realm of knowledge, you may answer.

18          THE WITNESS:  No.

19  BY MR. TEIN:

20      Q.   You have no idea that Mr. Leopold filed a

21  fifty million-dollar lawsuit on your behalf against

22  Jeffrey Epstein?

23          MR. LEOPOLD:  Same objection.

24      Do not answer that question if it's through

25      discussions that you and I had.  Outside of that,

**Onsor & Associates**
Reporting and Transcription, Inc.

Page 10

```
 1          you may answer.  So do not answer that question if

 2          that is the only basis by which you understand

 3          that answer.

 4                  THE WITNESS:  No.

 5     BY MR. TEIN:

 6          Q.    You didn't know that?

 7                  MR. LEOPOLD:  Don't answer that question.

 8          Again, it's attorney/client privilege.  Any

 9          information you've learned through conversations

10          between you and I are protected.  If you know it

11          through any other realm, you may answer.

12                  MR. TEIN:  Are you going to say that for

13          every question in the deposition, Mr. Leopold?

14                  MR. LEOPOLD:  When you ask improper

15          questions like that without the proper --

16                  MR. TEIN:  You're going to stop your

17          speaking objections right now.  Okay?

18                  MR. LEOPOLD:  Without the proper --

19                  MR. TEIN:  You need to stop your speaking

20          objections.

21                  Let's continue.

22                  MR. LEOPOLD:  Counsel, you just asked me a

23          question and I'm going to state it on the

24          record --

25                  MR. TEIN:  You need to stop your speaking
```

Case 9:08-cv-80804-KAM   Document 1   Entered on FLSD Docket 07/21/2008   Page 37 of 100

**Censor & Associates**
Reporting and Transcription, Inc.

Page 11

1    objections.  Check your rules.

2         MR. LEOPOLD:  Excuse me.  For the record,

3    Counsel asked me a question.  I'll state the

4    answer on the record.  He asked me the question am

5    I going to be answering that way throughout the

6    deposition.  So long as there's improper

7    foundation and predicate asked by the attorney, I

8    will protect my client and I make the record where

9    appropriate.  If counsel wishes to ask an

10   appropriate worded question with the proper

11   foundation and predicate, I will certainly allow

12   the client to answer the question.

13        MR. GOLDBERGER:  Why don't you just state

14   attorney/client privilege and just be done with

15   it?

16        MR. LEOPOLD:  I want the record to be

17   clear.

18        MR. TEIN:  You want to waste time is what

19   you want to do.

20        You were supposed to be here this morning

21   and you totally broke the deal, the agreement that

22   you had with us if your hearing got cancelled.

23        But let's move on and maybe you'll stop

24   obstructing this deposition.

25        MR. LEOPOLD:  I think the record is very

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

# Censor & Associates
Reporting and Transcription, Inc.

Page 12

1    clear where we stand thus far.

2            Is there a recording taken of this

3    deposition?

4            THE COURT REPORTER:  Yes.

5            MR. LEOPOLD:  Just make sure that's

6    preserved.

7    BY MR. TEIN:

8            Q.    Go to Exhibit 20-01 -- well, before you do

9    that,        are you aware that a lawyer named Jeffrey

10   Herman filed a lawsuit on your behalf, yes or no?

11           MR. LEOPOLD:  Objection.

12           Any conversations that you and I have had

13   regarding that, if that is the only way by which

14   you understand how to answer that question, do not

15   answer.  It's attorney/client privilege, as well

16   as any conversations you may have had with the

17   attorney from Miami.  That is also attorney/client

18   privilege.  And I'm assuming --

19           MR. TEIN:  You're actually wrong about the

20   attorney/client privilege.

21           MR. LEOPOLD:  I'm assuming Counsel is not

22   asking you to divulge attorney/client --

23           MR. TEIN:  Of course not.

24   BY MR. TEIN:

25           Q.        are you aware that Jeffrey Herman,

## Censor & Associates
Reporting and Transcription, Inc.

Page 13

1  an attorney, filed a fifty-million-dollar lawsuit on your

2  behalf against Jeffrey Epstein, yes or no?

3           MR. LEOPOLD:  Same objection.

4           MR. TEIN:  We've heard the objection 10

5      times already.

6           MR. LEOPOLD:  Counsel, excuse me.

7           MR. TEIN:  Just say attorney/client

8      privilege.  Stop interrupting my questions.

9           MR. LEOPOLD:  I'm entitled to make an

10     objection for the record, which I'm doing, and

11     I'll make the same objection.  And if it calls for

12     attorney/client privilege, any conversations you

13     and I have had, do not answer the question.

14          And I think that it might be appropriate,

15     for the record, to ask questions via ▇▇▇▇▇

16     ▇▇▇▇▇▇ as opposed to ▇▇▇▇▇  I think that

17     would be more appropriate for this deposition.

18  BY MR. TEIN:

19     Q.   Go ahead.  Please answer yes or no.

20     A.   Yes.

21     Q.   Thank you.

22          In fact, you know that Mr. Herman held a

23  press conference after he filed the fifty-million-dollar

24  lawsuit on your behalf, don't you?

25     A.   After it happened.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 14

1    Q.    You know that he had a press conference,

2    don't you, yes or no?

3    A.    Yes.

4    Q.    In fact, let's go to Exhibit 20-01.

5         MR. GOLDBERGER:  Look behind you.  You'll

6    see it.

7    BY MR. TEIN:

8    Q.    Have you ever seen that picture before?

9    A.    Yes.

10   Q.    Is that a picture of your father, your

11   stepmother and Mr. Herman at the press conference

12   regarding your lawsuit?

13   A.    Yes.

14   Q.    Now you know that this is a very serious

15   matter, don't you?

16        MR. LEOPOLD:  Asked and answered.

17   Objection.

18        MR. GOLDBERGER:  All right.  You can

19   object.  You're representing a witness here,

20   Mr. Leopold.  You can object on privilege grounds.

21   You cannot make legal objections.  You have no

22   standing to do so.

23        MR. LEOPOLD:  I'm going to make them and

24   then --

25        MR. GOLDBERGER:  We're --

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

08-80736-CV-MARRA

Censor & Associates
Reporting and Transcription, Inc.

Page 15

1      MR. LEOPOLD:  We're going to leave or we're

2    going to take a break, because his demeanor is not

3    appropriate.  There's no reason to have this kind

4    of demeanor.  If you want to have this kind of

5    demeanor with me --

6      MR. TEIN:  You are obstructing this

7    deposition.

8      MR. GOLDBERGER:  Why don't you guys go

9    outside and just talk about --

10      MR. LEOPOLD:  She -- her job is very

11   difficult and she's not going to be able to take

12   us both talking at the same time.

13      MR. GOLDBERGER:  Off the record.

14      MR. LEOPOLD:  We're not going off the

15   record, Jack.  We're not, Jack.  Her job is very

16   difficult.  I'm going to make the record.

17      I don't think it is appropriate, especially

18   in the small confines of this room, to be very

19   aggressive with this young lady.

20      MR. TEIN:  That's not happening.  Stop,

21   stop actually --

22      MR. LEOPOLD:  If you're going to interrupt

23   me, we're going to cancel this deposition --

24      MR. TEIN:  Stop misrepresenting.

25      THE COURT REPORTER:  I need one at a time,

**Censor & Associates**
Reporting and Transcription, Inc.

Page 16

```
 1    no matter who it is.
 2           MR. LEOPOLD:  I think we're going to take a
 3    break.  Perhaps you might want to talk to your
 4    co-counsel --
 5           MR. TEIN:  I don't need to talk to him.
 6           MR. LEOPOLD:  But we're going to take a
 7    break.
 8           MR. TEIN:  We're not taking a break unless
 9    the witness needs a break.
10           You're obstructing this deposition, Ted.
11           MR. LEOPOLD:  Come on, ████████
12           You all want to continue in this
13    demeanor --
14           MR. TEIN:  You're obstructing the
15    deposition.  Stop making speeches.  We're not
16    discussing this with you.  The questions are to
17    your client.  Go take your five-minute break.
18           MR. LEOPOLD:  Fine.  We need to make sure
19    the record's clear and clean.
20           And I want to make sure, as I've already
21    asked you -- I know that you're one of the best in
22    town -- that this audio -- this needs to be
23    preserved.  Okay?
24           MR. TEIN:  Go take your five-minute break,
25    Mr. Leopold, now.
```

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

**Censor & Associates**
Reporting and Transcription, Inc.

Page 17

1      You were supposed to be here at nine a.m.;

2    it's now after two.  Take your break and come

3    back.

4         MR. LEOPOLD:  Okay.  If the demeanor keeps

5    up, we will not be here beyond those five minutes.

6         MR. TEIN:  Take your break and come back.

7         MR. LEOPOLD:  Okay.  So I suggest that you

8    relax.

9         MR. TEIN:  I suggest that you take your

10   break.

11        MR. GOLDBERGER:  Let them take that

12   five-minute break.

13        MR. LEOPOLD:  But I would suggest that you

14   take deep breaths.

15        MR. TEIN:  Suggest whatever you want.  Go

16   take a break.

17        (Thereupon, a recess was taken.)

18   BY MR. TEIN:

19        Q.    █████████ you agree that giving testimony

20   today at your deposition is something very serious, don't

21   you?

22        A.    Yes.

23        Q.    And you respect the court, don't you?

24        A.    Yes.

25        Q.    Let me show you Exhibit 31-001.  Can you

**Censor & Associates**
Reporting and Transcription, Inc.

Page 18

1  read that out loud, please.

2          A.    Okay.   What do you want?

3          Q.    Will you read that out loud, please.

4          A.    Oh.

5          Q.    Thank you.

6          A.    Lol hah my baddd...lol yah i got some

7  stupid court shit on the 20th...bullshit...and damn you

8  still have court shit with him?  Like after so long wow

9  im sorry... well yah well we will definitely havta make

10  plans for sure..because i miss u tons times a million and

11  no no no i love you...o and p.s. i love ur default pic

12  niggaa.  Muah xo.

13          Q.    Did you send that message last week to a

14  friend of yours on MySpace?

15          A.    I wouldn't know.  There's no dates and I've

16  deleted that MySpace, so --

17          Q.    We're going to talk about that in a second.

18          A.    Okay.

19          Q.    Did you send that message last week --

20          A.    Right.

21          Q.    Let me finish my question.

22                Did you send that message last week to a

23  friend of yours on MySpace?

24          A.    I wouldn't know the date, but obviously,

25  it's to a friend.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 19

1          Q.     Did you send that message to a friend of

2     yours on MySpace?

3          A.     Sure, yes.

4          Q.     Were you referring to this deposition?

5          A.     Yes.

6          Q.     Do you find the term n-i-g-g-e-r offensive?

7          A.     That's not anywhere in there.

8          Q.     What word did you use in there?

9               MR. LEOPOLD:  Where are you referring to,

10    Counsel?  There's 20 plus words in there.

11              MR. TEIN:  Don't make a speaking objection.

12              THE WITNESS:  Are you referring to

13    anything --

14              MR. LEOPOLD:  No, ████  Don't -- don't --

15    let him ask you the question.

16    BY MR. TEIN:

17         Q.     What question were you asking, ████?

18              MR. LEOPOLD:  She doesn't ask questions.

19    You ask the questions.  What is the question

20    pending?

21    BY MR. TEIN:

22         Q.     ████ what is the last word on there in

23    the text of your message before the closing?

24         A.     Niggaa.

25         Q.     Don't you find that term offensive?

Censor & Associates
Reporting and Transcription, Inc.

Page 20

1        A.     No.

2               MR. LEOPOLD:  Can you spell it for the

3        record, please.

4               THE WITNESS:  N-i-g-g --

5               MR. TEIN:  No, no, no.  You are not going

6        to be asking questions.

7               MR. LEOPOLD:  I'm not asking questions.

8        I'm asking for the record the word to be spelled,

9        because we don't have a video here today.

10              MR. TEIN:  These exhibits are part of the

11       record.  You --

12              MR. LEOPOLD:  Well, it's not marked as an

13       exhibit.

14              MR. TEIN:  Stop interrupting me,

15       Mr. Leopold.  I have marked and identified as an

16       exhibit and you will get it.

17              MR. LEOPOLD:  There has been no

18       identification of this document in the record.

19              MR. TEIN:  Mr. Leopold, stop interrupting

20       this deposition.

21              MR. LEOPOLD:  What is the exhibit number

22       marked for identification?

23              MR. TEIN:  31-001.

24              MR. LEOPOLD:  Do we have copies?  Is it on

25       the record anywhere?

Censor & Associates
Reporting and Transcription, Inc.

Page 21

```
1     BY MR. TEIN:

2          Q.    Let me ask you, ███████ did you in fact

3     write your friend this message about this deposition?

4          A.    Yes.

5          Q.    So you wrote your friend that this

6     deposition is stupid court s-h-i-t, correct?

7          A.    Yes.

8          Q.    Because you think this deposition is stupid

9     court s-h-i-t, don't you?

10         A.    No.

11         Q.    You wrote that to your friend, didn't you?

12         A.    Yes.

13         Q.    You think that court is stupid, don't you?

14         A.    In some cases.

15         Q.    And you think that court is bull s-h-i-t,

16    don't you?

17         A.    No.

18         Q.    And you think this deposition is bull

19    s-h-i-t, don't you?

20         A.    No.

21         Q.    You wrote that to your friend, didn't you?

22               MR. LEOPOLD:  Objection.  Asked and

23         answered.

24               MR. TEIN:  That's not an objection.

25    BY MR. TEIN:
```

**Censor & Associates**
Reporting and Transcription, Inc.

                                              Page 22

1       Q.     You wrote that to your friend, didn't you?

2              MR. LEOPOLD:  Objection.  Asked and

3       answered, for the fourth time.

4              MR. TEIN:  You are improperly objecting,

5       Mr. Leopold.  You have no grounds to object.  And

6       that's not an objection.

7              MR. LEOPOLD:  It is an objection.

8              MR. TEIN:  Then terminate the deposition if

9       you think it's been asked and answered.

10             MR. LEOPOLD:  Counsel, I am not precluded

11      from just making an objection to the form of the

12      question.  As the courts well know, and if you

13      practice here in West Palm Beach, many of the

14      judges require you to set the objection with

15      specificity.  And I will do that.  And if you

16      don't want me to, you can make the record.  But I

17      will do that.

18             MR. TEIN:  Here's what we'll do, Ted.  You

19      can -- I will allow you to reserve an objection to

20      form for every single one of my questions.

21      Otherwise, all you're doing is obstructing.

22             MR. LEOPOLD:  I won't do that.

23             MR. TEIN:  Of course; because you want to

24      obstruct.

25             MR. LEOPOLD:  All right.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 23

```
 1    BY MR. TEIN:

 2          Q.    ███████ you think that giving testimony

 3    today, under oath, is bull s-h-i-t, don't you?

 4          A.    No.

 5          Q.    And you wrote that to your friend on

 6    MySpace last week, didn't you?

 7                MR. LEOPOLD:  Objection.  Asked and

 8          answered.

 9                THE WITNESS:  No, I did not.

10    BY MR. TEIN:

11          Q.    You didn't write this exhibit?

12          A.    I wrote that, but I didn't write what you

13    said.

14          Q.    You wrote in this exhibit, "I got some

15    stupid court s-h-i-t on the 20th.  Bull s-h-i-t."  Didn't

16    you write that?

17          A.    Yes.

18          Q.    Referring to this deposition, didn't you?

19          A.    Referring to the court.  I was later

20    informed that it was a deposition.

21          Q.    I'm going to ask you some questions now

22    about what happened when you went to Jeff Epstein's house

23    three years ago.  Okay?

24          A.    Uh-huh.

25          Q.    When the police interviewed you one month
```

## Censor & Associates
Reporting and Transcription, Inc.

Page 24

1   after you went to Epstein's house, you swore on your

2   mother's grave that you and Epstein did not engage in sex

3   of any kind?

4          A.    Yes.

5          Q.    Didn't you tell that to the police?

6          A.    Yes.  And I will continue.  I have never

7   had sex with him.

8          Q.    Did what happened upstairs at Jeff

9   Epstein's house take you completely by surprise, ███?

10         A.    Yes.

11         Q.    Now the civil complaint that you filed

12   against Mr. Epstein for fifty million dollars alleged

13   that you were totally shocked by what happened when you

14   got there.

15         A.    Yes.

16         Q.    Were you totally shocked by what happened

17   when you got to Epstein's house?

18         A.    Yes.

19         Q.    You didn't expect it at all, did you?

20         A.    No.

21         Q.    You had absolutely no idea why your friend

22   ███ was taking you to Epstein's house, right?

23         A.    I was informed it was a massage.

24         Q.    All you thought that it was going to be was

25   a massage, correct?

# Censor & Associates
Reporting and Transcription, Inc.

Page 25

1        A.    Yes.

2        Q.    Before you got to Epstein's house ▮▮▮▮

3   never said anything to you on the telephone about sexual

4   activity with Epstein, did she?

5        A.    No.

6        Q.    And before you got to Epstein's house

7   ▮▮▮▮ never sent you a message over the Internet about

8   sexual activity with Epstein, did she?

9        A.    No.

10       Q.    Did ▮▮▮▮ ever try to convince you to

11   engage in any sexual activity with Epstein?

12       A.    No.

13       Q.    Did ▮▮▮▮ every try to convince

14   you to engage in any sexual activity with Epstein?

15       A.    I don't know who ▮▮▮▮ is.

16       Q.    Do you have a friend ▮▮▮▮?

17       A.    No.

18       Q.    Okay.  Before you went so Epstein's house

19   did anyone call or e-mail you to induce you to engage in

20   sexual activity with Epstein?

21       A.    No.

22       Q.    So you're sure that before you got to

23   Epstein's house no one tried to persuade you to engage in

24   sexual activity with Jeffrey Epstein?

25       A.    No.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 26

1      Q.    You're sure that -- let me ask the question

2    again.

3                You're sure that before you got to

4    Epstein's house no one tried to persuade you to engage in

5    sexual activity with Epstein for money.  Are you?

6                MR. LEOPOLD:  Objection.  Asked and

7                answered.

8                THE WITNESS:  No.  And I've already

9                answered that a bazillion times.

10   BY MR. TEIN:

11     Q.    He's coaching you now.  So I'm going to ask

12   the question --

13                MR. LEOPOLD:  Counsel, I've made an

14                objection for the record.

15                MR. TEIN:  Stop speaking.

16                MR. LEOPOLD:  I'm not going to stop

17                speaking.  You can't interrupt me when I'm making

18                the record.

19                MR. TEIN:  You're coaching the witness.

20                MR. LEOPOLD:  Counsel --

21                MR. TEIN:  Stop coaching the witness.

22   BY MR. TEIN:

23     Q.    ███████  let me ask you --

24                MR. LEOPOLD:  If you continue to --

25                MR. TEIN:  Stop interrupting my questions.

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

08-80736-CV-MARRA

## Censor & Associates
Reporting and Transcription, Inc.

Page 27

```
1              MR. LEOPOLD:   If you do it one more time,

2       we're leaving.

3    BY MR. TEIN:

4       Q.      ████████

5              MR. LEOPOLD:   I'm going to make the record.

6       You cannot interrupt me when I'm making the

7       record.  Out of professional conduct, you cannot

8       do that.  I'm entitled to make the record.  I made

9       an objection, asked and answered.  Your demeanor

10      is inappropriate.  You're willing and you are able

11      and you're responsible to ask a question in a

12      professional manner, and ask the question and once

13      you get the answer, to either follow up on it or

14      move on, but not continuously browbeat and ask the

15      same question over and over because you don't like

16      the answer.

17             MR. TEIN:   Calm down, sir.

18             MR. LEOPOLD:   Trust me, I'm very calm here.

19      When I'm not calm, you'll know it.  I'm very calm.

20             So please continue on.  But I will not

21      allow you to continue to harass her in the

22      demeanor that you're doing.  Ask her a question

23      and move on.

24             MR. TEIN:   Are you done?

25             MR. LEOPOLD:   Thank you.  I am.
```

Censor & Associates
Reporting and Transcription, Inc.

Page 28

1          MR. TEIN:  Stop misrepresenting the record

2     and calm down.  I'm going to ask my question.

3     Stop it.

4   BY MR. TEIN:

5          Q.      ████      --

6          MR. LEOPOLD:  I think the record is very

7     clear.

8          MR. GOLDBERGER:  Let me just clarify

9     something.  When you object to the form of a

10    question, you're not instructing the witness not

11    to answer the question, are you?

12         MR. LEOPOLD:  No.  And I'm not making that

13    objection; only on attorney/client privilege.

14         MR. TEIN:  Will you stop speaking now so I

15    can ask my question?  Are you done?

16         Okay.  I'm going to ask my question.

17   BY MR. TEIN:

18         Q.      Listen, ████      --

19         MR. LEOPOLD:  Hold on.  Stop.

20         I've been doing this for 20 plus years and

21    have met a lot of attorneys, but I've never had an

22    experience like this where I've --

23         MR. TEIN:  Stop your speeches.

24         MR. LEOPOLD:  If you continue to do this,

25    whether it's with me or with my client, I will not

# Censor & Associates
### Reporting and Transcription, Inc.

Page 29

```
 1        put up with it and I don't need to put up with it
 2        and it's not appropriate.  And I'm sure
 3        Mr. Goldberger knows all this, because I know that
 4        he wouldn't do this.  So I will not put up with
 5        it.  And I think it's highly inappropriate to do
 6        this with this child sitting here, the way you're
 7        acting, primarily towards me, and I will not put
 8        up with it.
 9              MR. TEIN:  Will you please stop your speech
10        so I can ask questions?
11              MR. LEOPOLD:  So long as you act
12        professionally, I will do so.  But if you continue
13        to do it this way, I will leave.
14              MR. TEIN:  Suit yourself.
15   BY MR. TEIN:
16        Q.         ████      are you sure that before you got to
17   Epstein's house no one tried to persuade you to engage in
18   sexual activity with Epstein for money?
19              MR. LEOPOLD:  Asked and answered.
20        Objection.
21              MR. TEIN:  Did you get her answer?
22              THE COURT REPORTER:  No, I did not.
23              THE WITNESS:  I'm sure.
24   BY MR. TEIN:
25        Q.   Let me ask you a few questions about your
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 30

1     contact with Jeffrey Epstein.   Okay?

2              A.    (Witness nods head up and down.)

3              Q.    Jeff never e-mailed you, did he?

4              A.    No.

5              Q.    Jeff never text messaged you, did he?

6              A.    No.

7              Q.    Jeff never chatted in a chat room with you,

8     did he?

9              A.    No.

10             Q.    Before you got to Epstein's house you had

11    never spoken to Jeff, had you?

12             A.    No.

13             Q.    And before you got to Epstein's house you

14    had never met Jeff?

15             A.    Correct.

16             Q.    Before you got to Epstein's house you had

17    never told Jeff that you were under 18, right?

18             A.    No.

19             Q.    Before you got to Epstein's house had you

20    ever told Jeffrey that you were under 18?

21             A.    No.  I never spoke to the man before that.

22             Q.    And you only went to Jeff Epstein's house

23    that one time three years ago, correct?

24             A.    Yes.

25             Q.    You never went there again, correct?

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

08-80736-CV-MARRA

# Censor & Associates
### Reporting and Transcription, Inc.

Page 31

1     A.    No.

2     Q.    All right.  Let me ask you two final areas

3   of questioning about this and we'll move onto something

4   else.  Okay?

5     A.    Uh-huh.  Yes.  I'm sorry.

6     Q.    Before you got to Epstein's did anyone

7   associated with Epstein ever call you on the phone and

8   try to persuade, induce, entice or coerce you to engage

9   in any sexual activity?

10    A.    No.

11    Q.    Before you got to Epstein's did anybody

12  associated with Epstein ever contact you on the Internet

13  and try to persuade, induce, entice or coerce you to

14  engage in any sexual activity?

15    A.    No.

16    Q.    ████████ who told you that when you got to

17  Jeff Epstein's house you should lie to Jeff about your

18  age?

19    A.    ████████.

20    Q.    Was it ████████ or was it the other girl in

21  the car who you rode over with to Epstein's house?

22    A.    ████████

23    Q.    Who was the other girl in the car with you

24  that day?

25    A.    I honestly don't know.

Censor & Associates
Reporting and Transcription, Inc.

Page 32

1    Q.    Had you ever seen her before?

2    A.    No, sir.

3    Q.    You told the police that when you rode over

4    to Epstein's you had no idea who she was, right?

5    A.    Correct.

6    Q.    You told the police that you didn't know

7    her name, but she was like really dark, kind of like a

8    Spanish girl?

9    A.    Yes.

10   Q.    Those were your words, right?

11   A.    Yes.

12   Q.    Do you now know who she is?

13   A.    No, sir.

14   Q.    So it was ▓▓▓▓ who told you to lie about

15   your age to Jeff Epstein?

16   A.    Yes, sir.

17   Q.    And ▓▓▓ told you that if you weren't 18,

18   Epstein wouldn't let you into his house, right?

19   A.    That's -- yes, yes.

20   Q.    All right.  Let's talk for a minute about

21   when you first met Jeff.  Okay?

22   A.    Sure.

23   Q.    When you first met Jeff he tried to find

24   out how old you were, right?

25   A.    Excuse me?

## Censor & Associates
Reporting and Transcription, Inc.

Page 33

```
 1            Q.    When you first met Jeff he tried to find

 2   out how old you were, right?

 3            A.    Not when we first introduced each other;

 4   when we get upstairs, then, yes.

 5            Q.    During the massage Jeff asked you how old

 6   you were, correct?

 7            A.    Yes, yes.

 8            Q.    Now hadn't you already told Jeff's

 9   assistant, the one who walked you upstairs, that you went

10   to college and had just moved down here from Ohio?

11            A.    I never spoke to the lady.

12            Q.    Do you want to rethink that answer?

13            MR. LEOPOLD:  Is that a question?

14   BY MR. TEIN:

15            Q.    Do you want to rethink that answer?

16            A.    No.  I didn't really speak with her that

17   much.

18            Q.    Do you want to try to refresh your memory

19   on that?

20            MR. LEOPOLD:  Do you have something to

21       refresh her memory with?

22            MR. TEIN:  Do you want to stop making

23       speaking objections?

24            MR. LEOPOLD:  No.  But to refresh someone's

25       memory, you show them a document.
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 34

```
 1              MR. TEIN:  I know how to do this.

 2              MR. LEOPOLD:  Then show her a document.

 3              MR. TEIN:  Stop speaking.

 4              MR. LEOPOLD:  I'm not going to stop

 5      speaking.  I'm going to continue to make the

 6      record.

 7              MR. TEIN:  You're obstructing.  Please

 8      stop.

 9              MR. LEOPOLD:  I'm not obstructing.  But if

10      you want to refresh her recollection, you need to

11      show her something.

12              That's not a proper question.  I object to

13      the foundation and the predicate of that question.

14              MR. TEIN:  Are you done?

15              MR. LEOPOLD:  I am now.  Thank you.

16      BY MR. TEIN:

17          Q.   Do you want to try to refresh your memory

18      as to whether you had any conversation with the woman who

19      walked you upstairs in Epstein's house in which you told

20      her that you went to college and had just moved down from

21      Ohio?

22              MR. LEOPOLD:  Objection.  Object to the

23              form of the question.  Lack of foundation and

24              predicate.

25      BY MR. TEIN:
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 35

```
 1          Q.    You can answer the question.

 2          A.    Sure.

 3          Q.    Is there anything that would refresh your

 4    memory that in fact you told Mr. Epstein's assistant, the

 5    one who walked you upstairs, that you went to college and

 6    you had just moved down here from Ohio?

 7          A.    I don't remember saying that, but if you --

 8    I don't remember saying that myself, so --

 9          Q.    That would be a lie, right?

10          A.    No.  I really don't remember.

11          Q.    So you told Jeff that you were 18 years

12    old, correct?

13          A.    Yes.

14          Q.    Do you remember Detective ███████ Pagan of

15    the Police Department, Palm Beach Police Department?

16          A.    Yes.

17          Q.    Do you remember you spoke to her?

18          A.    Yes.

19          Q.    Do you remember that you told Detective

20    Pagan that when you lied about your age to Jeff you said

21    it really fast because you didn't want to make it sound

22    like you were lying?

23          A.    I don't remember the words exactly, but I

24    do remember telling her I told him I was 18.

25          Q.    And do you remember telling Detective Pagan
```

## Censor & Associates
Reporting and Transcription, Inc.

Page 36

1    that when you lied to Epstein about your age that you

2    said it really fast so Epstein wouldn't realize you were

3    lying?

4            A.    No, I don't remember saying those words

5    exactly to her.  I remember telling her that I told

6    Epstein I was 18.

7            Q.    Does it sound right to you that you told

8    Detective Pagan that you said your age really fast to

9    Epstein --

10               MS. BELOHLAVEK:  Objection.  Asked and

11           answered.

12   BY MR. TEIN:

13          Q.    -- so he wouldn't think that you were

14   lying?

15               MR. LEOPOLD:  Objection.  Asked and

16           answered, lack of foundation, mischaracterization

17           of her earlier testimony.  She's already answered

18           that question.

19   BY MR. TEIN:

20          Q.    You can answer it.

21               MR. LEOPOLD:  Same objection.  It's been

22           asked and answered.

23               You can answer.  I've made the objection.

24               THE WITNESS:  I forget the question, now.

25

## Censor & Associates
Reporting and Transcription, Inc.

Page 37

1   BY MR. TEIN:

2       Q.   Let me put it again.

3       Does it sound right to you that you told

4   Detective Pagan that when you lied about your age to

5   Jeffrey Epstein, you said it really fast because you

6   didn't want to make it sound like you were lying?

7       MR. LEOPOLD:  Objection.  Lack of

8       foundation, asked and answered.

9       THE WITNESS:  I could have possibly said

10       that, yes.

11  BY MR. TEIN:

12      Q.   You didn't want Mr. Epstein to know that

13  you were lying about your age, right?

14      A.   Correct.

15      Q.   You didn't want Mr. Epstein to know that

16  you were not 18 yet, right?

17      A.   Correct.

18      Q.   You wanted Mr. Epstein to believe that you

19  really were 18, right?

20      A.   Correct.

21      Q.   Do you remember when Mr. Epstein asked

22  where you went to school?

23      A.   Yes.

24      Q.   And you told Mr. Epstein you went to

25  Wellington, right?

## Censor & Associates
### Reporting and Transcription, Inc.

Page 38

1    A.    Yes.

2    Q.    Was that the truth?

3    A.    No.

4    Q.    In fact, you went to Royal Palm, right?

5    A.    Yes.

6    Q.    So you lied to Mr. Epstein again, correct?

7    A.    Yes.

8    Q.    Is Wellington the college that you told

9    Jeff's assistant that you were attending?

10    A.    I don't remember having that conversation

11    with her, so I wouldn't know if that's what I said.

12    Q.    That was a lie, though, wasn't it?

13    MR. LEOPOLD:  Objection to the form of the

14    question, lack of foundation.  You're making an

15    assumption.  She just answered you she can't tell

16    you that.

17    MR. TEIN:  Speaking objection.  And you

18    well know that, Mr. Leopold.

19    MR. LEOPOLD:  She can't answer that

20    question.  The way you phrased that question,

21    you're purposely making her not be honest in her

22    testimony.  She can't answer a question like that.

23    She doesn't remember.  So then you say, "So you

24    were lying."  That's improper and you know that.

25    That's not a proper question.  And any attorney

## nsor & Associates
Reporting and Transcription, Inc.

Page 39

1       that would do that to a witnesses or to a person

2       that's sitting in this chair is not acting

3       professionally.  You can't ask a question like

4       that.  You can do it, but it's not proper.  And

5       I'm sure you weren't trained that way, certainly

6       not ethically.

7               MR. TEIN:  Will you stop?

8               MR. LEOPOLD:  I'm not going to stop,

9       because the way you're asking that question is

10      improper and you know it.

11              MR. TEIN:  You're losing your cool.

12      BY MR. TEIN:

13          Q.     Ms. ███████ --

14              MR. LEOPOLD:  Trust me.  I'm very calm.

15      When I lose my cool, you'll know it.

16              MR. TEIN:  I do know it.

17      BY MR. TEIN:

18          Q.     Ms. ███████  Mr. Epstein never asked you

19      to do anything other than massage him, correct?

20          A.     Incorrect; because he asked me to take off

21      my bra, so that would be two things he's asked me to do.

22          Q.     Other than asking you to take your bra off,

23      Mr. Epstein never asked you to do anything with him other

24      than massage, correct?

25              MR. LEOPOLD:  Objection.  Foundation,

Censor & Associates
Reporting and Transcription, Inc.

Page 40

```
1              predicate.

2                       THE WITNESS:   Correct.

3    BY MR. TEIN:

4         Q.    You told the police, in your words, that

5    you did not whack him off, right?

6         A.    Correct.

7         Q.    What does that mean?

8         A.    Whack, like whacking off?

9         Q.    Your term, what does that mean?

10        A.    Masturbating.

11        Q.    Mr. Epstein never tried at any time to grab

12   your hand, did he?

13        A.    No.

14        Q.    Mr. Epstein never tried to put your hand

15   anywhere, did he?

16        A.    No.

17        Q.    At no time did you touch Mr. Epstein's

18   penis, did you?

19        A.    No.

20        Q.    And he did not touch you, correct?

21        A.    Incorrect.

22        Q.    Well, you told the police, "At no time did

23   he touch me."  Were you lying to the police then?

24        A.    No.  Well, I wasn't being fully truthful,

25   but I wasn't lying.
```

## nsor & Associates
Reporting and Transcription, Inc.

Page 41

1          Q.     You told the police twice when you spoke to

2          ▮▮▮▮     Pagan that "at no time did he touch me."  Didn't

3     you say that to the police?

4          A.     Yeah.

5          Q.     And you're saying that that was not fully

6     truthful.  Is that what you're saying now?

7          A.     Correct.

8          Q.     And you're saying if you're not fully

9     truthful, that's not a lie.  Correct?

10         A.     You took that out of context like really

11    bad.  I didn't mean like that.  Touching my legs and --

12    he never kept his hands to himself the entire time.

13    That's what I'm trying to say.

14         Q.     You told the police, "At no times did he

15    touch me."  You agree with that, correct?

16         A.     No, I don't agree with that, because he did

17    touch me.

18         Q.     Did you tell the police that he did not

19    touch you, yes or no?

20         A.     It's a possibility, but I do not remember.

21         Q.     Okay.  And you did not have any type of sex

22    with Jeff, correct?

23         A.     No.

24         Q.     And you did not have any type of oral sex

25    with Jeff, correct?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 42

```
 1          A.    No.

 2          Q.    No type of intercourse with Jeff, correct?

 3          A.    Correct.

 4          Q.    All right.  Let's talk about what happened

 5     after the massage was over.

 6          A.    Okay.

 7          Q.    After the massage, you told Epstein that

 8     you wanted to bring your twin sister back so she could

 9     make some money, correct?

10          A.    Incorrect.

11          Q.    Your twin sister is ████ right?

12          A.    Correct.

13          Q.    And you love ████ very much, don't you?

14          A.    Yes.

15          Q.    And when you left the house you were joking

16     with the other girls, weren't you?

17          A.    Incorrect.

18          Q.    Well, when ████ and the other girl in the

19     car that day made their statements to the police they

20     told the police that you were joking afterwards.  Are you

21     saying that they were lying to the police about that?

22          A.    No.  But a question or -- questions from

23     ████ -- like she asked me questions, but it wasn't

24     joking.  She was kind of like in a happy way, like, "Oh,

25     what did you do?  What did you do?"  Like those kind of
```

# Censor & Associates
Reporting and Transcription, Inc.

Page 43

```
 1    things, but it wasn't joking about it at all.
 2            Q.    You joked about it, didn't you?
 3            A.    No.
 4            Q.    You said to ███████ that if you did this
 5    every weekend you'd be rich, didn't you?
 6            A.    No.  That's what ███████ told me.
 7            Q.    You didn't tell that to ███████
 8                  MR. LEOPOLD:  Objection.  Asked and
 9            answered.
10                  THE WITNESS:  No.
11    BY MR. TEIN:
12            Q.    After you left Epstein's house you took the
13    money and you went shopping with ███████ and the other
14    girl in the car, correct?
15            A.    Incorrect.  I didn't spend any of the
16    money.
17            Q.    You went to Marshall's, didn't you?
18            A.    I went along, yes, but I didn't --
19            Q.    You went shopping with them at Marshall's,
20    didn't you?
21                  MR. LEOPOLD:  Objection.
22                  THE WITNESS:  I guess you could say that.
23                  MR. LEOPOLD:  Objection.  Lack of predicate
24            and foundation.  Mischaracterization of earlier
25            testimony.
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 44

```
1    BY MR. TEIN:

2         Q.    And ▇▇▇▇ bought a purse, right?

3         A.    Yes.

4         Q.    And you were with her the whole time at

5    Marshall's, correct?

6         A.    Yes.

7         Q.    Now tell me about when the federal

8    prosecutors told you about getting reimbursed.

9         A.    I have no idea what you're talking about.

10        Q.    Tell me about when the federal prosecutors

11   spoke to you about getting money you feel you're entitled

12   to from Mr. Epstein.

13        A.    I don't know what you're talking about.

14        Q.    Do you know who ▇▇▇▇ Villafona is?

15        A.    No, sir.

16        Q.    Did you ever meet with any federal

17   prosecutors?

18        A.    I think -- yeah.  I think they were -- I

19   think they were like FBI.

20        Q.    Uh-huh.  Did you meet with federal

21   prosecutors?

22        A.    They came to my house one time, yes.

23        Q.    When did they come to your house?

24        A.    Very long ago.

25        Q.    Was it this year, 2008?
```

**nsor & Associates**
Reporting and Transcription, Inc.

Page 45

1       A.    It was not this year, no.

2       Q.    Was it 2007?

3       A.    I'd have to say at least two years ago or a

4    year ago, yeah.  So it would be 2007, 2006; but it was a

5    while ago.

6       Q.    How many federal prosecutors or FBI agents

7    came to your house?

8       A.    I'm trying to remember.  I want to say four

9    people came.

10      Q.    Did they give you their business cards?

11      A.    If they did, I don't remember, and they

12   weren't toward me.  Maybe my parents have them.  I don't

13   know.

14      Q.    Did they give you their cell phone numbers?

15      A.    No.

16      Q.    Did you ever speak to them on their cell

17   phones?

18      A.    No, sir.

19      Q.    Did they speak to your parents?

20      A.    That's something you'd have to ask my

21   parents.

22      Q.    Do you know whether they spoke to your

23   parent's?

24      A.    No, sir.

25      Q.    You have no idea?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 46

```
1          A.    No, sir.

2                MR. LEOPOLD:  Objection.  Asked and

3          answered.

4     BY MR. TEIN:

5          Q.    So if I say the name to you ▉▉▉

6     Villafona, you don't know who that is?

7          A.    No, sir.

8          Q.    How many women and how many men came to

9     your house?

10         A.    I want to say two ladies and two guys.

11         Q.    Did someone named Jeffrey Sloman come to

12    your house?

13         A.    I don't know names, sir.

14         Q.    Do you know who Jeffrey Sloman is?

15         A.    No, sir.

16         Q.    Do you know who Jeffrey Herman is?

17         A.    Yes.

18         Q.    That's the lawyer who first sued Epstein on

19    your behalf, right?

20         A.    Yes.

21         Q.    Has Mr. Herman advanced your family any

22    money?

23               MR. LEOPOLD:  Any conversations that you've

24         had with Mr. Herman regarding that issue, you are

25         not to disclose.  If you've learned in some other
```

Censor & Associates
Reporting and Transcription, Inc.

Page 47

```
 1              fashion, you may answer.
 2                    THE WITNESS:  Okay.
 3                    I wouldn't know.
 4    BY MR. TEIN:
 5         Q.    You don't know?
 6         A.    No.
 7                    MR. LEOPOLD:  Objection.  Foundation.
 8              Attorney/client privilege.
 9    BY MR. TEIN:
10         Q.    And you say you don't know who Jeff Sloman
11    is?
12         A.    No, sir.
13         Q.    Does it refresh your recollection that he's
14    the number two prosecutor at the U.S. Attorney's Office?
15         A.    No.
16         Q.    That he's ███ Villafona's boss?
17         A.    No.
18         Q.    Does it refresh your memory that he's the
19    ex-partner of Jeff Herman, the first lawyer who sued
20    you -- sued Mr. Epstein on your behalf for fifty million
21    dollars?
22         A.    No, sir.  I don't know who he is.
23         Q.    Without telling me any conversations that
24    you've had with your lawyers, how is it that you selected
25    Mr. Herman as your lawyer from the 81,000 members of the
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 48

```
 1    Florida Bar?
 2              A.    I did not select him.
 3              Q.    Who did?
 4              A.    My father.
 5              Q.    Did you ever meet Mr. Herman?
 6              A.    Once.
 7              Q.    Don't -- don't tell me what you discussed
 8    with him.  Where did you meet him?
 9              A.    I was shopping in my -- he showed up at my
10    friend's house.
11              Q.    Whose house?
12              A.    My friend ████████.
13              Q.    Is that ██████ from the Quarterdeck
14    Tavern?
15              A.    Yes.
16              Q.    And did you have a meeting with him at
17    ███████ house?
18              A.    Yes.  I guess you could say that.
19              Q.    And who else was there?
20              A.    My Aunt ████.
21              Q.    And what was that meeting about?
22              MR. LEOPOLD:   Objection.   That calls for
23    attorney/client privilege.
24    BY MR. TEIN:
25              Q.    What discussions did you have with
```

Censor & Associates
Reporting and Transcription, Inc.

Page 49

1    Mr. Herman in the presence of ██████████?

2        A.   None.

3        Q.   What discussions did you have in the

4    presence of her aunt?

5        A.   Of my aunt?

6        MR. GOLDBERGER:  It's the witness's aunt.

7    BY MR. TEIN:

8        Q.   Oh, of your aunt.

9        A.   The only one that we've ever discussed or

10    ever had.

11        Q.   And so you were in a conversation with

12    Mr. Herman and your aunt?

13        A.   Yes, sir.

14        Q.   And you discussed privileged matters during

15    that conversation?

16        MR. LEOPOLD:  Object to the form.  I think

17        you might have to educate her on that question.

18    BY MR. TEIN:

19        Q.   You discussed the lawsuit?

20        A.   Yes.

21        Q.   Did ████████ tell you about any

22    conversations that she had with Mr. Herman?

23        A.   As far as I'm concerned, she's never spoken

24    or she's never had a conversation.  She only opened the

25    door and then left.  She's the one who answered the door.

**nsor & Associates**
Reporting and Transcription, Inc.

Page 50

1      Q.   Why did the meeting take place at ███████

2   ██████ house?

3      A.   I spent the night that night at her house.

4      Q.   And when was this?

5      A.   A while ago.

6      Q.   How long ago?

7      A.   A month and a half ago.  I'm guessing.

8      Q.   A month and a half ago?

9      A.   Uh-huh.

10      Q.   So was it before of after Mr. Herman filed

11   the fifty-million-dollar lawsuit against Epstein?

12      A.   After.

13      Q.   Did you meet with an FBI agent named

14   Nesbitt Kurkendall, a woman?

15      A.   I don't know.

16      Q.   Did Ms. Kurkendall speak to you about

17   getting reimbursed from Mr. Epstein?

18      A.   I've never had a discussion with anyone

19   about getting reimbursed from Mr. Epstein.

20      Q.   Have you met with an agent named Jason

21   Richards?

22      A.   Not to my knowledge.

23      Q.   How about an agent named Tim Slater?

24      A.   No, sir.

25      Q.   How about an agent named Junior Ortiz?

Censor & Associates
Reporting and Transcription, Inc.

Page 51

1        A.    No.

2        Q.    And we've learned that many of the girls,

3    some of whom are as old as 23, were told by the

4    government that they would get money at the end of the

5    criminal prosecution.  Does that sound familiar to you?

6        A.    No, sir.

7        Q.    Other than Mr. Leopold here -- I'm not

8    asking about Mr. Herman either --

9        A.    Uh-huh.

10        Q.    -- did anyone ever discuss with you that

11    you could get reimbursement for your damages?

12        A.    No, sir.

13        Q.    Did you or any member --

14             MR. LEOPOLD:  Are you referring to a

15             criminal matter or a civil matter?

16    BY MR. TEIN:

17        Q.    Did you or any member --

18             MR. LEOPOLD:  Excuse me.  Let me object to

19             the form of the question.

20    BY MR. TEIN:

21        Q.    Did you or any member of your family ever

22    get a victim notification letter from anyone?

23        A.    I no longer live at that residence and I

24    wouldn't know.

25        Q.    So your testimony is that you have never

08-80736-CV-MARRA                    001283



nsor & Associates
Reporting and Transcription, Inc.

Page 52

1    received a victim notification letter, correct?

2                              rect.

3         Q.    And your testimony is that you don't know

4    if your parents have ever received a victim notification

5    letter, correct?

6         A.    Correct.

7         Q.    Have you given any evidence to prosecutors

8    or law enforcement in this case?

9         A.    What do you mean by evidence?

10        Q.    Well.  Anything that you can touch or feel.

11        A.    No.

12              MR. LEOPOLD:  Objection to the form of the

13        question.

14   BY MR. TEIN:

15        Q.    So you haven't given anything physical --

16        A.    No.

17        Q.    -- any item to any prosecutor, police

18   officer or law enforcement agent, correct?

19        A.    My cell phone four years ago or three years

20   ago, but that's it.

21        Q.    You gave your cell phone to whom?

22        A.    ████████  Pagan.

23        Q.    Did she keep it?

24        A.    Ask her.

25        Q.    You gave it to her and then you didn't get



Censor & Associates
Reporting and Transcription, Inc.

Page 53

1    it back at the end of the meeting?

2         A.   No.   They -- yeah.   No.   They have it.   I'm

3    guessing.   I don't have it.

4         Q.   How much money are you hoping to get out of

5    Mr. Epstein?

6              MR. LEOPOLD:   Objection to the form of the

7              question.   Attorney/client privilege.

8    BY MR. TEIN:

9         Q.   How much money are you hoping to get, you,

10   yourself, hoping to get out of Epstein?

11             MR. LEOPOLD:   Same.   Same objection,

12             attorney/client privilege.

13             Don't answer the question.

14   BY MR. TEIN:

15        Q.   I'm not asking about what your lawyer told

16   you.

17             MR. LEOPOLD:   I'm instructing her not to

18             answer the question, because any of those

19             conversations involve her counsel.

20             MR. TEIN:   Certify that.

21             MR. LEOPOLD:   Please.

22   .................CERTIFIED QUESTION.................

23   BY MR. TEIN:

24        Q.   Now, ███████ you lied to get out of this

25   deposition, didn't you?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 54

1          A.     No, sir.

2          Q.     You didn't want to come to court today and

3     tell the story that you had told to the police under

4     oath, did you?

5               MR. LEOPOLD:  Object to the form of the

6          question.  Lack of foundation, predicate.

7               THE WITNESS:  No.  I have no problem coming

8          here and talking to you.

9     BY MR. TEIN:

10         Q.     And to avoid getting served with a lawful

11    subpoena, you lied about your name, didn't you?

12         A.     No.

13         Q.     And in fact, just lying yourself wasn't

14    enough, was it?

15              MR. LEOPOLD:  Objection to the form of the

16         question.

17              Don't answer it.  It's not a question.

18              Object to the form of the question.  Lack

19         of foundation.

20              MR. TEIN:  Are you instructing her not to

21         answer?

22              MR. LEOPOLD:  I am.

23              MR. TEIN:  Certify it.

24              MR. LEOPOLD:  Please.

25

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401
08-80736-CV-MARRA

80 of 316

001286

## Censor & Associates
Reporting and Transcription, Inc.

Page 55

```
 1          ................CERTIFIED QUESTION.................
 2     BY MR. TEIN:
 3          Q.    You asked your co-workers --
 4                MR. LEOPOLD:  It's vague and ambiguous.
 5     BY MR. TEIN:
 6          Q.    You asked your co-workers at the
 7     Quarterdeck Tavern to lie for you, didn't you?
 8          A.    No.  I informed my boss about what was
 9     going on and he told me that he would help in any way
10     that he can.
11          Q.    Okay.  You got your friend ████████ to lie
12     by switching name tags with you, correct?
13          A.    Incorrect.  It was a coincidence that same
14     night she was not wearing her name tag; she was wearing
15     mine.  But I was also not wearing -- I was wearing my
16     name tag.  Everyone switches name tags.  It just so
17     happens it was a coincidence that same night the people
18     came with the papers.
19                MR. TEIN:  Will you put up Exhibit 18-001?
20                MR. GOLDBERGER:  And mark 18-001 for
21          identification purposes to this deposition.
22                MR. LEOPOLD:  None of them have been marked
23          yet.  Can we mark them and put them as attachment
24          to the depositions?  Because I think you've shown
25          three photos now.  And this is the only one that
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 56

1   has been marked for identification yet.

2   BY MR. TEIN:

3        Q.    ██████ --

4             MR. LEOPOLD:  Hold on just a second.  Just

5   so the record is clear --

6             MR. TEIN:  I'm not speaking to you.

7             MR. LEOPOLD:  Okay.  Then don't speak to me

8   then.  But I'll speak to Mr. Goldberger, perhaps.

9             But at least for the record, can we put on

10  the record what the previous two photographs were

11  marked for identification?

12            MR. GOLDBERGER:  We will make sure that the

13  record is clear at the end of the deposition so

14  that there's no ambiguity.

15            MR. LEOPOLD:  Thank you.

16  BY MR. TEIN:

17        Q.    ██████  I've put a photograph marked 18-001

18  up on the screen.  Do you see that?

19        A.    Yup.

20        Q.    Who is that in the photo?

21        A.    ██████  on the left and me on the right.

22        Q.    ████████████  right?

23        A.    Yes.

24        Q.    ██████████  your friend at the

25  Quarterdeck Tavern, right?

**C**nsor & Associates
Reporting and Transcription, Inc.

Page 57

1          A.     Yes.

2          Q.     ████████ your friend, who you say the day

3     that the process servers went to serve you with a

4     subpoena for this deposition, just happened -- just by

5     coincidence, was wearing your name tag?

6          A.     Yes, sir.

7          Q.     And just by coincidence, you were wearing

8     her name tag, correct?

9          A.     Yes.

10         Q.     Your testimony under oath is that's just a

11    coincidence, right?

12         A.     Total honesty.

13         Q.     It just happens to be the day that you were

14    going to be served with a subpoena, correct?

15         A.     That wasn't the first day that --

16         MR. LEOPOLD:  ██████ just answer the

17    question.  It calls for a yes or no.

18         THE WITNESS:  Yes.

19    BY MR. TEIN:

20         Q.     You said that wasn't the first day you were

21    going to be -- you thought you were being served with a

22    subpoena, correct?

23         A.     Correct.

24         Q.     You knew before the day that you switched

25    name tags with ██████ that the process servers were

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401
08-80736-CV-MARRA

83 of 316                                                                                        001289

nsor & Associates
Reporting and Transcription, Inc.

Page 58

1    looking for you, didn't you?

2              A.    No.   I knew --

3              MR. LEOPOLD:   Just answer it.   It calls for

4         a yes or no.

5              THE WITNESS:   Okay.   No.

6    BY MR. TEIN:

7              Q.    Now you can explain the answer that your

8    counsel stopped you from explaining.

9              A.    Okay.   I work at Quarterdeck and people

10   were telling me that people were looking for me.   So yes,

11   I was aware that people were searching for me.   But I had

12   no idea who they were or what their intentions were.   But

13   I thought they were just people I didn't want to talk to.

14   So I just didn't want to talk to them.   And every time

15   they'd come to work I wasn't there.   And so happens the

16   night that they came in me and my friend switched name

17   tags.   No big deal.

18             Q.    That's a lie, isn't it?

19             MR. LEOPOLD:   Objection.   Don't answer that

20        question.   That's harassment and I will not allow

21        it.   He could ask the questions and we'll allow a

22        jury to make that determination, but not counsel.

23             I will not allow her to answer that

24        question.

25             MR. TEIN:   Certify it.

# Censor & Associates
Reporting and Transcription, Inc.

Page 59

1           MR. LEOPOLD:  I'll certify it.

2  .................CERTIFIED QUESTION.................

3  She's answered that question.  She's explained it five

4  times already.  The fact that Counsel doesn't like the

5           answer, that's a different query.

6           MR. TEIN:  Stop making speaking objections.

7           MR. LEOPOLD:  I'm not.  I'm not going to

8  put up with it, because it's in appropriate, Jack,

9  and you know it.  I will not allow Counsel to

10  berate a witness, whether it's in a criminal case

11  or a civil case, whether my client or --

12           MR. TEIN:  Calm down.

13           MR. LEOPOLD:  Excuse me.

14           No, I'm not going to allow it.  That is not

15  proper.

16           MR. GOLDBERGER:  Okay.

17           MR. LEOPOLD:  If he wants to say that she's

18  lying after asking it five times and her

19  explaining in great detail, he can do that.  But

20  I'm not going to allow her to answer, nor be

21  harassed by him.  It's improper.

22           MR. GOLDBERGER:  Okay.  But your response

23  that Counsel doesn't like the question -- or

24  doesn't like the answer -- just let me finish.

25           MR. LEOPOLD:  Absolutely.  I wasn't going

**ensor & Associates**
Reporting and Transcription, Inc

Page 60

1    to interrupt you.

2         MR. GOLDBERGER:  Just requires us to say we

3    like the answer to that question.  And it's not

4    you and I or you and Mr. Tein who are testifying

5    here.  It's the witness.

6         MR. LEOPOLD:  Fine.  But after the sixth

7    time of asking the same question and then coming

8    back and pointing a finger at her and saying,

9    "You're a liar" --

10        MR. TEIN:  That didn't happen.

11        MR. LEOPOLD:  That's fine.  But I'm not

12   going to allow her to answer that question,

13   because she's answered that same question and has

14   explained it.

15        Now Counsel might be sitting there rubbing

16   his head with a migraine.  That's his problem.

17   But if he can't ask a question appropriately in a

18   professional manner, we will leave.  I will not

19   allow her to be berated like that.

20        MR. GOLDBERGER:  Actually, we're very happy

21   with the answer.

22        MR. LEOPOLD:  That's great.

23        MR. GOLDBERGER:  Do you want us to get into

24   that?

25        MR. TEIN:  Ted --

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401
08-80736-CV-MARRA

86 of 316                                                                                    001292

## Censor & Associates
### Reporting and Transcription, Inc.

Page 61

1   MR. LEOPOLD:  This is really big stuff that

2   you're going through.  But that's fine; just ask

3   your question and move on.  But do it one time.

4   If you don't understand it, I'll let you follow

5   up, but I'm not going to allow you to ask the same

6   question time and again and then call her a liar.

7   Just ask the question, get the answer and move to

8   the next subject matter.

9        MR. TEIN:  Ted, I'm sitting right across

10   the table from you.

11        MR. LEOPOLD:  Yes, sir.

12        MR. TEIN:  Please be quiet.  Don't yell.

13        MR. LEOPOLD:  I will not be quiet.

14        MR. TEIN:  Stop yelling.

15        MR. LEOPOLD:  Lewis, when I'm yelling

16   you'll know it.  I will not --

17        MR. TEIN:  My name is not Lewis.

18        MR. LEOPOLD:  I thought your first name was

19   Lewis, Mr. Tein.

20        MR. TEIN:  You watched me for three days at

21   the evidentiary hearing where you sat in the back

22   of the courtroom.  You should know who I am.

23        MR. LEOPOLD:  Well, that's the impression

24   you must have made in the courtroom.

25        I will not be quiet.

**nsor & Associates**
Reporting and Transcription, Inc.

                                                        Page 62

1              MR. TEIN:   That's obnoxious.   Stop being

2       obnoxious.  It's stupid.  Let's go ahead with the

3       questions.

4              MR. LEOPOLD:  I will make the record.

5              MR. TEIN:  Let's get on with the questions.

6              MR. LEOPOLD:  Do you need a break?

7              (Thereupon, a recess was taken.)

8    BY MR. TEIN:

9          Q.   Okay.  ████████ after you told your manager

10   at the Quarterdeck Tavern everything that was going on

11   and he told you he would help you any way he could, he

12   hid you in the kitchen from the process servers, correct?

13         A.   Incorrect.

14         Q.   Isn't it true that lying to avoid service

15   is a meaningless lie to you, ███████

16         A.   Incorrect.

17         Q.   What is your manager's name?

18         A.   I have three.  Would you like to know

19   all --

20         Q.   Who's the one who lied for you?

21         A.   ██████████

22         Q.   And what did ██████ do to lie for you?

23         A.   Said I wasn't there.

24         Q.   And who did he tell wasn't there?

25         A.   Ask him.

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401
08-80736-CV-MARRA

88 of 316                                                              001294



**Censor & Associates**
Reporting and Transcription, Inc.

                                                                Page 63

1          Q.     Where were you when ███████ told this

2    someone that you were not at the Quarterdeck Tavern?

3          A.     Eating nachos.

4          Q.     At the Quarterdeck Tavern?

5          A.     Yes.

6          Q.     What did you do so that ███████ would lie to

7    the process servers for you?

8          A.     Nothing.

9          Q.     You just got him to lie for you, didn't

10   you?

11         A.     No. I had no influence on him saying I

12   wasn't there.

13         Q.     He took that upon himself?

14                Isn't it true that Mr. Epstein's process

15   servers had to ask the police to get you out of the

16   restaurant so that they could serve you?

17                MR. LEOPOLD:  Objection.  Lack of

18         foundation, predicate.

19   BY MR. TEIN:

20         Q.     You can answer the question.

21                MR. LEOPOLD:  If you know.  Don't guess.

22                THE WITNESS:  No.  Can you repeat the

23         question?

24                MR. TEIN:  Don't coach.

25                MR. LEOPOLD:  Don't guess.

**nsor & Associates**
Reporting and Transcription, Inc.

Page 64

1          MR. TEIN:  That's a coaching.

2          MR. LEOPOLD:  No.  That's an instruction to

3     the client.

4          MR. TEIN:  No.  You don't do that.

5          THE WITNESS:  Can you repeat the question?

6          MR. LEOPOLD:  Let me just state for the

7     record --

8  BY MR. TEIN:

9          Q.    Once the police -- isn't it true that

10    Mr. Epstein's process servers had to ask the police to

11    get you out of the restaurant so that they could serve

12    you?

13         A.    Incorrect.  My boss called the police.

14         Q.    And once the police showed up, to stop you

15    from lying to avoid service, you made up another lie that

16    the process servers had harassed you.  Isn't that

17    correct?

18         A.    Incorrect.

19         Q.    You lie all the time, don't you?

20         MR. LEOPOLD:  Objection.

21         THE WITNESS:  Incorrect.

22    BY MR. TEIN:

23         Q.    You have a MySpace page, don't you?

24         A.    No longer do I have a MySpace page.  I

25    deleted it.

## ☀nsor & Associates
### Reporting and Transcription, Inc.

Page 65

```
 1              Q.    When did you delete your MySpace page?

 2              A.    A couple days ago.

 3              Q.    Who told you to take your MySpace page down

 4       a couple of days ago?

 5              A.    Nobody.  I'm sick and tired of MySpace.

 6              Q.    You all of a sudden got sick and tired of

 7       MySpace and just a few days before this deposition you

 8       decided to delete your MySpace page, correct?

 9              A.    Correct.

10              Q.    Is that your testimony under oath?

11              A.    Yes.

12              Q.    Did you take your MySpace page down because

13       you thought the government might subpoena it?

14              A.    Incorrect.

15              Q.    Hadn't your MySpace page been up for over

16       three months before you took it down?

17              A.    Correct.  But I also had made tons of

18       MySpaces over the last years.  I just get tired of them

19       and delete them because -- drama -- and make new ones.

20              Q.    We're going to talk about that.

21                    So you deleted your MySpace page after you

22       were already under subpoena for this deposition, correct?

23              A.    Correct.

24              Q.    What about the MySpace page didn't you want

25       us to see, ███████
```

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

## Censor & Associates
Reporting and Transcription, Inc.

Page 66

```
 1            A.      Nothing.

 2            Q.      Well, we're going to come back to MySpace

 3       in a second.

 4            A.      You do that.

 5            Q.      ████   I'm going to ask you some questions

 6       about why you lie about your age so often, okay?

 7                    MR. LEOPOLD:   Objection to the form.

 8            Argumentative.

 9       BY MR. TEIN:

10            Q.      You lie about your age all the time, don't

11       you?

12                    MR. LEOPOLD:   Objection, argumentative.

13                    THE WITNESS:   Incorrect.

14       BY MR. TEIN:

15            Q.      You lie about your age to get body

16       piercings, don't you?

17            A.      Incorrect.

18            Q.      You have body piercings, don't you?

19            A.      Yes.

20            Q.      You have four body piercings; isn't that

21       right?

22            A.      Five.

23            Q.      Other than the piercings on your ears --

24       I'm not talking about that --

25            A.      Oh, then no; just one.
```

## Censor & Associates
Reporting and Transcription, Inc.

Page 67

1    Q.    And where is the one body piercing?

2    A.    Belly.

3    Q.    When did you get that?

4    A.    For my birthday, with my stepmother and my

5    father.

6    Q.    And when was that?

7    A.    When I was 14.

8    Q.    Okay.  So you had that body piercing when

9    you met Epstein, correct?

10    A.    It might have been, or maybe that -- yeah,

11    either my 14th birthday or my 15th.  I honestly don't

12    remember.

13    Q.    Now you've lied about your age to get into

14    bars by using driver's licenses that aren't yours,

15    correct?

16    A.    Incorrect.

17    Q.    Are you swearing under oath that you've

18    never done that?

19    A.    Yes, I swear under oath.

20    Q.    And you've lied about your age to buy beer,

21    correct?

22    A.    Incorrect.

23    Q.    You're swearing under oath that you've

24    never lied to stores about your age?

25    A.    I've never lied to a store about my age or

**Censor & Associates**
Reporting and Transcription, Inc.

Page 68

1     anything.

2           Q.     You try to look much older than you are,

3     don't you?

4           A.     Incorrect.

5           Q.     And you've lied about your age on your

6     MySpace pages, don't you?

7           A.     Incorrect.

8           Q.     All right.  Let's look at Exhibit 26-01

9     one.

10                 MS. BELOHLAVEK:  26-001?

11                 MR. TEIN:  Yes.

12    BY MR. TEIN:

13          Q.     On this page you lied to everyone that you

14    were 18, didn't you?

15          A.     Correct.

16          Q.     Let's go to Exhibit 33.

17                 MS. BELOHLAVEK:  That's 33-001?

18                 TEIN:  Correct.

19    BY MR. TEIN:

20          Q.     On this page you lied to everyone that you

21    were 19, didn't you?

22          A.     Incorrect.

23                 MR. LEOPOLD:  Just answer the question.

24                 THE WITNESS:  Oh, incorrect.

25    BY MR. TEIN:

## Censor & Associates
### Reporting and Transcription, Inc.

Page 69

1         Q.    Now you can explain your answer.

2         A.    I know that I have seen all of these and I

3     know that this one is mine.

4               Can you go down?

5               MR. LEOPOLD:   Just for the record, you're

6          pointing to the photo.

7               THE WITNESS:   I'm pointing to --

8     BY MR. TEIN:

9         Q.    You're pointing to the one where it says

10    your age is 18?

11        A.    Correct.

12        Q.    That's yours, right?

13        A.    Correct.   That's mine from a couple years

14    ago that I have not been on, because I don't use that.

15    Please keep going down, please.   And I think that's it,

16    because there's no one -- just that one is mine.

17        Q.    So the one you pointed to where it says

18    your age is 18, that's yours, correct?

19        A.    Correct.

20        Q.    And when you wrote 18 as your age on your

21    MySpace page, that was a lie, wasn't it?

22        A.    Correct.

23        Q.    Did you lie about your MySpace page back

24    then because you couldn't post on MySpace unless you were

25    18?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 70

1          A.     Correct.   There was a rule many years ago

2     that you had to be 18 to have a MySpace.

3          Q.     So you lied about your age so you could

4     post on MySpace, right?

5          A.     Yes.

6          Q.     Let's go back to the top one on this page,

7     33-01.

8               Are you testifying now under oath that this

9     MySpace page where the headline says, "Twins do have more

10    fun," and the location is given as Lox, abbreviation for

11    Loxahatchee, and the age is 19, and it says ████████

12    ████████ is it your testimony that you did not post

13    that?

14         A.     Correct.

15         Q.     Now let's go back to the one that you were

16    pointing to before on this page, where it says your age

17    is 18 and you lied about your age to post MySpace, okay?

18         A.     Uh-huh, yes.

19         Q.     All right.   Why did you finally put your

20    true age on your MySpace profile four days before you

21    were scheduled to testify before the Grand Jury?

22         A.     I don't know what you're talking about.

23              MR. LEOPOLD:   If you don't understand, ask

24         him to ask the question again.

25              MR. TEIN:   Don't coach.

## Censor & Associates
Reporting and Transcription, Inc.

Page 71

1          THE WITNESS:  I don't know which MySpace

2      you're talking about.

3   BY MR. TEIN:

4          Q.    The MySpace page that you're just pointing

5   to, where it says you were 18.

6          A.    Yes.

7          Q.    And you were lying about your age, right?

8          A.    Uh-huh.

9          Q.    Why did you finally post your true age on

10  your MySpace profile --

11         A.    Uh --

12         Q.    -- four days before you were scheduled to

13  testify before the Grand Jury?

14         A.    I honestly don't know which MySpace,

15  because I've had like a bazillion MySpaces, and in that

16  year, I had two, that one and another one, and that one's

17  been deleted.  So I don't know which one you're referring

18  to.

19         Q.    You remember that you changed your age on

20  your MySpace page from 18 to your true age just four days

21  before you went and testified in the Grand Jury?

22         A.    No.

23         Q.    You don't remember that.

24         A.    No.

25         Q.    Do you remember Detective Recarey?  Did you

**Censor & Associates**
Reporting and Transcription, Inc.

Page 72

1    ever meet a Detective Recarey?

2            A.    I don't know the names.

3            Q.    How many different detectives have you met

4    with on this case from Palm Beach?

5            A.    Probably a good six or seven, maybe.

6            Q.    Did one of the detectives tell you before

7    you testified in the Grand Jury that you should take your

8    MySpace age and put your true age?

9            A.    No.

10           Q.    Didn't Detective Recarey have to come to

11   your house to pick you up to get you to testify in front

12   of the Grand Jury?

13           A.    Possibly; maybe because I didn't have a

14   ride; I was only 14 or 15 at the time.

15           Q.    Your mom didn't drive you?

16           A.    No.

17           Q.    Stepmom didn't drive you?

18           A.    I think my dad.  Oh, my dad; my dad drove

19   me.

20           Q.    Your dad drove you?

21           A.    Yes, sir.

22           Q.    So your testimony is Detective Recarey did

23   not drive you, correct?

24                 MR. LEOPOLD:  Objection.  /asked and

25                 answered.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 73

1      THE WITNESS:  No.  I'm pretty sure my dad

2      drove me, because he was there with me.

3  BY MR. TEIN:

4      Q.    Did any detective tell you to change your

5  age on your MySpace page, to put your true age?

6      A.    No, sir.

7      Q.    Now you also lied on your MySpace page

8  about your income, didn't you?

9      A.    Yes.

10     Q.    And you lied, saying that you made a

11  quarter million dollars a year and higher, correct?

12     A.    As a joke, yes.

13     Q.    That was a lie, wasn't it?

14     A.    Yes.

15     Q.    And you also lied on your MySpace page,

16  saying that you were married, didn't you?

17     A.    Possibly.  And that might have been an

18  error on my part.

19     Q.    Now you also lie to the police, don't you?

20     A.    No.

21     Q.    Well, you lied to the police in your

22  tape-recorded statement that you gave to Detective

23  ██████ Pagan three years ago, didn't you?

24     A.    To my knowledge, no, I did not.

25     Q.    Well, you lied to the police when you

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

08-80736-CV-MARRA

**Censor & Associates**
Reporting and Transcription, Inc.

Page 74

1    accused Mr. Epstein of attempting to murder your father,

2    didn't you?

3          A.   No.  I never heard a statement saying that

4    Mr. Epstein tried to murder my father.

5          Q.   You made that statement, didn't you?

6          MR. LEOPOLD:  Do you have a statement to

7         show her?  That's been asked and answered.

8          MR. TEIN:  I'm sorry.  I didn't hear the

9         witness' answer, Mr. Leopold.

10   BY MR. TEIN:

11         Q.   █████████ you told the police, didn't you,

12   that Mr. Epstein almost killed your father, didn't you?

13         A.   No.

14         Q.   Three years ago, before Mr. Epstein even

15   knew about this investigation, you told the police that

16   Epstein had "already come to my dad's house and did

17   something to my dad's tires and my dad almost died.  I

18   didn't want my dad to get hurt, because Jeff already

19   almost killed him."

20         Didn't you say that?

21         A.   Not to my knowledge or recollection.  I

22   have never said anything like that.

23         Q.   That would have been a complete lie,

24   wouldn't it have been?

25         A.   Yeah.

Exhibit 10

1

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      WEST PALM BEACH DIVISION
 3                    CASE NO. 08-80119-CIV-MARRA

 4    _____|              WEST PALM BEACH, FLORIDA
      JANE DOE, et al.,       |
 5                            |
              Plaintiffs,     |              JUNE 12, 2009
 6                            |
         vs.                  |
 7                            |
      JEFFREY EPSTEIN,        |
 8                            |
              Defendant.      |
 9    _____x
10
                       TRANSCRIPT OF MOTION HEARING
11             BEFORE THE HONORABLE KENNETH A. MARRA,
                      UNITED STATES DISTRICT JUDGE
12
      APPEARANCES:
13
      FOR THE PLAINTIFFS:        ADAM D. HOROWITZ, ESQ.
14                               Mermelstein & Horowitz
                                 18205 Biscayne Boulevard
15                               Miami, FL 33160      305.931.2200
                                 For Jane Doe
16
                                 BRADLEY J. EDWARDS, ESQ.
17                               Rothstein Rosenfeldt Adler
                                 401 East Las Olas Boulevard
18                               Fort Lauderdale, FL 33301
                                 Jane Doe 3, 4, 5, 6, 7
19                                               954.522.3456
20                               ISIDRO M. GARCIA, ESQ.
                                 Garcia Elkins Boehringer
21                               224 Datura Avenue
                                 West Palm Beach, FL 33401
22                               Jane DOE II      561.832.8033
23                               RICHARD H. WILLITS, ESQ.
                                 2290 10th Avenue North
24                               Lake Worth, FL 33461
                                 For C.M.A.       561.582.7600
25
```

GOVERNMENT EXHIBIT

10

PENGAD 800-631-6989

```
 1
                              ROBERT C. JOSEFSBERG, ESQ.
 2                            Podhurst Orseck Josefsberg
                              25 West Flagler Street
 3                            Miami, FL 33130
                              For Jane Doe 101    305.358.2800
 4                            (Via telephone)
 5                            KATHERINE W. EZELL, ESQ.
                              Podhurst Orseck Josefsberg
 6                            25 West Flagler Street
                              Miami, FL 33130
 7                            For Jane Doe 101    305.358.2800
 8   FOR THE DEFENDANT:       ROBERT D. CRITTON, JR., ESQ.
                              MICHAEL BURMAN, ESQ.
 9                            Burman Critton, etc.
                              515 North Flagler Street
10                            West Palm Beach, FL 33401
                                             561.842.2820
11
                              JACK A. GOLDBERGER, ESQ.
12                            Atterbury Goldberger Weiss
                              250 Australian Avenue South
13                            West Palm Beach, FL 33401
                                             561.659.8300
14
     AS AMICUS CURIAE:        ████  ████  VILLAFANA, ESQ.
15                            Assistant U.S. Attorney
                              500 East Broward Boulevard
16                            Fort Lauderdale, FL 33394
                              For U.S.A.         954.356.7255
17
                              MARTIN G. WEINBERG, ESQ.
18                            20 Park Plaza
                              Boston MA 02116
19                            (Via telephone)    617.227.3700
20                            JAY LEFKOWITZ, ESQ.
                              (Via telephone)
21
     REPORTED BY:             LARRY HERR, RPR-RMR-FCRR-AE
22                            Official United States Court Reporter
                              Federally Certified Realtime Reporter
23                            400 North Miami Avenue, Room 8N09
                              Miami, FL  33128        305.523.5290
24
25
```

3

```
1          THE COURT:  We are here in the various Doe vs. Epstein

2    cases.

3          May I have counsel state their appearances?

4          MR. HOROWITZ:  Adam Horowitz, counsel for plaintiffs

5    Jane 2 through Jane Doe 7.

6          THE COURT:  Good morning.

7          MR. EDWARDS:  Brad Edwards, counsel for plaintiff Jane

8    Doe.

9          THE COURT:  Good morning.

10          MR. GARCIA:  Good morning, Your Honor.  Sid Garcia for

11    Jane Doe II.

12          THE COURT:  Good morning.

13          MR. WILLITS:  Good morning, Your Honor.  Richard

14    Willits, here on behalf of the plaintiff C.M.A..

15          THE COURT:  Good morning.

16          MS. EZELL:  Good morning, Your Honor.  I'm Katherine

17    Ezell from Podhurst Orseck, here with Amy Adderly and Susan

18    Bennett, and I believe my partner, Bob Josefsberg, is going to

19    appear by telephone.

20          THE COURT:  Mr. Josefsberg, are you there?

21          MR. JOSEFSBERG:  I am, Your Honor.

22          THE COURT:  Good morning.

23          MR. JOSEFSBERG:  Good morning.

24          THE COURT:  All right.  Do we have all the plaintiffs

25    stated their appearances?   Okay.
```

1            Defense?

2            MR. CRITTON:  Your Honor, Robert Critton on behalf of

3    Mr. Epstein, and my partner, Michael Burman.

4            THE COURT:  Good morning.

5            MR. GOLDBERGER:  Good morning, Your Honor.  Jack

6    Goldberger on behalf of Mr. Epstein.

7            THE COURT:  I see we have some representatives from

8    the United States Attorney's Office here.

9            MS. VILLAFANA:  Good morning, Your Honor.  ██ ██

10   Villafana for the U.S. Attorney's office.

11           THE COURT:  Good morning.

12           Who else do we have on the phone?

13           MR. CRITTON:  Your Honor, we have two members of the

14   defense team are on the phone, also.

15           THE COURT:  Who do we have on the phone?

16           MR. WEINBERG:  Martin Weinberg.  Good morning, Your

17   Honor.

18           MR. LEFKOWITZ:  Jay Lefkowitz.  Good morning, Your

19   Honor.

20           THE COURT:  Good morning.

21           I scheduled this hearing for very limited issues

22   which, as you all know, there's been a motion by Mr. Epstein to

23   stay the civil proceedings against him.  The one issue I have

24   concern about is Mr. Epstein's contention or assertion that by

25   defending against the allegations in the civil proceedings, he

5

1  may expose himself to an allegation by the United States in the

2  non-prosecution agreement that he's violated that agreement and

3  therefore would subject himself to potential federal charges.

4          I had asked for some briefing on this.  I asked the

5  United States to present its position to me.  And I received

6  the Government's written response, which I frankly didn't find

7  very helpful.  And I still am not sure I understand what the

8  Government's position is on it.

9          So first let me hear from Mr. Epstein's attorneys as

10  to what do you believe the concern is.  I don't believe the

11  non-prosecution agreement has ever been filed in this Court; am

12  I correct?

13          MR. CRITTON:  To my knowledge, Your Honor, it has not.

14          THE COURT:  So I don't believe I've ever seen the

15  entire agreement.  I've seen portions of it.

16          MR. EDWARDS:  Your Honor, I believe that it was filed

17  under Jane Doe 1 and 2 vs. United States of America, case under

18  seal in your court.

19          THE COURT:  Okay.

20          MR. EDWARDS:  In a separate case.

21          THE COURT:  In that case, okay.  Was it actually filed

22  in that case?

23          MR. EDWARDS:  I filed it under seal.

24          THE COURT:  In any event, what's Mr. Epstein's concern

25  about if you defend the civil actions, you're going to expose

1    yourself to a claim for a breach by the United States of the

2    non-prosecution agreement?

3           MR. CRITTON:  Robert Critton.

4           Your Honor, our position on this case is, I'd say is

5    somewhat different.  When this issue originally came before the

6    Court, as you are aware prior to my firm's involvement in the

7    case, there was a motion filed on behalf of Mr. Epstein seeking

8    a stay.  And I think it was in Jane Doe 102 and then

9    subsequently Jane Doe 2 through 5 because all of those cases

10   were filed on or about the same time.

11          And at that time the Court looked at the issue and it

12   was based upon a statutory provision at that time.  And the

13   Court said I don't find that it's applicable, or for whatever

14   reason I think the Court said I don't consider that to be a

15   pending proceeding or a proceeding at that particular time.

16          In that same order, which was in Jane Doe 2, I

17   believe it's -- not I believe, I know it's docket entry 33, the

18   Court also went on to talk about at that particular point in

19   time dealt with the issue of the discretionary stay.

20          And the Court said at that time, I'm paraphrasing, but

21   the Court also does not believe a discretionary stay is

22   warranted.  And what the Court went on to say is that if

23   defendant does not breach the agreement, then he should have no

24   concerns regarding his Fifth Amendment right against

25   self-incrimination.

7

1          The fact that the U.S. Attorney or other law

2     enforcement officials may object to some discovery in these

3     civil cases is not in and of itself a reason to stay the civil

4     litigation, so that any such issue shall be resolved as they

5     arise in the course of the litigation.

6          And I would respectfully submit to the Court that the

7     position that the Government has taken in its most recent

8     filings changes the playing field dramatically.  Because what

9     the Government in essence has said as distinct from the U.S.

10    saying is, well, we object to some discovery, or we may object

11    to some discovery in the civil cases.

12         What they have, in essence, said is if you take some

13    action, Mr. Epstein, that we believe unilaterally, and this is

14    on pages 13 and 14 of their pleading or of their response memo

15    to the Court's inquiry, they say if Mr. Epstein breaches the

16    agreement.  They said it's basically like a contract, and if

17    one side breaches, the other side can sue.

18         In this instance what the Government will do is if we

19    believe that Mr. Epstein has breached the agreement, we'll

20    indict him.  We will indict him.  And his remedy under that

21    circumstance, which is an incredible and catastrophic catch 22

22    is, we'll indict him and then he can move to dismiss.  That's a

23    great option.

24         In this particular instance my mandate in defending --

25    and that's a dramatic change in the Government's position,

1  because the Government is not saying, and the Court was pretty

2  specific in what you asked the Government for in its response

3  is, in essence, and it's the same question in a more limited

4  fashion you're posing today is whether Mr. Epstein's defense of

5  the civil action violates the NPA agreement, the

6  non-prosecution agreement, between the U.S. and Mr. Epstein.

7          And the Government refuses to answer that question.

8  They won't come out and say, yes, it will, or no, it won't.

9  What they're doing is they want to sit on the sideline, and as

10  their papers suggest is, they want us to lay in wait and that

11  if, in fact, they believe he violates a provision of the NPA as

12  it relates to the defense of this case or these multitude of

13  cases, then they can come in and indict him -- no notice, no

14  opportunity to cure.

15          We don't think that's what the NPA says, but that's

16  certainly what their papers say.  We'll indict him, no notice,

17  no opportunity to cure.  We will indict him, and his remedy

18  under that circumstance is that he can move to dismiss the

19  indictment.

20          Well, that's great except Mr. Epstein, his mandate to

21  me and I know his mandate to his criminal lawyers, is:  Make

22  certain I don't do anything, in particular in these civil cases

23  that would in any way suggest that I am in willful violation of

24  the NPA.

25          Now, in the Court's prior ruling in the docket entry

1  33, certainly some aspects of the NPA are within Mr. Epstein's

2  control.  There's no question about that.  But aspects that

3  relate to the defense of these cases, either in terms of the

4  civil lawyers who are defending these, I think there's 12 or 13

5  pending cases in front of you, there's another four cases in

6  the state court, is the risk is substantial, it's real, and it

7  presents a chilling effect for the civil lawyers in moving

8  forward to determine whether or not we're taking some action

9  that in some way may be a violation of the NPA.

10        And the Government's, again, refusal or non-position

11  with regard to past acts that have been taken in the civil case

12  with regard to the defense or future acts that we may take with

13  regard to these contested litigation casts an extraordinary

14  cloud of doubt and uncertainty and fear that the defense of

15  these cases could jeopardize Mr. Epstein and put him in the

16  irreparable position of violating the NPA and then subsequently

17  being indicted.

18        In this particular instance, again, Mr. Epstein has no

19  intention of willfully violating the NPA, but it's of great

20  concern to him.  And I'd say with the position that the

21  Government has taken, no notice, no cure period, no opportunity

22  to discuss.  Again, we think that's not what the NPA provides,

23  it's not what the deal was between the two contracting parties,

24  the United States and Mr. Epstein.  But that's clearly what

25  their papers say under the circumstances, and it would create

10

1    this irreparable harm to Mr. Epstein under the circumstances.

2          In essence, we're left with a catch 22 in defending

3    the civil cases.  We have a mandate to take no action, to take

4    any action which may be deemed to be a violation of the NPA,

5    either in the past or in the future, which would in any way

6    risk Mr. Epstein being indicted by the United States.

7          He has the clear risk of an indictment based upon the

8    papers that the Government filed.  It's real, it's not remote,

9    and it's not speculative.  It chills the action of the defense

10   in this instance of both Mr. Epstein and his attorneys in

11   trying to defend these cases and decide under the circumstances

12   can we do this, can we take this position with regard to

13   depositions, can we take this legal position with regard to

14   motions to dismiss, with regard to responses, with regard to

15   replies?

16         And we send out paper discovery.  Is this in some way

17   if we contact someone who may be an associate of these

18   individuals as part of our investigation, is that potentially

19   in any way a violation of the NPA?  Again, we don't think so.

20         And, obviously, again, my direction has been from my

21   client:  Don't take any action that would result in me being

22   indicted under the NPA.  Well, that's great.  But, generally,

23   civil lawyers or civil lawyers in defending a personal injury

24   case or a tort case, which is exactly what these are, and from

25   a practical standpoint, we use various tools to do discovery.

1   They're standard.  They're specific.  They're very temporary.

2   Very typical.

3           But in this instance, as the Court knows, things are

4   not typical with regard to this case in any way, shape or form.

5   We can't even serve subpoenaes, there's objections and there's

6   -- we can't even serve objections to third parties so we can

7   obtain documents unless we have to filter it through the

8   plaintiffs' attorneys.  They won't allow us to use their

9   clients' names, even in a subpoena that would never be filed in

10  the court.

11          How do we do a deposition of a third party?  We wanted

12  to take the deposition of Jane Doe 4.  Well, who is she?  Well,

13  we can't tell you that.  Well, who's the defendant?  Well, we

14  can't tell you that because nobody wants anybody to know

15  anything about the case.  They want to present it strictly

16  through rose-colored glasses.

17          And in this particular instance, we simply can't

18  defend this case or take certain action with the spector

19  hanging over us that, in fact, the Government may deem it to be

20  a violation of the NPA, because very clearly in their response

21  papers, they don't say.  They say we don't take the position,

22  and then they take a substantial position is we think there's

23  not all that substantial factors that would entitle him to a

24  stay.

25          Except for the one major issue which the Court posed

1    in the question is, is can he defend these cases?  That's what

2    I really want to know.  Can he defend these cases and, in

3    essence, what he has done in the past or what his defense team

4    has done in the past and what they're going to do in the

5    future, can you give him, Epstein, assurances that the

6    Government under this situation, whatever he does, based on

7    advice of counsel, that that cannot be a willful violation of

8    the NPA, which they can -- they, the U.S. -- can then turn

9    around and say that's a violation of the agreement and,

10    therefore, we're going to go proceed to indict you under the

11    circumstances.

12            Our position is, Your Honor, is that the U.S. has now

13    cavalierly suggested that, as they did in picking up on the

14    court's docket entry or prior order, is, look, compliance with

15    the NPA is solely up to Mr. Epstein.  In this type of balance

16    of equities, it doesn't speak in favor of a stay.

17            Well, that's great.  And maybe that was the position

18    back in '08, on August 5th of '08, when the issue came up in

19    front of the Court with regard to the initial stay.

20            But the Government's papers under these circumstances

21    suggested a very different set of circumstances.  Their own

22    unilateral, which is the issue that we argued in the motion for

23    stay, is that the Government's position is that we can

24    unilaterally indict this man if we think he's breached the NPA.

25            We don't think that's right, but we have no buffer

1  between us and the Government.  They'll say, and as the Court

2  knows, the Government has substantial power.  The Government

3  does what it wants.  Most of the time hopefully they're right.

4  Sometimes they make mistakes.

5       But in this particular instance, my client has rights.

6  We think that there's notice provisions, we think there's cure

7  provisions under the NPA.  That's not what their paper says

8  under the circumstances.

9       And what we'd like to know from the Government, and

10  maybe the answer is basically what the Court asks is, let the

11  Government come forward today and say, based on the knowledge

12  that we have, or as of today's date, June 12th, 2009, we, the

13  Government, agree that there is no set of circumstances, not

14  that we're not aware of, but as of today's date, there is

15  nothing that exists that would be a violation of the NPA.

16       THE COURT:  Well, that's way beyond what I'm

17  interested in.  I don't know what Mr. Epstein may have done

18  outside the context of defending this case that may constitute

19  a violation.  And if he has done something outside the context

20  of defending this case that's a violation, I don't care.

21  That's between the United States and Mr. Epstein.

22       I'm only concerned about whether anything he does in

23  defending these civil actions is going to be a violation of the

24  non-prosecution agreement.  If he has done something else, it's

25  none of my business, and I don't care, and I'm not going to

1  even ask the Government to give you an assurance that he hasn't

2  done anything that might have violated the agreement up till

3  today.  I'm only interested in defending these civil actions.

4       MR. CRITTON:  Then I would respectfully submit to the

5  Court that the Government be asked in that limited context, are

6  they as of today, whether there were or not, but as of today is

7  there anything that has been done or will you take the

8  position, the United States, that any position that Mr. Epstein

9  has taken with regard to defending these civil cases is in any

10  way a violation of the NPA?

11       THE COURT:  Well, I'm not sure what they're going to

12  say, but that might -- that cures the problem up to this point.

13  But then we have to deal with what's going to happen from here

14  on in.  And that's another issue that we have to deal with.

15       So I understand your position.

16       But has anyone suggested to you on behalf of the

17  United States that there is something that you've done in

18  defending this case that they believe may or could be construed

19  as a violation of the non-prosecution agreement?  Has anyone

20  pointed to anything that you've done?  For example, the fact

21  that you've wanted to take their -- I don't know if you've

22  noticed depositions or not in this case, but if you've sent

23  notice of taking deposition, if you sent requests for

24  production of documents, if you sent interrogatories, if you

25  issued third party subpoenas?  Is anything you've done thus far

1  in the context of this case been brought to your attention as a

2  potential violation?

3       MR. CRITTON:  I have received no notification nor am I

4  aware that we've received any notification of any action that

5  we have taken today.  As I suggested to the Court, I don't know

6  when they've done or not.  And in their papers they suggested,

7  well, we don't know everything that's gone on in the civil

8  litigation.

9       But from a practical standpoint, it was a number of

10 comments that were made in their papers is, we can indict, we

11 can see if there's a breach.

12      Judge, I may have some --

13      THE COURT:  Before you go on.

14      MR. CRITTON:  I'm sorry.

15      THE COURT:  You've focused a great deal on the

16 Government's response to my inquiry as supporting your position

17 that you're in jeopardy.  But you've made the suggestion, even

18 before this brief was filed, that defending the case was going

19 to potentially result in an assertion or allegation that you

20 breached the non-prosecution agreement.

21      So what was it that caused you to make that initial

22 assertion?  Because that's what caught my attention, was not --

23 this brief that the Government has filed was in response to

24 something that you filed initially in your most recent motion

25 for a stay which raised the issue.

1          So what was it that gave you some concern to even

2    raise the issue that defending this case is going to constitute

3    a breach?

4          MR. CRITTON:  Because there are other instances where

5    counsel other than myself, not in the civil aspects, where

6    allegations have been made and letters have been sent by the

7    United States suggesting that there's been a violation of the

8    NPA.  And under those circumstances, some notification was

9    provided.

10         THE COURT:  Did it have anything to do with defending

11   the civil actions?

12         MR. CRITTON:  It did not.

13         THE COURT:  So then why was that issue raised by you

14   in the first instance?

15         MR. CRITTON:  Because of the prospect that the

16   defendant could take, that the U.S. would take the position

17   under the circumstances that a position that we took with

18   regard to the contested litigation may well impact, that the

19   Government may have a very different view of what the

20   interpretation of the agreement is.

21         And as an example is a number of the parties, and I

22   know the Court doesn't want to get into a discussion, the issue

23   is, is under 2255 is that from the defendant's perspective the

24   deal that was cut on that, it was a very specific deal.  It

25   dealt with both consensual and contested litigation.  It dealt

1  with a secret list of individuals who we had no idea who was on

2  the list, and a commitment that he would under certain

3  circumstances be required to pay a minimum amount of damages,

4  which our position is under 2255 based upon the statute that

5  was in effect at the time, a $50,000 as to anyone who wanted --

6  who came forward who was on the list and met certain criteria.

7          The position that now has been asserted by a number of

8  the plaintiffs under the circumstances, and it's been pled, and

9  actually a number of the complainants is, is Epstein agreed,

10 and they cite to a letter that was sent by Ms. Villafana from

11 the Government, that says he has to plead guilty or he can't

12 contest liability.  That may be true under very, very limited

13 or specific circumstances.

14         But what the plaintiffs have done in a number of the

15 cases, and these are pending motions, is they've said is, well,

16 we think C.M.A. cases is a good example, they've pled 30

17 separate counts of 2255 alleged violations.  And they're saying

18 under the circumstances is, therefore, we have 2255 violations,

19 there's 30 of them, so 30 times 150, or should be, or whether

20 it's 150, that's the amount of money that we want, so maybe $15

21 million, or whatever the number is.

22         Some of the other plaintiffs' lawyers have been even

23 more creative.  They've said is, well, we'll agree that it's

24 only one cause of action but that each number of violations;

25 that is, if 20 alleged incidents occurred, that we would

1  consider to be, or that we will argue are violations, then we

2  can take 20 times the 50, or the 150, depending on which

3  statute is applicable.

4       So the Government under that set of circumstance could

5  say, and, again, this is one of the reasons that we raised it,

6  they could say, look, our deal with you was that you couldn't

7  contest liability, that you were waiving liability, or your

8  ability to contest an enumerated offense under 2255.

9       Again, part of the deal was as to an enumerated

10  offense.  Okay.  Well, what's that mean?  What did he plead to?

11  Well, he really didn't plead to anything, which is another

12  issue associated with the 2255.  But if the Government comes in

13  and says, no, wait a minute, our position was, is that you're

14  stuck with 2255 and the language within the NPA.  And,

15  therefore, whether it's an offense or whether it's multiple

16  offenses or violations or each one represents an individual

17  cause of action, if the Government takes the position that's

18  adverse to what we think the clear reading of the agreement was

19  under those circumstances, they could claim a violation.

20       And as a result -- and that's one of the reasons we

21  put -- that was the most glaring one to us, so we raised that

22  issue.  And then when the Government's response came with

23  regard to, is we can just proceed to indict if we think that

24  there's been a breach of the agreement.

25       That puts us at substantial risk and chills our

1   ability to move forward.  Thank you, Your Honor.

2           THE COURT:  Thank you.  Who wants to be heard from the

3   plaintiffs first?

4           Is there any plaintiff's attorney who is contending

5   that the defense of these civil actions by Mr. Epstein is going

6   to constitute a breach of the non-prosecution agreement?

7           MR. JOSEFSBERG:  Your Honor, this is Bob Josefsberg.

8   May I speak?

9           THE COURT:  Yes, sir.

10          MR. JOSEFSBERG:  We're not quite confident that any

11  breaches of any agreement, which were third-party

12  beneficiaries, should be resolved by you.  We're not saying it

13  shouldn't.  But we have not raised any breach of agreement.  We

14  think that is between the United States and Mr. Epstein.

15          What I find incredulous and disingenuous is that

16  Mr. Epstein is saying that he wants a stay because he may be

17  forced into taking actions in the defense of this case that

18  would violate the agreement.

19          And let me make our position clear on that.  If he

20  wants to move to take depositions, interrogatories, production,

21  and they are according to your rulings appropriate, not

22  invasive of the privacy of someone, and they are relevant, then

23  I don't know how those could in any way be violations of the

24  agreement.

25          What I find hypocritical is that there are two parts

1   to the agreement that I am a beneficiary of.  One of them is

2   that he has agreed that on any action brought in the 2255, he

3   will admit to liability.

4           And I received on May 26 a motion to dismiss, which

5   we're prepared to respond to and disagree with, but totally

6   contesting liability, saying that the statute doesn't apply

7   because the girls are no longer minors and saying, and this is

8   the great one, saying that the predicate of the conviction

9   under 2255 has not been satisfied.

10          Now, the understanding that I have is the agreement

11  between the Government and Mr. Epstein was that the Government

12  desired to see these victims made whole, and wanted them to be

13  in the same position as if Mr. Epstein had been prosecuted and

14  pled or convicted.  And they would be able to have the

15  predicate of that criminal conviction, which just as a matter

16  of liability would just be introduced as proof that he's done

17  this.

18          They, under the agreement, are supposed to admit to

19  liability on limited something that's under 2255.  He has

20  filed, but since there is no conviction, there can be no civil

21  suit under 2255, with which we disagree.  But it is totally in

22  opposite of the NPA.

23          The second part is there are many young ladies, and

24  this perhaps he can use this to his great advantage, who are

25  humiliated about this entire situation.  Some of them won't

1   come forward.

2          We were appointed by Judge ███ as a Special Master

3   to represent these young ladies.  And some of them don't even

4   want to file suit.  They don't even want to be known as Jane

5   Doe 103.  They don't want any of the risks for these motions

6   that are pending.

7          And part of the agreement was that if we represented

8   them and they settle, Mr. Epstein would pay our fees.  And he

9   has written us as of yesterday that he is under no obligation

10  to pay our fees on settling cases.

11         Now, those two matters, I believe, may be breaches.

12  But I am not asking this Court at this time to do anything

13  about them.  Nor am I telling the Government, I'm not running

14  to the Government and saying indict him because I want you to

15  pressure him to do what he agreed to.

16         I'm a third-party beneficiary for that agreement, and

17  I may move to enforce certain parts of it.  But as far as the

18  issue of staying the litigation, that is the exact opposite of

19  the intent and the letter of the NPA.  The purpose of the NPA

20  was so that these 34 young ladies, these victims who have been

21  severely traumatized, may move on with their lives.

22         And to stay this action would be the exact opposite of

23  the purpose of that agreement and would be horrible

24  psychologically for all of my clients.

25         THE COURT:  Mr. Josefsberg, I understand your

 1   position.  And I don't want to argue the merits of whether a

 2   stay should or should not be granted.

 3        I'm just trying to understand what the ground rules

 4   are going to be if I grant a stay or if I deny a stay.  And

 5   I've already denied a stay once.  I have to decide this current

 6   motion, and I just want to know what is going to happen if I

 7   deny the stay in terms of Mr. Epstein's exposure under the

 8   non-prosecution agreement.  That's my concern.

 9        So if you're telling me that you're not going to urge

10   the United States, on behalf of any of your clients, to take

11   the position that he's breached the agreement because he's

12   taking depositions, because he's pursuing discovery, because

13   he's conducting investigations that anyone in any other type of

14   civil litigation might conduct with respect to plaintiffs that

15   are pursuing claims against a defendant, that those typical

16   types of actions, in your judgment, are not breaches of the

17   agreement and that he can go forward and defend the case as any

18   other defendant could defend, and you're not going to run to

19   the United States and say, hey, he's breaching the agreement by

20   taking depositions and he's breaching the agreement by issuing

21   subpoenas to third parties in order to gather information

22   necessary to defend, then I don't have a problem.  But if he's

23   going to be accused of breaching the agreement because he sends

24   out a notice of deposition of one of your clients, how is he

25   supposed to defend the case?

```
 1            MR. JOSEFSBERG:  Your Honor, you're totally correct.
 2   He can depose my client.  That's not a problem.  But the
 3   problem is that these are not typical clients and this is not a
 4   typical case.  He has written in his pleadings that he wants to
 5   publish the names of these girls in the newspapers so that
 6   other people may come forward to discuss their sexual
 7   activities with these different plaintiffs.  That's not your
 8   typical case.  But are rulings that you'll make in this case,
 9   and they're not part of the NPA.
10            As far as my going to the Government is concerned, I
11   find it very uncomfortable for me to use the Government to try
12   to pursue my financial interest in litigation.  And I know that
13   Mr. Epstein and his counsel will make much ado about it.  So I
14   am not going to be running there.
15            However, if they start taking depositions regarding
16   liability, I will consider that to be a breach because they're
17   supposed to have admitted liability.
18            THE COURT:  But, again, I don't have the agreement and
19   I don't remember reading the agreement.  But what I'm being
20   told is the part of the agreement that admits liability is only
21   as to a 2255 claim, and there are numerous other personal
22   injury tort claims other than 2255 claims.
23            And there's a limit of damages on the 2255 claim, as I
24   understand it, but I presume that all the plaintiffs are going
25   to seek more than the limited or capped amount of damages in
```

24

1   the non-prosecution agreement as to the other claims.

2           And so why aren't they entitled to defend and limit

3   the amount of damages that your client is seeking on the

4   non-2255 tort claims?

5           MR. JOSEFSBERG:  Your Honor, you are correct.  On

6   non-2255 tort claims, they are permitted to do the defense,

7   whatever is appropriate.

8           My cases are pure 2255 on which liability under the

9   agreement is supposed to be admitted.  Now, as to the amount of

10  damages, there are legal issues that will be before you and

11  under the C.M.A. cases that are getting before you, as to

12  whether it is 50 or 150.  That has nothing to do with the NPA.

13          There are legal issues that are before you as to

14  whether it is per statute, per count or per incident or per

15  plaintiff.  Those have nothing to do with the NPA.  There is no

16  amount in NPA.  Those will be resolved.

17          Anyone who has brought a case that is outside of 2255,

18  the defense is permitted to contest liability under the NPA.

19  That's no violation.

20          Under the NPA if someone brought a case under just

21  2255, Mr. Epstein, if he is to keep his word, cannot contest

22  liability.  And there would no need to stay this.  Because it

23  is a self-fulfilling agreement.  He can contest liability.  And

24  as far as the amount of damages, anyone that wants to go over

25  the statutory minimums, of course, he can contest that in any

1    way that is proper under the Rules of Evidence and your

2    rulings.  The NPA has no limitation on his contesting damages

3    above the minimum statutory amount.

4              The only thing that he has done is in his actions of

5    refusing to pay for settling defendants, and in his saying that

6    he has no liability under 2255, those appear to be contrary to

7    what's in the NPA.

8              But I'm not in any position right now to claim a

9    breach, and I don't know whether I'd be claiming a breach or

10   enforcing it in front of you, suing him for fees, asking you to

11   have him admit liability, or complaining to the Government.

12   And that's why I'm not that helpful in this situation because I

13   think it's the Government's role.

14             But I do not waive the right to be a third-party

15   beneficiary because pursuant to my appointment, which was

16   agreed to by Mr. Epstein, I and my clients have certain rights,

17   and we want to enforce them.

18             But his defending this lawsuit will not in any way be

19   a violation.  His getting this lawsuit stayed would be a

20   violation of the spirit of taking care of these girls, and

21   there would be other issues.  Like if there is a stay, Your

22   Honor, would he be posting a bond?

23             THE COURT:  We don't need to talk about those issues.

24   That's not my concern.

25             MR. JOSEFSBERG:  I agree, Your Honor, we don't.

26

1      THE COURT:  That's not my concern.  So, again, I just

2  want to make sure that if the cases go forward and if

3  Mr. Epstein defends the case as someone ordinarily would defend

4  a case that's being prosecuted against him or her, that that in

5  and of itself is not going to cause him to be subject to

6  criminal prosecution.

7      MR. JOSEFSBERG:  I agree, Your Honor.

8      THE COURT:  Any other plaintiff's counsel want to

9  chime in?

10      MR. WILLITS:  Richard Willits on behalf of C.M.A..  I

11  would join, to weigh in on what Mr. Josefsberg said.

12      MR. JOSEFSBERG:  Your Honor, I could not hear.

13      THE COURT:  We'll get him to a microphone.

14  Mr. Willits is speaking.

15      MR. WILLITS:  On behalf of my client, C.M.A., we join

16  in what Mr. Josefsberg said, and we also want to point out

17  something to the Court.

18      First, we want to make a representation to the Court,

19  we have no intention of complaining to the U.S. Attorney's

20  Office, never had that intention, don't have that intention in

21  the future, but, of course, subject to what occurs in the

22  future.

23      I want to point out to the Court that Mr. Epstein went

24  into this situation with his eyes wide open, represented by

25  counsel, knowing that civil suits had to be coming.  If he

 1    didn't know it, his lawyers knew it.

 2          He appears to be having second thoughts now about he

 3    could have negotiated this way or he could have negotiated that

 4    way with the U.S. Attorney's Office.  And they want to impose

 5    their second thoughts on the innocent plaintiffs.  We don't

 6    think that's fair.  We think it's in the nature of invited

 7    error, if there was any error whatsoever.

 8          Thank you.

 9          THE COURT:  You agree he should be able to take the

10    ordinary steps that a defendant in a civil action can take and

11    not be concerned about having to be prosecuted?

12          MR. WILLITS:  Of course.  And we say the same thing

13    Mr. Josefsberg said.  It's all subject to your rulings and the

14    direction of this Court as to what is proper and what is not

15    proper.  And we're prepared to abide by the rulings of this

16    Court, and we have no intention of running to the State's

17    Attorney.

18          THE COURT:  The U.S. Attorney?

19          MR. WILLITS:  I'm sorry.  The U.S. Attorney.

20          THE COURT:  Mr. Garcia.

21          MR. GARCIA:  Thank you, Your Honor.

22          If I may briefly, I think perhaps defense counsel

23    forgot about this, but on pages 17 and 19 of my memorandum of

24    law in opposition to the motion to dismiss, I did make

25    reference to the non-prosecution agreement, and I did say that

1    the contesting of the jurisdiction of this Court was a

2    potential breach of the non-prosecution agreement.

3            So my client happens to have, and they have filed with

4    the Court a copy of her state court complaint, given the fact

5    that the non-prosecution agreement limits the non-contesting of

6    jurisdiction to claims exclusively brought under the federal

7    statute.

8            I'm going to go ahead and withdraw those contentions

9    on pages 17 and 19 of my memo of law because it doesn't apply

10   to my case.  So to the extent that I raised this issue with

11   defense counsel and the Court, I'm going to withdraw that

12   aspect of it.

13           THE COURT:  Can you file something in writing on that

14   point with the Court?

15           MR. GARCIA:  Yes.

16           THE COURT:  What do you say about this issue that

17   we're here on today?

18           MR. GARCIA:  I think that the problem that I have with

19   it is that this non-prosecution agreement is being used by

20   defense counsel for the exact opposite purpose that it was

21   intended.  My perception of this thing, and I wasn't around, is

22   that Mr. Epstein essentially bought his way out of a criminal

23   prosecution, which is wonderful for the victims in a way, and

24   wonderful for him, too.

25           Now he's trying to use the non-prosecution agreement

1   as a shield against the plaintiffs that he was supposed to make

2   restitution for.

3            And, certainly, he can take my client's depo.  He's

4   done extensive discovery in the state court case -- very

5   intrusive, I might add.  And we don't care, because we can win

6   this case with the prosecution agreement or without the

7   prosecution agreement.  We are ready to go forward.

8            THE COURT:  You're not going to assert to the United

9   States Government that what he's doing in defending the case is

10   a violation for which he should be further prosecuted?

11           MR. GARCIA:  Absolutely not.

12           THE COURT:  Anyone else for the plaintiffs?

13           MR. HOROWITZ:  Judge, Adam Horowitz, counsel for

14   plaintiffs Jane Doe 2 through 7.

15           I just wanted to address a point that I think you've

16   articulated it.  I just want to make sure it's crystal clear,

17   which is that we can't paint a broad brush for all of the

18   cases.

19           The provision relating to Mr. Epstein being unable to

20   contest liability pertains only to those plaintiffs who have

21   chosen as their sole remedy the federal statute.  My clients,

22   Jane Doe 2 through 7, have elected to bring additional causes

23   of action, and it's for that reason we were silent when you

24   said does anyone here find Mr. Epstein to be in breach of the

25   non-prosecution agreement.  That provision, as we understand

1    it, it doesn't relate to our clients.

2         THE COURT:  Okay.  But, again, you're in agreement

3    with everyone else so far that's spoken on behalf of a

4    plaintiff that defending the case in the normal course of

5    conducting discovery and filing motions would not be a breach?

6         MR. HOROWITZ:  Subject to your rulings, of course,

7    yes.

8         THE COURT:  Thank you.

9         Anyone else have anything to say from the plaintiffs?

10        Ms. Villafana, if you would be so kind as to maybe

11   help us out.  I appreciate the fact that you're here, and I

12   know you're not a party to these cases and under no obligation

13   to respond to my inquiries.  But as I indicated, it would be

14   helpful for me to understand the Government's position.

15        MS. VILLAFANA:  Thank you, Your Honor.  And we, of

16   course, are always happy to try to help the Court as much as

17   possible.  But we are not a party to any of these lawsuits, and

18   in some ways we are at a disadvantage because we don't have

19   access.  My access is limited to what's on Pacer.  So I don't

20   really know what positions Mr. Epstein may have taken either in

21   correspondence or in discovery responses that aren't filed in

22   the case file.

23        But your first order was really just what do you think

24   about a stay, and then the second order related to this hearing

25   and asked a much more specific question, which is whether we

1  believe that Mr. Epstein's defense was a breach of the

2  agreement.

3       And I've tried to review as many of the pleadings as

4  possible.  As you know, they're extremely voluminous.  And I

5  haven't been through all of them.  But we do believe that there

6  has been a breach in the filing that Mr. Josefsberg referred

7  to, and contrary to Mr. Critton, we do understand that we have

8  an obligation to provide notice, and we are providing notice to

9  Mr. Epstein today.

10      The pleading that we found to be in breach -- the

11 non-prosecution agreement, sought to do one thing, which was to

12 place the victims in the same position they would have been if

13 Mr. Epstein had been convicted of the federal offenses for

14 which he was investigated.

15      And that if he had been federally prosecuted and

16 convicted, the victims would have been entitled to restitution,

17 regardless of how long ago the crimes were committed,

18 regardless of how old they were at the time, and how old they

19 are today, or at the time of the conviction.

20      And it also would have made them eligible for damages

21 under 2255.

22      And so our idea was, our hope was that we could set up

23 a system that would allow these victims to get that restitution

24 without having to go through what civil litigation will expose

25 them to.

1    You have a number of girls who were very hesitant

2 about even speaking to authorities about this because of the

3 trauma that they have suffered and about the embarrassment that

4 they were afraid would be brought upon themselves and upon

5 their families.

6    So we did through the non-prosecution agreement tried

7 to protect their rights while also protecting their privacy.

8 So, pursuant to the non-prosecution agreement -- on the other

9 hand, we weren't trying to hand them a jackpot or a key to a

10 bank.  It was solely to sort of put them in that same position.

11    So we developed this language that said if -- that

12 provided for an attorney to represent them.  Most of the

13 victims, as you know from the pleadings, come from not wealthy

14 circumstances, may not have known any attorneys who would be in

15 a position to help them.

16    So we went through the Special Master procedure that

17 resulted in the appointment of Mr. Josefsberg, and the goal was

18 that they would be able to try to negotiate with Mr. Epstein

19 for a fair amount of restitution/damages.  And if Mr. Epstein

20 took the position, which apparently he has, which is that the

21 $50,000 or $150,000 floor under 2255 also would be a cap.  That

22 if they were to proceed to file suit in Federal Court to get

23 fair damages under 2255, Mr. Epstein would admit liability, but

24 he, of course, could fight the damages portion, which means

25 that, of course, he would be entitled to depositions; of

1   course, he would be entitled to take discovery, and we don't

2   believe that any of that violates the non-prosecution

3   agreement.

4          The issue with the pleading that he filed, the motion

5   to dismiss the case, I believe it's Jane Doe 101, represented

6   by Mr. Josefsberg, is that that is a case that was filed

7   exclusively under 18 U.S.C., Section 2255.  She met that

8   requirement.  Mr. Epstein is moving to dismiss it, not on the

9   basis of damages, he is saying that he cannot be held liable

10  under 2255 because he was not convicted of an offense.

11         The reason why he was not convicted of an offense is

12  because he entered into the non-prosecution agreement.  So that

13  we do believe is a breach.

14         The issue really that was raised in the motion to stay

15  and that I addressed in our response to the motion to stay is

16  that Mr. Epstein's -- Mr. Epstein wants to stay the litigation

17  in order to leave, in order to sort of attack the cases of the

18  victims whether they are fully within the non-prosecution or

19  not, non-prosecution agreement or not, and leave the Government

20  without a remedy if he does, in fact, breach those terms.  And

21  that is why we opposed the stay.

22         THE COURT:  I'm not sure what you mean by that last

23  statement.

24         MS. VILLAFANA:  Well, because this issue related to

25  the motion to dismiss on Mr. Josefsberg's client came up after

1    we had filed that response.  And what we said in the response

2    to the motion to stay is that the reason why he wants to stay

3    the litigation is so that the non-prosecution agreement

4    terminates based on a period of time, as he puts it.  And then

5    afterwards he would be able to come in here and make all of

6    these arguments that clearly violate the non-prosecution

7    agreement but we would be without remedy.

8         THE COURT:  But you're not taking the position that

9    other than possibly doing something in litigation which is a

10   violation of an express provision of the non-prosecution

11   agreement, any other discovery, motion practice, investigations

12   that someone would ordinarily do in the course of defending a

13   civil case would constitute a violation of the agreement?

14        MS. VILLAFANA:  No, Your Honor.  I mean, civil

15   litigation is civil litigation, and being able to take

16   discovery is part of what civil litigation is about.  And while

17   there may be, for example, if someone were to try to subpoena

18   the Government, we would obviously resist under statutory

19   reasons, all that sort of stuff.  But, no, Mr. Epstein is

20   entitled to take the deposition of a plaintiff and to subpoena

21   records, etc.

22        THE COURT:  And even if he seeks discovery from a

23   Government agency, you have the right to resist it under the

24   rules of procedure but that would not constitute a violation,

25   again unless there's a provision in the prosecution agreement

```
 1    that says I can't do this?

 2              MS. VILLAFANA:  Correct.

 3              THE COURT:  That's your position?

 4              MS. VILLAFANA:  Yes.

 5              THE COURT:  Thank you.

 6              MS. VILLAFANA:  Thank you, Your Honor.

 7              THE COURT:  Mr. Critton, did you want to add anything?

 8              MR. CRITTON:  Yes, sir.  Just a few responses to some

 9    of the issues that have been raised.

10              The most glaring, at least from our perspective, is

11    both Mr. Josefsberg's comments that he believes that there's a

12    violation of the NPA as well as Ms. Villafana with regard to

13    Jane Doe 101.

14              Mr. Josefsberg, while he was the attorney rep who was

15    selected by Judge ████ to represent a number of individuals,

16    alleged victims that may have been on the list, he represents

17    many of them.  And the type of response that was filed in 101

18    would probably be very similar to what we will file if he

19    files -- and he filed 102 as well.  But if he files 103, 104

20    and 105, or whatever number he files, we may well take that

21    same legal position in our motions and in our response or in

22    reply.

23              And what we've been, in essence, told today is we

24    consider that to be a violation of the NPA under the

25    circumstances.
```

1          102 is a perfect example that he filed is, we have

2     e-mails going back and forth between the Government and my

3     clients' attorneys at the time that suggested that 102 probably

4     doesn't even fit within the statute of limitations.

5          So under Mr. Josefsberg's argument is as well, we've

6     only brought a 2255 claim.  We don't care whether she's within

7     or is outside the statute of limitations.  Because she was on

8     the list and under the circumstances, he has to admit

9     liability, which we contest is under that set of circumstances

10    you're stuck with it.  You can fight damages if you can, but

11    she's a real person and you can't raise statute of limitations.

12         The other point that kind of strikes out is there's

13    probably a difference.  And I'm happy to provide a copy of the

14    NPA or a redacted portion of the NPA which deals with the civil

15    issues, which are paragraphs 7, 8, 9 and 10, and the entire

16    addenda in camera for the Court to look at, if plaintiff's

17    counsel and the Government, I guess, really, because they're

18    not a party, is if they have no objection because they all have

19    access based on a prior court order to the non-prosecution

20    agreement.

21         So I'm happy to provide that to the Court today and

22    show it to counsel so that the Court can review that.

23         But our position with regard to the 2255 claims is

24    that -- there were two types of claims that could be filed, one

25    was consensual litigation, the second was contested litigation.

1  And under the consensual, in essence, which Mr. Epstein did, is

2  he's offered $50,000 of the statutory minimum for that time

3  period to all of those individuals.

4          THE COURT:  Can I interrupt you a second?

5          MR. CRITTON:  Yes, sir.

6          THE COURT:  I'm not here, and I don't believe it's my

7  role to decide whether or not there is or is not a breach of

8  the agreement.  I'm just trying to understand what the

9  Government's position is regarding your defending these cases.

10         Now, I'm just saying this as an example.  If, for

11 example, in the non-prosecution agreement there was a provision

12 that said explicitly:  Jeffrey Epstein shall not move to

13 dismiss any claim brought under 2255 by any victim no matter

14 how long ago the allegations or the acts took place, period.

15         If that was in the agreement and you filed a motion to

16 dismiss by someone who brought a claim, it might sound like it

17 might be a violation.

18         MR. CRITTON:  I agree.

19         THE COURT:  So you would know that when you filed your

20 motion because it was right there for you to read.

21         And so to stay the case because I want to do something

22 that the contract expressly prohibits me from doing, so stay

23 the case until the agreement expires so then I can do something

24 that the agreement said I couldn't do so you won't be in fear

25 of prosecuting, I'm not sure that that is what I'm concerned

1    about.

2           I'm concerned about discovery, investigation, motion

3    practice, that's not prohibited by a provision of the

4    agreement.  If there's something that's prohibited by the

5    agreement that you, knowing what the agreement says, go ahead

6    and do, anyway, I guess that's a risk you're going to have to

7    take.  If there's a legitimate dispute about it, I guess some

8    arbiter is going to decide whether it's a breach or not.

9           But, again, that's something you and Mr. Burman,

10   Mr. Goldberger, and you are all very good lawyers, and he's got

11   a whole list of lawyers representing him, and you've got the

12   agreement and you're going to make legal decisions on how to

13   proceed, and you're going to have to go and make your own

14   decisions.

15          I'm concerned about things that aren't in the

16   agreement, that aren't covered, that you're going to be accused

17   of violating because, again, you take depositions, you send out

18   subpoenas, you file motions that are not prohibited by the

19   agreement.  And that's what I'm concerned about.

20          MR. CRITTON:  And I understand that, Your Honor.

21          But at the same time, it's as if the lawyers and the

22   clients, based upon our interpretation of the agreement, and,

23   believe me, we would not have filed 101, the motion to dismiss,

24   but for believing that there was a good faith basis to do that

25   under the circumstances.

1          And now, in essence, we're being accused not only by

2     -- not accused, but it's been suggested that there's a breach

3     of the NPA, not only by Mr. Josefsberg on behalf of 101, but as

4     well Ms. Villafana on behalf of the United States.

5          That's the perfect example.  They're basically saying

6     we think you violated.  We may send you notice under the

7     circumstances.  So does that mean that on 101 we have to back

8     off of it because we think in good faith that it's a motion and

9     is that something that this Court ultimately will rule?

10         THE COURT:  I don't know that I'm the one who is going

11    to make that decision.  Again, that's not the kind of thing

12    that I was concerned about.  I was more concerned about the

13    normal, ordinary course of conducting and defending a case that

14    would not otherwise expressly be covered under the agreement,

15    that you're going to then have someone say, ah, he's sent a

16    notice of deposition, he's harassing the plaintiffs.  I don't

17    know if there's a no contact provision in the agreement or no

18    harassment type of provision in the agreement.  Ah, this is a

19    breach because you sent discovery, or he's issuing subpoenas to

20    third parties trying to find out about these victims'

21    backgrounds, he's breaching the agreement.

22         Those are the kind of things that I was worried about.

23         MR. CRITTON:  The concern that we have is as part of

24    doing this general civil litigation, it's not just the

25    discovery process.  And I understand the issues that the Court

```
 1   has raised.

 2            But part of it is that often cases are disposed of

 3   either on a summary basis or certainly legal issues that come

 4   before the Court during the course of the case, just like in a

 5   criminal case.  That's clearly part of the, I'd say the defense

 6   of the case under the circumstances; and if, in fact, an

 7   individual can't legally bring a cause of action for certain

 8   reasons, such as has been suggested in 101, and may be

 9   suggested in 102 when that pleading is filed, that certainly is

10   a position that puts my client at risk.

11            As another example that I use with C.M.A., that they

12   filed this 30-count complaint.  Now, they have the state court

13   claims as well.  But they, in essence, have said they filed

14   another pleading with the Court that says depending on what the

15   Court rules, in essence, on whether we can file multiple claims

16   or one cause of action with multiple violations, we may dump

17   the state court claims and, therefore, we'll just ride along on

18   that.  That's a very different --

19            Mr. Epstein would never have entered into, nor would

20   his attorneys have allowed him to enter into that agreement

21   under those circumstances where he had this unlimited

22   liability.  That clearly was never envisioned by any of the

23   defendants -- by the defendant or any of his lawyers under the

24   circumstances.

25            And if that's claimed to be a violation, either by the
```

1  attorneys; i.e., he's not recapitulating on liability under the

2  2255, and that's all we have now.  That's our exclusive remedy.

3       And the Government says, yeah, that's right, that's a

4  violation of the NPA.  It again chills us from moving forward,

5  filing the necessary motion papers and taking legal positions

6  that may put my client at risk for violating the NPA and then

7  creating the irreparable harm of, after having been in jail,

8  after having pled guilty to the state court counts, after

9  registering on release as a sex offender, he's complied and

10 done everything, taken extraordinary efforts to comply with the

11 NPA, puts him at substantial risk.  And that's what our worry

12 is moving forward.

13       MR. JOSEFSBERG:  Your Honor, may I be heard.  May I

14 make three comments?  It will take less than a minute.

15       THE COURT:  Yes, sir.

16       MR. JOSEFSBERG:  Mr. Critton refers to the alleged

17 victims.  I want you to know that our position is that pursuant

18 to the NPA they're not alleged victims.  They are actual, real

19 victims, admitted victims.

20       Secondly, he argues about the statute of limitations

21 on 102.  I know that you don't want to hear about that, and I'm

22 not going to comment about it.  But please don't take our lack

23 of argument about this as being we agree with anything.

24       Last and most important, we totally agree with

25 Mr. Critton in his suggestion that he hand you a copy of the

1   NPA.  I think that many of the questions you asked will be

2   answered when you read the NPA, and I think it's very unfair of

3   everyone who is sitting in front of you who have the NPA to be

4   discussing with you whether it's being breached, whether there

5   should be a stay when you're not that familiar with it.

6        If we would give you a copy of it, I think it would be

7   much more helpful in making your ruling.

8        THE COURT:  Maybe Judge Colvat will resolve this issue

9   for me.

10       MR. JOSEFSBERG:  Even if he doesn't, Your Honor, I

11  believe we are allowed to show it to you.

12       THE COURT:  I'll tell you what:  I'll wait for Judge

13  Colvat to rule, and then if he rules that it should remain

14  sealed, then I'll consider whether or not I want to have it

15  submitted to me in camera.

16       Anything else, Mr. Josefsberg?

17       MR. JOSEFSBERG:  No.  I thank you on behalf of myself

18  and the other counsel on the phone for permitting us to appear

19  by phone.

20       THE COURT:  All right.  Anyone else have anything they

21  want to add?

22       MR. EDWARDS:  Brad Edwards on behalf of Jane Doe.

23       I only had one issue here, and when I read your motion

24  that you wanted to hear on the narrow issue of just defense in

25  the civil actions filed against him violates the

1    non-prosecution agreement, I was expecting that we were going

2    to hear something from the Government similar to the affidavit

3    that was filed by Mr. Epstein's attorneys wherein he indicates

4    as of the day of this affidavit attached to the motion to stay,

5    the U.S. Attorney's Office has taken the position that Epstein

6    has breached the non-prosecution agreement and it names

7    specifically investigation by Epstein of this plaintiff and

8    other plaintiffs, Epstein's contesting damages in this action.

9    Epstein, or his legal representatives, making statements to the

10   press.  And we didn't hear any of those things.

11          So that's what I was expecting that the U.S.

12   Attorney's Office was going to expound on and say, yes, we've

13   made some communications to Epstein.  He's violating.

14          What we're hearing right now, today, just so that I'm

15   clear, and I think the Court is clear now, is that the

16   non-prosecution agreement is what it is.  There have been no

17   violations, but for maybe what Mr. Josefsberg brought up.

18          But there are very few restrictions on Mr. Epstein.

19   He went into this eyes wide open.  And whether or not I agree

20   with the agreement, how it came to be in the first place, is

21   neither here nor there.

22          But there have been no violations or breaches up to

23   this point.  And his affidavit that was filed, I'm just

24   troubled by where it even came from.  I mean, it's making

25   specific allegations that the U.S. Attorney's Office is

 1    threatening a breach, and this is part of the motion to stay,

 2    which we're all battling here.

 3           So I just wanted to indicate to the Court or remind

 4    the Court that there have been specific allegations made, the

 5    United States Attorney's Office is making these allegations of

 6    breach, which we haven't heard any of the evidence of.

 7           Thank you.

 8           THE COURT:  All right.

 9           Ms. Villafana, did you want to respond to that

10    suggestion that there were other allegations of breach besides

11    the one that you've just mentioned today?

12           MS. VILLAFANA:  No, Your Honor.

13           THE COURT:  Thank you.  I appreciate your giving me

14    the information, which I think has been very helpful today, and

15    I'll try and get an order out as soon as possible.

16           [Court adjourned at 11:10 a.m.].

17                  C E R T I F I C A T E

18           I hereby certify that the foregoing is an accurate

19    transcription of proceedings in the above-entitled matter.

20

              s/Larry Herr

21    _____    _____

      DATE                   LARRY HERR, RPR-CM-RMR-FCRSC

22                           Official United States Court Reporter

                             400 N. Miami Avenue

23                           Miami, FL  33128 - 305/523-5290

                                      (Fax) 305/523-5639

24                           email:  Lindsay165@aol.com

25