UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE 1 AND JANE DOE 2,

        Petitioners,

vs.

UNITED STATES,

        Respondent.

_____/

GOVERNMENT'S RESPONSE AND OPPOSITION TO PETITIONERS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Respondent United States of America, by and through its undersigned counsel, files its

Response and Opposition to Petitioners' Motion for Partial Summary Judgment and Cross-

Motion for Summary Judgment, and states:

    I.    <u>INTRODUCTION</u>

Petitioners contend the Government violated their rights under the Crime Victims' Rights

Act ("CVRA"), 18 U.S.C. § 3771, by:  (1) failing to confer with them (D.E. 361 at 48-51; (2)

failing to treat them with fairness (D.E. 361 at 51-53); and (3) failing to provide petitioners with

reasonable and accurate notice (D.E. 361 at 54-55).

The Government disputes many of the facts which petitioners contend are not in dispute,

and have controverted those facts in the accompanying Response to Petitioners' Statement of

Uncontroverted Facts.   Indeed, many of the so-called "facts" are legal conclusions or argument

of petitioners' counsel.    The undisputed facts establish that the Government is entitled to

judgment as a matter of law, because it did not violate the CVRA rights of either petitioner.

II.     JANE DOE NO. 2 CANNOT INVOKE THE CVRA BECAUSE
        SHE OPENLY OPPOSED AND WAS HOSTILE TO THE
        <u>PROSECUTION OF JEFFREY EPSTEIN</u>

Petitioners have not distinguished the roles of Jane Doe No. 1 and Jane Doe No. 2, other

than to assert that Jeffrey Epstein sexually abused both.   However, the differing circumstances

of the two petitioners during the investigation of Epstein are highly relevant in determining

whether each petitioner can even invoke the CVRA.

Through her attorney, James Eisenberg, Esq.,[1] Jane Doe No. 2 refused to be interviewed

by the FBI and U.S. Attorney's Office unless she was granted immunity.  Ex. A, Sept. 21, 2006

Ltr. from Eisenberg to AUSA Villafaña; Ex. S, ¶¶ 6-12.  Thus, she was unwilling to provide any

information regarding her encounters with Epstein unless she was assured her statements would

not be used against her in a criminal prosecution.  In accordance with her request, the

Government obtained immunity under 18 U.S.C. § 6001 in order to obtain information from Jane

Doe No. 2.  Ex. B; Ex. S, ¶¶ 6-12.

On April 24, 2007, Jane Doe No. 2 was interviewed by FBI Special Agents E. Nesbitt

Kuyrkendall and Jason Richards and AUSA Marie Villafaña, in the presence of her attorney,

James Eisenberg, Esq.  Ex. C; Ex. R, ¶ 5; Ex. S, ¶ 12.  Jane Doe No. 2 described her meetings

with Epstein, and Epstein's offer to pay her $200 to bring girls to him.  Ex. C at 20.  When asked

whether Epstein "pulled you closer to him in a sexual way," Jane Doe No. 2 replied:

        A.      I wish.  No, no, never, ever, ever, no, never.  Jeffrey is an awesome
                man, no.

<u>Id.</u> at 22.  At the end of her interview, Jane Doe No. 2 was asked if she had any questions for the

agents or AUSA Villafaña.  <u>Id.</u> at 57.  Jane Doe No. 2 responded:

        A.      No, but I hope – I hope Jeffrey, nothing happens to Jeffrey because he's an

---

[1] Eisenberg's services were paid for by Epstein.  Ex. S, ¶ 7.

> awesome man and it would really be a shame.  It's a shame that he has to
> go through this because he's an awesome guy and he didn't do nothing
> wrong, nothing.

Id. at 58.

By her conduct, Jane Doe No. 2 plainly demonstrated that she did not view herself as a victim and did not seek to be treated as such, and she made clear her desire for the investigation to be resolved without charges being filed against Epstein.  Several months after that videotaped interview, Attorney Eisenberg was asked whether AUSA Villafaña could contact Jane Doe No. 2 directly and was told that contact had to occur via Mr. Eisenberg.  Ex. S, ¶ 14.

In seeking summary judgment, Jane Doe No. 2 bears the burden of coming forward and showing that there are no facts in dispute regarding her desire to consult with the prosecutor and her status as a victim.  Jane Doe No. 2 has provided no sworn testimony or other evidence suggesting that during the period between the videotaped interview and the signing of the Non-Prosecution Agreement ("NPA"), she wished to confer with an attorney for the Government or any Government agent, felt that she was treated unfairly, or that she failed to receive reasonable or accurate notice.

Jane Doe No. 2 has not only failed to carry her burden, but the evidence shows that there is no genuine issue of material fact[2] that Jane Doe No. 2 did not want to be treated as a victim with the rights provided by the CVRA.  The person who pointedly denied being a victim of criminal activity perpetrated by Epstein, was represented by counsel paid for by Epstein, regarded Epstein as "an awesome man," refused to be interviewed unless immunity was granted,

---

[2] For an issue to be "genuine" precluding summary judgment, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986) (internal citations omitted).

and hoped that Epstein would not be prosecuted cannot argue now that her rights as a victim were violated when the Government and Epstein entered into a non-prosecution agreement.[3] Similarly, to the extent the CVRA applies at all to Jane Doe No. 2, Jane Doe No. 2 cannot contend that she was not treated with fairness and with respect for her dignity and privacy because the Government honored her requests that the Government only communicate with her through attorney Eisenberg and took into consideration her expressed desire not to see Epstein prosecuted.  See Ex. S, ¶¶ 6-15; Ex. R, ¶¶ 3-6.  The Government is entitled to summary judgment as to Jane Doe No. 2's claims.

III.     THERE IS NO RIGHT TO NOTICE OR TO CONFER ABOUT A
          NON-PROSECUTION AGREEMENT

Section 3771(a)(5) provides that a crime victim has "[t]he reasonable right to confer with the attorney for the Government in the case."  Petitioners maintain the "right to confer" means the Government was obligated to notify Jane Doe No. 1 of its intention to enter into a non-prosecution agreement with Epstein.  The Government does not dispute that the NPA was signed on September 24, 2007, and Jane Doe No. 1 was not told about the NPA until October 2007.  However, the Government disagrees with petitioners' implicit assertion that a victim's statutory "right to confer" is a "right to be notified."

In § 3771(a)(2), Congress provided that a crime victim has "[t]he right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused."  The term "notice" is absent from § 3771(a)(5).  Congress's decision not to use the word "notice" in § 3771(a)(5) is significant

---

[3] Jane Doe No. 2's exculpatory statements regarding Epstein were not lost on his attorneys.  A December 21, 2007 letter from Jay Lefkowitz, one of Epstein's attorneys, to U.S. Attorney Acosta, devoted two pages examining Jane Doe No. 2's interview testimony on April 24, 2007.  Ex. D at 9-15.

because "[i]t is generally presumed that Congress acts intentionally and purposely where it includes particular language in one section of a statute but omits it in another." Lippert v. Community Bank, Inc., 438 F.3d 1275, 1279 (11th Cir. 2006), citing Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816, 824 (11th Cir. 1998), and Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted).

Section 3771(a)(5) provides a right of a crime victim to confer with the prosecutor in the case, but does not impose an obligation on the prosecutor to provide notice of a non-prosecution agreement. Section 3771(a)(5) obligates a prosecutor to give access to a crime victim to discuss issues brought up by the victim. It does not impose a duty on a prosecutor to give notice about a particular development in the case, nor to consult with every victim about every such development, other than what is required in § 3771(a)(2). "Confer" and "notice" have separate and distinct meanings. "We refrain from concluding here that the differing language in the two subsections has the same meaning in each." Russello, 464 U.S. at 23.

At the inception of the Epstein investigation, the U.S. Attorney's Office provided letters to the victims. On or about August 4, 2006, Jane Doe No. 2 was sent a letter describing her rights under the CVRA, and providing contact information for the prosecutor. Ex. E; Ex. S, ¶ 5. On or about August 11, 2006, Jane Doe No. 1 received a similar letter. Ex. F; Ex. S, ¶ 5. Both letters provided the name of the FBI agent handling the Epstein investigation, her phone number, the identity of the prosecutor, and her phone number. Plainly, both Jane Doe No. 1 and Jane Doe No. 2 had the means to contact the FBI agent and the prosecutor regarding any concerns about

the investigation.  If they wanted to confer with the prosecutor, they only had to call her or the FBI agent.  They did not.  Ex. S, ¶¶ 5, 13, 31; Ex. R, ¶¶ 6, 7.  In other words, the victims had the "right to confer" with the prosecutor, if they wanted and asked to do so.  The attorney for the Government, however, had no statutory obligation to engage in unsolicited consultation with a victim who had never requested to confer.

Petitioners refer to the May 2015 amendment of the CVRA to support their argument that the CVRA applies prior to the initiation of formal charges in a federal court.  D.E. 361 at 48 n.175.  More than seven years after the NPA was signed and nearly 7 years after this matter was filed, Congress added a new subsection, 18 U.S.C. § 3771(a)(9), which gave victims "[t]he right to be informed in a timely manner of any plea bargain or deferred prosecution agreement." Section 113(a), Pub. L. No. 114-22, 129 Stat. 227 (May 29, 2015).

But neither that 2015 amendment nor § 3771(a)(5) imposed a legal duty on the Government to notify petitioners of the non-prosecution agreement signed in 2007.  It is well-settled that, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."  Stone v. INS, 514 U.S. 386, 397 (1995).  The legislative history of Congress's addition of a new provision requiring prosecutors to timely inform crime victims of a plea bargain or deferred prosecution agreement illustrates that Congress believed the pre-existing version of § 3771(a)(1)-(8) did not encompass those subjects.

Further, Congress's specific reference to plea bargains and deferred prosecution agreements (DPA), but not non-prosecution agreements (NPA), is telling.  "DPA's differ from NPA's primarily with regard to the filing of criminal charges.  With an NPA, 'formal charges are not filed and the agreement is maintained by the parties rather than being filed with a court.'" United States v. Fokker Services B.V., 818 F.3d 733, 738 (D.C. Cir. 2016) (citation omitted).

"Non-prosecution agreements are similar to plea agreements, except adherence to a non-prosecution agreement is the responsibility of the prosecutor alone while a plea agreement is subject to the approval of the court."  United States v. Dorsett, 2009 WL 2386070 at *4 (D. Neb. Jul. 23, 2009), citing United States v. Minnesota Mining & Mfg. Co., 551 F.2d 1106, 1112 (8th Cir. 1977).  Congress's inclusion of two events, which both address formal criminal charges that have already been filed in court, but excluding non-filed NPA's, further supports the Government's contention that § 3771(a)(5)'s right to confer did not arise until a formal criminal charge had been filed.  Indeed, it makes no sense to conclude that conferring about an NPA is required where notification of an NPA is still not required after the 2015 amendments.

Congress's addition of § 3771(a)(9) demonstrates it wanted to close a gap in the statute. Indeed, the legislative history of the amendment demonstrates that the provision sought to add to and strengthen the existing rights found in the CVRA by ensuring notice of plea agreements and deferred prosecution agreements:

> Finally, this legislation would strengthen the rights of crime victims.  The bill would amend the Crime Victims' Rights Act to provide victims with the right to be informed in a timely manner of any plea agreement or deferred prosecution agreement.  The exclusion of victims in these early stages of a criminal case profoundly impairs victims' rights because, by the nature of these events, there often is no later proceeding in which victims can exercise their rights.

161 Cong. Rec. S106 (daily ed. Jan. 8, 2015) (statement of Sen. Feinstein, for herself and for Sens. Portman, Cornyn, Gillibrand, and Kirk) (addressing Senate Bill 140, the Combat Human Trafficking Act of 2015, which contained a provision, later incorporated into the Justice for Victims of Trafficking Act of 2015 that amended the CVRA, adding "[t]he right to be informed in a timely manner of any plea agreement or deferred prosecution agreement" to 18 U.S.C. § 3771(a)).  Indeed, many of the supporters and sponsors of the legislation explained that one of the purposes of the legislation was to create a requirement that ensured that crime victims would

be informed of plea agreements and deferred prosecution agreements in their cases.  See 161 Cong. Rec. S1345 (daily ed. Mar. 10, 2015) (statement of Sen. Thune) ("Among the bill's many victim-related provisions are . . . a notification requirement to ensure that trafficking victims are told of any plea bargains or deferred prosecution agreements in their case . . . ."); 161 Cong. Rec. S1398 (daily ed. Mar. 11, 2015) (statement of Sen. Reid) ("It keeps victims of trafficking and child pornography informed regarding any plea bargain or deferred prosecution related to their cases."); 161 Cong. Rec. S1466 (daily ed. Mar. 12, 2015) (statement of Sen. Hoeven) ("It ensures that Federal crime victims are informed of any plea bargain or deferred prosecution agreement in their case . . . .'); 161 Cong. Rec. S1466 (daily ed. Apr. 21, 2015) (statement of Sen. Hoeven) ("This bill has many important, strong points. . . .  It also ensures that Federal crime victims are informed of any plea bargain or deferred prosecution agreement in their case and clarifies that the ordinary standard of appellate review applies in cases concerning Federal crime victims' rights petitions. . . . This legislation will help for all of those reasons.").

     The presumption is that Congress intends to change the law when it enacts amendments. Bailey v. United States, 52 Fed. Cl. 105, 110 (2002), citing Wallace v. Jaffree, 472 U.S. 38, 59 n.48 (1985).  Here, not only did Congress change the law by creating a victim notification requirement for plea bargains and deferred prosecution agreements, it decided not to create such a requirement for non-prosecution agreements in the amended § 3771(a)(9).  Moreover, § 3771(a)(9) does not require advance notice of a plea offer or proposed deferral of prosecution while such resolutions are being considered or negotiated by the Government; rather, the plain language of § 3771(a)(9) only requires that notice be provided "in a timely manner" after a plea bargain or deferred prosecution agreement has come into existence.

     Even if the CVRA can apply prior to the filing of a formal charge, the scope of the duty

in § 3771(a)(5) does not extend to NPAs, and certainly not to inchoate NPAs, where the amended statute still does not even require notice to a crime victim of an NPA. Consequently, there was no duty to notify Jane Doe No. 1 or Jane Doe No. 2 of the NPA nor to confer with them about it.

IV.    THE GOVERNMENT DID NOT VIOLATE
          PETITIONERS' RIGHT TO CONFER

Petitioners nonetheless contend the Government violated their right to confer in three separate time periods:  (1) on and before September 24, 2007, when the Government was negotiating and signing the NPA; (2) in and around January 2008, when it sent letters to the victims counseling patience while the Government finished its investigation, but did not tell them about the NPA; and (3) in and around June 30, 2008, when the Government did not tell the victims that Epstein's state plea would effectively "extinguish their rights to ever see Epstein prosecuted." D.E. 361 at 49.

As to the first time period, the Government had no duty under § 3771(a)(5) to notify or confer with petitioners  about the NPA, particularly when neither petitioner had asked to confer about any charging decisions or any potential resolution of the investigation.  Section III, supra.

As to the second period, in and around January 2008, there can be no dispute that Epstein's attorneys aggressively sought review of the NPA at higher levels within the Department of Justice, seeking relief from the obligations Epstein had undertaken in that agreement.  First, he raised challenges to the United States Attorney's exercise of his prosecutorial discretion with the Assistant Attorney General and with the Child Exploitation and Obscenity Section (CEOS), within the Criminal Division of the DOJ in Washington, D.C.  See, e.g., Exs. G, K, L.  Indeed, from late 2007 to May 2008, Epstein's attorneys attempted to convince senior attorney at CEOS that Epstein had not committed any federal crimes, and they

submitted lengthy documents reviewing the evidence and case law, advocating the position that

Epstein had only violated Florida law, if any crime had even been committed, and suggesting

that the Florida state courts were the appropriate forum for adjudicating his criminal

responsibility.  E.g., Exs. G, V.  Meetings were held between CEOS officials and Epstein's

attorneys, in which Epstein sought to have the NPA overturned.  See Ex. H at 1.

      With these ongoing feverish attempts to set aside the NPA by Epstein's attorneys, the

U.S. Attorney's Office prudently proceeded with the investigation and preparation for a criminal

prosecution.  Ex. S, ¶¶ 34-36; see also Ex. R, ¶  10.  The January 2008 letters from the FBI

regarding the continuing investigation of Epstein were not deceptions, as suggested by

petitioners.  They reflected the investigative team's view that there might well be a federal

prosecution and that at least some of the victims would become prosecution witnesses at trial.

Ex. S, ¶¶ 35-36; see also Ex. R, ¶  10.

      On May 15, 2008, the Chief of the CEOS sent Jay Lefkowitz, Esq., a five-page letter,

explaining the inquiry it conducted of the federal criminal investigation of Epstein.  Ex. H.  The

letter concluded that "federal prosecution in this case would not be improper or inappropriate."

      Undeterred, Epstein next sought further review, ultimately proceeding to the Office of the

Deputy Attorney General.  Additional letter briefs were submitted by Epstein's attorneys to the

Deputy Attorney General.  Ex. V.  On June 23, 2008, John Roth, Senior Associate Deputy

Attorney General, wrote to Messrs. Lefkowitz and Starr, advising them that "federal prosecution

of this case is appropriate."  Ex. I.  Mr. Roth also told Epstein's attorneys that their allegations of

prosecutorial misconduct had been reviewed, and that the Office of the Deputy Attorney General

saw "nothing in the conduct of the U.S. Attorney's Office that gives us any reason to alter our

opinion."  Id.

Given the extraordinary efforts that Epstein's attorneys expended to obtain higher-level review of the criminal prosecution, and the possibility that DOJ officials might relieve Epstein of his obligations under the NPA, it was only reasonable and prudent for the U.S. Attorney's Office to assume that a federal criminal prosecution of Epstein might still proceed.  Seasoned prosecutors know it is folly to assume, based on defense representations, that a criminal defendant will plead guilty, or his plea will be accepted by the Court, and not prepare for trial. Indeed, a federal criminal prosecution remained a very viable possibility until Epstein entered his guilty plea to state charges, was sentenced, and performed his obligations in accordance with the NPA.

Petitioners next contend the Government, in and around June 30, 2008, failed to tell "the victims that the state plea would effectively extinguish their rights to ever see Epstein prosecuted."  D.E. 361 at 49.  As a threshold matter, the premise of this argument is completely wrong since the victims had no "right" to see Epstein prosecuted.  In American jurisprudence, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973).  Simply put, Epstein's state plea under the NPA could not extinguish any victim's right to prosecution since no such right existed.[4]

_____

[4] Just as petitioners had no right to see Epstein prosecuted, they also have no right to judicial review of the U.S. Attorney's reasons for entering into an NPA with Epstein.  Petitioners assail the Government, stating that "despite the fact that this case has been in litigation for more than seven years spanning several hundred pleadings, the Government does not write even a single sentence explaining why it entered into an NPA with a sex offender who had committed hundreds of federal sex offenses against young girls."  D.E. 361 at 50.  Despite Petitioners' insinuations, however, the Government has not set forth its rationale for entering into the NPA during the course of this litigation for the simple reason that that the Executive Branch's exercise of prosecutorial discretion is not subject to judicial review.  "[D]ecisions to dismiss pending criminal charges – no less than decisions to initiate charges and to identify which charges to bring – lie squarely within the ken of prosecutorial discretion."  Fokker, 818 F.3d at 742.  The

As to the third time period, when the Government found out on Friday, June 27, 2008, at approximately 4:15 p.m., that Epstein's plea had been scheduled by state officials for 8:30 a.m., Monday, June 30, 2008, the prosecutor and the Palm Beach Police Department attempted to provide notice to all the victims.  D.E. 14, ¶ 11; Ex. S ¶ 38.  The prosecutor contacted attorney Edwards by phone to advise him of the state court plea hearing.  (Id.)  At that time, Edwards represented Jane Doe No. 1 and Jane Doe No. 2.  (Id.)  This placed both petitioners on notice that Epstein would be pleading guilty on June 30, 2008, in Palm Beach Circuit Court.

Petitioners' arguments and the record in this case simply do not establish that there was any violation of the petitioners' right to confer.  See also Section III, supra, at 5-6.

---

Supreme Court has repeatedly emphasized that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion," United States v. Batchelder, 442 U.S. 114, 124 (1979), and the CVRA explicitly states that "[n]othing in th[e] [Act] shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction," 18 U.S.C. § 3771(d)(6).

As the Supreme Court explained when reviewing a claim that a passive prosecutorial enforcement scheme violated the First and Fifth Amendments, the Government's broad discretion as to whom to prosecute

> rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.  Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

Wayte v. United States, 470 U.S. 598, 607-08 (1985); see also Fokker, 818 F.3d at 737-738 (noting the long-settled understandings about the independence of the Executive with regard to charging decisions and concluding that "[n]othing in the [Speedy Trial Act's] terms or structure suggests any intention to subvert those constitutionally rooted principles so as to enable the Judiciary to second-guess the Executive's exercise of discretion over the initiation and dismissal of criminal charges").

V.   THE GOVERNMENT DID NOT VIOLATE PETITIONERS' § 3771(a)(2)
RIGHT TO REASONABLE, ACCURATE, AND TIMELY NOTICE

Petitioners contend that they are entitled to partial summary judgment on their claim that the Government violated their CVRA "right to reasonable, accurate, and timely notice of any public court proceeding . . . involving the crime," as set forth in 18 U.S.C. § 3771(a)(2), with respect to the Florida state court proceeding in which Epstein pled guilty to state crimes.  D.E. 361 at 54-55.  The law and the undisputed factual record in this case establish, however, that the Government in no way violated § 3771(a)(2).  The only public court proceedings that took place involving crimes committed by Epstein occurred in state court, and the CVRA does not create any right to notice of any state court proceeding.  Moreover, even if it did, the Government provided Jane Doe No. 1 and Jane Doe No. 2 with notice of Epstein's state court proceeding that, under the circumstances, was reasonable, accurate, and timely.  Accordingly, petitioners' request for partial summary judgment on the claimed violation of 18 U.S.C. § 3771(a)(2) must be denied, and the Government is instead entitled to summary judgment on that claim.

A.   *The CVRA Did Not Create a Right to Notice of Epstein's State Court Proceedings*

Although petitioners contend that they had a statutory right to notice of the June 30, 2008 state court proceeding in which Epstein pled guilty to state court criminal charges, the CVRA extends statutory notice rights to victims of *federal* crimes for *federal* court proceedings.  As the CVRA's legislative history reveals, the CVRA's statutory scheme is designed to confer rights upon crime victims in the federal judicial system, not in the various state judicial systems.  See, e.g., H.R. Rep. 108-711, at 10, 2004 U.S.C.C.A.N. 2274, 2283 ("This section amends Title 18 to codify eight statutory rights of crime victims in the Federal judicial system.") (addressing Section 102 in Report's Section-by-Section Analysis and Discussion section) (Sept. 30, 2004).  Indeed, the CVRA's general definition of "crime victim" does not include those who are harmed

as a result of the commission of state criminal offenses.  18 U.S.C. § 3771(e)(2)(A) ("The term

'crime victim' means a person directly and proximately harmed as a result of the commission of

a Federal offense or an offense in the District of Columbia.").

The only provisions of the CVRA that even address state criminal proceedings are found

in 18 U.S.C. § 3771(b)(2)—a provision that addresses collateral *federal habeas proceedings* that

arise from state criminal convictions.  For purposes of such federal habeas proceedings that

challenge a state conviction—but only for such purposes—the CVRA defines "the term 'crime

victim' [to] mean[] the person against whom the State offense is committed or, if that person is

killed or incapacitated, that person's family member or other lawful representative."  18 U.S.C.

§ 3771(b)(2)(D).  Federal prosecutors do not have any obligation to provide notice of such

federal habeas proceedings or of any state court proceeding.  See 18 U.S.C. § 3771(b)(2)(C)

("This paragraph relates to the duties of a court in relation to the rights of a crime victim in

Federal habeas corpus proceedings arising out of a State conviction, and does not give rise to any

obligation or requirement applicable to personnel of any agency of the Executive Branch of the

Federal Government.").[5]

---

[5] Petitioners argue that the Epstein's June 30, 2008 state court proceeding was a "court proceeding" within the meaning of the CVRA "because the NPA was directly involved in the proceedings in state court."  D.E. 361 at 54 & n.176.  If, as petitioners contend, the terms "court" and "court proceeding" in the CVRA included state courts and state court proceedings, then the CVRA would impose obligations on state courts and govern state court criminal proceedings anytime that a state proceeding involved a criminal offense that could also be charged federally, see, e.g., 18 U.S.C. § 3771(b)(1)—but the CVRA simply does not extend to state courts or state court proceedings.  See, e.g., State v. Skipwith, 123 A.3d 104, 108 & n.6 (Conn. App. Ct. 2015) (rejecting applicability of CVRA to state proceeding).  The "courts" and "court proceedings" addressed in the CVRA are only federal courts and federal court proceedings.  Indeed, the only trial court other than a federal district court that has been included within the scope of the CVRA's provisions is the Superior Court of the District of Columbia.  See 18 U.S.C. § 3771(e)(3).  Moreover, under petitioners' argument, state court rulings would be subjected to review by federal courts.  See, e.g., 18 U.S.C. §§ 3771(d)(3) and (e)(1)(A).  Any interpretation of the CVRA that would extend the Act's reach to regulate state courts and state court criminal

B.   *The Government Provided Reasonable, Accurate, and Timely Notice of*
     *Epstein's State Court Proceedings*

Even if federal prosecutors had an obligation to provide notice of state court proceedings, the Government provided Jane Doe No. 1 and Jane Doe No. 2 with reasonable, accurate, and timely notice of the Florida state court proceeding in which Epstein entered guilty pleas to state charges.  As set forth above, see Section IV, supra, at 12, when the Government learned on Friday, June 27, 2008, at approximately 4:15 p.m., that Epstein's plea to state charges had been scheduled by state officials for 8:30 a.m., AUSA Villafaña specifically called and informed Brad Edwards, the attorney for petitioners, of the date and time of Epstein's state court plea hearing. Ex. S ¶ 38.  Attorney Edwards informed AUSA Villafaña that someone would be present for him at the hearing.  Id.  Under the circumstances, and given Mr. Edwards' representation that someone would be present, the notice that was provided to petitioners was reasonable, timely, and accurate.

VI.   THE GOVERNMENT DID NOT TREAT THE VICTIMS UNFAIRLY

Petitioners next claim the Government did not treat them with fairness, in violation of section 3771(a)(8).  D.E. 361 at 51-53.  They focus on the victim letters sent by the Government in 2008, advising them that the case was under investigation, see Ex. J, and maintain this was a deception since the NPA had already been signed.  This argument is meritless since the undisputed facts reveal that there was no deception.  In January 2008, when the letters were sent

---

proceedings and provide review of state court rulings by federal appellate courts would not only lack support in the Act's text and legislative history but would also raise serious Tenth Amendment federalism concerns.  See, e.g., Heath v. Alabama, 474 U.S. 82, 93 (1985) ("The Constitution leaves in the possession of each State 'certain exclusive and very important portions of sovereign power.' The Federalist No. 9, p. 55 (J. Cooke ed. 1961). Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code.") (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601 (1982); McCulloch v. Maryland, 4 Wheat. 316, 418, 4 L. Ed. 579 (1819)).

by the FBI, Epstein's attorneys were actively engaged in attempts to convince higher levels of the DOJ that there was no basis for a federal prosecution of Epstein and that the U.S. Attorney's Office had abused its prosecutorial discretion in negotiating the NPA.  The NPA itself was attacked on a number of grounds, including the provision for compensation of Epstein's victims. Ex. K, Nov. 28, 2007 Ltr. from Kenneth W. Starr to Assistant Att'y Gen. Alice S. Fisher.

The Government cannot be faulted for properly recognizing that the NPA might be set aside by the efforts of Epstein's attorneys at the DOJ, or that Epstein would fail to satisfy the terms of the NPA.  The Government had continued its investigation because prudence dictated that the Government continue its investigation and preparations to be ready to move forward with a criminal prosecution of Epstein.  See Section IV, supra, at 9-12; Ex. R, ¶ 10; Ex. S, ¶¶ 34-36.

Petitioners also assail the Government for agreeing with defense attorneys to stop notifying victims, and agreeing to notify victims only after Epstein entered his plea.  D.E. 361 at 53.  But there were legitimate reasons for the Government to delay notifying the victims of the terms of the NPA.  If a prosecution of Jeffrey Epstein were to occur, the prosecution's witnesses would consist of young women who were teenaged girls when they were sexually abused by Epstein and who accepted money from Epstein for giving him sexual massages.  In turn, the defendant was a wealthy and socially prominent financier, who had virtually limitless resources to investigate the backgrounds of each prosecution witness and mount a full-scale attack on each young woman's credibility.  In a December 11, 2007 letter from Jay Lefkowitz to U.S. Attorney Acosta, Epstein previewed the probable impeachment of the victims, outlining claims of prior arrests for possession of marijuana and drug paraphernalia; stealing from an employer; and shoplifting.  Ex. L at 9-12.

Under these circumstances, it was completely appropriate for the Government to avoid creating additional impeachment material by not alerting the victims that the Government was seeking a resolution that would facilitate their collecting money damages from Epstein.  See Ex. R, ¶ 9; Ex. S, ¶¶ 21, 34-35.  In its first filing in this case on July 9, 2008, the Government explained that, after the NPA was signed in September 2007, four victims were contacted and the provision for a federal restitution remedy was discussed.  D.E. 14, ¶ 8.  When Epstein's attorneys learned of this, they complained that the Government was incentivizing the victims to overstate their involvement with Epstein in order to increase their damage claims.  Id.  AUSA Villafaña and the FBI agents concluded that informing additional victims could compromise both the witnesses' credibility and the agents' credibility at a later trial if Epstein reneged on the agreement.  Id.; Ex. R, ¶ 9; Ex. S, ¶ 34.

This strategic decision to limit a potential attack on the Government witnesses' credibility was a permissible exercise of prosecutorial discretion, which should not be second-guessed by means of a CVRA lawsuit.  Congress provided in section 3771(d)(6) that "[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction."  In United States v. Thetford, 935 F. Supp. 2d 1280 (N.D. Ala. 2013), victims of a boat theft sought to reopen the defendant's guilty plea.  The victims complained that the FBI failed to take possession of their stolen boat and did not bring criminal charges against the third-party purchaser of the boat.  Id. at 1282.  The district court rejected this claim, noting that the United States Attorney's Office retained broad prosecutorial discretion, and the CVRA did not transfer any of that discretion to victims.  Id. at 1285.  Relying upon § 3771(d)(6), the court stated that,

> [n]ot only do victims not have a veto, they do not have the right to
> dictate Government strategy or demand who to prosecute.  Instead,

the Government has the right, in exercising prosecutorial
discretion, to recognize "difficulties in proof of culpability."

Id. at 1285.  See also 150 Cong. Rec. S4260-01 (daily ed. Apr. 22, 2004) (statement of Sen. Kyl)

("This right to confer does not give the crime victim any right to direct the prosecution."); Jordan

v. Dep't of Justice, 173 F. Supp. 3d 44, 52-53 (S.D.N.Y. 2016) ("Although those who feel they

are victims of federal crimes will and should attempt to convince interested agencies to pursue

prosecution, they cannot dictate the manner, timing, or quantity of conferrals. . . . To hold

otherwise would unnecessarily and unreasonably burden the DOJ and its prosecutors.").

The strategy to be employed by the Government in criminal investigations and

prosecutions is plainly part of the prosecutorial discretion shielded by § 3771(d)(6).  Judicially

reviewing the Government's decision to avoid creating impeachment material by not telling

prosecution witnesses of the potential for obtaining monetary compensation from Epstein would

impair the prosecutorial discretion of the U.S. Attorney – which § 3771(d)(6) forbids.  As to the

scope of § 3771(d)(6), this Court has previously found that, "to the extent that the victims' pre-

charge CVRA rights impinge upon prosecutorial discretion, under the plain language of the

statute those rights must yield."  D.E. 99 at 10.  Therefore, the Government did not violate

petitioners' CVRA rights by not informing them of the terms of the NPA.

Petitioners nonetheless further assail those members of the U.S. Attorney's Office and the

FBI who were involved in the Epstein investigation and its resolution through the NPA, claiming

that they treated petitioners and other victims without fairness or respect for their dignity and

privacy, but the undisputed facts in this record belie those claims.  During the course of its

investigation, the Government learned that many of Epstein's victims were troubled by the

existence of the Government's criminal investigation and a majority expressed concern that their

identities and their involvement with Epstein might be made public. Ex. R, ¶ 12.  Many were

emotionally distressed because of the investigation and these concerns.  Id.  Some were reluctant to talk to the Government, and some refused to talk to the Government.  Id.  At the same time, during the interviews that were conducted with victims from 2006 to 2008, none expressed a strong view that Epstein be prosecuted.  Id. ¶ 13.  Some, like Jane Doe No. 2, even expressed the view that nothing should be done to Epstein, provided accounts that Epstein had done nothing wrong, and/or maintained that Epstein had committed no crime.  See, e.g., Ex. C; Ex. R, ¶ 5; Ex. S, ¶¶ 10, 12, 19, 24-26, 31.  Informed by these circumstances and the strengths and weaknesses of the case against Epstein, the U.S. Attorney's Office sought to resolve the matter in its prosecutorial discretion in a manner that obtained a guaranteed sentence of incarceration for Epstein, that did not subject victims to the scrutiny and travails associated with a trial, that provided victims with the equivalent of uncontested restitution from Epstein, and that guaranteed the sexual offender registration of Epstein, which would help protect other minors throughout the country in the future.  Ex. S, ¶ 18.  While the U.S. Attorney's Office did not provide victims with advance notice of the negotiated resolution, it did so to ensure that additional impeachment evidence would not be created to which the victims, prosecutor, and agents would be subjected to the detriment of a future prosecution of Epstein in the event the negotiated resolution of the investigation were not perfected.  Ex. R, ¶ 9; Ex. S, ¶ 21.  Given these circumstances, even if the resolution of the Epstein investigation under the NPA's terms may not have been optimal and may be subject to criticism, the discretionary actions of the U.S. Attorney's Office in resolving the federal investigation as it did through the NPA simply do not constitute unfair treatment of the victims and did not fail to respect the dignity and privacy of the victims.  See, e.g., Jordan, supra, 173 F Supp. 3d at 54 (In analyzing whether the right to dignity has been violated, the reason for the government's assessment "is irrelevant to this analysis.  Although [the petitioner]

asks this Court to scrutinize the prosecutors' reasons, . . . the CVRA bars this Court from second

guessing the Government's prosecutorial decisions.") (citing 18 U.S.C. § 3771(d)(6); add'l

citations omitted).

VII.   THE GOVERNMENT USED ITS BEST EFFORTS TO COMPLY
WITH THE CVRA

Section 3771(c)(1) provides that, "[o]fficers and employees of the Department of Justice

and other departments and agencies of the United States engaged in the detection, investigation,

or prosecution of crime shall make their best efforts to see that crime victims are notified of, and

accorded, the rights described in subsection (a)."  In this case, the Government did make its best

efforts in notifying petitioners of their rights under section 3771(a), and to accord them such

rights, consistent with its exercise of prosecutorial discretion.

A.   _Compliance with Attorney General Guidelines for Victim and Witness Assistance_

In May 2005, then Attorney General Alberto Gonzales issued the "Attorney General

Guidelines for Victim and Witness Assistance."  Ex. M.  Article II.D provides definitions of

"crime victim":

> 1. Enforcement of Rights.  For purposes of enforcing the rights
> enumerated in article 1.B, a victim is "a person directly and
> proximately harmed as a result of the commission of a Federal
> offense or an offense in the District of Columbia" (18 U.S.C. §
> 3771(e)), if the offense is charged in Federal district court.  If a
> victim is under 18 years of age, incompetent, incapacitated, or
> deceased, a family member or legal guardian of the victim, a
> representative of the victim's estate, or any other person so
> appointed by the court may exercise the victim's rights, but in no
> event shall the accused serve as a guardian or representative for
> this purpose.  (18 U.S.C. § 3771(e)).  A victim may be a
> corporation, company, association, firm, partnership, society, or
> joint stock company.  (1 U.S.C. § 1)(emphasis supplied).

Under the Attorney General Guidelines, a person could be considered a crime victim for

purposes of enforcing the rights enumerated in article 1.B (18 U.S.C. § 3771(a)(1)-(8)) only if

20

the person was directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia, "if the offense is charged in Federal district court." Thus, if there was no offense charged in Federal district court, then a person could not be a crime victim for purposes of enforcing the rights in 18 U.S.C. § 3771(a)(1)-(8). Since Epstein was not charged in Federal district court, petitioners were not "crime victims" under the 2005 Attorney General Guidelines.

Although this Court in 2011 rejected the view that the rights in the CVRA do not attach unless a charge is filed in Federal court, D.E. 99, for purposes of determining whether the U.S. Attorney's Office used its best efforts in 2007-2008 to see that crime victims were accorded the rights in § 3771(a)(1)-(8), the existing guidance promulgated by the Attorney General of the United States informs whether the "officers and employees of the Department of Justice" made use of "their best efforts" as required by § 3771(c)(1). The Attorney General is the head of the Department of Justice. 28 U.S.C. § 503. Further, the Attorney General shall "[s]upervise and direct the administration and operation of the Department of Justice, including the offices of U.S. Attorneys and U.S. Marshals, which are within the Department of Justice." 28 C.F.R. § 0.5(a).

The guidance provided by the Attorney General that was in effect in 2007 was that the rights in § 3771(a)(1)-(8) were enforceable only by persons who were deemed "crime victims." In order to be a "crime victim," a person had to have not only been directly and proximately harmed by the commission of a federal offense, but the offense must also have been charged in a Federal district court. Since Epstein was never charged with a federal offense in a Federal district court, none of the young women he sexually abused could be deemed crime victims with enforceable rights under the Attorney General Guidelines.

Neither the United States Attorney nor his assistants were free to disregard guidelines

promulgated by the head of the Department of Justice.  Because those Guidelines interpreting the CVRA were binding on them, and those Guidelines provided that no rights under § 3771(a)(1)-(8) attached until a charge had been filed in Federal district court, there was no duty under § 3771(a)(5) to consult with petitioners prior to entering into the NPA.

Petitioners go to great lengths to cast a sinister pall over the negotiations between the U.S. Attorney's Office and Epstein's attorneys over the NPA.  D.E. 361 at 19-24.  They ignore the fact that the Guidelines provided that the petitioners had no right to be consulted about the NPA because they were not "crime victims" since no Federal charge had been filed.  By adhering to the Attorney General's Guidelines on the application and enforcement of the CVRA as it sought to address the many competing interests and concerns in this matter, the United States Attorney's Office exercised its best efforts to comply with the CVRA.

To be sure, there were questions raised by subordinates in the U.S. Attorney's Office on whether the victims should be notified, despite the absence of a federal charge being filed. Indeed, on November 27, 2007, First Assistant U.S. Attorney Jeff Sloman advised Jay Lefkowitz by email that the Justice for All Act of 2004 obligated the United States to "notify the victims of the anticipated upcoming events and their rights associated with the agreement entered into by the United States and Mr. Epstein in a timely fashion."  Ex. N, Nov. 27, 2007 email from Sloman to Lefkowitz.  Epstein's attorneys responded by citing to the Attorney General's Guidelines provision stating that there must be a charge filed in a Federal district court before a person could be a "crime victim" under the CVRA.  Ex. O, Dec. 26, 2007 Ltr. from Jay Lefkowitz to U.S. Att'y Acosta at 1-2.

The mere fact that subordinates within the DOJ had questions about the applicability of § 3771(a)(5) to the young women abused by Epstein does not undermine the Government's

position that that there was no obligation to notify them of the NPA.  Even if these opinions of

subordinate employees in the DOJ were considered judicial admissions, a party's judicial

admissions on questions of law have no legal effect.[6]  Dabertin v. HCR Manor Care, Inc., 68

F.Supp.2d 998, 1000 (N.D. Ill. 1999).  Plainly, at the time the NPA was negotiated in 2007, the

then-current version of the Attorney General Guidelines provided that none of the young women

abused by Epstein were considered "crime victims" under the CVRA, and therefore, had no

enforceable rights under those Guidelines.  Given the resolution that the U.S. Attorney's Office

was seeking to achieve, balancing the competing interests and concerns in this matter in an

exercise of prosecutorial discretion, see Section VI, supra, at 18-19, and given the fact that the

Government was trying to minimize damaging impeachment evidence in the event that the

negotiated resolution embodied in the NPA failed, see Ex. R, ¶ 9; Ex. S, ¶¶ 21, 34, it cannot be

disputed that the U.S. Attorney's Office used its best efforts when it complied with the binding

CVRA guidance provided by the Attorney General of the United States as it pursued what it had

concluded was a proper resolution of the matter.

VIII.    PETITIONERS ARE EQUITABLY ESTOPPED FROM
         CHALLENGING THE NPA

On September 10, 2008, Jane Doe No. 1 filed an action in Palm Beach County, Florida,

E.W. v. Jeffrey Epstein, Case No. 50-2008-CA-028058-XXXXMB, seeking money damages

from Jeffrey Epstein for sexually abusing her.  Ex. P.  On September 11, 2008, Jane Doe No. 2

file an action in Palm Beach County, Florida, L.M. v. Jeffrey Epstein, Case No. 50-2008-CA-

28051-XXXXMB, seeking money damages from Jeffrey Epstein for sexually abusing her.  Ex.

Q.

---

[6] "A judicial admission is a formal concession in the pleadings or stipulations by a party
or counsel that is binding on the party making them."  Martinez v. Bally's Louisiana, Inc., 244
F.3d 474, 476-77 (5th Cir. 2001).

In Jane Doe No. 1's complaint, she alleged in part:

> 20.  The Plaintiff is included in the list of victims identified by the Federal Government as victims of the Defendant, Jeffrey Epstein's illegal conduct.  The Defendant, Jeffrey Epstein, is thus estopped by his plea and agreement with the Federal Government from denying the acts alleged in this Complaint, and must effectively admit liability to Plaintiff.

Ex. P, ¶ 20.  Similarly, in Jane Doe No. 2's complaint, she alleged in part.

> 20.  The Plaintiff is included in the list of victims identified by the Federal Government as victims of the Defendant, Jeffrey Epstein's illegal conduct.  The Defendant, Jeffrey Epstein, is thus estopped by his plea and agreement with the Federal Government from denying the acts alleged in this Complaint, and must effectively admit liability to the Plaintiff.

Ex. Q., ¶ 20.

Both petitioners invoked the NPA in their state court liability lawsuits, as a means to preclude Epstein from "denying the acts alleged in this Complaint" and to force him to "effectively admit liability to the Plaintiff."

In this lawsuit, petitioners condemn and assail the same NPA which they relied upon to preclude Epstein from disputing that he had sexually abused both petitioners and was liable to both of them.   The doctrine of equitable estoppel precludes petitioners from attacking, in this proceeding, the NPA they relied upon in their state court civil actions against Epstein.

> The purpose of the doctrine is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from "rely[ing] on the contract when it works to [his] advantage [by establishing the claim] and repudiat[ing] it when it works to [his] disadvantage by requiring arbitration."

In re Humana Inc. Managed Care Litigation, 285 F.3d 971, 976 (11th Cir. 2002), rev'd on other grounds by PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401 (2003), citing Tepper Realty Co. v. Mosaic Tile Co., 259 F.Supp. 688, 692 (S.D.N.Y. 1966).

This case does not involve an arbitration clause which petitioners are seeking to evade, but the same equitable estoppel principle applies.  "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes."  Blinco v. Green Tree Servicing LLC, 400 F.3d 1308, 1312 (11th Cir. 2005), citing Humana, 285 F.3d at 976.  As third-party beneficiaries of the NPA, petitioners claimed the benefit of the NPA in their state court damage claims against Epstein by arguing that Epstein was precluded by the NPA from contesting liability to them.  See also Ex. S, ¶ 26.  After successfully concluding their damage claims actions, petitioners cannot now allege that the same NPA they relied upon was entered into in violation of their rights under the CVRA.  Certainly, they cannot now claim they were wronged by the very agreement they invoked to seek relief against Epstein.

## IX.   PETITIONERS ARE JUDICIALLY ESTOPPED FROM CHALLENGING THE VALIDITY OF THE NPA

A separate estoppel doctrine – judicial estoppel – also applies to preclude petitioners from attacking the NPA.  Under the doctrine, "a party is precluded from 'asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'  Judicial estoppel is an equitable concept intended to prevent the perversion of the judicial process."  Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002) (citation omitted).  Judicial estoppel prohibits "parties from deliberately changing positions according to the exigencies of the moment."  New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001).

The Eleventh Circuit has identified three factors to be considered in determining whether to apply the equitable doctrine:  (1) whether there is a clear inconsistency between the earlier position and the later position; (2) a party's success in convincing a court of the earlier position, so that judicial acceptance of the inconsistent later position would create the perception that either the earlier or later court was misled; and (3) whether the inconsistent later position would

unfairly prejudice the opposing party.  Tampa Bay Water v. HDR Engineering, Inc., 731 F.3d 1171, 1182 (11th Cir. 2013) citing Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1273 (11th Cir. 2010).

In their state court tort actions against Epstein, both petitioners invoked the provisions of the NPA in their initial complaints, asserting that each of them was included in a list of victims prepared by the Federal Government, and identified as victims of Epstein.  Further, petitioners maintained that, by virtue of Epstein's "plea and agreement with the Federal government," he was estopped from denying the acts alleged by petitioners in their complaint, and from denying liability.  These assertions regarding the legal efficacy of the NPA, such that Epstein was bound by his plea and the terms of the NPA from denying petitioners' claims of sexual abuse, plainly are contradicted by their present claims that the NPA was entered into unlawfully, and should be set aside.

Petitioners were successful in obtaining monetary settlements of their tort actions against Epstein, without the need to proceed to trial.  Thus, Epstein ultimately did not contest liability, as petitioners claimed he could not, due to his plea and the NPA.  In this case, petitioners contend the Federal government failed to properly consult with them before entering into the NPA, and therefore, the NPA is invalid and should be set aside by this Court.  They insist that they wanted him prosecuted, and would not have approved of the NPA, if they had been consulted.

The two positions are completely inconsistent.  In the state court, they argued the NPA was binding on Epstein, and prevented him from denying their claims of sexual abuse.  In this court, they contend the NPA was illegally entered into, and should be set aside.  If their current position is accepted, then petitioners appear to have misled the state court as to the legal efficacy of the NPA.  If petitioners' state court argument is accepted, then their current argument that the

NPA is invalid would appear to be a deception of this court.

Petitioners' current position that the NPA is invalid because they had not been properly consulted under the CVRA unfairly prejudices the Government. The NPA was negotiated with a view, in part, to providing a mechanism for the victims – underage young women – to obtain financial compensation for the harm they suffered due to their sexual abuse by Epstein. This objective was achieved since many of the victims, including petitioners, availed themselves in at least some way of provisions in the NPA to preclude Epstein from challenging liability, and obtained monetary settlements without going to trial. The same NPA that assisted petitioners in obtaining compensation is now being challenged as invalid and an abuse of prosecutorial authority. Petitioners did not complain about CVRA violations or about any conspiracy between Epstein's attorneys and the Government to keep the NPA a secret, or allege that Epstein exerted improper influence on federal prosecutors, when they needed the NPA to support their damage claims in their state court tort actions. Now that their monetary settlements have been secured, the NPA has suddenly become the product of an illegal bargain between Epstein and the Government, which petitioners contend should be set aside.

Petitioners have asserted mutually inconsistent positions regarding the validity of the NPA. Judicial estoppel applies to prevent petitioners' gamesmanship from both making use of the NPA as a sword to advance their positions and then claiming that the NPA is a ruinous instrument that has been used to cause them injury. Indeed, the assertion of such diametrically opposed litigating positions could be perceived as making a mockery of the judicial system.[7]

---

[7] Neither privity nor detrimental reliance need be established for judicial estoppel to apply. "The doctrine of judicial estoppel protects the integrity of the judicial system, not the litigants; therefore, numerous courts have concluded, and we agree, that '[w]hile privity and/or detrimental reliance are often present in judicial estoppel cases, they are not required.'" Burnes, 291 F.3d at 1286 (citations omitted); Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81

There is a separate basis for estopping petitioners from challenging the NPA: their calculated delay in prosecuting this CVRA action until after their civil cases against Epstein had been resolved. On July 7, 2008, petitioners filed their Emergency Petition for Enforcement of Crime Victim's Rights Act, 18 U.S.C. Section 3771. The Court directed the Government to file a response by July 9, 2008, which it did.

An emergency hearing was held on July 11, 2008, and petitioners' counsel agreed that Epstein had entered his pleas of guilty and was serving 18 months of imprisonment by relying, in part, on the NPA negotiated with the Government. Ex. T at 20. Petitioners' counsel also told the Court that the matter was not an emergency. Id.

The Court held a second hearing on August 14, 2008, to determine whether additional information was needed to proceed with the pending motion. Ex. U at 2. Petitioners requested the Court to direct the Government to produce a copy of the NPA. Id. at 3. Petitioners' counsel stated that obtaining the NPA was a preliminary step, and their position would likely always be that the victims' rights were violated. Petitioners' counsel then added that, "because of the legal consequences of invalidating the current agreement, it is likely not in my clients' best interest to ask for the relief that we initially asked for." Id. at 4.

This Court observed that, "[o]ver the course of the next eighteen months, the CVRA case stalled as petitioners pursued collateral civil claims against Epstein. The CVRA case was administratively closed on September 9, 2010, and then re-opened at petitioners' request on October 28, 2010." D.E. 189 at 5, ¶ 8. Petitioners' initial position, on July 11, 2008, was that the NPA was invalid and illegal "as it did not pertain to the rights of the victim." Ex. T at 6. A month later, invalidation of the NPA was "likely not in [petitioners'] best interest," so the initial

_____

F.3d 355, 359-61 (3d Cir. 1996).

relief of invalidation was no longer being sought.  Ex. U at 4.  In the meantime, Epstein continued to perform his obligations under the NPA, to serve his jail sentence, to forego his right to appeal, to register as a sex offender, and to settle claims with other victims.  After petitioners' collateral civil litigation against Epstein was concluded, the NPA was again cast as being invalid because petitioners had not been consulted prior to the NPA being signed.

Judicial estoppel should be applied against petitioners because they bowed to the exigencies of the moment in formulating their litigating positions.   The NPA that was allegedly invalid because it was entered into in derogation of their CVRA rights suddenly became a valid, binding agreement, at least for 18 months, which could be enforced against Epstein to their benefit during that period.  Once that benefit was safely secured, the NPA again became an invalid agreement that should be set aside by this Court.  This manipulation of the judicial system is barred by judicial estoppel because it perverts the judicial process.

X.    THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT

The Government is entitled to summary judgment on their defenses of equitable estoppel; judicial estoppel; that it exercised its "best efforts" to comply with the CVRA; and that it exercised its prosecutorial discretion in determining not to notify petitioners of the NPA in order to limit potential impeachment of the victims should the case proceed to trial.

Moreover, the undisputed facts establish the Government did not violate the CVRA, so that petitioners' summary judgment motion should be denied.  Jane Doe No. 2 plainly demonstrated she had no interest in being informed about the progress of the case, since she steadfastly opposed any prosecution of Epstein.  As to Jane Doe No. 1, the text of § 3771(a)(5) does not impose a requirement to provide notice of an NPA.  Only recently did Congress amend § 3771(a) to add the right "to be informed in a timely manner of any plea bargain or deferred

29

prosecution agreement." Noticeably absent is any reference to a non-prosecution agreement which, unlike plea bargains and deferred prosecution agreements, does not involve any filing of a federal criminal charge in a District Court.

Additionally, although the government acknowledges that the Court previously denied its motion to dismiss for lack of subject matter jurisdiction (D.E. 189), the government now adopts and renews the jurisdictional arguments made in its filings seeking dismissal (D.E. 119, 147) as a basis for summary judgment based on the undisputed factual record that has since been developed in this case.

/ / /

/ / /

/ / /

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY


By: */s/ Dexter A. Lee*             
     Dexter A. Lee
     Assistant United States Attorney
     Fla Bar No. 0936693
     99 N.E. 4th Street, Suite 300
     Miami, Florida   33132
     Tel: (305) 961-9320; Fax: (305) 530-7139
     E-mail:  dexter.lee@usdoj.gov

     */s/ A. Marie Villafaña*         
     A. Marie Villafaña
     Assistant United States Attorney
     Fla Bar No. 0018255
     500 S. Australian Avenue, Suite 400
     West Palm Beach, Florida  33401
     Tel: (561) 820-8711; Fax:  (561) 820-8777
     E-mail:  ann.marie.c.villafana@usdoj.gov

     */s/ Eduardo I. Sánchez*        
     Eduardo I. Sánchez
     Assistant United States Attorney
     Florida Bar No. 877875
     99 N.E. 4th Street
     Miami, Florida  33132
     Tel: (305) 961-9057; Fax: (305) 536-4676
     Email: eduardo.i.sanchez@usdoj.gov

     Attorneys for the Government

<u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that on June 6, 2017, the foregoing Response and Opposition to Petitioners' Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment was filed with the Clerk of the Court and served on counsel on the attached service list using CM/ECF.

     */s/ Dexter A. Lee*          
     Dexter A. Lee
     Assistant United States Attorney

<u>SERVICE LIST</u>

Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida  33301
Tel: (954) 524-2820; Fax:  (954) 524-2822
E-mail:  brad@pathtojustice.com

Paul G. Cassell
Pro Hac Vice
S.J. Quinney College of Law at the
University of Utah
332 S. 1400 E.
Salt Lake City, Utah  84112
Tel: (801) 585-5202; Fax:  (801) 585-6833
E-mail:  casselp.@law.utah.edu

Attorneys for Jane Doe 1 and Jane Doe 2

——————————————

Jacqueline Perczek
BLACK SREBNICK KORNSPAN &
STUMPF
201 S. Biscayne Boulevard, Suite 1300
Miami , FL  33131
Tel: (305) 371-6421; Fax: 305-358-2006
 Email: Pleading@royblack.com

Roy E. Black
BLACK SREBNICK KORNSPAN &
STUMPF
201 S. Biscayne Boulevard, Suite 1300
Miami , FL  33131
Tel: (305) 371-6421; Fax: 305-358-2006
 Email: Rblack@royblack.com

Attorneys for Intervenor Jeffrey Epstein

Dexter A. Lee
Assistant United States Attorney
99 N.E. 4th Street, Suite 300
Miami, Florida  33132
Tel: (305) 961-9320; Fax: (305) 530-7139
E-mail:  dexter.lee@usdoj.gov

A. Marie Villafaña
Assistant United States Attorney
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida  33401
Tel: (561) 820-8711; Fax:  (561) 820-8777
E-mail:  ann.marie.c.villafana@usdoj.gov

Eduardo I. Sánchez
Assistant United States Attorney
Florida Bar No. 877875
99 N.E. 4th Street
Miami, Florida  33132
Tel: (305) 961-9057; Fax: (305) 536-4676
Email: eduardo.i.sanchez@usdoj.gov

Attorneys for the United States