# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80736-Civ-Marra/Johnson

JANE DOE No. 1 and JANE DOE No. 2

    v.

UNITED STATES
_____/


AFFIDAVIT OF BRADLEY J. EDWARDS, ESQ. REGARDING NEED FOR
PRODUCTION OF DOCUMENTS

1. I, Bradley J. Edwards, Esq., do hereby declare that I am a member in good standing of the Bar of the State of Florida. Along with co-counsel, I represent Jane Doe No. 1 and Jane Doe No. 2 and others similarly situated and identified by the United States Attorney's Office as victims of sexual crimes against minors committed by Jeffrey Epstein and his co-conspirators (often referred to as "the victims") in the above-listed action to enforce their rights under the Crime Victims Rights Act (CVRA). After the filing of the initial pleading in this case, I also represented Jane Doe 1 and Jane Doe 2 (and several other victims) in civil suits against Jeffrey Epstein for injuries my clients suffered as a consequence of Jeffrey Epstein's sexual abuse of them.

2. I have previously filed an affidavit in this matter (*see* DE 225-1). This affidavit repeats some of the information contained in that earlier affidavit for ease of reference. This affidavit covers factual issues regarding the Government's recent motion for summary judgment and more particularly provides greater context and information related to the affidavit filed by Assistant United States Attorney Ann Marie Villafaña ("Villafaña") (see DE 403-19). Finally, this affidavit provides information supporting the victims' position that the Government deliberately concealed the existence of a previously-entered non-prosecution agreement from the victims and their representatives at every stage through the date when Epstein pled guilty in State court on June 30, 2008. This affidavit will not address the various explanations Villafaña provides in her affidavit for the United States Attorney's Office ("the Office") violating the victims' rights, including those list in DE 403-19, paras. 19 (indicating certain victims were too afraid of Epstein or had been too damaged by Epstein to willingly participate in the prosecution or that the victims would face a "withering cross-examination"), 21 and 22 (the United States Attorney's Office's desire not to share information about the fact or terms of any potential resolution with the victims out of fear that it might subject the victims to additional cross-examination on monetary terms

1

that the victims never asked for out of the criminal case in the first place), 23 (the instruction from the Office to find a charge that resulted in a shorter sentence than the crimes which Epstein actually committed), 24 (the desire to avoid publicity and move the case to Miami), 25 - 26 (the reluctance of some of the victims to testify), 27 (the claim that it is "normal" for the Office to keep plea negotiations "confidential" throughout and not confer with victims), 19 and 29 (Villafaña or the Office's personal belief that the resolution was "in the best interests of the Office and the victims as a whole), or 32-35 (the claim that the Office was unsure whether the NPA was an enforceable document with any meaning even after it was signed by all parties in September, 2007), as those all appear to be legal affirmative defenses to be decided as a matter of law whether any would negate the responsibility of the Office to accord victims their rights under the CVRA. In addition, the victims have been denied discovery on these issues through the Government's assertion of work product protections and similar arguments. Because these explanations about the Government's internal motivations are now an important issue in the case on which the Government will apparently rely, the victims have filed a motion asking the Court to find that the Government has waived its work product protections regarding documents in this case that might shed light on its motivations and explanations.

3. Prior to my representation of any of the victims, which began with my representation of Jane Doe 1 on or about June 13, 2008, the federal criminal investigation was resolved by way of a non-prosecution agreement signed on about September 24, 2007, by Epstein and his attorneys and a representative of the U.S. Attorney's Office. The text of that agreement barred disclosure of the agreement to the victims, a point which the Government made in opposing my various efforts to obtain the agreement for the victims.

4. On about January 10, 2008, Jane Doe No. 1 received a letter from the FBI advising her of her rights under the CVRA and amongst other things that *"[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation."* I reviewed this letter when I undertook to represent Jane Doe 1 and my impression of the letter was similar to that of my client's (and in my view any reasonable person) – there was a complicated federal criminal investigation that may take a long time to complete and the Office wanted the victims, including Jane Doe 1, to wait patiently for its completion before any final decisions would be made. This letter, in conjunction with others the victims received, promised the victims each of their CVRA rights were recognized by the Government and intact and would be strictly honored throughout the process.

5. On May 30, 2008, another one of my clients, who was recognized as an Epstein victim by the U.S. Attorney's Office, received a similar letter from the FBI advising her that *"[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation."*

6. Jane Doe No. 2, and (according to the Government) many of Jeffrey Epstein's other identified minor sex abuse victims ,received similar notifications in 2008. I later reviewed the letters sent to my clients. To me, in light of all the information I have since received from the Government,

2

the statement in the notification letter is plainly deceptive because it failed to reveal that the case had previously been resolved by the non-prosecution agreement entered into by Epstein and the U.S. Attorney's Office in September 2007. Indeed, the statement affirmatively created an impression inconsistent with there already being a resolution or possible resolution to the case.

7. Further to that point, as Ms. Villafaña affirmed, Jane Doe 1 "was re-interviewed on January 31, 2008." She further stated that she "asked Jane Doe 1 whether she would be willing to testify if there were a trial. At that time, Jane Doe 1 stated that she hoped Epstein would be prosecuted and that she was willing to testify." (DE 403-19, para. 36).

8. The message Villafaña conveyed to Jane Doe 1 during the January 30, 2008 "re-interview" was even stronger in explaining the case posture than the victim notification letter explaining that the case was "under investigation." The message Villafaña admittedly conveyed to this young girl in that meeting was that there was a Federal criminal case being pursued against Epstein that might result in a trial if he did not take a plea, and that Jane Doe 1 will need to testify at that trial. Jane Doe 1 reasonably relied on that representation and stood by with the "continued patience" requested of her while awaiting the criminal prosecution and her the fulfillment of her promise to testify. There is no dispute that the conversation at this juncture related to a trial against Epstein for the federal crimes he committed against Jane Doe 1 and others; Jane Doe 1 agrees that this was the substance of the meeting and Villafaña agrees. Villafaña admittedly did not tell Jane Doe 1 about the NPA, about a possible resolution, and makes no effort to reconcile this meeting with the alleged post-NPA signing meeting between FBI agents and Jane Doe 1 referenced in Villafaña affidavit para. 33. Jane Doe 1 has explained what happened during that meeting in her affidavit, DE 361-27.

9. In about April 2008, Jane Doe No. 1 contacted the FBI because Epstein's counsel was attempting to take her deposition and private investigators were harassing her. Assistant U.S. Attorney Villafaña secured pro bono counsel to represent Jane Doe No. 1 and several other identified victims in connection with the criminal investigation. Pro bono counsel was able to assist Jane Doe No. 1 in avoiding the improper deposition. Villafaña secured pro bono counsel by contacting Meg Garvin, Esq. of the National Crime Victims' Law Center in Portland, Oregon, which is based in the Lewis & Clark College of Law. Ms. Garvin was not advised that a non-prosecution agreement had been reached in this matter or that any possible resolution of any kind had been reached. In fact, everything about this situation gave the clear impression that a criminal prosecution was underway.

10. On about June 13, 2008 I was approached by Jane Doe 1 to represent her as an identified victim of criminal offenses being federally investigated against Jeffrey Epstein and numerous co-conspirators. At the time, Jane Doe 1 had been a cooperating victim with the FBI and US Attorney's Office for a year or more; however, as I later explained to Villafaña, Jane Doe 1 was frustrated because she was unable to get anyone from the US Attorney's office to tell her what

3

was actually going on with the federal criminal case against Jeffrey Epstein and she wanted my assistance in getting some answers.

11. In mid-June 2008, I had several telephone calls with AUSA Villafaña. In her affidavit, Villafaña only recounts certain fragments of these calls. (*See* DE 403-19, para. 37-38). However, to the extent the substance of any of these calls is material to any aspect of the Office's defenses in this matter, greater context and elaboration on those calls is necessary. I initially contacted AUSA Villafaña to inform her that I represented Jane Doe 1 and that Jane Doe 1 was anxious for the U.S. Attorney's Office to prosecute Epstein for the federal crimes he had committed against her and many other minor victims. I told Villafaña that I wanted to meet to discuss the crimes Epstein had committed and that Jane Doe 1 wanted to understand what stage the investigation/prosecution was in, and what she should expect and when. Villafaña made it clear that she understood that Jane Doe 1 was cooperative and was expecting a federal prosecution of Epstein. Villafaña did nothing to dispel that notion and as explained below the entirety of the conversations provided the impression that there would, in fact, likely be a federal prosecution of Epstein. We discussed the fact that I was a former prosecutor and would help in any way possible; more specifically, I told her that I was meeting with other witnesses and victims, that I was going to be meeting soon with Jane Doe 2, and that I would provide the information to Villafaña as I received it for the sole purpose of strengthening the government's prosecution of Epstein. Villafaña invited me to send any information that I wanted considered by the United States Attorney's Office. Villafaña told me that she believed Jane Doe 2 was represented by James Eisenberg and I told her that I understood she had been in the past but no longer was and that I was led to believe she now wanted to cooperate. At the time of the first call with Villafaña, I had not yet had the opportunity to speak personally to Jane Doe 2.

12. During the first or perhaps second call, which occurred within a day or two of each other, I expressed to Villafaña that I had gathered extensive information from my client on Epstein's pyramid scheme, which was designed to perpetually grow to allow him to sexually abuse unlimited minor girls. I explained that from just my limited investigation, there was clear evidence of dozens if not hundreds of child victims. I also expressed my client's fear that if Mr. Epstein was engaging in sexual acts with children with this frequency in Florida, then it was highly likely he was committing similar crimes in all of the locations where he had residences, that he had likely been doing it for many years, and that if not stopped he would continue to harm children. While Villafaña would not comment on the evidence, she indicated she already knew of the extent of the crimes that Epstein had committed and that I, on behalf of my client, would be informed as the investigation progressed. She encouraged me to provide information to her as I learned it and at one point asked if I would be willing to make a presentation to other attorneys in her office if necessary at some point in the future on behalf of any of the victims I represented. I agreed to do so, and at multiple stages of the call Villafaña assured me that my client and my cooperation were appreciated and that we would remain in contact as the investigation continued and that she would let me know if or when a presentation might be helpful.

13. During the calls, I asked very specific questions about what stage the investigation was in, how many victims had already been identified, how many charges would likely be brought, and what Epstein's punishment would be. Indeed, on the sentencing issue, I prefaced with my spoken assumption that his sentence after a trial would likely be life, considering the large and growing number of identified victims and sentencing guidelines if found guilty of committing a sex-trafficking offense against just one victim. AUSA Villafaña would not provide many answers or comments to any of my direct questions and, in fact, expressed that while she wished she could answer my questions, it was an on-going active investigation which meant she could not. She did acknowledge that there were many already known victims and that the Office was already aware of the identities of the co-conspirators I informed her about.

14. AUSA Villafaña states in her affidavit that she told me during one of the calls to consider calling the State Attorney's Office. To provide context, Villafaña's suggestion was in response to a question I asked regarding why the State apparently turned the case over to the United States and also whether there was a parallel state case being prosecuted. Villafaña would not provide answers to either question and instead made her suggestion of who I could call. My recollection is that she told me to call Detective Recarey, who was the lead case detective for Palm Beach. Because Villafaña would not provide answers to any basic questions about what might be going on at the state level and she confirmed that Jane Doe 1 was one of the victims that was a part of the Federal case, there was no reason to pursue the State any further with respect to Doe 1.

15. During the telephone calls I had with Villafaña between mid and late June 2008, she never informed me that previously, in September 2007, the U.S. Attorney's Office had reached a non-prosecution agreement with Epstein. She never informed me that any resolution of the criminal matter was imminent at that time, nor even that such a resolution was being contemplated. In fact, Villafaña gave me the impression that the Federal investigation was on-going, very expansive, and continuously growing, both in the number of identified victims and complexity. I was never told, or even given the impression that any resolution of the case was looming; in fact, quite the opposite. The clear implication Villafaña gave me was that there was a major federal criminal investigation and that my client and I would be kept apprised at each phase. There was no doubt, and cannot be any dispute, that I was speaking with Villafaña on behalf of Jane Doe 1, and I told Villafaña Jane Doe 1 wanted to know what was going on with the federal case in which she had been cooperating.

16. I do not recall exactly how many phone calls I had with Villafaña between mid-June and the Friday, June 27, 2008 call, which was the last we had before Epstein's June 30, 2008 state plea. However, we had several calls, and we spoke at least once during the week that ended Friday June 27. It was during a call that week when I informed her that I represented Jane Doe 2 and that Jane Doe 2 wanted to cooperate and had significant helpful information to share. Villafaña wanted to discuss the issue of Jane Doe 2 with her Office, given that Jane Doe 2 had previously been represented by an Epstein-paid attorney and had already provided testimony with that lawyer present, before moving forward with setting a meeting with Jane Doe 2 and me. Again,

5

never during any call up to this point did Villafaña inform me, or even give me the impression, that the federal investigation was at risk of closing. Nor did she inform me, or even give me the impression, that a deal of any sort had been reached at any point in the past or was imminent to be reached in the future. In fact, Villafaña gave me all indications that were exactly the opposite, while apologizing for not be able to share more information or answer many of my questions. During the course of my calls, it was indisputably known to Villafaña that I was calling on behalf of Jane Doe 1 and in later conversations Jane Doe 2 and another client. While Villafaña states in her affidavit that I did not ever inform her that Jane Doe 1 or Jane Doe 2 wanted to confer with her before any resolution was reached, that statement is misleading because while I never used those words it was clear in our conversations that the only reason we were talking was for the purpose of conferral and making sure that Jane Doe 1 stay informed on the case and be apprised of anything major in the case – especially a resolution. There was never a time when Villafaña even hinted that the federal case was potentially resolving, thus there was no reason to tell her specifically what she already knew from our conversations and from her meeting with Jane Doe 1 to be true – that Jane Doe 1 was cooperative and wanted to confer with Villafaña before any resolution especially given that Jane Doe 1 had been led to believe she was going to be testifying in a federal trial.

17. While I was out of town from June 27-29, 2008, Villafaña called me. My recollection was that it was either on Saturday June 28 or Sunday June 29, 2008. She told me that she had just learned that Epstein was pleading guilty in state court on Monday, June 30, 2008. Villafaña gave no indication whatsoever that this plea would resolve the federal investigation. Indeed, Villafaña did not tell me that the state plea was even related to the federal investigation. In fact, this was the first time she had acknowledged that there was still an open state investigation. She gave the impression that she was caught off-guard herself that Epstein was pleading guilty or that this event was happening at all. Villafaña confirmed prior to this call that Doe 1 and Doe 2 were part of the federal investigation. Neither Doe 1 nor Doe 2 nor any other victims I had spoken to up that point, or even those I represented later, had ever been contacted by the Palm Beach State Attorney and told that they were victims of crimes being prosecuted by the State of Florida. Neither Doe 1 nor Doe 2 had any reason to believe that they were victims of a state crime that was being prosecuted. Based on everything Villafaña said, and could not say, there was no possible way I could have believed that this state plea could affect the federal investigation or the rights of my clients in that federal investigation.

18. Villafaña did express that this hearing was important, but never told me why she felt that way. My logical belief was that having Epstein plead guilty to any offense related to his sexual interaction with minors would only help the larger federal prosecution. Villafaña did not tell me that my clients could speak at the hearing or even had any role in or connection to the hearing; in fact, it is my belief to this day that there were several specifically identified victims to the state offenses for which Epstein pled guilty and none were Jane Doe 1 or Jane Doe 2. I told Villafaña that I was out of town and could not attend the hearing. Despite my questions about the case and investigation, both before and during this conversation, Villafaña did not ever tell me that there was a NPA or any resolution to the federal case, that the state plea would somehow resolve the

6

many federal crimes uncovered and expected to be charged federally. Indeed, the only message she conveyed directly to me was that the federal investigation was continuing and Jane Doe 1 and other identified victims would remain informed. I always had the feeling, in every call, that Villafaña wanted to tell me more and that her supervisors would simply not permit her to do so. A fair characterization of each call was that I provided information and asked questions and Villafaña listened and expressed that she was unable to say much or answer the questions I was asking.

19. After the June 30, 2008 plea, (perhaps on July 3, 2008 as Villafaña recollects) I contacted Villafaña to discuss how the state case had been resolved and the next stages of the federal prosecution. I started to get the sense during this call that the Office was beginning to negotiate with Epstein with respect to the federally identified crimes. I explained in detail, on behalf of my clients, why I felt it was essential to the preservation of full justice that any federal plea offer be sufficiently harsh to fit the extensive sex abuse crimes that the evidence demonstrated Epstein had committed. She did not tell me, or even give any indication, that her Office had already signed an NPA with Epstein; nor did she tell me that the federal investigation was already closed or resolved. In fact, even at this stage after the state plea, the indication was the opposite, although for the first time I was made to believe federal plea negotiations had commenced and a resolution could be reached shortly. I took time to write and send a letter to Villafaña'sattention on July 3, 2008, expressing the same feelings I had already expressed during our post-state-plea telephone call. **Ex. A.** In writing the letter, I was acting on my belief, derived from my conversation with Villafaña, that my letter could have some bearing on Government decisions, which I believed to be the decisions about whether to file federal charges, and what charges should be filed, against Epstein. This letter shows the type of conferral that I had been trying to have with Villafaña throughout my discussions with her and that type of conferral that my client had been hoping to have before any resolution.

20. After sending the July 3, 2008 letter, on July 7, 2008, I filed an emergency petition to enforce Jane Doe 1's rights under the CVRA. In the petition, I expressed my concern in that pleading that the United States was engaging in plea negotiations at that time that "may likely result in a disposition of the (federal) charges in the next several days" (DE 1). That petition accurately reflected what I had been lead me to believe was the current state of the federal investigation into Epstein's crime. It is clear at this point that I, on behalf of my clients, was trying desperately to get a conferral with the Government before what my clients and I believed was an imminent resolution to the federal case.

21. On July 9, 2008, the United States filed its response informing me, for the first time, that the United States had previously "agreed to defer prosecution in favor of prosecution by the State of Florida . . . ." (DE 13). Until that time, the victims and their counsel – including me -- had no notice whatsoever of the NPA nor of the fact that there had been a resolution to the federal investigation.  tThe earlier statements made by Villafaña in our prior conversations were misleading in light of the fact that, as Villafaña knew, her Office had signed the NPA months earlier, and as she acknowledges in her recent affidavit she knew during the time we were

7

speaking that "a final decision on Epstein's challenges to the NPA and the federal investigation was expected shortly…. (*See* DE 403-19, para. 37).

22. If I had been told by the Government previously about the NPA, and the fact that Epstein's guilty pleas were needed to trigger the NPA, I would have taken appropriate legal steps to challenge the NPA as Jane Doe 1 would have insisted, both with the Department of Justice and before the Florida state guilty pleas. For example, I would have filed the emergency petition in this case in mid-June if I had been told about the NPA. I detrimentally relied on the statements of Villafaña to me and my clients that the case was still under investigation, that my client may be needed for a trial, and similar representations – and that we should be patient – in not taking earlier action.

23. As a former prosecutor with some familiarity with both state and federal prosecutions – as well as the fair treatment of crime victims during prosecutions – I believe that it would have been customary, reasonable and fair for the Government to have fulfilled its obligations under the CVRA by informing the victims in this case of the resolution before it concluded any NPA with Epstein of the terms of the NPA. I also believe that once the Government had concluded an NPA with Epstein, it would have been customary, reasonable and fair for the Government to have informed the victims of the terms of the NPA well before any plea that extinguished the rights of all Epstein victims.

24. Nothing in this affidavit is intended to reveal, or does reveal, any confidential or internal attorney-client or work product protected information. Nothing in this affidavit should be construed as in any way waiving any attorney-client privilege or work product protection.

25. I declare under penalty of perjury that the foregoing is true and accurate to the best of my memory, knowledge, and belief.

* * * * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 11th day of August, 2017.

/s/ Bradley J. Edwards
BRADLEY J. EDWARDS, ESQ.

8

LAW OFFICE

**Brad Edwards**

AND ASSOCIATES

July 3, 2008

Ann Marie C. Villafana, AUSA
United States Attorney's Office
500 South Australian Avenue
West Palm Beach, Florida   33401

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED
7007 2680 0002 5519 8503

Dear Ms. Villafana:

    As you are aware, we represent several of the young girls that were victimized and abused by Jeffrey Epstein.  While we are aware of his recent guilty plea and conviction in his State Court case, the sentence imposed in that case is grossly inadequate for a sexual predator of this magnitude.  The information and evidence that has come to our attention in this matter leads to a grave concern that justice will not be served in this cause if Mr. Epstein is not aggressively prosecuted and appropriately punished.  Based on our investigation and knowledge of this case, it is apparent that he has sexually abused more than 100 underage girls, and the evidence against him is overwhelmingly strong.

    As former Assistant State Attorneys with seven years' prosecution experience, we believe that the evidence against Mr. Epstein is both credible and deep and that he may be the most dangerous sexual predator of children that our country has ever seen.  The evidence suggests that for at least 4 years he was sexually abusing as many as three to four girls a day.  It is inevitable that if he is not confined to prison, he will continue to manipulate and sexually abuse children and destroy more lives.  He is a sexual addict that focused all of his free time on sexually abusing children, and he uses his extraordinary wealth and power to lure in poor, underprivileged little girls and then also uses his wealth to shield himself from prosecution and liability.  We are very concerned for the health and welfare of the girls he has already victimized, and concerned that if justice is not properly served now and he is not imprisoned for a very long time, he will get a free pass to sexually abuse children in the future.  Future abuse and victimization is obvious to anyone who really reviews the evidence in this case, and future sexual abuse of minors is inevitable unless he is prosecuted, tried and appropriately sentenced.  Money and power should not allow a man to make his own laws, and he has clearly received preferential treatment at every step up to this point.  If he were a man of average wealth or the abused girls were from middle or upper class families, then this man would spend the rest of his life in prison.  In a country of true, blind justice, those distinctions are irrelevant, and we really hope he does not prove the point that a man can commit heinous crimes against children and buy his way out of it.

    If the Department of Justice's recent commitment to the protection of our children from child molesters is to be more than rhetoric, then this is the time and the case where the Department must step forward.  We urge the Attorney General and our United States

2028 HARRISON STREET, SUITE 202, HOLLYWOOD, FLORIDA 33020

OFFICE: 954-414-8033/305-935-2011
FAX: 954-924-1530/305-935-4227
BE@BRADEDWARDSLAW.COM

Ann Marie C. Villafana, AUSA
United States Attorney's Office
Page Two

Attorney to consider the fundamental import of the vigorous enforcement of our Federal laws. We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual perpetrator. We will help you to do this in any way possible to ensure that true Justice is served in this case.

Sincerely,

Brad Edwards, Esquire
Jay Howell, Esquire

2028 HARRISON STREET, SUITE 202, HOLLYWOOD, FLORIDA 33020

OFFICE: 954-414-8033/305-935-2011
FAX: 954-924-1530/305-935-4227
BE@BRADEDWARDSLAW.COM