UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE 1 AND JANE DOE 2,

        Petitioners,

vs.

UNITED STATES OF AMERICA,

        Respondent.

_____/

GOVERNMENT'S REPLY TO PETITIONERS' RESPONSE TO
GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Respondent United States of America, by and through its undersigned counsel, files its

Reply to Petitioners' Response to Government's Cross-Motion for Summary Judgment, and

states:

    I.     JANE DOE 2 CLEARLY EXPRESSED HER DESIRE NOT TO BE
          TREATED AS A VICTIM OF EPSTEIN

During the Government's investigation into Jeffrey Epstein in 2006, Jane Doe 2

expressed her clear and unequivocal desire not to be treated as a victim of Epstein.  She refused

to submit to an interview by the FBI unless she was granted immunity.   When immunity was

obtained, Jane Doe 2 stated during her April 24, 2007 interview that Epstein was "an awesome

man," (D.E. 403-3 at 23) who did not want underage girls providing him massages.  D.E. 403-3

at 9.  She lamented that Epstein was the subject of a criminal investigation:

> I hope Jeffrey, nothing happens to Jeffrey because he's an
> awesome man and it would really be a shame.  It's a shame that he
> has to go through this because he's an awesome guy and he didn't
> do nothing wrong, nothing.  D.E. 403-3 at 61.

Petitioners admit the direct quotations from the transcript of Jane Doe No. 2's interview.  D.E.

415 at 4, ¶ 15.

At the time of the April 24, 2007 interview, Jane Doe 2 was 19 years old, and was represented by legal counsel.   As an adult with the legal capacity to make her own decisions, the government was entitled to rely upon, and obligated to respect, her assertions that she did not want to be treated as a victim of Epstein.

While admitting that, during the course of her April 24, 2007 interview, "Jane Doe 2 provided some statements that were favorable to Epstein," D.E. 416 at 6, petitioners attempt to rationalize her conduct by citing scientific studies dealing with the victimization process of sex abuse victims.  D.E. 416 at 8-12.    The government was not responsible for divining when "no I'm not a victim," meant, "yes, I am a victim."   It was entitled to take Jane Doe 2, an adult with legal capacity, at her word.

Jane Doe 2's statements rendered her useless as a witness for the prosecution of Epstein. Villafana Decl, ¶ 14.  Her exculpatory statements regarding Epstein not wanting underage girls providing him massages would have been required to be disclosed to Epstein's defense attorneys under Brady v. Maryland, 373 U.S. 83 (1963).   If the government ever chose to call her as a prosecution witness, the government would have been obligated to disclose her prior exculpatory statements as impeachment material under Giglio v. United States, 405 U.S. 150 (1972).  While petitioners attempt to rehabilitate Jane Doe 2 by relying upon theories of victimization, to explain her April 24, 2007 statements at trial using a similar strategy would only have drawn further attention to Jane Doe 2's defense of Epstein in her interview.  Whatever her nondisclosed reasons may have been, Jane Doe 2 had done everything she could to undermine the government's efforts to prosecute Epstein.   The government had no reason to believe that she

wanted to be treated as a crime victim, or that she was intent on seeing Epstein prosecuted.[1]

II.   SECTION 3771(a)(5) DID NOT PROVIDE A RIGHT TO NOTICE OF THE NON-PROSECUTION AGREEMENT

The government has made a straight-forward statutory interpretation argument that the "reasonable right to confer with the attorney for the Government in the case" provided in § 3771(a)(5) was not a "right to notice," as petitioners contend.   D.E. 401-2 at 4-6.  In their response, petitioners assail the government because the argument does not "rest on an undisputed factual foundation that would provide a basis for summary judgment."  D.E. 416 at 12-13.

The government's statutory interpretation argument regarding the reach of § 3771(a)(5) is a legal one, and does not require any particular factual foundation for it to succeed.   The extent of § 3771(a)(5)'s "right to confer" does not vary depending upon the subjective good or bad faith of the government attorney.   The "right to confer with the attorney for the Government" is not some elastic concept that becomes broader if the government attorney acts in bad faith, as petitioners allege occurred in this case.   A crime victim's right to confer with the attorney for the government is the same in all cases.   "Statutory interpretation presents a question of law, and

---

[1] Petitioners have improperly sought to assert the rights and claims of other unnamed, non-party victims of Epstein in an effort to circumvent the factual shortcomings of their claims and overcome the government's motion for summary judgment.  See e.g. D.E. 416 at 4 ("[T]his CVRA action is brought on behalf of Jane Doe 1, Jane Doe 2, and 'many other young victims of [Epstein's] crimes.'")(quoting D.E. 9 at 1).  Petitioners, however, cannot assert the rights and claims of other victims, and indeed, lack standing to do so.  This is not a class action, and, even if a class action were a procedural vehicle available to litigate CVRA claims, petitioners have not satisfied and cannot satisfy the requirements for bringing a class action.  See e.g., Fed.R.Civ.P. 23(a).  Moreover, the CVRA does not permit representational standing or the assertion of representational claims.  Instead, the CVRA specifically limits those who can assert and seek to enforce CVRA rights to "the crime victim or the crime victim's lawful representative, and the attorney for the Government."  18 U.S.C. § 3771(d)(1).  Only under circumstances where a crime victim "is under 18 years of age, incompetent, incapacitated, or deceased" may someone else ("the legal guardians of the crime victim or the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court") assert a crime victim's rights.  Id. § 3771(e)(3).  Petitioners, however, cannot.

3

the facts of an individual case will not affect a court's interpretation of a statute."  United Rentals Northwest, Inc. v. Yearout Mechanical, Inc., 573 F.3d 997, 1001 (10th Cir. 2009).   In EEOC v. Catastrophe Management Solutions, 852 F.3d 1018, 1026 (11th Cir. 2016), the Eleventh Circuit observed that "[t]he meaning of the word 'race' in Title VII is, like any other question of statutory interpretation, a question of law for the court, " Id., citing Village of Freeport v. Barrella, 814 F.3d 594, 607 (2nd Cir. 2016).

Similarly, the meaning of the word "confer" in § 3771(a)(5) is a question of statutory interpretation for this court to resolve, without resort to the facts in this case.  The government's first statutory interpretation argument is that Congress drew a distinction between the right to "notice" of any public court proceeding in § 3771(a)(2), and the right to "confer" with the attorney for the Government in the case in § 3771(a)(5).   "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Duncan v. Walker, 533 U.S. 167, 173 (2001), citing Bates v. United States, 522 U.S. 23, 29-30 (1997).

Petitioners contend the government was required under § 3771(a)(5) to notify them of the negotiation of the non-prosecution agreement, in order to obtain their views on such a disposition of the criminal investigation.   The use of the word "confer," as opposed to "notice," plainly indicates Congress did not intend to place an affirmative duty on federal prosecutors to notify a crime victim of the negotiation of a non-prosecution agreement (NPA).   Moreover, granting a crime victim a right to confer, as opposed to creating a prosecutorial duty to consult, more naturally suggests that a crime victim has a right to access the federal prosecutor regarding the case.   If the crime victim invokes this right to confer, by calling the prosecutor or sending a

letter or email, the prosecutor has a duty to respond to the victim and address the questions or issues raised.  Although the prosecutor must be available to confer with a victim who seeks to confer, a prosecutor is not required to pursue and foist himself upon those victims who have never reached out and asked to confer.  Neither Jane Doe 1 nor Jane Doe 2 ever contacted AUSA Villafaña or FBI Special Agent Kuyrkendall regarding the case, despite being provided their phone numbers and addresses.  D.E. 403-19, ¶ 5.

Since the Court's statutory interpretation of the term "confer" is a pure question of law, petitioners' contention that the government engaged in a conspiracy with Epstein to affirmatively conceal the non-prosecution agreement from the victims, besides being an erroneous characterization, is irrelevant.  D.E. 416 at 13-19.  The scope of the victim's right to confer does not expand or contract depending upon the subjective intentions of the attorney for the government.  Heaping scorn upon the government does not enlarge petitioners' right to confer under § 3771(a)(5).

B.     The Government Did Not Argue the Addition of § 3771(a)(9) Was an Implied Repeal

The government also argued that, when Congress amended the CVRA in 2015 to add § 3771(b)(9), it did so because the CVRA did not already cover plea agreements and deferred prosecution agreements.  D.E. 401-2 at 6-9.  The new § 3771(a)(9), which gave victims "[t]he right to be informed in a timely manner of any plea bargain or deferred prosecution agreement," demonstrates that Congress did not believe the pre-amendment CVRA encompassed a right to be informed of a plea bargain or deferred prosecution agreement.  If those two areas were already covered in the CVRA, Congress would not have amended the statute with § 3771(a)(9).

Instead of addressing this argument, petitioners stand up a strawman and contend the government argued that § 3771(a)(9) "operates retroactively to prove that it did not need to

5

inform the victims of Epstein's non-prosecution agreement." D.E. 416 at 19.   The government

did not argue a repeal by implication had occurred, as petitioners contend. D.E. 416 at 25.

Instead, the government's argument is straightforward:  Why would Congress amend the CVRA

to create a right for a victim to be informed about a plea bargain or deferred prosecution

agreement, when such a right already existed?   In support of its argument, the government relied

upon well-settled tools of statutory interpretation, that "[w]hen Congress acts to amend a statute,

we presume it intends its amendment to have real and substantial effect."  Stone v. INS, 514 U.S.

386, 397 (1995), and Pierce County v. Guillen, 537 U.S. 129, 145 (2003)(rejecting an argument

under which a statutory amendment "would protect from disclosure only information that was

already protected before the amendment" and concluding that such a reading "gives the

amendment no "real and substantial effect' and, accordingly, cannot be the proper understanding

of the statute").

        Section 3771(a)(9) does not need to have retroactive effect in order for the government's

argument to succeed.   The prospective impact of § 3771(a)(9) – inclusion of plea agreements

and deferred prosecution agreements as part of a crime victim's right to be informed –

demonstrates what was not encompassed in § 3771(a)(5) prior to the amendment.  The

government is not arguing that the May 2015 amendment renders lawful what occurred in 2007.

Instead, that amendment demonstrates that nothing in the CVRA forbade what the government

did, or did not do, in 2006 – 2007.

        Petitioners chide the government for "not fully explain[ing] the background leading up to

this 2015 amendment."  D.E. 416 at 20.  They quote at length letters written in 2011 by one of

the CVRA's sponsors to the Attorney General, regarding the DOJ's interpretation of the CVRA.

D.E. 416 at 20-21.   Petitioners contend that, "[i]t was because of the Justice Department's

failure to follow the law – that is, its failure to properly implement the CVRA's statutory command to give victims their rights before charges are formally filed – that Congress added additional statutory protections in 2015." D.E. 416 at 23.

Petitioners' references to the purported motivations of legislators in amending the CVRA in 2015 are unavailing. "In analyzing a statute, we begin by examining the text …, not by 'psychoanalyzing those who enacted it.'" Carter v. United States, 530 U.S. 255, 271 (2000)(citations omitted). The statutory text in § 3771(a)(9) creates and confers on crime victims a right to be informed in a timely manner of any plea bargain or deferred prosecution agreement. It would be odd indeed for Congress to amend the CVRA to add a right to be informed of a plea bargain or deferred prosecution agreement if the CVRA already provided for a crime victim to be notified of those two types of dispositions of a criminal investigation.

Even more telling is Congress's failure to include non-prosecution agreements in § 3771(a)(9). Petitioners erroneously state that, "[a]ccording to the Government, the fact that Congress specifically added a right for victims to be informed about NPA's in 2015 means that no such right existed in 2008." D.E. 416 at 20. Section 3771(a)(9) makes no mention at all of non-prosecution agreements. If anything, this demonstrates that non-prosecution agreements still are not covered by the CVRA. Not only that, both plea agreements and deferred prosecution agreements (DPA) require judicial supervision, since formal charges have been filed with the court by the Government. "DPA's differ from NPA's primarily with regard to the filing of criminal charges. With an NPA, 'formal charges are not filed and the agreement is maintained by the parties rather than being filed with a court.'" United States v. Fokker Services B.V., 818 F.3d 733, 738 (D.C. Cir. 2016) (citation omitted). "Non-prosecution agreements are similar to plea agreements, except adherence to a non-prosecution agreement is the responsibility

of the prosecutor alone while a plea agreement is subject to the approval of the court."  United States v. Dorsett, 2009 WL 2386070 at *4 (D. Neb. Jul. 23, 2009), citing United States v. Minnesota Mining & Mfg. Co., 551 F.2d 1106, 1112 (8th Cir. 1977).  Congress's inclusion of two events, which both address formal criminal charges that have already been filed in court, but excluding non-filed NPA's, further supports the Government's contention that § 3771(a)(5)'s right to confer did not arise until a formal criminal charge had been filed.  Indeed, it makes no sense to conclude that conferring about an NPA is required where notification of an NPA is still not required after the 2015 amendments.

### III.    THE GOVERNMENT DID NOT DENY THE VICTIMS THEIR RIGHT TO CONFER UNDER § 3771(a)(5)

Petitioners chide the government for only addressing three separate time periods in reference to the victims' right to confer, and claim the government "conveniently" omits a fourth time period, October 2007.   The government addressed these three time periods because these were the ones specified by petitioners as ones where their rights under § 3771(a)(5) were allegedly violated.  D.E. 361 at 49 ("Here, the Government violated the victims right to confer during at least three separate time periods …").

In their response, petitioners again accuse the government of deliberately concealing the existence of the non prosecution agreement, claiming that, "[w]hatever else might be said about the scope of the Government's conferral obligations, the Government certainly violates those obligations when it covers up the existence of an agreement it has reached with a sexual abuser."  D.E. 416 at 28.

Petitioners provide no authority for their argument that the scope of the right to confer in § 3771(a)(5) depends upon the conduct or intent of the Government.   Nothing in the text of the CVRA supports an argument that the scope of § 3771(a)(5)'s right to confer expands into a right

to notice of an NPA if the government engages in deliberate concealment of the NPA.

The scope of § 3771(a)(5) is a question of law to be decided by this Court.  "Statutory interpretation is a matter of law appropriate for resolution on summary judgment."  Thomas v. Metropolitan Life Ins. Co., 631 F.3d 1153, 1160 (10th Cir. 2011)(citation omitted).  "Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment."  Santa Fe RR Co. v. U.S., 294 F.3d 1336, 1340 (Fed.Cir. 2002).  Thus, petitioners' argument that disputed issues of fact preclude granting summary judgment to the government is incorrect.  Here, the disputed facts are not material to the legal issue presented.  The relevant dispute in this case is not when the right to confer attached, but whether the right to confer ever imposed an obligation on the government to affirmatively notify petitioners of the negotiation of the NPA, the execution of the NPA, or when the NPA became a final, binding agreement between the government and Epstein.

The scope of a victim's right to confer with the attorney for the government is dictated solely by the statutory text.  The scope does not expand or contract depending on whether a prosecutor inadvertently does not disclose the existence of an NPA, as opposed to when there is deliberate concealment of the NPA, as petitioners allege.  If § 3771(a)(5) imposes no duty to notify a victim of an NPA being negotiated when the government acts in good faith, then no duty exists even if the government acts in bad faith, as petitioners allege.

IV.    SECTION 3771(a)(2) PROVIDES NO RIGHT TO NOTICE OF A STATE COURT PROCEEDING

Petitioners argue the government violated their "right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or any release or escape of the accused."  § 3771(a)(2).  They contend that, while the June 30, 2008 state court hearing was not a federal court proceeding, "the Government chose to interweave

state court proceedings with federal crimes through its non-prosecution agreement." D.E. 416 at

40. From this, petitioners argue that § 3771(a)(2) obligated the government to give notice of the

state court hearing as if it were a federal criminal court proceeding.

The text of the CVRA provides no support for petitioners' attempt to engraft a state

criminal court proceeding onto § 3771(a)(2)'s right to notice. Under § 3771(e)(2)(A), a crime

victim "means a person directly and proximately harmed as a result of the commission of a

Federal offense or an offense in the District of Columbia." Since the June 30, 2008 state court

hearing was a resolution of violations of Florida state law by Epstein, petitioners would not be

"crime victims" under the CVRA insofar as the Florida state criminal proceedings are concerned.

Moreover, even petitioners concede that neither Jane Doe 1 nor Jane Doe 2 were victims of the

crimes to which Epstein entered guilty pleas to on June 30, 2008. D.E. 416 at 40. The United

States was not a party to the state court criminal proceeding against Epstein, nor had it initiated

those proceedings.

Despite all of these facts, petitioners still argue that the term "involving the crime" in §

3771(a)(2) applied to the June 30, 2008 state court hearing, because the state court pleas would

have an impact on federal charges against Epstein D.E. 416 at 41. Petitioners' exceedingly

broad construction of § 3771(a)(2) drains it of any meaning. The term "crime" in the CVRA

can only mean a federal crime committed against a victim, consistent with the definition in §

3771(e). Moreover, federal courts have exclusive jurisdiction over federal crimes, 18 U.S.C. §

3231. Thus, the government is obligated to provide reasonable, accurate and timely notice of a

public court proceeding involving the federal crime committed against the crime victim, and

such proceedings addressing federal crimes can only occur in federal court, unless a statute

provides otherwise. Since the federal government, acting through the U.S. Attorney, charges a

defendant in a U.S. District Court, it only makes sense that the government notifies a crime victim of any public federal court proceeding in a case which the federal government has brought, and in which it is a party.

There is no reason to believe Congress intended to impose this same duty on the U.S. Attorney to notify victims of state court proceedings involving the same accused.  This right to notice is plainly intended to allow the victim to attend this public proceeding, and "to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding."  § 3771(a)(4).   The use of the term "district court" clearly indicates Congress was referring to U.S. District Courts, and the Superior Court of the District of Columbia.  § 3771(e)(3), and the review process in the federal courts of appeal, § 3771(d)(3), (e)(1), confirms that the court proceedings addressed in the CVRA are federal court proceedings.

> B.   PETITIONERS' COUNSEL WAS PROVIDED REASONABLE, ACCURATE AND TIMELY NOTICE OF THE JUNE 30, 2008 STATE COURT PROCEEDING

On Friday, June 27, 2008, at approximately 4:15 p.m., AUSA Villafaña received a copy of Epstein's proposed state plea agreement and learned that Epstein's state court change of plea hearing was scheduled for 8:30 a.m., Monday, June 30, 2008.  D.E. 403-19 at 21, ¶ 38.   AUSA Villafaña called attorney Edwards, told him of the June 30, 2008 hearing, and stressed the importance of the hearing.[2]

Thus, the government provided petitioners with notice of the time, place, and purpose of the hearing, in as prompt a manner as possible under the circumstances, since the government

---

[2] Attorney Edwards admits that AUSA Villafaña "did express that this hearing was important," but complains that she "never told me why she felt that way."  D.E. 416-1 at 6, ¶ 18.

only learned of it on June 27, at 4:15 p.m.    Petitioners knew the purpose of the hearing was for Epstein to enter a plea of guilty.    If petitioners wanted to know more about the state court criminal charges, and the nature of the hearing, they had a ready solution:  attend the hearing. Instead, petitioners blame the government for not telling them more about what the state court hearing was about.   D.E. 416 at 43-44.  Section 3771(a)(2) obligates the government to give reasonable, accurate, and timely notice of any public court proceeding; it does not require the government to provide a program for what is likely to occur at the proceeding.

The main thrust of petitioners' argument is that the Government did not inform them that Epstein's plea of guilty to the state court criminal charges was the last act that would consummate the NPA.   This suggests that petitioners would have done something different had they been told.    But, the sole issue before the Circuit Court was whether defendant Epstein was entering pleas of guilty that were voluntary, knowing, and intelligent, and whether there was a factual basis for the plea.  Fla.R.Crim.P. 3.172.   The NPA was an agreement between the U.S. Attorney and Epstein, which was not subject to judicial supervision by a federal court, much less a state court.   "Non-prosecution agreements are similar to plea agreements, except adherence to a non-prosecution agreement is the responsibility of the prosecutor alone while a plea agreement is subject to the approval of the court."  U.S. v. Dorsett, 2009 WL 2386070 at *4 (D. Neb. Jul. 23, 2009), citing U.S. v. Minnesota Mining & Mfg. Co., 551 F.2d 1106, 1112 (8th Cir. 1977).

The State Attorney for Palm Beach County was not a party to the non-prosecution agreement, nor was the State Attorney obligated to perform any duties under the agreement.  The Circuit Court, just like the federal court, had no authority to judicially review the exercise of prosecutorial discretion by the Executive Branch of the federal government.   The Circuit Court's inquiry on June 30, 2008 was limited to the pleas of guilty made by Epstein, and whether they

were provident.   Even if petitioners had appeared at the June 30, 2008 state court hearing, they could not have prevented the Circuit Court from accepting Epstein's pleas of guilty.  Indeed, they were not even victims of the state court offenses.

Despite being told by the Government that the June 30, 2008 hearing was important, petitioners chose not to attend.   The Government should not be faulted for petitioners' decision.

V.      THE GOVERNMENT DID NOT TREAT THE VICTIMS UNFAIRLY

In their summary judgment motion, petitioners' allegation of unfair treatment was based upon alleged deception by the Government in the letters sent to victims in 2008, in which they were told the case "is currently under investigation" and that "[t]his can be a lengthy process and we request your continued patience while we conduct a thorough investigation."  D.E. 361 at 51-52.[3]   The Government responded that these assertions were not deceptions because Epstein's attorneys sought review of the non-prosecution agreement at the Department of Justice in Washington, D.C., with these efforts commencing in November 2007.  D.E. 401-2 at 15-16. Since a successful appeal by Epstein to the DOJ would result in the termination of the non-prosecution agreement, the U.S. Attorney's Office proceeded on the assumption that a criminal prosecution of Epstein might still occur.

Even though petitioners do not dispute that Epstein sought review at the DOJ, first at the Criminal Division's Child Exploitation and Obscenity Section, then at the Office of the Deputy Attorney General, they dismiss the Government's argument as "resorts to technicalities."  D.E. 416 at 45.    When it suited their needs to harangue the Government for giving inadequate notice

_____

[3] In their motion, petitioners provided sixteen (16) examples of what they claimed was unfair treatment.  D.E. 361 at 52-53.  All of the examples dealt with the government allegedly engaging in "secret" negotiations with Epstein's attorrneys and concealing the NPA from petitioners.

under § 3771(a)(2), petitioners argue that the Government failed to notify them that "Epstein's plea was (sic) triggering event for the (still secret) NPA …, that the Government did not inform the victims that the plea would prevent prosecution of crimes against them … ." D.E. 461 at 43. Petitioners continued that "Epstein's guilty pleas triggered an NPA barring his prosecution for crimes committed against them." Id. Petitioners' own position is that Epstein's guilty pleas were necessary in order for the non prosecution agreement to be consummated. That position was necessary to their argument that the allegedly inadequate notice prejudiced them, since they claimed that better notice would have alerted them to the final act that would consummate the NPA, and they could have appeared at the June 30, 2008 hearing to prevent that from occurring.

In the same breath, petitioners argue that the January 2008 victim letters deceived the victims because "the Government had already concluded an agreement not to prosecute Epstein," D.E. 416 at 45, and "the victims were not interested in what sort of fallback measures the prosecutors were taking as hedges against the unlikely event that Epstein tried to pull out of a very favorable agreement he had already signed with the Government; the victims were plainly interested in how efforts to prosecute Epstein were proceeding – efforts that had been effectively brought to a halt by the NPA." D.E. 416 at 45-46. This argument is based upon the erroneous claim that the NPA was a final, executed agreement by the end of September 2007, and any suggestion otherwise by the Government was a deception.

In truth, Epstein's attorneys vigorously sought higher-level review of the NPA at the DOJ. Their first efforts were at the Criminal Division's Child Exploitation and Obscenity Section, which upheld the U.S. Attorney's exercise of prosecutorial discretion on May 15, 2008. Undeterred, Epstein sought additional review at the Office of the Deputy Attorney General. On June 23, 2008, the Deputy Attorney General's Office also upheld the U.S. Attorney's exercise of

14

prosecutorial discretion.   Only then did Epstein agree to entered pleas of guilty in Florida state court.

The victims were not treated unfairly by the government.  With the fate of the NPA in question due to Epstein's attorneys seeking higher-level review, the U.S. Attorney's Office and FBI prudently and reasonably moved forward in preparing for a criminal prosecution of Epstein. The statements in the January 2008 letters to petitioners that the case was currently under investigation were accurate, and petitioners have not controverted that fact.   Moreover, since prosecution of Epstein was a real possibility, the U.S. Attorney's Office did not tell the victims about the NPA since doing so would create impeachment material for the defense, in a case where the credibility of teenage girls, who accepted money from Epstein, and who had even asserted in some instances that Epstein had done nothing wrong, would be pitted against the word of a multimillionaire financier.

Petitioners disclaim any intention to seek review of the Government's strategies, but are "simply asking the Court to discharge its obligations under the CVRA to 'ensure that the crime victim is afforded the rights described in [the CVRA].'"  D.E. 416 at 48.   Petitioners cannot sidestep the primacy of the government's exercise of prosecutorial discretion so easily.  A ruling from this Court that the CVRA required the government to notify petitioners of the NPA, despite the government's judgment that such notice would make the victims more vulnerable to impeachment at trial, would plainly be in derogation of the government's prosecutorial discretion and is precluded by § 3771(d)(6)("Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction.").  Simply stated, if the prosecutor decided that informing the victims of the NPA would subject them to additional impeachment vulnerability at a criminal trial, then any arguable right to notice about

the NPA, under § 3771(a)(5) or any other provision in the CVRA, must yield.  Does v. U.S., 817

F.Supp.2d 1337, 1343 (S.D.Fla. 2011)("Thus, to the extent that the victims' pre-charge CVRA

rights impinge upon prosecutorial discretion, under the plain language of the statute those rights

must yield.").

      Petitioners do not claim the government failed to accord them respect for their dignity

and privacy.   Thus, petitioners' § 3771(a)(8) claim rests on alleged lack of fair treatment, due to

not being told about the NPA and being told in January 2008 that the case was still under

investigation.  Since the case was still under investigation in January 2008, and the government

had a legitimate basis for not telling the victims about the NPA, rooted in an exercise of

prosecutorial discretion, the government is entitled to summary judgment on the § 3771(a)(8)

claim.

      VI.    THE GOVERNMENT USED ITS BEST EFFORTS TO SEE THAT
              PETITIONERS WERE ACCORDED THEIR RIGHTS UNDER THE CVRA

      Petitioners' argue that the Court has an independent obligation to ensure that the victims

receive their rights, even if the government used its best efforts.  D.E. 416 at 49.   It is more

accurate to state that the Court has an independent obligation to see that the CVRA is enforced,

in accord with the terms of the statute, as enacted by Congress.

      In § 3771(c)(1), Congress directed  that, "[o]fficers and employees of the Department of

Justice and other departments and agencies of the United States engaged in the detection,

investigation, or prosecution of crime shall make their best efforts to see that crime victims are

notified of, and accorded, the rights described in subsection (a)."   Plainly, Congress desired the

highest level of effort from the DOJ in complying with the CVRA.  That highest level was met

by the government in this case, consistent with its exercise of prosecutorial discretion, which

Congress also directed must be respected by the courts in construing the CVRA's provisions.  If

the government did not accord a crime victim the fullest extent of a right otherwise recognized in § 3771(a)(1)-(8), due to the government's exercise of prosecutorial discretion, then the requirements of the CVRA have been met because the government used its best efforts to comply.

Petitioners argue that the government's argument is a "non-starter, because nothing in the Attorney General Guidelines prohibited the U.S. Attorney's Office from conferring with the victims or notifying them of the Epstein non-prosecution agreement." D.E. 416 at 50. They also argue that the Guidelines "did not forbid the U.S. Attorney's Office from going further to protect victims' rights, even before charges were filed." D.E. 416 at 51.

Petitioners seem not to understand that Attorneys General of the United States do not issue Guidelines so they can be ignored by subordinates in the Department of Justice. The Guidelines are an authoritative interpretation of the CVRA, issued by the head of the DOJ, intended to be followed by subordinates in interpreting their duties under the CVRA. Each of the 94 United States Attorney's Offices was not free to disregard the Guidelines and implement their own views on when the rights in § 3771(a) attached. Instead, Article 1(B) set forth the rights of crime victims under § 3771(a)(1)-(8). D.E. 403-13 at 6. Further, Article 1(B) contains a footnote stating that a "[a] 'crime victim' for purposes of these rights is a person who satisfies the definition in article II.D.1 of this document." Id. In turn, article II.D.1, entitled "Enforcement of Rights," provides that, "[f]or purposes of enforcing the rights enumerated in article 1.B, a victim is 'a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia' (18 U.S.C. § 3771(e)) if the offense is charged in Federal district court."

Petitioners contend the Guidelines did not prevent the U.S. Attorney's Office from going

further in protecting victims' rights, even before charges were filed.  D.E. 416 at 51.  They point

to nothing in the Guidelines that suggest compliance with them was optional.  Indeed, the

Guidelines were promulgated to achieve uniform application of the CVRA throughout the DOJ

as the government exercised its prosecutorial discretion.  If each U.S. Attorney's Office had its

own interpretation of when CVRA rights attach, victims rights' advocates would rail at the

arbitrary and inconsistent application of the CVRA.

       The Government does not dispute that the federal courts are the ultimate authority in

interpreting the application of the CVRA.   However, the May 2005 Guidelines interpreted the

then newly-enacted Justice for All Act of 2004, which became effective on October 30, 2004.

During the period 2006 to 2008, when the investigation of Epstein was occurring and the non-

prosecution agreement was negotiated, the authoritative interpretation of the CVRA, for

personnel in the DOJ, was the 2005 Guidelines.

       Even when it fails to satisfy a later judicial interpretation of the CVRA, the government

uses its best efforts when it complies with Guidelines issued by the Attorney General of the

United States, who is charged by Congress with rendering opinions on questions of law to the

President (28 U.S.C. § 511), the heads of executive departments (28 U.S.C. § 512), and the

secretaries of the military departments (28 U.S.C. § 513).

VII.    PETIIONERS ARE EQUITABLY ESTOPPED FROM CHALLENGING THE
            NON-PROSECUTION AGREEMENT

       The government first raised the equitable estoppel argument in its reply to petitioners'

opposition to the government's motion to dismiss, filed on January 26, 2012 (D.E. 205-6 at 1.[4]   The

---

[4] On July 5, 2013, the Government filed unsealed versions of its Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. 118) and its Reply in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. 147), in its Notice of Filing (D.E. 205).  The Government's Reply is located at Appendix F, D.E. 205-6 at 1.  The Government will be

government argued that petitioners could not seek rescission of the non-prosecution agreement because they delayed in seeking their remedy, and they sought a benefit under the non-prosecution agreement.  Contrary to petitioners' claim that the government raised a separate estoppel argument, "but not the particular claim that the civil lawsuits filed by the victims create estoppel issues,"  D.E. 416 at 54 n.10, the government's January 26, 2012 reply attached copies of the complaints in <u>E.W. v. Jeffrey Epstein</u> (Exhibit A), and <u>L.M. v. Jeffrey Epstein</u>, the same two complaints attached in support of the government's motion for summary judgment.  D.E. 403-16 and D.E. 403-17.   Therefore, the government timely raised its estoppel argument as to petitioners' reliance upon the non-prosecution agreement in their civil lawsuits against Epstein.

Petitioners next argue that equitable estoppel cannot be applied where Congress has created a substantive right.   For this proposition, they rely upon <u>Fulghum v. Embarq Corp.</u>, 785 F.3d 395 (10th Cir. 2015), where employers and retirees brought suit against employers and welfare benefit plans for alleged violations of the Employee Retirement Income Security Act (ERISA).   The issue was the application of the six-year statute of limitations period to bring an action for a breach of a fiduciary's duty.  29 U.S.C. § 1113.   The court found this to be a statute of repose, which operated to extinguish a plaintiff's cause of action whether or not the plaintiff should have discovered within that period that there was a violation or an injury.  785 F.3d at 413.   Also, the court noted that, because a statute of repose creates a substantive right in those protected to be free from liability after a legislatively-determined period of time, it is not subject to equitable tolling or equitable estoppel.  <u>Id.</u> at 415-16.

In support of the equitable estoppel argument, the government relied upon <u>Blinco v.</u>

---

referring to D.E. 205 and its appendices, since these documents are located in the public court file.

Green Tree Servicing LLC, 400 F.3d 1308 (11ᵗʰ Cir. 2005), an action where the plaintiffs, Jack

Blinco, Jr. and Deborah Blinco, claimed that Green Tree Servicing LLC violated their statutory

rights under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605.   Mr. Blinco

alone had executed a promissory note in favor of Conseco Finance Servicing Corporation

(CFSC), which contained an arbitration clause.  Id. at 1310.  In 2003, CFSC filed for chapter 11

bankruptcy.  Under the court-approved plan of reorganization, CFSC transferred certain assets to

Green Tree Investment.  In 2003, both Blincos filed an action against Green Tree Servicing,

claiming failure to provide the notice required by section 6 of RESPA when servicing of the loan

was transferred to Green Tree Servicing.  Id. at 1311.

Green Tree Servicing filed a motion to stay litigation and compel arbitration, which the

district court denied.  Id.  On appeal, the Eleventh Circuit found that, despite Mrs. Blinco's

failure to sign the promissory note, she was nonetheless subject to the arbitration clause because

she invoked the Note to bring her RESPA claims.   Applying the doctrine of equitable estoppel,

the Eleventh Circuit observed:

> Here, Mrs. Blinco has made RESPA claims which, as discussed
> above, derive from her status as a borrower under the Note.  Mrs.
> Blinco may not rely upon the Note to establish her RESPA claims
> while avoiding her obligation under the Note to arbitrate such
> claims.  Id. at 1312.

Mrs. Blinco was asserting a statutory right provided by RESPA, just like petitioners are asserting

rights under the CVRA.   Despite this reliance upon RESPA, the Eleventh Circuit applied

equitable estoppel against Mrs. Blinco, just like this Court should apply it to petitioners.

Petitioners cannot invoke the non-prosecution agreement to gain a benefit, and then condemn it

as a violation of their CVRA rights.

A.     The Government Has Clean Hands

Petitioners also contend the government cannot assert equitable estoppel against them because it has "unclean hands."   Typically, the doctrine of unclean hands is asserted by a defendant against a plaintiff who seeks equitable relief.  Calloway v. Partners Nat'l Health Plans, 986 F.2d 446 (11th Cir. 1993).   For a defendant to successfully avail itself of the doctrine of unclean hands, it must satisfy two requirements:  (1) the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted; and (2) even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can  show that it was personally injured by her conduct.  Id. at 450-51(citations omitted).   In Calloway, the defendants in a wage discrimination action claimed plaintiff Calloway lied about receiving a college degree when she applied for employment, and that barred her wage discrimination claim. The Eleventh Circuit rejected the unclean hands claim, finding that neither her predecessor or successor had college degrees, and the employer was not injured by the misrepresentation.

In the context of the assertion of unclean hands to bar an equitable defense, the same analysis applies.   The equitable defense of laches requires proof of three elements:  (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that the delay caused the defendant undue prejudice.  Conagra, Inc. v. Singleton, 743 F.2d 1508, 1517 (11th Cir. 1984)(citation omitted).   In order for a plaintiff to succeed on an unclean hands claim to defeat the assertion of laches, the plaintiff must "show not only that the defendant engaged in misconduct, but moreover that the defendant's misconduct was responsible for the plaintiff's delay in bringing suit."  Serdarevic v. Advanced Medical Optics, Inc., 532 F.3d 1352, 1361 (Fed. Cir. 2008).

Petitioners' assertion of unclean hands is based upon the government allegedly working with Epstein to deliberately conceal the NPA from the victims.  D.E. 416 at 56.  "Where the

21

Government has first orchestrated such concealment, it cannot then turn around to ask this Court to provide an equitable justification for its conduct." Id.  The Government's equitable estoppel defense is based on petitioners' reliance on the NPA in their civil lawsuits against Epstein, and subsequently attacking the same NPA as a violation of their CVRA rights.  The government has clean hands because its alleged concealment of the NPA from petitioners did not cause or contribute to petitioners' reliance upon the NPA in their civil lawsuits against Epstein. Petitioners made their own choice to try to use the NPA to their advantage in their civil lawsuits; they were not induced by the Government to do so.

Petitioners' argument that the equitable estoppel defense is premature is also without merit.  The core of petitioners' claim is that they were not told about the negotiation and execution of the NPA, in derogation of their rights under the CVRA.   The NPA is the focal point of their attack, as they claim the NPA extinguished their "right" to have Epstein prosecuted. D.E. 361 at 49.   Since the petitioners' relied upon the same NPA they now condemn, they should be estopped from asserting these CVRA claims.

      B.      Petitioners are equitably estopped from challenging the non-prosecution agreement

Petitioners next argue the government has not met the elements of equitable estoppel since they are not relying upon the terms of the written agreement in asserting their claims.  D.E. 416 at 57, citing MS Dealer Service Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999).   They maintain that their claims in this litigation are not based on the NPA, but the CVRA.   This argument is meritless since it ignores petitioners' reliance upon the terms of the NPA in their civil lawsuits, while at the same time challenging the NPA as being negotiated and executed in violation of their CVRA rights.

Petitioners also attempt to rationalize their reliance upon the non-prosecution agreement

in their civil lawsuits, claiming they made only "very limited reference" to the agreement, and they "briefly alleged" that Epstein had agreed he had sexually abused the victims and was therefore estopped from denying the abuse.  D.E. 416 at 57-58.   Petitioners claim they were simply acting prudently by including this argument in the September 2008 civil lawsuits, to preserve the argument.  D.E. 416 at 58.

      Petitioners' reliance upon the non-prosecution agreement was not limited to the initial complaints filed in September 2008.    On December 29, 2008, amended complaints were filed in both civil lawsuits.  D.E. 205-6 at 54 (E.W. v. Epstein) and D.E. 205-6 at 85 (L.M. v. Epstein). In both amended complaints, petitioners "briefly alleged" some more about the non-prosecution agreement:

> 20.  In June 2008, in the Fifteenth Judicial Circuit in Palm Beach County, Florida, Defendant, Jeffrey Epstein, entered pleas of "guilty" to various Florida state crimes involving the solicitation of minors for prostitution and the procurement of minors for the purposes of prostitution.
>
> 21.  As a condition of that plea, and in exchange for the Federal Government not prosecuting defendant, Jeffrey Epstein, for numerous federal offenses, Defendant, Jeffrey Epstein, additionally entered into an agreement with the Federal Government acknowledging that the Plaintiff was a victim of his conduct.
>
> 22.  The Plaintiff is included in the list of victims identified by the Federal Government as victims of the Defendant, Jeffrey Epstein's illegal conduct.  Defendant, Jeffrey Epstein, is thus estopped by his plea and agreement with the Federal Government from denying the acts alleged in this Complaint, and must effectively admit liability to the Plaintiff.

D.E. 205-6 at 58-59.    The identical allegations are made in the amended complaint filed in L.M. v. Epstein.  D.E. 205-6 at 89-90.

      In order for them to have alleged in the original and amended complaints that the non-

prosecution agreement was binding on Epstein, and required Epstein to admit liability to plaintiffs because he had agreed to do so in an agreement with the Federal Government, petitioners must have had a good faith basis to believe the non-prosecution agreement was valid and lawful.   They cannot distance themselves from these assertions by dismissing their previous reliance on the non-prosecution agreement as an exercise in cautious lawyering.

VIII.    PETITIONERS ARE JUDICIALLY ESTOPPED FROM CHALLENGING THE NON PROSECUTION AGREEMENT

Petitioners contend that judicial estoppel does not apply to them because the government has not established one of the elements of the three-part test examined in Tampa Bay Water v. HDR Engineering, Inc., 731 F.3d 1171 (11th Cir. 2013).  D.E. 416 at 60.   Specifically, petitioners contend the government has not demonstrated the second factor, that petitioners succeeded in convincing a court of the earlier position, so that judicial acceptance of the inconsistent later position would create the perception that either the earlier or later court was misled.[5]  731 F.3d at 1182.

On September 18, 2017, the Eleventh Circuit issued its en banc decision in Slater v. U.S. Steel Corp., -- F.3d --, 2017 WL 4110047 (11th Cir. Sep. 18, 2017)(en banc), which reexamined judicial estoppel jurisprudence in the Eleventh Circuit.    The case arose in the context of a plaintiff in an employment discrimination civil lawsuit, who failed to disclose the lawsuit in a

---

[5] Petitioners also castigate the government for disingenuously claiming that Epstein ultimately did not contest liability, as the victims claimed he could not, due to his plea and the NPA.  D.E. 416 at 61.  Petitioners continue that this was not an accurate description of the outcome of the state court cases, and that "[t]he parties reached a confidential settlement with each other."  Id.  Curiously, petitioners have not come forward with the settlement documents in the two cases.  What the government maintained in its cross-motion is accurate.  Since he settled the lawsuits, Epstein ultimately did not contest liability.  Further, petitioners claimed, in both the original and amended complaints, that Epstein could not contest liability due to his state court pleas of guilty and the non-prosecution agreement.

Chapter 7 bankruptcy petition.  Invoking the doctrine of judicial estoppel, the district court granted summary judgment to the employer, U.S. Steel Corporation.

The appellate court found that a district court may apply judicial estoppel when a two-part test is satisfied:  the plaintiff (1) took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system.  Id. at *4.   In adopting the two-part test, the Eleventh Circuit expressly considered New Hampshire v. Maine, 532 U.S. 742 (2001), a Supreme Court decision which utilized a three-part test for the application of judicial estoppel, including the plaintiff's success in convincing a court to accept its earlier position, the element that petitioners in this case claim the government did not establish.  Id. at *5 - *6.

Plaintiff Slater argued that the Eleventh Circuit had to abandon its two-part test in favor of the three-part test in New Hampshire.   The Eleventh Circuit rejected Slater's argument, finding that the State of Maine, the party seeking to apply judicial estoppel, had been a party to the prior lawsuit in which New Hampshire had taken an inconsistent position.  Id. at *5, citing New Hampshire, 532 U.S. at 745.  Continuing, the Eleventh Circuit stated:

> The Supreme Court was not presented with – and so did not address – the question of how judicial estoppel should be applied when the party seeking to invoke the doctrine was not a party to the other proceeding.  Here, because the party seeking to invoke judicial estoppel, U.S. Steel, was not a party to the bankruptcy case and could not have been unfairly disadvantaged by any position Slater took in that case, we conclude that New Hampshire is inapplicable.  Consistent with New Hampshire's recognition that its test was not exhaustive, we adhere to our two-part test in the scenario before us.

Id. at *5 (footnote omitted).   Consequently, because the government was not a party to petitioners' two civil lawsuits against Epstein, it need not show that petitioners were successful in convincing the state court that the non-prosecution agreement was binding on Epstein and

precluded him from contesting liability to the two petitioners.

In its opinion on the substantive issue of how to determine whether a plaintiff intended to make a mockery of the judicial system, the Eleventh Circuit overruled its prior cases which held that a mere failure to disclose a civil claim was an appropriate basis for inferring the intent.  Id. at *8.  Instead, the appellate court directed the lower courts to look at all the facts and circumstances of the case to decide whether the plaintiff intended to mislead the court.  It instructed lower courts to look to factors such as the plaintiff's level of sophistication, his explanation for the omission, whether he subsequently corrected the disclosures taken by the bankruptcy court concerning the nondisclosure, and any action taken by the bankruptcy court concerning the nondisclosure.  Id. at *1.   Slater cited three reasons for its implementation of the new facts and circumstances inquiry:  (1) such an inquiry ensures that judicial estoppel is applied only when a party acted with a sufficiently culpable mental state; (2) it allows a district court to consider any proceedings that occurred in the bankruptcy court after the omission was discovered, arguably a better way to ensure that the integrity of the bankruptcy court was protected; and (3) it is more consistent with the equitable principles that undergird the doctrine to limit judicial estoppel to those cases in which the facts and circumstances warrant it.  Id. at *8.

In this case, petitioners' reliance on the non-prosecution agreement in their civil lawsuits was intentional and purposeful.   Their attorneys intended to use the NPA to convince the state court and Epstein that Epstein could not contest liability, because he had signed a valid, binding agreement with the federal government saying he would not do so.   The second factor is inapplicable since the petitioners' reliance upon the NPA, in both their original complaints and amended complaints, was not the result of inadvertent omission, but purposeful inclusion in their lawsuits.

As to the equitable principles undergirding the doctrine of judicial estoppel, the doctrine is designed to protect the integrity of the judicial process by prohibiting parties from changing positions according to the exigencies of the moment.  New Hampshire, 532 U.S at 749-50, citing U.S. v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993).   Judicial estoppel is "designed to prevent parties from making a mockery of justice by inconsistent pleadings."  McKinnon v. Blue Cross & Blue Shield of Ala., 935 F.2d 1187, 1192 (11th Cir. 1991).

The instant case does not involve an omission from a bankruptcy petition of a pending civil claim by the debtor, or a district court's later examination of the facts to determine if that omission was intentional, and calculated to mislead the court.   After petitioners received a copy of the non-prosecution agreement in August 2008, they seized upon it in September 2008, and made affirmative use of it when they filed their civil actions against Epstein in Florida state court.   They did not argue to the state court that the non-prosecution agreement was negotiated and executed in derogation of their rights under the CVRA and should be set aside, and treated as null and void.  Quite the opposite, petitioners claimed the non-prosecution agreement was a valid and binding agreement between the federal government and Epstein, such that Epstein was contractually obligated not to deny liability to petitioners.  Petitioners cannot rationalize away the plainly inconsistent positions they took on the validity of the non-prosecution agreement.  Therefore, they should be judicially estopped from claiming the non-prosecution agreement violated the CVRA.

## CONCLUSION

The scope of the "right to confer" provided in § 3771(a)(5) is an issue of statutory interpretation, a legal question to be resolved by the Court.   Determining the extent of § 3771(a)(5) does not depend on the facts of each individual case, but is resolved by using the

usual tools of statutory interpretation.   A victim's right to confer with the attorney for the government grants a right of access to discuss a case with the prosecutor; it does not create a prosecutorial duty to notify on the prosecutor.   Thus, the government was not required under § 3771(a)(5) to notify Jane Doe 1 or Jane Doe 2 about the negotiation and execution of the non-prosecution agreement.

The government exercised its prosecutorial discretion when it chose not to notify all of Epstein's victims about the non-prosecution agreement.  The non-prosecution agreement was being challenged at higher levels in the DOJ, and a criminal prosecution of Epstein would have ensued if Epstein's attorneys were successful in having the non-prosecution agreement voided. The U.S. Attorney's Office decided that notifying the victims of the non-prosecution agreement, with its provision regarding financial compensation to victims for Epstein's sexual abuse, would create additional impeachment material that would have been used against the victims if they testified at a trial against Epstein.   This exercise of prosecutorial discretion is shielded from judicial review by § 3771(d)(6) and cannot form the basis of a finding that a CVRA violation occurred.

The government treated the victims fairly, and with respect for their dignity and privacy. The government owed no affirmative duty to petitioners to notify them about the negotiation and execution of the non-prosecution agreement.   As to the claim under § 3771(a)(2), since there was no federal criminal charge, there was no public court proceeding in a federal criminal case, and the government had no obligation to notify petitioners of the June 30, 2008 state court proceeding.   Even if § 3771(a)(2) could be deemed to apply to state court proceedings, the government discharged its obligations by notifying petitioners' counsel in advance of the June 30, 2008 state court hearing.   Petitioners admit that AUSA Villafaña told them the hearing was

important.  It was their choice not to attend the hearing.

The government used its best efforts to see that the victims were notified of and accorded the rights in § 3771(a)(1) – (8).  § 3771(c)(1).   The U.S. Attorney's Office followed the Attorney General Guidelines for Victim and Witness Assistance (May 2005), which provided that, in order to be eligible for the rights in § 3771(a)(1) – (8), the offense had to be charged in federal court.   Since no charge was ever filed in federal court against Epstein, the Guidelines provided that the rights provided in § 3771(a) did not attach.   The Guidelines provided explicit direction on the application of the CVRA, which the U.S. Attorney's Office was not free to ignore, as it exercised its prosecutorial discretion during the investigation.  In complying with these Guidelines, the government exercised its best efforts.

Petitioners are estopped from challenging the non-prosecution agreement.   In their civil lawsuits against Epstein, filed in September 2008, petitioners expressly relied on the non-prosecution agreement in their original and amended complaints, contending that the non-prosecution agreement between the federal government and Epstein precluded Epstein from denying liability for the sexual abuse of petitioners.   They did so because it suited their needs in order to prevail in their civil money damage lawsuits against Epstein.   Now that victory has been secured in the civil lawsuits, petitioners condemn the same non-prosecution agreement that they wielded as a sword, claiming that it is the product of a conspiracy between Epstein's attorneys and the government, and the subject of deliberate concealment by the government.   Petitioners cannot have it both ways.    Judicial estoppel should be applied to bar their claims.

The government's cross-motion for summary judgment should be granted.

DATED:  October 10, 2017                    Respectfully submitted,

                                            BENJAMIN G. GREENBERG
                                            ACTING UNITED STATES ATTORNEY

By:    ___ s/ Dexter A. Lee_____
DEXTER A. LEE
Assistant U.S. Attorney
Fla. Bar No. 0936693
99 N.E. 4th Street, Suite 300
Miami, Florida  33132
(305) 961-9320
Fax:  (305) 530-7139
E-mail:  dexter.lee@usdoj.gov


_/s/ A. Marie Villafaña_____
A. Marie Villafaña
Assistant United States Attorney
Fla Bar No. 0018255
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida  33401
Tel: (561) 820-8711; Fax:  (561) 820-8777
E-mail:  ann.marie.c.villafana@usdoj.gov

_/s/ Eduardo I. Sánchez_____
Eduardo I. Sánchez
Assistant United States Attorney
Florida Bar No. 877875
99 N.E. 4th Street
Miami, Florida  33132
Tel: (305) 961-9057; Fax: (305) 536-4676
Email: eduardo.i.sanchez@usdoj.gov

Attorneys for the Government

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 10, 2017, the foregoing was filed with the Clerk of

the Court and served on counsel on the attached service list using CM/ECF.

_/s/ Dexter A. Lee_____
Dexter A. Lee
Assistant United States Attorney

<u>SERVICE LIST</u>

Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida  33301
Tel: (954) 524-2820; Fax:  (954) 524-2822
E-mail:  brad@pathtojustice.com

Paul G. Cassell
Pro Hac Vice
S.J. Quinney College of Law at the
University of Utah
332 S. 1400 E.
Salt Lake City, Utah  84112
Tel: (801) 585-5202; Fax:  (801) 585-6833
E-mail:  casselp.@law.utah.edu

Attorneys for Jane Doe 1 and Jane Doe 2

---

Jacqueline Perczek
BLACK SREBNICK KORNSPAN & STUMPF
201 S. Biscayne Boulevard, Suite 1300
Miami , FL  33131
Tel: (305) 371-6421; Fax: 305-358-2006
 Email: Pleading@royblack.com

Roy E. Black
BLACK SREBNICK KORNSPAN & STUMPF
201 S. Biscayne Boulevard, Suite 1300
Miami , FL  33131
Tel: (305) 371-6421; Fax: 305-358-2006
 Email: Rblack@royblack.com

Attorneys for Intervenor Jeffrey Epstein

Dexter A. Lee
Assistant United States Attorney
99 N.E. 4th Street, Suite 300
Miami, Florida   33132
Tel: (305) 961-9320; Fax: (305) 530-7139
E-mail:  dexter.lee@usdoj.gov

A. Marie Villafaña
Assistant United States Attorney
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida  33401
Tel: (561) 820-8711; Fax:  (561) 820-8777
E-mail:  ann.marie.c.villafana@usdoj.gov

Eduardo I. Sánchez
Assistant United States Attorney
Florida Bar No. 877875
99 N.E. 4th Street
Miami, Florida  33132
Tel: (305) 961-9057; Fax: (305) 536-4676
Email: eduardo.i.sanchez@usdoj.gov

Attorneys for the United States