UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE 1 AND JANE DOE 2,

Petitioners,

vs.

UNITED STATES,

Respondent.

_____/

**OPINION AND ORDER**

This cause is before the Court upon Jane Doe 1 and Jane Doe 2's Motion for Partial

Summary Judgment (DE 361); the United States's Cross-Motion for Summary Judgment (DE

408); Jane Doe 1 and Jane Doe 2's Motion to Compel Answers (DE 348) and Jane Doe 1 and

Jane Doe 2's Motion for Finding Waiver of Work Product and Similar Protections by

Government and for Production of Documents (DE 414).  The Motions are fully briefed and ripe

for review.  The Court has carefully considered the Motions and is otherwise fully advised in the

premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers to interrogatories and

reasonably inferred, for the purpose of these motions, are as follows:

From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor

girls, including Petitioners Jane Doe 1 and Jane Doe 2 (hereinafter, "Petitioners"), at his mansion

in Palm Beach, Florida, and elsewhere in the United States and overseas.  (Government Resp. to

Petitioner's Statement of Undisputed Material Facts (hereinafter, "DE 407" at ¶ 1.)  Because

Epstein and his co-conspirators knowingly traveled in interstate and international commerce to sexually abuse Jane Doe 1, Jane Doe 2 and others, they committed violations of not only Florida law, but also federal law. (DE 407 at ¶ 2.)  In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. (DE 407 at ¶ 3.)  Epstein used paid employees to find and bring minor girls to him.  Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others. (DE 407 at ¶ 8.)

In 2005, the Town of Palm Beach Police Department ("PBPD") received a complaint from the parents of a 14 year old girl about her sexual abuse by Jeffery Epstein.  The PBPD ultimately identified approximately 20 girls between the ages of 14 and 17 who were sexually abused by Epstein. (DE 407 at ¶ 4.)  In 2006, at the request of the PBPD, the Federal Bureau of Investigation ("FBI") opened an investigation into allegations that Epstein and his personal assistants used the facilities of interstate commerce to induce girls between the ages of 14 and 17 to engage in illegal sexual activities. (DE 407 at ¶ 5.)  The FBI ultimately determined that both Jane Doe 1 and Jane Doe 2 were victims of sexual abuse by Epstein while they were minors. Jane Doe 1 provided information about her abuse and Jane Doe 2's abuse to the FBI on August 7, 2007. (DE 407 at ¶ 6.)

From January of 2007 through September of 2007, discussions took place between the U.S. Attorney's Office for the Southern District of Florida ("the Office") and Jeffrey Epstein's attorneys. (DE 407 at ¶ 9.)  On February 1, 2007, Epstein's defense team sent a 24-page letter to the Office going over what they intended to present during a meeting at the Office the same day. (DE 407 at ¶ 10.)

By March 15, 2007, the Office was sending letters to victims informing them of their rights pursuant to the Crime Victims' Rights Act ("CVRA"). (DE 407 at ¶ 11.)  By May of 2007, the Office had drafted an 82-page prosecution memorandum and a 53-page indictment outlining numerous federal sexual offenses committed by Epstein. (DE 407 at ¶ 12.)  On or about June 7, 2007, FBI agents had delivered to Jane Doe 1 a standard CVRA victim notification letter.[1]  The notification letter promised that the Justice Department would make its "best efforts" to protect Jane Doe 1's rights, including "the reasonable right to confer with the attorney for the United States in the case" and " to be reasonably heard at any public proceeding in the district court involving [a] . . . plea."  The notification further stated that, "[a]t this time, your case is under investigation." (DE 407 at ¶ 13.) Jane Doe 1 relied on those representations and believed that the Government would protect those rights and keep her informed about the progress of her case. (DE 407 at ¶ 14.)

On July 6, 2007, Epstein's lawyers sent a 23-page letter lodging numerous arguments to persuade the Office that no federal crimes had been committed by him. (DE 407 at ¶ 15.)   By August 3, 2007, the Government had rejected Epstein's various arguments against federal

_____

[1] On or about August 11, 2006, Jane Doe 2 received the same CVRA letter. (DE 407 at ¶ 7.)

Initially, Jane Doe 2 was unwilling to provide any information to the FBI or the Office unless she was assured her statements would not be used against her.  She also described Epstein as "an awesome man" and stated that she hoped "nothing happens to" him.  (DE 415 at ¶¶ 14-15.)  This was during the time period where Jane Doe 2 had obtained counsel paid for by Epstein. (Jane Doe 2 Decl. ¶¶ 5-7.)

Assistant United States Attorney ("AUSA") A. Marie Villafaña ("line prosecutor" "Villafaña") testified that both Jane Doe 1 and Jane Doe 2 received letters describing their rights under the CVRA. Although Jane Doe 1 and 2 were given Ms. Villafaña's and the FBI agent's name and phone number, neither contacted either of them. (Villafaña Decl. ¶ 5, DE 403-19.)

charges and sent a letter to Epstein's counsel stating, "[w]e would reiterate that the agreement to Section 2255 [a civil restitution provision] liability applies to all of the minor girls identified during the federal investigation, not just the 12 that form the basis of an initial planned charging instrument." (DE 407 at ¶ 17.)  On September 10, 2007, multiple drafts of a non-prosecution agreement ("NPA") had been exchanged between Epstein's counsel and the Office. (DE 407 at ¶ 18.)

On September 12, 2007, while attempting to create alternative charges against Epstein, the Office expressed concern about "the effect of taking the position that Mr. Epstein's house is in the special maritime and territorial jurisdiction of the United States" because the Government had "no evidence of any assaults occurring either on Mr. Epstein's plane or offshore from his residence." (DE 407 at ¶ 19.)  On September 13, 2007, the line prosecutor emailed Epstein's counsel indicating an effort to come up with a solution to the aforementioned concern and she stated that she had been "spending some quality time with Title 18 looking for misdemeanors." The line prosecutor further indicated, "I know that someone mentioned there being activity on an airplane. I just want to make sure that there is a factual basis for the plea that the agents can confirm."  Epstein's counsel responded, "[a]lready thinking about the same statutes." (DE 407 at ¶ 20.)

On September 14, 2007, after having spoken on the telephone about the subject matter of the September 13 emails, Epstein's counsel and the line prosecutor exchanged emails including a proposed plea agreement for Epstein to plead guilty to assaulting one of his coconspirators.  (DE 407 at ¶ 21.)   On September 15, 2007, the line prosecutor sent an email to the Epstein defense team raising concerns about a resolution that would not involve one of

4

Epstein's minor victims and stating:

> I have gotten some negative reaction to the assault charge with [a co-conspirator] as the victim, since she is considered one of the main perpetrators of the offenses that we planned to charge in the indictment. Can you talk to Mr. Epstein about a young woman named [Jane Doe]? We have hearsay evidence that she traveled on Mr. Epstein's airplane when she was under 18, in around the 2000 or 2001 time frame.

(DE 407 at ¶ 22.)

On September 16, 2007, the line prosecutor corresponded with Epstein's counsel about having Epstein plead guilty to obstruction of justice for pressuring one of his co-conspirators not to turn over evidence or complying with a previously-served grand jury subpoena. (DE 407 at ¶ 23.) The Office also stated, "On an 'avoid the press' note, I believe that Mr. Epstein's airplane was in Miami on the day of the [co-conspirator] telephone call. If he was in Miami-Dade County at the time, then I can file the charge in the District Court in Miami, which will hopefully cut the press coverage significantly." They also discussed having Epstein plead guilty to a second charge of assaulting a different co-conspirator. (DE 407 at ¶ 24.)

On September 16, 2007, the line prosecutor wrote to Epstein's counsel indicating that the Office did not like the factual basis for the proposed charges as the Office was "not investigating Mr. Epstein [for] abusing his girlfriend." (DE 407 at ¶ 25.)  The correspondence further stated:

> Andy [i.e., AUSA Andrew Laurie] recommended that some of the timing issues be addressed only in the state agreement, so that it isn't obvious to the judge that we are trying to create federal jurisdiction for prison purposes.
>
> I will include our standard language regarding resolving all criminal liability and I will mention 'co-conspirators,' but I would prefer not to highlight for the judge all of the other crimes and all of the other persons that we could charge. Also, we do not

have the power to bind Immigration . . . there is no plan to try to proceed on any immigration charges against either Ms. [co-conspirator] or Ms. [coconspirator]

(Ex. 7, DE 361-7.)

In the same email, the line prosecutor wrote to defense counsel about a meeting outside the U.S. Attorney's Office: "Maybe we can set a time to meet. If you want to meet 'off campus' somewhere, that is fine." (DE 407 at ¶ 27.)   On about September 16, 2007, Epstein's counsel provided a proposed NPA to the Government that extended immunity from federal prosecution not only to Epstein, but also to certain co-conspirators. (DE 407 at ¶ 28.)

On September 17, 2007, the line prosecutor wrote to defense counsel Jay Lefkowitz: "Please send [a document] to my home e-mail address – [redacted] and give me a call on my cell [redacted] so I can be ready for some discussions tomorrow." (DE 407 at ¶ 29.)  On September 17, 2007, Lefkowitz responded: "[D]o you have another obstruction proffer I can review that you have drafted? Also, if we go that route, would you intend to make the deferred prosecution agreement public?" (DE 407 at ¶ 30.)

On September 18, 2007, the Office responded: "A non-prosecution agreement would not be made public or filed with the Court, but it would remain part of our case file. It probably would be subject to a FOIA request, but it is not something that we would distribute without compulsory process." (DE 407 at ¶ 31.)  On September 20, 2007, the U.S. Attorney's Office wrote: "On the issue about 18 USC 2255, we seem to be miles apart. Your most recent version not only had me binding the girls to a trust fund administered by the state court, but also promising that they will give up their 2255 rights.… In the context of a non-prosecution agreement, the office may be more willing to be specific about not pursuing charges against others." (DE 407 at ¶ 32.)

On September 21, 2007, Palm Beach County State Attorney Barry Krischer wrote the line prosecutor about the proposed agreement and added: "Glad we could get this worked out for reasons I won't put in writing. After this is resolved I would love to buy you a cup at Starbucks and have a conversation." (DE 407 at ¶ 33.)  On September 21, 2007, the line prosecutor emailed Epstein's counsel stating, "I think that the attached addresses the concerns about having an unlimited number of claimed victims, without me trying to *bind* girls whom I do not represent." (DE 407 at ¶ 34.)  On September 23, 2007, the U.S. Attorney's Office sent an email to Lefkowitz stating: "It is factually accurate that the list we are going to give you are persons we have identified as victims. If we did not think they were victims, they would have no right to bring suit." (DE 407 at ¶ 35.)

On September 24, 2007, the line prosecutor sent an e-mail to a prospective representative for the Epstein victims, entitled "Conflict Check."  The email confirmed the girls' status as victims, stating: "Please keep this confidential because these are minor victims. This is a preliminary list." Later on September 24, 2007, the line prosecutor sent an email to Lefkowitz stating: "I have compiled a list of 34 confirmed minors." (DE 407 at ¶ 36.)  As correspondence continued on September 24, 2007, and the NPA was being executed, Lefkowitz sent an email to the line prosecutor stating: "Marie – Please do whatever you can to keep this [i.e., the NPA] from becoming public." (DE 407 at ¶ 37.)

On September 24, 2007, Epstein and the Office formally reached an agreement whereby the United States would defer federal prosecution in favor of prosecution by the State of Florida. Epstein and the Office accordingly entered into a NPA reflecting such an agreement. (DE 407 at ¶ 38.)  The NPA provided that "the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for [the victims], who shall be

7

paid for by Epstein."  The NPA also provided that if any of the victims elected to bring suit under 18 U.S.C. § 2255, they must agree to waive any other claim for damages.  As part of the NPA, Epstein would not contest the jurisdiction of the United States District Court and waived his right to contest liability and damages. (NPA, DE 361-62.)

Among other provisions, the NPA expanded immunity to any "potential coconspirator" of Epstein's: "In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova."  (DE 407 at ¶ 40.)  The NPA also provided that: "The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure." (DE 407 at ¶ 41.)

From the time the FBI began investigating Epstein until September 24, 2007—when the NPA was concluded—the Office never conferred with the victims about a NPA or told the victims that such an agreement was under consideration. (Marie Villafaña Decl. ¶ 7, DE 361-64; DE 407 at ¶ 43.) Many, if not all, other similarly-situated victims received standard CVRA victim notification letters substantively identical to those sent to Jane Doe 1 and Jane Doe 2. (DE 407 at ¶ 44.)  The Office did not consult or confer with any of the victims about the NPA before it was signed. (DE 407 at ¶¶ 45-46.)

Epstein's counsel was aware that the Office was deliberately keeping the NPA secret from the victims and, indeed, had sought assurances to that effect. (DE 407 at ¶ 48.) After the NPA was

8

signed, Epstein's counsel and the Office began negotiations about whether the victims would be told

about the NPA. (DE 407 at ¶ 49.)  It was a deviation from the Government's standard practice to

negotiate with defense counsel about the extent of crime victim notifications. (DE 407 at ¶ 50.)

On September 24, 2007, the Office sent an email to Lefkowitz:

Thank you, Jay. I have forwarded your message only to [United States Attorney] Alex [Acosta], Andy, and Roland. I don't anticipate it going any further than that. When I receive the originals, I will sign and return one copy to you. The other will be placed in the case file, which will be kept confidential since it also contains identifying information about the girls.

When we reach an agreement about the attorney representative for the girls, we can discuss what I can tell him and the girls about the agreement. I know that Andy promised Chief Reiter an update when a resolution was achieved.… Rolando is calling, but Rolando knows not to tell Chief Reiter about the money issue, just about what crimes Mr. Epstein is pleading guilty to and the amount of time that has been agreed to. Rolando also is telling Chief Reiter not to disclose the outcome to anyone.

(DE 407 at ¶ 52.)

On September 25, 2007, the line prosecutor sent an e-mail to Lefkowitz stating: "And

can we have a conference call to discuss what I may disclose to . . . the girls regarding the

agreement." (DE 407 at ¶ 53.)  Also on September 25, 2007, the line prosecutor sent an email to

Lefkowitz which stated in part: "They [Ted Babbitt, Stuart Grossman, Chris Searcy, [L]ake

Lytal] are all very good personal injury lawyers, but I have concerns about whether there would

be an inherent tension because they may feel that THEY might make more money (and get a lot

more press coverage) if they proceed outside the Terms of the plea agreement. (Sorry – I just

have a bias against plaintiffs' attorneys.) One nice thing about Bert is that he is in Miami where

there has been almost no coverage of this case." (DE 407 at ¶ 54.)

On September 26, 2007, the line prosecutor sent an e-mail to Lefkowitz in which she

stated: "Hi Jay – Can you give me a call at 561-[xxx-xxxx] this morning? I am meeting with the agents and want to give them their marching orders regarding what they can tell the girls." (DE 407 at ¶ 55.)  On September 27, 2007, the attorney representative for the victims emailed the Office and asked whether he could get a copy of the indictment or plea agreement to find out "exactly what Epstein concedes to in the civil case." (Sept. 27, 2007 email, DE 362-2.)  Upon inquiry from the Office, Lefkowitz responded by stating that the attorney representative "certainly [] should not get a copy of any indictment." (DE 407 at ¶ 57.) That same day, the line prosecutor informed Epstein's counsel of concerns raised by the attorney representative for the girls.  Specifically, "[t]he concern is, if all 40 girls decide they want to sue, they don't want to be in a situation where Mr. Epstein says this is getting too expensive, we won't pay anymore attorneys' fees." (DE 407 at ¶ 58.)

Also on that same day, the line prosecutor sent an email to state prosecutors Lanna Belohlavek and Barry Krischer: "Can you let me know when Mr. Epstein is going to enter his guilty plea and what judge that will be in front of? I know the agents and I would really like to be there, 'incognito.'" (DE 407 at ¶ 59.)

On October 3, 2007, the Office sent a proposed letter that would have gone to a special master for selecting an attorney representative for the victims under the NPA's compensation procedure. The letter described the facts of the Epstein case as follows: "Mr. Epstein, through his assistants, would recruit underage females to travel to his home in Palm Beach to engage in lewd conduct in exchange for money. Based upon the investigation, the United States has identified 40 young women who can be characterized as victims pursuant to 18 U.S.C. § 2255. Some of those women went to Mr. Epstein's home only once, some went there as many as 100 times or more. Some

of the women's conduct was limited to performing a topless or nude massage while Mr. Epstein masturbated himself. For other women, the conduct escalated to full sexual intercourse." (DE 407 at ¶ 60.)

On October 10, 2007, Lefkowitz sent a letter to U.S. Attorney Alex Acosta stating, in pertinent part: "Neither federal agents nor anyone from your Office should contact the identified individuals to inform them of the resolution of the case, including appointment of the attorney representative and the settlement process. Not only would that violate the confidentiality of the agreement, but Mr. Epstein also will have no control over what is communicated to the identified individuals at this most critical stage. We believe it is essential that we participate in crafting mutually acceptable communication to the identified individuals." The letter further proposed that the attorney representative for the victims be instructed that "[t]he details regarding the United States's investigation of this matter and its resolution with Mr. Epstein is confidential. You may not make public statements regarding this matter." (DE 407 at ¶ 61.)

U.S. Attorney Acosta then met with Lefkowitz for breakfast and Lefkowitz followed up with a letter stating, "I also want to thank you for the commitment you made to me during our October 12 meeting in which you . . . assured me that your Office would not . . . contact any of the identified individuals, potential witnesses, or potential civil claimants and their respective counsel in this matter." (DE 407 at ¶ 63.)

On October 24, 2007, AUSA Jeff Sloman sent a letter to Jay Lefkowitz, proposing an addendum to the NPA clarifying the procedures for the third-party representative for the victims under the NPA's compensation provisions. (DE 407 at ¶ 64.) On October 25, 2007, AUSA Sloman sent a letter to Retired Judge Davis about selecting an attorney to represent the victims under the

11

NPA's compensation procedure. (DE 407 at ¶ 65.)

On about October 26 or 27, 2007, Special Agents E. Nesbitt Kuyrkendall and Jason Richards met in person with Jane Doe 1.  They explained that Epstein would plead guilty to state charges, he would be required to register as a sex offender for life, and he had made certain concessions related to the payment of damages. (DE 407 at ¶ 70.)  According to Jane Doe 1, the Agents did not explain that the NPA had already been signed. (Jane Doe 1 Decl. ¶ 5, DE 361-26.)   Jane Doe 1's understanding was that the federal investigation would continue. (Jane Doe 1 Decl. ¶ 6.) In contrast, Special Agent Kuyrkendall stated that the meeting with Jane Doe 1 was to advise her of the main terms of the NPA.[2]   (Kuykendall Decl. ¶ 8, DE 403-18.)   After the meeting, Special Agent Kuyrkendall became concerned about what would happen if Epstein breached the NPA, and thought that if the victims were aware of the NPA, the provision about monetary damages could be grounds for impeachment of the victims and herself. (Kuykendall Decl. ¶ 9.)  According to  Special Agent Kuyrkendall, the investigation of Epstein continued through 2008. (Kuykendall Decl. ¶ 11.)

In addition to Jane Doe 1, FBI agents only talked to two other victims out of the 34 identified victims about the "general terms" of the NPA, including the provision providing a federal civil remedy to the victims. (DE 407 at ¶ 76.)  After these meetings with three victims, Epstein's defense team complained.  (DE 407 at ¶ 77.)

On about November 27, 2007, AUSA Sloman sent an e-mail to Lefkowitz, (with a copy to U.S. Attorney Acosta) stating that the Office had a statutory obligation to notify the victims about Epstein's plea to state charges that was part of the NPA:

---

[2] Special Agent Kuyrkendal also stated that on August 7, 2007, Jane Doe 1 never asked to confer with anyone from the government about charging decisions or any resolution of the matter.  (Kuykendall Decl. ¶ 7.)

The United States has a statutory obligation (Justice for All Act of 2004) to notify the victims of the anticipated upcoming events and their rights associated with the agreement entered into by the United States and Mr. Epstein in a timely fashion. Tomorrow will make one full week since you were formally notified of the selection. I must insist that the vetting process come to an end. Therefore, unless you provide me with a good faith objection to Judge Davis's selection [as special master for selecting legal counsel for victims pursuing claims against Epstein] by COB tomorrow, November 28, 2007, I will authorize the notification of the victims. Should you give me the go-head on [victim representative] . . . selection by COB tomorrow, I will simultaneously send you a draft of the letter. I intend to notify the victims by letter after COB Thursday, November 29th.

(DE 407 at ¶ 79.)

On November 28, 2007, the Government sent an email to Lefkowitz attaching a letter dated November 29, 2007 (the apparent date upon which it was intended to be mailed) and explained that "I am writing to inform you that the federal investigation of Jeffrey Epstein has been completed, and Mr. Epstein and the U.S. Attorney's Office have reached an agreement containing the following terms." The proposed letter then spelled out a number of the provisions in the NPA, including that because Epstein's plea of guilty to state charges was "part of the resolution of the federal investigation," the victims were "entitled to be present and to make a statement under oath at the state sentencing." (DE 407 at ¶ 80.)

On November 29, 2007, Lefkowitz sent a letter to U.S. Attorney Acosta objecting to the proposed victim notification letter, stating that it is inappropriate for any letter to be sent to the victims before Epstein entered his plea or had been sentenced. Lefkowitz also told the Government that the victims should not be invited to the state sentencing, that they should not be encouraged to contact law enforcement officials, and that encouraging the attorney representative to do anything other than get paid by Epstein to settle the cases was to encourage an ethical conflict. (DE 407 at ¶

82.)

On about November 30, 2007, U.S. Attorney Acosta sent a letter to one of Epstein's

defense attorneys, Kenneth Starr, stating: "I am directing our prosecutors not to issue victim

notification letters until this Friday at 5 p.m., to provide you with time to review these options

with your client." The letter also explained that the line prosecutor had informed U.S. Attorney

Acosta "that the victims were not told of the availability of Section 2255 relief during the

investigation phase of this matter" despite the fact that the "[r]ule of law . . . now requires this

District to consider the victims' rights under this statute in negotiating this Agreement." (DE 407 at

¶ 83.)  On December 5, 2007, Starr sent a letter to U.S. Attorney Acosta (with copy to AUSA

Sloman) asking about issuance of victim notification letters and stating: "While we believe that it

is wholly inappropriate for your Office to send this letter under any circumstances, it is certainly

inappropriate to issue this letter without affording us the right to review it." (DE 407 at ¶ 85.)

On about December 6, 2007, AUSA Sloman sent a letter to Lefkowitz stating in part:

> [E]ach of the listed individuals are persons whom the Office identified as victims.
> [T]he Office is prepared to indict Mr. Epstein based upon Mr. Epstein's 'interactions'
> with these individuals. This conclusion is based upon a thorough and proper
> investigation - one in which none of the victims was informed of any right to receive
> damages of any amount prior to the investigation of her claim.

> [T]he Office can say, without hesitation, that the evidence demonstrates that each
> person on the list was a victim of Mr. Epstein's criminal behavior.

> Finally, let me address your objections to the draft Victim Notification Letter. You
> write that you don't understand the basis for the Office's belief that it is appropriate
> to notify the victims. Pursuant to the 'Justice for All Act of 2004,' crime victims are
> entitled to: 'The right to reasonable, accurate, and timely notice of any public court
> proceeding … involving the crime' and the 'right not to be excluded from any such
> public court proceeding.…' 18 U.S.C. § 3771(a)(2) & (3). Section 3771 also
> commands that 'employees of the Department of Justice . . . engaged in the detection,
> investigation, or prosecution of crime shall make their best efforts to see that crime

14

victims are notified of, and accorded, the rights described in subsection (a).' 18 U.S.C. § 3771(c)(1)....

With respect to notification of the other information that we propose to disclose, the statute requires that we provide a victim with the earliest possible notice of: the status of the investigation, the filing of charges against a suspected offender, and the acceptance of a plea. 42 U.S.C. 10607(c)(3). Just as in 18 U.S.C. 3771, these sections are not limited to proceedings in a federal district court. Our Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense. The victims identified through the federal investigation should be appropriately informed, and our Non-Prosecution Agreement does not require the U.S. Attorney's Office to forego its legal obligations. [T]he Office believes that it has proof beyond a reasonable doubt that each listed individual was a victim of Mr. Epstein's criminal conduct while the victim was a minor. The law requires us to treat all victims "with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. 3771(a)(8).

The letter included a footnote stating: "Unlike the State's investigation, the federal investigation shows criminal conduct by Mr. Epstein at least as early as 2001, so all of the victims were minors at the time of the offense." (DE 407 at ¶ 83.)

On December 7, 2007, defense attorney Lilly Ann Sanchez sent a letter to AUSA Sloman, requesting "that the Office hold off on sending any victim notification letters." No letters were sent in December of 2007. (DE 407 at ¶ 88.) On December 13, 2007, the line prosecutor sent a letter to Lefkowitz stating that "You raised objections to any victim notification, and no further notifications were done." (DE 407 at ¶ 89.) On December 19, 2007, U.S. Attorney Acosta sent a letter to Lilly Ann Sanchez stating, "I understand that the defense objects to the victims being given notice of time and place of Mr. Epstein's state court sentencing hearing. We intend to provide victims with notice of the federal resolution, as required by law. We will defer to the discretion of the State Attorney regarding whether he wishes to provide victims with notices of the state proceedings. (DE 407 at ¶ 90.)

In January of 2008, any requirement that Epstein carry out his obligations under the NPA was delayed while he sought higher level review within the Justice Department. (DE 407 at ¶ 92.)  On January 10, 2008, Jane Doe 1 and Jane Doe 2 were sent victim notification letters from the FBI advising them that "[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." (DE 407 at ¶ 93.) The January 10, 2008 notification letters did not disclose that the Jane Doe 1 and Jane Doe 2 case in the Southern District of Florida was the subject of the NPA entered into by Epstein and the Office, or that there had been any potentially binding resolution. (DE 407 at ¶ 94.)  Other victims received the same letters as sent to Jane Doe 1 and Jane Doe 2.  (DE 407 at ¶ 95.)

According to the declaration of Jane Doe 1, she believed that criminal prosecution of Epstein was important and she wanted to be consulted by prosecutors before any resolution.  Based on the letters received, she believed the Government would contact her before   reaching any final resolution. (Jane Doe 1 Decl. ¶ 9.)  On January 31, 2008, Jane Doe 1 met with FBI Agents and an AUSA from the U.S. Attorney's Office. She provided additional details of Epstein's sexual abuse of her. The AUSA  did not disclose to Jane Doe 1 at this meeting that they had already negotiated a NPA with Epstein. (DE 407 at ¶ 97.)  According to the declaration of Jane Doe 2, while she recognizes she did not initially help the investigation, she later tried to cooperate with the investigation but was never given an opportunity to cooperate with the investigation.[3] (Jane Doe 2

---

[3]  The Government believed that a negotiated resolution was in the best interest of the Office and the victims as a whole based on information obtained from the victims and the agents assigned to the case. (Villafaña Decl. ¶ 19.)  The Government also believed that Epstein was trying to set aside the NPA and therefore the Government needed to be prepared for a prosecution. (Villafaña Decl. ¶ 34.) Petitioners object to this evidence, claiming the Government previously claimed work product and similar protections over internal materials.  Given that the Court is ruling in favor of Petitioners on the present motions, the Court need not address this

Decl. ¶ ¶ 13-14, DE 361-27.)

On March 19, 2008, the line prosecutor sent a lengthy email to a prospective pro bono attorney for one of Epstein's victims who had been subpoenaed to appear at a deposition. The email listed the attorneys representing Epstein, the targets of the investigation, and recounted in detail the investigation that had been conducted to that point. The email did not reveal the fact that Epstein had signed the NPA in September 2007. (DE 407 at ¶ 98.)

On May 30, 2008, Jane Doe 5, who was recognized as an Epstein victim by the Office, received a letter from the FBI advising her that "[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." (DE 407 at ¶ 99.) The May 30, 2008 victim letter to Jane Doe 5 also acknowledged the victims' rights under the CVRA . (DE 407 at ¶ 100.)

In mid-June of 2008, Mr. Bradley Edwards, the attorney for Petitioners, contacted the line prosecutor to inform her that he represented Jane Doe 1 and, later, Jane Doe 2. Edwards asked to meet to provide information about the federal crimes committed by Epstein against these victims. The line prosecutor and Edwards discussed the possibility of federal charges being filed in the future. Edwards was led to believe federal charges could still be filed, with no mention whatsoever of the existence of the NPA or any other possible resolution to the case. (DE 407 at ¶ 101.)

At the end of the call, the line prosecutor asked Edwards to send any information that he wanted considered by the Office in determining whether to file federal charges. The line prosecutor did not inform Edwards about the NPA. (DE 407 at ¶ 102.) On June 19, 2008, Edwards

───────────────

issue. To the extent it might have an impact on future rulings, Petitioners may reassert this argument if and when appropriate.

17

sent an email to the line prosecutor requesting to meet and discuss plans. (DE 407 at ¶ 103.)

On June 23, 2008, the line prosecutor sent an email to Lefkowitz stating that the Deputy Attorney General had completed his review of the Epstein matter and "determined that federal prosecution of Mr. Epstein's case [wa]s appropriate. Accordingly, Mr. Epstein ha[d] until the close of business on Monday, June 30, 2008, to comply with the terms and conditions of the agreement between the United States and Mr. Epstein." (DE 407 at ¶ 105.)

On or about June 27, 2008, the Office called Edwards to provide notice to his clients regarding the entry of Epstein's guilty plea in state court. (DE 407 at ¶ 107.) According to Edwards, the line prosecutor only told him that Epstein was pleading guilty to state solicitation of prosecution. He was not told that the state plea was related to the federal investigation or that the state plea would resolve the federal crimes. Edwards claims he was not told his clients could address the state court. (Edwards Decl. ¶¶ 17-18, DE 416-1.) In contrast, the line prosecutor claims she told Edwards that his clients could address the state court. (Villafaña Decl. ¶ 38, DE 403-19.)

On or before June 30, 2008, the Office prepared a draft victim notification to be sent to the victims. The notification was designed to inform the victims of the provisions of the deferral of federal prosecution in favor of state charges. The notification letter began by describing Epstein's guilty plea in the past tense: "On June 30, 2008, Jeffrey Epstein … entered a plea of guilty to violations of Florida statutes forbidding the solicitation of minors to engage in prostitution and felony solicitation of prostitution." Later, a substantively identical letter was prepared for Epstein's and his counsel's review. (DE 407 at ¶ 110.)

On June 30, 2008, the Office sent an e-mail to Epstein's counsel: "The FBI has received several calls regarding the Non-Prosecution Agreement. I do not know whether the title of the

document was disclosed when the Agreement was filed under seal, but the FBI and our office are declining comment if asked." (DE 407 at ¶ 111.)  That same day, Epstein pled guilty to state law solicitation of prostitution charges. (DE 407 at ¶ 112.)  Immediately following the June 30, 2008 hearing, the line prosecutor told one of the victims' attorneys that Epstein had "pled guilty today in state court." (DE 407 at ¶ 113.)  Also after the plea, the line prosecutor emailed the assistant state attorney a copy of the NPA to be filed under seal. (July 1, 2008 email, DE 362-38.)

On June 30, 2008, based on what she had been told by the Government, Jane Doe 1 thought that the Office was still investigating and pursuing her case. She did not receive notice that Epstein's state guilty plea affected her rights in any way. If she had been told that the state plea had some connection to blocking the prosecution of her case, she would have attended and tried to object to the judge to prevent that plea from going forward. (Jane Doe 1 Decl. ¶ 13.) According to the line prosecutor, Edwards did not tell her that Jane Doe 1 wanted to meet with her before a resolution was reached. (Villafaña Decl. ¶ 37, DE 403-19.)

On July 3, 2008, as specifically directed by the Office, Edwards sent a letter to the Office communicating the wishes of Jane Doe 1, Jane Doe 2, and Jane Doe 5 that federal charges be filed against Epstein: "We urge the Attorney General and our United States Attorney to consider the fundamental import of the vigorous enforcement of our Federal laws. We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual predator." (DE 407 at ¶ 118.)

On July 7, 2008, the line prosecutor corresponded with Epstein's counsel seeking his signed agreement concerning a notification letter to the victims before beginning the distribution of that

letter. (DE 407 at ¶ 120.)  That same day, Jane Doe 1 filed an emergency petition for enforcement

of her rights under the CVRA. (DE 407 at ¶ 126.)  On July 9, 2008, Edwards saw the first reference

to the NPA when the Government filed its responsive pleading to Jane Doe's emergency petition.

(Edwards Decl. ¶ 21.)

On July 8, 2008, the line prosecutor sent a letter to Epstein's counsel stating that

victims would be informed about the civil compensation provision of the NPA the next day:

> In accordance with the terms of the Non-Prosecution Agreement, on June 30,
> 2008, the United States Attorney's Office provided you with a list of thirty-one
> individuals "whom it was prepared to name in an Indictment as victims of an
> enumerated offense by Mr. Epstein." . . . In deference to your vacation, we
> allowed you a week to provide us with any objections or requested modifications
> of the list and/or the Notification language. Yesterday, I contacted you via
> telephone and e-mail, but received no response. Accordingly, the United States
> hereby notifies you that it will distribute the victim notifications tomorrow, July 9,
> 2008, to each of the thirty-two identified victims, either directly or via their
> counsel.

(DE 407 at ¶ 127.)

On July 9, 2008, Epstein's counsel sent a letter to the line prosecutor raising concerns

about the notifications, and suggesting modifications to the notification letter. Epstein's counsel

also objected to the victim notification letters containing certain information about the NPA. (DE

407 at ¶ 128.)  The line prosecutor responded: "Without such an express Acknowledgment by

Mr. Epstein that the notice contains the substance of that Agreement, I believe that the victims

will have justification to petition for the entire agreement, which is contrary to the confidentiality

clause that the parties have signed."  (DE 407 at ¶ 129.)  That same day, the U.S. Attorney's

Office sent victim notification letters to Jane Doe 1 and Jane Doe 5, via their attorney, Edwards,

and to other identified victims of Epstein. That notification contained a written explanation of

some of the civil compensation provisions of the NPA. The notification did not provide the full terms of the NPA.

On July 10, 2008, Epstein's counsel continued to protest victim notification as evidenced by an email to the line prosecutor stating, "we respectfully request a reasonable opportunity to review and comment on a draft of the modified notification letter you intend to mail before you send it." (DE 407 at ¶ 131.)

On August 10, 2008, Jane Doe 1 and Jane Doe 2 filed a motion seeking release of the NPA. (DE 407 at ¶ 136.)  On August 14, 2008, the line prosecutor emailed Epstein's counsel stating that the court has "ordered us to make the Agreement available to the plaintiffs." (DE 407 at ¶ 141.)

On August 18, 2008, Lefkowitz wrote the line prosecutor that Epstein objected to disclosure of the terms of the NPA, but that Epstein would "cooperate with the government to reach an agreement as to substance of the notification to be sent to the government's list of individuals. Based on the Agreement, the information contained in the notification should be limited to (1) the language provided in the Agreement dealing with civil restitution (paragraphs 7-10) and (2) the contact information of the selected attorney representative. We object to the inclusion of additional information about the investigation of Mr. Epstein, the terms of the Agreement other than paragraphs 7-10 and the identity of other identified individuals." (DE 407 at ¶ 143.)  On August 21, 2008, the Government sent a letter to Epstein's counsel stating that, "[c]opies of the victim notifications will continue to be provided to counsel for Mr. Epstein."

Jane Doe 2 was not informed of the contents of the NPA until August 28, 2008, when the line prosecutor provided a copy to Edwards. (DE 407 at ¶ 146.)  On September 2, 2008, the line

prosecutor sent an email to Epstein's counsel stating, "I will start sending out the victim notifications today. In accordance with your request, I have changed the language regarding the victims' right to receive a copy of the Agreement." (DE 407 at ¶ 147.)  On September 2 and 3, 2008, the Office sent to Jane Doe 1 and other identified victims amended notification letters, stating "the United States has agreed to defer federal prosecution in favor of this state plea and sentence." (Sept. 3, 2008 letter, DE 363-66; (DE 407 at ¶ 148.)

On September 16, 2008, attorney Jeffrey Herman, who represented several Epstein victims, wrote to the line prosecutor to object to the restitution procedures established in the NPA after learning that another attorney, established through the NPA, would be making unsolicited contacts to the victims. Mr. Herman explained that the notification letters were "misleading" because they referred generally to a waiver of "any other claim for damages," without informing them that this waiver might include a valuable punitive damages claim against an alleged billionaire. (DE 407 at ¶ 152.)  On September 17, 2008, the line prosecutor sent an email to State Attorney Barry Krischer, explaining that the NPA "contain[ed] a confidentiality provision that require[ed] us to inform Mr. Epstein's counsel before making any disclosure." (DE 407 at ¶ 153.)

Around this same time period, Jane Doe 1 and Jane Doe 2 filed actions in Palm Beach County, seeking money damages from Epstein from sexually abusing them. (Petitioners' Resp. to Gov't's Statement of Undisputed Material Facts (hereinafter "DE 415") at ¶¶ 8-9.)  Eventually, they received monetary settlements of their lawsuits. (DE 415 at ¶ 12.)

In moving for summary judgment, the Petitioners make the following arguments in support of their contention that the Government violated their CVRA rights.  The Government

violated Petitioners' right to confer under the CVRA: (1) when the Government was negotiating and signing the NPA; (2) when the Government sent letters telling Petitioners to be patient while the Government completed its investigation and (3) when the Government did not tell the victims that the state plea would extinguish the federal case. Petitioners also claim the Government violated their right to be treated with fairness under the CVRA by concealing the negotiations of the NPA. Additionally, Petitioners contend the Government violated their rights to reasonable and accurate notice when it concealed that the NPA and the federal investigation were implicated in the state court proceeding.

In moving for and responding to summary judgment, the Government contends that there is no right to notice or conferral about a NPA; it was reasonable for the Government to send letters to victims while continuing to investigate the case because the Government could not assume that Epstein would plead guilty; and the line prosecutor contacted Petitioners' attorneys about the state court plea hearing. The Government also claims it did not violate the right to reasonable, accurate and timely notice because the CVRA does not create any right to notice of state court proceedings and, in any event, the Government gave notice. The Government asserts it did not treat the victims unfairly and used its best efforts to comply with the CVRA, including complying with the Attorney General's guidelines for victim assistance. Furthermore, the Government argues that Petitioners are equitably estopped from challenging the NPA because they relied upon the NPA in their state court civil actions against Epstein. Lastly, the Government contends that Petitioners are judicially estopped from challenging the validity of the NPA because they have asserted mutually inconsistent positions; namely, that the NPA is invalid in federal court but was binding on Epstein in state court.

23

II.  Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant  is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477

24

U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  Anderson, 477 U.S. 242, 249-50.

III. Discussion

The CVRA was designed to protect victims' rights and ensure their involvement in the criminal justice process.  United States v. Moussaoui, 483 F.3d 220, 234 (4th Cir. 2007); Kenna v. U.S. Dist. Court, 435 F.3d 1011, 1016 (9th Cir. 2006) ("The [CVRA] was enacted to make crime victims full participants in the criminal justice system.").  The statute enumerates the following ten rights:

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and

privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

18 U.S.C. § 3771(a).

This Court previously held the following with respect to the CVRA:  First, the rights under the CVRA attach before the Government brings formal charges against a defendant.  Does v. United States, 817 F. Supp. 2d 1337, 1341 (S.D. Fla. 2011).  Second, the CVRA authorizes the rescission or "reopening" of a prosecutorial agreement, including a non-prosecution agreement, reached in violation of a prosecutor's conferral obligations under the statute. Doe v. United States, 950 F. Supp. 2d 1262, 1267 (S.D. Fla. 2013).  Third, section 3771(d)(5) of the CVRA authorizes the setting aside of pre-charge prosecutorial agreements, despite the fact that the particular statutory enforcement provision expressly refers to the reopening of a plea or sentence. Id. at 1267.  Fourth, the "reasonable right to confer . . . in the case" extends to the pre-charge state of criminal investigations and proceedings.  Id. Fifth, the federal sex offense crimes involving minors allegedly committed by Epstein renders these Petitioners crime victims under the CVRA.  Id. at 1269.  Sixth, "questions pertaining to [the] equitable defense[s] are properly left for resolution after development of a full evidentiary record." Id. at 1269 n. 6.

Here, it is undisputed that the Government entered into a NPA with Epstein without conferring with Petitioners during its negotiation and signing.  Instead, the Government sent letters to the victims requesting their "patience" with the investigation even after the Government

entered into the NPA.  At a bare minimum, the CVRA required the Government to inform

Petitioners that it intended to enter into an agreement not to prosecute Epstein.  Although the

binding effect of the NPA was contingent upon Epstein pleading guilty to the state charges, that

contingency was out of the control of the Government. The Government's hands were

permanently tied if Epstein fulfilled his obligations under the NPA.  Thus, Petitioners and the

other victims should have been notified of the Government's intention to take that course of

action before it bound itself under the NPA.  Had the Petitioners been informed about the

Government's intention to forego federal prosecution of Epstein in deference to him pleading

guilty to state charges, Petitioners could have conferred with the attorney for the Government and

provided input.  In re Dean, 527 F.3d 391, 394 (5th Cir. 2008) (there are rights under the CVRA

including the "reasonable right to confer with the attorney for the Government").  Hence, the

Government would have been able to "ascertain the victims' views on the possible details of the

[non-prosecution agreement]."  Id. Indeed, it is this type of communication between prosecutors

and victims that was intended by the passage of the CVRA.  See United States v. Heaton, 458 F.

Supp. 2d 1271 (D. Utah 2006)(government motion to dismiss charge of using facility of

interstate commerce to entice minors to engage in unlawful sexual activity would not be granted

until government consulted with victim); United States v. Ingrassia, No. CR-04-0455ADSJO,

2005 WL 2875220, at *17 n. 11 (E.D.N.Y. Sept. 7, 2005) (Senate debate supports the view that

the contemplated mechanism for victims to obtain information on which to base their input was

conferral with the prosecutor concerning any critical stage or disposition of the case).

    Particularly  problematic was the Government's decision to conceal the existence of the

NPA and mislead the victims to believe that federal prosecution was still a possibility.[4]  When

the Government gives information to victims, it cannot be misleading. While the Government

spent untold hours negotiating the terms and implications of the NPA with Epstein's  attorneys,

scant information was shared with victims.  Instead, the victims were told to be "patient" while

the investigation proceeded.

The Government, however, interprets the CVRA as only obligating the prosecutor to

answer inquiries by a crime victim and does not impose a duty on the prosecutor to give notice

about case developments, other than what is required in section 3771(a)(2).   Such an

interpretation is in direct contravention of the intent of the CVRA.  See Ingrassia, 2005 WL

2875220, at *17 n.11 (Senate debate explaining the right to confer is "intended to be expansive"

including the right of victim to confer "concerning any critical state of disposition of the case").

In any event, no meaningful conferral could take place as long as the Government chose to

conceal the existence of the NPA from the victims.[5]

Nor does the Court agree with the Government that the 2015 amendment to the CVRA,

section 3771(a)(9), which gave victims the "right to be informed in a timely manner of any plea

---

[4]  Even if the Court accepted the Government's version of the facts relative to the Agent
having told Jane Doe 1 the "main terms" of the NPA (which is left undefined), the victims were
not told about it until *after* it was signed and the Government was bound.  This precluded the
Government from obtaining any input from the victims.

[5]  The Government devotes time to distinguishing between the words "confer" and
"notice" and suggesting that "confer" is more limited in scope than "notice."  Nothing about the
definition of confer, however, suggests it is limited to one party bearing the burden of
communication.  See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/
dictionary (last visited January 7, 2019) ("to compare views or take counsel"); Blacks Law
Dictionary (10th ed. 2014) ("to hold a conference, to consult with one another").

bargain or deferred prosecution agreement" specifically excluded the right of victims to be informed of a non-prosecution agreement.  Prior to this amendment, this Court held that the right to confer extended to the pre-charge state of criminal investigations and proceedings.  Doe, 950 F. Supp. 2d at 1267; see also 157 Cong. Rec. S7060-01, 157 Cong. Rec. S7060-01, S7060 (CVRA co-sponsor Senator Jon Kyl's 2011 letter to the Attorney General, explaining that "Congress intended the CVRA to broadly protect crime victims throughout the criminal justice process-from the investigative phases to the final conclusion of a case.")

The 2015 amendment did not serve to repeal or restrict the obligations of the Government to confer with victims in the early stages of a case.  Instead, the 2015 amendment clarified that certain events, such as plea agreements or deferred prosecution agreements, must be conveyed to the crime victim.  Put another way, the 2015 amendment codified what the courts had been interpreting the CVRA to require, such as entitlement to notice of a plea bargain.  See In re Dean, 527 F.3d at 394 ("the government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain"); United States v. Okun, No. CRIM. 3:08CR132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009) (the statutory language of the CVRA gives the victims' rights before the accepting of plea agreements).

To the extent the Government relies upon the "interpretive canon, *expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left unmentioned'" the Court is not persuaded.  Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 80 (2002) (quoting United States v. Vonn, 535 U.S. 55, 65 (2002)).  "The force of any negative implication . . . depends on context." Marx v. General Revenue Corp., 568 U.S. 371, 381 (2013).

"[T]he *expressio unius* canon does not apply unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it, and that the canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." Id. (internal citations and quotation marks omitted).

The expansive context of the CVRA lends itself to only one interpretation; namely, that victims should be notified of significant events resulting in resolution of their case without a trial. See Kenna v. U.S. Dist. Court for C.D.Cal., 435 F.3d 1011, 1016 (9th Cir. 2006) ("[t]he statute was enacted to make crime victims full participants in the criminal justice system"); Heaton, 458 F. Supp. 2d at 1273 (the right to confer is "not limited to particular proceedings" but is "expansive" and applies broadly to "any critical stage or disposition of the case"). Reading into the statute a negative implication that victims need not be informed of non-prosecution agreements, and only informed of the more common events of plea bargains or deferred prosecution agreements, would be inconsistent with the goal of the CVRA.[6]  In the context of plea agreements, the CVRA provides victims with rights prior to the acceptance of plea agreements.  See In re Dean, 527 F.3d at 394; United States v. Okun, No. CRIM. 3:08CR132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009).  Furthermore, victims obtain rights under the CVRA even before prosecution.  Okun, 2009 WL 790042, at *2 (citing In re Dean, 527 F.3d at 394).  Based on this authority, the Court concludes that the CVRA must extend to conferral about non-prosecution agreements.

_____

[6] A NPA entered into without notice has a more damaging impact on the victims than a plea agreement entered into without notice.  When a plea agreement is entered into without notice, the victims will at least have an opportunity to provide input to a judge at sentencing. Once a NPA is entered into without notice, the matter is closed and the victims have no opportunity to be heard regarding any aspect of the case.

30

Next, the Government claims it did not violate the right to confer when, in January of 2008, it sent letters to the victims counseling patience because, at that time, Epstein's attorneys were seeking review of the NPA at higher levels within the Department of Justice.  As indicated previously, however, at this point, the Government had bound itself to the terms of the NPA unless Epstein failed to comply with its terms.  It was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute.  While Epstein was within his rights to attempt to persuade higher authorities within the Department of Justice to overrule the prosecutorial decisions of the U. S. Attorney's Office in the Southern District of Florida, the CVRA was designed to give the victims the same opportunity to attempt to affect prosecutorial decisions before they became final.  Instead, the Office engaged in lengthy negotiations with Epstein that included repeated assurances that the NPA would not be "made public or filed with the Court." (DE 407 at ¶ 31.)

Nor did the Justice Department guidelines create an exemption from the CRVA's statutory requirements.  Although the Government points to guidelines that conflicted with the requirements of the CVRA (by restricting CVRA rights until after a formal indictment), the Court is not persuaded that the guidelines were the basis for the Government's decision to withhold information about the NPA from the victims.  If that had been the case, the Government would not have sent the victim letters telling them that they had rights protected under the CVRA. Nor would they have told Epstein's attorneys that it had obligations to notify the victims. In any event, an agency's own "'interpretation' of a statute cannot supersede the language chosen by Congress."  Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980).

Next, the Court rejects the Government's contention that Jane Doe 2 is not protected by

the CVRA because she made statements favorable to Epstein early in the investigation.[7]  There is

no dispute that Epstein sexually abused Jane Doe 2 while she was a minor.  Therefore, regardless

of her comments to the prosecutor, she was a victim.  See 18 U.S.C. § 3771(e) (the CVRA

defines a victim as "a person directly and proximately harmed as a result of the commission of a

Federal offense"); In re Stewart, 552 F.3d 1285, 1288 (11th Cir. 2008) ("to determine a crime

victim, then, first, we identify the behavior constituting 'commission of a Federal offense.'

Second, we identify the direct and proximate effects of that behavior on parties other than the

United States. If the criminal behavior causes a party direct and proximate harmful effects, the

party is a victim under the CVRA.").

The Court need not resolve the factual questions surrounding what and when the victims

were told about the state court proceeding and whether a state court proceeding is covered by the

CVRA.  Under the facts of this case, once the Government failed to advise the victims about its

intention to enter into the NPA, a violation of the CVRA occurred.

Nor does the Court need to consider the Government's estoppel arguments at this time.

These arguments relate only to the remedy, and not the determination of whether there was a

CVRA violation.  Therefore, the Court will address this issue at the appropriate juncture.

Lastly, the Court will address the Government's argument that its prosecutorial discretion

permitted it to enter into the NPA.  The Government correctly notes that the CVRA provides that

"[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney

General or any officer under his direction." 18 U.S.C.A. § 3771(d)(6).  The Court is not ruling

---

[7] In fact, the Office considered Jane Doe 2 a victim as early as August of 2006 when it
sent her a CVRA letter.

that the decision not to prosecute was improper.  The Court is simply ruling that, under the facts

of this case, there was a violation of the victims rights under the CVRA.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)    Jane Doe 1 and Jane Doe 2's Motion for Partial Summary Judgment (DE 361) is

**GRANTED** to the extent that Petitioners' right to conferral under the CVRA was

violated.

2)    The United States's Cross-Motion for Summary Judgment (DE 408) is **DENIED.**

3)    Jane Doe 1 and Jane Doe 2's Motion to Compel Answers (DE 348) is **DENIED**

**WITHOUT PREJUDICE.**

4)    Jane Doe 1 and Jane Doe 2's Motion for Finding Waiver of Work Product and

Similar Protections by Government and for Production of Documents (DE 414) is

**DENIED WITHOUT PREJUDICE.**

5)    The parties should confer and inform the Court **within 15 days of the date of**

**entry of this Order** how they wish to proceed on determining the issue of what

remedy, if any, should be applied in view of the violation.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 21st day of February, 2019.

_____
KENNETH A. MARRA
United States District Judge

33