UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80736-CIV-MARRA

JANE DOE 1 AND JANE DOE 2,

     Petitioners,

vs.

UNITED STATES OF AMERICA,

     Respondent.

_____/

JEFFREY EPSTEIN,

     Limited Intervenor.

_____/

# LIMITED INTERVENOR JEFFREY EPSTEIN'S BRIEF

# IN OPPOSITION TO PROPOSED REMEDIES

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................... ii

TABLE OF CITATIONS ......................................................................... iv

INTRODUCTION ..................................................................................... 2

BACKGROUND ....................................................................................... 4

ARGUMENT ........................................................................................... 14

I.    PRINCIPLES OF PROCEDURAL DUE PROCESS PRECLUDE
IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES .......... 14

    A.    Mr. Epstein was not a Party to the Underlying Litigation and There is no
Judgment Against him................................................................. 15

    B.    There was no Judicial Finding of "Bad Faith" or an "Illegal Agreement"
and no Factual Basis for any Such Findings ................................. 19

        *i.*    *Mr. Epstein's Counsel Acted in Good Faith* ................................... 20

        *ii.*    *The NPA is a Legal Agreement* ......................................... 25

II.    THE CVRA ITSELF PRECLUDES IMPOSITION OF PETITIONERS'
PROPOSED EPSTEIN REMEDIES...................................................... 27

    A.    Judicial Reformation of an NPA is not an Authorized Remedy ................. 27

    B.    The Remedies Sought by Petitioners Against Mr. Epstein are Time-Barred
under the CVRA ......................................................................... 30

III.    PRINCIPLES OF CONTRACT LAW PRECLUDE IMPOSITION OF
PETITIONERS' PROPOSED EPSTEIN REMEDIES......................................... 33

    A.    A Court may not Re-write an Agreement Between Two Contracting Parties
to Eliminate all Benefits to one Party........................................... 33

    B.    The General Releases Signed by Petitioners Bar Petitioners' Proposed
Epstein Remedies ....................................................................... 37

IV.   THE DOCTRINES OF EQUITABLE AND JUDICIAL ESTOPPEL PRECLUDE IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES ........... 39

V.    PRINCIPLES OF SUBSTANTIVE DUE PROCESS PRECLUDE IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES.................................... 43

VI.   THE DOCTRINE OF SEPARATION OF POWERS PRECLUDES IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES.................................... 46

VII.  THE DOCTRINE OF RIPENESS PRECLUDES IMPOSITION OF PROPOSED EPSTEIN REMEDY #2……………………………………………………….49

VIII. THE GOVERNMENT'S PROPOSED REMEDY IS NOT AUTHORIZED BY THE CVRA ......................................................................................................... 50

IX.   MR. EPSTEIN ADOPTS THE ARGUMENTS PREVIOUSLY RAISED BY THE GOVERNMENT INSOFAR AS THEY AFFECT THE REMEDY IN THIS CASE ....................................................................................................................... 51

CONCLUSION ............................................................................................................. 52

## TABLE OF AUTHORITIES

## CASES                                                                   Page

*Abbadessa v. Moore Business Forms, Inc.*,
    987 F.2d 18 (1st Cir. 1993) ................................................................... 34

*Amelia v. United States*,
    732 F.2d 711 (9th Cir. 1984) .................................................................. 31

*American Telephone & Telegraph Co. v. United States*,
    177 F.3d 1368 (Fed.Cir. 1999) ............................................................... 35

*AVVA-BC, LLC v. Amiel*,
    25 So. 3d 7 (Fla. 3d DCA 2009) ............................................................. 34

*Bahamas Sales Associate, LLC v. Byers*,
    701 F.3d 1335 (11th Cir. 2012) .............................................................. 41

*Blinco v. Green Tree Servicing LLC*,
    400 F.3d 1308 (11th Cir. 2005) .............................................................. 41

*Borck v. Holewinski*,
    459 So. 2d 405 (Fla. 4th DCA 1984) ...................................................... 33

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978) ............................................................................... 48

*Burnes v. Pemco Aeroplex, Inc.*,
    291 F.3d 1282 (11th Cir. 2002) ........................................................ 41, 42

*Carlisle v. United States*,
    517 U.S. 416 (1996) ......................................................................... 31, 32

*Cerniglia v. Cerniglia*,
    679 So. 2d 1160 (Fla. 1996) .................................................................. 38

*Chase National Bank v. Norwalk*,
    291 U.S. 431 (1934) ............................................................................... 17

*Community For Creative Non-Violence v. Pierce*,
    786 F.2d 1199 (D.C. Cir. 1986) ............................................................. 46

*Craig v. People,*
  986 P.2d 951 (Colo. 1999) ................................................................. 26

*Digital Props., Inc. v. City of Plantation,*
  121 F.3d 586, 590 (11th Cir. 1997) ................................................. 50

*Doe No. 1 v. United States,*
  749 F.3d 999 (11th Cir. 2014) ................................................ 10, 13, 16

*Does v. United States,*
  817 F. Supp. 2d 1337 (S.D. Fla. 2011) ............................................ 51

*Dolan v. United States,*
  560 U.S. 605 (2010) ......................................................................... 32

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,*
  485 U.S. 568 (1988) ......................................................................... 30

*Ex parte Rich,*
  194 S.W. 3d 508 (Tex. Crim. App. 2006) ........................................ 27

*Gundy v. United States,*
  ___ U.S. ___, 2019 WL 2527473 (June 20, 2019) ............................ 22

*Halperin v. United States,*
  610 F. Supp. 8 (S.D. Fla. 1985) ....................................................... 31

*Hansberry v. Lee,*
  311 U.S. 32 (1940) ........................................................................... 15

*HDR Engineering, Inc. v. R.C.T. Engineering, Inc.,*
  No. 08-81040-CIV, 2010 WL 2402908 (S.D. Fla. June 15, 2010) ........ 18

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ......................................................................... 46

*Hendricks v. Stark,*
  99 Fla. 277 (Fla. 1930) .................................................................... 34

*Herrlein v. Kanakis,*
  526 F.2d 252 (7th Cir. 1975) ........................................................... 16

*Hold v. Manzini,*
    736 So. 2d 138 (Fla. 3d DCA 1999).......................................................................... 39

*In re Aiken County,*
    725 F.3d 255 (D.C. Cir.2013) ................................................................................ 48

*In re Dean,*
    527 F.3d 391 (5th Cir. 2008)................................................................................. 29

*In re Grand Jury Subpoena (T-112),*
    597 F.3d 189 (4th Cir. 2010)................................................................................. 31

*In re Humana Inc. Managed Care Litigation,*
    285 F.3d 971 (11th Cir. 2002)................................................................................ 41

*In re United States,*
    345 F.3d 450 (7th Cir. 2003)................................................................................. 46

*Jackson v. BellSouth Telecommunications,*
    372 F.3d 1250 (11th Cir. 2004).............................................................................. 35

*Jacobs v. Parodi,*
    50 Fla. 541 (Fla. 1905) ........................................................................................ 35

*Jane Does 1 and 2 v. United States,*
    359 F. Supp. 3d 1201 (S.D. Fla. 2019)..................................................................... 3

*Jelencovich v. Dodge Enterprises, Inc.,*
    No. 09-81045-CIV, 2010 WL 289300 (S.D. Fla. Jan. 12, 2010) .......................... 24

*Klay v. All Defendants,*
    389 F.3d 1191 (11th Cir. 2004).............................................................................. 16

*Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co. of Florida,*
    827 F.2d 1454 (11th Cir. 1987).............................................................................. 24

*Landgraf v. USI Film Products,*
    511 U.S. 244 (1944) ............................................................................................. 17

*Lomayaktewa v. Hathaway,*
    520 F.2d 1324 (9th Cir. 1975)............................................................................... 18

*Marbury v. Madison*,
  5 U.S. 137 (1803) ........................................................................................ 27

*Martin v. Wilks*,
  490 U.S. 755 (1989) .............................................................................. 17, 18

*Mazzoni Farms, Inc., v. E.I. Dupont de Nemours & Co.*,
  671 So. 2d 306, 313 (Fla. 2000) ...................................................... 34, 38

*Mulhern v. Rogers*,
  636 F. Supp. 323 (S.D. Fla. 1986)........................................................... 38

*National Advertising Co. v. City of Miami*,
  402 F.3d 1335 (11th Cir. 2005) .............................................................. 49

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) .............................................................................. 41, 42

*Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*,
  451 U.S. 77 (1981) .................................................................................... 28

*PacifiCare Health Systems, Inc. v. Book*,
  538 U.S. 401 (2003) .................................................................................. 41

*Parklane Hosiery Co., Inc. v. Shore*,
  439 U.S. 322 (1979) .................................................................................. 15

*Petite v. United States*,
  361 U.S. 529 (1960) .................................................................................... 6

*Pettinelli v. Danzig*,
  722 F.2d 706 (11th Cir. 1984).................................................................. 38

*Plumpton v. Continental Acreage Development Co., Inc.*,
  830 So. 2d 208 (Fla. 5th DCA 2002) ...................................................... 39

*Power Financial Credit Union v. National Credit Union Administration Board*,
  494 Fed. Appx. 982 (11th Cir. 2012) ................................................ 44, 45

*Rakip v. Paradise Awnings Corp.*,
  514 F. App'x 917 (11th Cir. 2013).......................................................... 39

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996) ................................................................ 42

*Santobello v. New York*,
    404 U.S. 257 (1971) ........................................................................ 43

*School District of City of Pontiac v. Secretary of U.S. Department of Education*,
    584 F.3d 253 (6th Cir. 2009) ........................................................... 18

*Seh Ahn Lee v. United States*,
    895 F.3d 1363 (Fed. Cir. 2018) ....................................................... 35

*Slater v. United States Steel Corp.*,
    871 F.3d 1174 (11th Cir. 2017) ................................................... 41, 42

*State v. Garcia*,
    582 N.W. 2d 879 (Minn. 1998) ........................................................ 26

*State v. Mazzone*,
    212 W.Va. 368 (2002) ...................................................................... 27

*State v. Wall*,
    348 N.C. 671 (1998) ................................................................... 26, 27

*State of Indiana ex rel. Zoeller v. Pastick*,
    696 F. Supp. 970 (N.D. Ind. 2010) ............................................. 16, 17

*Steans v. Combined Insurance Co. of America*,
    148 F.3d 1266 (11th Cir. 1998) ....................................................... 17

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ........................................................................ 16

*Tepper Realty Co. v. Mosaic Tile Co.*,
    259 F. Supp. 688 (S.D.N.Y. 1966) ................................................... 41

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979) .......................................................................... 28

*United States v. Al-Arian*,
    514 F.3d 1184 (11th Cir. 2008) ....................................................... 43

*United States v. Armstrong*,
      517 U.S. 456 (1996) ........................................................................................ 48

*United States v. Baird*,
      218 F.3d 221 (3d Cir. 2000) .......................................................................... 44

*United States v. Batchelder*,
      442 U.S. 114 (1979) ........................................................................................ 48

*United States v. Bradley*,
      428 F.2d 1013 (5th Cir. 1970) ....................................................................... 31

*United States v. Cox*,
      342 F.2d 167 (5th Cir. 1965) ......................................................................... 46

*United States v. Diaz-Clark*,
      292 F.3d 1310 (11th Cir. 2002) ..................................................................... 32

*United States v. Fernandez*,
      960 F.2d 771 (9th Cir. 1991) ......................................................................... 35

*United States v. Fokker Services B.V.*,
      818 F.3d 733 (D.C. Cir. 2016) ................................................................. 47, 48

*United States v. Harvey*,
      869 F.2d 1439 (11th Cir. 1989) ..................................................................... 43

*United States v. Hill*,
      643 F.3d 807 (11th Cir. 2011) ....................................................................... 43

*United States v. HSBC Bank USA, N.A.*,
      863 F.3d 125 (2d Cir. 2017) .......................................................................... 47

*United States v. Hunter*,
      548 F.3d 1308 (10th Cir. 2008) ..................................................................... 29

*United States v. Hunter*,
      No. 2:07-CR-307-DAK, 2008 WL 153785 (D.Utah Jan. 14, 2008) .................... 30

*United States v. Microsoft Corp.*,
      56 F.3d 1448 (D.C. Cir. 1995) ....................................................................... 46

*United States v. Monzel,*
    641 F.3d 528 (D.C. Cir. 2011) ........................................................ 29, 33

*United States v. Skidmore,*
    998 F.2d 372 (6th Cir. 1993) ............................................................... 35

*United States v. Stolt-Nielsen,*
    524 F. Supp. 2d 609 (E.D. Pa. 2007) .................................................... 44

*United States v. Tilley,*
    964 F.2d 66 (1st Cir. 1992) .................................................................. 44

*United States v. Walker,*
    98 F.3d 944 (7th Cir. 1996) ............................................................ 25, 26

*Wayte v. United States,*
    470 U.S. 598 (1985) .............................................................................. 46

*Weingart v. Allen & O'Hare,*
    654 F.2d 1096 (5th Cir. 1981) .............................................................. 38

## <u>CONSTITUTION, STATUTES AND RULES</u>

U.S. Const. art. II, § 3 .................................................................... 46, 48

U.S. Const. art. III, § 2 ......................................................................... 49

18 U.S.C. § 1591 ..................................................................................... 5

18 U.S.C. § 2255 ..................................................................................... 9

18 U.S.C. § 2422 ..................................................................................... 5

18 U.S.C. § 2423 ..................................................................................... 5

18 U.S.C. § 3664(d)(5) .......................................................................... 32

18 U.S.C. § 3771 ............................................................................ *passim*

28 C.F.R. § 45.10 ............................................................................ 22, 45

Fla. Stat. § 796.03 ................................................................................... 7

Fla. Stat. § 796.07 ................................................................................................ 4, 7

Fed.R.Crim.P. 29(c) ............................................................................................ 31, 32

Fed.R.Crim.P. 35(a) ................................................................................................. 32

Fed.R.Crim.P. 41(c) ................................................................................................. 31

## **OTHER AUTHORITIES**

U.S. Department of Justice, Office of Legal Counsel (OLC), <u>The Availability of Crime Victims' Rights Under the Crime Victims' Rights Act of 2004</u>, (Dec. 17, 2010) ............................................................................................................ 22

Craig S. Morford, Acting Deputy Attorney General, <u>Selection and Use of Monitors in Deferred Prosecution Agreements and Non–Prosecution Agreements with Corporations</u>, (Mar. 7, 2008) ........................................................................................................... 23

Black's Law Dictionary (4th ed. 1968) ............................................................... 33

Black's Law Dictionary (6th ed. 1990) ............................................................... 31

Limited Intervenor Jeffrey Epstein, through counsel, respectfully files this Brief in opposition to Petitioners' Submission on Proposed Remedies (DE 458), and in reply to the Government's Response to Petitioners' Submission on Proposed Remedies (DE 462).

## <u>INTRODUCTION</u>

Petitioners are asking a federal court to do something that has never been done in the history of American jurisprudence. On the basis of a judgment finding that ***the government*** failed to comply with the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, Petitioners propose several lopsided remedies that benefit the government, (DE 462:14), and target only Mr. Epstein, a non-party to the litigation. Specifically, Petitioners seek: 1) a judicially-imposed reformation of the non-prosecution agreement ("NPA") to excise only the "immunity provisions" and eliminate all contractual consideration provided by the government to induce Mr. Epstein to enter into the NPA, and 2) an advisory opinion that the Constitution would permit a hypothetical future prosecution of Mr. Epstein by the United States Attorney's Office for the Southern District of Florida (USAO-SDFL) (hereinafter "Petitioners' Proposed Epstein Remedies"). (DE 458:4-5, 13 n.5). Neither proposed remedy has any principled legal basis.

Despite having expressly invoked the financial provisions of the NPA to obtain money from Mr. Epstein, and thereafter agreed in settlement agreements to not seek any further monetary or ***equitable*** remedies against him, Petitioners urge the Court to strip Mr. Epstein of the only provisions of the NPA that benefit him, ten years after he fully performed the NPA's obligations and endured its burdens. At the same time, Petitioners propose to leave intact those provisions of the NPA that benefitted them. Petitioners'

2

Proposed Epstein Remedies, if imposed, would punish only Mr. Epstein (a non-party) while releasing the government from its contractual obligations and allowing Petitioners and their counsel to retain all of their financial benefits resulting from Mr. Epstein's full performance.

Petitioners' premise for these drastic and unprecedented proposed remedies against Mr. Epstein is the baseless conclusion that Petitioners draw from a single factual finding in the Court's opinion granting summary judgment *against the government*.  (DE 435). Quoting directly from a stipulation between Petitioners and the government in connection with summary judgment litigation to which Mr. Epstein was not even a party, this Court found: "Epstein's counsel was aware that the [USAO-SDFL] was deliberately keeping the NPA secret from the victims and, indeed, had sought assurances to that effect." *Jane Does 1 and 2 v. United States*, 359 F. Supp. 3d 1201, 1208 (S.D. Fla. 2019) (DE 435:8, citing DE 407, at ¶48). Petitioners overstate that finding to argue that Mr. Epstein was "the instigator of – the Government's CVRA violations," and that Mr. Epstein acted with "unclean hands" and in "bad faith" with the "deliberate plan to violate the law." (DE458:16-19).  No conspiracy existed, and no such conclusions can be legally or logically inferred from the Court's factual findings. There was no finding that Mr. Epstein was in any way responsible for the CVRA violation found by the Court: the government's failure to confer with victims prior to September 24, 2007, when the NPA was signed.

Petitioners' proposed excision of the "immunity provisions" that Mr. Epstein bargained for, relied upon, and endured the consequences for: a) would violate Mr. Epstein's constitutional rights; b) is neither expressly authorized by the CVRA nor

3

available as an inherent remedy; c) contravenes well-established principles of contract law; and d) is not supported by the facts.  The Court should reject Petitioners' Proposed Epstein Remedies.

## **BACKGROUND**

On July 19, 2006, a grand jury in Florida's Fifteenth Judicial Circuit indicted Mr. Epstein on a single felony count of solicitation of prostitution, in violation of Fla. Stat. § 796.07. *See State v. Epstein*, 50-2006-CF-009454-AXXX-MB. While the state charge was pending, the Department of Justice began investigating whether Mr. Epstein's alleged conduct also violated federal law. The federal investigation was led by R. Alexander Acosta (U.S. Attorney) and a team of veteran prosecutors from the Southern District of Florida, including Jeffrey Sloman (First Assistant U.S. Attorney), Matthew Menchel (Chief, Criminal Division), Andrew Lourie (Deputy Chief, Northern Region), AUSA Karen Atkinson, and AUSA Anna Marie Villafaña. To defend against this federal investigation, Mr. Epstein retained counsel with expertise in federal law and federal jurisdiction, including a former federal appellate judge, a former United States Attorney, former Assistant United States Attorneys, the former Principal Deputy Chief of the DOJ Child Exploitation and Obscenity Section, and a Harvard Law School professor.

Counsel for Mr. Epstein referred the federal prosecutors to evidence from the state investigation that undermined the factual and legal bases for a federal prosecution of this local Palm Beach case. Among other things, the federal prosecutors reviewed contradictory sworn statements given by the same witnesses, and obvious inconsistencies between the reports of witness statements taken by the police and their actual sworn statements.  The

sworn statements, taken by police before defense counsel was ever retained, created other issues for the federal prosecutors because the statements indicated that women who were under the age of 18 told police that they misrepresented their age to Mr. Epstein to gain entry into his home.  The misrepresentations of age to Mr. Epstein negated an essential element of the federal statutes under consideration. (DE 361-43:4-5).  The federal prosecutors considered detailed statutory analyses and applicable case law which cast doubt on whether: a) federal jurisdiction existed to prosecute these local offenses; b) the federal statutes being contemplated for prosecution even applied to Mr. Epstein's alleged conduct; and c) federal jurisprudence provided precedential support for the application of the federal sex offense statutes to Mr. Epstein's alleged conduct.  *See* DE 361-46.  Jeffrey Sloman, the Former First Assistant United States Attorney who supervised the investigation, recently acknowledged that the federal prosecutors faced "significant legal impediments to prosecuting what was, at heart, a local sex abuse case." *See* Jeffrey Sloman, Alex Acosta Acted with Professionalism and Integrity in Handling the Jeffrey Epstein Case, Miami Herald Op-Ed, Feb. 15, 2019 (attached as Exhibit 1).

As the former Deputy Chief of the DOJ's Child Exploitation and Obscenity Section, Stephanie D. Thacker was an experienced former federal sex crimes prosecutor well versed in the application of federal law to alleged sex offenses. In her submission to the government, she explained:

> ***This is a case about purely local activity, involving local actors, and affecting local interests and thus, should be handled by local authorities***. Nonetheless, the USAO has indicated its intent to prosecute Mr. Epstein for purported violations of 18 U.S.C. §§ 2422, 2423, and 1591.  However, as set forth in detail in prior submissions, the facts of this case fall squarely outside

> the heartland of those statutes – in fact, in law, and in congressional intent. As their plain text and history indicate, those statutes were designed to address problems that are truly national and international in scope … Unlike the alleged conduct here, those problems unquestionably present multi-jurisdictional obstacles that States and localities cannot confront effectively on their own. Mr. Epstein's conduct was purely local in nature, and the State of Florida and Palm Beach County are effectively prosecuting and punishing that conduct.

Letter from Stephanie D. Thacker to John Roth, Sr. Assoc. Deputy Attorney General, June 19, 2008 (emphasis added) (attached as Exhibit 2). DOJ officials who reviewed the case acknowledged the many "compelling" arguments against the government's unprecedented, proposed application of federal statutes. (Exh. 2, at p.6). Given the pending state charge, it was also necessary for the federal prosecutors to consider whether the "*Petite* Policy," *see Petite v. United States*, 361 U.S. 529 (1960), set forth at 9-2.031 of the United States Attorneys' Manual, required it to decline a federal prosecution for the same alleged conduct being prosecuted by the State. *See* DE 361-43:23.

Counsel for the government and Mr. Epstein spent months negotiating, at arms-length, a resolution of the pending state charge and threatened federal charges. No bribes were paid to government officials. No threats or illegal inducements were made to them. No one in the government was coerced. No one's free will was overborne. No one obstructed justice. The seasoned federal prosecutors were not "wowed" by Mr. Epstein's counsel or impressed by Mr. Epstein's wealth. There was no backroom deal engineered by U.S. Attorney Alexander Acosta to curry favor with anyone, as has been publicly suggested. The lawyers on both sides were vigorous, but cordial, advocates. Indeed, by our count, more than fifteen (15) prosecutors and senior officials at the DOJ reviewed and

either authorized or helped negotiate the resolution of the matter.  *See, e.g.,* United States'
Second Supplemental Privilege Log (DE 329-1) (illustrating the number of prosecutors
involved in the decision-making over the NPA).

Ultimately, the parties agreed to a non-prosecution agreement regarding the federal
charges, which required Mr. Epstein to plead guilty to the pending state felony charge (Fla.
Stat. § 796.07), and to a new state felony charge of violating Fla. Stat. § 796.03 (Case No.
2008-CF-9381AXX), a charge requiring registration as a sex offender.  The NPA required,
*inter alia*, an 18-month sentence of incarceration, followed by 12 months of community
control, restitution, and sex offender registration.  (DE 361-62).  As in any hard-fought
negotiation, this resolution resulted, in part, from the government's recognizing weakness
in its legal positions and the risk of litigation.  *See* Exh. 1.  According to AUSA Villafaña,
who was the line prosecutor in the federal investigation, the government made the decision
to enter into the NPA out of a desire to obtain a guaranteed sentence of incarceration, the
equivalent of uncontested financial restitution for the victims, and guaranteed sex offender
registration. (DE 403-19:10, ¶18).

The government's decision to enter into the NPA was also influenced by its
consideration of the privacy interests of certain of the victims. According to AUSA
Villafaña, "our hope was that we could set up a system that would allow these victims to
get that restitution without having to go through what civil litigation will expose them to.
You have a number of girls who were very hesitant about even speaking to authorities
about this..."  (DE 403-19:163-64).  The NPA endured multiple levels of review by career
prosecutors both before its execution, (DE 329-1:1-6), and then after. (DE 329-1:6-18).

Senior members of the DOJ, including the heads of CEOS, a high-level representative of the Criminal Division and the Deputy Attorney General were consulted, received legal submissions, and fully approved the exercise of discretion by the federal prosecutors in the Southern District of Florida.

In the end, the Executive Branch exercised in good faith the unreviewable prosecutorial discretion afforded to it by Article II of the Constitution and the CVRA itself. *See* § 3771(d)(6) ("Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction."). First Assistant U.S. Attorney Jeffrey Sloman, who oversaw the investigation, has debunked the notion that "well-connected lawyers corrupted [ ] then-U.S Attorney Alex Acosta and his team into giving Epstein a sweetheart deal. They did not. I would know. I was there." (Exh. 1).

The NPA is a valid and binding agreement. It contains no illegal provisions nor is it against public policy. As the government readily concedes, (DE 462:6-7), Mr. Epstein fully performed his obligations under the NPA "in exchange for the benefits provided by this agreement." (DE 361-62:3). He pleaded guilty to two felonies in state court, which resulted in his serving thirteen months in jail,[1] followed by a year of community control, and his continuous registration as a sex offender for more than ten years. Moreover, Mr. Epstein was required by the NPA to waive his constitutional right to contest civil liability as to a list prepared by the government of potential plaintiffs whose identity would be

---

[1] The 13 months in jail that Mr. Epstein served on an 18-month sentence was the result of standard sentence computations by jail authorities applied to Mr. Epstein in the same manner as any other inmate.

revealed by the government to Mr. Epstein only *after* Mr. Epstein was incarcerated. (DE 361-62:5, ¶7). A Special Master – former Chief United States District Judge Edward B. Davis – was appointed to select an attorney-representative, Robert C. Josefsberg, Esq., whom the NPA required Mr. Epstein to pay to enable those unidentified plaintiffs to pursue civil monetary claims against himself under 18 U.S.C. § 2255. (DE 362-9).

The State of Florida, after communicating with federal prosecutors (*E.g.,* DE 329:10-11; DE 361-62:3), also accepted the NPA and relied upon it. State prosecutors brought a second more serious felony charge – one that required sex offender registration -- in order to satisfy the requirements of the NPA. A state court judge required a copy of the NPA as part of the plea colloquy, (Tr. 6/30/08, at p.40) (attached as Exhibit 3), and viewed the NPA "as a significant inducement in accepting this plea." (Exh. 3, at p. 39).

On June 30, 2008, Mr. Epstein began serving his state sentence. When Petitioners appeared at a status conference on this CVRA lawsuit on July 11, 2008, *knowing that Mr. Epstein was already incarcerated*, they chose to not proceed with the CVRA case on an emergency basis, (DE 15:24-25; DE 99:4), despite clear statutory provisions within the CVRA that required a decision to be made "forthwith" and that imposed other strict time limits measured in hours and days, not years. Moreover, at a hearing one month later, Petitioners' counsel stated that "because of the legal consequences of invalidating the current agreement, it is likely not in [the petitioners'] interest to ask for the [rescission] relief that we initially asked for." (DE 27:4).

Petitioners' counsel received a copy of the NPA on August 28, 2008. (DE 435:21). Thereafter, for nearly two years, Petitioners deliberately ceased all substantive activity in

this CVRA case in favor of pursuing civil monetary damages actions against Mr. Epstein. To that end, while Mr. Epstein was incarcerated, the two Petitioners, represented by the same counsel as in the instant case, filed civil complaints for monetary damages against Mr. Epstein in Palm Beach Circuit Court. *See E.W. v. Epstein*, Case No. 50-2008-CA-028058-XXXX-MB (Fla. 15th Jud. Cir.) (Jane Doe 1); *L.M. v. Epstein*, Case No. 50-2008-CA-028051-XXXX-MB (Fla. 15th Jud. Cir.) (Jane Doe 2).  Without explanation, one of the Petitioners (Jane Doe 2), represented by the Scott Rothstein firm, later filed an action against Mr. Epstein in federal court based on precisely the same facts as she alleged in her state court complaint. *See* (DE 1) in *L.M. v. Epstein*, Case No. 09-81092-Civ-KAM (S.D.Fla.).  Other individuals also filed civil actions against Mr. Epstein seeking monetary damages.  (DE 205-6:11-12).  In each of their complaints, and then in amended complaints, Petitioners and others specifically relied on the provisions of the NPA to obtain money from Mr. Epstein.  They alleged, among other things, that Mr. Epstein: a) had entered guilty pleas to the state crimes noted above; b) entered into the NPA with the federal government "acknowledging that [Petitioner] was a victim of his conduct;" and c) was "estopped by his plea and agreement with the Federal Government from denying the acts alleged in this Complaint, and must effectively admit liability to the Plaintiff."  (DE 403-16, at ¶¶18-20; DE 403-17, at ¶¶18-20; DE 205-6:11-12; 58-59, 89-90).  Petitioners leveraged the NPA as a valid and binding agreement by arguing that his obligations in that agreement precluded Mr. Epstein from exercising his constitutional right to contest liability in their monetary damage lawsuits. *See Doe No. 1 v. United States*, 749 F.3d 999, 1002 (11th Cir. 2014) ("As a basis for relief against Epstein in the civil suit, the victims relied on Epstein's waiver of

his right to contest liability in the non-prosecution agreement.").

Petitioners ultimately secured substantial monetary settlements of their civil claims against Mr. Epstein in July 2010, while the CVRA case was pending against the government. *See* Settlement Agreement and General Release between Jeffrey Epstein and Jane Doe 1 (E.W.) (partially redacted) (attached as Exhibit 4); Settlement Agreement and General Release between Jeffrey Epstein and Jane Doe 2 (L.M.) (partially redacted) (attached as Exhibit 5). Both settlement agreements contained the same "General Release" of Mr. Epstein which provided that Petitioners:

> HEREBY remise, release, acquit, satisfy, and forever discharge [Mr. Epstein and other potential defendants] *from all, and all manner of, action and actions* of [Petitioner], including State or *Federal,* cause and causes of action (common law *or statutory*), suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, *controversies*, agreements, promises, variances, trespasses, damages, judgments, executions, *claims, and demands whatsoever* in law or *in equity* for compensatory or punitive damages *that said First Parties ever had or now have*, or that any personal representative, successor, heir, or assign of said First Parties hereafter can, shall, or may have, *against Jeffrey Epstein* … for, upon, *or by reason of any matter, cause, or thing whatsoever* (whether known or unknown), *from the beginning of the world to the day of this release*.

*See* Exh. 4, ¶2; Exh. 5, ¶2 (emphasis added). Thus, in exchange for money, Petitioners expressly released Mr. Epstein from any federal claims for equitable relief by reason of any matter whatsoever, whether known or unknown, from the beginning of the world to the day of the release. Petitioners did not carve out from the General Release an exception for equitable remedies they might seek against Mr. Epstein in their pending CVRA lawsuit. Rather, with respect to the CVRA, Petitioners and Mr. Epstein agreed as part of the civil monetary settlements only that Petitioners "*may desire to use*" "certain correspondence

between Epstein's agents and federal prosecutors" "to prove a violation of her right to notice *by the government* …under the CVRA …," and that Petitioners must provide advance notice of their "intent to so use" that correspondence. *See, e.g.,* Exh. 4, Addendum, ¶3 (emphasis added); Exh. 5, Addendum, ¶3.

On September 8, 2010, this Court ordered the CVRA case closed "[i]n light of the underlying settlements between the victims and Mr. Epstein," (DE 38), and issued an Order to show cause why the case should not be dismissed "for lack of prosecution" given the "lack of activity for nearly seventeen months." (DE 40). In an effort to revive the CVRA lawsuit they had abandoned, Petitioners defended their inaction by arguing that "[i]t seemed reasonable to the victim[s] to resolve those [civil] cases first and then turn to the CVRA case…" (DE 41:6). Petitioners acknowledged the finality of their settlement with Mr. Epstein by contrasting him with the government, emphasizing to this Court that "while they had settled their case with Jeffrey Epstein, they had reached no settlement *with the U.S. Attorney's Office*…" (DE 41:1) (emphasis in original). Petitioners did not reveal at that time that they would later seek to engineer an end-run around the General Release language they agreed to in connection with their monetary settlements by using a CVRA lawsuit against the government to obtain extraordinary equitable relief against Mr. Epstein: judicial reformation of the very NPA that Petitioners relied upon and sought to enforce against Mr. Epstein in their civil lawsuits.

Thereafter, for the next nine years, Petitioners litigated their CVRA case against the government. When issues arose in that case that directly implicated Mr. Epstein's and his counsel's legal privileges, they intervened for the limited purpose of asserting those

privileges, both in the district court, and on appeal to the Eleventh Circuit.  *See Doe No. 1,*

*supra*.  That there would be no judgment against Mr. Epstein at the end of this CVRA

litigation, however, was understood throughout the litigation.  As the Eleventh Circuit

observed on appeal from this Court's order requiring disclosure of defense counsel's plea

negotiation correspondence, "Epstein's only opportunity to challenge the disclosure order

is *now* because ***there will not be an adverse judgment against him or his attorneys.***  The

district court instead will enter any judgment against either the victims or the United

States."  *See Doe No. 1*, 749 F.3d at 1005 (emphasis added).  Beyond that, when Mr.

Epstein suggested he be permitted to participate in mediation in this case after this Court

had granted Mr. Epstein's motion for limited intervention at the remedy stage, Petitioners

opposed that request, writing that:

> the case has not yet reached any remedy stage where [Epstein] might have a
> more direct interest.  More important, the issues to be mediated at this stage
> involve the victims' pending motion for summary judgment (DE 361), which
> seeks summary judgment ***only against the Government – not Epstein***.

(DE 388:2) (emphasis added).  Petitioners' counsel also argued during a telephone status

conference that "until we have certainly reached that juncture [the remedy phase], he

[Epstein] is like any other citizen that has no interest in the case." (DE 461:18).  Moreover,

whereas Petitioners supported the motion of Jane Does 3 and 4 to formally join as parties

to the litigation, (DE 280:11), Petitioners did not file a motion to join Mr. Epstein as a

party.

On February 21, 2019, this Court granted partial summary judgment against the

government "to the extent that Petitioners' right to conferral under the CVRA was

violated." (DE 435:33). As a result of that judgment ***against the government,*** Petitioners now seek to impose remedies ***against Mr. Epstein*** that would deprive him of the entire consideration he received in exchange for pleading guilty, serving time in jail, registering as a sex offender, and paying substantial money damages and fees to Petitioners and their attorneys. ***Undersigned counsel know of no precedent, ever, where a citizen who had fully performed his obligations under a contract with the government, and did not breach it, was stripped of its benefits without even being a party to the litigation, on the basis that the government was found to have violated the statutory rights of third parties prior to entering into the contract.*** Petitioners' Proposed Epstein Remedies should be rejected.

<u>**ARGUMENT**</u>

## I.   PRINCIPLES OF PROCEDURAL DUE PROCESS PRECLUDE IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES

Petitioners' proposal to excise the "immunity provisions" from the NPA seeks a remedy that substantially harms Mr. Epstein and frees the government from the constraints of the NPA by allowing the government "to seek prosecution of Epstein and his coconspirators…" (DE 458:22). As the government itself recognized, Petitioners' Proposed Epstein Remedies reward the government, the purported CVRA offender, by "allow[ing] the government to enjoy all the benefits of Epstein's compliance without binding it to its commitments under the NPA." (DE 462:21).

Petitioners contend that their proposed remedies against Mr. Epstein are permitted because Mr. Epstein's counsel acted in "bad faith," have "unclean hands," and were the

"instigators" of the CVRA violation, and because the NPA is an "illegal agreement" based on "illegal promises." (DE 458:17-19, 21). Remarkably, Petitioners argue that the government has the "power to provide all the various remedies being sought through the lawsuit…" and "agree to the remedies," (DE 458:12), as if the government has the legal authority at the initiative of a third party to breach a binding contract after full performance by its counterparty. Petitioners have lost their way; their arguments are a distortion of the facts and demonstrate a flawed understanding of principles of due process. There is neither a legal basis nor a factual basis for any remedies that impair Mr. Epstein's rights.

### A.    Mr. Epstein was not a Party to the Underlying Litigation and There is no Judgment Against him

Summary judgment was granted against the government, not against Mr. Epstein. Therefore, there can be no remedy that prejudices him. Moreover, none of the Court's actual factual findings, nor, more importantly, any of the baseless inferences Petitioners seek to draw from the findings that were entered by the Court, may be applied against Mr. Epstein. As such, the entire premise for Petitioners' Proposed Epstein Remedies fails.

"It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). "It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.7 (1979). "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate'

the claims and issues settled in that suit.  The application of claim and issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court."  *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) (citation omitted).  Contrary to Petitioners' argument that "all of the Court's previous holdings are now law of the case," (DE 458:13), the "law of the case doctrine does not bind nonparties." *Klay v. All Defendants*, 389 F.3d 1191, 1198 n.5 (11th Cir. 2004).  To direct harsh remedies at Mr. Epstein is "antithetical to the primary axiom of our jurisprudence that no man shall be subject to judicial sanction without the opportunity for a hearing on the merits of the claim."  *Herrlein v. Kanakis*, 526 F.2d 252, 255 (7th Cir. 1975).

Granting extraordinary relief against Mr. Epstein – relief that frees his adverse party, the government, from its contractual obligations under the NPA -- on the basis of a judgment that the government did not comply with its statutory obligations would violate principles of procedural due process.  Petitioners did not name or seek to join Mr. Epstein as a party at the liability phase.  The fact that Mr. Epstein moved for limited intervention at the remedy stage to oppose any prejudicial and illegal relief against him is of no moment, as the Eleventh Circuit has already expressly rejected Petitioners' argument that by virtue of his limited intervention, Mr. Epstein "has made himself an ordinary litigant."  *Doe No. 1*, 749 F.3d at 1005; *see also State of Indiana ex rel. Zoeller v. Pastick*, 696 F. Supp. 2d 970, 993 n.18 (N.D. Ind. 2010) ("The fact that the Foundations have moved to intervene [ ] does not now mean that the Foundations have had a right to be heard as to their potential liability in this case. The Foundations moved explicitly 'for the limited purpose of

objecting to any relief sought against the Foundations' … and plaintiffs have made no attempt to join them as parties to litigate the issue of the Foundations' liability.").

To be sure, the law has been settled for thirty years that "a party seeking a judgment binding on another cannot obligate that person to intervene; he must be joined." *Martin v. Wilks*, 490 U.S. 755, 763 (1989), *superseded by statute in not relevant part as stated in Landgraf v. USI Film Products*, 511 U.S. 244 (1944).  As the Supreme Court stated:

> The parties to a lawsuit presumably know better than anyone else the nature and scope of relief sought in the action, and at whose expense such relief might be granted. It makes sense, therefore, to place on them a burden of bringing in additional parties where such a step is indicated, rather than placing on potential additional parties a duty to intervene when they acquire knowledge of the lawsuit.

*Id.* at 765; *Steans v. Combined Ins. Co. of America*, 148 F.3d 1266, 1270 (11th Cir. 1998) (citing *Martin v. Wilks* and refusing to allow an Order to bind a non-party); *see also Chase Nat'l Bank v. Norwalk*, 291 U.S. 431, 441 (1934) ("The law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger …. Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights.").  Therefore, even assuming there was a factual basis in the record for Petitioners' assertions that Mr. Epstein's counsel has "unclean hands" and acted in "bad faith" – which there is not, *see* Argument I.B., *infra* – those findings and conclusions cannot be applied against Mr. Epstein.

Significantly, Petitioners cite no case in which a Court rescinded or reformed a contract to prejudice a contracting party who was not even a party to the litigation.  The

reason is rooted in principles of procedural due process.  "It is hornbook law that all parties to a contract are necessary in an action challenging its validity…."  *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 303 (6th Cir. 2009).  "No procedural principle is more deeply imbedded in the common law that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."  *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975).  As this Court has recognized, "a contracting party is the paradigm of an indispensable party."  *HDR Eng'g, Inc. v. R.C.T. Eng'g, Inc.*, No. 08-81040-CIV-KAM, 2010 WL 2402908, *2 (S.D.Fla. June 15, 2010) (citation omitted).  "Parties to a contract are indispensable when a suit concerns the rights and obligations afforded by the contract."  *Id.* When the government moved to dismiss the CVRA lawsuit on the basis that due process precluded the invalidation of Mr. Epstein's contractual rights because he was not a party, (DE 205-2:5-6), Petitioners first opposed the motion and thereafter opted to not join Mr. Epstein as a party.  In so doing, Petitioners necessarily decided to forego any remedies against him. *Martin v. Wilks, supra.*

The absence of any process deprived Mr. Epstein of the ability to contest numerous allegations and stipulations at the liability phase. For example, the Court accepted the government's concession that Petitioners met the definition of "crime victims" under the CVRA, (DE 189:4), which requires that they have been "directly and proximately harmed as a result of the commission of a ***Federal*** offense" under 18 U.S.C. § 3771(e)(2)(A) (emphasis added).  But there was no federal charge against Mr. Epstein and no finding of which federal offense, if any, Mr. Epstein had committed against the Petitioners.  The

absence of any basis to prosecute Mr. Epstein for a federal offense was a point of particular contention by him during the federal investigation.  As another example, at the July 11, 2008 hearing, the government did not object to a delayed decision in this matter when Petitioners agreed with the Court that there was no longer an emergency and an immediate resolution was not necessary. (DE 15:24-27; DE 99:4). At that time, Mr. Epstein had already begun serving the sentence required by the NPA and was incarcerated. The stipulated delay ensured that the mandatory time deadlines in the CVRA would be exceeded, to Mr. Epstein's detriment, because he would be forced to endure all of the burdens of the NPA before a decision would ever be issued in this case.  *See* Argument II.B., *infra.*  In sum, imposition of Petitioners' Proposed Epstein Remedies would violate Mr. Epstein's constitutional right to due process of law.

> **B.     There was no Judicial Finding of "Bad Faith" or an "Illegal Agreement" and no Factual Basis for any Such Findings**

Even assuming, *arguendo*, that the Constitution would ever permit a finding against the government to be the basis for imposition of extraordinary remedies against a non-party, nowhere in the Court's opinion (DE 435) was there a finding that Mr. Epstein's counsel acted in "bad faith" with the deliberate intent to violate the CVRA or that the government's non-prosecution agreement with Mr. Epstein was an "illegal agreement." Thus, there is no ***factual*** basis in the record for imposition of Petitioners' Proposed Epstein Remedies.

### i. Mr. Epstein's Counsel Acted in Good Faith

The Court's finding that "Epstein's counsel was aware that the [USAO-SDFL] was deliberately keeping the NPA secret from the victims and, indeed, had sought assurances to that effect" was based on a stipulation between Petitioners (DE 361:19 & n.62) and the government (DE 407:7), during the liability phase of this case.[2] From that stipulation, which the government had no motive to contest or clarify on Mr. Epstein's behalf, Petitioners now attribute to the Court findings that it did not make about the intent and motives of Mr. Epstein's counsel. The Court made no such findings, and beyond that, the record conclusively refutes any bad faith.

The essence of the CVRA violation, as found by the Court, was that "the Government failed to advise the victims about its intention to enter into the NPA," *i.e.,* before September 24, 2007. (DE435:32; DE435:7-8). The Court reasoned that "the CVRA required the Government to inform Petitioners that ***it intended to*** enter into an agreement not to prosecute Epstein" and that Petitioners "should have been notified of the Government's intention to take that course of action ***before*** it bound itself under the NPA." (DE 435:27) (emphasis added). Although the parties "anticipate[d]" that the NPA "will not be made part of any public record," (DE 361-62:6), **nowhere in the record is there**

---

[2] On February 10, 2016, Petitioners filed a "Consolidated Statement of Undisputed Material Facts" as part of their motion for partial summary judgment, containing 157 separately-numbered paragraphs with facts Petitioners claimed were undisputed. (DE 361:7-47). Paragraph 48 of Petitioners' submission contains the allegation regarding the "awareness" and "assurances." (DE 361:19). On June 6, 2017, the USAO-SDFL filed its response to each of the numbered paragraphs, (DE 407), either admitting or denying (with amplification) those facts. The USAO-SDFL admitted paragraph 48, (DE 407:7), so we refer to it as a stipulation.

**any evidence that Mr. Epstein's counsel, prior to September 24, 2007, urged the government not to consult with Petitioners about the government's intentions**.

The stipulation relies on exhibits (DE 361-63; DE361-66; DE 361-67) that do not support a finding that Mr. Epstein's counsel urged the government to conceal the NPA from Petitioners or any other victims prior to its execution.  Mr. Epstein's counsel never conditioned his agreement to the NPA on non-disclosure to victims of the intended resolution.  And, despite full disclosure to Petitioners during this litigation of all communications between Mr. Epstein and the government, Petitioners do not cite a single instance, prior to September 24, 2007, where Mr. Epstein's counsel either mentioned the CVRA or urged non-disclosure to victims of the intended resolution of the matter. Rather, Petitioners and the government stipulated, and the Court found, as follows: "*After the NPA was signed*, Epstein's counsel and the [USAO-SDFL] *began* negotiations about whether the victims would be told about the NPA." (DE 361-19; DE 407-7; DE 435:8-9) (emphasis added).  Thus, there is no record support for Petitioners' claims that Mr. Epstein was the "instigator" of the CVRA violation or that "the parties *negotiated* [the NPA] in deliberate violation of the victims' rights under the Crime Victims' Rights Act…"  (DE 458:16) (emphasis added).

After the NPA was signed, Mr. Epstein's counsel rightfully advocated that the USAO-SDFL adhere to the "Attorney General Guidelines for Victim and Witness Assistance," which were issued in May 2005 (before this case).  (DE 403-15).  Those Guidelines, which the USAO-SDFL was not free to disregard, determined that the CVRA applied only "if the offense is charged in Federal district court."  (DE 408:20-21, DE 403-

21

13; DE 403-15).   The U.S. Department of Justice, Office of Legal Counsel ("OLC") confirmed this in 2010, noting that "the CVRA is best read as providing that the rights identified in section 3771(a) are guaranteed from the time that criminal proceedings are initiated (by complaint, information, or indictment) and cease to be available if all charges are dismissed either voluntarily or on the merits (or if the Government declines to bring formal charges after the filing of a complaint.)."   U.S. Department of Justice, Office of Legal Counsel (OLC), The Availability of Crime Victims' Rights Under the Crime Victims' Rights Act of 2004, 1 (Dec. 17, 2010).   At the time the NPA was signed, there was no case law which would even arguably challenge the DOJ's guidelines nor anything to suggest that, by urging the USAO-SDFL to follow its own national guidelines, Mr. Epstein's counsel would be acting in bad faith.[3]

Although Mr. Epstein's counsel requested that the USAO-SDFL follow its own national guidelines with respect to the CVRA after the NPA was signed, counsel also reiterated in December 2007 that "*we do not object (as we made clear in our letter last week) that some form of notice be given to the alleged victims*."   (DE 403-15:3) (emphasis added).   To be sure, the NPA itself contemplated notification to the alleged victims through

---

[3] The CVRA required the Attorney General to "promulgate regulations to enforce the rights of crime victims and to ensure compliance by responsible officials with the obligations described in law respecting crime victims."  18 U.S.C. § 3771(f)(1).  The Attorney General did just that.  *See* 28 C.F.R. § 45.10. Furthermore, the CVRA provides that the Attorney General or his/her designee shall be the "final arbiter," without judicial review, of any complaints filed against responsible officials under the CVRA.  18 U.S.C. § 3771(f)(2)(D). This was a proper delegation of authority. *See Gundy v. United States*, ____ U.S. ___, 2019 WL 2527473 (June 20, 2019) (plurality opinion).  There was no basis for Mr. Epstein to believe that the DOJ's guidelines had misinterpreted the notice provisions of the CVRA.

their attorney-representative who would be selected by a process that included a Special Master, former Chief Judge Davis, who himself was notified about the NPA in October 2007.  (DE 361-62:5).

The fact that Mr. Epstein's counsel sought to keep the NPA outside the public record was hardly unusual as non-prosecution agreements are not filed in any court.  *See* Craig S. Morford, Acting Deputy Attorney General, <u>Selection and Use of Monitors in Deferred Prosecution Agreements and Non–Prosecution Agreements with Corporations</u>, at 1 n. 2 (Mar. 7, 2008) (with an NPA, "formal charges are not filed and the agreement is maintained by the parties rather than being filed with a court").  According to AUSA Villafaña, confidentiality of an NPA is the norm, not the exception; this was no concession granted to Mr. Epstein.  (DE 403-19:18, ¶30) ("As courts have acknowledged, NPAs are not made part of a public court file but are maintained by the prosecutor's office...the assurance that I would not distribute...the NPA was simply an assurance that I intended to abide by Office and Department policy and law.").

There is simply no evidence of impropriety by Mr. Epstein's counsel either before or after the NPA was signed.  (DE 408:21-23).  Rather, federal law enforcement's decision to not consult with Petitioners was made, not for Mr. Epstein's benefit, but rather to protect their own prosecutorial interests.  (DE 14:5) (DE 403-19, ¶21) (AUSA Villafaña: "I did not want to share with victims that the Office was attempting to secure for them the ability to obtain monetary compensation for the harm they had suffered.  I was aware that, if I disclosed that and the negotiations fell through, Epstein's counsel would impeach the victims and my credibility by asserting that I had told victims they could receive money

for implicating Epstein."); (DE 403-18, ¶21) (FBI Special Agent E. Nesbitt Kuyrkendall: "I was concerned that if the victims were informed of the Non-Prosecution Agreement, which included an option for victims to seek monetary damages in a civil matter, then Epstein's counsel would use the notifications to impeach me and the victims if a prosecution were to proceed in the future."); (DE 403-19, ¶34) (DE 408:17); (DE 427:15).

The CVRA imposed no obligations on Mr. Epstein to notify victims of his intent to enter into an NPA or to assure that the right of conferral was implemented. Responsibility for compliance with the CVRA falls exclusively on the government. Knowing that the decision rests squarely with the government, it cannot be bad faith for defense counsel to argue that the USAO-SDFL should follow its own national guidelines regarding the inapplicability of the CVRA to NPAs. Lawyers do not act in "bad faith" by making such arguments, especially considering that there was no developed case law with respect to this issue. *Cf. Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co. of Florida*, 827 F.2d 1454, 1458 (11th Cir. 1987) ("Rule 11 is intended to deter frivolous lawsuits, not to deter legal arguments or cases of first impression."); *accord Jelencovich v. Dodge Enters, Inc.*, No. 09-81045-civ, 2010 WL 289300 (S.D. Fla. Jan. 12, 2010) ("While the Court ultimately disagreed with Plaintiff's legal theory, this alone cannot form a basis for sanctions under either Rule 11 or Section 57.105, particularly where there is a lack of developed case law with respect to the particular theory."). That defense counsel advanced the interests of their client is precisely what the Sixth Amendment requires.

### ii.        The NPA is a Legal Agreement

The Court "simply rul[ed] that, under the facts of this case, there was a violation of the victims rights under the CVRA." (DE 435:33). The Court did not rule that the NPA was an illegal agreement. To the contrary, the Court specifically wrote that it was "not ruling that the decision not to prosecute was improper." (DE 435:32-33). Petitioners have not identified a single clause within the NPA that is contrary to law, outside the prosecutor's authority, or against public policy. Rather, Petitioners acknowledged that the terms of the NPA were within the government's discretion. (DE 15:6-7, 22).

Nonetheless, Petitioners repeatedly refer to the NPA as an "illegal agreement," an "illegal non-prosecution agreement," or an agreement "vitiated by illegality," in a misguided effort to analogize the NPA to cases where illegal promises were not enforced by the courts or plea agreements were stricken for illegal provisions within the agreements themselves. (DE 458:15-17). The cases cited by Petitioners are easily distinguished and do not stand for the propositions for which Petitioners cite them. Rather, they stand for the unremarkable proposition that a court may not enforce promises or contractual terms that, unlike the provisions of the NPA, are illegal on their face.

For example, Petitioners' discussion of their primary case, *United States v. Walker*, 98 F.3d 944 (7th Cir. 1996), is entirely confused and off-base. In *Walker*, the issue was whether defendant was entitled to specifically enforce a mistaken oral representation made by the district court at his arraignment that the sentence on his new charges would run concurrent with the parole violation sentence he was currently serving. *Id.* at 945-46. The district court ultimately imposed a consecutive sentence, instead of the concurrent one the

court had mistakenly suggested at the arraignment, because the law required consecutive sentences. On appeal, the Seventh Circuit held that the defendant's remedy was not to specifically enforce the district court's mistaken representation about concurrent sentences but, rather, to seek to withdraw his plea on the basis that the mistaken representation induced him to plead guilty. *Id.* at 947. The defendant simply chose the wrong remedy because one cannot seek to specifically enforce a sentence that is contrary to law.

Contrary to Petitioners' repeated contention, the defendant in *Walker* had not "forfeited the right to seek specific performance" of an illegal agreement, (DE 458:15-16; DE 127:9), but rather had forfeited his right to withdraw his plea by failing to seek that remedy when the district court did not fulfill the representation he made at the arraignment. *Walker*, 98 F.3d at 947. *Walker* has nothing to do with forfeiting rights to specific performance of an NPA or any other agreement. (DE 458:16).

The other cases cited by Petitioners involved plea agreements containing (or challenged as containing) unlawful terms or promises that, to be performed, would have required the respective courts to impose sentences that were contrary to law. They stand for the unassailable proposition, not present here, that a court cannot enforce facially invalid plea agreements that contain illegal terms or omit the required components of a sentence. *Craig v. People*, 986 P.2d 951, 959-60 (Colo. 1999) (court cannot enforce a plea agreement that waives the mandatory parole period); *State v. Garcia*, 582 N.W. 2d 879, 881-82 (Minn. 1998) (plea agreement promised a sentence that did not contain the statutorily-required 10-year conditional release term); *State v. Wall*, 348 N.C. 671, 675-76 (1998) (holding that court cannot enforce a plea agreement for concurrent sentence where

law mandated consecutive one); *Ex parte Rich*, 194 S.W.3d 508, 515 (Tex. Crim. App. 2006) (court cannot enforce an illegal sentence below the statutory range; remedy was for defendant to withdraw his plea); *State v. Mazzone*, 212 W.Va. 368, 374 (2002) (court would not enforce plea agreement that called for court to unlawfully sentence the defendant by treating two misdemeanor offenses as felony offenses).  None of the cases stand for the proposition, urged by Petitioners, that the appropriate remedy for a CVRA violation is to excise a *legal* term (*i.e.,* the "immunity provisions") from the NPA.  *See* DE 462:20 n.16.

## II.   THE CVRA ITSELF PRECLUDES IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES

Petitioners argue that because the CVRA does not expressly exclude the judicial reformation of a non-prosecution agreement as a possible remedy, the CVRA impliedly authorizes that remedy.  (DE 458:8, 10).  The Government's Response to Petitioners' Submission on Proposed Remedies ("Government's Response"), (DE 462:7-13), eviscerates Petitioners' contention that the scope of remedies permitted under the CVRA is virtually limitless.  Beyond that, the CVRA does not authorize the imposition of any remedies against Mr. Epstein eleven (11) years after Petitioners filed their CVRA petition.

### A.   Judicial Reformation of an NPA is not an Authorized Remedy

Citing cases dating back to *Marbury v. Madison*, 5 U.S. 137, 163 (1803), and emphasizing the "broad remedial structure surrounding the CVRA," Petitioners argue that this Court has the "power to grant any appropriate relief" because the CVRA contains only a "few, narrowly drawn limitations on remedies."  (DE 458:7-8).  Petitioners misread the CVRA and rely on broad generalities in lieu of case law directly interpreting the statute.

"[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines, Inc. v. Transp.t Workers Union of America, AFL-CIO*, 451 U.S. 77, 97 (1981). "The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs." *Id.*

The CVRA contains just such a comprehensive legislative scheme. The structure of the statute – including its prompt deadlines for victims to seek enforcement of the ten separate rights listed in 18 U.S.C. § 3771(a) and the strictly limited and time-sensitive circumstances under which victims may seek to re-open a plea or sentence, *see* § 3771(d)(3) and (d)(5)(A)-(C) – is designed to ensure immediate remedial action while a case is pending and before an agreement has been fully performed. The statute does not delegate authority to a court to sanction non-compliance, impose measures that are punitive against an individual, interfere with prosecutorial discretion, or re-write terms of an agreement between the government and an individual. Sanctions for non-compliance by the government are delegated to the Attorney General for self-enforcement, based on complaints from victims.

Contrary to Petitioners' argument, (DE 458:8-9), the "limitation on relief" provision of § 3771(d)(5) does not, by implication, mean that any and all other remedies are available. Section 3771(d)(5) provides a strict limitation on whether and when a plea or sentence may

28

be re-opened.  It does not imply that specific clauses in non-prosecution agreements may be struck eleven years after the fact.  Because this same provision served as the basis for the Court's conclusion that rescission of an NPA, being akin to re-opening a plea, was an authorized remedy under the CVRA, (*see* DE 462:15 n.13, citing DE 189:7-9), then the same "only if" limitations in § 3771(d)(5)(A)-(C) must apply to whether and when an NPA may be invalidated.  Those limitations preclude Petitioners' Proposed Epstein Remedies.

Two CVRA appellate decisions, not cited by Petitioners, reject Petitioners' "implied remedies" construct.  In *United States v. Monzel*, 641 F.3d 528, 531-33 (D.C. Cir. 2011), the D.C. Circuit observed that the CVRA's "carefully crafted and detailed enforcement scheme" provides "strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Monzel*, 641 F.3d at 542 (emphasis in original) (citation omitted).  In *United States v. Hunter*, 548 F.3d 1308, 1315 (10th Cir. 2008), the Court refused to "read additional remedies" into the CVRA beyond those expressly contained therein.  In the only CVRA case cited by Petitioners, *In re Dean*, 527 F.3d 391 (5th Cir. 2008), the Fifth Circuit did not grant a remedy, much less decide that a court may simply re-write the terms of a non-prosecution agreement as directed by a third party.

Moreover, an interpretation of the CVRA that would allow a district court to impose the "implied remedy" of re-writing the terms of a non-prosecution agreement, or invalidating "immunity provisions," after an individual had served his time in jail and paid substantial money damages, would require this Court to decide the serious constitutional questions raised herein regarding due process and separation of powers.  Under the doctrine

of constitutional avoidance, courts should construe a statute to avoid serious constitutional problems unless such a construction is plainly contrary to the intent of Congress. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Accordingly, this Court should construe the CVRA to avoid reaching those questions.

### B. The Remedies Sought by Petitioners Against Mr. Epstein are Time-Barred under the CVRA

Section 3771(d)(3) provides as follows:

> The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred. ***The district court shall take up and decide any motion asserting a victim's right forthwith***. If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus. The court of appeals may issue the writ on the order of a single judge pursuant to circuit rule or the Federal Rules of Appellate Procedure. The court of appeals shall take up and decide such application forthwith within 72 hours after the petition has been filed, unless the litigants, with the approval of the court, have stipulated to a different time period for consideration. In deciding such application, the court of appeals shall apply ordinary standards of appellate review. ***In no event shall proceedings be stayed or subject to a continuance of more than five days for purposes of enforcing this chapter***. If the court of appeals denies the relief sought, the reasons for the denial shall be clearly stated on the record in a written opinion.

(Emphasis added). Thus, the CVRA mandates that a district court ***shall*** decide any motion asserting a victim's right ***forthwith***. Moreover, the statute expressly prohibits a stay or continuance of more than "five days" under any circumstances for purposes of enforcing this chapter. *But see United States v. Hunter*, No. 2:07-CR-307-DAK, 2008 WL 153785, *1 (D.Utah Jan. 14, 2008) (court stating that it is "ambiguous" whether these restrictions refer to continuances in the district court or in the court of appeals).

30

Black's Law Dictionary 654 (6th ed. 1990) defines "forthwith" as "Immediately; without delay; directly; within a reasonable tine under the circumstances of the case; promptly and with reasonable dispatch." The former Fifth Circuit discussed the concept of "forthwith" in the context of executing a search warrant under a former version of Fed.R.Crim.P. 41(c), as follows:

> The word 'forthwith' is deliberately undefined, in our view, to allow courts to interpret it in the context of 'reasonableness,' on a case-by-case basis. We are convinced that 'forthwith' requires no more or less than reasonable promptness, diligence or dispatch in executing a warrant, considering the difficulties actually encountered in attempting to perform the task. ***The command of 'forthwith' clearly will not tolerate delay 'when deliberate and made by the officers for the purpose of selecting their own time and for their own purpose', especially where that purpose is to prejudice the rights of a suspect***.

*United States v. Bradley*, 428 F.2d 1013, 1016 (5th Cir. 1970) (emphasis added). Courts measure the term "forthwith" in days. *See, e.g., Amelia v. United States*, 732 F.2d 711, 713 (9th Cir. 1984) (service of process 63 days not "forthwith"); *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 202-03 (4th Cir. 2010) (five months delay to produce documents under subpoena not "forthwith"); *Halperin v. United States*, 610 F. Supp. 8, 10 (S.D.Fla. 1985) (service of process 93 days after filing complaint not "forthwith"). In using the term "forthwith" in the CVRA, Congress plainly contemplated that same degree of swiftness, as the same subsection of the CVRA defines time periods in hours (72) and days (5), not years or, as in this case, more than a decade. These time limits were expressly "framed to resist ad hoc relaxation" and, thus, may fairly be characterized as "rigid." *Cf. Carlisle v. United States*, 517 U.S. 416, 434-36 (1996) (Ginsburg, J., together with Souter and Breyer, JJ., concurring) (interpreting strict time limit under Fed.R.Crim.P. 29(c)).

31

Courts have often grappled with the effect that missing a deadline imposed by a statute or rule has on the court's authority to act. In some instances, courts have deemed the deadline to be a condition which cannot be waived or extended and, if missed, prohibits the court from acting. *See Carlisle,* 517 U.S. at 421-28 (district court lacked authority to grant a post-verdict motion for judgment of acquittal filed one day outside the time limit prescribed by Fed.R.Crim.P. 29(c)); *United States v. Diaz-Clark*, 292 F.3d 1310, 1319 (11th Cir. 2002) (holding that "there exists no 'inherent authority' for a district court to modify a sentence" outside the time limit in Rule 35(a)). In other instances, courts view a deadline as "seek[ing] speed by creating a time-related directive that is legally enforceable but does not deprive a judge … of the power to take the action to which the deadline applies if the deadline is missed." *Dolan v. United States*, 560 U.S. 605, 611 (2010) (the fact that a sentencing court missed the 90-day deadline "for the final determination of the victim's losses" under 18 U.S.C. § 3664(d)(5) did not deprive the court of the power to order restitution).

This Court, however, need not decide whether missing a mandatory deadline under the CVRA *ipso facto* deprives it of the authority to grant relief. Nor does this Court need to alternatively decide at what point past the mandatory deadline its discretion is circumscribed. Whatever the elasticity, if any, of the CVRA's time limits, there are no conceivable circumstances in which a delay of eleven years can be considered "forthwith," particularly where the first two years of that delay are directly attributable to deliberate inaction by Petitioners, knowing that Mr. Epstein was incarcerated and enduring the consequences of the NPA. The command of "forthwith" under the CVRA simply does not

tolerate deliberate inaction or an extraordinary delay.

In that regard, the decision in *Monzel* is easily distinguished. There, the Court decided a petition for writ of mandamus under the CVRA approximately three (3) months after it was filed. The Court reasoned that "[a]lthough the statute leaves us no room to set aside the 72-hour deadline, the multiple issues of first impression this case raises, involving several statutes and conflicting views among the circuits, called for oral argument and a published opinion that is being issued past the deadline." *Monzel,* 641 F.3d at 532. The Court was not faced with a deliberate delay by the CVRA petitioners to pursue civil monetary claims, an extraordinary delay that exceeded a decade, nor prejudice to a non-party to the CVRA action. The strict deadlines in the CVRA would be rendered entirely meaningless if they could be disregarded under the circumstances presented in this case. Petitioners' Proposed Epstein Remedies are statutorily time-barred.

## III. PRINCIPLES OF CONTRACT LAW PRECLUDE IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES

### A. A Court may not Re-write an Agreement Between Two Contracting Parties to Eliminate all Benefits to one Party

Rescission means "[a]nnulling or abrogation or unmaking of [a] contract and the placing of the parties to it in status quo." Black's Law Dictionary (4th ed. 1968). "The effect of rescission is to render the contract abrogated and of no force and effect *from the beginning*." *Borck v. Holewinski*, 459 So. 2d 405, 405 (Fla. 4th DCA 1984) (emphasis added). "A prerequisite to rescission is placing the other party in status quo" and "the

necessary pre condition for rescission is tender of the benefits received under the contract."

*Mazzoni Farms, Inc., v. E.I. Dupont de Nemours & Co.*, 671 So. 2d 306, 313 (Fla. 2000).

Although Petitioners describe their request as one for "rescission," they have actually disavowed rescission of the NPA as a remedy. (DE 458:19) ("Jane Doe 1 and 2 are only seeking that these particular provisions be set aside.").  Plainly, Petitioners have no legally valid claim to rescission.

> Where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm.

*Hendricks v. Stark*, 99 Fla. 277, 285 (Fla. 1930); *AVVA-BC, LLC v. Amiel*, 25 So. 3d 7, 11 (Fla. 3d DCA 2009) ("[W]here a party seeking rescission has discovered grounds for rescinding an agreement and either remains silent when he should speak or in any manner recognizes the contract as binding upon him, ratifies or accepts the benefits thereof, he will be held to have waived his right to rescind."); *Mazzoni Farms*, 761 So. 2d at 313 ("[A] party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission."); *Abbadessa v. Moore Bus. Forms, Inc.*, 987 F.2d 18, 23-24 (1st Cir. 1993) (contracts could not be rescinded where parties seeking rescission treated agreements as binding and sought benefits pursuant to the agreements).

Petitioners and their counsel do not wish to (and cannot) restore Mr. Epstein to the status quo or return the money they received from him in their civil settlements, including their attorneys' fees.  Instead, they seek to remove from the NPA only its legally valid

"immunity provisions," while at the same time demanding additional benefits, including more compensation for themselves and fees for their attorneys. (DE 458:7, ¶17). Petitioners "wish to retain the benefits of [the NPA] while simultaneously challenging its burdens.  Florida law does not provide them with such a windfall."  *Jackson v. BellSouth Telecomms*, 372 F.3d 1250, 1279 (11th Cir. 2004).  There is no basis for rescinding any aspect of the NPA, especially because it has been fully performed. *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1372 (Fed. Cir. 2018) ("Because of the disruptive effect of retroactively invalidating a government contract, the invalidation of a contract after it has been fully performed is not favored.") (citation omitted); *American Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1375-76 (Fed. Cir. 1999).

Regardless, Petitioners are asking the Court to reform the NPA to their liking, not to rescind it. Reformation of a contract is an equitable remedy, but its purpose is to "conform to the intention, agreement, and understanding of all the parties," *Jacobs v. Parodi*, 50 Fla. 541, 544 (Fla. 1905) (citation omitted), not to change the bargain, punish one of the contracting parties, or provide a windfall to a third party.  Even when there is a disagreement between two contracting parties, courts cannot simply re-write agreements between them to eliminate the contractual consideration provided by one side, (DE 462:19-20), or change material terms. *Cf. United States v. Fernandez*, 960 F.2d 771, 773 (9th Cir. 1991) (district court erred in rejecting one paragraph of the plea agreement rather than accepting or rejecting the entire agreement); *United States v. Skidmore*, 998 F.2d 372, 375 (6th Cir. 1993) ("Nothing in [Rule 11] even remotely allows the district court to accept a guilty plea but rewrite the plea agreement….").

The NPA is not a divisible agreement. (DE 462:19-20); (DE361-62:7) ("Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration…."). Invalidating any one part of the NPA, particularly one that contained the *entire* consideration for Mr. Epstein to enter into it, would render the entire agreement invalid and would, in the government's view, "pose a significant risk of harm to certain victims" with whom the government has communicated. (DE 462:15). It would place all of the civil monetary damage settlements at risk, and thus "imperil … the benefits and settlements obtained by the more than dozen victims who invoked the NPA terms." (DE 462:14). Mr. Epstein's state felony convictions and sex offender registration would also be subject to collateral attack, given the state court's recognition that the NPA was the "significant inducement" for Mr. Epstein to plead guilty. (Exh. 3, at p.39). Such a collateral attack would compromise the efforts of the state prosecutors and judiciary to conform their resolution of the case to the terms of the NPA.

Even assuming, *arguendo*, that there was any legal basis to judicially modify the terms of an agreement between two contracting parties at the request of a third party, there is simply no logical basis for striking the "immunity provisions" and "rewarding the government for what the Court determined was a violation of the CVRA." (DE 462:21). The Court made it clear that it "is *not* ruling that the decision not to prosecute was improper." (DE 435:32-33) (emphasis added). Thus, there is no finding that the immunity provisions were illegal. They are not; they do not violate public policy. The government had the legal authority to provide that consideration and should not be released from its contractual obligations.

**B.      The General Releases Signed by Petitioners Bar Petitioners'
Proposed Epstein Remedies**

The "Settlement Agreement and General Release" signed by Petitioners in their civil
lawsuits against Mr. Epstein were "negotiated and entered into by the Parties with the
advice and assistance of respective counsel." (*E.g.,* Exh. 4, at p.5). Petitioners were
represented in those civil settlement agreements by the same counsel who represent them
in this CVRA litigation.  The settlement agreements are governed by Florida law; each
contained the same "General Release" clause with the broadest language and no
exceptions.  (Exh. 4 at pp. 1-2, 4; Exh. 5, at pp. 1-2, 4).  The General Release expressly
encompassed "all, and all manner of, action and actions," including "State or Federal,"
whether "common law or statutory" and "claims, and demands whatsoever in law or in
equity … for, upon, or by reasons of any matter, cause or thing whatsoever (whether known
or unknown), from the beginning of the world to the day of this release." *Id.*

Although the General Release extends to even unknown matters, this CVRA case
arises from the same subject matter as the civil lawsuits and was well-known to Petitioners
at the time of their monetary settlements as it had already been pending for two years.
Petitioners, though well aware of the potential remedies they might seek in this CVRA
case, did not carve out from the General Release any of the proposed equitable remedies
they now seek against Mr. Epstein relating to the NPA.  Nor would such a carve-out have
been consistent with the entire purpose of the settlement agreement, which was to ensure
finality of all claims between Mr. Epstein and Petitioners in exchange for the monetary
payments Petitioners received.  (*E.g.,* Exh. 4, at p.2) ("It is further agreed that this

Settlement Agreement represents a final resolution of a disputed claim and is intended to avoid further litigation."). Petitioners' counsel emphasized the fact of finality vis-à-vis Mr. Epstein when they sought to revive their CVRA lawsuit solely against the government. (DE 41:1) ("[W]hile [Petitioners] had settled their case with Jeffrey Epstein, they had reached no settlement *with the U.S. Attorney's Office*…") (emphasis in original).

Florida law "favors the finality of settlements," *Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir. 1984), and Florida courts enforce general releases in settlement agreements "to further the policy of encouraging settlements." *Mazzoni Farms, Inc.*, 761 So. 2d at 314. The construction and enforcement of a release are governed by general principles of contract law. *Weingart v. Allen & O'Hare*, 654 F.2d 1096, 1103 (5th Cir. 1981). "[W]here the language of a release is clear and unambiguous a court cannot entertain evidence contrary to its plain meaning." *Cerniglia v. Cerniglia*, 679 So. 2d 1160, 1164 (Fla. 1996). A general release will ordinarily be regarded as embracing all claims which have matured at the time of its execution. *Mulhern v. Rogers*, 636 F.Supp. 323, 325 (S.D.Fla. 1986).

Florida courts and the Eleventh Circuit have not hesitated to enforce broad general releases in myriad circumstances. For example, in *Cerniglia*, the Florida Supreme Court held that a wife's general release of the husband from "all claims of whatever nature each may have had in or to any assets/property or estate of whatever kind, now or hereafter owned or possessed by the other" was intended by the parties to serve as a complete bar to all claims arising from the marriage and barred the wife's claims to assets based on tort and contract theories. *Cerniglia, 679 So. 2d* at 1164 & n.4; *Jackson,* 372 F.3d at 1278-79 (interpreting Florida law and barring Plaintiff's claims based on "the unequivocal terms of

38

the general releases" they signed); *Pettinelli*, 722 F.2d at 710.  Where, as here, a release has all-inclusive language such as "any and all liabilities and claims" and covers the time period "from the beginning of the world to the days present," it bars all claims which have matured prior to executing the release. *Plumpton v. Cont'l Acreage Dev. Co., Inc.*, 830 So. 2d 208, 210 (Fla. 5thDCA 2002); *Hold v. Manzini*, 736 So.2d 138, 141 (Fla. 3d DCA 1999). Indeed, even where a claim is unrelated to the litigation that resulted in the release, that claim will be barred if the general release in the prior litigation covered "any and all claims" that had matured.  *Plumpton*, 830 So. 2d at 211.

Petitioners readily acknowledge that the government "will obviously suffer no harm if this Court invalidates the immunity provisions in the non-prosecution agreement," (DE 458:20), so it is clear that Petitioners' Proposed Epstein Remedies are directed only at Mr. Epstein, a non-party.  It makes no difference that Petitioners are seeking this equitable relief through the vehicle of a CVRA case filed against the government rather than in a lawsuit directly naming Mr. Epstein, as the language of the General Release is all-encompassing and bars any form of relief, including equitable relief, against him.[4]

IV.   **THE DOCTRINES OF EQUITABLE AND JUDICIAL ESTOPPEL PRECLUDE IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES**

In their civil monetary damage lawsuits, Petitioners sought to enforce the terms of

---

[4] While, in the ordinary case, release is an affirmative defense which must be pled in the party's answer to the complaint, *Rakip v. Paradise Awnings Corp.*, 514 F. App'x 917, 920 (11th Cir. 2013)), Mr. Epstein was not served with a complaint.  Thus, now is his first opportunity to assert the defense of release, as Petitioners are seeking remedies ***against him*** as a result of the summary judgment ruling against the government.

the NPA against Mr. Epstein.  Principles of equitable and judicial estoppel preclude Petitioners from doing a complete about-face on the enforceability of that agreement.

As argued in Section II.B, *supra*, the CVRA requires a decision "forthwith," which suggests a concern that judicial action be taken before the parties have performed their obligations in reliance on an agreement.  Petitioners, far from proceeding with dispatch, stymied the operation of the CVRA because, as they conceded in August 2008, it was "likely not in [the petitioners'] interest to ask for the [rescission] relief that we initially asked for."  (DE 27:4).  As this Court observed, "the CVRA case stalled as petitioners pursued collateral civil claims against Epstein."  (DE 189:5, ¶ 8).  In their civil lawsuits for money damages, Petitioners argued that the NPA precluded Mr. Epstein from "denying the acts alleged in this Complaint" and forced him to "effectively admit liability to the Plaintiff."  (DE 403-16, at ¶¶18-20; DE 403-17, at ¶¶18-20; DE 205-6:11-12; 58-59, 89-90).  In the interim, Mr. Epstein, to his detriment, served his sentence and a year of community control, registered as a sex offender, and made substantial financial payments, including to Petitioners, to settle numerous civil claims to comply with his obligations under the NPA.  Only *after* they had utilized the NPA to their advantage in securing their own substantial monetary settlements from Mr. Epstein did Petitioners resurrect their CVRA lawsuit.  Petitioners made a deliberate decision to choose one lawsuit over the other.

The doctrine of equitable estoppel precludes Petitioners from attacking, in this

proceeding, the NPA they expressly relied upon in their civil lawsuits.[5]  "The doctrine of equitable estoppel is grounded in fairness." *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012).  "The purpose of the doctrine is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from "rely[ing] on the contract when it works to [his] advantage [by establishing the claim] and repudiat[ing] it when it works to [his] disadvantage . . . ." *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002), *rev'd on other grounds*, *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003), *quoting Tepper Realty Co. v. Mosaic Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y. 1966).  "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005) (citing *Humana*, 285 F.3d at 976).

Plainly, the doctrine of equitable estoppel applies.  So does the separate doctrine of judicial estoppel, which precludes a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002), *overruled in part*, *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1176–77 (11th Cir. 2017). It is "an equitable concept intended to prevent the perversion of the judicial process," *id.*, which prohibits "parties from deliberately changing positions according to the exigencies of the moment." *New*

---

[5] The government raised the issues of equitable estoppel and judicial estoppel in its summary judgment submissions and re-raised the argument in its response to Petitioners' proposed remedies. (DE 462:17, n.14). This Court expressly reserved ruling on those arguments because they "relate only to the remedy."  (DE 435:32).

*Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). "Stated simply, the doctrine of judicial estoppel rests on the principle that 'absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'" *Slater*, 871 F.3d at 1180-81 (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996)).

The Eleventh Circuit "employs a two-part test to guide district courts in applying judicial estoppel: whether (1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were 'calculated to make a mockery of the judicial system.'" *Id.* at 1181 (quoting *Burnes*, 291 F.3d at 1285). These two factors "are not inflexible or exhaustive; rather, courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of this doctrine." *Burnes*, 291 F.3d at 1286.

In their civil actions, Petitioners relied on the NPA as a valid, legal agreement which precluded Mr. Epstein from contesting his liability for money damages to them, telling this Court at about the same time that the NPA's invalidation was likely not in their best interest. (DE 27:4). After they reaped for themselves the financial benefits of the NPA and released Mr. Epstein from all further actions related to the NPA, Petitioners reversed their position and argued that the NPA was an "illegal agreement" that should be reformed to eliminate all benefits to Mr. Epstein. The first part of the *Slater* standard is satisfied.

Such blatant inconsistency is calculated to make a mockery of the judicial system: trying to convince one court to rule in their favor based on the binding validity of the NPA and then trying to convince this Court that the NPA agreement was an "illegal agreement."

Apparently, the NPA shifted from being an invalid to a valid agreement and then back to an invalid agreement based solely on the financial benefits Petitioners stood to gain and the different legal strategies that served their purposes in the different proceedings. This was no inadvertence or mistake. Petitioners are represented by able and sophisticated lawyers; their manipulation of the legal system for their financial benefit was not accidental. The doctrine of judicial estoppel is designed to prevent this type of gamesmanship.

## V. PRINCIPLES OF SUBSTANTIVE DUE PROCESS PRECLUDE IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES

Petitioners invite this Court to judicially endorse a prospective breach of the NPA by the government. The Court should decline that invitation. "Due process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes." *United States v. Hill*, 643 F.3d 807, 874 (11th Cir. 2011) (quoting *United States v. Harvey*, 869 F.2d 1439, 1443 (11th Cir. 1989) (en banc)). *See, e.g., Santobello v. New York*, 404 U.S. 257, 262 (1971) ("When a plea rests in any significant degree on a promise ... of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."); *United States v. Al-Arian*, 514 F.3d 1184, 1190 (11th Cir. 2008) ("Due process requires the government to adhere to the promises it has made in a plea agreement."). That the "immunity provisions" were very clearly an inducement for Mr. Epstein to enter his state court plea was confirmed by the state court judge who sentenced him: "I would view [the agreement "not to prosecute you federally"] as a significant

inducement in accepting this plea." (Exh. 3, at p.39).

A federal court's role is to ensure that the government fulfills, not breaches, its contractual promises to criminal defendants. *United States v. Tilley*, 964 F.2d 66, 70 (1st Cir. 1992). A non-prosecution agreement is entitled to no less constitutional protection than a plea agreement. *See*, *e.g.*, *United States v. Stolt-Nielsen*, 524 F. Supp. 2d 609, 615-16 (E.D. Pa. 2007) (non-prosecution agreements "are to be construed in light of 'special due process concerns'") (quoting *United States* v. *Baird*, 218 F.3d 221, 229 (3d Cir. 2000) (citations omitted); (DE 205-2:3-4) ("[C]onstitutional due process guarantees do not allow either the Non-Prosecution Agreement – which by its terms induced Epstein to, *inter alia*, plead guilty to state criminal charges and serve an 18-month sentence of state incarceration – or the governmental obligations undertaken therein to be set aside."); (DE 435:27) (Court: "Although the binding effect of the NPA was contingent upon Epstein pleading guilty to the state charges, that contingency was out of the control of the government. *The government's hands were permanently tied if Epstein fulfilled his obligations under the NPA*.") (emphasis added).

Petitioners acknowledge this well-established principle but argue that it does not apply because the government "cannot abide by illegal promises." (DE 458:17). As argued *supra*, however, the "immunity provisions" are not illegal. (DE 435:32-33) ("The Court is not ruling that the decision not to prosecute was improper."). That distinction renders inapposite the cases cited by Petitioners, which involved contracts whose very terms were illegal. (DE 458:18). For example, in *Power Fin. Credit Union v. Nat'l Credit Union Admin. Bd.*, 494 Fed. Appx. 982, 986 (11th Cir. 2012), the question was whether one party,

a Florida credit union, could prospectively enforce an agreement it had entered into with a National Credit Union to purchase certain mortgages when a Florida statute expressly prohibited such purchases. The essential term of the contract was illegal. The Eleventh Circuit held that a court could not prospectively enforce any part of a contract that required one party to violate the law. *Id.*

At its core, Petitioners' claim is not that any particular provision of the NPA is unenforceable as against the law or public policy, but rather that the NPA as a whole was executed before the government complied with its conferral obligations under the CVRA. The government's failure to comply with its obligation to third parties, however, is simply no basis for unshackling the government from its contractual obligations to its counterparty. Rejection of Petitioners' Proposed Epstein Remedies would not leave Petitioners without any remedies. The CVRA, and its implementing regulations, contain a mechanism for remedying prosecutorial violations of the CVRA. *See* 18 U.S.C. § 3771(f)(2)(C); 28 C.F.R. § 45.10; (DE 462:9-10). That is not to say that such sanctions are appropriate here.

The inequities of invalidating the "immunity provisions" of the NPA at this juncture, and depriving Mr. Epstein of its benefits, are stark. Mr. Epstein can never be returned to the *status quo ante*. The time he spent in jail and on community control cannot be restored to him, the prejudice he has suffered from being required to register as a sex offender cannot be undone, and he will never recoup the substantial amounts he paid in monetary settlements. Invalidating the "immunity provisions" of the NPA after full performance by Mr. Epstein would violate his substantive due process rights.

## VI.    THE DOCTRINE OF SEPARATION OF POWERS PRECLUDES IMPOSITION OF PETITIONERS' PROPOSED EPSTEIN REMEDIES

The Executive Branch has broad discretion to decide when to initiate criminal proceedings. *Cmty. For Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see the faithful execution of the laws."); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("The decision of a prosecutor in the Executive Branch not to indict … has long been regarded as the special province of the Executive … who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'") (citing U.S. Const. art. II, § 3). This "broad discretion" exists because the Executive Branch is responsible for considering many factors "not readily susceptible to the kind of analysis the courts are competent to undertake," such as "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan…" *Wayte v. United States*, 470 U.S. 598, 607 (1985). As such, the decision to prosecute is "particularly ill-suited to judicial review." *Id.*

Furthermore, "a district judge must be careful not to exceed his or her constitutional role." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995). "When a judge assumes the power to prosecute, the number [of branches] shrinks to two." *In re United States*, 345 F.3d 450, 454 (7th Cir. 2003); *see also United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) ("It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.").

These principles are particularly important in the context of non-prosecution agreements, which are private contracts between the government and an investigatory target, entered into in the exercise of the government's sole discretion to decide whether to bring criminal charges. Non-prosecution agreements are not filed with the court, do not generally become public, and where, as here, there has been full performance on both sides, non-prosecution agreements ordinarily do not involve judicial proceedings of any sort. Unlike a plea agreement or deferred prosecution agreement ("DPA"), which are the result of a "case or controversy" filed in court, a non-prosecution agreement is extrajudicial and does not require court approval.[6]  Petitioners' proposal that the Court order the excision of the "immunity provisions" from the NPA and declare that the Constitution permits the federal prosecution of Mr. Epstein would eliminate all contractual consideration provided to Mr. Epstein.  It would thrust the Court into the role of prosecutor and plea negotiator, intrude on the authority and function of the Executive to resolve criminal investigations the way it deems appropriate, and violate the Separation of Powers doctrine.

Even in the context of DPAs, where courts do have limited involvement, courts may not permissibly reject a DPA based on disapproval of its substance.  *United States v. Fokker*

---

[6] These crucial distinctions between DPAs, which require the involvement of the courts, and NPAs, which do not, may explain why Congress did not include NPAs in the 2015 amendment to § 3771(a)(9). Although Mr. Epstein is aware that the Court has decided otherwise, (DE 435:28-30), Congress likely chose not to open up a wholly non-judicial process committed to the exclusive jurisdiction of the Executive to scrutiny under the CVRA. "If, in the context of [N]PAs, Congress intended to rejigger the historical allocation of authority between the courts and the Executive, we would expect it to do so rather clearly."  *Cf. United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 138 (2d Cir. 2017) (discussing DPAs).

*Servs. B.V.*, 818 F.3d 733 (D.C. Cir. 2016). Nor may courts oversee the implementation of a DPA. *HSBC Bank USA, N.A.*, 863 F.3d at 138. *Fokker Services* addressed the intersection of judicial and executive powers with respect to a DPA and held that the district court could not reject the DPA based on its disagreement with the Executive's charging decisions.

> The Executive's primacy in criminal charging decisions is long settled. That authority stems from the Constitution's delegation of "take Care" duties, U.S. Const. art. II, § 3, and the pardon power, id. § 2, to the Executive Branch. *See United States v. Armstrong*, 517 U.S. 456, 464 . . . (1996); *In re Aiken Cnty.*, 725 F.3d 255, 262–63 (D.C.Cir.2013). Decisions to initiate charges, or to dismiss charges once brought, "lie[ ] at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non–Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C.Cir.1986). The Supreme Court thus has repeatedly emphasized that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124 . . . (1979); *see Bordenkircher v. Hayes*, 434 U.S. 357, 364 . . . (1978).

*Fokker Services*, 818 F.3d at 741.

Accordingly, judicial authority is "at its most limited when reviewing the Executive's exercise of discretion over charging determinations." *Id.* In *Fokker*, the question before the D.C. Circuit was whether the district court had the power to decline to enter a speedy trial waiver because it believed that the terms of the DPA were too lenient. The Court answered that question with a definitive no, reasoning that Congress, in enacting the Speedy Trial Act, "acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions" and that "[n]othing in the statute's terms or structure suggests any intention to subvert those constitutionally rooted principles so as to enable the Judiciary to second-guess the Executive's exercise of discretion over the initiation and dismissal of criminal charges." *Id.* at 738.

Although *Fokker* addressed DPAs, the same principles apply with even greater force to NPAs, which involve no judicial supervision. By granting Petitioners' Proposed Epstein Remedies and re-writing the terms of the NPA to remove the "immunity provisions," the Court in effect would be rejecting the deal agreed to by the parties and would be deciding, on behalf of the Executive, how to resolve Mr. Epstein's criminal exposure. It does not matter that the Court would not actually be initiating a prosecution; by dictating the outcome of a negotiated contract between the government and Mr. Epstein relating to the decision not to prosecute, which is within the Executive's exclusive discretion, the Court would be playing the role of prosecutor. The Separation of Powers doctrine does not permit shrinking the number of branches to two.

## VII.   THE DOCTRINE OF RIPENESS PRECLUDES IMPOSITION OF PROPOSED EPSTEIN REMEDY #2

Remedy #2 proposed by Petitioners seeks a declaration from the Court as follows: "If, after consultation with the victims, the U.S. Attorney's Office determines that prosecution of Epstein for crimes committed against Jane Doe 1 and Jane Doe 2 (or any other victim) is appropriate, the Constitution would permit such a prosecution[.]" (DE 458:4-5). The Court should reject Petitioners' invitation to render an advisory opinion. A declaration that "the Constitution would permit" a prosecution of Mr. Epstein would violate the well-settled ripeness doctrine. This doctrine is rooted in the constitutional requirement that federal courts consider only "cases" and "controversies," U.S. Const. art. III, §2, and in prudential concerns. *National Advertising Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005).

49

"Strict application of the ripeness doctrine prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential abstract disputes." Id. The prudential aspect of this doctrine "asks whether it is appropriate for this case to be litigated in a federal court by these parties at this time." Id. A ripeness inquiry requires a two part "determination of (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* One of the "basic rationales" for the ripeness doctrine is "to protect the [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Digital Props., Inc. v. City of Plantation,* 121 F.3d 586, 590 (11th Cir. 1997) (internal quotation marks and citations omitted). There is no prosecution pending before this Court. Thus, the Court should not assume the role of deciding the myriad of constitutional challenges that Mr. Epstein might have to that prosecution. It truly is an advisory opinion as the government has re-affirmed again that "fundamental tenets of contract law … bind the government's hands in this case." (DE 462:18).

## VIII.  THE GOVERNMENT'S PROPOSED REMEDY IS NOT AUTHORIZED BY THE CVRA

Mr. Epstein does not oppose the first and third remedies proposed by the government (DE 462:7), as those are self-imposed measures that the government may undertake even without a directive from the Court. Moreover, Mr. Epstein has no legal basis to object if the government voluntarily chooses to provide a forum within the Executive Branch for individuals to make public victim impact statements and to express

their displeasure with the DOJ about how it handled the case.

However, there is no authority under the CVRA nor, to our knowledge, any historical precedent, for a federal judge to order and preside over a proceeding in a federal courtroom for unadjudicated victims to make impact statements about a person who has not been convicted of, or facing sentence for, a federal crime.  This proposal would provide a federal judicial forum for non-parties who were not individually found to have been harmed by federal crimes to make statements about another non-party, Mr. Epstein, who was never adjudicated guilty of a federal crime. There is no "case or controversy" before this Court.

## IX.   MR. EPSTEIN ADOPTS THE ARGUMENTS PREVIOUSLY RAISED BY THE GOVERNMENT INSOFAR AS THEY AFFECT THE REMEDY IN THIS CASE

Throughout the CVRA litigation, the government raised several arguments about the scope of the CVRA which the Court rejected.  These arguments included: a) whether a crime victim's rights under the CVRA attach before the government brings formal charges against a defendant; b) whether the CVRA's conferral right extends to conferring about non-prosecution agreements; c) whether rescission is an available remedy for a violation of the right to confer; and d) whether Petitioners are crime victims under the CVRA.  *See Does v. United States*, 817 F. Supp. 2d 1337, 1341 (S.D. Fla. 2011); *Doe v. United States*, 950 F. Supp. 2d 1262, 1267-69 (S.D. Fla. 2013); (DE 99; DE 119; DE 189; DE 435:26; DE 462:1-2 n.1).  Mr. Epstein respectfully adopts those arguments insofar as they preclude the remedies Petitioners are now seeking and preserves those arguments in the event there

is further review of this case by the Eleventh Circuit or the Supreme Court.

## CONCLUSION

For the foregoing reasons, this Court should reject Petitioners' Proposed Epstein

Remedies, as well as the government's second proposed remedy.

Respectfully submitted,

/s/Roy Black
**Roy Black, Esq.**
(FL Bar No. 126088)
**Jackie Perczek, Esq.**
(FL Bar No. 042201)
**BLACK SREBNICK KORNSPAN & STUMPF, P.A.**
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tele: (305) 371-6421
Fax: (305) 358-2006
E-Mail: rblack@royblack.com
E-Mail: jperczek@royblack.com

s/Martin G. Weinberg
Martin G. Weinberg, Esq.
**MARTIN G. WEINBERG, P.C.**
(MA Bar No. 519480)
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
Tele: (617) 227-3700
Fax: (617) 338-9538
E-Mail: owlmgw@att.net

/s/ Scott A. Srebnick
Scott A. Srebnick, Esq.
(FL Bar No 872910)
**SCOTT A. SREBNICK, P. A**
201 S. Biscayne Boulevard, Suite 1210
Miami, Florida 33131
Tele: (305) 285-9019
E-Mail: scott@srebnicklaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that July 8, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  According to the Court's website, counsel for all parties and intervenors are able to receive notice via the CM/ECF system.


/s/Jackie Perczek
Jackie Perczek